# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NORTHWEST BIOTHERAPEUTICS, INC., | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-10185 (GHW) (GWG) |
| CANACCORD GENUITY LLC, CITADEL SECURITIES LLC, G1 EXECUTION SERVICES LLC, GTS SECURITIES LLC, INSTINET LLC, LIME TRADING CORP., SUSQUEHANNA INTERNATIONAL GROUP LLP, AND VIRTU AMERICAS LLC, | |
| Defendants. | |

## DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF NORTHWEST BIOTHERAPEUTICS, INC.'S COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    A.    The Parties ...................................................................................3

    B.    The OTC Trading Venues...........................................................4

    C.    Purported "Spoofing" of NWBO Shares .....................................6

ARGUMENT ............................................................................................................9

I.    NWBO'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ...............9

    A.    NWBO Fails To Allege Manipulative Conduct With Particularity...................10

    B.    NWBO Does Not Allege A Strong Inference Of Scienter ...................15

    C.    NWBO Fails To Account For Nonculpable Explanations Demonstrating That Defendants Were Engaged In Lawful Behavior On Behalf Of Their Clients ...................23

    D.    NWBO Does Not Allege Loss Causation...........................................26

    E.    NWBO Does Not Adequately Allege Reliance ...................................29

II.    NWBO FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD........................30

CONCLUSION.........................................................................................................30

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ............................................................. 20

*Alki Partners, L.P. v. Vatas Holding GmbH*,
   769 F. Supp. 2d 478 (S.D.N.Y. 2011) ...................................................................... 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 12, 23, 29

*Ashland, Inc. v. Morgan Stanley & Co.*,
   700 F. Supp. 2d 453 (S.D.N.Y. 2010) ...................................................................... 30

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   2008 WL 850473 (S.D.N.Y. Mar. 27, 2008) ............................................................ 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ............................................................................... *passim*

*Baxter v. A.R. Baron & Co.*,
   1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) ............................................................. 11

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004) ....................................................................................... 4

*C.F.T.C. v. Wilson*,
   2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ..................................................... 21-22

*In re Citigroup Auction Rate Sec. Litig.*,
   700 F. Supp. 2d 294 (S.D.N.Y. 2009) ...................................................................... 26

*In re Citigroup, Inc.*,
   2011 WL 744745 (S.D.N.Y. Mar. 1, 2011) ................................................................ 4

*Cohen v. Stevanovich*,
   722 F. Supp. 2d 416 (S.D.N.Y. 2010) ................................................................ *passim*

*CP Stone Fort Holdings, LLC v. Doe(s)*,
   2016 WL 5934096 (N.D. Ill. 2016) ..................................................................... 22, 27

*DiMuro v. Clinique Labs., LLC*,
   572 F. App'x 27 (2d Cir. 2014) ................................................................................. 11

*Dulsky v. Worthy*,
   2013 WL 4038604 (S.D.N.Y July 30, 2013) ...................................................... 11-12, 28

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................ 17, 26

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ..................................................................................... 19

*Fezzani v. Bear, Stearns & Co. Inc.*,
  777 F.3d 566 (2d Cir. 2015)..............................................................................28

*Finn v. Barney*,
  471 F. App'x 30 (2d Cir. 2012) ............................................................................4

*Gamma Traders – I LLC v. Merrill Lynch*,
  41 F.4th 71 (2d Cir. 2022) ....................................................................27-28, 29

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..........................................................20, 25

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts., Inc.*,
  585 F. Supp. 3d 405 (S.D.N.Y. 2022)...........................................................18, 24

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
  309 F. Supp. 3d 100 (S.D.N.Y. 2018) ..................................................................16

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.*,
  2021 WL 3863372 (S.D.N.Y. Aug. 30, 2021) ........................................................5

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)..................................................................................20

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..........................................................................*passim*

*Kessev Tov, LLC v. Doe(s)*,
  2022 WL 2356626 (N.D. Ill. June 30, 2022) ..................................................21, 22

*Last Atlantis Cap. LLC v. Chi. Bd. Options Exch., Inc.*,
  455 F. Supp. 2d 788 (N.D. Ill. 2006) ..................................................................18

*Lewis v. M&T Bank*,
  2022 WL 775758 (2d Cir. Mar. 15, 2022) ............................................................4

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018)............................................................17, 29

*In re Merrill, Bofa, and Morgan Stanley Spoofing Litig.*,
  2021 WL 827190 (S.D.N.Y. 2021) .................................................................26, 29

*In re MRU Holdings Sec. Litig.*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011)..................................................................22

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., plc*,
  709 F.3d 109 (2d Cir. 2013)..................................................................................4

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)..................................................................23

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................................4

*Salvani v. ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014)....................................................................30

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017) ................................................................. 21

*Stone Family Trust v. Credit Suisse AG*,
  2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ................................................. 10, 27

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................... *passim*

*In re Trex Co., Inc. Sec. Litig.*,
  212 F. Supp. 2d 596 (W.D. Va. 2002) ................................................................. 19

**Statutes and Rules**

15 U.S.C. § 78c ................................................................................................. 4, 7

15 U.S.C. § 78u-4 ........................................................................................... 9, 15

Fed. R. Civ. P. 9(b) ......................................................................................... *passim*

FINRA Rule 5310 ................................................................................................ 24

FINRA Rule 6460 ................................................................................................ 24

Defendants[1] respectfully submit this joint memorandum of law in support of their motion to dismiss Plaintiff Northwest Biotherapeutics, Inc.'s ("NWBO") Complaint, Dkt. 1.

## **PRELIMINARY STATEMENT**

This action is an attempt by NWBO to shift blame onto Defendants for its disappointing stock performance by baselessly portraying standard trading activity as purported "spoofing." This is precisely the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Because NWBO's allegations fall far short of those exacting requirements—and the basic requirement of plausibility—this suit should be dismissed.

The crux of NWBO's claims is that each of the Defendants, separately and without coordinating, engaged in a nearly five-year spoofing scheme to "consistently" drive down the price of the same micro-cap stock. NWBO hypothesizes an elaborate fraud through which sell orders allegedly placed but not executed by Defendants were in fact manipulative "Baiting Orders" designed to mislead the market and create downward pressure on the price of NWBO shares. But NWBO's theory is incoherent and lacks key allegations that distinguish spoofing schemes, including that any Defendant profited from the purported manipulation. Even assuming the truth of NWBO's factual allegations, the far more compelling inference is that Defendants, many of which are market makers and all of which are broker-dealers, were engaged in routine market activity—including trading on behalf of clients.

As set forth in detail below, NWBO fails to adequately allege multiple elements of its fraud

---

[1]   Defendants are Citadel Securities LLC ("Citadel Securities"), Canaccord Genuity LLC ("Canaccord"), G1 Execution Services LLC ("G1X"), GTS Securities LLC ("GTS"), Instinet LLC ("Instinet"), Lime Trading Corp. ("Lime"), Susquehanna International Group, LLP ("SIG"), and Virtu Americas LLC ("Virtu"). As set forth in the separate memorandum filed by SIG and G1X, the Complaint contains no substantive allegations regarding SIG—it was named in this lawsuit as G1X's parent—and thus the descriptions of Defendants in this memorandum do not include SIG.

claims.  *First*, NWBO does not allege any manipulative conduct with the specificity required under Rule 9(b).  For 1,160 of the 1,171 trading days of this alleged scheme, NWBO does not allege a single specific manipulative act by any Defendant; NWBO's claim ultimately amounts to a conclusory assertion that Defendants each independently engaged in the same nearly five-year overarching manipulative scheme.  With respect to the eleven days where NWBO *does* allege trading activity, it deploys nefarious labels like "Baiting Order" and "parking" to suggest manipulation, but in fact merely identifies unremarkable market activity, and even then does so in cursory fashion, failing to sufficiently allege the number, size, timing, or other required details of these purportedly manipulative orders.

*Second*, NWBO falls far short of pleading the "strong inference" of fraudulent intent required by the PSLRA.  The Complaint offers no rational economic explanation for Defendants' purported manipulation.  NWBO fails to cite a single instance where any Defendant profited from the purported effort to drive down NWBO's stock price—the typical objective of a manipulative spoofing scheme—or allege how any Defendant could possibly have profited given the allegation that Defendants "continuously" drove down NWBO's share price.  Even if Defendants had purchased NWBO stock for themselves (which is not alleged), continuously driving down the price would result in significant losses to Defendants, which is why spoofing cases typically include the allegation (absent here) that the price rebounded and the alleged spoofer then sold for a profit.

Nor does the Complaint allege any evidence of misconduct, relying instead on unremarkable allegations that market makers and broker-dealers engaged in typical trading activity, displaying orders to buy or sell shares of NWBO at various volumes and prices.  NWBO's attempt to plead misconduct boils down to the unfounded inference that because some orders were allegedly no longer displayed, those prior orders must have been "canceled," and therefore were

2

"fictitious"—a false premise that would transform routine over-the-counter market activity into securities fraud.

*Third*, NWBO's allegations do not establish the required "strong" inference of scienter for the independent reason that they fail to account for multiple other "cogent" and more plausible explanations, including that Defendants were engaged in ordinary market activity and trading on behalf of clients—indeed, the Complaint fails to acknowledge that Defendants trade at the direction of clients—and that any stock decline during the narrow windows identified in the Complaint was attributable to negative investor sentiment surrounding NWBO.

*Finally*, NWBO fails to allege that any losses it purportedly suffered from selling stock at deflated prices are attributable to any alleged action by Defendants.  To start, the Complaint does not even attempt to link any specific alleged spoofing with NWBO's own purported stock sales. Remarkably, NWBO alleges it sold shares at "artificially depressed" prices on only one day on which NWBO specifically alleges spoofing.  Even on that one day, NWBO fails to explain how the supposed impact of the alleged activity still existed at the time NWBO purportedly sold shares—a defect fatal to NWBO's spoofing claim.

At bottom, NWBO offers nothing more than conclusory allegations that routine trading activity was actually market manipulation.  If such bare assertions of fraud were sufficient to state a claim under the Exchange Act, a never-ending tide of securities lawsuits would flood the courts. The PSLRA, and controlling authority, demand far more.  NWBO's Complaint should be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND

### A.    The Parties

NWBO, a clinical-stage biotechnology company that has never received approval for any drug since it was founded in 1996, is an issuer of stock (NWBO) that trades publicly "over the

counter" ("OTC") on OTC Link LLC ("OTC Link") and NYSE ARCA Global OTC ("Global OTC"). *See* ¶¶ 14, 36, 40.[2]  OTC securities do not trade on a national exchange such as the New York Stock Exchange ("NYSE") or Nasdaq.  NWBO's shares currently trade at around $0.58, and have not traded over $1.00 for months, aside from a momentary spike around the time NWBO commenced this litigation.[3]

Defendants are SEC-registered broker-dealers, and all trade OTC securities on OTC Link, Global OTC, or both.  ¶¶ 12, 15-31.  As broker-dealers, Defendants conduct at least a portion of their trading on behalf of clients.  *See id.*; 15 U.S.C. § 78c(a)(4) (defining "broker" as "any person engaged in the business of effecting transactions in securities for the account of others.").  Most of the Defendants also function as market makers, providing liquidity by publicly displaying proprietary quotations to buy and sell OTC securities.[4]

## B.  The OTC Trading Venues

NWBO claims Defendants manipulated the price of NWBO shares by "spoofing" on OTC Link and Global OTC.  ¶ 9.  Trading on OTC Link and Global OTC is unlike trading on national exchanges (*e.g.*, NYSE or Nasdaq), and in fact, OTC Link and Global OTC operate very differently

---

[2]  Citations to the Complaint are made by reference only to the relevant paragraph number therein.

[3]  *See* Exhibit 1 to the Declaration of William Burck ("Burck Decl."), NWBO (U.S.:OTC), Wall Street Journal (Mar. 20, 2023), https://www.wsj.com/market-data/quotes/NWBO.  The Court may take judicial notice of each of the publicly-available documents cited in this memorandum. *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (court "may also look to public records . . . in deciding a motion to dismiss"); *Lewis v. M&T Bank*, 2022 WL 775758, at *2 n.4 (2d Cir. Mar. 15, 2022) (the Second Circuit "regularly take[s] judicial notice of agency documents on official websites"); *In re Citigroup, Inc.*, 2011 WL 744745, at *3, 9 (S.D.N.Y. Mar. 1, 2011) (taking judicial notice of SEC Order, disclosure statements, and website and prospectus excerpts), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012); *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., plc*, 709 F.3d 109, 127 (2d Cir. 2013) (taking judicial notice of press coverage); *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 297 n.2 (S.D.N.Y. 2010) (considering "supplemental documents" to "inform the competing inference analysis required by *Tellabs*").

[4]  Instinet and Lime are agency broker-dealers (not market makers) that do not engage in proprietary trading for profit. *See* ¶ 21 (Instinet), ¶ 23 (Lime).  They conduct no trading for themselves and operate platforms that allow their customers to make their own trading decisions.

from each other.[5]  OTC Link is a centralized, inter-dealer quotation system that allows market participants, such as broker-dealers, to display bid (buy) and ask (sell) quotations and, based on those quotes, negotiate trades directly with other participants.  ¶ 7 n.3.[6]  Global OTC, by contrast, is a centralized trading platform that directly matches buyers and sellers for automated executions.

Unlike national exchanges, OTC Link permits market participants to display only one bid and one offer per security at a time.[7]  Therefore, broker-dealers using OTC Link display only their single best bid (highest buy price) and single best offer (lowest sale price) at any given time,[8] regardless of whether that bid or offer represents proprietary trading interest or a client order.  If, for example, a broker-dealer is displaying a quote based on one or more client orders and receives a new client order with a better price than its currently-displayed bid or offer, the broker-dealer **must** update its quote to display that better price to the market.  As a result—and particularly relevant here—when a broker-dealer's displayed best bid or offer changes, it does not necessarily mean that the previously-displayed bid or offer was canceled.  Rather, the broker-dealer will continue to retain the previously-displayed client order, and it will be redisplayed if that order once again becomes the best bid or offer.[9]

---

[5]  General characteristics of OTC markets, including that OTC Link involves dealer-to-dealer trading instead of centralized execution, are subject to judicial notice by the Court as facts that are "generally known within" the District. *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2021 WL 3863372, at *3 n.24 (S.D.N.Y. Aug. 30, 2021) (taking "judicial notice of the fact that securities on the OTCQX are quoted on OTC Link"); *supra* n.3.

[6]  *See also* Burck Decl. Ex. 2, *Over-the-Counter Market*, Sec. Exch. Comm'n, https://www.sec.gov/divisions/marketreg/mrotc (explaining that OTC Link provides this capability to broker-dealers on its platform).  The Court may take judicial notice of SEC documents.  *See supra* n.3.

[7]  *See* Burck Decl. Ex. 3, *OTC Link FIX Quot. Serv.—"FIXIE Quote" Client Specification 14*, OTC Markets Grp., , Inc., (Feb. 28, 2023), https://www.otcmarkets.com/files/FIXIE_Quote_Spec.pdf (showing that participants will receive error code "105" if they attempt to disseminate two or more quotes for any given security).  The Court may take judicial notice of OTC Link rules.  *See supra* n.3.  Some market participants have more than one market participant ID, and therefore could display one bid and one offer for each ID for each security.

[8]  Provided the quotes meet minimum volume requirements.

[9]  For example, suppose Client A places an order to buy at $1.01 and Client B places an order to sell at $1.04 with the same broker-dealer.  That broker-dealer's displayed quote would be $1.01 x $1.04.  Then suppose Client C places a

### C. Purported "Spoofing" of NWBO Shares

#### 1. The Alleged "Spoofing"

NWBO brings claims under Sections 10(b) and 9(a) of the Exchange Act based on Defendants' purported "spoofing" of NWBO's stock. According to NWBO, "spoofing" is a form of market manipulation that consists of the "submission and cancellation of buy and sell orders without the intention to trade in order to manipulate other traders." ¶ 51. NWBO alleges that by placing orders "that are not intended to be executed and have no legitimate economic purpose"— which NWBO calls "Baiting Orders"—Defendants "create[d] a false illusion of excess supply or demand" to "generate a response from other market participants to follow the artificial selling or buying trend[,]" with the spoofer then trading against this response and canceling the so-called "Baiting Orders." ¶¶ 47-48.

NWBO alleges generally that Defendants—separately, and without coordinating their activities[10]—each "spoofed" NWBO stock on thousands of separate occasions over a nearly five-year period from December 2017 to August 2022 (which NWBO defines as the "Relevant Period"). ¶ 1.[11] Although NWBO alleges that the spoofing "pattern was repeated by the Defendants multiple times a day and continuously" through the "Relevant Period," it generally offers only summary or aggregated figures that purportedly suggest Defendants' spoofing. *See, e.g.*, ¶¶ 67-73. In fact, the Complaint identifies only sixteen purported "spoofing episodes" over the "Relevant Period"—which themselves are cursory and incoherent—five of which fall on the

---

buy order at $1.02 with the same broker-dealer. Because $1.02 is a better bid than $1.01, and because the platform only allows broker-dealers to display a single bid and offer per security, the broker-dealer must update its quote to $1.02 x $1.04. Client A's order at $1.01 is no longer displayed, but has not been canceled and is still active and waiting to be redisplayed (if, for example, Client C's order at $1.02 is executed).

[10] Despite references to "Defendants' scheme," (*e.g.*, ¶ 1), NWBO nowhere alleges that Defendants conspired or otherwise coordinated any activities.

[11] NWBO provides no explanation for the beginning and end of its "Relevant Period."

same day: May 10, 2022.  ¶¶ 74-79, 87-92, 100-05, 113-18, 126-31, 139-44, 151-56, 163-74, 182-87, 194-99, 207-36.[12]

NWBO then attempts to allege that Defendants caused it to lose money by way of a table that appears to list alleged sales of NWBO stock by NWBO, though it lacks enough information for Defendants to be certain.  ¶ 259.  Among other deficiencies, the table provides a column labeled "Agreement Date" and another labeled "Pricing Date," but fails to explain what these terms represent or, more egregiously, the date on which any listed sale occurred.  *Id.*  Each sale appears to be associated with one Agreement Date and one or more Pricing Dates.  *See id.*  The Pricing Date sometimes precedes the Agreement Date and sometimes follows it.  *E.g.*, *id.* ("Agreement Date" March 2, 2021 associated with "Pricing Dates" of February 19, 22, 23, 25, 26, March 5, 8, 9, 10, and April 1, 2021).

For seven of the eight Defendants, NWBO does not allege it sold ***any*** shares of NWBO "priced" on the same date as any example "spoofing episode" alleged in the Complaint.  There appears to be only *one date* when NWBO's alleged stock sales overlap with an alleged spoofing "episode."  *Compare* ¶ 259 *with* ¶¶ 113-18.  NWBO also alleges that it last sold shares in March 2022, *id.*, months before seven of the sixteen "example" spoofing episodes, and months before the end of the so-called "Relevant Period."  ¶¶ 182-87, 194-99, 207-36.  Even accepting NWBO's allegations as true, it stopped selling shares before nearly half of the purported spoofing episodes occurred, and thus could not have suffered losses as a result of those alleged incidents.

---

[12]   The allegations for these sixteen episodes follow the same general pattern.  NWBO alleges that the Defendant placed so-called "Baiting Orders" to sell at a range of prices, and that "some" of the "Baiting Orders" were "parked" behind (by which NWBO appears to mean priced higher than) orders from another market participant, and thus these "Baiting Orders" were "extraordinarily unlikely to be executed."  NWBO further alleges that the "Baiting Orders" drove down the price of NWBO shares and the Defendant then purchased shares at a price below the then-prevailing best offer, sold no shares, and canceled the "Baiting Orders"—which, according to NWBO, demonstrates that the "Baiting Orders" were "fictitious."

NWBO also makes *no* allegation that any Defendant ever sold NWBO stock acquired through the alleged scheme, let alone that any specific Defendant earned a profit by doing so.  Nor does NWBO allege that the market rebounded after the alleged artificial sell-side pressure disappeared, when the so-called "Baiting Orders" were purportedly canceled—the typical fact pattern alleged in a spoofing scheme.  Instead, NWBO claims that Defendants' alleged spoofing caused "persistent" and "long-lasting" declines in the trading price of NWBO stock.  ¶¶ 262, 264.

### 2. The Complaint Does Not Account For Obvious Alternate Explanations For Any Declines In NWBO's Share Price

The Complaint omits several significant publicly-reported events during the "Relevant Period" that explain the declines in NWBO's share price.  For example, in 2019—the middle of the "Relevant Period"—NWBO disclosed that it had failed to timely file its annual Form 10-K report for sixteen consecutive years, and had agreed to pay a $250,000 fine to the SEC relating to "material weaknesses" in its internal financial controls.[13]

NWBO also omits that on May 10, 2022—a day on which NWBO alleges "the market learned excellent news" about an NWBO clinical trial, and yet its share price suffered a "staggering decline . . . caused by Defendants' relentless and brazen manipulation," ¶ 64—an industry commentator published an analysis of NWBO's trial data, writing that the results of the trial were "the antithesis of what's required from any effective cancer treatment," and actually showed that NWBO's drug "perform[ed] worse than a placebo."[14]  The omission of these publicly-disclosed regulatory violations and critical reporting raises serious questions about NWBO's allegations, and further suggests this lawsuit is an attempt to find a scapegoat for its struggles.

---

[13]   *See* Burck Decl. Ex. 4, Nw. Bio., Inc., Exchange Act Release No. 87281, 2019 WL 5088987 (Oct. 10, 2019).

[14]   Burck Decl. Ex. 5, Adam Feuerstein, *It took years, but the failure of Northwest Bio's brain cancer vaccine is now in the open*, STAT News (May 10, 2022), https://www.statnews.com/2022/05/10/it-took-years-but-the-failure-and-futility-of-northwest-bios-brain-cancer-vaccine-is-now-in-the-open/.  The Court may take judicial notice of press coverage.  *See supra n.3.*

## ARGUMENT

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  This requires—under both the PSLRA and Rule 9(b)—that a plaintiff "state with particularity the circumstances constituting fraud."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also ATSI*, 493 F.3d at 101 ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).").

Because NWBO's "market manipulation [claim] requires a showing of scienter, the PSLRA's heightened standards for pleading scienter also apply."  *ATSI*, 493 F.3d at 102.  To meet this heightened pleading standard, the Complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  Such an inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent . . . and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  These are "[e]xacting pleading requirements," which Congress adopted "to curb perceived abuses of the § 10(b) private action," including "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers."  *Id.* at 313, 320 (internal quotations omitted).

## I.     NWBO'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

To plead market manipulation under Section 10(b) of the Exchange Act, NWBO must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.  Similarly, to plead a claim under Section 9(a)(2), NWBO must "identify

transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010). "The analysis of claims under Section 9(a) 'closely parallels' the analysis of claims under Section 10(b)." *Stone Family Trust v. Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022). NWBO's Exchange Act claims should be dismissed for four independent reasons: its failure to adequately plead (1) manipulative acts; (2) scienter; (3) causation; and (4) reliance on an assumption of an efficient market.

### A.   NWBO Fails To Allege Manipulative Conduct With Particularity

To satisfy Rule 9(b), NWBO must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," which requires NWBO to specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102. NWBO purports to compile statistics to create the illusion of particularity, but its allegations of manipulation rest entirely on generalizations, averages, and conclusory allegations insufficient to meet its heightened pleading burden.

Despite alleging a wide-ranging scheme spanning nearly five years, NWBO does not even attempt to allege specific manipulative acts for more than 99% of this period. For all but eleven of the 1,171 trading days in the alleged "Relevant Period," the allegations are wholly summary—NWBO does not attempt to identify a single specific bid, offer, or trade by any Defendant. Instead, it provides a table purporting to "list by Defendant the share volume of Baiting Orders which were subsequently cancelled." ¶ 59. But NWBO does not allege the dates when any "Baiting Order" was entered, the prices at which any alleged orders were placed, the volumes of any alleged order, or when the orders were supposedly canceled. Nor does NWBO explain what makes the aggregated trades in its table "Baiting Orders" at all (or the source of this purported data). Instead,

it alleges, circularly, that "Baiting Orders" are orders that "have no legitimate economic purpose" (¶ 7), without providing any details regarding the basis for that assertion. *See infra* at 21-22. This is insufficient under any pleading standard, and plainly so under Rule 9(b). *See DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 30-31 (2d Cir. 2014) (pejorative labels "are not facts, and certainly not facts sufficient for Rule 9(b)").

NWBO's allegations for these 1,160 trading days—more than 99% of the Relevant Period—fail also because they are impermissibly based on group-aggregated data.[15] "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *7 (S.D.N.Y. Oct. 12, 1995). For example, NWBO frequently pleads generic allegations of conduct by undifferentiated "Defendants," even though NWBO does not allege a conspiracy or any other coordination or communication between the Defendants.[16] NWBO pleads allegations as to total shares purchased by all Defendants over certain periods (¶ 58), the "median" volumes of all Defendants' aggregated alleged transactions (¶¶ 251-52), and the "average" volumes of shares allegedly traded by all Defendants (¶¶ 60-61, 69-70, 73, 82-83). NWBO alleges that a comparison between these aggregated figures demonstrates market manipulation. ¶¶ 60-62. But this is definitionally not particularized. Even more egregious is NWBO's "loss causation" chart displaying a "# of Spoofing Episodes" column without specifying **which Defendant(s)** allegedly spoofed that day, let alone which trades constituted purported manipulation. ¶ 259. NWBO's scattershot allegations do not satisfy the particularity requirements under 9(b) with respect to any Defendant. *Dulsky v. Worthy*, 2013 WL 4038604, at *4 (S.D.N.Y July 30, 2013)

---

[15] *E.g.*, ¶¶ 56, 58-62, 69-73, 251-52, 256, 259.

[16] *E.g.*, ¶¶ 9, 52-58, 62-65, 72, 85-86, 99.

(dismissing for failure "to separate these defendants with specific allegations of wrongdoing as to each one of them").

For the mere *eleven days* during the so-called "Relevant Period" (1,171 trading days) on which NWBO attempts to allege specificity through its "Example Episodes," its claims do not meet the plausibility standard of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), let alone the heightened pleading standard required for a claim of securities fraud.

*First*, NWBO's allegations regarding "Baiting Orders"—the mechanism by which Defendants purportedly manipulated the market—are inadequate.  The Complaint contains no allegations concerning the number of so-called "Baiting Orders" in each time frame, the timing of each order, or the volume of shares of each order, and often fails to allege the price of each order.[17] Instead, NWBO merely alleges the total sum of shares offered and a range of times and prices, making it impossible to identify any particular manipulative orders or determine their potential effect on the market.

*Second*, NWBO alleges in conclusory fashion that the "Baiting Orders" were canceled, purportedly demonstrating that these orders were never intended to be executed.[18]  There are no facts alleged to support this conclusory allegation.  NWBO does not explain how it determined that any "Baiting Order" was canceled—trade execution data (as opposed to records regarding displayed bids and asks) from OTC Link and Global OTC is not public.  Given that nearly all of the Defendants trade on OTC Link,[19] NWBO appears to have inferred that the removal of a quote

---

[17]   *See, e.g.*, ¶¶ 75, 88, 101, 114, 127, 140, 152, 164, 170, 183, 195, 208, 214, 220, 226, 232.

[18]   *See, e.g.*, ¶¶ 79, 92, 105, 118, 131, 144, 156, 168, 174, 187, 199, 212, 218, 224, 230, 236.

[19]   Canaccord, Citadel Securities, G1X, GTS, and Virtu trade NWBO on OTC Link, with Citadel Securities, G1X, and Virtu trading NWBO exclusively on that platform.  Burck Decl. Ex. 6, *Broker Dealer Directory for Trading on OTC Markets*, https://www.otcmarkets.com/otc-link/broker-dealer-directory.  The Court may take judicial notice of OTC Markets' website.  *See supra* n.3.

from display on OTC Link indicates that it was "canceled."  This is not a plausible inference because when a participant's bid or offer changes on OTC Link, rather than the prior bid or offer being canceled, the client order the previously displayed bid or offer may have represented could have been filled, or the participant may have received a better-priced client order that they were required to display.  NWBO also fails to address that, if the quote changed because of a better-priced order, the client order the previously displayed bid or offer represented may remain live in the participant's order book, even if it has been displaced from public view on OTC Link (rather than having been canceled, as NWBO alleges without support).  And even accepting *arguendo* that NWBO's cursory allegations were sufficient to plead that these orders were canceled, NWBO does not allege why the cancelation of an order, a common aspect of trading, in the absence of any of the other hallmarks of spoofing—none of which is alleged here—creates an inference that the order was not intended to be executed.

*Third*, NWBO fails to allege with specificity the purported "parking" of "Baiting Orders." NWBO claims that Defendants entered "Baiting Orders" they knew would not be executed because there were existing orders at better prices in the market (*i.e.*, the "Baiting Orders" orders were "parked" behind better-priced orders).  But even in its spoofing "examples," NWBO fails to sufficiently identify both the specific orders that were allegedly "parked" and the orders currently in the market from other participants (NWBO identifies just one other participant per example), making it impossible to determine whether and how many other orders from other market participants were at the same, better, or worse prices.  *See, e.g.*, ¶ 77.  And significantly, even by NWBO's own allegations, many of the alleged "Baiting Orders" were at better prices than the orders of the one participant they were supposedly "parked" behind.  NWBO's own pleading is thus fundamentally inconsistent with its spoofing theory because many of the Baiting Orders were

13

*more likely* to be executed than other orders NWBO alleges were in the market—they were not "Baiting Orders" at all.[20]

*Fourth*, NWBO alleges that Defendants did not sell any shares during the periods they were purportedly canceling the "Baiting Orders" (*e.g.*, ¶ 76), purportedly demonstrating that the so-called "Baiting Orders" were never intended to be executed. This allegation lacks any explanation and could not be supported—Defendants are unaware of any publicly available data that would provide information sufficient for NWBO to identify parties to executed OTC trades.

*Finally*, NWBO also fails to adequately allege any details concerning the purported "sell-side imbalances" created by the "Baiting Orders"—which is what allegedly drove down the price of NWBO shares. NWBO alleges that, in the two minutes preceding purchases, Defendants placed significantly more "Baiting Orders" to sell than bids to buy to create the impression that more investors were selling NWBO stock than buying it. *E.g.*, ¶ 57. But NWBO does not allege, for example, what Defendants' market positions were prior to the purported spoofing or the volume or timing of buy-side orders, and thus fails to plead when the imbalances began and whether they persisted over time, or whether and to what extent the "Baiting Orders" contributed to the purported imbalances. Nor does NWBO allege that the imbalances were unusual for NWBO stock (which NWBO alleges experienced a "sustained decline" throughout the "Relevant Period," ¶ 66). Without sufficiently alleging a persistent imbalance during any of the purported spoofing episodes, NWBO has not pleaded with particularity that the purported scheme caused downward pressure on its stock (or how it could have, given that the imbalances are not alleged to have persisted). And given the comparatively small size of the alleged "Baiting Orders"—which, in one example, totaled 1,400 shares when the then-existing best bid and offer were allegedly 2,990 and 57,655

---

[20]   ¶¶ 75, 77, 88, 90, 101, 103, 114, 116, 152, 154, 170, 172, 195, 197, 214, 216, 220, 222.

shares, respectively (¶¶ 113-14)—it is simply implausible, and certainly not as compelling as other inferences, that these "Baiting Orders," which in this example represent less than 3% of the volume of the alleged pre-existing best offer, were intended to (or could) move the market.[21]

At bottom, even for the less than 1% of trading days in the "Relevant Period" when NWBO attempts to allege specific trading activity, the Complaint requires the Court to assume that when certain vaguely-described orders—some of which allegedly were better-priced than some other existing orders—were no longer displayed, that means they were canceled, which in turn means they were "fictitious Baiting Orders" that "artificially dr[o]ve down the price of NWBO shares." These cursory, circular, and countersensical allegations fall far short of meeting the particularity requirements of Rule 9(b) and the PSLRA.  *See ATSI*, 493 F.3d at 102.

### B.      NWBO Does Not Allege A Strong Inference Of Scienter

Recognizing the risk that private securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law," *Tellabs*, 551 U.S. at 313, Congress in the PSLRA required plaintiffs to "plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors," *ATSI*, 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)); *see also id.* (scienter is particularly important in market manipulation cases because, often times, it "is the only factor that distinguishes legitimate trading from improper manipulation.").  To meet this heightened standard, NWBO must allege facts (i) to demonstrate "defendants had both motive and opportunity to commit the fraud," or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  NWBO fails to satisfy the "strong inference" requirement under either prong.

---

[21]   Similarly, NWBO often merely alleges that Defendants purchased shares at the pre-spoofing prevailing best bid (*e.g.*, ¶¶ 74, 78), without making any allegation that, prior to the alleged spoofing, bids displayed at that price were not being executed.  Accordingly, NWBO has not sufficiently alleged that the purchases would not have occurred but for the purported spoofing.

1.    **NWBO's Market Manipulation Theory Does Not Support A Plausible Inference of Motive**

To plead a strong inference of scienter through allegations of motive and opportunity, NWBO **must** allege "a concrete and personal benefit . . . resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131,139 (2d Cir. 2001). "Motives that are generally possessed by most corporate directors and officers do not suffice." *Id.*

NWBO's sole allegation of "benefit" to Defendants from the alleged scheme appears to be that Defendants "took advantage of the artificially depressed price of NWBO shares they created by placing Executing Purchases to purchase a total of 19,300,908 shares below the prevailing best offer[.]" ¶ 58. This is insufficient. As an initial matter, such "better price" motives are too general to establish scienter. *See, e.g.*, *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) (allegations that defendant manipulated stock price "to access additional shares . . . at lower prices" "fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit.").

What's more, Defendants are market makers and broker-dealers that frequently trade on behalf of clients. The Complaint fails to allege whether the trades at issue were proprietary or for clients. The Complaint also fails to allege whether the same party was on both sides of the market (*i.e.*, that both the purported "Baiting Orders" and purchases were on a Defendant's own behalf, rather than for the same client or different clients), which is required for a spoofing scheme. This is fatal to NWBO's claims: without specific allegations that the trades at issue were each on the Defendant's own behalf, there can be no inference of motive by Defendants.

NWBO also fails to allege any purpose of the alleged market manipulation: there is not a single instance alleged where any Defendant actually *profited*—or *could have* profited—from the alleged spoofing. Importantly, spoofing is a short-term form of manipulation that includes two

steps.  When executed to put downward pressure on a stock's price, the profitability of spoofing typically depends on (i) the spoofer buying the shares at the lower price, and (ii) the stock price rebounding after the spoofer removes the artificial sell pressure from the market.  This then allows the spoofer to sell at a profit the shares it bought at the deflated, spoofed price.  *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018).  That typical profit motive is absent here in light of NWBO's allegations that the Defendants "continuously" sought to artificially decrease NWBO's stock price, and never sold the stock (after the price rebounded or otherwise).  ¶ 56.  Merely alleging that a stock purchase occurred at a price affected by alleged manipulation is insufficient.  Simply "as a matter of pure logic," buying a share at a supposedly artificially depressed price does not itself result in any profit to the buyer because the "purchase payment," artificially depressed or not, "is offset by ownership of a share that at that instant possesses equivalent value."  *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Yet this is exactly the illogical, money-losing scheme NWBO alleges.

Nowhere does NWBO allege that Defendants *ever* sold the stock, let alone for a profit.  Nor does NWBO allege that its stock increased in price after Defendants purportedly purchased it at a discount such that Defendants *could* sell NWBO stock for a profit.[22]  Even accepting *arguendo* that Defendants' alleged "continuous" one-sided spoofing caused a "persistent and long-lasting" decline in the price of NWBO stock, ¶ 262, Defendants allegedly purchased NWBO stock and then proceeded to intentionally diminish its value by continuing to drive the price down.  But how could Defendants have profited if they were "continuously" pushing down the price, and thus lacked an opportunity to sell at a profit?  This refutes any inference of motive to carry out a scheme

---

[22]   Exacerbating this deficiency, NWBO has not alleged that Defendants acted in concert.  Defendants were apparently each "continuously" attempting to lower the price of NWBO stock by spoofing without any coordination.  But because spoofing requires a price reversion to work, this would mean that Defendants were working at cross-purposes.

and demonstrates the facial implausibility of NWBO's scienter theory. *See Kalnit*, 264 F.3d at 140-41 ("Where plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent") (internal quotation and citation omitted). "[C]ompletely absent from [NWBO's] description of these transactions are any allegations that demonstrate or explain why it was advantageous for [Defendants] to" engage in this supposed scheme. *Last Atlantis Cap. LLC v. Chi. Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 797 n.8 (N.D. Ill. 2006).

Even in *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts., Inc.*, on which NWBO relies heavily in its pre-motion letter (Dkt. 75 at 2), the court found the scienter allegations only "tenuous" despite the *Harrington* plaintiff having alleged a significantly more economically coherent theory, 585 F. Supp. 3d 405, 412 (S.D.N.Y. 2022). In *Harrington*, the plaintiff alleged that defendants borrowed stock, sold it short, drove down the stock price via spoofing, and bought shares back at a lower price to return to the lender, keeping the price differential as a profit. *Id.* The alleged spoofing and short selling thus, according to the *Harrington* plaintiff, "operated in concert," *id.*, making it at least theoretically possible to profit from the "cumulative impact of the spoofing episodes," *id.* at 418. Here, by contrast, NWBO has not alleged a single instance where any Defendant profited from its supposed scheme, or any theory by which any Defendant **could have** profited. Thus, NWBO's theory falls short even when compared to allegations the court found "tenuously" coherent in *Harrington*. *See id.* at 421.

Putting aside the total illogic of NWBO's theory, the purported "discount" at which Defendants allegedly purchased NWBO stock is simply too small to justify the alleged scheme. NWBO's specific examples of alleged spoofing all involve a Defendant purchasing a small number of shares—often only 100 shares—at a "discount" of a few pennies or less, for a few dollars of

*unrealized* "profit."   ¶¶ 78, 91, 104, 117, 130, 143, 155, 167, 173, 186, 198, 211, 217, 223, 229, 235.  The notion that Defendants separately carried out a complex scheme to generate minuscule "profits" over a five-year period is absurd; it cannot support a strong inference of scienter.  *See Kalnit*, 264 F.3d at 140-41; *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 608 n.9 (W.D. Va. 2002) (a "small" motivation does not give rise to the required strong inference of intent).  The far more "compelling" inference is that Defendants, as registered broker-dealers, were simply trading—frequently on behalf of clients, or, for Instinet and Lime Trading, letting their clients trade on their platforms—in the ordinary course of business.  *Tellabs*, 551 U.S. at 323-24.

Relatedly, NWBO does not explain how tiny profits in a handful of trades allowed Defendants, in the aggregate, to reap "hundreds of millions in aggregate profits," ¶ 258, and the mere assertion does not support an inference of scienter.  NWBO's own "example" allegations undermine the conclusory assertion of hundreds of millions in aggregate profits.  For instance, NWBO alleges that two of the Defendants engaged in the allegedly "egregious" May 10, 2022 spoofing incident in order to obtain **one-one hundredth of a cent** of discount compared to the previously prevailing best offered price.  ¶¶ 229, 235.[23]

### 2.    NWBO Fails To Allege Conscious Misbehavior Or Recklessness

Because NWBO fails to allege any motive for the nonsensical alleged scheme, "the strength of the circumstantial allegations must be correspondingly greater."  *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (citing *Kalnit*, 264 F.3d at 142).  NWBO fails to allege recklessness, much less conscious misbehavior, and every purported indicator of potential fraudulent intent falls apart under scrutiny.

---

[23]   Regardless, as explained *infra* at 26 n.32, these allegations must be rejected because the Complaint lacks any allegation that NWBO sold stock after March 2022.

*First*, "[c]onclusory statements of . . . generalized allegations of scienter against groups of defendants will not state a claim for securities fraud," *Cohen*, 722 F. Supp. 2d at 428, yet rather than allege specific facts creating a strong inference of motive or circumstantial evidence of fraud, NWBO offers a list of 15 boilerplate bases for scienter without naming any particular Defendant. ¶¶ 241-58.

*Second*, all Defendants are entities, which operate only through their agents. Yet NWBO fails to plead facts sufficient to raise a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter," as is ***required*** where a defendant is an entity. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Instead, NWBO makes only one conclusory allegation that the allegedly fraudulent trading practices were "approved by corporate officials sufficiently knowledgeable about the trading practices of each Defendant" (¶ 243), which is plainly insufficient to plead scienter as to an entity. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient" to establish scienter). NWBO does not allege, as it must, what trading practices were approved, when, or by which officials. Without alleging a single fact about what *any* employee (much less executive) of *any* Defendant knew about this supposed "scheme," NWBO cannot satisfy the high bar for pleading scienter. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (dismissing complaint for failure to plead scienter where plaintiff did not sufficiently allege executives had "actual knowledge" of falsity).

*Third*, NWBO's conclusory allegation that Defendants "designed and implemented algorithmic trading programs to execute their spoofing schemes" (¶ 242) falls short. NWBO does not specify what programs Defendants supposedly used to execute their schemes, who ran the

programs, or how those programs were used.  General assertions that Defendants—who are in the business of trading—used "algorithms" and "trading programs" are not enough to establish a strong inference of fraudulent intent.  *See Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 432-34 (S.D.N.Y. 2017) (dismissing complaint for failure to plead scienter where details about "E\*TRADE's trading algorithms" were not alleged).  Commonplace algorithmic trading is not evidence of fraudulent intent.  *See Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at \*1, \*9 (N.D. Ill. June 30, 2022) (recognizing the "ubiquity of rapid trading" and granting motion to dismiss). Further, there is no allegation that Defendants' trading programs are relevant to orders placed on behalf of Defendants' clients, an alternative explanation the Complaint ignores.  *See infra* at 23-25.

*Fourth*, NWBO's argument that the so-called "Baiting Orders" (¶¶ 248-52) are indicative of scienter is circular.  NWBO defines "Baiting Orders" as orders that (it asserts conclusorily) Defendants never intended to execute, but provides no support for its bald assumption that each time an order is purportedly canceled, the broker-dealer who placed it must never have intended to execute it, and that the order therefore had "no legitimate economic purpose."  ¶ 7.[24]  NWBO nonetheless contends—implausibly—that the mere cancelation of these so-called "Baiting Orders" means they must have been placed with manipulative intent, even though manipulative intent was NWBO's premise for applying the label "Baiting Orders" in the first instance.  *Compare* ¶ 7 *with* ¶ 255.  Such circular reasoning cannot create a strong inference of scienter.  *See, e.g., C.F.T.C. v. Wilson*, 2018 WL 6322024, at \*15 (S.D.N.Y. Nov. 30, 2018) (dismissing Commodity Exchange Act market manipulation claim reliant on "circular" theory that prices were illegitimate because

---

[24]  The same problem applies to the "Baiting Period" (which is not even clearly defined, ¶ 53) and "Spoofing Episode" (¶ 56), both of which are defined by circular reference to "Baiting Orders."

defendants intended to affect them); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("It is rather circular to say that the Individual Defendants committed fraud by concealing their intent to commit fraud."); *CP Stone Fort Holdings, LLC v. Doe(s)*, 2016 WL 5934096, at *5 (N.D. Ill. 2016) ("there is nothing improper or illegitimate about placing passive orders in the order book and then reversing position"). Without more, "Plaintiff[] fail[s] to allege sufficient facts underpinning their allegations that [] the cancelled orders demonstrate a plan to deceive." *Kessev Tov*, 2022 WL 2356626, at *10.

*Fifth*, NWBO's allegation that Defendants quickly placed and canceled orders (¶ 249) simply describes a fundamental feature of modern markets and does not demonstrate manipulative intent. Putting aside that NWBO's allegations regarding cancelations are unsupported and inadequate (*see supra* at 12-13), given today's technology, "placing rapid orders and cancelling them does not necessarily evince illegal market activity," and "courts have recognized the ubiquity of rapid trading across securities platforms." *Kessev Tov*, 2022 WL 2356626, at *9. Even if adequately pleaded, rapid order placement and cancelation adds nothing to the analysis—indeed, if that were sufficient, ordinary modern trading would always be grounds for a market manipulation claim.

*Sixth*, NWBO's allegation that Defendants "parked" "Baiting Orders" behind others to avoid execution (¶ 247) similarly ignores the reality of the market. The Complaint alleges, for instance, that Defendants placed "fictitious" orders to sell, some—but not all—of which were higher than other offers in the market, presumably to decrease the chance of being matched with a buyer. *E.g.*, ¶¶ 77, 90, 103. Although NWBO refers to this practice as "parking" in an attempt to make it sound intentional and nefarious, all it has described is a market where not every participant is making the same offer. In fact, most of the so-called "Baiting Orders" were allegedly placed at

*better* prices than the orders behind which they were allegedly "parked"—meaning they were not alleged to have been "behind" anything at all.  *See supra* at 13-14 & n.20.  NWBO's own Complaint thus refutes its "parking" argument.  And in any event, it is common for different market participants to display different bids and offers—that is the hallmark of a free market—further demonstrating NWBO's failure to plead manipulative intent.  *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 207 (S.D.N.Y. 2020) ("active price competition" is one indicator of a competitive market).

### C.  NWBO Fails To Account For Nonculpable Explanations Demonstrating That Defendants Were Engaged In Lawful Behavior On Behalf Of Their Clients

NWBO's market manipulation claims fail for the additional and independent reason that the Complaint does not acknowledge—let alone address—obvious, nonculpable explanations for the alleged conduct at issue.  Under *Tellabs*, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. at 310.  In other words, NWBO's theory must be "***at least as likely as*** any opposing inference" that could be drawn from the facts as alleged or supplemental facts, and the "court must consider plausible, nonculpable explanations for the defendant's conduct."  *Id.* (emphasis in original).  Even under the more lenient plausibility standard, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," and to consider "more likely explanations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679-81 (2009).  NWBO's claims fail to meet any of these requirements.

Defendants, as broker-dealers, routinely display bids and offers and execute transactions

***on behalf of clients***, and it is the clients that set the terms of those orders.[25]   A stringent set of rules and regulations imposed and enforced by several regulatory bodies governs how Defendants must handle client orders and when Defendants must publicly disseminate client bids and asks via venues such as OTC Link and Global OTC.   *See, e.g.*, FINRA Rules 5310 (best execution obligation) and 6460 (Display of Customer Limit Orders).   Even the alleged manipulative conduct—the purported displaying and then cancelation of so-called Baiting Orders—has an obvious alternative explanation: rather than an order being canceled, the market participant may have received a better client bid or offer that it was required to display, or the client order that the bid or offer may have represented could have been filled.   And even if an order was canceled (a routine aspect of market activity), the more likely explanation is that it was canceled by the client ***without manipulative intent***.

NWBO's own allegations support this more compelling inference.   For example, NWBO asserts in conclusory fashion that a "particularly egregious example of Defendants' manipulative spoofing . . . occurred on May 10, 2022" when NWBO's stock declined despite supposedly "excellent news" about a drug trial.   ¶ 64.   However, NWBO's own allegations reveal that, ***before*** the alleged "spoofing," there was far more interest in selling NWBO stock than buying it.   *E.g.*, ¶¶ 113, 126, 207, 213.   Thus, the activity NWBO labels "spoofing" was consistent with the "pre-spoofing" trade flow, and it is more likely that it reflects the facilitation of client orders to sell.[26]

Nor is it surprising that there was significant interest in selling NWBO stock on May 10,

---

[25]   In fact, the only kind of trading Instinet and Lime did in NWBO stock was to allow their clients to place their own orders over the companies' platforms.

[26] In its pre-motion letter, NWBO argued that this Court may rely on *Harrington*, 585 F. Supp. 3d at 405, to hold Defendants liable for trades executed at the direction of their clients, Dkt. 75 at 2.   But that court subsequently clarified that the plaintiff had "not articulated any plausible theory under which any currently named Defendant is liable for their customers' trading activity."   *Harrington*, No. 21-cv-761 (LGS) (Dkt. 120 at 4) (S.D.N.Y. Aug. 15, 2022).

2022, given reporting that NWBO's drug "perform[ed] ***worse than a placebo***."[27]  This is true throughout the "Relevant Period," which brought NWBO several crises, including criticism of key drug development efforts;[28] changing "endpoints" for clinical trials, which it acknowledged regulators did not always accept;[29] and other governance failures and investigations.[30]

Thus, the compelling, nonculpable inference for the alleged manipulative conduct is that the market activity reflects the differing views of independent actors—the very mechanism by which prices are set in a functioning market.  This cannot possibly establish fraudulent intent.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008) (imposing Rule 11 sanctions where only allegation against market maker was that it processed client orders in the ordinary course), *aff'd in part, rev'd in part*, 579 F.3d 143 (2d Cir. 2009); *Glaser*, 772 F. Supp. 2d at 593 (alleged inference of widespread fraud "is not as strong as the inference of non-fraudulent activity drawn from the facts viewed collectively").

In stark contrast to this compelling explanation of lawful trading, NWBO's lack of specific allegations against each Defendant—just a few "examples" for each over a five-year period (*see supra* at 6-7)—fails to justify any inference of fraudulent intent, much less an inference that is cogent and at least as strong as other nonculpable inferences.  *Tellabs*, 551 U.S. at 324.  NWBO may not "base securities fraud claims on speculation and conclusory allegations."  *Kalnit*, 264 F.3d at 142.

---

[27]  *See supra* n.14.

[28]  *See supra* nn.14, 27.

[29]  Burck Decl. Ex. 7 (NWBO 2019 Form 10-K) at 15 ("There can be no assurance that the regulatory authorities will find this to be an approvable endpoint."); Burck Decl. Ex. 8 (NWBO 2020 Form 10-K) at 16.  The Court may take judicial notice of SEC filings.  *See supra* n.3.

[30]  *E.g.*, *supra* n.13.

### D.       NWBO Does Not Allege Loss Causation

To state a claim for market manipulation, NWBO must plead with particularity facts supporting a "legally cognizable loss" and a "causal connection between the [alleged manipulation or] material misrepresentation and the loss." *Cohen*, 722 F. Supp. 2d at 430 (quoting *Dura*, 544 U.S. at 342). To do so, NWBO must "allege that [it] suffered [] *specific* economic harm as a result of Defendants' conduct." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).[31] NWBO alleges it suffered losses when it sold NWBO stock at prices artificially deflated by Defendants' spoofing on 51 days between January 2018 and March 2022. ¶¶ 259-60. These allegations are insufficient.

*First*, NWBO notably fails to tie its sale price on these 51 days to the sixteen instances of (inadequately) alleged market manipulation. Indeed, there is only ***one*** day across the five-year Relevant Period in which NWBO identifies a purported "spoofing episode" and alleges that it sold stock at an allegedly depressed price: October 27, 2020.[32] Thus, there is no connection between virtually any of the specifically alleged spoofing and NWBO's purported losses. *See In re Merrill*, 2021 WL 827190, at *12 (dismissing claim for failure to plead trading occurred immediately after spoofing events at affected prices). NWBO cannot allege it suffered losses based on stock sales that occurred (or were priced) hours, days or weeks removed from the alleged spoofing. *Dura*, 544 U.S. at 343 (recognizing that there are a "tangle of factors affecting price" and the "the longer the time between" the wrongful act and the sale, "the more likely that other factors caused the loss.").

---

[31]  NWBO's loss causation allegations are similarly subject to the heightened pleading standard under Rule 9(b), *e.g.*, *Cohen*, 722 F. Supp. 2d at 432 n.9, but likewise fail under Rule 8.

[32]  Notably, NWBO does not allege a single instance of specific spoofing before October 12, 2020, and admits that all of its trades concluded on March 14, 2022.  ¶ 259.  All of NWBO's sales prior to October 12, 2020 and after March 14, 2022 are therefore irrelevant.  *See In re Merrill, Bofa, and Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *12 (S.D.N.Y. 2021) (a plaintiff must plead that they "traded after the spoof").

*Second*, for the sole "Pricing Date"—which, again, the Complaint does not define—on which NWBO alleges an example of spoofing, NWBO still fails to allege that it sold shares at a deflated price due to market manipulation.  To start, the alleged "sale prices" (at which NWBO presumably contends it sold stock) connected to the October 27, 2020 "Pricing Date" were $2.15 and $2.08, approximately 90% **higher** than the alleged $1.13 closing price on October 27, 2020. ¶ 259 at p.75.  Thus, NWBO has not plausibly alleged that it suffered any losses that day, much less from purported market manipulation.  NWBO also fails to allege that any market manipulation that occurred on October 27, 2020 impacted the **closing** price of NWBO's stock, which NWBO must do since it alleges that the sales price was (somehow) related to the closing price that day.  In fact, NWBO's allegations undermine any inference that the closing price was impacted by any purported manipulation given NWBO's allegations that, following the purported manipulation, the Defendant "eliminat[ed] the artificial sell-side imbalance" and "dramatically revers[ed] the position it had taken only moments before."  ¶ 118.  *See CP Stone Fort Holdings*, 2017 WL 1093166, at *6 (spoofing complaint failed to plead loss causation because plaintiff did not allege that the less favorable prices at which it transacted were "the result of the cancellation of the Deceptive Orders, rather than legitimate market forces").[33]

NWBO's allegations are substantially similar to those recently rejected by the Second Circuit in *Gamma Traders – I LLC v. Merrill Lynch*, which affirmed dismissal of a spoofing claim for failure to plead loss causation where the "[c]omplaint provide[d] no factual basis that would

---

[33]   NWBO fails to adequately allege the so-called "sell-side imbalance" in the first place.  In every instance, NWBO alleges that Defendants placed a certain volume of so-called "Baiting Orders" in a two-minute window preceding the so-called "Executing Purchases."  *See, e.g.*, ¶ 114 ("Baiting Orders" placed for 1,400 shares).  But NWBO alleges **nothing** about the share volume of *buy-side* orders that Defendants may have placed over that same two-minute window.  Without alleging buy-side order information during that time, NWBO's allegation that Defendants' order books were "imbalance[d]" because of the purported spoofing (*see, e.g.*, ¶ 118) is unsupported.  Further demonstrating NWBO's lack of particularity, Lime has neither an order book nor a trading desk.

justify an inference that the market price was still artificial by the time [plaintiff] traded." 41 F.4th 71, 80-81 (2d Cir. 2022). The Court held that "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day." *Id.* Without alleging facts demonstrating that NWBO sold shares at a price affected by Defendants' purported spoofing, NWBO has "not specifically pleaded a causal link between any single stock purchase or sale and a corresponding [spoofing episode] by [any specific Defendant] or coordinated transactions by others." *Fezzani v. Bear, Stearns & Co. Inc.*, 777 F.3d 566, 572 (2d Cir. 2015) (affirming dismissal of market manipulation claim).

*Third*, lacking specific allegations of manipulation on the days NWBO supposedly suffered harm, NWBO resorts to conclusory allegations of the number of "spoofing episodes" on the "Pricing Dates" for its stock sales. ¶ 259. NWBO fails to tie any specific allegations of spoofing to any specific harm, as is required to plead causation. Notably, on the bulk of these Pricing Dates, NWBO alleges a single (non-specific) "Spoofing Episode," *id.*, meaning that only one Defendant allegedly spoofed once at some unspecified point on that date. But NWBO fails to identify **which** Defendant supposedly engaged in this unspecified spoofing. This does not suffice to establish loss causation against any Defendant, let alone all Defendants. *Dulsky*, 2013 WL 4038604, at *4 ("Because plaintiffs fail 'to separate these defendants with specific allegations of wrongdoing as to each one of them, the [complaint] does not pass muster under Rule 9(b).'").

*Finally*, perhaps recognizing the failure to tie the alleged manipulative conduct on any given day to NWBO's losses, NWBO asserts, in conclusory fashion, that the alleged spoofing had a "long-term cumulative effect" and therefore must have affected the price at which it sold at some point. ¶ 262. However, this "long term" theory, like NWBO's other allegations of harm, is simply

implausible, particularly because courts have rejected spoofing claims where plaintiffs sought to allege a price effect continuing for even a single *day*, much less five years. *See Gamma Traders*, 41 F.4th at 81 (allegations in the Complaint insufficient to "infer that spoofing's effects last throughout the day"); *see also In re Merrill*, 2021 WL 827190, at *13 (spoofing that is only alleged to have lasted "a matter of seconds" would not necessarily impact the trades of others).

"Manipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief." *In re London Silver*, 332 F. Supp. 3d at 923.  Even if NWBO was "regularly in the market and transacting throughout the Class Period, while Defendants were also placing spoof orders, it does not follow that any particular trade of [NWBO's]—or necessarily any of the trades made by [NWBO]—would have been affected by Defendants' alleged manipulative conduct." *In re Merrill*, 2021 WL 827190, at *13.  "To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*." *Id.*

At bottom, "the numerous inferences required to connect [Defendants'] manipulative conduct to NWBO's alleged injury (if they suffered any injury at all)" are "too attenuated and speculative to survive a motion to dismiss." *In re London Silver*, 332 F. Supp. 3d at 923.

###    E.    NWBO Does Not Adequately Allege Reliance

To plead a claim under Sections 9(a) or 10(b), NWBO must plead "reliance on an assumption of an efficient market free of manipulation." *ATSI*, 493 F.3d at 101.  In yet another example of its insufficient pleading, NWBO fails to allege facts demonstrating that OTC Link and Global OTC—the markets on which NWBO traded—are efficient markets.  Instead, in conclusory fashion, NWBO asserts that it "suffered damages in that it sold shares at manipulative prices, in reliance on an assumption of an efficient market free of manipulation."  ¶ 268.  This allegation, which merely parrots an element of the claim, is insufficient to plead reliance in the context of the

OTC markets.  *See, e.g.*, *Cohen*, 722 F. Supp. 2d at 434 (dismissing manipulation claim for failure to allege efficient market and explaining that "a plaintiff must specifically plead that the market in which he or she purchased the shares was efficient"); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 472 (S.D.N.Y. 2014) ("Plaintiffs' theory of reliance fails because they do not allege that the [OTC] Bulletin Board is an efficient market."); *see also Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) (dismissing manipulation claim for failure to plead OTC market was efficient).

## II.     NWBO FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD

NWBO has not stated a claim for common law fraud.  Courts dismiss tag-along common law fraud claims where Exchange Act claims predicated on the same allegations have been found wanting.  *E.g.*, *Cohen*, 722 F. Supp. 2d at 436 (dismissing common law fraud claim after finding federal securities fraud claim deficient because the "elements of common-law fraud are essentially the same as those for a violation of Section 10(b) of the Exchange Act[]" (internal quotation marks omitted)); *Ashland, Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 471-72 (S.D.N.Y. 2010) (same).  NWBO's common law fraud claim should be dismissed because it is predicated on the same allegations as its flawed Exchange Act claims.

## <u>CONCLUSION</u>

For the reasons stated above, NWBO's Complaint should be dismissed with prejudice.

Dated:  March 20, 2023
      New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

 _/s/ William A. Burck_
William A. Burck
Christopher G. Michel (*pro hac vice*
forthcoming)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Brenna Nelinson
Brendan T. Carroll
Peter H. Fountain
Leigha Empson
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
brendancarroll@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for Defendant Citadel Securities
LLC*

**MORRISON & FOERSTER LLP**

 /s/ *Anthony S. Fiotto* (with permission)
Anthony S. Fiotto
Julia C. Koch
200 Clarendon Street
Boston, MA 02116
Telephone: 617-648-4700
Facsimile: 617-830-0142
Email: AFiotto@mofo.com
Email: JKoch@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: 212-336-4067
Facsimile: 212-468-7900
Email: ELawson@mofo.com

*Attorneys for Defendant Canaccord Genuity LLC*

**GREENBERG TRAURIG, LLP**

 /s/ *Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Nicholas T. Barnes
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
barnesn@gtlaw.com

*Attorneys for Defendant Instinet, LLC*

**KATTEN MUCHIN ROSENMAN LLP**

 /s/ *Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac vice*)
Hannah O. Koesterer (admitted *pro hac vice*)
Leigh Brissenden (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
hannah.koesterer@katten.com
leigh.brissenden@katten.com

*Attorneys for Defendant GTS Securities LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation

 /s/ *Stephen Young* (with permission)
Jon W. Zinke
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California  90802
Telephone:  (562) 436-2000
jon.zinke@kyl.com
steve.young@kyl.com;
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading Corp.*

**BALLARD SPAHR LLP**

 /s/ Marjorie J. Peerce (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel:  (212) 223-0200
Fax:  (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (*pro hac vice* forthcoming)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  (215) 665-8500
Fax:  (215) 864-8999
goldbergerm@ballarspahr.com
krabilll@balladrspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendants Susquehanna*
*International Group, LLP and*
*G1 Execution Services LLC*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 */s/ Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas*
*LLC*