# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

NORTHWEST BIOTHERAPEUTICS, INC.,

       Plaintiff,

   v.

CANACCORD GENUITY LLC, CITADEL
SECURITIES LLC, G1 EXECUTION
SERVICES LLC, GTS SECURITIES LLC,
INSTINET LLC, LIME TRADING CORP.,
AND VIRTU AMERICAS LLC,

       Defendants.

Case No. 1:22-cv-10185 (GHW) (GWG)

# DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 5

    A.    The Parties ......................................................................................... 5

    B.    The OTC Trading Venues................................................................. 6

    C.    Purported "Spoofing" Of NWBO Shares ........................................ 8

ARGUMENT .................................................................................................................. 12

I.    NWBO'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ............................ 12

    A.    NWBO Does Not Adequately Allege Manipulative Conduct ............................. 12

    B.    NWBO Does Not Allege The Required Strong Inference Of Scienter ................ 21

    C.    NWBO Does Not Adequately Allege Loss Causation .......................................... 30

    D.    NWBO Does Not Adequately Allege Reliance ..................................................... 34

II.    PUBLICLY-AVAILABLE TRADING RECORDS REFUTE NWBO'S CLAIMS ........ 35

III.    NWBO FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD ....................... 39

IV.    NWBO'S AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE .................................................................................................................. 40

CONCLUSION ................................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Alki Partners, L.P. v. Vatas Holding GmbH,*
    769 F. Supp. 2d 478 (S.D.N.Y. 2011)..................................................................35

*Ashland, Inc. v. Morgan Stanley & Co.,*
    700 F. Supp. 2d 453 (S.D.N.Y. 2010)..................................................................40

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    2008 WL 850473 (S.D.N.Y. Mar. 27, 2008) ........................................................22

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007).......................................................................... *passim*

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
    369 F.3d 212 (2d Cir. 2004)..................................................................................6

*C.F.T.C. v. Wilson,*
    2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ......................................................29

*In re Citigroup Auction Rate Sec. Litig.,*
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)............................................................24, 31

*In re Citigroup, Inc.,*
    2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), ..........................................................6

*Cohen v. Stevanovich,*
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)..........................................12, 31, 35, 40

*CP Stone Fort Holdings, LLC v. Doe(s),*
    2016 WL 5934096 (N.D. Ill. 2016) ...............................................................28, 33

*DiMuro v. Clinique Labs., LLC,*
    572 F. App'x 27 (2d Cir. 2014) ...........................................................................15

*In re Duane Reade Inc. Sec. Litig.*
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)...................................................26

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005).......................................................................................31, 32

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009).................................................................................27

*In re Fed Ex Corp. Sec. Litig.*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021) ...................................................................40

*Fezzani v. Bear, Stearns & Co. Inc.*,
    777 F.3d 566 (2d Cir. 2015) ...............................................................................34

*Gamma Traders - I LLC v. Merrill Lynch Commods., Inc.*,
    41 F.4th 71 (2d Cir. 2022) .....................................................................25, 33, 34

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ............................................................22, 30

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts., Inc.*,
    585 F. Supp. 3d 405 (S.D.N.Y. 2022) ...............................................................25

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
    309 F. Supp. 3d 100 (S.D.N.Y. 2018) ...............................................................26

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.*,
    2021 WL 3863372 (S.D.N.Y. Aug. 30, 2021) ........................................................7

*J.T. v. de Blasio*,
    500 F. Supp. 3d 137 (S.D.N.Y. 2020) ...............................................................14

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) .............................................................................30

*Jurupa Valley Spectrum, LLC v. Nat'l Indem. Co.*,
    2007 WL 1862162 (S.D.N.Y. June 29, 2007) ......................................................36

*Kalnit v. Eichler*,
    264 F.3d 131,139 (2d Cir. 2001) ................................................................24, 26

*Kemp v. Universal Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ............................................................5

*Kessev Tov, LLC v. Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ...............................................27, 29, 30

*In re London Silver Fixing Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ...............................................................32

*In re Merrill, BOFA, & Morgan Stanley Sec. Litig.*,
    2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) .......................................................32, 33, 34

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) ...............................................................29

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................................28

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Comm.*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010).......................................................................................6

*Salvani v. ADVFN PLC*,
   50 F. Supp. 3d 459 (S.D.N.Y. 2014).......................................................................................35

*Saraf v. Ebix, Inc.*,
   2022 WL 4622676 (S.D.N.Y. Sep. 30, 2022).........................................................................29

*Schwab v. E*TRADE Fin. Corp.*,
   258 F. Supp. 3d 418 (S.D.N.Y. 2017).....................................................................................30

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) .................................................................................35

*In re Shanda Limited Sec. Litig.*,
   2020 WL 5813769 (S.D.N.Y. Sept. 30, 2020)........................................................................35

*Stone Family Trust v. Credit Suisse AG*,
   2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ..........................................................................12

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................................12

*In re Trex Co., Inc. Sec. Litig.*,
   212 F. Supp. 2d 596 (W.D. Va. 2002) ....................................................................................26

*Union Cent. Life Ins. Co. v. Ally Financial, Inc.*,
   2013 WL 2154220 (S.D.N.Y. March 29, 2013) ......................................................................24

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..................................................................................31

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).....................................................................................................34

*In re Yukos Oil Co. Sec. Litig.*,
   2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .........................................................................36

## <u>Rules / Statutes</u>

15 U.S.C. § 78u-4 ............................................................................................... *passim*

Federal Rule of Civil Procedure 9(b)..................................................................... *passim*

Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Northwest Biotherapeutics, Inc.'s ("NWBO") Amended Complaint (ECF 95).

## PRELIMINARY STATEMENT

The Amended Complaint alleges that each of the seven Defendants—without coordination or communication, and for reasons unknown, unexplained, and unalleged—all *separately* and *simultaneously* embarked upon *identical* "spoofing" schemes to drive down the price of NWBO's stock over the *exact same* five-year period.  Yet NWBO does not come close to pleading facts sufficient to support these fanciful assertions.  The allegedly manipulative trading at issue is plainly and far more plausibly routine, lawful market activity carried out by Defendants—all of which are market makers or broker-dealers—frequently on behalf of clients (as NWBO acknowledges).  This action is a transparent attempt by NWBO to scapegoat the Defendants for its own mismanagement and corporate governance failures[2] and is precisely the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

The Amended Complaint should be dismissed with prejudice for several independent reasons.  *First*, NWBO has not pled manipulative conduct with particularity.  NWBO's spoofing theory—as best it can be described—alleges that Defendants sought to drive down NWBO's stock price by placing so-called "Baiting Orders," which NWBO describes as "fictitious" offers to sell that Defendants never intended to be executed.  As purported support for this allegation, NWBO contends that Defendants (i) deliberately "parked" these "Baiting Orders" behind better-priced sale

---

[1]    Defendants are Citadel Securities LLC ("Citadel Securities"), Canaccord Genuity LLC ("Canaccord"), G1 Execution Services LLC ("G1X"), GTS Securities LLC ("GTS"), Instinet LLC ("Instinet"), Lime Trading Corp. ("Lime"), and Virtu Americas LLC ("Virtu").

[2]    *See* Nw. Biotherapeutics, Inc., Exchange Act Release No. 87281, 2019 WL 5088987 (Oct. 10, 2019) (describing NWBO's failure to, among other things, "file timely its annual report on Form 10-K for sixteen consecutive years," resolve material weaknesses in its internal controls, and other violations of the Exchange Act).

offers from just one other market participant, and then (ii) cancelled the "Baiting Orders."   Yet NWBO's own allegations show that Defendants' orders were competitively priced, often better than other market participants—they were not "parked" at all.   And NWBO admits it does not know whether *any* Defendant actually cancelled *any* "Baiting Orders."   In addition, NWBO's theory that Defendants displayed multiple "Baiting Orders" and then cancelled them *is impossible in the predominant venue in which Defendants trade NWBO*, which permits a market participant to display only one order at a time.   NWBO's own allegations illustrate that its spoofing theory is contrived, incoherent, and implausible.

Nor does NWBO even attempt to allege that any of the purported "Baiting Orders" had any effect on the market.   After Defendants presented NWBO with data (which NWBO does not and cannot contest) showing that the price of NWBO stock actually *went up* during many of the purported spoofing episodes, NWBO's Amended Complaint *simply removed all allegations regarding the price of its stock before the start of any purported spoofing episode*.   NWBO thus leaves Defendants—and the Court—with only its say-so that the so-called "Baiting Orders" "depressed" its stock price.   In an attempt to conceal this gap in its pleading, NWBO now offers a sham formula masquerading as quantitative analysis: a "price decline" calculation that *always generates a negative number, even when a share price increases*.   This is obviously insufficient.

As further evidence that NWBO's manipulative conduct theory is incoherent and implausible, it alleges that whether Defendants acted in one manner, or in the exact opposite manner, either constitutes market manipulation.   For example, after Defendants presented NWBO with data refuting the initial Complaint's allegations that they "did not sell any shares of NWBO" during certain two-minute periods, NWBO amended its Complaint to allege that "even if [Defendants] sold some shares . . . such sales would be consistent with . . . spoofing."   But NWBO's

spoofing theory relies on the allegation that Defendants did not sell shares in certain periods to show that the "Baiting Orders" were "fictitious"—that is why its initial Complaint was predicated on Defendants *not* selling any NWBO shares during those periods.  NWBO's new "heads-I-win, tails-you-lose" theory that Defendants manipulated the market *whether or not* they sold shares in certain periods cannot succeed.  The PSLRA does not permit NWBO to support its spoofing claims based on one set of facts or, alternatively, their exact opposite.

*Second*, NWBO fails to plead any inference of scienter, let alone the "strong inference" required by the PSLRA.  Just the opposite.  NWBO concedes—as it must—that the trading at issue "may have been executed  . . . for client accounts."  This destroys any suggestion that Defendants acted with manipulative intent.  Defendants are all registered broker-dealers that take and display orders from their clients.  These clients—not the Defendants—decide whether and when to place an order and at what price.  Even if NWBO could articulate a theory by which Defendants could be held liable for their clients' trading decisions—and it does not and cannot do so—NWBO does not even attempt to plead that the *same client* placed both the alleged "Baiting Order" and the corresponding "Executing Purchase."  NWBO alleges, as it must, that Defendants are market makers and broker-dealers that executed trades on behalf of clients, but nonetheless asks the Court to pretend that all of the trading identified in the Amended Complaint should be attributed to the Defendants themselves, as would be required for its spoofing theory.

NWBO also offers no rational economic explanation for Defendants' purported manipulation.  NWBO asserts that each Defendant "sold shares of NWBO both before and after" the purported spoofing episodes, "which enabled [them] to convert profits from [their] spoofing."  As an initial matter, NWBO's new allegation that Defendants sold shares at a profit (after the share price supposedly rebounded) sits squarely at odds with its claims that Defendants "continuously"

drove down NWBO's share price over the five-year period with "permanent" impacts.  In any event, in selecting these "before and after" sales, NWBO simply cherry-picks *any* sale within a *six-day* window that purportedly supports its theory, without even attempting to tie the sales to the particular "Executing Purchase" or even alleging that the sales were on behalf of the Defendants themselves as opposed to their clients.  In so doing, NWBO plucks sales at will from within this six-day window, asking the Court to ignore the facts and conclude that the cherry-picked comparisons give rise to market manipulation claims against Defendants.  Under NWBO's theory, a Defendant can be liable for securities fraud if a Defendant's client completed an "Executing Purchase" on Wednesday, and that purchase was profitable as compared to a *different client's* sale on Monday or Friday.

*Third*, NWBO has not adequately pled loss causation because it fails to allege both price decline and that it suffered any loss.  Having omitted from the Amended Complaint any allegation concerning the price of its stock before the purported spoofing, NWBO does not allege that the prices at which it sold stock were higher, lower, or the same as the prices before the alleged manipulation.  NWBO relies only on its sham "price decline" formula which always shows a decline, even when the price of its stock increases.  And NWBO's stock price *did* increase—it more than doubled during the "Relevant Period."  Against this backdrop, NWBO's naked assertion that *every single sale* of its stock from January 2018 to July 2022 was at a price artificially depressed by Defendants' spoofing is woefully insufficient and fails to establish any loss.

*Finally*, a simple review of the quote and anonymized trading data on which NWBO claims it relies—which the Court may consider on a motion to dismiss—confirms that Defendants were simply engaged in routine market activity.  As described in detail below, the trading data shows that (i) Defendants' purported "Baiting Orders" were often better-priced than orders from other

market participants; and (ii) NWBO's share price *increased* during many of the alleged spoofing episodes, contrary to NWBO's allegation that the Defendant drove down NWBO's share price.

At bottom, NWBO's claims are internally inconsistent, refuted by its own allegations, and disproven by the data on which it purports to rely. Stripped of its fallacious reasoning and nefarious labels, NWBO's pleading alleges nothing more than registered and highly-regulated broker-dealers, often acting on behalf of clients, facilitating orders and providing liquidity to securities markets. This is bedrock market-making activity that the Securities and Exchange Commission has explained is an "indispensable part of an efficient and liquid market."[3] Yet NWBO's contrived theory would convert routine, regulated market making in virtually every stock in every trading venue across the country into securities fraud, flooding the courts with frivolous copycat lawsuits attempting to end-run the PSLRA, potentially upending the entire U.S. equity market system. Indeed, since the initial Complaint, different plaintiffs' lawyers have already filed a copy-and-paste complaint on behalf of another company making the same "Baiting Orders" allegations. Permitting NWBO's claims to proceed to discovery would invite every publicly traded company to try out the same frivolous arguments in the hopes of a windfall, undermining the core purpose of the PSLRA and permitting "a never-ending tide of securities lawsuits [to] flood the courts." *Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007).

## **FACTUAL BACKGROUND**

### A.    The Parties

NWBO is a clinical-stage biotechnology company that has never received approval for a single drug. ¶ 2.[4] Although the Amended Complaint alleges that NWBO has experienced a "string

---

[3]  Exhibit 1 to the Declaration of William A. Burck in support of Defendants' Motion to Dismiss ("Ex."), Comm'r Luis A. Aguilar, *U.S. Equity Market Structure: Making Our Markets Work Better for Investors*, SEC. EXCH. COMM'N, (May 11, 2015), https://www.sec.gov/news/statement/us-equity-market-structure.

[4]  Citations to the Amended Complaint are made by reference to the relevant paragraph number therein.

of encouraging news about its lead product," in reality NWBO has suffered several crises, including that NWBO's lead drug "perform[ed] worse than a placebo" and other reported criticism of its drug development efforts;[5] regulatory concerns about changing "endpoints" for its clinical trials;[6] and an SEC enforcement action related to long-standing material weaknesses regarding its internal controls over financial reporting.[7]  NWBO's shares currently trade at around $0.57, and have not traded over $1.00 for months, aside from a momentary spike around the time NWBO filed its initial Complaint.[8]  Defendants are SEC-registered broker-dealers and, in that capacity, regularly trade on behalf of clients.  ¶¶ 38, 287.  Most of the Defendants also function as market makers, providing liquidity by publicly displaying proprietary quotations to buy and sell OTC equity securities.[9]

### B.      The OTC Trading Venues

Since being delisted from Nasdaq in 2016 for violating certain exchange rules, NWBO's stock has traded publicly on the "over the counter" ("OTC") market.  NWBO alleges that the purported spoofing took place on two OTC trading venues, NYSE ARCA Global OTC ("Global

---

[5]   *E.g.*, Ex. 2, Adam Feuerstein, It took years, but the failure of Northwest Bio's brain cancer vaccine is now in the open, STAT NEWS (May 10, 2022), https://www.statnews.com/2022/05/10/it-took-years-but-the-failure-andfutility-of-northwest-bios-brain-cancer-vaccine-is-now-in-the-open/.  The Court may take judicial notice of each of the publicly-available documents cited in this memorandum.  *See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (court "may also look to public records . . . in deciding a motion to dismiss"); *In re Citigroup, Inc.*, 2011 WL 744745, at *3, 9 (S.D.N.Y. Mar. 1, 2011) (taking judicial notice of SEC Order, disclosure statements, and website and prospectus excerpts), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012); *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 297 n.2 (S.D.N.Y. 2010) (considering "supplemental documents" to "inform the competing inference analysis required by *Tellabs*").

[6]   *See* Ex. 3, (NWBO 2019 Form 10-K) at 30 ("There can be no assurance that the regulatory authorities will find this to be an approvable endpoint."); Ex. 4 (NWBO 2020 Form 10-K) at 16.

[7]   *See supra* n.2.

[8]   *See* Ex. 5, NWBO December 9, 2016 Form 8-K; *see also* Ex. 6, NWBO (U.S.:OTC), Yahoo! Finance (July 12, 2023).

[9]   Instinet and Lime are agency broker-dealers (not market makers) that do not engage in proprietary trading for profit. *See* ¶ 25 (Instinet), ¶ 30 (Lime).  They conduct no trading of NWBO stock for themselves and operate platforms that allow their customers to make their own trading decisions.

OTC") and OTC Link LLC ("OTC Link").  ¶ 10.[10]  Global OTC is a centralized trading platform that, similar to exchanges like Nasdaq, directly matches buyers and sellers for automated executions.  OTC Link, by contrast, is an inter-dealer quotation system that allows broker-dealers to display quotes to buy (known as a "bid") and sell (known as an "offer") and negotiate trades directly with other market participants.  ¶ 8 n.3.[11]  OTC Link is, by far, the most commonly used venue by broker-dealers to display quotes to buy and sell OTC equities such as NWBO, and it is used by the majority of the Defendants here (and exclusively by three of the seven).[12]

These differences between OTC Link and Global OTC are significant in light of NWBO's allegations.  In particular, OTC Link permits market participants to *display only one bid and one offer per security at a time*, ¶ 8 n.4, consisting of their single best bid and single best offer.  Broker-dealers using OTC Link must generally update their currently displayed quote if they receive an order from a client at a better bid or offer.[13]  As a result, when a broker-dealer's displayed best bid or offer changes, it does not necessarily mean that the previously displayed order was cancelled.  Rather, even if a bid or offer is no longer displayed, the broker-dealer may continue to retain the previously displayed client order, which may be redisplayed if that order once again becomes the

---

[10]  General characteristics of OTC markets, including that OTC Link involves dealer-to-dealer trading instead of centralized execution, are subject to judicial notice by the Court as facts that are "generally known within" the District. *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2021 WL 3863372, at *3 n.24 (S.D.N.Y. Aug. 30, 2021) (taking "judicial notice of the fact that securities on the OTCQX are quoted on OTC Link"); *see supra* n.5.

[11] *See also* Ex. 7, *Over-the-Counter Market*, SEC. EXCH. COMM'N, https://www.sec.gov/divisions/marketreg/mrotc (explaining that OTC Link provides this capability to broker-dealers on its platform).  The Court may take judicial notice of SEC documents.  *See supra* n.5.

[12]  Canaccord, Citadel Securities, G1X, GTS, Instinet, and Virtu trade NWBO on OTC Link, with Citadel Securities, G1X, and Virtu trading NWBO exclusively on that platform.  Ex. 8, *Broker Dealer Directory for Trading on OTC Markets*, OTC MARKETS GRP., INC., https://www.otcmarkets.com/otc-link/broker-dealer-directory.  The Court may take judicial notice of OTC Markets' website.  *See supra* n.5.

[13]  *See also* Ex. 9, *OTC Link FIX Quot. Serv.—"FIXIE Quote" Client Specification 14*, OTC MARKETS GRP., INC., (Feb. 28, 2023), https://www.otcmarkets.com/files/FIXIE_Quote_Spec.pdf (showing that participants will receive error code "105" if they attempt to disseminate two or more quotes for any given security).  The Court may take judicial notice of OTC Link rules.  *See supra* n.5.

broker-dealer's best bid or offer.[14]  As discussed in detail below, these unique features of trading

on OTC Link mean that it is not possible for a market participant to *display*, or for other market

participants to *see*, more than a single order on OTC Link from any market participant at any time.

### C.    Purported "Spoofing" Of NWBO Shares

NWBO alleges that Defendants—separately, without coordinating their activities—each

purportedly "spoofed" NWBO stock on thousands of occasions during the exact same period from

December 5, 2017 to August 1, 2022.  ¶ 1.[15]  Yet the Amended Complaint sets out just sixteen

"example episodes" of purported spoofing, which follow the same pattern:

*First*, NWBO alleges that, during a two-minute period, a Defendant placed "Baiting

Orders"—offers to sell, generally at a range of prices, which allegedly were "never intended" to

be executed, but instead were purportedly placed to create "an appearance of a downward trending

market."  ¶¶ 8, 76.  NWBO does not allege how many orders were placed, when each order was

placed, or whether the orders were submitted on behalf of a client or for the Defendant's own

account, and generally fails to allege the volume and price of each order.

*Second*, NWBO alleges that at least some (NWBO does not say how many) of Defendants'

"Baiting Orders" were "parked" behind a lower-priced offer of a single other market participant.

*E.g.*, ¶¶ 86, 237.  According to NWBO, this "parking" establishes that these "Baiting Orders" were

"extraordinarily unlikely to be executed" and thus "fictitious."  *E.g.*, ¶¶ 262-63.  NWBO does not

---

[14]   For example, suppose Client A places an order to buy at $1.01 and Client B places an order to sell at $1.04 with the same broker-dealer.  That broker-dealer's displayed quote would be $1.01 x $1.04.  Then suppose Client C places a buy order at $1.02 with the same broker-dealer.  Because $1.02 is a better bid than $1.01, and because the platform only allows broker-dealers to display a single bid and offer per security, the broker-dealer must update its quote to $1.02 x $1.04.  Client A's order at $1.01 is no longer displayed, but has not been cancelled and is still active and waiting to be redisplayed (if, for example, Client C's order at $1.02 is executed).

[15]   Despite references to "Defendants' scheme," *e.g.*, ¶ 1, NWBO nowhere alleges that Defendants conspired or otherwise coordinated any activities.  NWBO does not attempt to explain why or how Defendants all purportedly alighted on identical but uncoordinated schemes to spoof the same stock over the same arbitrary five-year period.

explain how or why it selected the third-party market participants for these "parking" claims, and it makes no allegations concerning the prices displayed by any other market participants or how Defendants' "Baiting Orders" compared to any other participants.   NWBO also alleges that Defendants' offers to sell were "parked" regardless of whether the offers were displayed earlier or later in time than the offers they were purportedly "parked" behind.  *E.g.*, ¶ 86 n.18.  In other words, for multiple episodes NWBO attempts to blame Defendants for "parking" their orders behind other orders *that had not even been placed at the time the order was purportedly "parked*."

*Third*, NWBO alleges that the so-called Baiting Orders "successfully induced" other market participants to enter sell orders, purportedly driving down the price of NWBO shares.  ¶ 74. These allegations are wholly conclusory; NWBO does not identify any other market participants that reacted to Defendants' purported "Baiting Orders."  In fact, NWBO alleges no facts at all to support the critical claim that other market participants were induced to do anything by the so-called "Baiting Orders."

*Fourth*, NWBO alleges that after the two-minute period in which the Defendant placed the so-called "Baiting Orders," the Defendant made "Executing Purchases" to acquire NWBO shares at purportedly "depressed" prices.  *E.g.*, ¶ 85.  Incredibly, after Defendants identified errors in NWBO's trading data,[16] NWBO attempted to elude these inconvenient facts by *affirmatively removing* the initial Complaint's allegations regarding the pre-"spoofing" prices, and thus NWBO does not and cannot plead that the execution prices were in fact "depressed," or that those prices changed at all as a result of the purported spoofing.

*Fifth*, NWBO alleges that after making the "Executing Purchases," the Defendants began

---

[16] As Defendants previously informed NWBO, and as explained below in Section II, publicly available data shows that many of the "Executing Purchases" were actually at prices *higher than* the pre-spoofing best price—which refutes a critical premise of NWBO's "spoofing" theory.

cancelling the "Baiting Orders," and cancelled them all within two minutes of the so-called Executing Purchase. *E.g.*, ¶ 88. After Defendants explained in their initial motion to dismiss that an order may no longer be displayed on OTC Link for many reasons other than cancellation, NWBO amended its complaint to allege that Defendants *may* have "cancelled" the "Baiting Orders" *or* some *unidentified* "equivalent order[s] previously placed by that Defendant."   ¶ 84 n.17.   NWBO does not even attempt to explain what these supposedly "equivalent orders" are; NWBO is attempting to establish securities fraud without telling Defendants (or the Court) the absolute basics of which orders were placed and when, which orders were cancelled or executed and when, or whether there is any overlap between the two.   Similarly, NWBO claims that during this period of cancellation, Defendants "did not sell any shares of NWBO, which is consistent with the fictitious nature of the Baiting Orders." *E.g.*, ¶ 85.   After Defendants provided NWBO with uncontestable data showing that Defendants indeed *did* sell shares of NWBO during the purported cancellation periods, NWBO added the fundamentally inconsistent allegation that "even if [the] Defendant[s] sold some NWBO shares during this episode, such sales would be consistent . . . with spoofing." *E.g.*, *id.*

*Finally*, NWBO alleges that Defendants "profit[ed]" by "[selling] shares of NWBO both before and after [the purported] Spoofing Episode," *e.g.*, ¶89, identifying some purported sales generally within an arbitrary *six-day* period surrounding each *two minute* "spoofing episode," *see, e.g.*, ECF 102-1.   NWBO did not select these allegedly profitable sales because they were connected with the relevant "Executing Purchases," or even because they were executed on behalf of Defendants themselves (as opposed to Defendants' clients).   To the contrary, NWBO picked *any* sales within this six-day window—an eternity in trading time, especially where NWBO's spoofing allegations turn on mere seconds.   Indeed, the Amended Complaint does not contain even

the most cursory allegations to connect the alleged "Executing Purchases" to these cherry-picked sales, to connect the sales to any Defendant (as opposed to a client), or even to connect the sales or the Executing Purchases to the *same* client. By definition, if Defendants *did not buy and sell on their own behalf, they could not have profited from the scheme.*[17] NWBO also alleges that "*if* [a Defendant's] sale created a short position that was closed out by the Executing Purchases at the artificially depressed price" then the Defendant would realize a profit. *E.g.*, ¶ 247 (emphasis added). This is cursory, admitted speculation, yet it is the only other allegation that any Defendant profited from the alleged spoofing.

NWBO alleges it sold stock "at share prices artificially depressed" by Defendants' purported spoofing. ¶ 288. It attaches as an exhibit a chart of every sale NWBO made during the purported "Relevant Period" and simply asserts that *every single sale* from January 2018 to July 2022 was at a price artificially depressed by Defendants' spoofing. ¶ 289; ECF 95-2. NWBO also includes a chart purportedly identifying the 51 days between January 2018 and March 2022 on which NWBO's stock sales coincide with alleged spoofing episodes. But NWBO expressly alleges that the price at which it sold its shares was tied to the closing price on a given day—*i.e.*, after any purported "spoofing episode" had long since concluded. ¶ 289.

In addition to sixteen "example episodes" and charts that lack meaningful details of purported market activity, NWBO appends an exhibit purporting to show 2,848 "spoofing episodes." That exhibit does not include even a suggestion of "parking," cancellation of "Baiting Orders," or that there were periods that Defendants "did not sell any shares" in certain periods, and thus fails to contain any of the indicia that purportedly transform routine sell orders into

---

[17]   And even those limited alleged "profit[able]" sales contradict NWBO's allegation that Defendants' purported spoofing caused "persistent" and "long-lasting" declines in the price of NWBO stock, which presumably would result in Defendants suffering losses—not gains—on their purported "Executing Purchases." ¶¶ 292, 295.

"spoofing."  *See* ECF 102-1.

**ARGUMENT**

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  This requires—under both the PSLRA and Rule 9(b)—that a plaintiff "state with particularity the circumstances constituting fraud."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also ATSI*, 493 F.3d at 101 ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).").

**I.     NWBO'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED**

To plead market manipulation under Section 10(b) of the Exchange Act, NWBO must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.  Similarly, to plead a claim under Section 9(a)(2), NWBO must "identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors."  *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010).  "The analysis of claims under Section 9(a) 'closely parallels' the analysis of claims under Section 10(b)."  *Stone Family Trust v. Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).  NWBO's Exchange Act claims should be dismissed for four independent reasons: its failure to adequately plead (1) manipulative acts; (2) scienter; (3) loss causation; and (4) reliance on an assumption of an efficient market.

**A.     NWBO Does Not Adequately Allege Manipulative Conduct**

To satisfy Rule 9(b), NWBO must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the

scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102.  The Amended

Complaint falls well short of these requirements.

### 1. NWBO's "Baiting Orders" allegations are internally contradictory, refuted by NWBO's own allegations, and impossible.

NWBO's allegations regarding "Baiting Orders"—the mechanism by which Defendants

purportedly manipulated the market—fall far short of the PSLRA's exacting pleading standards.

Applying even cursory scrutiny to NWBO's allegations reveals that *every single indicia* NWBO

alleges to support its "fictitious Baiting Orders" theory is contradicted by its own allegations,

refuted by accurate trading data, or impossible in the relevant markets.

*First*, NWBO alleges that the "Baiting Orders" were "never intended" to be executed, and

thus "fictitious," because they were cancelled.  But NWBO does not—and cannot—plead with

particularity that any so-called Baiting Order was actually cancelled.  It alleges in cursory fashion

that Defendants each displayed various "Baiting Orders" over a two-minute period and began

canceling those orders after the corresponding "Executing Purchase."[18]  But replacing an order

with another order does not mean the prior order was cancelled.  Because, as NWBO

acknowledges, a participant on OTC Link can display only one order at a time, ¶ 8 n.4, a Defendant

broker-dealer will update its quote if it receives a better-priced client order (which it is generally

required to display) and may also update the quote when a displayed order is filled.[19]  NWBO's

concession thus destroys its spoofing theory as applied to any OTC Link trading.

The correct understanding of how OTC Link works disproves another fundamental piece

---

[18]  *See, e.g.*, ¶¶ 88, 102, 116, 130, 144, 158, 171, 184, 191, 205, 218, 232, 239, 246, 253, 260.

[19]  After Defendants explained this to NWBO in their first motion to dismiss, rather than address this inaccuracy, NWBO redefined "cancellation" to mean any reduction in displayed share volume.  ¶ 64 n.11.  Under this tortured definition, even reducing a quote by one share purportedly "cancels" the quote (and thus supposedly shows manipulation).  And NWBO alleges no facts suggesting that a change to the quotes at issue means they were cancelled or, even if they had been, that cancellation of a quote was manipulative.

of NWBO's theory: that Defendants placed multiple "Baiting Orders" before cancelling any of them.  NWBO alleges that "[i]mmediately *after* executing the Executing Purchases . . . , the spoofer cancels *all* of the Baiting Orders to sell, which completes the spoofing cycle."  ¶ 57 (emphasis added).  This allegation is necessarily false.  As NWBO admits, a "market participant is allowed to show only one order" at a time on OTC Link. ¶ 8 n.4, and a Defendant thus could not have displayed *multiple* orders.  The Court "is not required to accept as true an allegation contradicted by Plaintiff's own evidence," and the falsity of these core "Baiting Order" allegations is fatal to NWBO's claims. *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 162 (S.D.N.Y. 2020).

*Second*, perhaps realizing that its allegations are impossible, NWBO now admits that the so-called Baiting Orders *may not have been cancelled at all*, even though that is the crux of NWBO's theory.  NWBO alleges that Defendants may have instead "cancelled" "an equivalent order previously placed by that Defendant on the over-the-counter markets."  ¶ 84 n.17.  NWBO fails to explain what it means by "equivalent," making it impossible to identify which supposedly cancelled orders it claims made up the purported manipulative scheme.  In any event, this is entirely inconsistent with NWBO's argument that Baiting Orders were "not intended to be executed" and were placed only to drive down the price of NWBO.  ¶ 8.  If Baiting Orders were not actually cancelled and instead were executed, they are not "Baiting Orders" at all.

But even accepting *arguendo* that NWBO's allegations were sufficient to plead that purported "Baiting Orders" were cancelled, NWBO admits that Defendants "may have" been merely displaying bids and offers on behalf of clients.  ¶ 38.  There is no allegation that the "Baiting Orders" were even placed or cancelled by the *same* client that placed the bids to purchase shares; the bids and offers could be placed by completely unrelated customers and have absolutely no relation.  Moreover, the cancellation of an order is an expected and common aspect of trading in

modern equity markets—in fact, *only a "few percent" of equity orders are executed, and the "majority" are cancelled*.[20]  NWBO fails to allege why the cancellation of an order, on its own, creates an inference that the order was not intended to be executed.  *See DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 30-31 (2d Cir. 2014) (pejorative labels "are not facts, and certainly not facts sufficient for Rule 9(b)").

*Third*, NWBO claims that Defendants entered "Baiting Orders" they knew would not be executed because there were orders from another market participant at better prices in the market (*i.e.*, the "Baiting Orders" were "parked" behind better-priced offers to sell and were therefore "away from the market").  *E.g.*, ¶ 86.  However, multiple market makers displaying bids and offers at different prices is a defining feature of OTC markets, and thus NWBO's allegations that a single other market participant displayed a better price than a Defendant does not establish that the Defendant's order was "parked" or "away from the market."  ¶ 86 n.18.[21]  Relatedly, because NWBO does not allege the price of its stock at the start of the purported "spoofing episode"—that is, when Defendants purportedly began placing the "Baiting Orders"—it fails to plead with particularity that those offers to sell were "away from the market" at all.  *Id.*

Indeed, in more than half of the sixteen "example episodes," many of the alleged "Baiting Orders" were at *better prices* than the offers of the one market participant the Defendant supposedly "parked" behind.[22]  For instance, on October 12, 2020, Citadel Securities is alleged to have placed "Baiting Orders" at prices ranging from $1.03 to $1.05 per share.  ¶ 84.  NWBO

---

[20]   Ex. 10, *The Speed of the Equity Markets*, Sec. Exch. Comm'n, (Oct. 9, 2013), https://www.sec.gov/marketstructure/data-highlight/speed-equity-markets.

[21]   Considering there were seven Defendants and numerous other market participants (including NWBO's so-called "unsuspecting traders") displaying orders for NWBO during the "Relevant Period," the vast majority of all orders—all but the single best order—would qualify as "parked" under NWBO's allegations, further demonstrating the facial implausibility of its spoofing theory.

[22]   E.g., ¶¶ 84, 86, 98, 100, 112, 114, 126, 128, 167, 169, 187, 189, 214, 216, 235, 237, 242, 244.

alleges that Citadel Securities "parked" these "Baiting Orders" behind orders from the Vertical Trading Group, which allegedly displayed offers to sell at $1.04, a *worse price* than some of Citadel Securities' alleged Baiting Orders. ¶ 86. Even by NWBO's own allegations, these so-called Baiting Orders included offers that were priced lower than Vertical Trading Group's offers and were therefore not "parked" behind anything.[23] NWBO's pleading is thus fundamentally inconsistent with its spoofing theory because many of the supposed Baiting Orders were *more likely* to be executed than other orders NWBO alleges were in the market.

*Fourth*, NWBO alleges that orders to sell were in fact so-called Baiting Orders based on the fact that Defendants "did not sell any shares of NWBO" in the two-minute windows when they were placing "Baiting Orders." *E.g.* ¶ 85. But NWBO admits it does not know whether Defendants sold any shares while the "Baiting Orders" were pending. *See, e.g.*, ¶ 75 n.14 (executions on OTC Link are "not publicly visible" so NWBO "matched anonymized transactions from FINRA to changes in displayed OTC Link LLC quotes").

In fact, Defendants *did* sell shares during the relevant windows and informed NWBO as much. Knowing its guesswork resulted in false allegations, NWBO hedges, alleging that "even if" Defendants sold shares during the purported Baiting Period, such sales would be "consistent with" spoofing. *E.g.*, ¶ 85. NWBO cannot state a claim for securities fraud by alleging that if Defendants did not sell shares during certain periods, it is spoofing, but if Defendants did actually sell shares during those same periods, that is spoofing too.[24]

*Finally*, the Amended Complaint contains no allegations concerning the number of so-

---

[23] In response to verifiable market data provided to NWBO that disproves its allegations that offers to sell were "parked," NWBO amended its Complaint to add a number of caveats, including that "parking" is not necessary to establish spoofing (contrary to NWBO's twenty paragraphs spent discussing "parking"). ¶ 274.

[24] In any event, NWBO makes no attempt to explain how Defendants' alleged sales during "Baiting Periods" (during which Defendants are purportedly driving the price of NWBO *down*) would result in any profits to Defendants.

called Baiting Orders in each time frame or the timing of each order, and often fails to allege the price and volume of each order.[25]  Instead, NWBO merely alleges the total sum of shares offered and a range of times and prices, making it impossible to identify any particular "manipulative" offers, determine whether they were in fact "parked," whether they were cancelled, and whether they had any potential effect on the market.  The PSLRA demands far more specificity to plead market manipulation.

### 2. *NWBO fails to sufficiently plead that Defendants' alleged activity "depressed" the price of its shares.*

Even putting aside the glaring deficiencies in its "Baiting Orders" theory, NWBO also fails to sufficiently allege that the so-called Baiting Orders had any effect on the market, as is required to plead manipulative conduct.  *See ATSI*, 493 F.3d at 102 (plaintiff must allege with specificity "what effect the scheme had on the market for the securities at issue").

*First*, NWBO does not even attempt to substantiate its naked assertion that the "Baiting Orders" successfully induced the entry of sell orders from other market participants, driving the price of NWBO shares downward."  ¶ 87.  NWBO fails to identify the sell orders that were induced, the market participants that placed them, or the decrease in NWBO share prices.  Nor could it.  As NWBO acknowledges, a market participant on OTC Link may display only a single order at a time, and NWBO has not alleged—and cannot allege—that a *single* order artificially depressed the *entire* market for NWBO stock.

*Second*, NWBO fails to plead any decline in the price of its stock because it fails to allege the stock's prices—the best bid and best offer—at the start of each purported spoofing episode.  This is a glaring omission given that NWBO's theory depends entirely on the prices of its stock

---

[25]  *See, e.g.*, ¶¶ 84, 98, 112, 126, 167, 187, 214, 235, 242.

being "artificially depressed" by the purported spoofing. *See, e.g.*, ¶¶ 83-85, 97-99. As a result, there is no particularized allegation that the share price at the end of the spoofing episode is lower than at the start, and thus NWBO fails to sufficiently allege that the price of its stock decreased at all—let alone that purported spoofing caused any decrease. This defeats NWBO's claims, the entire premise of which is that Defendants drove the price of NWBO shares down by "spoofing." *E.g.*, ¶ 73; *ATSI*, 493 F.3d at 103-104 (affirming dismissal where plaintiff "pleads no particular connection between the negative reaction of the stock price and anything the defendants did").

It is notable that these stock prices are readily ascertainable and known to NWBO. NWBO alleges that it relied on "the complete stream of historical Level II quotes and executed trades reported to FINRA," ¶ 61 n.10, which includes this data. In fact, NWBO included these price allegations in its initial Complaint, and then omitted them from the Amended Complaint after being presented with verifiable data showing that its allegations were false, and that the actual prices refuted its claims of market manipulation. Indeed, as set forth below in Section II, NWBO's stock price actually *increased* during many of the purported "spoofing episodes."

*Third*, instead of alleging actual prices, NWBO purports to show its share price decreased because of the alleged spoofing through a faulty "Price Decline" formula that *always yields a negative result, even if stock prices actually increased*. ECF 102-1. NWBO defines "Price Decline" as the "peak-to-trough" change in prices over the relevant time period, and calculates the "price decline" as the difference between the lowest and highest transaction prices during the four minutes surrounding the "Executing Purchases," regardless of which came first. *Id.* A peak-to-trough calculation is not the same as the change in price—the lowest price (trough) will definitionally be less than or equal to the highest price (peak), so NWBO's "price decline" calculation always results in a negative number and does not in fact measure a decline in price.

For example, say a Defendant makes a hypothetical Executing Purchase for $1.10 at 2:00 pm.  To determine the "price decline," NWBO looks for the lowest price of all transactions back two minutes to 1:58 pm and forward two minutes to 2:02 pm, and the highest transaction price back two minutes to 1:58 pm.  ECF 102-1 n.1.  Consider, for example, what NWBO would allege based on its formula if transaction prices were $1.00 at 1:58 pm, rose to $1.10 by 2:00 pm, and then rose even further to $1.20 by 2:02 pm.  In this example, prices increased by 10% (from $1.00 to $1.10) in the two minutes before the Executing Purchase.  But NWBO's calculation would still generate a negative number: The lowest transaction price from 1:58 pm through 2:02 pm ($x$) is $1.00; the highest transaction price from 1:58 pm through 2:00 pm ($y$) is $1.10; and the "Price Decline," computed as $x/y$-1, is ($1.00/$1.10)-1 or -9.09%.  As this misleading "decline" figure is NWBO's sole price-decrease allegation, NWBO fails to plausibly allege—let alone with particularity—that its shares declined in price due to the alleged manipulative scheme or that there was in fact any spoofing.

*Fourth*, NWBO fails to adequately plead that Defendants profited from their purported "Executing Purchases" because it does not connect those purchases to corresponding stock sales. NWBO attaches as Exhibit 1 to the Amended Complaint a chart purporting to lay out various "Baiting Orders," "Executing Purchases," and a "Next Sale" made by the Defendant "within a three-day window" of the supposed Executing Purchase.  ECF 102-1 & n.2.  But NWBO does not allege that any of the "Next Sale[s]" by Defendants were sales of the stock purportedly acquired in the "Executing Purchase" at a depressed price.  *Id.* at n.2.  It alleges merely that the "Next Sale" is *a* sale "attributable to the Defendant at a price higher than the Executing Purchase" within a three-day window.  There is no allegation that the stock sold in this "Next Sale" has any connection whatsoever with the "Executing Purchase," which is particularly noteworthy given that NWBO

lists the exact same "Next Sales" for many so-called spoofing episodes alleged in its Exhibit.  *Id.*
In fact, there could have been intervening purchases and sales (almost a certainty considering the
Defendants are active participants in the OTC marketplace), and the stock sold in the "Next Sale"
by each Defendant could have been purchased at a higher price after the "Executing Purchase"
was made and sold at a loss.  *See ATSI*, 357 F. Supp. 2d at 719 (plaintiff's reliance on comparison
of "average of the five lowest prices during 'look-back period' to average [price of stock during
the thirty days prior to the look-back period]" was "ludicrous.").

### 3.   *NWBO's "trading records" contradict its spoofing claims.*

NWBO's 212 pages of so-called trading records, ECF 102-1, contradict its own claims.  As
an initial matter, for more than 1,000 of the 2,848 purported "spoofing episodes" alleged in
Exhibit 1, NWBO's own records show that Defendants' "Baiting Orders" were at prices making
execution *likely* because they were priced better (lower) than the alleged best offer displayed in
the market.[26]  This refutes NWBO's claim that the orders to sell were "not intended to be executed
and ha[d] no legitimate economic purpose."  ¶ 48.  For other so-called episodes, Defendants
allegedly bought shares at or above the prevailing best offer price, contrary to NWBO's claims
that they purportedly bought at artificially depressed prices *below* the then-prevailing best offer.[27]

Moreover, the "spoofing examples" listed in NWBO's exhibit inexplicably fail to include
the factual details of the spoofing steps present in the "example episodes" included in the text of
the Amended Complaint.  Nowhere in the exhibit does NWBO attempt to show, for example,

---

[26]  *E.g.* ECF 102-1 at 1 ("Baiting Orders" at $0.7199 with "Best Offer" of $0.77), 10 ("Baiting Orders" at $0.24 with "Best Offer" of 0.26), 20 ("Baiting Orders" at $1.98 with "Best Offer" at $2.01).

[27]   *E.g.*, ECF 102-1 at 8 (example showing Canaccord's purchase of 3,500 shares of NWBO on May 16, 2022 at a price of $0.6815 against a "best offer" of $0.68 ); *id.* at 71 (example showing Citadel Securities' purchase of 5,747 shares of NWBO on May 16, 2022 at a price of $0.7320 against a "best offer" of $0.73); *id.* at 203 (examples showing Virtu's purchases of 13,867 shares of NWBO on May 13, 2019 at a price of $0.3320 against a "best offer" of $0.33 and of 4,870 shares of NWBO on September 17, 2019 at a price of $0.2520 against a "best offer" of $0.25).

"parking" "Baiting Orders" behind offers to sell displayed by other market participants, or that a Defendant "did not sell any shares of NWBO" following the placement of so-called "Baiting Orders"—but those allegations are what purportedly separate regular offers to sell from "fictitious Baiting Orders."  Without alleging these details, NWBO has not even pled the elements of its own implausible spoofing theory.

**B.      NWBO Does Not Allege The Required Strong Inference Of Scienter**

Recognizing the risk that private securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law," *Tellabs*, 551 U.S. at 313, Congress in the PSLRA required plaintiffs to "plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors," *ATSI*, 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)); *see also id.* (scienter is particularly important in market manipulation cases because, often times, it "is the only factor that distinguishes legitimate trading from improper manipulation.").  To meet these "[e]xacting pleading requirements," NWBO must allege facts (i) to demonstrate "defendants had both motive and opportunity to commit the fraud," or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  NWBO—which admits that Defendants may have been acting on behalf of clients—fails to satisfy the "strong inference" requirement under either prong.

*1.      NWBO's admission that Defendants traded on clients' behalf eliminates any argument that Defendants acted with scienter.*

Under *Tellabs*, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. at 310.  In other words, the "court must consider plausible, nonculpable explanations for the defendant's conduct," and NWBO's theory must be "*at least as likely as* any opposing inference" that could be drawn from the facts as alleged or supplemental

facts.  *Id.* (emphasis in original).  It is not.  Rather than seven independent market makers and broker-dealers alighting on the exact same five-year spoofing scheme to consistently drive down the price of the same stock, the only compelling inference drawn from NWBO's allegations is that Defendants were engaged in routine market activity, frequently on behalf of their clients.

Defendants, as broker-dealers, routinely display bids and offers and effect transactions *on behalf of clients*, and it is the clients that set the terms of those orders.[28]  A stringent set of rules imposed and enforced by several regulatory bodies governs how Defendants must handle client orders and when Defendants must publicly display client orders via venues such as OTC Link and Global OTC.  *See, e.g.*, FINRA Rules 5310 (best execution obligation) and 6460 (Display of Customer Limit Orders).  Viewed against the backdrop of this regulatory regime, the alleged manipulative conduct—the purported displaying and then cancellation of so-called "Baiting Orders"—has an obvious alternative explanation: rather than spoofing the market, Defendants were simply displaying orders on behalf of clients, *as they are required to do*.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008) (imposing Rule 11 sanctions where only allegation against market maker was that it processed client orders in the ordinary course), *aff'd in part, rev'd in part*, 579 F.3d 143 (2d Cir. 2009); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) (alleged inference of widespread fraud "is not as strong as the inference of non-fraudulent activity drawn from the facts viewed collectively").

NWBO's own allegations support the far more compelling inference that the trading at issue was routine market activity by broker dealers facilitating client orders.  For example, NWBO asserts in conclusory fashion that much of the purported spoofing occurred on May 10, 2022, when

---

[28]  In fact, the only kind of trading Instinet and Lime did in NWBO stock was to allow their clients to place their own orders over the companies' platforms.  Even if any of Instinet's or Lime's client had ever spoofed NWBO stock during the five-year period alleged, it would be baseless and legally insufficient to attribute a client's scienter to one of the Defendants.

NWBO's stock declined despite supposedly "excellent news" about a drug trial.   ¶ 73.   But it is not surprising—or suggestive of fraudulent intent—that there was significant interest in selling NWBO stock on May 10, 2022, given reporting that NWBO's drug "perform[ed] *worse than a placebo*."[29]   As another example, NWBO's own allegations reveal that, *before* the alleged "spoofing," there was far more interest in selling NWBO stock than buying it.   *E.g.*, ¶¶ 125 ("On October 27, 2020 at 10:27:42, the best bid and offer for NWBO as calculated by [NWBO] was a bid to purchase 2,990 shares at a price of $1.16 per share and an offer to sell 57,655 shares at a price of $1.17 per shares"), 139, 227, 234.   This is true throughout the "Relevant Period," which brought NWBO several crises, including criticism of key drug development efforts; changing "endpoints" for clinical trials, which it acknowledged regulators did not always accept; and other governance failures and investigations.[30]   Thus, the activity NWBO labels "spoofing" was consistent with the "pre-spoofing" trade flow, and more likely reflects the facilitation of client orders to sell, as the market as a whole often disfavored the stock.

## 2. *NWBO's spoofing theory does not support a "concrete and personal benefit."*

To plead a strong inference of scienter through allegations of motive and opportunity, NWBO must allege "a concrete and personal benefit . . . resulting from the fraud."   *Kalnit v. Eichler*, 264 F.3d 131,139 (2d Cir. 2001).   "Motives that are generally possessed by most corporate directors and officers do not suffice."   *Id.*   NWBO's two-sentence allegation that "profits" were a "strong motive" for Defendants falls far short for at least three reasons.

*First*, Defendants had no motive to profit because, for many of the transactions, they *could not profit*.   As discussed above, Defendants—mostly market makers and all registered broker-

---

[29]   *See supra* n.5.

[30]   *E.g.*, *supra* nn.5-8.

dealers—frequently traded on behalf of clients, or, for Instinet and Lime, only allowed clients to trade on their platforms, in the ordinary course of business.  It is Defendants' clients, and not Defendants, who stood to profit from any trading done on the clients' behalf.  NWBO attempts to plead around this obvious structural flaw in its theory by claiming, without factual support, that Defendants were motivated to help clients "spoof" for "commissions" and "fees."  ¶ 287.  But it is black letter law that this generic profit motive allegation is insufficient to plead scienter.  *See, e.g.*, *Union Cent. Life Ins. Co. v. Ally Financial, Inc.*, 2013 WL 2154220, at *3 (S.D.N.Y. March 29, 2013) ("Plaintiffs' allegation that the UBS Defendants had a motive to grow profits and generate commissions is also totally insufficient to demonstrate scienter.").  And in any event, NWBO pleads no facts whatsoever regarding any Defendant's supposed "commissions, fees, or other forms of compensation" that purportedly motivated them to commit (or, more accurately, allow their clients to commit) securities fraud.  This naked allegation falls far short of the particularity required to plead the required strong inference of scienter.  *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) ("Plaintiff's conclusory allegations regarding Defendants' motive . . . to obtain fees for services . . . are insufficient.").

*Second,* the Amended Complaint fails to allege whether the same party was on both sides of the market (*i.e.*, that both the purported "Baiting Orders" and "Executing purchases" were on a Defendant's own behalf, rather than for different clients).[31]  This is likewise fatal to NWBO's claims:  without specific allegations that the corresponding "Baiting Orders," "Executing Purchases," cancellations, and subsequent sales were all on the Defendant's own behalf, there can

---

[31]  With respect to Instinet and Lime, moreover, the "Baiting Orders" and purchases were always only placed by customers, and yet there is no allegation that they were placed by the same customer.  Beyond speculation, there is no allegation of scienter even by Instinet or Lime's customers, much less those Defendants themselves.

be no inference of motive by Defendants to commit fraud.[32]  *See, e.g.*, *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts., Inc.*, No. 1:21-cv-00761-LGS (S.D.N.Y.) ECF 120 (noting that "[t]he allegations of the Amended Complaint to which Plaintiffs cite allege only the obvious fact that the named Defendants execute trades for customers, not that those trades give rise to liability," and explaining that plaintiff has "not articulated any plausible theory under which any currently named Defendant is liable for their customers' trading activity."); *see also Gamma Traders - I LLC v. Merrill Lynch Commods., Inc.*, 41 F.4th 71, 75 (2d Cir. 2022) (describing spoofing scheme as involving "one trader placing both buy- and sell-side orders in the same market"); *ATSI*, 493 F.3d at 105 (allegations that Defendant "knew or should have known of the manipulation" and that the plaintiff believed that Defendant "was a cooperating broker-dealer" were insufficient to plead manipulation or raise a strong inference of scienter).

*Third,* even ignoring NWBO's dispositive admission that Defendants' trades "may have been executed . . . for client accounts," ¶ 38, NWBO still fails to allege motive.  NWBO makes no particularized allegation that the purported spoofing caused the price of its stock to decrease, nor does it allege that Defendants profited from the purported spoofing because NWBO fails to connect the "Executing Purchase" to later sales.  *See supra* § I.A.2.

In addition to being implausible and not well-pleaded, this "better price" motive is legally insufficient.  *See, e.g.*, *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) (allegations that defendant manipulated stock price "to access additional

---

[32]  Even in *Harrington*, on which NWBO relied heavily in its prior pre-motion letter (ECF 75 at 2), the court found the scienter allegations only "tenuous" despite the *Harrington* plaintiff having alleged a significantly more economically coherent theory, 585 F. Supp. 3d 405, 412, 418 (S.D.N.Y. 2022).  In *Harrington*, the plaintiff alleged that defendants sold stock short, then drove down the price via spoofing to buy back shares at a lower price, thus closing the short position, and keeping the price difference as a profit.  *Id.* at 412.  The alleged spoofing and short sales thus allegedly "operated in concert," *id.*, making it at least theoretically possible to profit from the "cumulative impact of the spoofing episodes," *id.* at 418.  Here, by contrast, NWBO has not alleged with particularity a single instance where any Defendant profited from its supposed scheme.  Even accepting the truth of NWBO's incoherent allegations, they pale in comparison to those which the *Harrington* court found to be only "tenuous."  *See id.* at 421.

shares . . . at lower prices" "fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit."). NWBO claims in its "example episodes" that Defendants made small purchases of NWBO stock "below the prevailing best offer" at the time, but never pleads the price of its stock at the start of the "episode" or the decrease in the price as a result of the spoofing "episode."

Even comparing the "Executing Purchase" to the alleged best offer after the purported spoofing, the difference between the alleged prevailing best offer and the purchase price is often fractions of a cent.[33] For instance, NWBO alleges that two of the Defendants engaged in spoofing episodes on May 10, 2022 to obtain *one-one hundredth of a cent* discount compared to the alleged prevailing best offer price. ¶¶ 252, 259. And even where the difference is a full cent, NWBO alleges, for example, that a Defendant generated a return of only 0.641% on its purported spoofing scheme. ¶ 185. This "defies economic reason" and thus "does not yield a reasonable inference of fraudulent intent." *Kalnit*, 264 F.3d at 140-41; *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 608 n.9 (W.D. Va. 2002) (a "small" motivation does not give rise to the required strong inference of intent); *see also In re Duane Reade Inc. Sec. Litig.* 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) (holding that where a company had an expected annual outlay of $50 million in capital expenditures and a $79.3 million credit facility, it would be "illogical to commit fraud to save money on acquisitions totaling $4.7 million.").

### 3.       *NWBO fails to allege conscious misbehavior or recklessness.*

Because NWBO pleads no plausible motive, "the strength of the circumstantial allegations must be correspondingly greater." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan*

---

[33]  ¶¶ 87, 101, 115, 129, 143, 157, 170, 183, 190, 204, 217, 231, 238, 245, 252, 259.

*Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009).  NWBO attempts to plead fraudulent intent by rehashing many of its defective allegations of placement, "parking," and cancellation of "Baiting Orders."  ¶¶ 274-285.  NWBO's allegations of fraudulent intent—multiple market participants placing and cancelling quotes to buy and sell securities at different prices—are the very mechanism established by regulators through which prices are set every day in a functioning market.

NWBO's allegations concerning the "short time period [that elapsed] between the placement and cancellation" and the "concentration of cancelled" "Baiting Orders," ¶¶ 276-77, are plainly insufficient to establish manipulative intent.  Putting aside that NWBO concedes it cannot tell if any orders were actually cancelled, *see supra* at 14-15, *the overwhelming majority of orders in the equity markets are not executed, and the "majority" are cancelled*.  *See* Ex. 10.  NWBO's allegations regarding rapid cancellation also fail to show any misconduct, as "placing rapid orders and cancelling them does not necessarily evince illegal market activity," and "courts have recognized the ubiquity of rapid trading across securities platforms."  *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at \*9 (N.D. Ill. June 30, 2022).  And even if an order was cancelled, the more likely explanation is that a client cancelled the order *without manipulative intent*.

The nature of trading on OTC Link provides a far more compelling inference for NWBO's "cancellation" theory.  Because, as NWBO acknowledges, broker-dealers may only display one bid and one offer at a time, rather than an order being cancelled, the market participant may have received a better-priced order from a client that it was required to display as its bid or offer, or the client order that the bid or offer may have represented could have been filled.  *See CP Stone Fort Holdings, LLC v. Doe(s)*, 2016 WL 5934096, at \*5 (N.D. Ill. 2016) ("[T]here is nothing improper or illegitimate about placing passive orders in the order book and then reversing position" [*i.e.*, "cancelling the 'Deceptive Orders' and simultaneously entering 'Aggressor Orders' in the opposite

direction for the same security."]).

NWBO's allegation that Defendants "intentionally parked" "Baiting Orders" behind others to avoid execution, ¶ 274, similarly ignores market reality and contradicts the Amended Complaint. NWBO's own allegations show that most of the so-called "Baiting Orders" were in fact placed at *better* prices than the orders behind which they were allegedly "parked" or were placed *before* the better-priced offer—meaning they were not parked behind anything at all. *See supra* at 15-16. And in any event, it is common for market participants to display different bids and offers—that is the hallmark of robust price competition in our equity markets—further demonstrating NWBO's failure to plead manipulative intent. *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 207 (S.D.N.Y. 2020) ("active price competition" is one indicator of a competitive market).

Likewise, NWBO's spoofing theory is refuted by the fact that orders on OTC Link are not anonymous. Orders, volumes, and prices are attributed to specific market participants, and participants therefore knows which broker-dealer is quoting at what price. *See, e.g.*, Ex. 13. If, as NWBO alleges, each Defendant engaged in "thousands of spoofing episodes" over a five-year period, other market participants would have recognized that these purported spoofer's orders were "Baiting Orders" that were "not intended to be executed" and would, therefore, not have been "induc[ed] . . . to submit additional sell orders and artificially drive down [NWBO's] price." ¶¶ 61-62.

NWBO's argument that the so-called "Baiting Orders" themselves are indicative of scienter is circular. NWBO defines "Baiting Orders" as orders Defendants purportedly never intended to execute, but it provides no support for its bald assumption regarding intent. NWBO merely asserts—without any factual basis—that any time an order was purportedly cancelled, the

party that placed the order must have never intended to execute it, and the order therefore had "no

legitimate economic purpose." ¶ 8.  NWBO then labels such purportedly cancelled orders as

"Baiting Orders," ¶¶ 275-79, a term NWBO uses to refer to offers to sell based on an entirely

presumed manipulative intent.  *Compare* ¶ 8 *with* ¶ 282.[34]  Such circular reasoning, where the

evidence offered to support a claim is a repetition of the claim itself, cannot create a strong

inference of scienter.  *See, e.g.*, *C.F.T.C. v. Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30,

2018) (dismissing Commodity Exchange Act market manipulation claim reliant on "circular"

theory that prices were illegitimate because defendants intended to affect them); *In re MRU*

*Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("It is rather circular to say that

the Individual Defendants committed fraud by concealing their intent to commit fraud.").  Without

more, "Plaintiff[] fail[s] to allege sufficient facts underpinning [its] allegations that [] the cancelled

orders demonstrate a plan to deceive."  *Kessev Tov*, 2022 WL 2356626, at *10.

NWBO's conclusory allegation that Defendants "designed and implemented algorithmic

trading programs to execute their spoofing schemes" (¶ 267) is manifestly inadequate.[35]  As an

initial matter, NWBO acknowledges that the trades at issue may have been on behalf of clients,

and thus fails to allege that these purported "programs" were doing anything more than displaying

client orders, as Defendants were required to do.  Moreover, NWBO does not specify what

programs each of the seven distinct Defendants supposedly used to execute their schemes, who

ran the programs, or how those programs were used.  General assertions that Defendants—who

are in the business of trading—used "trading programs" and "algorithms" are not enough to

---

[34]  The same deficiency applies to the "Baiting Period" (which itself is not defined, *see* ¶ 62), and "Spoofing Episode," ¶ 65, both of which are baselessly defined by circular reference to "Baiting Orders."

[35]  Similarly, NWBO's conclusory allegation that "each of the Defendants has a history of violating various securities laws" adds nothing to the calculus.  This generalized assertion, unsupported and untethered from the facts alleged in this case, does not support an inference of scienter, let alone the required "strong inference."  *See, e.g.*, *Saraf v. Ebix, Inc.*, 2022 WL 4622676, at *7 (S.D.N.Y. Sep. 30, 2022).

establish a strong inference of fraudulent intent. *See Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 432-34 (S.D.N.Y. 2017) (dismissing complaint for failure to plead scienter where details about "E\*TRADE's trading algorithms" were not alleged). Commonplace algorithmic trading is not evidence of fraudulent intent. *See Kessev Tov*, 2022 WL 2356626, at \*1, \*9 ("placing rapid orders and cancelling them does not necessarily evince illegal market activity").

Further, NWBO pleads no facts showing any agent's or employee's intent that can be imputed to the company Defendants. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (requiring plaintiff to plead "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" when defendant is an entity). A lone conclusory allegation that "activities were approved by corporate officials," ¶ 268, is woefully insufficient without details of what was approved, when, and by whom. *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient" to establish scienter). NWBO does not allege, as it must, what trading practices were approved, when, or by which officials. Without alleging a single fact about what *any* employee (much less executive) of *any* Defendant knew about this supposed "scheme," NWBO cannot satisfy the high bar for pleading scienter. *See, e.g.*, *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at \*28 (S.D.N.Y. Apr. 2, 2020) (dismissing for failure to plead scienter where plaintiff did not sufficiently allege executives had knowledge of, or reckless disregard for, falsity).

## C.    NWBO Does Not Adequately Allege Loss Causation

To state a claim for market manipulation, NWBO must plead with particularity facts supporting a "legally cognizable loss" and a "causal connection between the [alleged manipulation or] material misrepresentation and the loss." *Cohen*, 722 F. Supp. 2d at 430 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). This requires NWBO to "allege that [it] suffered []

*specific* economic harm as a result of Defendants' conduct." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d at 307.[36]   NWBO fails to meet this standard.

> ## 1.   *NWBO does not adequately allege that Defendants' purported conduct caused a price decline.*

Critically, NWBO fails to adequately allege that Defendants' purported spoofing caused a decline in the price of its stock.   As explained above, NWBO omitted from the Amended Complaint any allegations regarding its stock price prior to each alleged spoofing "episode," and therefore cannot plead with the required specificity that the purported scheme drove down the price of its stock.   *See supra* at 18; *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1183 (N.D. Cal. 2004) (loss causation not pleaded where no decline in value was adequately alleged).   And NWBO's purported "Price Decline" calculation does not in fact show a decline in NWBO's share price.   Rather, NWBO employed a formula that always shows a negative value, even when NWBO's share price actually increased during the period at issue.   *See supra* at 18-19. Without specific allegations that Defendants caused a decline in the price of its stock, NWBO fails to allege damages or loss causation sufficient to sustain a securities fraud claim.

> ## 2.   *NWBO does not adequately allege that Defendants' purported conduct caused its loss.*

NWBO fails to sufficiently plead that Defendants' purported spoofing caused NWBO to sell shares at prices lower than it otherwise would have.   NWBO's naked allegation that every sale from January 2018 to July 2022 was affected by Defendants' alleged spoofing plainly fails under the heightened pleading standard and is also not plausible.   ¶¶ 288-89.   Even if NWBO was "regularly in the market and transacting throughout the [Relevant Period], while Defendants were also placing spoof orders, it does not follow that any particular trade of the Plaintiff[]—or

---

[36]   NWBO's loss causation allegations are similarly subject to the heightened pleading standard under Rule 9(b), *e.g.*, *Cohen*, 722 F. Supp. 2d at 432 n.9, but likewise fail even under Rule 8.

necessarily any of the trades made by Plaintiffs—would have been affected by Defendants' alleged manipulative conduct." *In re Merrill, BOFA, & Morgan Stanley Sec. Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. 2021).  This is so because "[m]anipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief."  *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018).

Significantly, NWBO does not claim that it sold *even a single* share (or that any of its sales were priced) during the brief windows of, at most, "one to two minutes" in which NWBO alleges its share price was artificially depressed by "spoofing."  ¶ 276.  By NWBO's own admission, the price at which NWBO sold its shares appears to have been (somehow) related to the closing price on a given day—*i.e.*, necessarily after any alleged "spoofing episode" had concluded.  ¶ 289.  NWBO cannot allege it suffered losses based on stock sales that occurred (or were priced) hours, days or weeks removed from the alleged spoofing.  *Dura*, 544 U.S. at 343 (recognizing that there are a "tangle of factors affecting price" and the "the longer the time between" the wrongful act and the sale, "the more likely that other factors caused the loss.").  "To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*."  *In re Merrill*, 2021 WL 827190, at *13.  The Second Circuit recently rejected similar allegations in *Gamma Traders*, affirming dismissal of a spoofing claim for failure to plead loss causation.  There, the "[c]omplaint provide[d] no factual basis that would justify an inference that the market price was still artificial by the time [plaintiff] traded."  41 F.4th 71, 80 (2d Cir. 2022).  The Second Circuit held that "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day."  *Id.*

NWBO's allegations that, following the purported manipulation, the Defendant "eliminat[ed] the artificial sell-side imbalance" and "dramatically revers[ed] the position it had taken only moments before" undermine any inference that NWBO's closing price—often occurring hours later—was impacted by any purported manipulation. ¶ 130. *See CP Stone Fort Holdings*, 2017 WL 1093166, at *6 (spoofing complaint failed to plead loss causation because plaintiff did not allege that the less favorable prices at which it allegedly transacted were "the result of the cancellation of the Deceptive Orders, rather than legitimate market forces").

Perhaps recognizing its failure to tie the alleged manipulative conduct to NWBO's losses, NWBO falls back on the theory that the alleged spoofing had a "long-term cumulative effect" that was "permanent" and therefore affected every single one of its stock sales. ¶¶ 60, 288, 292-94. NWBO alleges that this allows it to plead damage from stock sales *weeks or months* after any alleged spoofing.[37] NWBO cannot allege both (i) that Defendants profited from the alleged scheme by selling shares *above* what they paid and (ii) that the spoofing caused "persistent and long-lasting" *declines* in NWBO's stock price such that NWBO's sales weeks or months later were affected. ¶¶ 288, 292-94. This "long term" theory, like NWBO's other allegations of harm, renders its Amended Complaint internally inconsistent and squarely conflicts with precedent from this Circuit, in which courts have rejected spoofing claims where plaintiffs sought to allege a price effect continuing for even a single *day*, much less five years. *See Gamma Traders*, 41 F.4th at 80 (allegations in the Complaint insufficient to "infer that spoofing's effects last throughout the day"); *see also In re Merrill*, 2021 WL 827190, at *13 (spoofing that is only alleged to have lasted "a matter of seconds" would not necessarily impact the trades of others). NWBO's "long-term"

---

[37] For instance, two of NWBO's "example" spoofing episodes are in May 2022, but there is not a single "Pricing Date" for NWBO sales alleged after *March* 2022. ¶ 289. And, the next sale of NWBO stock is not alleged to have occurred until *July* 2022, two months later, and no "Pricing Date" is alleged for this sale. *See* ECF 95-2 at 11.

theory is also squarely contradicted by reality, as NWBO's stock price more than doubled during the "Relevant Period," increasing from $0.27 to $0.71.  Ex. 6 at 1-2.

Without alleging facts demonstrating that NWBO sold shares at a price affected by Defendants' purported spoofing, NWBO has "not specifically pleaded a causal link between any single stock purchase or sale and a corresponding [spoofing episode] by [any specific Defendant] or coordinated transactions by others." *Fezzani v. Bear, Stearns & Co. Inc.*, 777 F.3d 566, 572 (2d Cir. 2015) (affirming dismissal of market manipulation claim).

### D.   NWBO Does Not Adequately Allege Reliance

To plead a claim under Sections 9(a) or 10(b), NWBO must plead "reliance on an assumption of an efficient market free of manipulation." *ATSI*, 493 F.3d at 101.  This is an uphill battle in the OTC context, as OTC markets are typically illiquid.  NWBO fails to allege facts demonstrating that OTC Link and Global OTC—the markets on which NWBO was traded—are efficient markets.  Instead, NWBO merely asserts that "the market for NWBO was an efficient market" and adds to the Amended Complaint an inaccurate recitation of certain legal factors[38] sometimes considered when courts evaluate market efficiency.  ¶ 297.

Merely parroting an element of their securities fraud claim and factors sometimes considered in evaluating that element is insufficient to plead reliance, yet that is all NWBO does. NWBO alleges no facts supporting any market efficiency factor.  For instance, NWBO alleges that "NWBO shares traded at high weekly trading volumes" but alleges no facts regarding the volume

---

[38]  NWBO's allegations do not align with the factors typically considered by courts in the Second Circuit to determine market efficiency.  *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) (factors routinely considered are: "(1) the average weekly trading volume of the [stock], (2) the number of securities analysts following and reporting on [it], (3) the extent to which market makers traded in the [stock], (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the [stock's] price[ ].").  NWBO does not allege anything about the average weekly trading volume except that it was "high" and does not make any allegations regarding the other factors, except for factor (4).

of trading.  ¶ 297.  Similarly, NWBO alleges that "the market reacted promptly to public information disseminated by NWBO."  *Id.*  But NWBO does not allege a single instance where its stock price increased on purportedly positive news, and in fact alleges the opposite.  ¶ 73 (alleging stock price decline on day with purportedly positive announcements).   These allegations are insufficient.  *See In re Shanda Limited Sec. Litig.*, 2020 WL 5813769, at *2 (S.D.N.Y. Sept. 30, 2020) (recitation of factors considered for market efficiency insufficient where plaintiff did not allege a single increase in stock price associated with positive announcements); *see also Cohen*, 722 F. Supp. 2d at 434 (dismissing for failure to allege efficient market and explaining "plaintiff must specifically plead that the market in which [it] purchased the shares was efficient").

This is especially deficient in the context of OTC markets, which courts routinely hold are not assumed to be efficient without factual allegations demonstrating efficiency.  *See, e.g.*, *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 472 (S.D.N.Y. 2014) ("Plaintiffs' theory of reliance fails because they do not allege that the [OTC] Bulletin Board is an efficient market."); *see also Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) ("the Court is unaware of any court holding that the OTCBB" is efficient); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1252 (C.D. Cal. 2015) (collecting cases and noting "numerous courts have held as a matter of law that the OTC market is not efficient").

## II.     PUBLICLY-AVAILABLE TRADING RECORDS REFUTE NWBO'S CLAIMS

NWBO's claims should be dismissed for the additional reason that its allegations are refuted by the publicly-available trading data on which it claims to rely.  NWBO identifies the sole source for its trading allegations:

> The data utilized by [NWBO] to support the allegations in this [Amended] Complaint consist of the complete stream of order book messages on NYSE ARCA Global OTC, including cancellations and executions, provided directly by NYSE Data Services, as well as the complete stream of historical Level II quotes and executed trades reported to FINRA, provided directly by OTC Markets Group.

¶ 61 n.10.  As this identified trading data is "integral to the complaint," the data may be considered by the Court "in deciding the [] motion to dismiss, without converting the proceeding to one for summary judgment."  *Jurupa Valley Spectrum, LLC v. National Indem. Co.*, 2007 WL 1862162, at *5 (S.D.N.Y. June 29, 2007) (citation omitted).[37]  The complete stream of data refutes NWBO's spoofing theory, which relies on cherry-picked data in an attempt to manufacture securities fraud, and the Court "need not accept as true [NWBO's allegations] [because they] are contradicted by . . . materials amenable to judicial notice."  *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).

In fact, nearly all of NWBO's trading allegations are contradicted by the publicly-available data it claims to have relied on.  For example, the price of NWBO shares actually *went up* during many of NWBO's alleged spoofing episodes, the exact opposite of its claim that Defendants caused the price of its stock to decrease.  *E.g.*, ¶ 87.  NWBO's October 12, 2020 "example episode"—one of its only sixteen "examples"—is illustrative.  In that example, NWBO alleges that from 14:18:25 to 14:20:25, a Defendant placed Baiting Orders, which induced the entry of sell orders, "driving the price of NWBO shares downward," with the Defendant then allegedly purchasing shares "at a price of $1.02 per share, which was below the prevailing best offer of $1.04 per share."  ¶¶ 83-89.  But, as shown by the verifiable trading records purportedly relied on by NWBO, at 14:18:25 the best bid was $0.995 and the best offer was $1.00 per share.  *See* Ex. 11.  NWBO alleges that, after the purported spoofing, the best bid was $1.02 and the best offer was $1.04.  Therefore, the *price of NWBO stock went up* (not down) during the purported spoofing episode.  In fact, if the Defendant had purchased at $1.02 per share (as alleged, ¶ 89), then it paid

---

[37]  To the extent the Court determines that it cannot consider this data without converting the instant motion to one for summary judgment, Defendants respectfully request that the Court disregard the information and treat the motion as a motion to dismiss.

*a higher price than both the best bid and the best offer before the purported spoofing*.

These false allegations are not limited to the sixteen "example episodes" in the Amended Complaint.  Take, for example, the January 11, 2021, 9:51:10 "spoofing episode" in NWBO's exhibit, in which it alleges that the "Best Offer" was $1.48 and the Executing Purchase was $1.47.  ECF 102-1 at 40.  But two minutes before this purported "spoofing example," the best bid was $1.45 and best offer was $1.47, which means that the best bid *increased* to $1.47, and the "Best Offer" had *increased* to $1.48.  Ex. 12.  This issue—*i.e.*, the price *increasing* (rather than decreasing) during NWBO's "examples" of Defendants' purported spoofing—repeats throughout NWBO's Exhibit.  This refutes NWBO's entire spoofing theory—that the purported spoofing drove *down* the price of its shares.

NWBO's allegations regarding "parking" are likewise refuted by the verifiable trading records on which it purports to rely.  As described above, NWBO asserts that because some of a Defendant's sell orders were allegedly at higher prices than offers displayed by just one other market participant, they were "parked" and thus "extraordinarily unlikely to be executed."  *E.g.*, ¶¶ 86, 100, 114.  But *for every single one of the sixteen "example episodes"* that NWBO relies on to purportedly show spoofing, the publicly-available data shows that Defendants' offers were consistent with *or better than* those from other market participants.

For example, NWBO alleges that on October 12, 2020, from "[f]rom 14:18:25 to 14:20:25," Citadel Securities "parked" "10,850 shares of Baiting Orders at prices ranging from $1.05 to $1.03 per share" "behind orders placed by other unsuspecting traders," but identifies just one "unsuspecting" trader, Vertical Trading Group ("VTG").  ¶¶ 84–86.  Publicly available quote data, however, shows that Citadel Securities' offers to sell were in line with, and even better than, offers displayed by other market participants (including VTG)—and thus not "away from the

market," as NWBO falsely alleges.  *See* Ex. 11 (Citadel Securities showing offers to sell at better (lower) prices than other market participants).

Specifically, the publicly-available data NWBO purportedly relied on shows that when VTG displayed an offer at $1.09, Citadel Securities displayed a better offer at $1.05.  *See id.* Significantly, the data also shows that when Citadel Securities displayed an offer at $1.02, Vertical Trading Group displayed an offer at $1.04 (and that when Citadel Securities displayed an offer at $1.05, VTG displayed an offer at $1.09).  Under NWBO's theory, VTG was thus "parking" behind Citadel Securities—the opposite of what NWBO alleges.  *See id.*

Likewise for the other 15 "example episodes" alleged by NWBO, the complete stream of data confirms that the Defendant's so-called "Baiting Orders" were not "parked," *e.g.*:

- October 15, 2020 "Example Episode."  NWBO alleges that "[f]rom 09:28:17 to 09:30:17, [Canaccord allegedly 'parked'] 29,400 shares of Baiting Orders at prices ranging from $2.40 to $1.18 per share."  ¶¶ 98, 100.  The full dataset shows that Canaccord's supposed "Baiting Orders" were at prices consistent with or better than the bids and offers of other market participants reflected in the OTC Markets limit order book for the period 09:28:17 to 09:30:17, which ranged from $1.20 to $5.00.  Ex. 13 (complete stream of publicly available quotation data from OTC Link, October 15, 2020, 09:28:17 to 09:30:17).

- October 27, 2020 "Example Episode."  NWBO alleges that "[f]rom 10:25:42 to 10:27:42, [Virtu allegedly 'parked'] 1,400 shares of Baiting Orders at prices ranging from $1.21 to $1.17 per share."  ¶¶ 126, 128.  The full dataset shows that Virtu's supposed "Baiting Orders" were at prices consistent with or better than the bids and offers of other market participants reflected in the OTC Markets limit order book for the period 10:25:42 to 10:27:42, which ranged from $1.17 to $2.60.  Ex. 14 (complete stream of publicly-available quotation data from OTC Link, October 27, 2020, 10:25:42 to 10:27:42).[39]

---

[39]  *Compare* ¶¶ 111-17 (October 20, 2020 "example episode" for Instinet) *with* Ex. 15 (OTC Link data for October 20, 2020 between 11:37:44 and 11:41:44); *compare* ¶¶ 139-145 (November 2, 2020 "example episode" for G1X) *with* Ex. 16 (OTC Link data for November 2, 2020 between 09:59:30 and 09:51:30); *compare* ¶¶ 153-59 (November 18, 2020 "example episode" for G1X) *with* Ex. 17 (OTC Link data for November 18, 2020 between 09:59:59 and 10:03:59); *compare* ¶¶ 166-72 (December 24, 2020 "example episode" for Canaccord) *with* Ex. 18 (OTC Link data for December 24, 2020 between 10:49:52 and 10:53:52); *compare* ¶¶ 179-85 (February 1, 2021 "example episode" for GTS) *with* Ex. 19 (OTC Link data for February 1, 2021 between 09:28:51 and 09:32:51); *compare* ¶¶ 186-92 (February 1, 2021 "example episode" for Lime) *with* Ex. 20 (OTC Link data for February 1, 2021 between 15:46:21 and 15:50:21); *compare* ¶¶ 200-06 (May 17, 2021 "example episode" for Virtu) *with* Ex. 21 (OTC Link data for May 17, 2021 between 11:17:58 and 11:21:58); *compare* ¶¶ 213-19 (May 9, 2022 "example episode" for Instinet) *with*

Moreover, publicly available, anonymized data showing executions—likewise incorporated by reference into the complaint, ¶ 75 n.14—also refutes NWBO's allegations. For example, NWBO alleges that on May 10, 2022 at 11:30:18, Citadel Securities sold 4,870 NWBO shares at $0.93 per share, ¶ 240, but the public data on which NWBO purports to rely squarely rebuts this claim, showing there was no such sale by any market participant at that time. Ex. 28 (anonymized, publicly available transaction data showing no trades in the quantity alleged in NWBO's Exhibit). That NWBO's specific allegations do not match the body of independently maintained, publicly available trading data on which NWBO purportedly built its allegations undermines the plausibility of its entire spoofing theory.

## III.   NWBO FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD

NWBO has not stated a claim for common law fraud. Courts dismiss tag-along common law fraud claims where Exchange Act claims predicated on the same allegations have been found wanting. *E.g.*, *Cohen*, 722 F. Supp. 2d at 436 (dismissing common law fraud claim after finding federal securities fraud claim deficient because the "elements of common-law fraud are essentially the same as those for a violation of Section 10(b) of the Exchange Act[]" (internal quotation marks omitted)); *Ashland, Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 471–72 (S.D.N.Y. 2010) (same). NWBO's common law fraud claim should be dismissed because it is predicated on the same allegations as its flawed Exchange Act claims.

---

Ex. 22 (OTC Link data for May 9, 2022 between 14:44:35 and 14:48:35); *compare* ¶¶ 227-33 (May 10, 2022 "example episode" for GTS) *with* Ex. 23 (OTC Link data for May 10, 2022 between 12:51:43 and 12:53:43); *compare* ¶¶ 234-40 (May 10, 2022 "example episode" for Citadel Securities) *with* Ex. 24 (OTC Link data for May 10, 2022 between 11:25:43 and 11:29:43); *compare* ¶¶ 241-47 (May 10, 2022 "example episode" for Canaccord) *with* Ex. 25 (OTC Link data for May 10, 2022 between 09:45:08 and 09:49:08); *compare* ¶¶ 248-54 (May 10, 2022 "example episode" for G1X) *with* Ex. 26 (OTC Link data for May 10, 2022 between 11:52:48 and 11:56:48); *compare* ¶¶ 255-61 (May 10, 2022 "example episode" for Virtu) *with* Ex. 27 (OTC Link data for May 10, 2022 between 12:17:03 and 12:21:03).

## IV.   NWBO'S AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

After Defendants filed their initial motions to dismiss, and Citadel Securities served its first Rule 11 motion, NWBO exercised its right to amend its complaint.  Accordingly, NWBO had the opportunity to review Defendants' arguments and authorities and to amend the complaint to attempt to address its deficiencies.  NWBO then had another opportunity to seek leave to amend after being served with a second Rule 11 motion, but chose instead only to "correct" Exhibit 1 to the Amended Complaint regarding its so-called trading records.  *See* ECF 106.

Despite this, NWBO *still* fell woefully short of satisfying the heightened pleading requirements of Rule 9(b) and the PSLRA.  Because there are no additional facts that NWBO could plead to meet these requirements, further amendment would be futile.  *E.g.*, *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 239 (S.D.N.Y. 2021) (dismissing with prejudice where amendment would be futile); Ind. Prac. of Hon. Gregory H. Woods § 3.D (parties that elect not to amend their pleadings upon the filing of a motion to dismiss "should not expect that the Court will grant further leave to amend the complaint.").

## <u>CONCLUSION</u>

NWBO's Amended Complaint should be dismissed with prejudice.

Dated:  July 12, 2023
       New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

 _/s/ William A. Burck_
William A. Burck
Christopher G. Michel (admitted _pro hac vice_)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Brenna Nelinson
Brendan T. Carroll
Peter H. Fountain
Leigha Empson
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
brendancarroll@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

_Attorneys for Defendant Citadel Securities LLC_

41

**MORRISON & FOERSTER LLP**

 /s/ *Anthony S. Fiotto* (with permission)
Anthony S. Fiotto
Julia C. Koch
200 Clarendon Street
Boston, MA 02116
Telephone: 617-648-4700
Facsimile: 617-830-0142
Email: AFiotto@mofo.com
Email: JKoch@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: 212-336-4067
Facsimile: 212-468-7900
Email: ELawson@mofo.com

*Attorneys for Defendant Canaccord Genuity LLC*

**GREENBERG TRAURIG, LLP**

 /s/ *Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Nicholas T. Barnes
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
barnesn@gtlaw.com

*Attorneys for Defendant Instinet, LLC*

**KATTEN MUCHIN ROSENMAN LLP**

 /s/ *Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac vice*)
Hannah O. Koesterer (admitted *pro hac vice*)
Leigh Brissenden (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
hannah.koesterer@katten.com
leigh.brissenden@katten.com

*Attorneys for Defendant GTS Securities LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation

 /s/ *Stephen Young* (with permission)
Jon W. Zinke
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California  90802
Telephone:  (562) 436-2000
jon.zinke@kyl.com
steve.young@kyl.com;
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading Corp.*

42

**BALLARD SPAHR LLP**

 */s/ Marjorie J. Peerce* (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel:  (212) 223-0200
Fax:  (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (*pro hac vice* forthcoming)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  (215) 665-8500
Fax:  (215) 864-8999
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendant*
*G1 Execution Services LLC*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 */s/ Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas*
*LLC*