# EXHIBIT 3

10-K 1 tm205288-1_10k.htm FORM 10-K

---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2019**

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 001-35737

# NORTHWEST BIOTHERAPEUTICS, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **94-3306718** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**4800 Montgomery Lane, Suite 800, Bethesda, MD 20814**
(Address of principal executive offices) (Zip Code)

**(240) 497-9024**
(Registrant's telephone number)

**N/A**
(Former Name, Former Address and Former Fiscal Year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class: | Trading Symbol(s): | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, par value $0.001 per share | NWBO | OTCQB |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was $138,133,000 on June 30, 2019. As of March 14, 2020, the registrant had 648,717,833 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
None.

# NORTHWEST BIOTHERAPEUTICS, INC.

## FORM 10-K

### TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 19 |
| Item 2. | Properties | 20 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Mine Safety Disclosures | 20 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| Item 6. | Selected Financial Data | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition And Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 28 |
| Item 8. | Financial Statements and Supplementary Data | 28 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 28 |
| Item 9A. | Controls and Procedures | 28 |
| Item 9B. | Other Information | 29 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 29 |
| Item 11. | Executive Compensation | 29 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 29 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 29 |
| Item 14. | Principal Accountant Fees and Services | 29 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 30 |
| **SIGNATURES** | | 35 |

*Changes in manufacturing methods for DCVax-L could require us to conduct equivalency studies and/or additional clinical trials.*

With biologics products, in some cases "the process is the product": i.e., the manufacturing process is considered to be as integral to the product as is the composition of the product itself. If any changes are made in the manufacturing process, and such changes are considered material by the regulatory authorities, the company sponsor may be required to conduct equivalency studies to show that the product is equivalent under the changed manufacturing processes as under the original manufacturing processes, and/or the company sponsor may be required to conduct additional clinical trials. In addition, if there are multiple manufacturing locations, equivalency studies may be required to show that the products produced in the respective facilities are substantially the same. Our manufacturing processes have undergone some changes during or since the early clinical trials, and we have multiple manufacturing locations. Accordingly, we may be required to conduct equivalency studies, and/or additional clinical trials, before we can obtain product approval, unless the regulatory authorities are satisfied that the changes in processes do not affect the quality, efficacy or safety of the product, and satisfied that the products made in each manufacturing location are substantially the same.

*We may not receive regulatory approvals for our product candidates or there may be a delay in obtaining such approvals.*

Our products and our ongoing development activities are subject to regulation by regulatory authorities in the countries in which we and our collaborators and distributors wish to test, manufacture or market our products. For instance, the FDA will regulate our product in the U.S. and equivalent authorities, such as the MHRA and EMA will regulate in Europe and other jurisdictions. Regulatory approval by these authorities will be subject to the evaluation of data relating to the quality, efficacy and safety of the product for its proposed use, and there can be no assurance that the regulatory authorities will find our data sufficient to support product approval of DCVax-L or DCVax-Direct. In addition, the endpoint against which the data is measured must be acceptable to the regulatory authorities, and the statistical analysis plan for how the data will be evaluated must also be acceptable to the regulatory authorities. Under the Protocol for our Phase III trial of DCVax-L for Glioblastoma brain cancer, the primary endpoint is progression free survival, or PFS. Sometimes regulators have accepted this endpoint, and sometimes not. There can be no assurance that the regulatory authorities will find this to be an approvable endpoint for Glioblastoma multiforme cancer. In addition, as previously recognized, the PFS endpoint in our Phase III trial is complicated and potentially confounded by the phenomenon of pseudo-progression, in which a patient appears to have disease progression (tumor recurrence) but does not actually have such progression (for example, where the appearance of progression is actually inflammation or scarring, or is infiltration of beneficial immune cells). Under the Protocol for our Phase III trial the secondary endpoint is overall survival, or OS. There can be no assurance that regulatory authorities will find a secondary endpoint to be an acceptable basis for product approval. In addition, as previously recognized, the OS endpoint in our Phase III trial is complicated or confounded by the trial design, which allowed all patients (including patients initially assigned to the placebo arm of the trial) to "cross over" and receive DCVax-L treatment after recurrence of their tumor. These factors could result in regulatory authorities refusing to accept either of these endpoints, or the analysis of our data relating to either of these endpoints, as a basis for approval.

The time period required to obtain regulatory approval varies between countries. In the U.S., for products without "Fast Track" status, it can take up to 18 months after submission of an application for product approval to receive the FDA's decision. Even with Fast Track status, FDA review and decision can take up to 12 months. At present, we do not have Fast Track status for our lead product, DCVax-L for GBM. We plan to apply for Fast Track status, but there can be no assurance that FDA will grant us such status for DCVax-L.

Different regulators may impose their own requirements and may refuse to grant, or may require additional data before granting, an approval, notwithstanding that regulatory approval may have been granted by other regulators. Regulatory approval may be delayed, limited or denied for a number of reasons, including clinical data, the product not meeting safety or efficacy requirements or any relevant manufacturing processes or facilities not meeting applicable requirements as well as case load at the regulatory agency at the time.

*We may not obtain or maintain the benefits associated with orphan drug status, including market exclusivity.*

Although our lead product, DCVax-L for GBM, has been granted orphan drug status in both the U.S. and the E.U., we may not receive the benefits associated with orphan drug designation (including the benefit providing for market exclusivity for a number of years). This may result from a failure to maintain orphan drug status, or result from a competing product reaching the market that has an orphan designation for the same disease indication. Under U.S. and E.U. rules for orphan drugs, if such a competing product reaches the market before ours does, the competing product could potentially obtain a scope of market exclusivity that limits or precludes our product from being sold in the U.S. for seven years or from being sold in the E.U. for ten years. Also, in the E.U., even after orphan status has been granted, that status is re-examined shortly prior to the product receiving any regulatory approval. The EMA must be satisfied that there is evidence that the product offers a significant benefit relative to existing therapies, in order for the therapeutic

product to maintain its orphan drug status. Accordingly, our product candidates will have to re-qualify for orphan drug status prior to any potential product approval in the E.U., and may have to do so elsewhere as well.

15