# EXHIBIT 4

[Table of Contents](#)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2020**

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 001-35737

# NORTHWEST BIOTHERAPEUTICS, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 94-3306718 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**4800 Montgomery Lane, Suite 800, Bethesda, MD 20814**
(Address of principal executive offices) (Zip Code)

**(240) 497-9024**
(Registrant's telephone number)

**N/A**
(Former Name, Former Address and Former Fiscal Year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class: | Trading Symbol(s): | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, par value $0.001 per share | NWBO | OTCQB |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was $234,821,000 on June 30, 2020. As of March 26, 2021, the registrant had 842,137,013 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
None.

Table of Contents

# NORTHWEST BIOTHERAPEUTICS, INC.
# FORM 10-K

## TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 21 |
| Item 2. | Properties | 21 |
| Item 3. | Legal Proceedings | 21 |
| Item 4. | Mine Safety Disclosures | 21 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| Item 6. | Selected Financial Data | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition And Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 8. | Financial Statements and Supplementary Data | 29 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 29 |
| Item 9A. | Controls and Procedures | 29 |
| Item 9B. | Other Information | 30 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 30 |
| Item 11. | Executive Compensation | 31 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 31 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 31 |
| Item 14. | Principal Accountant Fees and Services | 31 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 31 |
| **SIGNATURES** | | 34 |

Table of Contents

***Our business could be adversely affected by animal rights activists.***

Our business activities have involved animal testing and could involve further such testing, as such testing is required before new medical products can be tested in clinical trials in human patients. Animal testing has been the subject of controversy and adverse publicity. Some organizations and individuals have attempted to stop animal testing by pressing for legislation and regulation in these areas. To the extent that the activities of such groups are successful, our business could be adversely affected. Negative publicity about us, our pre-clinical trials and our product candidates could also adversely affect our business.

***Multiple late stage clinical trials of DCVax-L for GBM, our lead product, may be required before we can obtain regulatory approval.***

Typically, companies conduct multiple late stage clinical trials of their product candidates before seeking product approval. Our current Phase III 331-patient clinical trial of DCVax-L for GBM is our first late stage trial. We may be required to conduct additional late stage trials with DCVax-L for GBM before we can obtain product approval. This would substantially delay our commercialization, and might not be possible to carry out, due to development and/or approval of competing products, lack of funding, and/or other factors. In addition, our Phase III trial of DCVax-L was placed on a partial clinical hold for new screening for enrollment in 2015. Although the FDA lifted its hold in February 2017 as previously reported by the Company, the Company had already closed enrollment with 331 of the planned 348 patients. Since we did not enroll the last 17 of the planned 348 patients, this could adversely affect the statistical and other analyses of our Phase III trial results, and could make it more difficult to seek product approval or more likely that further trials could be required. In addition, a rapidly growing number of products are under development for brain cancer, including immunotherapies such as checkpoint inhibitor drugs and T cell-based therapies, and some (e.g., NovoCure's device) have been approved in the U.S. It is possible that the standard of care for brain cancer could change before we complete our Phase III trial and analysis of its results, or before we are able to seek approval for commercialization. This could necessitate further clinical trials with our DCVax-L product candidate for brain cancer, which may not be feasible.

***Changes in manufacturing methods for DCVax-L could require us to conduct equivalency studies and/or additional clinical trials.***

With biologics products, in some cases "the process is the product": i.e., the manufacturing process is considered to be as integral to the product as is the composition of the product itself. If any changes are made in the manufacturing process, and such changes are considered material by the regulatory authorities, the company sponsor may be required to conduct equivalency studies to show that the product is equivalent under the changed manufacturing processes as under the original manufacturing processes, and/or the company sponsor may be required to conduct additional clinical trials. In addition, if there are multiple manufacturing locations, equivalency studies may be required to show that the products produced in the respective facilities are substantially the same. Our manufacturing processes have undergone some changes during or since the early clinical trials, and we have multiple manufacturing locations. Accordingly, we may be required to conduct equivalency studies, and/or additional clinical trials, before we can obtain product approval, unless the regulatory authorities are satisfied that the changes in processes do not affect the quality, efficacy or safety of the product, and satisfied that the products made in each manufacturing location are substantially the same.

***We may not receive regulatory approvals for our product candidates or there may be a delay in obtaining such approvals.***

Our products and our ongoing development activities are subject to regulation by regulatory authorities in the countries in which we and our collaborators and distributors wish to test, manufacture or market our products. For instance, the FDA will regulate our product in the U.S. and equivalent authorities, such as the MHRA and EMA will regulate in Europe and other jurisdictions. Regulatory approval by these authorities will be subject to the evaluation of data relating to the quality, efficacy and safety of the product for its proposed use, and there can be no assurance that the regulatory authorities will find our data sufficient to support product approval of DCVax-L or DCVax-Direct. In addition, the endpoint against which the data is measured must be acceptable to the regulatory authorities, and the statistical analysis plan for how the data will be evaluated must also be acceptable to the regulatory authorities. The statistical analysis plan that we submitted to regulators for the Phase III trial embodies a different primary endpoint and secondary endpoint than did the original Protocol for the trial. Under the Protocol the primary endpoint was progression free survival, or PFS, and the secondary endpoint was overall survival, or OS. Both of these endpoints were confounded: the PFS endpoint by pseudo-progression, and the OS endpoint by the "crossover" provision in the trial design, which allowed all of the patients in the trial to cross over to DCVax-L treatment after tumor recurrence (while remaining blinded as to which treatment they received before tumor recurrence).  The statistical analysis plan uses external control patients rather than within-study controls. There can be no assurance that regulatory authorities will allow a product approval to be based upon this approach.

16