**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NORTHWEST BIOTHERAPEUTICS, INC.,

Plaintiff,

- against-

CANACCORD GENUITY LLC, CITADEL
SECURITIES LLC, G1 EXECUTION
SERVICES LLC, GTS SECURITIES LLC,
INSTINET LLC, LIME TRADING CORP.,
and VIRTU AMERICAS LLC.

Defendants.

Case No:  1:22-cv-10185-GHW-GWG

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 6

    A.  Spoofing Is A Form Of Market Manipulation............................................... 6

    B.  Defendants Intentionally Or Recklessly Engaged In The Manipulative Spoofing Of NWBO ......................................................................................................... 7

III.    LEGAL STANDARD ........................................................................................ 12

IV.   PLAINTIFF ADEQUATELY ALLEGES EXCHANGE ACT CLAIMS UNDER SECTION 10(b) AND SECTION 9 .................................................................... 12

    A.  Plaintiffs' Allegations Are More Specific And Persuasive Than The Complaints In *Harrington* And *Kessev Tov,* Which Are Factually And Legally On Point Cases Where Courts Recently Denied Similar Motions to Dismiss ................................... 12

    B.  Plaintiff Adequately Alleges Manipulative Conduct With Particularity..................... 16

        1.   Plaintiff's Baiting Order Allegations Constitute Misconduct.............................. 17

        2.   The Complaint Adequately Alleges That Defendants' Misconduct Artificially Depressed The Price Of NWBO Stock.................................................... 25

    C.  The Complaint Pleads A Strong Inference Of Scienter ............................ 27

        1.   The Complaint Alleges Conscious Misbehavior Or Recklessness ..................... 28

        2.   The Complaint Alleges That Defendants Had Motive To Spoof NWBO Shares Both When Trading For Their Own Accounts And Even If They Traded For Client Accounts.................................................................................... 31

V.      THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ............................ 33

VI.    THE COMPLAINT ADEQUATELY PLEADS RELIANCE ......................................... 36

VII.   DEFENDANTS' REFERENCE TO TRADING DATA OUTSIDE THE COMPLAINT IS IMPROPER ....................................................................................................... 38

VIII.  CONCLUSION ................................................................................................. 40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
 692 F.3d 34 (2d Cir. 2012)...............................................................................26, 35

*Alaska Electrical Pension Fund v. Bank of America*,
 Case No. 14-cv-7126 (JMF), ECF 551 (S.D.N.Y. Jan. 22, 2018) ...........................30

*Alki Partners, L.P. v. Vatas Holding GmbH*,
 769 F. Supp. 2d 478 (S.D.N.Y. 2011)......................................................................37

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
 93 F.Supp.2d 424 (S.D.N.Y. 2000) ..........................................................................10

*In re Aphria, Inc. Sec. Litig.*,
 342 F.R.D. 199 (S.D.N.Y. Aug. 30, 2022) ...............................................................37

*In re ArthroCare Corp. Sec. Litig.*,
 726 F.Supp.2d 696 (W.D. Tex. 2010)........................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
 493 F. 3d 87 (2d Cir. 2007).......................................................................16, 32, 33

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
 390 F. Supp. 3d 432 (S.D.N.Y. 2019).................................................................24, 34

*Brown v. China Integrated Energy, Inc.*,
 875 F.Supp.2d 1096 (C.D. Cal. 2012) .......................................................................8

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ........................................................................37, 38

*Carlson v. Xerox Corp.*,
 392 F. Supp. 2d 267 (D. Conn. 2005).......................................................................28

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
 310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................36

*CFTC v. Banoczay et al.*,
 No. 20-cv-05777, ECF 1 (N.D. Ill. Sept. 29, 2020)..............................................18, 20

*CFTC v. Edge Fin. Techs., Inc.*,
 No. 1:18-cv-00619, 2020 WL 6381288 (N.D. Ill. Aug. 13, 2020) ..........................19

*CFTC v. Flotron*,
No. 3:18-cv-00158, ECF 1 (D. Conn. Jan. 26, 2018) .........................................................9, 18

*CFTC v. Mohan*,
No. 4:18-cv-00260, ECF 1 (S.D. Tex. Jan. 28, 2018) ...............................................9, 18, 20, 22

*CFTC v. Nav Saro Futures Ltd.*, *PLC*,
No. 15-cv-3398, 2016 WL 8257513 (N.D. Ill. Nov. 14, 2016) ...............................................19

*CFTC v. Nowak et al.*,
No. 19-cv-06163, ECF 1 (N.D. Ill. Sept. 16, 2019).......................................................9, 17, 29

*CFTC v. Oystacher*,
No. 15-cv-9196, 2015 WL 7356255 (N.D. Ill. Oct. 19, 2015) ...............................................20

*CFTC v. Oystacher et al.*,
203 F.Supp.3d 934 (N.D. Ill. 2016) ................................................................................ *passim*

*CFTC v. Oystacher et al*,
No. 15-cv-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) ...............................................10

*CFTC v. Skudder*,
No. 22-cv-1925, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022)....................................... *passim*

*CFTC v. Thakkar et al.*,
No. 18-cv-00619, ECF 1 (N.D. Ill. Jan. 28, 2018).......................................................................9

*CFTC v. Zhao*,
No. 1:18-cv-00620, ECF 1 (N.D. Ill., Jan. 28, 2018) ...........................................................17, 20

*Chill v. Gen. Elect. Co.*,
101 F. 3d 236 (2d Cir. 1996).......................................................................................................40

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).........................................................................................31

*CP Stone Fort Holdings, LLC v. Doe(s)*,
No. 16-cv-4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017) ...........................8, 17, 22, 29

*Dalton Petrie v. Electronic Game Card, Inc. et al*,
No. SACV 10-0252 DOC(RNBx), ECF 303 (C.D. Ca. July 21, 2015),  ................................37

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
413 F. Supp. 3d 187 (S.D.N.Y. Sept. 23, 2019) (Woods, J.)....................................................33

*Fabi v. Prudential Ins. Co. of Am.*,
No. 21-cv-4944, 2022 WL 5429520 (E.D.N.Y. Aug. 29, 2022) ...............................................40

*Faulkner v. Beer,*
    463 F.3d 130 (2d Cir. 2006)......................................................................39, 40

*In re Focus Enhancements, Inc. Sec. Litig.,*
    309 F. Supp. 2d 134 (D. Mass. 2001) .................................................................11

*Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.,*
    41 F. 4th 71 (2d Cir. 2022) ...................................................................5, 35, 36

*Goel v. Bunge, Ltd.,*
    820 F.3d 554 (2d Cir. 2016)...............................................................................39

*Greebel v. FTP Software, Inc.,*
    194 F.3d 185 (1st Cir. 1999) .............................................................................11

*Harrington Global Opportunity Fund., Limited v. CIBC World Markets Corp.,*
    585 F. Supp. 3d 405 (S.D.N.Y. 2022)........................................................ *passim*

*Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.,*
    No. 21-cv-00761, ECF 63 (S.D.N.Y. May 6, 2021) ...........................................5, 11

*Jurupa Valley Spectrum, LLC v. National Indem. Co.,*
    No. 06-cv-4023, 2007 WL 1862162 (S.D.N.Y. June 29, 2007) ............................38

*Kessev Tov, LLC v. Doe(s),*
    No. 20-cv-4947, 2022 WL 2356626 (N.D. Ill. June 30, 2022)...................... *passim*

*Kessev Tov, LLC v. Doe(s),*
    No. 20-cv-4947, 2023 WL 4825110 (N.D. Ill. July 27, 2023) ....................... *passim*

*Lorenzo v. Securities and Exchange Commission,*
    139 S. Ct. 1094 (2019)...............................................................................5, 16, 21

*Myun-Uk Choi v. Tower Research Capital LLC,*
    890 F.3d 60 (2d Cir. 2018).................................................................................11

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC,*
    No. 02-cv-0767-LBS, 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002) ..................16

*In re Parmalot Sec. Litig.,*
    No. 04 cv-0030, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)...........................37

*In re Petrobras Sec. Litig.,*
    862 F.3d 250 (2d Cir. 2017)...............................................................................38

*S.E.C. v. U.S. Environmental, Inc.,*
    155 F.3d 107 (2d Cir. 1998)...........................................................................5, 21

*Salvani v. ADVFN PLC*,
   50 F. Supp. 3d 459 (S.D.N.Y. 2014)...................................................................................37

*Schwab v. E\*TRADE Fin. Corp.*,
   258 F. Supp. 3d 418 (S.D.N.Y. 2017)................................................................................30

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................................................36

*ScriptsAmerica, Inc. v. Ironridge Global LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015) ............................................................................38

*SEC v. Lek Sec.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019)........................................................................10, 24

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003)...............................................................................17

*SEC v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007)...............................................................................29

*SEC v. Nielsen*,
   No. 5:20-cv-3788, ECF 1 (N.D. Cal. June 9, 2020) .........................................................30

*Set Capital LLC v. Credit Suisse Corp. AG*,
   996 F. 3d 64 (2d Cir. 2021)...................................................................................... *passim*

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015).......................................................................*passim*

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16-cv-6728, 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).........................................21

*In re Take-Two Interactive Sec. Litig.*,
   551 F.Supp.2d 247 (2008) ...............................................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................................27, 29, 31

*In re Tufin Software Technologies Ltd. Sec. Litig.*,
   No. 20-cv-5646, 2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) (Woods, J.)............................40

*U.S. v. Coscia*,
   866 F.3d 782 (7th Cir. 2017) .......................................................................................17, 29

*U.S. v. Nielsen*,
   No. 22-cr-161, ECF 1 (N.D. Cal. Apr. 18, 2022) ............................................................30

*U.S. v. Smith and Nowak*,
　　No. 1:19-cr-00669, ECF 903 (N.D. Ill. Aug. 16, 2023)..........................................................24

*United States v. Chanu*,
　　40 F.4th 528 (7th Cir. 2022), cert. denied, 143 S. Ct. 746, (2023) ...........................................21

*In re Vivendi, S.A. Sec. Litig.*,
　　838 F.3d 223 (2d Cir. 2016)..........................................................................................................4

*Waggoner v. Barclays PLC*,
　　875 F.3d 79 (2d Cir. 2017)...........................................................................................................38

*In re Wells Fargo & Co. Sec. Litig.*,
　　No. 20-cv-4494, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) (Woods, J.).........................12

*Xu v. Gridsum Holding, Inc.*,
　　2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) ..........................................................................40

**Statutes**

15 U.S.C. § 78c(a)(38) ........................................................................................................................21

**Other Authorities**

17 C.F.R. § 255.3(a), 255.4(b) .........................................................................................................22

69 Fed. Reg. 48,015 (Aug. 6, 2004).................................................................................................10

73 Fed. Reg. 61,699 (Oct 17, 2008).................................................................................................10

FINRA Report 3130 ...........................................................................................................................11

FINRA Rule 2020 ...............................................................................................................................11

FINRA Rules 5210 .............................................................................................................................11

Plaintiff Northwest Biotechnologies, Inc. ("NWBO" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] motion to dismiss (ECF 114).[2]

## I.   <u>INTRODUCTION</u>

This case arises from Defendants' illegal manipulation of NWBO's share price between December 5, 2017 and August 1, 2022 (the "Relevant Period"). Throughout the Relevant Period, Defendants deliberately engaged in repeated manipulative spoofing of NWBO shares that interfered with the natural forces of supply and demand, driving NWBO's share price downward and causing NWBO to sell shares at depressed prices. (¶ 1.)

NWBO is a clinical stage biotechnology company focused on the development of personalized cancer vaccines designed to treat a broad range of solid tumor cancers. (¶2.) A successful Phase 3 trial of the Company's lead product, DCVax®-L, a treatment for patients with glioblastoma multiforme ("GBM") – the most aggressive and lethal form of brain cancer – was recently completed and published in the prestigious *JAMA Oncology*. (¶5.) The trial demonstrated that DCVax®-L was "associated with a clinically meaningful and statistically significant extension of overall survival" and "also had an excellent safety profile and noteworthy tails of long-term survival curves" – the first Phase 3 trial of a systemic treatment in nearly 20 years to have shown such survival extension in newly diagnosed GBM patients, and the first time in nearly 30 years that a Phase 3 trial of any type of treatment has shown such survival extension in recurrent GBM.

---

[1] Citadel Securities LLC ("Citadel"), Canaccord Genuity LLC ("Canaccord"), G1 Execution Services LLC ("G1"), GTS Securities LLC ("GTS"), Instinet LLC ("Instinet"), Lime Trading Corp. ("Lime"), and Virtu Americas LLC ("Virtu") (together, the "Defendants").  The initial complaint in this action (ECF 1) named Susquehanna International Group LLP as a defendant; the Amended Complaint (ECF 95) removed all claims against that defendant.

[2] Citations to Defendants' Joint Memorandum of Law in Support of Motion to Dismiss Amended Complaint (ECF 115) are set forth as "Def. Br."  Citations to "¶ __" are to paragraphs of the Amended Complaint (ECF 95) (the "Complaint").  Unless otherwise indicated, quotation marks and citations are omitted and alterations are adopted.

(¶ 5.) Following the success of the trial, NWBO was approved for a commercial manufacturing license for the importation and exportation of DCVax®-L from its U.K facility (¶ 6), and the Company is in the final stages of preparing an application for regulatory approval of DCVax®-L (¶47.)[3]

Despite the encouraging news about its lead product, the value of NWBO's share price has fallen because of Defendants' manipulative spoofing. (¶¶3-7, 43-52.) Specifically, on nearly 34% of the trading days and on at least 2,849 occasions during the Relevant Period, Defendants created an imbalance in the market and an artificial price for NWBO shares by placing tens of millions of fake Baiting Orders that caused NWBO and other unsuspecting investors to sell NWBO shares at depressed prices. (¶10.) By manipulating the market through their spoofing, Defendants caused Plaintiff to suffer significant losses: due to Defendants' spoofing, NWBO sold over 283 million shares at artificially depressed prices, including 49 million shares sold at the closing price on dates when Spoofing Episodes occurred. (¶11.) Defendants' illegal market manipulation of NWBO stock impaired the ability of the Company to raise funds from the public markets and get its life-saving cancer treatment quickly to market. (¶52.)

The Complaint alleges – as is typical in spoofing cases – that the combination of a number of highly unusual and suspicious aspects of Defendants' trading activity, when viewed collectively, strongly establishes misconduct and the requisite inference of scienter. The Complaint is replete with particularized factual allegations and quantitative analyses of Defendants' repeated suspicious patterns of trading activity in NWBO stock including, among

---

[3]  *See also*  https://www.sec.gov/ix?doc=/Archives/edgar/data/1072379/000141057823001633/nwbo-20230630x10q.htm (last visited on August 24, 2023).  Notably, Ray Tancredi, Divisional Vice President of Walgreens in charge of specialty pharmacy development and brand Rx/vaccine purchasing, recently noted in a presentation at the Asembia 2023 Specialty Pharmacy Summit that he anticipated DCVax®-L was in the pipeline to receive FDA approval in the near term.  https://www.ajmc.com/view/an-overview-of-the-specialty-therapy-pipeline-in-2023.(last visited on August 24, 2023)

other things, the timing of Defendants' orders, the placement of those orders in the Limit Order Book, the percentage of orders executed within certain time periods, the ratio of those orders and executions to orders and executions in other contexts, and the cancellation of orders immediately following executed purchases, all of which expressly contradict Defendants' (inconsistent and improper) factual assertion that they were acting as passive, innocent "market makers" simply engaging in normal "bedrock market-making activity" in NWBO stock.

In response to Plaintiff's detailed allegations of Defendants' manipulative conduct, Defendants resort to unsubstantiated scare tactics of an impending "flood" of "frivolous lawsuits" that would upend "the entire U.S. equity market system" if Plaintiff's claims are sustained, rely on an outdated opinion that was subsequently reversed,[4] and ignore directly on point recent case law to embark on a legally inappropriate strategy of challenging some of Plaintiff's allegations in a vacuum and ignoring others entirely.  These flaws are fatal to Defendants' motion even if its piecemeal attacks on (some of) Plaintiffs' allegations were independently valid (which they are not).

Defendants first claim – without any legal support – that, to be sufficient, a spoofing complaint must include *nonpublic* data in the exclusive possession of Defendants. This is an improper approach to any motion to dismiss, but is especially inappropriate in spoofing cases, where the information pled by Plaintiff here has been found to be sufficient in numerous spoofing cases and given that manipulation cases need not be plead "to the same degree of specificity as a plain misrepresentation claim" because they "involve facts solely within the defendant's

---

[4] Defendants rely heavily on *Kessev Tov, LLC v. Doe(s)*, No. 20-cv-4947, 2022 WL 2356626 (N.D. Ill. June 30, 2022), but after Defendants filed their motion to dismiss, that court issued a revised opinion on an amended complaint which reached opposite conclusions and *denied* the defendants' motion to dismiss. No. 20-cv-4947, 2023 WL 4825110 (N.D. Ill. July 27, 2023).

knowledge." *Harrington Global Opportunity Fund., Limited v. CIBC World Markets Corp.,* 585 F. Supp. 3d 405, 418 (S.D.N.Y. 2022) (*citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F. 3d 87, 102).

Defendants next assert that the Complaint fails to plead manipulative conduct with particularity because of how it defines certain terms. Defendants' definitional disputes—which are inappropriate for a motion to dismiss, *see Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 84 (S.D.N.Y. 2015) (attacking definitions is inappropriate on motion to dismiss), are largely directed at an imaginary complaint that claims that a single trading act alone is *independently* sufficient to demonstrate Defendants engaged in illegal spoofing, rather than the actual Complaint that presents a multitude of different aspects of Defendants' trading activity which, *in combination*, demonstrates that Defendants engaged in illegal spoofing.  Indeed, far from "routine, regulated market making," the Complaint alleges detailed facts demonstrating that Defendants' actions were the opposite of how a rational market maker would act.

Defendants then argue that Plaintiff does not sufficiently allege that their manipulative spoofing depressed NWBO's share price. But the Complaint alleges Defendants' spoofing resulted in the price of NWBO shares being depressed below their true market value – all that is required. *Cf. In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223, 258 (2d Cir. 2016) ("a statement may cause inflation not simply by adding it to a stock, but by maintaining it."). That the price of NWBO's shares might have been higher or lower before a Spoofing Episode than after a Spoofing Episode does not mean that spoofing did not depress that price below *what it would have been* in a fair market.

Defendants next argue that the Complaint fails to plead a strong inference of scienter.  This argument again ignores the detailed allegations of the Complaint and improperly seeks to raise

*factual* disputes to a few of Plaintiff's scienter allegations in isolation. Those arguments fail. For example, Defendants bizarrely argue that, based on their (improper on a motion to dismiss) unsubstantiated factual assertion that *two* of the Defendants (Lime and Instinet) enter orders only on behalf of clients, the allegations in the Complaint cannot support an inference of scienter against *any* Defendant. Even if Defendants' factual assertion was true, all Defendants (including Lime and Instinet) are liable for trading activity that they conducted, whether or not some portion (or all) of the spoofing trades were for client accounts or their own accounts. *See S.E.C. v. U.S. Environmental, Inc.*, 155 F.3d 107, 112 (2d Cir. 1998); *Harrington Glob. Opportunity Fund, Ltd.*, 585 F. Supp. 3d at 416 (S.D.N.Y. 2022); *Lorenzo v. Securities and Exchange Commission*, 139 S. Ct. 1094, 1103-1104 (2019).

Defendants then claim that the timing of their Baiting Order placements and cancellations, the "parking" of those orders, and their concentration do not provide sufficient detail to demonstrate Defendants' scienter – but courts routinely find such allegations sufficient to support the necessary inference of scienter in spoofing cases. *See Harrington*, 585 F. Supp. 3d at 417 (collecting cases); *Kessev Tov*, 2023 WL 4825110 at *4-6. Similarly, Defendants draw up a laundry list of details they claim are required to be pled in spoofing cases – such as the identity of their clients or what name they each gave their trading algorithms – but cite to no case that required such allegations.

Finally, Defendants argue Plaintiff fails to adequately allege loss causation and reliance by wrongly claiming that Plaintiff is required to plead such allegations with more particularity. But, Plaintiff alleges in detail how Defendants' spoofing scheme forced the Company to sell its stock at artificially depressed prices by directly linking Defendants' spoofing to the Company's sales of NWBO stock immediately thereafter (*Gamma Traders – I LLC v. Merrill Lynch Commodities,*

*Inc.*, 41 F. 4th 71 (2d Cir. 2022)), and alleges that the Company relied on an assumption of an efficient market when selling shares at the artificially depressed prices caused by Defendants – all that is required. *See, e.g.*, *Set Capital LLC v. Credit Suisse Corp. AG*, 996 F. 3d 64, 76 (2d Cir. 2021).

Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.   BACKGROUND

### A.   Spoofing Is A Form Of Market Manipulation

Spoofing is a form of market manipulation that undermines securities markets by artificially and illegally moving the market price of a security either upwards or downwards. (¶54.)

To engage in spoofing, a market participant, often utilizing algorithmic trading programs to maximize the speed of their market access and the execution of their trading strategies, creates a false impression of excess supply or demand by placing Baiting Orders, either into a Limit Order Book if one exists, or into an IDQS (Inter-Dealer Quotation System), that are not intended to be executed and have no legitimate economic purpose. These Baiting Orders create an illusion of market interest intended to generate a response from other market participants to follow the artificial selling or buying trend that the Baiting Orders created. (¶55.) A legitimate trader buys when it thinks the price of a security is likely to go higher and sells when it thinks the price of a security will go lower. One of the tell-tale signs of a manipulative spoofer is a rapid reversal of trading direction – a lot of sell orders, followed by buy orders, followed by the cancellation of sell orders – which suggests that the original sell orders were merely a ploy to drive the price down to "buy low." Defendants engaged in this distinctive manipulative spoofing pattern repeatedly during the Relevant Period. (¶56.)

Thus, if the spoofer's goal is to drive the price down from its natural market price, the spoofer enters Baiting Orders to sell to "bait" or "trick" investors into entering sell orders to

6

minimize or avoid suffering losses in a downward trending market. Shortly after the spoofer places the Baiting Orders to sell, and after those Baiting Orders have lured unsuspecting traders into placing their own orders, the spoofer executes orders to buy, or "Executing Purchases," on the opposite side of the Limit Order Book or IDQS. These Executing Purchases to buy are intended to be executed at the artificially low prices generated by the Baiting Orders to sell. Immediately after executing the Executing Purchases to buy in the Limit Order Book or IDQS, the spoofer cancels all of the Baiting Orders to sell, which completes the spoofing cycle. (¶57.) As the SEC's "Staff Report on Algorithmic Trading in U.S. Capital Markets," describes, spoofing is a "harmful strategy" in which some high-frequency traders engage in "the submission and cancellation of buy and sell orders without the intention to trade in order to manipulate other traders." (¶59.)

### B. Defendants Intentionally Or Recklessly Engaged In The Manipulative Spoofing of NWBO

Both the examples in and Exhibit 1 to the Complaint ("Exhibit 1") demonstrate that Defendants engaged in thousands of spoofing episodes and placed tens of millions of Baiting Orders to sell NWBO shares during the Relevant Period. Defendants spoofing activity deliberately drove NWBO's market price downward so that Defendants could purchase NWBO shares at artificially lower prices in three stages. (¶61.)

First, Defendants flooded the markets with Baiting Orders to sell during the "Baiting Period." These orders were not intended to be executed but instead were designed to deceive market participants into believing that the market price of NWBO's securities was moving downward. (¶62.) Second, shortly after the Baiting Orders to sell were placed in the Limit Order Book or IDQS, Defendants executed their Executing Purchases on the opposite side of the Limit Order Book or IDQS to purchase NWBO shares at the lower stock prices created by the downward manipulation of their Baiting Orders to sell. (¶63.) Third, immediately after the completion of their

Executing Purchases to buy NWBO shares at the lower prices, Defendants cancelled and removed all of their Baiting Orders to sell from the Limit Order Book or IDQS. (¶64.)

This pattern was repeated by the Defendants multiple times a day and continuously throughout the Relevant Period. Specifically, during the Relevant Period, Defendants collectively submitted at least 30,464,591 shares of fictitious Baiting Orders on OTC Link LLC and NYSE ARCA Global OTC. (¶65.) As reflected in Exhibit 1, Defendants then took advantage of the artificially depressed price of NWBO shares they created by executing Executing Purchases to purchase a total of 19,300,908 shares below the prevailing best offer prior to entry of the Baiting Orders, pocketing the difference. Almost immediately thereafter, Defendants then cancelled all their fictitious Baiting Orders. (¶67.) When spoofing the market, and contrary to "market making" activity, Defendants injected exponentially more artificial sell-side order flow prior to buying shares, as measured by: (1) the volume of sell side order flow (814% higher); (2) the cancellation of that order flow (2,074% higher); and (3) the greater share of cancelled sell-side order flow (97.15% vs. 40.82%).  (¶71.)

Defendants knew or were reckless in not knowing that their conduct was illegal. Among other things:

- Defendants regularly and intentionally "parked" fictitious Baiting Orders behind orders placed by other unsuspecting traders – which meant they were extraordinarily unlikely to be executed – in order to hide[5] their spoofing activities. *See Harrington*, 585 F. Supp. 3d at 417 (common indicium of spoofing is "parking baiting orders behind smaller legitimate orders placed by other traders")*; CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16-cv-4991, 2017 WL 1093166, at *1, 4 (N.D. Ill. Mar. 22, 2017) (baiting orders placed at the best available price and parked behind other orders to minimize the possibility that baiting orders would be executed); *CFTC v. Oystacher et al.*, 203 F.Supp.3d 934, 942 (N.D. Ill.

---

[5] Efforts to conceal fraud support a strong inference of scienter. *See Pozniak v. Imperial Chem. Indus. PLC*, 2004 WL 2186546, at *7 (S.D.N.Y. Sept. 24, 2004) (defendants' concealment of facts indicative of scienter); *Pathfinder Mgmt. v. Mayne Pharma PTY*, 2008 WL 3192563, at *12 (D.N.J. 2005) ("acts of concealment" indicative of scienter); *Brown v. China Integrated Energy, Inc*., 875 F.Supp.2d 1096, 1124 (C.D. Cal. 2012) ("evidence of concealment is strongly indicative of scienter.").

2016) (defendants placed spoof orders at or near the best bid or offer price behind existing orders); *CFTC v. Mohan*, No. 4:18-cv-00260, ECF 1, at ¶¶ 39, 43 (S.D. Tex. Jan. 28, 2018) (spoof orders placed behind existing orders). While "parking" Baiting Orders need not always accompany Spoofing Episodes, (*Kessev Tov*, 2023 WL 4825110 at *4 (while "'parking' bids may be one way of proving spoofing, there is no case law that holds it is the only way to do so."); *CFTC v. Skudder*, No. 22-cv-1925, 2022 WL 17752392 at *8 (N.D. Ill. Dec. 19, 2022) (not necessary to allege parking)), parking such Baiting Orders is further evidence that Defendants did not intend for their orders to be filled, and knew that they were placing the orders as a manipulative technique and were not engaging in legitimate market activity. (¶274.)

- Defendants' Baiting Orders frequently left Defendants with an imbalanced order book position favoring the sell side – something that should not happen if Defendants were truly the neutral market makers they claim to be. *See Harrington*, 585 F. Supp. 3d at 417 (listing among common indicia of spoofing, "large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer"); *Kessev Tov*, 2023 WL 4825110 at *4 (sufficient for private plaintiff to allege that "Defendants' actions were irrational and contradictory to ordinary market making behavior"); *Skudder*, 2022 WL 17752392 at *6 (denying motion to dismiss spoofing complaint which alleged that "by placing spoof orders that were larger than the visible genuine orders" the defendant "created imbalance in the market and put pressure in the direction of his genuine orders"). Despite these imbalanced order book positions, Defendants often did not sell any shares of NWBO after posting Baiting Orders, indicating that they placed the Baiting Orders in order to create artificial selling pressure and induce other market participants to submit additional sell orders, and thus artificially drive down the price of NWBO shares, contrary to the behavior of an ordinary trader or market maker. (¶275.)

- There was a short time period (ranging from milliseconds to two minutes) between Defendants' placement and cancellation of their Baiting Orders, indicating that Defendants never intended to execute the Baiting Orders (¶276.) *Harrington*, 585 F. Supp. 3d at 417 (indicia of spoofing include "the passage of time between placement and canceling of orders (usually in milliseconds)"); *Skudder*, 2022 WL 17752392, at *7 (cancellation within thirty seconds); *CFTC v. Thakkar et al.*, No. 18-cv-00619, ECF. 1, at ¶¶ 37–39 (N.D. Ill. Jan. 28, 2018) (spoof orders exposed to the market for only two minutes).

- There was a high concentration of cancelled Baiting Orders after an Executing Purchase during the limited period when each spoofing event occurred. *See Harrington*, 585 F. Supp. 3d at 417 (indicia of spoofing include "cancellation of orders when … legitimate small orders are completely filled"); *Kessev Tov*, 2023 WL 4825110 at *5 (Defendants were "placing and canceling irrationally high bids"); *CFTC v. Nowak et al.*, No. 19-cv-06163, ECF 1, at ¶¶ 53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (spoof orders canceled immediately after receiving a fill on genuine orders); *CFTC v. Flotron*, No. 3:18-cv-00158, ECF 1, at ¶¶ 29–30 (D. Conn. Jan. 26, 2018) (spoof orders canceled as soon as the market moved close to those orders). During each Spoofing Episode, Defendants cancelled all of the Baiting Orders, sometimes amounting to tens of thousands of Baiting Orders, in a matter

of seconds and sometimes milliseconds after an Executing Purchase, all of which had been placed by Defendants at most mere minutes earlier. (¶277.)[6]

- The stark contrast between the share volume of Baiting Orders and executed sell-side orders during each Spoofing Episode is additional and further indication that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices, rather than making a genuine attempt to sell NWBO shares. (¶278.) In the median Spoofing Episode, Defendants placed and subsequently cancelled 4,500 sell-side shares in Baiting Orders while, according to data available to Plaintiff, they executed zero sell-side orders. An extremely high sell-side cancellation rate, such as the 100% here, is a strong indication that Defendants never intended to execute those Baiting Orders. (¶279.) *See Skudder*, at *3 (upholding spoofing complaint where defendant's "median futures spoof order was 100 times the size of his genuine futures orders" and defendant "canceled more than ninety-nine percent of all of the spoof order contracts that he placed"); *CFTC v. Oystacher et al*, No. 15-cv-9196, 2016 WL 3693429, at *31 (N.D. Ill. July 12, 2016) (defendant's "execution rates were much higher on the trade side than on the cancel side").

- The stark contrast between the share volume of each Defendant's Executing Purchases and each Defendant's sell-side orders is additional and further indication that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices at which to execute Executing Purchases at favorable prices. Defendants executed 2,000 shares in Executing Purchases, while in contrast Defendants did not execute any sell-side orders. (¶280.) The lopsided ratio between Defendants' Executed Purchases and executed sell-side orders is additional indication that Defendants never intended to execute their Baiting Orders to sell. (¶281.) *See, e.g.*, *SEC v. Lek Sec.*, 370 F. Supp. 3d 384, 391 (S.D.N.Y. 2019) (upholding identification of spoofing episodes where ratio of executed shares on the genuine side to spoofed side of the market was 3 to-1).

- Defendants carried out thousands of Spoofing Episodes over the Relevant Period, and often multiple episodes per trading day. The repetition of this pattern of placing fictitious Baiting Orders which create an artificial price, transacting Executing Purchases at the artificial price, and then cancelling all of the Baiting Orders, is indicative of scienter. (¶282.)[7]

- Defendants' behavior was inconsistent with *bona fide* market making, which involves purchases and sales in roughly comparable amounts to provide liquidity while remaining roughly market neutral. *See, e.g.*, 73 Fed. Reg. 61,699 (Oct 17, 2008); 69 Fed. Reg. 48,015 (Aug. 6, 2004). Over Baiting Periods, Defendants posted a median of 149% more new sell-side orders than new buy-side orders. Over Cancellation Periods, Defendants cancelled a median of 100% of the sell-side orders created during Baiting Periods, but only a median

---

[6] *See Skudder*, at *7 n.19 ("[t]here are times when a trader may cancel an order for 'totally legitimate reasons,'" but "evidence of a series of cancellations made in close connection to orders placed on the opposite side of the market still provides a factual basis to infer an intent to cancel") (quoting *United States v. Chanu*, 40 F.4th 528, 534 (7th Cir. 2022)).

[7] *See, e.g.*, *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 447 (S.D.N.Y. 2000) (length of time (covering several years) that fraud occurred was indicative of scienter).

of 71% of the buy-side orders created during Baiting Periods. (¶283.) *Cf. Skudder*, at *3 (spoofed futures orders were cancelled 99.78% of the time while genuine orders were cancelled 78.9% of the time).

- Defendants specifically designed and implemented algorithmic trading programs to execute their spoofing activities. Moreover, each Defendant – all of which are sophisticated entities which utilize cutting edge technology – closely monitored, modeled, and analyzed the performance, impact, and effects of their algorithmic trading program throughout the Relevant Period, including the spoofing pattern which the algorithm executed again and again on NWBO stock during the Relevant Period with similar effects each time. (¶267.) *See Oystacher,* 203 F.Supp.3d at *942 (spoofing conducted through automated tools).

- As registered broker-dealers, Defendants knew and/or were required to know that it was unlawful to place Baiting Orders to sell in a Limit Order Book or IDQS that were never intended to be executed in order to trick market participants into selling shares of NWBO stock. (¶¶268-9.) As registered broker-dealers, Defendants were required, pursuant to FINRA Rule 2020, to have internal policies, procedures and systems that detected and prohibited manipulative or fraudulent trading devices or schemes. As registered broker-dealers, Defendants were also required, pursuant to FINRA Rules 5210, to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm. Indeed, during the Relevant Period each Defendant filed an "Annual Certification of Compliance and Supervisory Processes," pursuant to FINRA Report 3130.[8] (¶270.) Defendant Citadel also admits to having such a monitoring program. (¶ 271.)[9]

- Each of the Defendants has a history of violating various securities laws, including being found by various financial regulators to have improperly manipulated or failed to prevent the manipulation of stock prices. (¶273.)[10]

- There is an extremely low statistical likelihood that the price variations for each of the Spoofing Episodes occurred naturally. (¶285.)[11]

---

[8] *Cf., In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (signing of SOX certifications supports inference of scienter).

[9] The complaint in *Harrington* – which the court found adequately pleaded manipulation claims – similarly alleged that U.S. broker-dealer defendants were required under FINRA rules to have, maintain, and certify to such internal policies. Amended Complaint at ¶¶168-169 (ECF. 63), *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.*, No. 21-cv-00761 (S.D.N.Y. May 6, 2021).

[10] *See, e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) ("evidence of past practice may indeed be probative of present practice"); *In re Focus Enhancements, Inc. Sec. Litig.,* 309 F. Supp. 2d 134, 159 (D. Mass. 2001) ("A repetition of past practices may establish scienter").

[11] *See e.g., Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d at71 (2d Cir. 2021) (defendant knew that its conduct would cause the security's price "to spike over and above what would have been expected based on market volatility alone" based on statistics); *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 70 (2d Cir. 2018) (crediting allegation that it was a "near statistical certainty" that plaintiffs traded

By manipulating down the share price of NWBO, Defendants were collectively able to make hundreds of millions of dollars in aggregate profits by purchasing hundreds of millions of shares of NWBO at artificially depressed prices. (¶286.) Defendants also have a financial incentive to spoof NWBO shares to execute client trades at artificially favorable prices and thereby gain or retain the trading business of clients. (¶287.)[12]

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Wells Fargo & Co. Sec. Litig.*, No. 20-cv-4494, 2021 WL 4482102, at *8 (S.D.N.Y. Sept. 30, 2021) (Woods, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While Plaintiff's claims must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, even under the PSLRA, "[t]he court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Wells Fargo*, at *8 (citing *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (*per curiam*).

## IV.   PLAINTIFF ADEQUATELY ALLEGES EXCHANGE ACT CLAIMS UNDER SECTION 10(b) AND SECTION 9

### A.   Plaintiffs' Allegations Are More Specific And Persuasive Than The Complaints In *Harrington* And *Kessev Tov,* Which Are Factually And Legally On Point Cases Where Courts Recently Denied Similar Motions to Dismiss

Two recent spoofing decisions, including one in this District, make clear that Defendants' motion should be denied. In *Harrington*, Judge Schofield recently denied a motion to dismiss, rejecting the very same arguments that Defendants raise here in a very similar case. Defendants,

---

directly with defendants).

[12] *See Harrington*, 585 F. Supp. 3d at 416 ("Of note, the Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices for either client or proprietary accounts.")

however, largely ignore Judge Schofield's decision, do not attempt to distinguish the spoofing allegations in that case, and do not argue that *Harrington* was wrongly decided on the law. Rather, Defendants cite only to an unpublished *discovery* order in that case, misleadingly implying that it addressed the pleading standards for stating spoofing claims.[13]

Like here, in *Harrington*, the plaintiff alleged that multiple broker-dealer defendants engaged in market manipulation by spoofing the stock of a particular company by placing baiting orders to sell that defendants did not intend to execute in order to push down the price of the stock so that defendants could purchase it at artificially depressed prices. *Compare with id.* at 412; ¶¶274-283 (alleging specific detail about the timing, volumes, prices, and other statistical analyses of Baiting Orders). Similarly to here, the *Harrington* complaint contained six examples of defendants' spoofing conduct and alleged a total of approximately 100,000 spoofing episodes. *Compare id.* at 416; ¶¶75-261, Ex. 1 (alleging 16 examples and thousands of spoofing episodes). And like here, the plaintiff alleged that defendants sought to benefit from their spoofing by obtaining shares at below-market prices in order to cover short positions established through a related alleged scheme of naked short selling. *Cf. id.* at 412; ¶¶67, 286, Ex. 1 (alleging Defendants profited by purchasing shares at below-market prices to sell later in time).[14]

The defendants in *Harrington* moved to dismiss the spoofing claims on four grounds – all

---

[13] *See* Def. Br. at 25; *Harrington*, ECF 120 (denying Plaintiff's motion to compel discovery of Defendants' customers in order to determine whether they should be added as Defendants). Currently pending in *Harrington* is a motion to dismiss the plaintiff's second amended complaint, which, after extensive discovery, alleges that non-market maker defendants engaged in a cross-border spoofing scheme by giving their customers Direct Market Access (DMA). By contrast, the Complaint alleges that Defendants spoofed NWBO shares in a proprietary capacity as market makers as well as on behalf of customers including those who did not have DMA. (¶38.)

[14] Other similarities between the allegations in the present case and *Harrington* also undermine Defendants' arguments. In *Harrington*, the plaintiff, like Plaintiff here, alleged that defendants engaged in separate but simultaneous spoofing schemes (*id.* at 412), that the spoofing occurred on a trading venue that was (at least) partially de-anonymized, that each individual spoofing episode caused a small decrease in share price (*id.* at 412), and that the orders and trades were effected by algorithmic trading programs (*id.* at 416).

asserted by Defendants here[15] – and Judge Schofield denied them all. Judge Schofield rejected defendants' assertion that the complaint needed to plead whether trades were for defendants' own accounts or client accounts because "[t]he Complaint alleges that the … Defendants placed the allegedly manipulative orders and specifies the date and time of multiple manipulative orders and trades for each … Defendant."[16] Judge Schofield rejected defendants' assertion that the complaint failed to plead scienter because it contained "particularized facts constituting circumstantial evidence of conscious misbehavior" fitting each of four indicia that are examined by courts in spoofing cases, and which are specifically pled in detail in the Complaint.[17] Judge Schofield also rejected defendants' claim that the complaint failed to plead loss causation because it alleged spoofing on a large percentage of trading days and that each spoofing episode had a lasting price effect.[18] And Judge Schofield rejected the assertion that the complaint failed to plead reliance because the complaint contained sufficient allegations that the plaintiff relied on an assumption of an efficient market that was distorted by defendants' spoofing.[19]

*Kessev Tov v. Doe(s)*, 2023 WL 4825110 (N.D. Ill. July 27, 2023), is also directly on point. In *Kessev Tov,* the court found that even allegations that <u>lacked</u> many of the detailed elements in

---

[15] *Cf. Harrington*, at 415 *with* Def. Br. at 12.

[16] *Id.* at 416 ("That the Complaint mentions that Defendants trade for their own proprietary accounts and the accounts of their customers does not undercut the Complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed Concordia stock.  Of note, the Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices for either client or proprietary accounts.").

[17] *Id.* at 417 (the four indicia are: "(1) the passage of time between placement and canceling of orders (usually in milliseconds), (2) cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled, (3) parking baiting orders behind smaller legitimate orders placed by other traders and (4) large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer.")

[18] *Id.* at 419 ("It would not be proper to draw the inference sought by Defendants – that individual spoofing episodes cannot have a long-term cumulative effect on the price of a stock – at the motion to dismiss stage.")

[19] *Id.* at 420.

*Harrington* sufficed to state a claim for spoofing under Section 10(b). It too rejected a number of the very same arguments raised by Defendants here. For example, *Kessev Tov* denied the defendants' motion to dismiss despite the fact that it involved spoofing on the market for S&P 500 index options, a similar market to OTC Link and NYSE ARCA Global OTC. *Compare Kessev Tov*, 2023 WL 4825110 at *1 *with* Def. Br. at 6-8, 34. Similarly, in rejecting defendants' claim that "the sizes of the bids and asks" placed by defendants were "relatively small" and "equal on both sides of the market," the *Kessev Tov* court held that "even if the orders entered were relatively small, because it was not an active market, these allegedly deceptive orders could still have great effect." *Compare Kessev Tov*, 2023 WL 4825110 at *5 *with* Def. Br. at 26. The Court further held that "[w]hile "layering" or "parking" bids may be one way of proving spoofing, there is no case law that holds it is the only way to do so." *Compare Kessev Tov*, 2023 WL 4825110 at *4 *with* Def. Br. at 15-16. And the Court held that it was irrelevant at the pleading stage that the plaintiff did not identify who specifically benefitted from the spoofing scheme and how much profit they made (*id.* at *5), and that stock prices may have moved in the opposite direction as the Baiting Orders during a spoofing episode (*id.* at *6). *Compare with* Def. Br. at 25-26.

Notably, throughout the Defendants' Motion they cite extensively to and rely on an earlier decision in *Kessev Tov* that was superseded by this decision. *See* Def. Br. at 27-30 (citing *Kessev Tov v. Doe(s)*, 2022 WL 2356626 (N.D. Ill. June 30, 2022)). Despite the fact that the *Kessev Tov* decision Defendants rely on in their Motion was superseded a month ago, Defendants have not notified the Court that the case is no longer sound law.

Because Plaintiff here alleges not only the same facts held to be sufficient in *Harrington* and *Kessev Tov*, but also additional numerous other facts further evidencing that Defendants were engaging in illegal spoofing,  (¶¶84, 98, 112, 126, 140, 154, 167, 180, 187, 201, 214, 228, 235,

242, 249, 256, 264), and that virtually all of the objections raised by Defendants here were rejected in *Harrington*, *Kessov Tov* or both, Defendants' motion to dismiss should likewise be denied.

### B.   Plaintiff Adequately Alleges Manipulative Conduct With Particularity

To state a claim for market manipulation under Section 10(b)5-(a) and (c) and Section 9[20], a plaintiff must plausibly allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). Such a claim is adequately pled when "the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc.*, 493 F.3d at 102. Because manipulation "can involve facts solely within the defendant's knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id. See also Harrington Global Opportunity Fund., Limited.*, 585 F. Supp. 3d at 418 (same).  Rather, the plaintiff need only "lay out the nature, purpose, and effect of the fraudulent conduct and the roles of the defendant without requiring specific instances of the conduct." *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC,* No. 02-cv-0767-LBS, 2002 WL 31819207, at *5 (S.D.N.Y. Oct. 10, 2002)).

Securities fraud claims encompass "a wide range of conduct."  *Lorenzo v. SEC,* 139 S. Ct. 1094, at 1101, 1104 (2019).   Market manipulation includes practices "intended to mislead investors by artificially affecting market activity," or "controlling or artificially affecting the price

---

[20] Defendants do not offer any unique arguments for dismissal of Plaintiff's Section 9 claim. (Def. Br. at 12.) or common law fraud claim.  (Def. Br. at 39.).

of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). "[S]ufficient proof of manipulation [exists] if the manipulator caused **either** actual **or** apparent activity **or** caused a rise in the market price." *SEC v. Martino,* 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003) (emphasis added). "For market activity to 'artificially' affect a security's price, we generally ask whether the transaction or series of transactions 'sends a false pricing signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded. *Set Capital,* 996 F. 3d at 76.

Defendants' spoofing of NWBO falls well-within the "wide range of conduct" prohibited by Sections 10b5-(a) and (c) and Section 9.

### 1.  Plaintiff's Baiting Order Allegations Constitute Misconduct

Defendants argue the Complaint fails to plead manipulation because Plaintiff's allegations relating to "Baiting Orders" are internally contradictory, refuted by Plaintiff's own allegations, or impossible. (Def. Br. at 13.) These excuses are incorrect and/or irrelevant.

Defendants' <u>first</u> attempt to challenge the Complaint is to recharacterize and replace the actual allegations in the Complaint with a single, alternate allegation – that "Baiting Orders were never intended to be executed, and thus fictitious, because they were cancelled." (Def. Br. at 13.) This reductive circularity is not what the Complaint alleges, as the allegation that an order is a Baiting Order is based on multiple criteria well-established in the case law[21] that includes the

---

[21] *See CFTC v. Skudder*, 2022 WL 17752392, at *8 (upholding complaint when alleged spoof orders were placed to move the market in favor of genuine orders and cancelled after genuine orders were executed even without alleging that spoof orders were placed near best bid/ask price or parked behind existing orders); *CP Stone Fort Holdings, LLC v. Doe(s)*, 2017 WL 1093166, at *1, 4 (baiting orders placed at best available price and parked behind other orders to minimize the possibility that baiting orders would be executed); *U.S. v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (relative size and timing of canceled orders indicative of manipulation); *CFTC v. Oystacher*, 203 F.Supp.3d at 942  (spoof orders placed at or near the best bid or offer and existing orders); *CFTC v. Nowak et al*., No. 19-cv-06163, ECF 1, at ¶¶ 53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (spoof orders placed close to the best bid or ask and canceled immediately after receiving a fill on genuine orders on opposite side of limit order book); *CFTC v. Zhao*, No. 18-cv-00620, ECF 1, at ¶¶36–38 (N.D. Ill. Jan. 28, 2018) *CFTC v. Mohan*, No. 4:18-cv-00260, ECF. 1, at ¶¶39, 43 (S.D. Tex. Jan. 28, 2018) (spoof orders placed behind existing orders close to the best bid or ask); *CFTC*

volume of Baiting Orders, timing relative to Executed Purchases, impact on a Defendant's own order book, and other characteristics.[22] *E.g.*, ¶69 (ratio of sell-side orders per executing purchase); ¶70 (sell-side shares cancelled compared to non-spoofed executed purchases); ¶71 (exponentially more artificial sell-side order flow prior to buying shares, as measured by the volume of sell side order flow, the cancellation of that order flow and the greater share of cancelled sell-side order flow); ¶82 (asymmetry in order cancellation rates vs. *bona fide* market making). Such allegations are routinely sufficient to allege manipulative spoofing. *Harrington*, at 417 (collecting cases).

Defendants then bizarrely go on to claim, without any citation or support, that a cancelled order cannot be a Baiting Order because "replacing an order with another order does not mean the prior order was cancelled." (Def. Br. at 13.)[23] But in a footnote, Defendants are forced to acknowledge that the Complaint expressly addresses this point and explains that it limits the term "cancellation" to updates where Defendants ***removed*** some volume of shares from the quote or order.[24] (Def. Br. at 13 n.19.) This definition[25] of "cancellation" is appropriate because the

---

*v. Banoczay et al.*, No. 20-cv-05777, ECF 1, at ¶¶51–75 (N.D. Ill. Sept. 29, 2020) (spoof orders placed near the best bid or ask); *CFTC v. Flotron*, No. 3:18-cv-00158, ECF 1, at ¶¶29–30 (D. Conn. Jan. 26, 2018) (spoof orders canceled when market moved close to those orders).

[22] Defendants' claim that most orders in any market are cancelled is irrelevant to the allegations regarding specific orders that are the subject of the Complaint and has been rejected repeatedly by courts. *See Harrington*, at 418 ("Defendants also argue that the large volume of placed and cancelled orders does not support an inference of scienter because more than 95% of all placed orders are canceled before execution. Even if it were permissible to consider that fact on a motion to dismiss, it does nothing to explain the frequent pattern of spoofing alleged in the Complaint. That 95% of placed orders are canceled in the market does not mean spoofing was absent here.")

[23] This argument only applies to one of the two venues at issue – OTC Link – even though Defendants admit that Canaccord, GTS, and Instinet also trade NWBO stock on NYSE ARCA Global OTC, where limit orders are cancelled as well as updated. (Def. Br. at 7 n. 12.)

[24] The Complaint focuses on the orders and transactions that Defendants placed on OTC Link and NYSE ARCA Global OTC because those are the actions that were visible to and manipulated the market. Whether Defendants "retained" other "client orders" in their own records after removing firm offers from a trading venue is not relevant to the factual allegations of spoofing conduct.

[25] Defendants' definitional disputes are improper for a motion to dismiss. *Sharette*, 127 F. Supp. 3d at 84

removal of a *portion* of shares in a sell order, together with all other allegations in the Complaint, publicly communicates the same false signal to the market as the removal of an entire sell order of the same size and price.[26] Courts regularly treat order modifications as equivalent to cancellations in spoofing cases. *See, e.g.*, *CFTC v. Edge Fin. Techs., Inc.,* No. 1:18-cv-00619, 2020 WL 6381288*, at *3* (N.D. Ill. Aug. 13, 2020) (spoofer "automatically and continuously modified [the] order at a particular price level down and then up by one lot"); *CFTC v. Nav Saro Futures Ltd.*, *PLC*, No. 15-cv-3398, 2016 WL 8257513 (N.D. Ill. Nov. 14, 2016) (spoofed orders "were modified hundreds of times to keep them from resulting in executed trades"); *cf.* CME Group Market Regulatory Advisory Rule 575 ("No person shall enter or cause to be entered an order with the intent, at the time of order entry, to cancel the order before execution or ***to modify the order to avoid execution***.") (emphasis added).

Second, Defendants argue that there is something inconsistent, and therefore implausible, about the allegation that Defendants in some instances cancelled an identically sized and priced prior order rather than the specific Baiting Order. (Def. Br. at 14.) For one, this objection is irrelevant to OTC Link, which shows one quote at a time. (¶8 n.4.) And as with Defendants' above definitional challenge, they are wrong. The allegations in the Complaint are entirely appropriate because the effect on the market is the same regardless of whether a Defendant who had a pre-

---

(S.D.N.Y. 2015) ("In questioning the definition of 'hedging' and 'hedge ratio' used in the [complaint], however, the Credit Suisse Defendants have merely raised a factual dispute inappropriate for resolution at the pleading stage, before the development of a fuller factual record of discovery, including the opinion of other experts whose testimony may shed better light on these complex economic and industry practice issues. Resolving a disagreement over the interpretation of terminology instrumental to the alleged manipulative scheme—as well as the alleged misstatements and omissions—would require assaying the weight of the evidence, which is not permitted when adjudicating a motion to dismiss.")

[26] While Defendants criticize the Complaint's use of the term "cancellation," they do not dispute that the replacement of one order to sell 200 shares with an order to sell 100 shares (at the same price) communicates the same relevant information to other traders as the removal of one of two identical orders to sell 100 shares each.

Spoofing Episode sell order and then entered one or more additional sell orders during the episode ultimately elected after they made their Executing Purchase to cancel the pre-existing sell order or the subsequent sell order(s). In both instances, the Defendant is falsely increasing the supply of shares for sale during the Spoofing Episode and then removing that supply once its goal of purchasing shares at artificially depressed prices was achieved.[27]

Contrary to Defendants' assertion that it is necessary "to identify which supposedly cancelled orders it claims made up the purported manipulative scheme" (Def. Br. 14.), spoofing complaints characterize the impact of the defendant's order flow on the ***aggregate*** volume of supply and demand in the market. It does not matter "which" order was cancelled.[28]

<u>Third</u>, Defendants argue that they cannot be held liable for their manipulative trading because two of them (Lime Financial and Instinet) may have engaged in certain of the manipulative trading only on behalf of clients. This is wrong. Even if true (which is not at all substantiated or alleged)[29], a broker-dealer is liable under the securities laws for its own knowingly or recklessly

---

[27] Defendants have not identified a single case which immunized a spoofing defendant from liability merely because the defendant cancelled older order identifiers rather than newer ones. This is because whether a cancellation message refers to newer or older identifiers following Executing Purchases has no impact on whether the Defendants "sent false market signals." *Skudder*, 2022 WL 17752392, at *8. *Cf. Kessev Tov*, 2023 WL 4825110 at *5 (evaluating the effect of Baiting Orders on the market rather than the specific characteristics of individual orders).

[28] *See, e.g.*, Complaint, *CFTC v. Mohan*, No. 4:18-cv-00260, ECF 1, Ex. A (S.D. Tx. Jan. 28, 2018) (orders differentiated only by price and side of order book); Complaint, *CFTC v. Zhao*, No. 1:18-cv-00620, ECF 1, Ex A (N.D. Ill., Jan. 28, 2018) (same). Much like OTC Link, "[t]he visible portion of the order book includes only the aggregate number of orders at each price level and the aggregate number of lots comprising those orders." Complaint, *CFTC v. Banoczay*, No. 1:20-cv-05777, ECF 1 at 8 (N.D. Ill. Sep. 29, 2020). Rather, "if the aggregate size and number of sell orders significantly outweighs the total aggregate size and number of buy orders, market participants may believe that book balance indicates that supply is exceeding demand and a price drop is imminent and may decide to place orders to sell." Complaint, *CFTC v. Oystacher*, 2015 WL 7356255 (N.D. Ill. Oct. 19, 2015).  Nor is it necessary for spoofing to follow a formulaic scheme of placing baiting orders before executing purchases and cancelling those specific order identifiers thereafter. *See Banoczay* at 23 n.8, at 25 n.11 (certain spoofed orders placed ***after*** executing purchases).

[29] Defendants' improper factual assertion that "clients…decide whether and when to place an order and at

manipulative conduct whether on behalf of itself or others.  *See SEC v. U.S. Env't Inc.*, 155 F.3d 107, 108 (2d Cir. 1998) ("We hold that [defendant broker-dealer] can be primarily liable under §10(b) for following a stock promoter's directions to execute stock trades that [the defendant] knew, or was reckless in not knowing, were manipulative, even if [the defendant] did not share the promoter's specific overall purpose to manipulate the market for that stock."); *see also Harrington,* 585 F. Supp. 3d at 416  ("That the Complaint mentions that Defendants trade for their own proprietary accounts and the accounts of their customers does not undercut the Complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed Concordia stock"); *Lorenzo*, 139 S. Ct. 1094 (holding a broker dealer liable under Sections 10b-5(a) and (c) for the knowing dissemination of false and misleading information to investors, despite the fact that the dissemination was at the direction of the broker dealer's boss and the broker dealer did not have ultimate authority over the false and misleading statement).[30] And regardless, this argument is inapplicable to the remainder of the Defendants because they concede – as they must – that the alleged manipulative trading occurred in their own proprietary accounts and, therefore, not on behalf of any clients. (Def. Br. at 23-24.)  Indeed, in order to be "market makers" – which they elsewhere claim to be (*id*.) – Defendants cannot be trading on client accounts.  15 U.S.C. § 78c(a)(38) (Exchange Act defines "market maker" . . . who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) *as*

---

what price" (Def. Br. at 3), and "the clients set the terms of those orders" (Def. Br. at 22), are inconsistent with the facts pled in the Complaint and therefore inappropriate for a motion to dismiss.  *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2018 WL 6167889, at *10 (S.D.N.Y. Nov. 26, 2018).

[30] Spoofing is the dissemination of materially false information. *United States v. Chanu*, 40 F.4th at 541 (7th Cir. 2022), cert. denied, 143 S. Ct. 746, 214 L. Ed. 2d 449 (2023) ("By obscuring their intent to cancel, through an orchestrated approach," the spoofing defendants "advanced a quintessential "half-truth" or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in the hopes of financial gain").

*being willing to buy and sell such security for his own account* on a regular or continuous basis.")
(emphasis added).[31]

    <u>Fourth</u>, Defendants argue that the Complaint fails to plead manipulative conduct because
only some of their Baiting Orders were "parked" behind other orders in the Limit Order Book.
(MTD at 15.)[32] This argument not only ignores the many instances in which Defendants did, in
fact, park their Baiting Orders, but also improperly attempts to isolate one indicium of scienter and
ignore the rest of the Complaint.   Plaintiff does not allege that *every* Baiting Order was parked
behind other orders[33], but instead alleges that Defendants *often* parked their sell orders behind
other orders and that pattern of conduct – in combination with all other aspects of Defendants'
NWBO trading activity – supports a plausible inference of manipulation.[34] Indeed, Defendants
acknowledge the relevance of Plaintiffs' parking allegations when they observe that orders that are
not parked are "more likely to be executed than other orders." (Def. Br. at 16.)  And, regardless,

---

[31]    *See also* SEC Staff Report on Algorithmic Trading at *37,
https://www.sec.gov/files/algo_trading_report_2020.pdf. (last visited on August 24, 2023.) Market makers
engage in "trading their own principal.") (citing Stock Exchange Practices, Senate Report No. 1455, 73rd
Congress 2d Session (June 16, 1934)); 17 C.F.R. § 255.3(a), 255.4(b) (excluding "market making-related
activities" from the prohibition on "engaging as principal for the trading account of a banking entity").
Defendant Citadel's own website states that market makers earn the bid-ask spread by "taking the market
risk to trade." (*See* Citadel Website, available at https://www.citadelsecurities.com/what-we-do/what-is-a-
market-maker/). (last visited on August 24, 2023.)

[32] Defendants also suggest that there is something improper about the allegation that Defendants "parked"
some orders behind later-placed orders (Def. Br. at 9), but do not attempt to explain why the false market
signal of a Baiting Order is any different based on the relative timing of other third-party orders. As the
Complaint describes in ¶86 n.18, a Defendant's decision to maintain an order "parked" behind a newer
better offer has the same market impact as a decision to place a new order behind a pre-existing better offer.

[33] Defendants plainly mischaracterize the Complaint's allegations in this regard.  *See* ¶274 ("While
'parking' Baiting Orders need not always accompany Spoofing Episodes … parking such Baiting Orders
is further evidence that Defendants did not intend for its orders to be filled….").

[34] *See Harrington*, 585 F.Supp.3d at 417 ("parking baiting orders behind smaller legitimate orders placed
by other traders" is evidence of scienter); *CP Stone Fort Holdings, LLC v. Doe(s)*, 2017 WL 1093166, at
*1, 4 (baiting orders placed at the best available price and parked behind other orders to minimize the
possibility that baiting orders would be executed); *CFTC v. Oystacher et al.*, 203 F.Supp.3d at 942 (N.D.
Ill. 2016) (defendants placed spoof orders behind existing orders); *CFTC v. Mohan*, No. 4:18-cv-00260,
ECF 1, at ¶¶39, 43 (S.D. Tex. Jan. 28, 2018) (spoof orders placed behind existing orders).

parking is not required.  *See, e.g., Kessev Tov*, 2023 WL 4825110 at *4 (while "'parking' bids may

be one way of proving spoofing, there is no case law that holds it is the only way to do so.");

*Skudder*, 2022 WL 17752392, at *8 (same).

      <u>Fifth</u>, Defendants claim that their conduct was not manipulative because they purportedly

sold NWBO shares during certain of the Spoofing Episodes and "informed NWBO as much."

(Def. Br. 16.) This is apparently a reference to a certain Defendant's improper attempts to threaten

Plaintiff with Rule 11 sanctions by claiming that unverified, limited and cherry-picked data

contained in certain charts produced in a letter to Plaintiff without any authentication of its nature

or source was conclusive proof of that Defendant's relevant trading activity. (ECF 110.) Putting

aside that there are numerous instances in which Defendants did not, in fact, sell during Spoofing

Episodes,[35] that Defendants sold NWBO shares during certain of the Spoofing Episodes is, as the

Complaint alleges, entirely consistent with manipulative spoofing because it reflects that illegally-

acquired shares were in some instances being sold in order to earn profits. (¶89.) This is more than

sufficient to defeat a motion to dismiss. *See Kessev Tov*, 2023 WL 4825110 at *5 (not necessary

to show that Defendants "took advantage of an allegedly distorted stock price" because Plaintiffs

"do not know the entirety of Defendants' trading activity"); *Harrington*, 585 F.Supp.3d at 418

("That spoofing may have ultimately worked against Defendants' long positions in Concordia

stock does not negate their manipulative intent in receiving a benefit by buying shares at artificially

lower prices.").   Notably, courts routinely reject similar attacks on very similar spoofing

allegations, *even following discovery and trial*.[36]

---

[35] After filing the Complaint and submitting their motion to dismiss, one Defendant provided Plaintiff with nonpublic transaction data that appears to confirm the absence of any sales by that Defendant for one minute and twenty-one seconds following just <u>one</u> of the thousands of Executing Purchases identified in the Complaint.

[36] *See, e.g., U.S. v. Smith and Nowak*, No. 1:19-cr-00669, ECF 903 (N.D. Ill. Aug. 16, 2023) (jury found

Lastly, Defendants offer the claim, unsupported by any case law, that Plaintiff's Baiting Order allegations are insufficient because they do not include the price and volume of each of the alleged *tens of millions* of Baiting Orders. (Def. Br. at 17.) The Complaint and Exhibit 1 provide more than sufficient detail regarding Defendants' Baiting Orders, including over 200 pages of trading records that include the total number of shares offered and the range of prices for Baiting Orders during each of hundreds of Spoofing Episodes. Moreover, the details that Defendants insist must be included are fully within Defendants' knowledge[37] and would require that a complaint be thousands of pages long to state a claim. As this Court held in *Harrington*:

> Defendants' argument that these facts are insufficient because the Complaint must plead additional particularized facts is unavailing…..Defendants' argument is unfounded because '[a] claim of manipulation … can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.  If Defendants' argument were correct, it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms."

585 F.Supp.3d at 418; *see also Kessev Tov*, 2023 WL 4825110 at *5 ("in early stages of a case, manipulation need not be pled to the same degree of specificity as a misrepresentation claim"); *In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (S.D.N.Y. 2019) (same); *Sharette.*, 127 F. Supp. 3d at 83 (S.D.N.Y. 2015) (same).

---

defendants liable for spoofing despite defendants' argument that the government "cherry-picked data" to make otherwise acceptable trading conduct appear illegal and court denied motion for a new trial and rejected a defendants' claim that the government's expert's analysis of defendant's trading "cherry-picked" data); *Securities and Exchange Commission v. Lek Securities Corp.*, 370 F.Supp.3d 384, 407 (S.D.N.Y. 2019) (denying *Daubert* motion and rejecting a spoofing defendant's claim that the government's expert's analysis was inadequate because it did not include "the entirety of [the defendant's] trading").

[37] Defendants are among the most technologically advanced trading firms in the world and can determine without Plaintiff's assistance any details they may find useful regarding their own trades of NWBO stock.

24

### 2. The Complaint Adequately Alleges That Defendants' Misconduct Artificially Depressed The Price Of NWBO Stock

The Complaint alleges with particularity that the intended and actual consequence of Defendants' spoofing conduct was to depress the price of NWBO shares below its true market level. (¶¶63-67; Ex. 1.)[38]

Defendants argue that these allegations are "unsubstantiated" because they do not identify "the sell orders that were induced, the market participants that placed them, or the decrease in NWBO share prices." (Def. Br. at 17.)[39] For each of its 16 examples, however, the Complaint explains that Defendants' Baiting Orders successfully induced the entry of sell orders from other market participants, which is confirmed by the fact that Defendants' Executing Purchases were consummated. These Executing Purchases were passively priced limit buy orders that, by definition, required the entry of a new, aggressively-priced sell order by another market participant at a price equal to or below the price of the buy order in order to execute.[40] And regardless, as with all of Defendants' arguments that the 100-plus page complaint and 200-plus page Exhibit 1[41] lack

---

[38] Exhibit 1 contains 213 pages of trading records that identify thousands of Defendants' Spoofing Episodes. These data include the date, time, volume, and price of Executing Purchases; the calculated Best Offer; the date, volume, minimum and maximum prices of Baiting Orders; the calculated price decline; and the date, time and price of certain prior or next sales by Defendants. (ECF 102-1.) In total, Exhibit 1 identifies 30,464,591 shares of Baiting Orders and 19,300,908 shares of Executing Purchases, which is a conservative figure that understates the true scope of Defendants' spoofing conduct. The Complaint and Exhibit 1 only include one Executing Purchase per Spoofing Episode, but Defendants often purchased multiple times at artificially depressed prices per Spoofing Episode. (¶68 n.12.)

[39] Defendants argue that the Complaint "has not alleged—and cannot—allege that a *single* order artificially depressed the *entire* market for NWBO stock," Def. Br. at 17, which is irrelevant. The Complaint alleges that the *combined* impact of Defendants' spoofing conduct was to cause a substantial and persistent negative impact on NWBO share price.

[40] Defendants fail to mention that publicly available data from OTC Link and NYSE ARCA Global OTC do not contain information regarding third-party matching sell orders beyond the execution of Defendants' passive buy orders. Here, again, Defendants ask that Plaintiff be required to conjure up nonpublic data to satisfy an imaginary pleading standard that no plaintiff could ever satisfy and no case law requires.

[41] Defendants attack Exhibit 1 using the same unavailing arguments presented elsewhere in their brief – that some (less than half of) Baiting Orders were priced at the market and that some unspecified number of

sufficient detail, Defendants provide no legal citation or even a rationale as to why details regarding *third-parties' trades* are supposedly required to plead market manipulation. The quantification of the decrease in NWBO share prices caused by Defendants' illegal conduct will be the subject of expert opinion at the appropriate stage.

Defendants next argue that "there is no particularized allegation that the share price at the end of the spoofing episode is lower than at the start." (Def. Br. at 18.) This argument demonstrates only that Defendants chose to misconstrue Plaintiff's allegations. The Complaint alleges that Defendants' conduct depressed the price of NWBO shares beneath their true market value, which could of course occur whether or not the price of NWBO shares was higher or lower at a given point in time than at any earlier point in time. If NWBO's share price should have risen 10 cents over a period of time but only rose 5 cents due to Defendants' illegal conduct, Defendants would have caused a material decline in the price of NWBO shares notwithstanding that the price did not decrease in absolute terms. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (securities fraud damages are "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct"). Indeed, this very argument was rejected in *Kessev Tov*. In response to defendants' argument that "prices fell over the course of bidding"—*i.e.*, that the share price moved in the opposite direction as Baiting Orders over the spoofing episode—the court concluded that "this price drop, however, could still reflect artificial prices." 2023 WL 4825110 at *6.

Defendants then ignore or misstate the Complaint's allegations of price impact and falsely

---

Executing Purchases were above the "prevailing best offer price." (Def. Br. at 20; *see supra* at 26-27.) Defendants claim that this exhibit "inexplicably fail[s] to include the factual details of the spoofing steps present in the 'example episodes,'" (Def. Br. at 20) although such additional factual details are what make the "example episodes" useful "examples," and Defendants fail to provide any legal support for a conclusion that a market manipulation complaint must contain hundreds of pages of trading detail already in the possession of Defendants.

attack the "peak-to-trough" calculation as its "sole price-decrease allegation." (Def. Br. at 19.) The Complaint specifically explains for each of its 16 examples and for every Spoofing Episode contained in Exhibit 1 that Defendants' Baiting Orders allowed them to obtain Executing Purchases at a price below the prevailing best offer – direct allegations of price decrease for every Spoofing Episode. (¶¶87, 101, 115, 129, 143, 157, 170, 183, 190, 204, 217, 231, 238, 245, 252, 259.) The "peak-to-trough" calculation is provided in the Complaint's summary tables and in Exhibit 1 as an *additional* measure of price impact.  Contrary to Defendants' assertions (and their artificial hypothetical[42]), the calculation does not always generate a negative number, but will instead (correctly) result in a "price decline" of zero when the share price increased from before to after a Spoofing Episode.[43]  Conservatively, the Complaint does not allege any Spoofing Episodes where the price decline from this calculation was zero.

### C.    The Complaint Pleads A Strong Inference Of Scienter

To establish scienter, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Capital,* 996 F.3d at 78. The question is whether "all of the facts alleged, taken *collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308 at 322-23 (2007) (emphasis in original).[44] Because a plaintiff

---

[42] Defendants do not show that the "peak-to-trough" calculation would generate an incorrect result for any of the Spoofing Examples in the Complaint.

[43] For example, if the share price increased from $10 during the two minutes before the Executing Purchase to $11 during the two minutes after the Executing Purchase, then the "peak-to-trough" calculation would be ($10 / $10) – 1 = $0.

[44] Under the PSLRA, the strong inference of scienter may be inferred even where each individual component is not "independently sufficient" if those facts "bolster the inference of manipulative intent." *Set Capital LLC*, 996 F. 3d at 81 (2d Cir. 2021).  In spoofing cases, scienter may be inferred from a pattern of trading activity even when that activity is otherwise legal.  *Kessev Tov, LLC*, 2023 WL 4825110, at *4

"generally must frame the facts respecting the defendant's mental state . . . without the benefit of discovery . . . most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 287 (D. Conn. 2005) (quoting *Arnlund v. Deloitte & Touche LLP*, 199 F.Supp.2d 461, 475 (E.D.Va. 2002)).

### 1.   The Complaint Alleges Conscious Misbehavior Or Recklessness

The Complaint sufficiently alleges scienter through conscious misbehavior or recklessness by alleging, among other things, that Defendants designed and operated algorithmic trading programs (¶267) that executed spoofing activities that Defendants approved (¶268) despite knowing that spoofing is illegal (¶¶269-273), which conduct involved thousands of repeated instances (¶282) of parking Baiting Orders (¶274) for short periods of time (¶276) before executing purchases and then cancelling Baiting Orders (¶277). The Complaint also alleges that Defendants' Baiting Orders were far larger than *bona fide* sell-side orders (¶278), that the ratio of cancelled Baiting Orders to executed *bona fide* orders was extremely high (¶279), that the share volume of executed sell-side orders was far lower than the volume of Executed Purchases (¶280), that the ratio of executed sell-side orders to Executing Purchases was very low (¶281), and that the asymmetry in the posting and cancellation of Defendants' orders was inconsistent with *bona fide* market making (¶283). This is sufficient for scienter. *Harrington*, 585 F. Supp. 3d at 417-418.

Defendants' motion flies in the face of Supreme Court precedent that allegations in a securities complaint must be analyzed *as a whole* (*Tellabs Inc..*, 551 U.S. at 310 (2007)), but even

---

("[m]arket manipulation can be accomplished through otherwise legal means.") (quoting *CP Stone Fort Holdings, LLC v. Doe(s),* No. 16-cv-4991, 2016 WL 5934096, at *5 (N.D. Ill. Oct. 11, 2016)).  *See also Skudder*, 2022 WL 17752392, at *8 (rejecting argument that "the complaint merely alleges lawful trading activity" and finding sufficient allegations that the Defendant's "spoof orders sent false market signals" even if the "pattern of trading alleged in this complaint is different than that at issue in other cases").

when improperly viewed one-by-one in isolation, Defendants' arguments still fail to undermine the strong inference of scienter.

Defendants first argue that Plaintiff's allegations of the short time period between the placement of a Baiting Order and its cancellation[45], the concentration of Baiting Orders, and the "parking" of those orders are insufficient to establish manipulative intent (Def. Br. 27-29), even though they are among the aspects of trading conduct that courts have repeatedly found to support an inference of manipulation. *Harrington*, 585 F.Supp.3d at 417 (relevant aspects include timing, cancellation, parking, and order book asymmetry); *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (cancellations following executing orders); *CP Stone Fort Holdings*, 2017 WL 1093166, at *4 (parking and cancellation of orders); *CFTC v. Oystacher*, 203 F. Supp. 3d at 945 (N.D. Ill. 2016) (pattern of baiting order placement and cancellation speed); *CFTC v. Skudder*, 2022 WL 17752392, at *6-7 (rapid cancellations); *CFTC v. Nowak et al.*, No. 19-cv-06163, ECF 1, at ¶¶53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (price impact); *see also SEC v. Masri*, 523 F. Supp. 2d 361, 369 (S.D.N.Y. 2007) (timing, size, repetition of transactions).

Defendants then argue that since orders on one of the two relevant venues – OTC Link – are not anonymous, spoofing cannot occur on that venue because other market participants would recognize and ignore it.[46] (Def. Br. at 28.) Defendants' speculative assertion that the OTC markets are immune to manipulation would come as a surprise to the SEC and DOJ, who have both alleged spoofing on OTC Link. *See, e.g.,* Complaint, *SEC v. Nielsen*, No. 5:20-cv-3788, ECF 1, (N.D. Cal.

---

[45] Defendants repeat their assertion that the Complaint's definition of Baiting Orders is improper in this section of their brief and it is refuted earlier herein, *supra* at 21-22.

[46] Defendants are simply wrong here because orders on NYSE ARCA Global OTC are fully deanonymized as well. Global OTC Integrated Feed Client Specification, at *8, https://www.nyse.com/publicdocs/nyse/data/Global_OTC_Integrated_Feed_Client_Specification_V1.16.pdf (listing only "attributed" add order message) (last visited on August 24, 2023).

June 9, 2020); Felony Information, *U.S. v. Nielsen*, No. 22-cr-161, ECF 1, (N.D. Cal. Apr. 18,

2022). In reality, "OTC stocks [are] frequent targets of market manipulation," Joshua T. White,

*Outcomes of Investing in OTC Stocks*, SEC Division of Economic and Risk Analysis, Dec. 16,

2016 (collecting studies), for the simple reason that market participants cannot be certain that

deanonymized order flow is manipulative.  ¶60; Expert Report of Professor Paul Milgrom, *Alaska*

*Electrical Pension Fund v. Bank of America*, Case No. 14-cv-7126 (JMF), ECF 551, (S.D.N.Y.

Jan. 22, 2018) ("manipulative trades are viewed by market participants as potentially informed

[*i.e.*, non-manipulative]").

Next, Defendants assert that the Complaint must also contain additional details regarding

its algorithmic trading programs[47] and the individual employees of Defendants who approved or

executed them, but do not cite to a single spoofing case where these details were required at the

pleading stage. *Cf. Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 435 (S.D.N.Y. 2017)

("While a plaintiff is not required to identify specifically the individuals at a company who acted

with scienter in order to plead scienter with respect to a company, the allegations must still

establish that *someone* whose intent could be imputed to the corporate defendants acted with

scienter."). The Complaint sufficiently alleges, among other things, that Defendants were required

as broker-dealers to comply and certify their compliance with anti-spoofing regulations (¶¶269-

271), and that they instead designed and implemented algorithmic trading programs approved by

corporate officials whose algorithms spoofed NWBO stock. (¶¶267-268.) Notably, the Court in

*Harrington* specifically rejected this very same argument: "Defendants argue that the Complaint

---

[47] It is unclear even to what type of detail Defendants refer when they argue that the Complaint must allege "what programs" each of the Defendants used (what name a Defendant gave its program?), or who ran the programs (the names of individual traders?), or how the programs were used (what computer buttons were pressed?).

needs to plead additional facts regarding Defendants' algorithmic trading programs and the corporate officials who designed or oversaw those programs. Defendants' argument is unfounded because a claim of manipulation can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain manipulation claim." *Harrington*, 585 F. Supp. 3d at 418.

### 2. The Complaint Alleges That Defendants Had Motive To Spoof NWBO Shares Both When Trading For Their Own Accounts And Even If They Traded For Client Accounts

Pleading scienter does not require evidence of personal financial incentives. *Tellabs*, 551 U.S. at 325. The absence of stock sales or financial gain "does not make the fraud illogical; indeed, if that were the case, motive and opportunity would be the sole test for pleading scienter, not just an alternative test." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012). Although not required, in addition to the robust evidence above, Defendants had a pecuniary motive to defraud NWBO. ¶¶286-287.[48]

Defendants argue, without any support, that they did not have motive to commit fraud because, they claim, two of them were acting only on behalf of clients during some of the alleged transactions. (Def. Br. at 22.) This argument is a red herring. Even if those two Defendants were placing orders and executing transactions exclusively for client accounts in every one of the millions of instances covered by the Complaint (which is not what the Complaint alleges and which Defendants concede is not true), they still had motive to commit fraud.[49] This is because Defendants engaging in spoofing in client accounts still obtain commissions and fees generated by

---

[48] Defendants do not dispute that they had the "opportunity" to defraud investors.

[49] Defendants assert that just two Defendants, Lime and Instinet, exclusively traded NWBO stock by allowing clients to place orders over those companies' platforms (Def. Br. at 22 n. 28), which is a factual statement that is inappropriate on a motion to dismiss and will be the subject of discovery (to the extent it is relevant).

obtaining below-market price shares for its customers. (¶287.) In fact, *purchasing* shares for clients at artificially depressed prices makes it necessary to *sell* those shares to convert their profits to cash, yielding Defendants even more commissions and fees. The more Defendants engage in spoofing in client accounts, the more profit they make on the trading derived from that activity.

Defendants next claim that the Complaint fails to allege that Defendants profited by obtaining NWBO shares at artificially low prices. This argument fails on two levels. The Complaint pleads that Defendants profited at the point at which they acquired NWBO shares at lower prices than they would have paid *absent their illegal conduct. See Harrington*, 585 F. Supp. 3d at 418 ("Ostensibly, when a spoofing Defendant sold that stock, their profits would be increased, **or losses decreased**, by the difference of the price they paid versus the price they would have paid had they not engaged in spoofing.") (emphasis added); *Kessev Tov*, 2023 WL 4825110 at *6 (price decline during upward spoofing "could still reflect artificial prices"). In addition, the Complaint pleads details of hundreds of Defendants' sales of NWBO stock within three days[50] of an Executing Purchase at prices above the Executing Purchases, showing a conversion of spoofing profits to cash. It is unclear why Defendants believe that these subsequent sales must be "connected" in some unspecified way to the Executing Purchases – all of these transactions are in NWBO shares, which are fungible.[51]

Thus, whether on their own behalf or on behalf of clients, Defendants' spoofing activity provided each of them with a clear and substantial financial motive to engage in the illegal

---

[50] *See In re Take-Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 311 n.51 (S.D.N.Y. 2008) (In analyzing insider trading under Section 20A, "the weight of authority in this Circuit, [] maintains that trades are contemporaneous if they occur within a reasonable period of time, usually limited to a few days, of one another.") (finding contemporaneous trades within 5 business days).

[51] Defendants include no authority in their brief for any requirement of some form of specific attribution of sales to purchases and its citation to *ATSI* regards a comparison of average prices that has nothing to do with the Complaint. (Def. Br. at 20.)

conduct.[52] While the trading gains from any individual Spoofing Episode are small, Defendants'

high-frequency algorithmic trading programs effected *many millions* of transactions at better-than-

market prices, which provide enough motive for Defendants' conduct.[53]

## V.      THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

A plaintiff's burden to plead loss causation is "not a heavy one." *DoubleLine Capital LP

v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. Sept. 23, 2019)

(Woods, J.) (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187

(2d Cir. 2015)). "[C]ourts in this District have historically evaluated loss causation under the notice

pleading standard of Rule 8 of the Federal Rules of Civil Procedure." *Sharette*, 127 F. Supp. 3d at

80 (S.D.N.Y. 2015).  Thus, "a short and plain statement that provides the defendant with notice of

the loss and its causal connection to the alleged misconduct is therefore sufficient to assert loss

causation; pleading the elements with particularity is not required." *Id.*

Plaintiff more than meets this standard. Plaintiff alleges exactly how Defendants'

manipulative spoofing allowed Defendants to manipulate and depress the price of NWBO stock

and how, as a result of Defendants' spoofing, it was forced to sell stock at artificially depressed

prices.[54]

---

[52] *ATSI* is not to the contrary. There, the ***only*** allegations against a market maker defendant were that it "was the principal market maker [and] that it therefore must have known the [other] defendants were engaged in manipulation, and that it therefore must have been complicit." *ATSI Commc'ns*, 493 F.3d at *3. Plaintiff does not seek to hold Defendants liable for others' conduct but for their own, and the factual allegations in the Complaint regard Defendants' own actions, not inferences of scienter to be drawn from the mindset or conduct of third parties.

[53] *See e.g.,* Citadel Website, available at https://www.citadelsecurities.com/what-we-do/what-is-a-market-maker/ ("To generate revenue, a market maker must accurately price securities almost instantaneously and execute trades at significant scale.")

[54] *Compare* ¶¶288-296 *with Harrington*, 585 F.Supp. 3d at 419 (holding that the plaintiff sufficiently pleaded loss causation by alleging that spoofing occurred on a majority of trading days during the Relevant Period, that the plaintiff traded on twenty-seven of those days and that "the spoofing depressed the price for up to fifteen minutes with lingering cumulative effects over the Relevant Period"). *See also Sharette,*

Defendants argue Plaintiff does not adequately allege that it sold shares during the time periods in which NWBO's share price was depressed by Defendants' manipulative spoofing. (Def. Br. at 32.) This is wrong for two reasons.  First is that the Complaint alleges, for each and every example and for all the Spoofing Episodes in Exhibit 1, that Defendants' Baiting Orders allowed each Defendant to execute Executing Purchases at a price below the prevailing best offer. (*See e.g.,* ¶¶61-63, 67.) That is direct evidence of a price decrease caused by Defendants' manipulative spoofing. Plaintiff then also alleges a peak-to-trough "Price Decline" for each Spoofing Episode, which is further direct evidence of a price decrease caused by Defendants' spoofing.  (Ex. 1.)[55]

Second, Plaintiffs allege numerous instances in which it sold shares when its share price was artificially depressed by Defendants' spoofing. Plaintiff alleges it sold "more than 49 million shares . . . where the sale price was formulaically derived from the closing price on dates where Spoofing Episodes occurred, such that a decline in the price on that day caused a decline in the price at which Plaintiff sold shares of NWBO stock." (¶289.) It lays out in painstaking detail the (1) transaction date; (2) number of shares sold; (3) sale price; (4) pricing date; (5) number of

---

127 F. Supp. 3d at 103 (holding that the plaintiffs "pleaded enough facts evidencing a link between the alleged manipulative scheme and their damages" because they "have shown in some detail exactly how the structure of the Offerings allowed investors to manipulate and depress the price of ECD stock" and "that following the Offerings, short sales of ECD stock skyrocketed while the price of ECD stock plummeted."); *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (holding that the plaintiffs plausibly alleged "that the Exchanges' alleged misconduct was *a* proximate cause of the economic loss they suffered by trading in the manipulated securities market").

[55] Contrary to Defendants' claim, the Price Decline does not "always result in a negative number."  Def. Br. at 18.  As defined in footnote 1 to Exhibit 1, "The "Price Decline" is the peak-to-trough percentage change in the price of executed transactions, i.e., x / y - 1, where *x* is the lowest transaction price over the two minutes preceding the Executing Purchase to the two minutes following the Executed Purchase and *y* the highest transaction price over the two minutes preceding the Executing Purchase." Suppose the price increases from $10 during the two minutes before the Executing Purchase to $11 during the two minutes after the Executing Purchase. Then (y) the highest transaction price over the two minutes preceding the Executing Purchase is $10, and (x) the lowest transaction price over the two minutes preceding the Executing Purchase to the two minutes following the Executed Purchase is also $10. The Price Decline in that example would be $10 / $10 - 1 = $1 - $1 = $0.  In other words, the Price Decline is defined such that when the price increases from before to after the Executing Purchase, the Price Decline is zero.

spoofing episodes during that day; and (6) the average return to Spoofing Episodes for each of those 49 million shares. (*Id*.) And, it details 30 instances in which Defendants spoofed *within an hour*, and in some instances, just seconds before a NWBO sale. (*Id*. (as denoted by the asterisk)).[56]

Relying on *Gamma Traders,* Defendants claim that such allegations are inadequate. (Def. Br. at 32.) They are wrong. Unlike here, in *Gamma Traders*, the plaintiff "never pleaded that it traded after Defendants spoofed on a particular day" or even that it traded "in close proximity to Defendants' spoofing." *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 77, 81 (2d Cir. 2022). Rather, it alleged "conclusorily" via "rote probabilities" that "there must have been at least one trade – though it has no idea which one or when it may have occurred – in which it came out on the net losing end of Defendants' market manipulation" and that it was "implausible as a matter of sheer probabilities that Defendants' spoofing activities never once affected the price at which Gamma traded." *Id.* at 78. By contrast, Plaintiff here cites numerous specific examples in which it traded after and in close proximity to Defendants' spoofing, as well as "facts to support its theory about the length of time that spoofing affect[ed] the market or the timing of any of its trades in relation to the spoofs." *Id.* at 81-82.  Indeed, exactly as prescribed by the Second Circuit in *Gamma Traders*, Plaintiff alleges how "its trades occurred so close in time

---

[56] Plaintiff also alleges how Defendants' spoofing negatively impacted NWBO's share price long term. (¶¶293-295.) It is not contradictory to allege that Defendants profited from their spoofing conduct and that the spoofing caused persistent and long-lasting declines in NWBO share price.  (Def. Br. at 33.) Defendants' argument rests on the same flawed argument, rejected by the court in *Kessev Tov*, that prices cannot increase during a Spoofing Episode. Just like decreases in a stock price following a material misstatement in a Rule 10b-5(b) claim do not necessarily reflect the dissipation of price inflation, so also an increase in the price of NWBO shares that would have occurred even absent Defendants' spoofing does not unwind the deflationary effect of a Spoofing Episode which is "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Acticon AG*, 692 F.3d at *38. Defendants profited from short sales opened at a higher price prior to a Spoofing Episode as well as from ordinary sales thereafter if the price partially reverts. (*E.g.*, ¶¶179, 185 (price declined during Spoofing Episode from best offer of $1.59 per share to allow Defendant GTS to purchase at $1.56 per share and sell 7,930 shares at a price of $1.57 per share after the Spoofing Episode)).

to Defendants' spoofing as to permit [the Court] to infer as a matter of common sense that the market prices were artificial when [NWBO] traded." *Id.* at 80.

Defendants next argue that Plaintiff does not sufficiently allege that its share price declines were caused *exclusively* by Defendants' manipulative misconduct. (Def. Br. at 33.)  But there is no such requirement at the pleading stage, and isolating the harm caused by a misrepresentation or a manipulation is generally reserved for expert analysis. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) ("whether plaintiffs will be able to … measure price impact … [is a] question[] that go[es] to the merits"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-414 (S.D.N.Y. 2015) (expert analyses are not required even at the class certification stage).  And, regardless, Plaintiff does allege that at some points in time Defendants' manipulative spoofing is the only explanation for NWBO's share price decline. *See, e.g.*, ¶290 (explaining that there was "no negative news issued that day regarding NWBO"). Furthermore, as Plaintiff alleges, whether the prevailing market sentiment towards NWBO at any particular moment was trending in a positive or negative direction does not alter the fact that the Defendants' spoofing caused a negative impact on the price of NWBO shares, depressing the price from what it would have been in an unmanipulated market. Whether the market was reacting at any particular instant to positive or negative news regarding NWBO, the market price of its stock was lower than it would have been throughout the Relevant Period absent Defendants' manipulative conduct. (¶292, fn. 61.)

## VI.    **THE COMPLAINT ADEQUATELY PLEADS RELIANCE**

To allege reliance for market manipulation claims, Plaintiff need only allege that it "reli[ed] on an assumption of an efficient market free of manipulation." *Set Cap.*, 996 F.3d at 76 (quoting *ATSI Commc'ns*, 493 F.3d at 101). This is because, "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are

determined by the natural interplay of supply and demand, not rigged by manipulators." *Harrington,* 585 F. Supp. 3d at 420 (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011)).

Here, the Complaint alleges that Defendants "deliberately engaged in repeated spoofing that interfered with the natural forces of supply and demand, and repeatedly drove NWBO's share price downward" (¶¶1, 307), and that Plaintiff relied "on an assumption of an efficient market free of manipulation" when it sold its shares. (¶301.) That is all that is required.  *See Harrington,* 585 F. Supp. 3d at 420*; Sharette*, 127 F. Supp. 3d at 101 n.9 (S.D.N.Y. 2015).

Nevertheless, Defendants argue that Plaintiff does not adequately plead reliance because it "fails to allege facts demonstrating that OTC Link and Global OTC – the markets on which NWBO traded – are efficient markets." (Def. Br. at 34.) First, Plaintiff adequately alleges that the markets for NWBO on OTC Link and Global OTC were efficient. Specifically, it alleges facts demonstrating that the market for NWBO meets the *Cammer* factors.[57] *See, e.g.*, ¶¶297-298. That OTC Link and Global OTC are "over the counter" markets does not mean that the market for NWBO was inefficient.  To the contrary; courts routinely find that such "over the counter" markets are efficient. *See, e.g.*, *In re Parmalot Sec. Litig.*, No. 04 cv-0030, 2008 WL 3895539, *9 (S.D.N.Y. Aug. 21, 2008) (finding an OTC market efficient); *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 206 (S.D.N.Y. Aug. 30, 2022) (same); *Dalton Petrie v. Electronic Game Card, Inc. et al*, No. SACV10-0252 DOC(RNBx), ECF 303, (C.D. Ca. July 21, 2015), (same).  Indeed, *Cammer* itself involved a security that was traded "over the counter." *Cammer*, 711 F. Supp. at 1283.[58] Finally,

---

[57] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[58] Defendants' cases are inapposite. *See Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 472 (S.D.N.Y. 2014) (plaintiff conceded it knew the alleged misstatements were false); *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) (plaintiff conceded it did not rely on the OTCBB market and that it was "not ignorant of the manipulation of the price of RMDX stock that they now claim to be

whether the market for NWBO was efficient is a matter for expert testimony, not appropriate to be decided at the pleading stage.

Relatedly, Defendants argue that Plaintiff does not sufficiently allege that the market for NWBO meets *Cammer* factor 5 – that the market reacted promptly to public information – because Plaintiff does not allege that its stock price increased on purportedly positive news. (Def. Br. at 35.) Putting aside that such a determination is not appropriate at the motion to dismiss stage, Defendants are wrong. Indeed, the Second Circuit has made clear that a plaintiff need not even demonstrate that its stock price reacted to public information at all – whether positive or negative – in order to demonstrate reliance. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (holding that the *Cammer* factors serve only as a guide for determining market efficiency to be applied in a case-by-case basis and that *Cammer* factor 5 is not a mandatory prerequisite to finding market efficiency); *In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) (same). Moreover, Plaintiff specifically alleges that the reason that its shares did not increase on the positive news regarding its key cancer drug is *because of* Defendants' spoofing.

## VII.   DEFENDANTS' REFERENCE TO TRADING DATA OUTSIDE THE COMPLAINT IS IMPROPER

Throughout their motion, Defendants cite to unverified and nonpublic "trading data," claiming that these data "may be considered in deciding the [] motion to dismiss, without converting the proceeding to one for summary judgment" because it is "integral to the complaint," citing *Jurupa Valley Spectrum, LLC v. National Indem. Co.,* No. 06-cv-4023, 2007 WL 1862162, at *5 (S.D.N.Y. June 29, 2007) (citation omitted). (Def. Br. at 36.) In a footnote, Defendants hedge

---

victims of"); *ScriptsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1253-58 (C.D. Cal. 2015) (the plaintiff failed to demonstrate at the class certification stage even basic information about the ScriptsAmerica market that would be sufficient to establish market efficiency, including trading volume, analyst coverage, Form S-3 eligibility, or an event study).

that to the "extent the Court determines that it cannot consider these data without converting the instant motion to one for summary judgment, Defendants respectfully request that the Court disregard the information and treat the motion as a motion to dismiss." (Def. Br. at 36, n. 37.) That footnote is necessary because Defendants' citation to this unverified and nonpublic trading data is, as Defendants implicitly acknowledge, not permitted on a motion to dismiss for two reasons: (1) it is not "integral to the complaint" and (2) a dispute exists regarding the accuracy and completeness of the data.

In their Motion, Defendants present a few pieces of unverified trading data concerning bids and offers in the OTC markets before certain of the alleged Spoofing Episodes (Def. Br. at 36-37); as a basis to factually argue that their Baiting Orders "were at prices consistent with or better than the bids and offers of other market participants reflected in the OTC Markets limit order book" (Def. Br. at 37-38); and the time of a single transaction (Def. Br. at 39).

None of these pieces of data are relevant, much less "integral to the complaint." *Goel v. Bunge, Ltd*., 820 F.3d 554, 559 (2d Cir. 2016). The Complaint does not rely on bids and offers for NWBO shares before the Spoofing Episode.  Nor does Plaintiff allege that Defendants' Baiting Orders were *always* priced above offers by other market participants. And the time of a single transaction among the thousands of data points in the Complaint is anything but "integral."

Moreover, even if the unverified "trading data" identified by Defendants were "integral to the complaint," they cannot be considered on a motion to dismiss because there is a dispute regarding the accuracy and completeness of those data. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Plaintiff here disputes that the data cited by Defendants are accurate and complete, as well as has the meaning ascribed by Defendants. As there is a dispute regarding the "authenticity or accuracy" of Defendants unverified "trading data" as well as the "relevance" of these records,

they cannot be considered on a motion to dismiss. *See id.*; *Fabi v. Prudential Ins. Co. of Am.*, No. 21-cv-4944, 2022 WL 5429520, at *4 (E.D.N.Y. Aug. 29, 2022), report and recommendation adopted in part, No. 21-cv-4944, 2022 WL 4483400 (E.D.N.Y. Sept. 27, 2022) (not considering documents related to an insurance contract because plaintiffs dispute their validity).

Even if this Court were to consider these unverified and nonpublic trading data, Defendants recycle arguments made elsewhere in the motion.[59] These arguments all fail for reasons previously given.[60]

## VIII.   <u>CONCLUSION</u>

For these reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.[61]

---

[59] *Compare* Def. Br. at 36 ("[T]he price of NWBO stock went up (not down) during the purported spoofing episode) *to* Def. Br. at 18 ("[T]here is no particularized allegation that the share price at the end of the spoofing episode is lower than at the start."). *Compare* Def. Br. at 37 ("[T]he publicly-available data shows that Defendants' offers were consistent with or better than those from other market participants") *to* Def. Br. at 15 ("[M]any of the alleged "Baiting Orders" were at better prices than the offers of the one market participant the Defendant supposedly "parked" behind.").

[60] Defendants are wrong on the facts as well. For example, Defendants insist that "the price of NWBO stock went up" during the Spoofing Episode on October 12, 2020. (Def. Br. at 36) But transaction data from that day—which Defendants omitted from the exhibits attached to their motion—show that the price of NWBO shares ***went down***, not up, after the downward pressure induced by Defendant Citadel's Baiting Orders. Specifically, immediately prior to Defendant Citadel's Executing Purchase at $1.02 at 14:20:25, the price of NWBO shares declined from $1.04 at 14:20:09 to $1.03 at 14:20:22.

[61] Should the Court dismiss the Complaint, Plaintiff respectfully requests leave to amend. *See Chill v. Gen. Elect. Co.*, 101 F. 3d 236, 271 (2d Cir. 1996) ("In the securities litigation context, leave to amend is particularly appropriate[.]"); *In re Tufin Software Technologies Ltd. Sec. Litig.*, No. 20-cv-5646, 2022 WL 596861, at *11 (S.D.N.Y. Feb. 25, 2022) (Woods, J.) (granting leave to amend for a second time); *Xu v. Gridsum Holding, Inc*., 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (same).  In the Second Circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead*." In re Tufin*, at *11.

Dated:  August 25, 2023               Respectfully submitted,
       New York, New York

By:  *Laura H. Posner*            
  Laura H. Posner
  Michael B. Eisenkraft
  COHEN MILSTEIN SELLERS & TOLL PLLC
  88 Pine Street, 14th Floor
  New York, New York 10005
  Tel: (212) 838-7797
  Fax: (212) 838-7745
  lposner@cohenmilstein.com
  meisenkraft@cohenmilstein.com

  Raymond M. Sarola
  COHEN MILSTEIN SELLERS & TOLL PLLC
  100 N. 18th Street, Suite 1820
  Philadelphia, PA 19103
  Tel: (267) 479-5700
  Fax: (267) 479-5701
  rsarola@cohenmilstein.com

  *Counsel for Plaintiff*