**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NORTHWEST BIOTHERAPEUTICS, INC.,

        Plaintiff,

    v.

CANACCORD GENUITY LLC, CITADEL
SECURITIES LLC, G1 EXECUTION
SERVICES LLC, GTS SECURITIES LLC,
INSTINET LLC, LIME TRADING CORP.,
AND VIRTU AMERICAS LLC,

        Defendants.

Case No. 1:22-cv-10185 (GHW) (GS)

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .................................................................................................................................2

I.      NWBO'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ...............................2

        A.      The Opposition Fails To Defend NWBO's Deficient Theory Of
                Manipulative Conduct ............................................................................................2

        B.      *Kessev Tov* And *Harrington* Support Dismissal ....................................................9

        C.      NWBO Does Not Allege The Required Strong Inference Of Scienter .................12

        D.      NWBO Does Not Adequately Allege Loss Causation .........................................20

        E.      NWBO Does Not Adequately Allege Reliance ...................................................22

II.     PUBLICLY-AVAILABLE TRADING RECORDS REFUTE NWBO'S CLAIMS ........23

CONCLUSION ............................................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Alki Partners, L.P. v. Vatas Holding GmbH*,
769 F. Supp. 2d 478 (S.D.N.Y. 2011)................................................................22, 23

*In re Aphria, Inc. Sec. Litig.*,
342 F.R.D. 199 (S.D.N.Y. Aug. 30, 2022) ...............................................................23

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
2008 WL 850473 (S.D.N.Y. Mar. 27, 2008) ...........................................................14

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................7, 12, 19, 22

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ......................................................................22, 23

*CFTC v. Banoczay*,
No. 20-cv-05777, ECF 50 (N.D. Ill. Dec. 7, 2021) ...................................................3

*CFTC v. Edge Fin. Techs., Inc.*,
2020 WL 6381288 (N.D. Ill. Aug. 13, 2020) ............................................................5

*CFTC v. Mohan*,
No. 18-cv-00260, ECF 28 (S.D. Tx. Feb. 25, 2019)..................................................3

*CFTC v. Oystacher*,
No. 15-cv-09196, ECF 287 (N.D. Ill. Dec. 20, 2016) ..........................................3, 18

*CFTC v. Skudder*,
2022 WL 17752392 (N.D. Ill. Dec. 19, 2022) ...........................................................6

*In re Citigroup Auction Rate Sec. Litig.*,
700 F. Supp. 2d 294 (S.D.N.Y. 2009)......................................................................14

*Dalton Petrie v. Electronic Game Card, Inc.*,
No. 10-cv-0252, ECF 80, 121, 268 (C.D. Cal. July 21, 2015) ................................23

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan, Chase Co.*,
553 F.3d 187 (2d Cir. 2009).....................................................................................17

*Fabi v. Prudential Ins. Co. of Am.*,
2022 WL 5429520 (E.D.N.Y. Aug. 29, 2022)..........................................................25

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006)....................................................................................25

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
    41 F.4th 71 (2d Cir. 2022) ..............................................................................21, 22

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)....................................................................................24

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
    2021 WL 3491779 (D. Del. Aug. 9, 2021) ..............................................................16

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)......................................................................................18

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)....................................................................................16

*Kessev Tov, LLC v. Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ..............................................8, 9, 11

*Kessev Tov, LLC v. Doe(s)*,
    2023 WL 4825110 (N.D. Ill. July 27, 2023)................................. 6, 8, 10, 16-17

*In re London Silver Fixing Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018)....................................................................21

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019).....................................................................................19, 20

*In re Merrill, Bofa, and Morgan Stanley Spoofing Litig.*,
    2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ..........................................................21

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).......................................................23

*Pozniak v. Imperial Chem. Indus. PLC*,
    2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004).........................................................6

*Salvani v. ADVFN PLC*,
    50 F. Supp. 3d 459 (S.D.N.Y. 2014)......................................................................23

*Schwab v. E*TRADE Fin. Corp.*,
    258 F. Supp. 3d 418 (S.D.N.Y. July 10, 2017).....................................................18

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) .................................................................23

*SEC v. U.S. Environmental, Inc.*,
   155 F.3d 107 (2d Cir. 1998) ................................................................................. 19

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015) ................................................................ 21, 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................................ 12

*In re Trex Co., Inc. Sec. Litig.*,
   212 F. Supp. 2d 596 (W.D. Va. 2002) ................................................................. 16

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
   2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013) ..................................................... 14

*United States v. Coscia*,
   866 F.3d 782 (7th Cir. 2017) .............................................................................. 18

*In re Yukos Oil Co. Sec. Litig.*,
   2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ...................................................... 23

## **Rules**

Fed. R. Civ. P. 9(b) ......................................................................................................... 9

Fed. R. Civ. P. 11 ............................................................................................................ 9

Defendants[1] respectfully submit this reply memorandum of law in support of their motion to dismiss NWBO's Amended Complaint, ECF 95.

## PRELIMINARY STATEMENT

By its own admission, NWBO's theory of market manipulation is whatever it needs to be to survive the pleadings stage. After being confronted with Defendants' first motion to dismiss and uncontestable trading data refuting the allegations in its original Complaint, NWBO chose to remove key allegations and add qualifiers that render its theory even more incoherent and insufficient to support a claim. NWBO removed, for example, allegations regarding the prices of its shares at the beginning of the alleged spoofing episodes—prices that are known to NWBO and were included in the initial Complaint—because they refute its claims that Defendants' purported spoofing drove down its share price. And NWBO pivoted from blasting Defendants for "not sell[ing] any shares of NWBO," to alleging that "even if" they sold some shares, that too would be "consistent with" its spoofing theory.

Faced now with a second motion to dismiss that lays bare the implausibility of its claims, NWBO has backed away entirely from core allegations in its Amended Complaint. No longer must the "fictitious Baiting Orders" be "parked." It matters not which orders Defendants purportedly cancelled, or if they cancelled any. Even the *sine qua non* of NWBO's theory—that Defendants drove down the price of NWBO shares to purchase them at a discount—is negotiable: NWBO now says that it is irrelevant whether the price went up or down during the purported spoofing episodes. NWBO's about-face concerning the critical features that its own Amended Complaint relies on to purportedly distinguish lawful trading from illegal manipulation confirms

---

[1] Defined terms have the meanings provided in Defendants' joint memorandum of law in support of their motion to dismiss, ECF 115, which is referred to as "Motion" or "Mot." NWBO's memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint, ECF 123, is referred to as "Opposition" or "Opp'n."

what was already apparent: according to NWBO, no matter what Defendants allegedly did or did not do in its shape-shifting pleading, it was illegal spoofing.  Just as a man with a hammer sees everything as a nail, NWBO claims that everything Defendants do somehow demonstrates market manipulation.

Tellingly, the only concrete assertion NWBO stands by is that seven unaffiliated broker-dealers *independently* alighted on the *exact same* implausible spoofing scheme targeting the *same* obscure stock over the *exact same* five-year period.  This extraordinary claim defies common sense.  The obvious and far more compelling inference is that the seven broker-dealer Defendants were engaged in routine trading activity, lawfully transacting in the market for NWBO, frequently on behalf of their clients.

Permitting NWBO's claims to proceed would render nearly all routine market activity by broker-dealers unlawful.  That result would flood the courts with baseless suits, drowning out legitimate claims of securities fraud.  This case is precisely the type of abusive litigation the PSLRA was designed to prevent.  The Court should dismiss this lawsuit with prejudice.

## ARGUMENT

**I.    NWBO'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED[2]**

### A.    The Opposition Fails To Defend NWBO's Deficient Theory Of Manipulative Conduct

Rather than attempt to defend its manipulation theory against the deficiencies identified in the Motion, NWBO mischaracterizes Defendants as insisting that *every* spoofing complaint must allege cancellations, "parking," and a price decline.  Opp'n 17 & n.21.  But Defendants' position is not that *every* market manipulation case must contain those features—Defendants' position is

---

[2] NWBO does not dispute that its common law fraud claims rise and fall with its Exchange Act claims, *see* Opp'n 16 n.20, and those claims should thus be dismissed for the same reasons, *see* Mot. 39.

that NWBO should be judged on *its own Amended Complaint*, which defined its claim in terms of those features, and which failed to allege them with particularity.

In the Amended Complaint, NWBO alleges that Defendants engaged in a "three stage[]" market manipulation scheme.  ¶ 61.  *First*, Defendants purportedly placed "tens of millions of Baiting Orders," which are orders that "had no legitimate purpose and when placed, were not intended to be executed."  ¶¶ 61-62.  Defendants allegedly "parked" these orders "behind orders placed by other unsuspecting traders," thus "ensur[ing] that those Baiting Orders were extraordinarily unlikely to be executed."  ¶¶ 262-63.  *Second*, "shortly after the Baiting Orders to sell were placed," Defendants allegedly placed orders "to purchase NWBO shares at the lower stock prices created by the downward manipulation of their Baiting Orders."  ¶ 63.  During this period when the "Baiting Orders" were pending, Defendants purportedly "did not sell any shares of NWBO."  *E.g.*, ¶ 85.  *Third*, after the completion of these so-called Executing Purchases, Defendants allegedly "cancelled and removed all of their Baiting Orders to sell."  ¶ 64.

Now, NWBO contends that it does not matter whether *any* of the three stages of this farfetched scheme are sufficiently alleged.  NWBO takes the position that (i) "[i]t does not matter 'which' order was cancelled," or whether Defendants actually cancelled *any* "Baiting Orders," (ii) "parking is not required," and (iii) it does not matter whether "the price of NWBO shares was higher or lower" after the purported spoofing.  Opp'n 20, 23, 26.  And NWBO doubles down on its heads-I-win, tails-you-lose contention that whether Defendants sold shares or did not sell shares during spoofing episodes, either is indicative of fraud.  Opp'n 23.[3]

---

[3] Notably, NWBO relies on *complaints* as purportedly demonstrating "well established" criteria for spoofing, rather than opinions evaluating the sufficiency of those pleadings.  Opp'n 17; *CFTC v. Mohan*, No. 18-cv-00260, ECF 28 (S.D. Tx. Feb. 25, 2019); *CFTC v. Zhao*, No. 18-cv-00620, ECF 56 (N.D. Ill. June 4, 2021); *CFTC v. Banoczay*, No. 20-cv-05777, ECF 50 (N.D. Ill. Dec. 7, 2021); *CFTC v. Oystacher*, 15-cv-09196, ECF 287 (N.D. Ill. Dec. 20, 2016).

NWBO chose to allege that routine orders to sell and purchases of NWBO shares were transformed into "Fictitious Baiting Orders" and fraudulent "Executing Purchases" because of purported "parking," cancellations, and price declines.  *See, e.g.*, ¶¶ 83-89.  To survive a motion to dismiss, those facts must be alleged with particularity.  They are not.

1.   ***NWBO concedes that its "Baiting Orders" theory is impossible on the venue Defendants trade NWBO.***

NWBO's claim that Defendants *first* placed Baiting Orders and then cancelled *all of them* is impossible on the predominant venue on which Defendants trade NWBO, OTC Link.[4]  Mot. 13-14.  By NWBO's own allegation, on OTC Link, "each market participant is allowed to show only one order" at a time. ¶ 8 n.4; Opp'n 19 ("OTC Link ... shows one quote at a time.")  Thus, NWBO's spoofing theory—where Defendants *first* placed multiple "Baiting Orders" and *then* cancelled all of those orders, *e.g.*, ¶ 57 ("[i]mmediately *after* executing the Executing Purchases ..., the spoofer cancels *all* of the Baiting Orders" (emphasis added))—*is impossible on OTC Link*, Mot. 13-14.  NWBO fails to address this argument, which dooms its claims; the Court is not required to accept as true a claim contradicted by NWBO's own allegations.  Mot. 14.

2.   ***NWBO fails to allege any *order cancellations with particularity.***

NWBO fails to specifically allege that any "Baiting Order" was cancelled because the Amended Complaint expressly alleges that, rather than cancelling the "Baiting Orders," Defendants may instead have "cancelled" "an equivalent order previously placed by that Defendant on the over-the-counter markets."  Mot. 14.  In the Opposition, NWBO asserts that "it does not matter 'which' order was cancelled."  Opp'n 20.  But the core of NWBO's spoofing theory is that Defendants "cancelled *all* of their fictitious Baiting Orders."  *E.g.*, ¶ 67 (emphasis

---

[4]  Canaccord, Citadel Securities, G1X, GTS, Instinet, and Virtu trade NWBO on OTC Link, with Citadel Securities, G1X, and Virtu trading NWBO exclusively on that platform.  Mot. 7 n.12.

added).  The Amended Complaint alleges cancellation of *all Baiting Orders* no fewer than 29

times.[5]  Indeed, according to NWBO, "Baiting Orders" have "no legitimate economic purpose"

*because* they "are not intended to be executed," ¶ 8—under its theory, cancellation is *the critical*

*difference* between a Baiting Order and a legitimate one.  Simply stated, if an order was not

cancelled, it was not a Baiting Order—and cannot support NWBO's claimed manipulation.  And

yet by its own admission, NWBO has not pled that *any* of the cancelled orders were the purported

"Baiting Orders," as opposed to non-manipulative "equivalent orders."  In fact, NWBO admits

that these "equivalent orders" were placed outside of the supposed "Spoofing Episodes," and thus,

even if cancelled, *could not have been part of the purported scheme.*  Opp'n 19.[6]

### 3.     NWBO concedes that the so-called "Baiting Orders" were competitively priced, rather than "parked."

NWBO's own definition of "parking" does not evince a manipulative act; NWBO does not

even allege that Defendants' orders were "away from the market" at all.  As an initial

matter, alleging that Defendants' orders were priced worse than orders displayed by just a single

other market participant establishes *only* that the orders were not the single best order in the

market—an entirely unremarkable and commonplace feature of securities markets.  Mot. 15.

Moreover, NWBO's sixteen examples of alleged "parking" demonstrate that many of the "Baiting

Orders" were priced lower (better) than the orders of the single other market participant the

Defendant purportedly "parked" behind, and thus were competitively priced orders (not "fictitious

---

[5]  *See, e.g.*, ¶¶ 57, 64, 67-68, 70-71, 74, 76-82, 88, 90-96, 102, 104-10, 116, 118-24, 130, 132-38, 144, 146-52, 158, 160-65, 171, 173-78, 184, 191, 193-99, 205, 207-12, 218, 220-26, 232, 239, 246, 253, 260, 265, 276-79, 284.

[6]  NWBO suggests that its failure to allege cancellations with particularity is excused because the Amended Complaint defined "cancellation" to include instances where Defendants purportedly "removed some volume of shares from the quote."  Opp'n 18.  But there is no allegation in the Amended Complaint that any Defendant ever removed shares from a quote, and NWBO's argument that courts "regularly" treat order modifications as equivalent to cancellations, Opp'n 18-19, is entirely unsupported; its cases all involve orders being modified *and then actually cancelled*.  *See, e.g.*, *CFTC v. Edge Fin. Techs., Inc.*, 2020 WL 6381288, at *3 (N.D. Ill. Aug. 13, 2020) (spoofing software "immediately and automatically cancelled [spoofer's] order … as soon as any portion of his order was filled").

Baiting Orders"). *Id.* Finally, NWBO alleges that "parking" includes placing an order at a price worse than another order, *even where that other order was not placed yet*—this definition of "parking" is meaningless and certainly is not "evidence that Defendants did not intend for [their] orders to be filled." ¶ 274. NWBO's response is that it still alleges that "*some*" of Defendants' orders were "parked," but does not dispute that this means *only* that they were not the single best order in the market. Opp'n 22-23. NWBO's "parking" allegations thus do not support its claim that Defendants' orders "were extraordinarily unlikely to be executed," ¶ 263—and therefore do not establish any manipulative act.[7] Recognizing these pleading deficiencies, NWBO now argues repeatedly that "[p]arking is not required," Opp'n 22-23, 9, 15. This is a strawman. Defendants do not argue that *every* spoofing case requires "parking," but here, where "parking" is what purportedly establishes "that Defendants never intended for their Baiting Orders to be executed," ¶ 263, the failure to sufficiently allege parking dooms NWBO's spoofing theory.[8]

### 4.    The Opposition confirms that NWBO failed to plead price decline.

The crux of NWBO's theory is that Defendants' spoofing "dr[ove] down the price of NWBO shares," permitting Defendants to purchase shares "below the prevailing best offer *prior to entry of the Baiting Orders*." Opp'n 8-9 (emphasis added); *e.g.*, ¶¶ 1, 7.[9] But NWBO fails to

---

[7] NWBO also asserts that this "parking" was purportedly done "in order to hide [the] spoofing activities," Opp'n 22-23, but elsewhere admits this is impossible, as the identities of the firms displaying orders on OTC Link are visible to all market participants, Opp'n 25-26 & n.14. In any event, the case law cited by NWBO for this proposition is startingly inapposite, *see* Opp'n 8 n.5, concerning, for example, affirmative misrepresentations made in a news interview, *see Pozniak v. Imperial Chem. Indus. PLC*, 2004 WL 2186546, at *7 (S.D.N.Y. Sept. 28, 2004).

[8] NWBO's cases are wholly inapposite. *Kessev Tov, LLC v. Doe(s)* did not require the plaintiff to allege "parking" because "there were no other participants behind whom Defendants could park their allegedly manipulative bids," 2023 WL 4825110, at *4 (N.D. Ill. July 27, 2023), and in *CFTC v. Skudder*, the plaintiff alleged a pattern of trading that was "different than that at issue in other [spoofing] cases," namely, the *plaintiff never alleged that the defendant engaged in parking*, 2022 WL 17752392 at *8 (N.D. Ill. Dec. 19, 2022).

[9] NWBO's Exhibit alleges only that Defendants "Executing Purchases" were below the "best offer immediately prior to [a Defendant's] Executing Purchase," ECF 102-1 n.3—*i.e.*, *after* the alleged Baiting Orders had already been placed. That data point is irrelevant: it sheds no light on whether the "Baiting Orders" caused prices to go up or down.

allege its share price was affected by the purported spoofing because it fails to allege the price of its stock at the start of any purported spoofing episode.  Mot. 17-18.[10]  NWBO does not dispute that its pre-spoofing "stock prices are readily ascertainable and known to NWBO," Mot. 18—indeed, NWBO included these prices in its initial Complaint, *e.g.*, ECF 1 ¶ 74—and does not dispute that it removed those prices from the Amended Complaint after Defendants explained how the prices refuted its spoofing theory, ECF 86 at 2.  Instead, NWBO asserts without support that "Baiting Orders ... lured unsuspecting traders into placing their own orders" and—remarkably—argues that it is not required to plead a price decline because (i) it is "confirmed" that the "Baiting Orders" drove down the prices of its stock because "Defendants' Executing Purchases were consummated"; and (ii) Defendants' spoofing "depressed the price of NWBO shares" below some unalleged "true market value."  Opp'n 25-26.

Each of these arguments is meritless.  *First*, NWBO's tautological assertion that it sufficiently alleged that the "Baiting Orders" drove down its share price because "Defendants' Executing Purchases were consummated," Opp'n 25, fails because there is no allegation that these "Executing Purchases" would not have been consummated *but for* the purported spoofing; the Amended Complaint removed all allegations about the market for NWBO stock at the start of any purported spoofing episode, *see* Mot. 18.  *Second*, NWBO's "true market value" theory fails for several independent reasons.  As an initial matter, NWBO is required to plead the "effect of the fraudulent conduct" "with particularity," *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007), yet makes only a single conclusory allegation in a footnote that "the market price of its stock was lower than it would have been throughout the Relevant Period absent Defendants'

---

[10]  NWBO concedes that its "price decline" formula is flawed and does not actually show a decline—it asserts in a footnote that it does not "*always*" result in a negative number because, if the price of its stock did not change at all, it would result in a zero, Opp'n 27 n.43, but this only confirms that its formula will show a decline even if NWBO's share price actually increased.

manipulative conduct," ¶ 292 n.61; NWBO makes no attempt to specify the "true" value of its shares or even hint as to how such a value could be ascertained.  Moreover, NWBO's "true market value" theory is entirely different from its claim that the "Baiting Orders … dr[ove] down the price of NWBO shares" to permit Defendants to purchase shares at a discount.  ¶ 76.  If the price of NWBO stock did not decrease during the purported spoofing, NWBO's entire theory collapses.

Nor does NWBO have any authority for this remarkable "true value" argument.  It cites *In re Vivendi* as purportedly standing for the proposition that "all that is required" for price decline is an allegation that the stock price was depressed below its true market value, Opp'n 4, but *Vivendi* says nothing of the sort.  *Vivendi* stands for the narrow proposition that not every misstatement must cause a price reaction at the time the misstatement is made, but there still must be a price effect when the misrepresentation is revealed—and *Vivendi* has never been extended to the manipulation context, *see* 838 F.3d 223, 258 (2d Cir. 2016).  Indeed, the failure to "allege[] any facts to establish what the prevailing market price would have been for the [securities] involved in the at-issue transactions" is precisely what led to dismissal in *Kessev Tov I*.[11]  *Kessev Tov II* added allegations—entirely absent here—that, "when comparing the market midpoint to a volatility index, all other bids for certain S&P 500 index options on August 24 followed a tight linear relationship consistent with option theory."  2023 WL 4825110, at *2.  And unlike NWBO, the plaintiff in *Harrington* alleged the price of shares at the start of the spoofing episode to show that they had decreased.  *E.g.*, 21-cv-00761, ECF 63 ¶ 70.

*Finally*, to the extent NWBO's stock price was "depressed," it is far more plausible that was because of NWBO's mismanagement, failure to bring a single treatment to market, and

---

[11]   *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at *10 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*"); *see also Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *2 ("*Kessev Tov II*").

flooding of the market with 283 million shares during the Relevant Period, Mot. 1—almost *ten times* the total shares NWBO alleges (in a cursory chart) were placed in the "Baiting Orders," ¶ 67.

### 5. *NWBO doubles down on its improper heads-I-win, tails-you-lose allegation.*

As Defendants explained, NWBO's "Baiting Orders" theory lacks particularity because the Amended Complaint alleges, as purported evidence that routine orders to sell were "Baiting Orders," that Defendants "did not sell any shares of NWBO," but "even if" Defendants sold shares during the purported Baiting Period, such sales would be "consistent with" spoofing. ¶ 85. The Opposition doubles down on this heads-I-win, tails-you-lose allegation, citing to irrelevant passages from *Kessev Tov* and *Harrington*, Opp'n 23, that do not address Defendants' argument— under the PSLRA and Rule 9(b), it cannot be that whether Defendants acted in one manner, or in the exact opposite manner, either establishes market manipulation, Mot. 16.

### 6. *NWBO's exhibit does not meet its own theory of spoofing.*

NWBO asserts repeatedly that it has alleged "16 examples and thousands of spoofing episodes." *E.g.*, Opp'n 13 & 25 n.38. These "thousands of spoofing episodes" are alleged only in NWBO's Exhibit 1,[12] but the Exhibit fails to contain *any* of the indicia that purportedly transform routine sell orders into "spoofing." *See* Mot. 11-12. This argument is unaddressed, and the Court should disregard the Exhibit as deficient even under NWBO's own implausible theory.

### B. *Kessev Tov* And *Harrington* Support Dismissal

NWBO points to *Kessev Tov* and *Harrington* as purportedly establishing that its allegations are sufficient, but those cases support dismissal. *Kessev Tov* concerns alleged spoofing of options on the Chicago Board Options Exchange during a 2015 "flash crash" by "Doe" defendants. 2022

---

[12] ECF 102-1 is the "corrected" exhibit filed by NWBO after Citadel Securities served its second motion for Rule 11 sanctions (the first resulted in withdrawal of the Complaint). Magistrate Judge Gorenstein directed that Citadel Securities file its second sanctions motion following the disposition of the motion to dismiss. *See* ECF 110, 113.

WL 2356626, at *1.  Due to the flash crash, "many of those options had no bid or ask information," and the defendants allegedly took advantage of "the vacuum created by the lack of market makers by simultaneously placing offers to buy ... and offers to sell put options [] that Defendants never intended to execute and cancelling them within milliseconds."  2023 WL 4825110, at *1.  This conduct allegedly "created a false market midpoint … causing some market participants to execute midpoint bid orders that were well outside the rational price for those options."  *Id.*

On June 30, 2022, the court in *Kessev Tov* dismissed plaintiffs' first amended complaint, explaining that "plaintiffs had not alleged any facts to establish what the prevailing market price would have been for the options involved in the at-issue transactions and merely labeled prices irrational … without demonstrating why that was the case."  2023 WL 4825110, at *2 (cleaned up).  Plaintiffs subsequently amended their complaint to add, among other things, allegations regarding "all other bids" during the flash crash, "charts demonstrat[ing] a pattern of bids disconnected from other bids," and an expert declaration "sufficiently demonstrat[ing] how and why the injected prices were artificial as a matter of option theory."  *Id.* at *6-7.  On July 27, 2023,[13] the court in *Kessev Tov* denied a motion to dismiss the second amended complaint, finding that the plaintiffs had sufficiently pled a claim through the addition of "numerous exhibits plausibly suggesting that Defendants' actions were irrational."  *Id.*

*Kessev Tov I* and *II* squarely support Defendants' motion to dismiss, standing for the proposition that a plaintiff must allege with particularity that a defendant's prices were "irrational and contradictory to ordinary market making behavior."  2023 WL 4825110, at *4.  NWBO falls far short of this standard.  As an initial matter, NWBO fails to allege the price of its stock at the

---

[13]  NWBO makes the curious assertion that *Kessev Tov I* "is no longer sound law," Opp'n 15, but this is wrong: *Kessev Tov II* relies heavily on, and incorporates, *Kessev Tov I.  E.g.*, 2023 WL 4825110, at *1, *6.

start of the spoofing episode or the activities of other market participants (save one), and thus does

not establish Defendants' orders were "irrational," "artificial," or even out of line with the market.

As in *Kessev Tov I*, NWBO fails to allege "all other bids" as would be required to show

Defendants' orders were manipulative. *See id.* at *2. Nor does NWBO "allege[] any facts to

establish what the prevailing market price would have been for the [security] involved in the at-

issue transactions," *id.*, as required to plead price effect.

*Harrington* likewise supports dismissal. That case concerns a scheme very different—and

significantly more coherent—than that alleged by NWBO. *Harrington* involves an alleged

conspiracy to manipulate the market for Concordia shares, which trade as interlisted securities on

presumptively efficient markets NASDAQ and Toronto Stock Exchange. 585 F. Supp. 3d at 411-

12 (S.D.N.Y. 2022). Plaintiff alleged that certain Canada-based defendants placed "Baiting

Orders" that each "had a 'small negative impact' on the price of Concordia's shares that eventually

drove the price from $28.03 to $3.13." *Id.* at 412. At the same time, the defendants' U.S.-based

co-conspirators "engaged in excessive and abusive short selling," including "naked short selling."

*Id.* Working in tandem, the conspirators drove down the price of Concordia shares by spoofing

while the naked short sellers bought shares at a lower price, permitting them to close their short

positions and keep the price difference as a profit. *Id.* Although this scheme is far more cogent

than NWBO's, Judge Schofield found that it only "tenuously" made "economic sense" sufficient

to survive a motion to dismiss. *Id.* at 418. In contrast to *Harrington*, NWBO has not alleged a

comparable naked short-selling scheme, nor has it made anything more than conclusory,

speculative, and generalized allegations that Defendants actually caused any decrease in the price

of NWBO stock, or that any Defendant profited from the purported scheme. Following her denial

of the motion to dismiss in *Harrington*, Judge Schofield clarified that plaintiffs had "not articulated

any plausible theory under which any currently named Defendant is liable for their customers' trading activity," and "[t]he allegations of the Amended Complaint to which Plaintiffs cite allege only the obvious fact that the named Defendants execute trades for customers, not that those trades give rise to liability." No. 21-cv-761, ECF 120 at 4 (S.D.N.Y. Aug. 5, 2022).[14]  As NWBO alleges that Defendants "may have" been trading for "client accounts," ¶ 38, this clarification demonstrates that NWBO's economically irrational scheme fails to sufficiently allege scienter.[15]

### C.   NWBO Does Not Allege The Required Strong Inference Of Scienter

To establish the required "strong inference that the defendant intended to deceive investors," NWBO must allege facts (i) demonstrating that "defendants had both motive and opportunity to commit the fraud," or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  The "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Despite these "exacting pleading requirements," *id.* at 313, the Opposition makes sweeping, false claims that are unsupported by the allegations in the Amended Complaint: that "[b]y manipulating down the share price of NWBO, Defendants were collectively able to make hundreds of millions of dollars in aggregate profits by purchasing hundreds of millions of shares of NWBO at artificially depressed prices," or, alternatively, Defendants "have a financial incentive to spoof NWBO shares to execute client trades at artificially favorable prices and thereby gain or

---

[14]   NWBO argues weakly that this clarification was an "unpublished discovery order" but the order specifically addressed whether the plaintiff had articulated a cognizable theory.  No. 21-cv-761, ECF 120 at 4.  Following this order, the *Harrington* plaintiff amended, and a motion to dismiss that complaint is pending.

[15]   NWBO's representation that it alleged a "scheme of naked short selling," Opp'n 13, is false.  NWBO alleges that the Defendants purchased shares and then, at some point within a three day period, sold shares at a higher price—ignoring all other purchases and sales of NWBO stock by the Defendant during that period.  The handful of references to short selling in the Amended Complaint are irrelevant, as every single allegation regarding short sales is hypothetical.  Mot. 11; *e.g.*, ¶ 219 ("which generated a return … *if* that sale created a short position" (emphasis added)).

retain the trading business of clients," and that the seven Defendants' alleged manipulative conduct, viewed "collectively," meets these standards.  Opp'n 2.

Not only has NWBO failed to allege a theory of scienter that makes any financial sense, it has *no response* to what Defendants explained is the only plausible inference to be drawn from NWBO's allegations: that the seven broker-dealers were engaged in routine and lawful trading activity, frequently (or for some Defendants, exclusively) on behalf of clients.  This inference is far more plausible than NWBO's assertion that several broker dealers all separately and independently alighted on the exact same implausible "Baiting Orders" scheme over the same five-year period to spoof NWBO stock to obtain discounts of fractions of pennies.

## 1. *NWBO's admission that Defendants traded on clients' behalves eliminates any argument that Defendants acted with scienter.*

NWBO fails to establish that "defendants had both motive and opportunity to commit the fraud" because it alleges no "concrete and personal benefit" the Defendants could have obtained from the purported spoofing.  Mot. 23.  This is because, among other things, Defendants were frequently (or exclusively) trading on behalf of their clients—as alleged, ¶ 38[16]—and NWBO does not even suggest Defendants had insight into—let alone profited from—allegedly manipulative activity conducted by clients.  Realizing its admission that Defendants traded on behalf of clients is devastating to its claims, NWBO mischaracterizes Defendants' argument, insisting that Defendants argue that just "two of them" were acting on behalf of clients.  Opp'n 31.  But as NWBO itself alleges, every single one of the Defendants is a "broker-dealer" and "may have" been acting "for client accounts" when engaging in the trading activity alleged in the Complaint.  ¶¶ 38,

---

[16]  NWBO asserts that the fact that Defendants trade on behalf of clients is an "improper factual assertion," Opp'n 20-21, n.29, but NWBO itself alleges that the alleged trading activity "may have been … for client accounts," ¶ 38.  Indeed, there is no allegation that *any* of the alleged trading at issue was proprietary.

269.  Because the Amended Complaint contains no specific allegation that any Defendant engaged in any of the purported spoofing activities for its own proprietary benefit, NWBO cannot state a claim for securities fraud.  *See ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008) (imposing Rule 11 sanctions where only allegation against market maker was that it processed client orders in the ordinary course), *aff'd in part, rev'd in part*, 579 F.3d 143; *Harrington* No. 21-cv-761, ECF 120 at 4 (plaintiffs had "not articulated any plausible theory under which any currently named Defendant is liable for their customers' trading activity").

The *only illicit motive* NWBO attempts to muster for Defendants' client trading is that "Defendants engaged in spoofing in client accounts still obtain commissions and fees generated by obtaining below-market price shares for its customers."  Opp'n 31-32.  But NWBO does not allege that any customer engaged in spoofing, much less attempt to explain how all of the different Defendants' clients would or could have independently decided to "spoof" the same stock using the exact same methodology and over the exact same (to the day) five-year period.  Nor does NWBO attempt to allege that the *same client* placed both the Baiting Orders and Executing Purchases.  Even putting this aside, NWBO does not dispute that the Amended Complaint's conclusory allegations of "commissions" and "fees" are deficient as a matter of black-letter law. Mot. 24.[17]  They are also facially nonsensical and insufficient: NWBO itself acknowledges that Defendants would "still" have obtained the commissions and fees by acting lawfully, Opp'n 31,

---

[17]   *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154220, at *3 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' allegation that [Defendants] had a motive to grow profits and generate commissions is [] totally insufficient to demonstrate scienter."); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) ("Plaintiff's conclusory allegations regarding Defendants' motive ... to obtain fees for services ... are insufficient.").

and does not argue that these "commissions and fees" would have been different or larger because of any fraudulent scheme as compared to legitimate market transactions.[18]

### 2.    NWBO has not alleged a "concrete and personal benefit" sufficient to establish motive.

Defendants' Motion also explains that NWBO's spoofing theory "defies economic reason" and thus "does not yield a reasonable inference of fraudulent intent," because the discount that resulted from the purported spoofing is merely "fractions of a cent." Mot. 26. In the Opposition, NWBO asserts that "Defendants were collectively able to make hundreds of millions of dollars in aggregate profits by purchasing hundreds of millions of shares of NWBO at artificially depressed prices." Opp'n 12 (citing ¶ 286). The Amended Complaint, in turn, alleges that "[b]y manipulating down the share price of NWBO, Defendants were able to make at least hundreds of millions in aggregate profits by purchasing hundreds of millions of shares of NWBO at artificially depressed prices." ¶ 286. *This conclusory, improper group-pleading claim is not alleged with particularity, yet it is the sum total of NWBO's profit allegations*. The Court should disregard NWBO's unsubstantiated claim that Defendants profited at all.

*First*, NWBO fails to adequately allege that Defendants even purchased any shares at depressed prices—as would be necessary to obtain a "discount"—*because NWBO removed the pre-spoofing price of NWBO from its Amended Complaint*. The Opposition asserts that "the [Amended] Complaint pleads that Defendants profited at the point at which they acquired NWBO shares at lower prices than they would have paid *absent their illegal conduct*." Opp'n 32 (emphasis in original). But NWBO simply does *not* allege this (and certainly does not allege it with particularity); tellingly, *the Opposition contains no citation to the Amended Complaint for this*

---

[18]   NWBO makes no non-conclusory allegations that any of the Defendants even earned "commissions" or "fees" in connection with client orders. Mot. 24.

*assertion*.  NWBO even argues in its Opposition that it is irrelevant whether "*the price of NWBO shares was higher or lower at a given point in time than at any earlier point in time*," Opp'n 26; *supra* at 3, but if NWBO's share price was "higher" after the spoofing, *then Defendants did not obtain any "discount" from the purported spoofing*—and achieved no benefit.

*Second*, NWBO's theory—that Defendants "execut[ed] Executing Purchases … below the prevailing best offer prior to entry of the Baiting Orders, *pocketing the difference*," Opp'n 8 (emphasis added)—is incoherent and refuted by its own allegations.  Comparing the difference between each "Executing Purchase" and alleged "prevailing best offer" for every spoofing episode *yields a "discount" of $94,485.68, total between the seven Defendants, over a five year period*.[19]  Mot. 26.  Putting aside that NWBO's failure to allege the pre-spoofing prices renders the "prevailing best offer" irrelevant, that NWBO's Exhibit uses a wholly different definition of "prevailing best offer"—the "best offer immediately prior to the Executing Purchase" (and lacks any supposed indicia of spoofing), and that Defendants' activity is admitted to have been for "client accounts," ¶ 38, *NWBO articulates no coherent—let alone cogent—explanation for why Defendants would engage in a fraudulent scheme that*, on the most charitable reading of the Amended Complaint, *allowed them to obtain a discount of less than $3,000 per year*.  Where a plaintiff's theory "does not make a whole lot of sense," it cannot "be found cogent or at least as compelling" as the non-culpable inference.  *See In re Grand Canyon Educ., Inc. Sec. Litig.*, 2021 WL 3491779, at *16 (D. Del. Aug. 9, 2021).[20]  The far "more compelling" inference is that

---

[19]   This includes every purported spoofing episode in the Amended Complaint and NWBO's Exhibit 1; the total alleged "discounts" obtained per Defendant are: $6,135.46 (Canaccord); $41,847.99 (Citadel); $8,604.25 (G1); $6,266.07 (GTS); $11,499.40 (Instinet); $14,792.58 (Lime); $5,340.92 (Virtu).

[20]   NWBO's citations to *Harrington* and *Kessev Tov II* are unavailing; as explained above, *Harrington* concerned a significantly more coherent economic theory—a conspiracy where spoofing and naked short selling "[o]perat[ed] in concert"—which the court still found only made "tenuous" economic sense, *supra* at 11, and *Kessev Tov* involved anonymous "Doe" defendants, and the court relaxed the scienter requirement, 2023 WL 4825110, at *6.

Defendants were engaged in routine, lawful trading activity, frequently on behalf of their clients. Mot. 26.[21]

*Finally*, NWBO asserts that it "pleads details of hundreds of Defendants' sales of NWBO stock within three days of an Executing Purchase," Opp'n 32, but Defendants were regularly transacting in the market for NWBO, and, as explained in Defendants' Motion, NWBO fails to even attempt to (i) connect the alleged "Executing Purchases" to some vague three-days-later cherry-picked sales, (ii) connect the sales to any Defendant (as opposed to a client), *or* (iii) connect the sales or the Executing Purchases to the *same* client. Mot. 10-11.

NWBO's failure to articulate any coherent profit motive dooms its claims; as *Kessev Tov II*—in which the court relaxed the standard in light of the anonymous defendants—explained: "Plaintiffs' claims may be doomed if they are unable to prove Defendants profited from the alleged market manipulation, as it would be difficult to prove intent to deceive if Defendants did not make money off their alleged spoofing." 2023 WL 4825110, at *5.

### 3.    *NWBO fails to allege conscious misbehavior or recklessness.*

Recognizing that it has not pled motive or opportunity, NWBO's scienter arguments focus primarily on conscious misbehavior or recklessness. Opp'n 29-31. But where, as here, there is an absence of adequate motive allegations, the strength of allegations of conscious misbehavior "must be correspondingly greater." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan, Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009). NWBO fails to meet this standard.

As an initial matter, there is nothing improper about the alleged trading. NWBO's theory is that Defendants' sell orders were actually "fictitious Baiting Orders" because (i) they were

---

[21]   *See Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent.") (internal quotations and citations omitted); *see also In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 608 n.9 (W.D. Va. 2002) (a "small" motivation does not give rise to the required strong inference of intent).

"parked"—that is, priced worse than the order *of just one other market participant*, *which includes every order but the single best order*, (ii) Defendants either "did not sell any shares of NWBO, consistent with the fictitious nature of the Baiting Orders" or "sold some NWBO shares," and (iii) Defendants then "cancelled" the "Baiting Orders" (or some "equivalent" order) which includes the order being replaced with a better order, or executed. *See supra* at 3-4. As explained in Defendants' Motion and above, this theory—key aspects of which NWBO has now abandoned—is impossible in the predominant venue where Defendants trade NWBO and does not withstand even the barest scrutiny. *Id.*; Mot. 15.

Against this backdrop, NWBO's references to the Amended Complaint's cursory allegations are particularly unavailing; indeed, these allegations are not even pled specifically as to each Defendant. Opp'n 28. For example, NWBO's conclusory assertions that Defendants "designed and implemented" unspecified "algorithmic trading programs" "despite knowing that spoofing is illegal" falls far short of the PSLRA's stringent pleading requirements for scienter. Mot. 29-30. NWBO asserts that it is not required to plead any additional details (what the purported programs did, who operated and oversaw them, who "approved" them, etc.), Opp'n 30-31, relying on *Schwab v. E\*TRADE Fin. Corp.* for the proposition that it need only plead that *someone* whose intent could be imputed to the company acted with scienter, *id.*[22] But that court *dismissed the securities fraud complaint on this exact basis for failing to plead sufficient facts to establish scienter.* 258 F. Supp. 3d 418, 432-34 (S.D.N.Y. July 10, 2017).[23]

---

[22] This discussion of corporate scienter in *Schwab* is inapposite here in any event, as it merely states the proposition that corporate scienter may be established in cases where a misstatement was made to investors, and such statements would have been approved by corporate officials who knew the statements were misleading.

[23] NWBO's remaining authority, Opp'n 29, all involve indicia of scienter much stronger than the mere speed or number of cancellations. *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (computer program designed to cancel orders in milliseconds after the partial fillings of large orders); *CFTC v. Oystacher*, 203 F. Supp. 3d 934, 945 (N.D. Ill. 2016) (plaintiff alleged "much more than" fast cancellations, including tools to "avoid orders that cross"). And *Harrington* involved a significantly more coherent profit motive than alleged by NWBO here. *Supra* at 11.

Nor can NWBO escape its failure to identify a single individual at any Defendant company whose scienter can be imputed to any Defendant.  Mot. 30.  NWBO's sole authority, *Jackson v. Abernath*y, is inapposite; it stands for the proposition that an individual need not be identified only where a misstatement is so "dramatic" that it can be inferred that *someone* whose scienter may be imputed to the corporation approved the statement and knew it was false.  960 F.3d 94, 98 (2d Cir. 2020).  NWBO fails to explain why it is entitled to the inference that senior management at each Defendant would have been aware of and approved a scheme to spoof the same obscure biotechnology company's stock for the benefit of mere pennies or fractions of pennies.

NWBO's arguments are even more deficient given that it alleges Defendants are alleged to have been trading on behalf of clients.  *ATSI*, 493 F.3d at 105 (allegations that Defendant "knew or should have known of the manipulation" and that the plaintiff believed that Defendant "was a cooperating broker-dealer" were insufficient to raise a strong inference of scienter).  And NWBO identifies no case holding a broker-dealer responsible for client trading on facts like those here. NWBO cites *SEC v. U.S. Environmental, Inc.* to argue that brokers can be liable for following their client's directions to execute trades that the broker knew—or was reckless in ignoring—were manipulative.  Opp'n 21.  But in *U.S. Environmental*, the trader coordinated with the promoter to *engage in wash sales and match orders*—facial market manipulation—to "create the appearance of an actual market" for trading the relevant stock, and the trader was alleged to have spoken on the phone with the promoter to coordinate this misconduct.  155 F.3d 107, 109 (2d Cir. 1998). Here, there are no allegations that (i) any *client* was engaged in a fraudulent scheme; (ii) any Defendant colluded with its *clients* to carry out a scheme; and (iii) any Defendant communicated in any way with anyone to purportedly carry out a manipulative scheme.  Indeed, there is no allegation of any conspiracy whatsoever.  NWBO also cites *Lorenzo v. SEC*, in which the

defendant investment banker *sent emails to potential investors about the value of his bank's sole client that he admitted he knew were false*, and the Supreme Court held that the banker could be held liable for knowingly disseminating false information under a scheme liability theory, even if the banker's supervisor had ultimate authority over the statement.  139 S. Ct. 1094 (2019).  This case is inapplicable, including because (i) no Defendant is alleged to have been aware of any manipulation by any client, and (ii) the "maker" of a misstatement is not at issue here.  *Id.* at 1098.

### D.    NWBO Does Not Adequately Allege Loss Causation

The Opposition confirms that NWBO does not plead facts demonstrating a "legally cognizable loss" or a "causal connection between the [alleged manipulation or] material misrepresentation and the loss."  *See* Mot. 30.  NWBO fails to allege both that (i) the purported spoofing caused its stock price to decline and (ii) NWBO sold stock at prices affected by the purported spoofing.  *See* Mot. 31-34.  *First*, NWBO has not adequately alleged that the purported spoofing caused any decline in NWBO's stock price for two reasons: (i) NWBO does not allege the price of its stock before the spoofing and (ii) NWBO relies on a faulty "Price Decline" calculation that does not in fact show a decline in NWBO's share price.[24]  Mot. 31.  NWBO argues that it adequately alleges that Defendants executed purchases "at a price below the prevailing best offer," Opp'n 34, but it does not allege whether the "prevailing best offer" was higher, lower, or the same as before the purported spoofing, and thus whether any loss was caused by Defendants'

---

[24]   It is unsurprising that the purported spoofing would not drive down prices, including because orders on OTC Link are not anonymous.  Mot. 28.  If the Defendants engaged in a five-year scheme with constant spoofing, market participants would have recognized this activity and would not have been induced to sell at lower prices.  NWBO's argument that there have been *allegations* of much shorter manipulation schemes of OTC markets, Opp'n 29, does not mean Defendants could have realistically executed this scheme for five years.

purported actions.[25]  Accordingly, NWBO has failed to plead a price decline and thus a cognizable

loss.  Mot. 31.

*Second*, even if NWBO had alleged a price decline, NWBO does not sufficiently allege

that it sold stock at a price affected by Defendants' purported spoofing, as opposed to *after the*

*price rebounded*.  Mot. 30-34.  This failure is critical, because "[m]anipulative trading strategies

like 'spoofing' ... depend for their profitability on a reversion of prices to the market-level,

meaning that the period of artificiality may be brief."  *In re London Silver Fixing Ltd., Antitrust*

*Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018).  NWBO retreats from its allegation that every

single sale made during the five-year "relevant period" was affected by Defendants' spoofing,

relegating it to a footnote.  *See* Opp'n 35 n.56.[26]  Instead, NWBO now contends that some of its

stock sales—all of which were made as of the closing price—were affected by spoofing because

some (unidentified) "examples" of spoofing were "after and in close proximity" to the close.

Opp'n 35.  This is deficient under *Gamma Traders*: "[e]ven pleading same-day, post-spoof trades

does not justify an inference of injury without any factual allegations to support the inference that

the effects of the spoof linger for the remainder of the trading day."  *Gamma Traders*, 41 F.4th at

80.[27]  There are no factual allegations supporting an inference that the effects of any purported

---

[25]  NWBO also cites paragraphs 61-63 and 67 of its Amended Complaint as supposedly sufficient for loss causation, but those paragraphs refer to its Exhibit 1, ECF 102-1, which in turn relies only on NWBO's "Price Decline" calculation to show loss.  As explained in detail in Defendants' Motion, and not disputed by NWBO, this faulty formula does not measure "price decline" at all, and would show a negative number *even if the price of NWBO's stock increased during the purported spoofing episode*.  Mot. 18-19; *supra* n. X.

[26]  This is not surprising, as the authority emphasizes that the effects of spoofing are by nature temporary and do not last hours or days.  *See Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022); *In re Merrill, Bofa, and Morgan Stanley Spoofing Litig.*,  2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021).  NWBO's contention that its price "partially" recovered, Opp'n 35 n.56, is nowhere in the Amended Complaint, and the argument that Defendants "profited from short sales" is not alleged with particularity and is wholly speculative, *supra* n.15.

[27]  NWBO attempts to distinguish *Gamma Traders* by arguing that the plaintiff there did not allege it traded after defendants on a particular day.  But the court in *Gamma Traders* granted plaintiff the assumption that, as alleged here, it "traded *after* the spoofs," yet still found the claim insufficient.  41 F.4th at 80.

spoofing affected the closing price. Rather, NWBO alleges Defendants' purported spoofing lasted seconds or minutes. *E.g.*, ¶¶ 276-77.[28] NWBO argues that "it details 30 instances in which Defendants spoofed within an hour, and in some instances, just seconds before a NWBO sale," Opp'n 35, 5, but only *one* of the sixteen "examples" occurred on the same day as a "pricing date," and that spoofing was not within an hour of closing (nor would an hour be sufficient). NWBO's claim that it alleged sales "immediately []after" the spoofing and within "seconds," *id.* is simply false, and NWBO "is limited to factual contentions it alleged." *Gamma Traders*, 41 F.4th at 80.

### E.    NWBO Does Not Adequately Allege Reliance

The Opposition confirms that NWBO fails to adequately allege that OTC Link and Global OTC—the venues on which NWBO traded—are efficient markets, and NWBO thus also fails to plead "reliance on an assumption of an efficient market free of manipulation." Mot. 34-35 (quoting *ATSI*, 493 F.3d at 101); Opp'n 36-38. *First*, NWBO asserts that it "allege[d] facts demonstrating that the market[s] for NWBO meets the *Cammer* factors," citing to two paragraphs in its Amended Complaint, ¶¶ 297-98. Opp'n 37. But these paragraphs do not allege facts; they are merely a cursory and inaccurate recitation of *some* of the *Cammer* factors.[29] *Compare* ¶ 297 ("NWBO shares traded at high weekly trading volume") *with Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) ("plaintiffs could have alleged there existed an average weekly trading volume during the class period in excess of a certain number of shares"). This is not sufficient to survive a motion to dismiss under black-letter law. Mot. 35. NWBO cites *Harrington* and *Sharette* without explanation, Opp'n 37, and those cases have no bearing on NWBO's failure to plead

---

[28] NWBO's authority is distinguishable, particularly because here, the price of NWBO stock actually increased over the relevant period. Mot. 33-34, Ex. 6; *see Harrington*, 585 F. Supp. 3d at 419 (longer length of spoofing episodes and significant decline of stock price over relevant period); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 103 (S.D.N.Y. 2015) (allegations that defendant's manipulative short sales skyrocketed while the price plummeted).

[29] NWBO makes no attempt to allege facts regarding at least two factors. Mot. 34 n.38.

reliance, *see Harrington*, 585 F. Supp. 3d at 420 (Concordia shares traded on NASDAQ, which is presumptively efficient[30]); *Sharette*, 127 F. Supp. 3d at 101 n.9 (S.D.N.Y. 2015) ("the Motion [to dismiss] does not argue that Plaintiffs have failed to adequately allege [the reliance] element"). *Second*, NWBO asserts that "courts routinely find that such 'over the counter' markets are efficient," Opp'n 37, *but the cases NWBO cites do not come close to supporting that proposition*.[31] *Finally*, the Motion explains that courts routinely hold that OTC markets are not assumed to be efficient, Mot. 35, and NWBO's attempts to distinguish Defendants' cases are wrong.[32]

## II.   PUBLICLY-AVAILABLE TRADING RECORDS REFUTE NWBO'S CLAIMS

Defendants' Motion explained that NWBO's allegations were refuted by the publicly-available trading data that NWBO had identified as the *sole* source of its trading allegations, which the Court could consider on a motion to dismiss because the data is "integral to the complaint." Mot. 35-36.  That data shows, among other things, that (i) the price of NWBO shares actually *went up* during many of NWBO's alleged spoofing episodes—the exact opposite of NWBO's claim that Defendants' "Baiting Orders" "dr[ove] the price of NWBO shares downward" to permit Defendants to purchase shares "below the prevailing best offer," *e.g.*, ¶ 87—and (ii) Defendants' so-called Baiting Orders were always competitively priced offers to sell shares; they were not

---

[30] *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) ("the NASDAQ is recognized as maintaining an efficient market).

[31] *See In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *10 (S.D.N.Y. Aug. 21, 2008) (court did not need to determine whether OTC market was efficient because the investors also traded the security on an efficient market); *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 206 (S.D.N.Y. Aug. 30, 2022) (stock traded on NYSE (a presumptively efficient exchange) and an OTC market, so court did not need to analyze whether the OTC market was efficient); *Dalton Petrie v. Electronic Game Card, Inc.*, No. 10-cv-0252, ECF 80, 121, 268 (C.D. Cal. July 21, 2015) (court did not analyze market efficiency under motion to dismiss standard); *see also Cammer*, 711 F. Supp. at 1283 (same).

[32]   NWBO mischaracterizes *Salvani v. ADVFN PLC*, as "plaintiff conceded it knew the alleged misstatements were false," Opp'n 37 n.58, but the court found that "Plaintiffs' theory of reliance fails because they do not allege that the Over–the–Counter Bulletin Board ('OTCBB') is an efficient market," 50 F. Supp. 3d 459, 472 (S.D.N.Y. 2014). NWBO attempts to distinguish *Alki* as "plaintiff conceded it did not rely on the OTCBB market," but that court explained it was "unaware of any court holding that the OTCBB … meets this [efficient market] standard." 769 F. Supp. 2d at 493.  And in *ScripsAmerica, Inc. v. Ironridge Global LLC*, the court determined that plaintiff had failed to plead that the OTC market on which Scrips traded was efficient.  119 F. Supp. 3d 1213, 1253-58 (C.D. Cal. 2015).

"away from the market" or "parked" at all, ¶ 86 & n.21.  Mot. 35-38.  This is fatal to NWBO's

claims; NWBO does not dispute that the Court "need not accept as true [NWBO's allegations] [if

they] are contradicted by  ... materials amenable to judicial notice."  *In re Yukos Oil Co. Sec. Litig.*,

2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).

   NWBO asserts that Defendants' "unverified and nonpublic trading data is … not permitted

on a motion to dismiss for two reasons: (1) it is not 'integral to the complaint' and (2) a dispute

exists regarding the accuracy and completeness of the data."  Opp'n 39.  Each of NWBO's

arguments is wrong.  *First*, the data is not "unverified and nonpublic": as the sworn declaration of

William Burck explains, it is "publicly-available quote data from OTC Markets Group," Burck

Decl., ECF 116 ¶¶ 12-29.  This is precisely the data NWBO used as the source for the trading

allegations in its Amended Complaint.  *See* ¶ 61 n.10 ("The data utilized by Plaintiff to support

the allegations in this Complaint consist of … the complete stream of historical Level II quotes

and executed trades reported to FINRA, provided directly by OTC Markets Group").  Indeed, a

comparison of NWBO's trading allegations with the exhibits to the Burck declaration make

abundantly clear it is the exact same data.[33]  Unsurprisingly, NWBO provides no explanation or

substantiation of its assertion that the data is "unverified and non-public."  Opp'n 38.

   *Second*, NWBO's argument that the data is not "integral to the complaint," Opp'n 39, is

frivolous.  NWBO's own case, *Goel v. Bunge, Ltd.*, explains that a document is "integral to the

complaint" if the complaint "relies heavily upon its terms and effect."  820 F.3d 554, 559 (2d Cir.

2016).  Here, the trading data at issue is the *only source of NWBO's spoofing allegations*.  *See* ¶ 61

n.10.  As *Goel* further explains, courts rely on such material when plaintiff did not attach it to the

---

[33] *Compare, e.g.*, ¶ 97 ("On October 15, 2020 at 09:30:17, the best bid and offer … was a bid to purchase 20,000 shares at a price of $1.20 per share and an offer to sell 100 shares at a price of $1.21 per share") *with* Mot. Ex. 13 at 3 row 9 (showing a bid to purchase 20,000 shares at 1.2 per share and an offer to sell 100 shares at 1.21 per share).

complaint "*because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim.*" 820 F.3d at 559 (emphasis added).  This is the case here.  NWBO does not provide the "entirety" of the trading data because the data shows, for example, that in each instance, Defendants' offers were consistent with or better than the offers of other market participants, directly undermining NWBO's allegations that Defendants' sell orders were "fictitious" and "extraordinarily unlikely to be executed."  Mot. 37.  Nor did Defendants provide data from "before the Spoofing Episode," Opp'n 39—the publicly-available OTC Markets data provided by Defendants *matches exactly* the time period for each of NWBO's sixteen "Example Episodes."[34]

*Finally*, there is no actual dispute as to the accuracy or completeness of the data, and NWBO misapprehends the caselaw it purports to rely on.  In each of the cases cited by NWBO, the "dispute" concerning the authenticity of the document *was in the plaintiff's own complaint*. Opp'n 39-40; *Faulkner v. Beer*, 463 F.3d 130, 135 (2d Cir. 2006) (document was disputed where "the terms of the complaint itself clearly put that factual assumption in dispute"); *Fabi v. Prudential Ins. Co. of Am.*, 2022 WL 5429520, at *4 (E.D.N.Y. Aug. 29, 2022) ("[P]laintiff disputes the validity of the [insurance] denial in her Complaint.").  Here, the Amended Complaint does not create a dispute as to the accuracy or completeness of the publicly-available trading data; as explained *supra*, the data provided by Defendants is an exact match to the trading allegations in the Amended Complaint.  In short, NWBO's only issue with the data is that it refutes its claims.

## CONCLUSION

NWBO's Amended Complaint should be dismissed with prejudice.  NWBO makes no argument that it should be permitted to amend, and it should not.  *See* Mot. 40.

---

[34] *Compare, e.g.*, ¶¶ 97-103 (October 15, 2020 "Example Episode," alleging purported spoofing between 09:28:17 and 09:32:17) *with* Burck Decl. Ex. 13 (publicly-available quote data from OTC Markets Group showing bids and offers displayed by market participants on October 15, 2020 between 09:28:17 and 09:32:17).

Dated:  September 27, 2023
        New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

 _/s/ William A. Burck_
William A. Burck
Christopher G. Michel (admitted *pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Brenna Nelinson
Peter H. Fountain
Leigha Empson
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for Defendant Citadel Securities LLC*

**MORRISON & FOERSTER LLP**

 /s/ *Anthony S. Fiotto* (with permission)
Anthony S. Fiotto
Julia C. Koch
200 Clarendon Street
Boston, MA 02116
Telephone: 617-648-4700
Facsimile: 617-830-0142
Email: AFiotto@mofo.com
Email: JKoch@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: 212-336-4067
Facsimile: 212-468-7900
Email: ELawson@mofo.com

*Attorneys for Defendant Canaccord Genuity LLC*

**GREENBERG TRAURIG, LLP**

 /s/ *Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Nicholas T. Barnes
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
barnesn@gtlaw.com

*Attorneys for Defendant Instinet, LLC*

**KATTEN MUCHIN ROSENMAN LLP**

 /s/ *Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac vice*)
Hannah O. Koesterer (admitted *pro hac vice*)
Leigh Brissenden (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
hannah.koesterer@katten.com
leigh.brissenden@katten.com

*Attorneys for Defendant GTS Securities LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation

 /s/ *Stephen Young* (with permission)
Jon W. Zinke
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California  90802
Telephone:  (562) 436-2000
jon.zinke@kyl.com
steve.young@kyl.com;
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading Corp.*

**BALLARD SPAHR LLP**

 */s/ Marjorie J. Peerce* (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel:  (212) 223-0200
Fax:  (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (*pro hac vice* forthcoming)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  (215) 665-8500
Fax:  (215) 864-8999
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendant*
*G1 Execution Services LLC*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 */s/ Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas*
*LLC*