UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTHWEST BIOTHERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>- against-<br><br>CANACCORD GENUITY LLC, CITADEL SECURITIES LLC, G1 EXECUTION SERVICES LLC, GTS SECURITIES LLC, INSTINET LLC, LIME TRADING CORP., and VIRTU AMERICAS LLC.<br><br>Defendants. | Case No: 1:22-cv-10185-GHW-GS |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Plaintiff Northwest Biotherapeutics, Inc. ("NWBO" or "Plaintiff") respectfully submits this Notice of Supplemental Authority to bring to the Court's attention the recent decision dated September 28, 2023 in *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.*, Case No. 1:21-cv-00761-LGS, ECF No. 147 (S.D.N.Y.) (Schofield, J.) ("Opinion," attached as Exhibit A) (*Harrington II*), which further supports denial of Defendants' Motion to Dismiss (ECF No. 115).

Because both the claims and facts alleged in *Harrington* are nearly identical to those alleged here, both Plaintiff and Defendants have repeatedly acknowledged that *Harrington* is directly applicable to the motion to dismiss. *See* Motion to Dismiss (ECF No. 115) at 24-25 (arguing that a discovery order in *Harrington* supports Defendants' argument that a spoofing complaint cannot allege motive unless it contains "specific allegations that the corresponding

'Baiting Orders,' 'Executing Purchases,' cancellations and subsequent sales were all on the Defendant's own behalf."); Opposition to Motion to Dismiss (ECF No. 123) at 12-14 (explaining that *Harrington I* rejected the same arguments that Defendants argue in their motion to dismiss); Reply in Support of the Motion to Dismiss (ECF No. 124) at 11-12, n.12 (again relying on the *Harrington* discovery order and noting that the *Harrington* plaintiff subsequently amended its complaint—the complaint that *Harrington II* has now held to sufficiently plead spoofing claims). Yesterday, Judge Schofield issued an order denying Defendants' second motion to dismiss in *Harrington*. That opinion, which rejects every one of the defendants' asserted grounds for dismissal is (most of which are repeated by Defendants here), is like in *Harrington I*, well-reasoned and consistent with the law of market manipulation in this Circuit. Accordingly, *Harrington II* provides further support for denial of Defendants' motion to dismiss.

***First,*** the *Harrington* decision confirms that a pattern of trading conduct that involves the placement of a large volume of "baiting orders," the execution of a small volume of trades on the opposite side of the market, and the cancellation of the outstanding baiting orders is sufficient to plead manipulative conduct to support spoofing claims:

> The SAC alleges that Defendants 'injected false and misleading information into the marketplace' by placing baiting orders of at least 138,678,121 Concordia shares that 'had no legitimate financial purpose and were never intended to be executed' and were intended to 'drive Concordia's share price downward in order to permit Defendants and/or their customers to purchase Concordia shares at lower prices.' These baiting orders were effected by Canadian Defendants on Canadian exchanges pursuant to the direction of their customers and had the effect of driving down Concordia shares by, on average, 0.8652%. The Canadian Defendants effected near-simultaneous executing orders through U.S. intermediaries on U.S. exchanges, while the U.S. Defendants effected executing orders directly onto U.S. exchanges. Defendants executed 578,530 executing orders of Concordia shares, purchasing them at depressed prices induced by the flood of baiting orders. The outstanding baiting orders were then cancelled immediately. The SAC also alleges that each Defendant 'designed and implemented algorithmic trading programs that executed the spoofing schemes.' These allegations are sufficient to plead the 'manipulative acts' prong of a Section 10(b) claim for market manipulation.

(Opinion at 11.)[1]  *See also id*. at 12-13 ("Harrington distinguishes baiting orders from other sell orders by the fact that none of the sell orders in the illustrative examples were ever executed, and instead functioned to manipulate the market to enable Defendants' purchase of Concordia securities at lower prices.").

Virtually identical allegations are pled by NWBO here.  *See* Amended Complaint (ECF No. 95) at ¶¶ 55-57, 61-72 (alleging that Defendants entered Baiting Orders "that are not intended to be executed and have no legitimate economic purpose," "to create an illusion of market interest intended to generate a response from other market participants," "and after those Baiting orders have lured unsuspecting traders into placing their own orders, the spoofer places orders to buy, or 'Executing Purchases,' on the opposite side. . . to be executed at the artificially low prices generated by the Baiting Offers to sell," "immediately after the completion of their Executing Purchases to buy NWBO shares at the lower prices, Defendants cancelled and removed all of their Baiting Orders to sell from the Limit Order Book or IDQS").[2]

**Second**, *Harrington II* held that the plaintiff sufficiently pled scienter, relying on four factors that courts regularly examine to distinguish spoofing from legitimate market activity:  "(1) the passage of time between placement and cancelling of orders (usually in milliseconds), (2) cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled, (3) parking baiting orders behind smaller legitimate orders placed by other traders and (4) large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer."  (Opinion at 14.)  Specifically with regard to the

---

[1] Notably, the Court approved of the *Harrington* plaintiff's definition of "baiting order"—a definition similar to that used by NWBO here and which Defendants refute— as "a Defendant and its affiliates placed sell-side baiting orders in vastly greater quantities than their buy-side baiting orders."  (Opinion at 12.)

[2] References to paragraphs in the Amended Complaint are designated by "¶."

3

defendants' order book imbalance, the *Harrington* Court noted that defendants "placed large baiting orders on one side of the market and executed much smaller orders on the other side of the market," although they "often" (but not always) "did not sell any shares of Concordia after posting baiting orders." (Opinion 15.).

Again, nearly identical allegations are pled here. *See* ¶¶ 69-71, 275, 279, 283 (alleging that "Defendants' Baiting Orders frequently left Defendants with an imbalanced order book position favoring the sell side[,]" and that "[d]espite these imbalanced order book positions, Defendants often did not sell any shares of NWBO after posting Baiting Orders.").[3]

***Third***, *Harrington II* makes clear that a defendant broker-dealer can be liable for spoofing conduct regardless of whether that conduct involves trading for that defendant's own account or for its clients. Indeed, in rejecting the *Harrington* defendants' assertion (that Defendants here repeat at length) that spoofing claims must specify which orders and executions were placed for a broker-dealer's own account and which were placed for client accounts, the Court explained that allegations that such trades were for a defendant's own account "and/or" for its clients' accounts "does not cause it to fall short of Rule 9(b)'s particularity requirement, but instead functions to demonstrate the breadth of Defendants alleged conduct—effecting orders on both Canadian and U.S. exchanges, on behalf of either themselves or their customers, with the objective of manipulating the price of Concordia securities." (Opinion at 11-12.) Notably, in reaching its conclusion, the *Harrington* Court (like Plaintiff here) cites favorably to the Second Circuit's decision in *S.E.C. v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir. 1998), which held that

---

[3] Notably, just days ago, the SEC announced that Defendant Citadel agreed to pay $7 million to resolve claims that it violated rules by mismarking sale orders as to whether they were short or long. *See* SEC Press Release 2023-192 (Sept. 22, 2023), available at https://www.sec.gov/news/press-release/2023-192. This enforcement action adds to the history of Defendant Citadel's violations of securities laws in its trading activity (*see* ¶ 273) and is also relevant to Defendant Citadel's scienter and motive here.

"primary liability for a Rule 10b-5 violation may be found where a broker 'was reckless in not knowing' that the trades he executed at another's direction were manipulative. . . . even where the broker 'did not share the customer's specific overall purpose to manipulate the market for that stock,'" and which "gives teeth to the SAC's theory of liability." (Opinion at 16.)[4]

**Fourth,** *Harrington II* found plaintiff's presentation of *seven* "illustrative examples" of defendants' spoofing conduct and a chart that contained an *additional thirty* spoofing episodes sufficient, directly rejecting the defendants' argument (identical to that raised by Defendants here) that a spoofing complaint must contain further detail regarding every alleged spoofing episode. Opinion at 12 ("It would be both unwieldly and unreasonable to require Plaintiff to proffer detailed descriptions of each alleged episode in order to plead a sufficient claim."). Here, NWBO alleges *16* illustrative examples of Defendants' spoofing conduct and a 213-page chart that identifies *thousands* of additional spoofing episodes, far exceeding the detail and volume of specific trading allegations held sufficient in *Harrington II*.

**Fifth,** *Harrington II* held that the complaint there sufficiently pled a "plausible economic rationale for the alleged misconduct"— the same economic rationale pled here (¶¶ 286-287)— because it "alleges that Defendants derived economic gain from the spoofing scheme through 'paid transaction fees for completed customer trades,' hundreds of thousands of dollars in saved execution costs for the baiting orders that were cancelled and 'at least millions of dollars in ill-gotten gains.'" (Opinion at 17.) Importantly, *Harrington II* held that "[w]hether Defendants' alleged misconduct was ultimately economically rational is a matter to be explored at summary

---

[4] Despite Defendants' attempts to obfuscate both the allegations in the Complaint and their own business conduct, it is clear that all but two of the Defendants trade for their own proprietary accounts. Indeed, Defendant Virtu is presently suing its former Head of Client Technology for violating a non-compete agreement and has made multiple filings in that action that describe in detail its client-serving "Execution Services business" and its distinct proprietary "Market Making segment." *See Virtu Financial Operating LLC v. Clark*, Index No. 654230/2023 (N.Y. Sup. Ct.).

judgment or trial." *Id.* Moreover, contrary to Defendants' claim here, the *Harrington II* plaintiff's motive allegation do not rely on allegations of naked short selling—indeed, no such allegations exist in the *Harrington* second amended complaint.[5]

**Lastly,** as to loss causation, the Court held that the plaintiff's "burden in alleging loss causation 'is not a heavy one'" and that "[t]he complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." (Opinion at 18, quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).) The *Harrington* second amended complaint satisfied this liberal standard by alleging that "spoofing episodes took place on 111 of 188 trading days during the Relevant Period, and that Plaintiff traded on thirty-four of those days, experiencing losses as a result of the artificially depressed market price of Concordia shares," and that when "spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the spoofing events." (Opinion at 18.)

Again, nearly identical allegations are pled here. *See* ¶¶ 288-296 (alleging that Spoofing Episodes occurred on 395 of 1,171 trading days in the Relevant Period, that NWBO sold millions of shares at prices formulaically derived from closing prices on days where spoofing occurred, that "[t]he artificially depressed price of a Spoofing Episode may generally not fully recover to the price that existed prior to the Spoofing Episode," and that "[b]ecause the price impact of

---

[5] In their Reply in Support of the Motion to Dismiss, Defendants also falsely claim that *Harrington I* relied on naked short selling allegations to establish economic motive, *see* Reply to Motion to Dismiss, at *11, when in fact *Harrington I* sustained the spoofing allegations despite ***dismissing*** the naked short selling claims. 585 F. Supp. 3d at 418 (S.D.N.Y. 2022) ("That spoofing may have ultimately worked against Defendants' ***long positions*** in Concordia stock does not negate their manipulative intent in receiving a benefit by buying shares at artificially lower prices." (emphasis added)).

Defendants' spoofing activity was not limited to the time period immediately following each individual Spoofing Episode, the prices at which Plaintiff sold its stock throughout the Relevant Period were negatively affected by Defendants' spoofing. . . .").

Accordingly, Judge Schofield's decision in *Harrington II* further demonstrates why NWBO has alleged considerably more than is necessary to plead spoofing claims, and why Defendants' Motion to Dismiss should be denied in its entirety.

Dated: September 29, 2023
       New York, New York

Respectfully submitted,

By: *Laura H. Posner*
    Laura H. Posner
    Michael B. Eisenkraft
    COHEN MILSTEIN SELLERS & TOLL PLLC
    88 Pine Street, 14th Floor
    New York, New York 10005
    Tel: (212) 838-7797
    Fax: (212) 838-7745
    lposner@cohenmilstein.com
    meisenkraft@cohenmilstein.com

    Raymond M. Sarola
    COHEN MILSTEIN SELLERS & TOLL PLLC
    100 N. 18th Street, Suite 1820
    Philadelphia, PA 19103
    Tel: (267) 479-5700
    Fax: (267) 479-5701
    rsarola@cohenmilstein.com

    *Counsel for Plaintiff*