UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTHWEST BIOTHERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CANACCORD GENUITY LLC, CITADEL SECURITIES LLC, G1 EXECUTION SERVICES LLC, GTS SECURITIES LLC, INSTINET LLC, LIME TRADING CORP., AND VIRTU AMERICAS LLC,<br><br>Defendants. | Case No. 1:22-cv-10185 (GHW) (GS) |

**DEFENDANTS' JOINT RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants[1] respectfully submit this response to NWBO's notice concerning Judge Schofield's recent decision in *Harrington II*. ECF 127 ("Notice").[2] Although the Notice strains to portray NWBO's allegations as "virtually identical" to *Harrington*'s, Notice at 3, the only "identical" allegations are conclusory statements NWBO copied and pasted from *Harrington* despite their complete lack of fit with the dramatically different trading activity at issue here. In fact, it was this attempt to graft *Harrington*'s spoofing theory—word for word—onto different trading taking place on a completely different venue that led to NWBO's incoherent and implausible pleading. Among other examples discussed below, NWBO:

- Copied *Harrington*'s core theory that Defendants spoofed to "driv[e] down the price of [Concordia/NWBO] shares." *Harrington* SAC ¶ 54; ECF 95 ¶ 76. But after being presented with trading data showing the price of its shares *went up* during the purported spoofing episodes, NWBO simply removed its price allegations, which is fatal to its claims.

- Copied *Harrington*'s allegation that Defendants "did not sell any shares of [Concordia/NWBO]" during the so-called baiting periods. *Harrington* SAC ¶ 65; ECF 95 ¶ 85. After being presented with trading data showing this too was false, NWBO admitted that Defendants "sold some NWBO shares" during these periods, *e.g.*, ECF 95 ¶ 85—which is entirely inconsistent with its own theory of purported spoofing.

- Copied *Harrington*'s allegation that after making purchases, "Defendants cancelled all of the fictitious Baiting Orders." *Harrington* SAC ¶ 54; ECF 95 ¶ 76. After Defendants explained in their first motion to dismiss that this allegation was impossible on OTC Link, NWBO admitted it has not alleged any Defendant actually cancelled *any* "Baiting Order."

Even if the *Harrington* plaintiff's far more particularized allegations were sufficient under the different facts alleged in that complaint (a question on which this Court is not bound and need not take any position), NWBO's cribbing of the *conclusions* of the spoofing scheme alleged in

---

[1] Defined terms have the meanings provided in Defendants' Motion, ECF 115. "*Harrington II*" refers to *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Inc.*, 21-cv-761, ECF 147 (S.D.N.Y. Sept. 28, 2023).

[2] NWBO identifies no authority permitting it to file a seven-page notice of supplemental authority, and Defendants are aware of none. Defendants respond in seven pages for parity; any further improper submission by NWBO would be subject to a motion to strike.

*Harrington* does not mean that *NWBO* has stated a claim. The PSLRA and Rule 9(b) require NWBO to allege particularized *facts*, and the court's reasoning in *Harrington II* further confirms that NWBO's implausible allegations fall well short of this requirement.

***Manipulative Conduct.*** **First**, *Harrington II* relies on allegations far more particularized and plausible than NWBO's heavily-caveated and now selectively-abandoned allegations.

In contrast to the plaintiff in *Harrington II*, NWBO failed to allege with particularity "what effect the scheme had on the market for the securities at issue." *Harrington II* at 11 (quoting *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)). In *Harrington II*, the court found that the alleged spoofing "had the effect of driving down Concordia shares by, on average, 0.8652%," *Harrington II* at 11, which was substantiated by: (i) the price at the start and end of spoofing episodes, showing a price decline; and (ii) that the price of its stock dropped 89% during the alleged spoofing period (from $28.02 to $3.13). *Harrington* SAC ¶¶ 54, 78-79, 143. In its initial Complaint, NWBO attempted to allege a price decline, but those allegations simply did not track the trading data or NWBO's share price. This is why NWBO, after being served with a Rule 11 motion, (i) *removed* the prices of its stock at the beginning of spoofing episodes; (ii) *admitted* its "Price Decline" formula is flawed; and (iii) *does not contest* that its share price more than doubled during the "Relevant Period" (from $0.27 to $0.71). Reply 6-9. NWBO now argues that it is irrelevant whether "*the price of NWBO shares was higher or lower*" as a result of the purported spoofing, Opp'n 26, relying only on a "true market value" hypothesis—a circular claim that is inconsistent with NWBO's theory, clashes with the theory credited in *Harrington II*, has never been recognized by any authority, and is deficient under *ATSI*, Reply 8.

Moreover, *Harrington II* found that the absence of sales during baiting periods—that "none of the sell orders in the illustrative examples were ever executed"—was a material allegation

"distinguish[ing] baiting orders from [non-manipulative] sell orders." *Harrington II* at 13. NWBO initially copied *Harrington*'s "did not sell shares" allegations word-for-word. *Compare Harrington* SAC ¶ 65 *with* ECF 1 ¶ 215. But after being presented with irrefutable trading records showing that Defendants *did* sell shares, NWBO was forced to amend its pleading to expressly allege that, unlike in *Harrington*, Defendants "sold some NWBO shares" during the purported baiting periods, *see, e.g.*, ECF 95 ¶ 85. NWBO contends that either of these two opposite sets of facts is "consistent with" its spoofing theory; to the contrary, its pleading demonstrates why attempting to shoehorn *Harrington*'s theory onto a dramatically different set of facts resulted in such incoherent and implausible allegations. Mot. 16.

NWBO also identifies as "identical" to *Harrington* its allegation that Defendants "cancelled and removed all of their Baiting Orders." Notice at 3. But after Defendants explained that, due to the nature of trading on the OTC venues, these "Baiting Orders" were executed or replaced by orders with better prices, NWBO alleged that Defendants may have instead cancelled unidentified "equivalent" orders. ECF 95 ¶ 84 n.17; Reply 4-5. Specific factual allegations of this critical aspect of how spoofing operates are thus entirely absent from NWBO's pleading.

**<u>Scienter.</u>** *Second*, *Harrington II* began by looking to whether the plaintiff had alleged "strong circumstantial evidence of conscious misbehavior or recklessness," examining three factors from *Coscia*, each of which demonstrates that NWBO's allegations fall far short of this exacting standard. *Harrington II* at 13-14 (citing *United States v. Coscia*, 866 F.3d 782, 787 (7th Cir. 2017)). As to the first factor, "the passage of time between placement and canceling of orders (usually in milliseconds)," NWBO alleges that "Defendants placed and then cancelled the Baiting Orders *within one to two minutes*," ECF 95 ¶ 276 (emphasis added), not the "milliseconds" that can be indicative of manipulative activity and is alleged in *Harrington*. *Harrington II* at 14;

3

*Harrington* SAC ¶¶ 67, 86.  Next, with respect to "cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled," NWBO admits Defendants may have in fact cancelled unidentified non-manipulative "equivalent orders" and, therefore, has not alleged that Defendants actually cancelled *any* Baiting Orders.  Reply 4-5.  Finally, in evaluating the alleged "large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer," *Harrington II* specifically focused on the allegation that "[d]espite these imbalanced positions, *Defendants often did not sell any shares of Concordia after posting Baiting Orders*."  *Harrington II* at 15 (emphasis added).  Yet NWBO alleges that during every one of its "example episodes," *Defendants did sell shares*.  *E.g.*, Opp'n at 23.  Thus, even if NWBO *had* alleged imbalances—an unremarkable occurrence in the markets—by NWBO's own allegation, Defendants were selling shares, and thus reducing or eliminating any purported imbalances.  NWBO's allegations fall far short of establishing that the alleged trading presented an "obvious" danger that Defendants "must have been aware of." *Harrington II* at 13.

Moreover, the *Harrington II* court evaluated the *Coscia* factors against the backdrop of allegations of a cross-border scheme that was *intentionally designed to evade regulatory detection*. *Harrington* SAC ¶ 131.  In contrast to *Harrington*—which alleged placing baiting orders in one jurisdiction then executing purchases in a separate jurisdiction through a different entity, thereby evading surveillance by preventing both U.S. and Canadian regulators from gaining a full picture into the trading at issue—NWBO alleges that all of the purported "Baiting Orders" and "Executing Purchases" in a purported "spoofing episode" were placed by the same Defendant on the same venue that *specifically and publicly attributed market activity*.  Reply 13 & n.24.[3]

---

[3] NWBO's claim that an SEC announcement that Citadel Securities marked certain short sales as long sales is "relevant to Defendant [Citadel Securities'] scienter and motive here," Notice at 4 n.3, demonstrates only that NWBO has failed to allege any actual motive relevant to the purported spoofing and that NWBO views every action or inaction

4

***Scienter.*** **Third**, *Harrington II* concluded that the defendants could be liable for client trading under a recklessness theory based on *S.E.C. v. U.S. Envtl., Inc.*, 155 F.3d 107 (2d Cir. 1998). In *Envtl.*, the court found that the SEC (which is not subject to the heightened pleading standard governing this action) sufficiently pled that a trader, Romano, was reckless where it alleged an *express conspiracy* in which Romano acted at the direction of a promoter to buy shares at dictated prices from accounts controlled by the promoter, then sold shares to third parties at prearranged prices, obtaining a "risk-free" profit. *Envtl.*, 94-cv-6608, ECF 57 ¶ 79 (Oct. 20, 1995). Similarly, the *Harrington* plaintiff alleged specific details concerning how defendants provided their clients with "Direct Market Access"[4]—allowing clients to use the broker-dealers' exchange connections to place trades, and the corresponding obligations flowing from that arrangement, in the context of a cross-border spoofing scheme designed to evade regulatory detection in both countries. *E.g.*, *Harrington* SAC ¶¶ 28-30. *Harrington II* found that plaintiff's "allegations go beyond the SEC's relatively bare allegations in *U.S. Environmental*." *Harrington II* at 16. The allegations of express conspiracy in *Envtl.* and cross-border schemes in *Harrington* are a far cry from NWBO's shoulder-shrug claim that the trading "may have been … for client accounts" and cursory reference to regulations that prohibit fraud and apply to every broker-dealer. ¶¶ 38, 270.

**Fourth,** NWBO asserts that *Harrington II* supports a finding that NWBO pled a plausible economic rationale for the purported spoofing. Notice at 5. It does not. In *Harrington II*, the court concluded that "Plaintiff has offered a 'plausible economic rationale for the alleged misconduct'" based on three allegations: (i) "paid transaction fees for completed customer trades,"

---

as somehow being evidence of market manipulation. In any event, the SEC's Order finds that the "inadvertent" error "did not benefit Citadel Securities" and did not "impact Citadel Securities' handling of client orders." *See In re Citadel Securities LLC*, SEC Order (Sept. 22, 2023), https://www.sec.gov/files/litigation/admin/2023/34-98482.pdf.

[4]   Of course, merely operating a trading platform that allows customers to trade, while complying with the requirements of Exchange Act Rule 15c3-5, could not give rise to recklessness.

(ii) "hundreds of thousands of dollars in saved execution costs for the baiting orders that were cancelled," and (iii) "at least millions of dollars in ill-gotten gains." *Harrington II* at 17.  With respect to "transaction fees for completed customer trades," it is black letter law that conclusory allegations regarding a motive to "obtain fees" are insufficient. Mot. 24.  Yet NWBO alleges only that: "Defendants obtain commissions, fees, or other forms of compensation for acting as a broker for client trades," ECF 95 ¶ 287; there is no allegation as to why these conclusory and group-pled "forms of compensation" would be greater or different as a result of illegal activity.  Moreover, there is no allegation in this matter that Defendants "saved execution costs" by cancelling any orders.  Lastly, with respect to "millions of dollars in ill-gotten gains," the *Harrington* plaintiff, unlike NWBO, alleges the price of its stock at the beginning and end of each spoofing episode, and the beginning and end of the relevant period, thus sufficiently alleging that the defendants *were* able to purchase shares at a discount.  In any event, even granting every inference to NWBO, the total benefit alleged from the scheme is *less than $3,000 per Defendant, per year*—a *de minimis* purported benefit that fatally undermines NWBO's scienter theory and is drastically different from the "millions of dollars in ill-gotten gains" in *Harrington II*.  Reply at 16-17.

**<u>Loss Causation.</u>**   *Fifth*, *Harrington II* found sufficient allegations of an "actual loss suffered" and a "plausible causal link between that loss and the alleged misrepresentations," *Harrington II* at 18.[5] NWBO first copied from *Harrington* a scheme whereby spoofing "dr[ove] down the price of NWBO shares," permitting Defendants to purchase at a discount. *Harrington* SAC ¶ 54; ECF 95 ¶ 76.  But critically, the plaintiff in *Harrington* alleged the share price at the start of each spoofing episode to show it declined during those episodes, *e.g.*, *Harrington* SAC

---

[5]  Contrary to NWBO's claims, Notice at 5, nothing in *Harrington II* changes the fact that superficial and incomplete charts cannot be a plaintiff's sole source of pleading an element of a market manipulation claim, Mot. at 11.

6

¶¶ 78-9, and also alleged that the price of Concordia's stock declined 89% during the *Harrington* relevant period, *id.* ¶ 143.  NWBO did neither.  Moreover, the *Harrington* plaintiff alleged that it sold shares *within seconds* of the spoofing episodes.  *Harrington* SAC ¶ 100 (alleging multiple sales less than 10 seconds after spoofing episode).  NWBO, by contrast, *never alleges that it sold shares in close proximity to the purported spoofing*, which is fatal under controlling Second Circuit authority.  Reply 21-22.  Instead; NWBO alleges that it sold shares *based only on the closing* price. ECF 95 ¶ 289.  Indeed, NWBO alleges that it traded on only *one* day on which there was a spoofing "example episode," and that purported spoofing occurred hours prior to closing.  Reply 22.

**Reliance.**  **Finally**, *Harrington* involved alleged spoofing on presumptively efficient exchanges, NASDAQ and TSX, which operate entirely differently from NWBO's OTC venues. *Harrington* SAC ¶¶ 6-7.  NWBO's copying-and-pasting of the *Harrington* spoofing theory thus further explains NWBO's failure to allege the facts necessary to plead reliance.  Reply 22-23.

*          *          *

Although NWBO believes that copying-and-pasting "identical" conclusory allegations from *Harrington* is some sort of panacea, it serves only to explain how NWBO ended up with an implausible and outright impossible theory of spoofing.  A comparison of the *specific allegations* in the two cases demonstrates that the critical facts *Harrington II* relied on to deny a motion to dismiss are entirely absent here.  Indeed, *Harrington*'s allegations of a cross-border scheme exploiting gaps in regulatory surveillance by trading interlisted securities on presumptively efficient markets are night-and-day from NWBO's facially implausible theory that seven broker-dealers, separately and without coordinating, spoofed the exact same obscure stock over the exact same five-year period to obtain mere fractions of pennies on a venue where the alleged scheme is not even possible.

Dated: October 6, 2023
       New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

 /s/ *William A. Burck*
William A. Burck
Christopher G. Michel (admitted *pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Brenna Nelinson
Peter H. Fountain
Leigha Empson
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
brennanelinson@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for Defendant Citadel Securities LLC*

8

| | |
|---|---|
| **MORRISON & FOERSTER LLP**  /s/ *Anthony S. Fiotto* (with permission) Anthony S. Fiotto Julia C. Koch 200 Clarendon Street Boston, MA 02116 Telephone: 617-648-4700 Facsimile: 617-830-0142 Email: AFiotto@mofo.com Email: JKoch@mofo.com  Eric D. Lawson 250 West 55th Street New York, NY 10019 Telephone: 212-336-4067 Facsimile: 212-468-7900 Email: ELawson@mofo.com  *Attorneys for Defendant Canaccord Genuity LLC* | **KATTEN MUCHIN ROSENMAN LLP**  /s/ *Peter G. Wilson* (with permission) Peter G. Wilson Christian T. Kemnitz (admitted *pro hac vice*) Leigh Brissenden (admitted *pro hac vice*) 525 West Monroe Street Chicago, Illinois 60661-3693 Telephone: (312) 902-5200 peter.wilson@katten.com christian.kemnitz@katten.com leigh.brissenden@katten.com  *Attorneys for Defendant GTS Securities LLC* |
| **GREENBERG TRAURIG, LLP**  /s/ *Richard A. Edlin* (with permission) Richard A. Edlin Daniel P. Filor Nicholas T. Barnes One Vanderbilt Avenue New York, NY 10017 Telephone: (212) 801-9200 Facsimile: (212) 801-6400 edlinr@gtlaw.com filord@gtlaw.com barnesn@gtlaw.com  *Attorneys for Defendant Instinet, LLC* | **KEESAL, YOUNG & LOGAN** A Professional Corporation  /s/ *Stephen Young* (with permission) Jon W. Zinke Stephen Young (admitted *pro hac vice*) Elizabeth H. Lindh (admitted *pro hac vice*) 400 Oceangate Avenue, Suite 1400 Long Beach, California  90802 Telephone:  (562) 436-2000 jon.zinke@kyl.com steve.young@kyl.com; elizabeth.lindh@kyl.com  *Attorneys for Defendant Lime Trading Corp.* |

9

**BALLARD SPAHR LLP**

 /s/ *Marjorie J. Peerce* (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel:  (212) 223-0200
Fax:  (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (*pro hac vice* forthcoming)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  (215) 665-8500
Fax:  (215) 864-8999
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendant*
*G1 Execution Services LLC*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 /s/ *Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas LLC*