quinn emanuel trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8120**

WRITER'S EMAIL ADDRESS
**williamburck@quinnemanuel.com**

November 20, 2023

<u>VIA ECF</u>

Honorable Gary Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:   <u>Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC, et al.,
      No. 1:22-cv-10185-GHW-GS</u>

Dear Judge Stein:

We represent Defendant Citadel Securities LLC and write on behalf of all Defendants in response to the Court's request for caselaw in which a court took judicial notice of trading data. *See* Nov. 14, 2023 Hr'g Tr. at 95:19-25.  By way of background, the trading data at issue here—quote data for NWBO—shows the price and volume of the best bid and best offer displayed by each market participant.  This trading data is available to the public and is the source for the spoofing allegations in the Amended Complaint.  *See* ECF 95 ¶ 61 n.10.  The data was downloaded from OTC Markets Group (which operates OTC Link), and provided to the Court "as is," along with a sworn declaration.  Nov. 14, 2023 Hr'g Tr. at 100:10-17; ECF 116 ¶¶ 12-29.

Courts in this District regularly take notice of trading data.  Indeed, "trading data directly contradicting plaintiffs' allegations of price increases can be fatal to [a] plaintiffs' case." *In re IPO Sec. Litig.*, 383 F. Supp. 2d 566, 583-586 (S.D.N.Y. 2005).  Courts take notice of such data on two bases.  **First**, where the data can be accurately and readily determined, such as publicly available data.  *See, e.g.*, *id.* (taking judicial notice of "publicly available trading data" and granting motion to dismiss with prejudice); *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *12 & n.16 (S.D.N.Y. Mar. 29, 2022) (taking judicial notice of "pricing data from [subscription-based industry analyst] IHS Markit" submitted by defendant at motion to dismiss stage); *Set Cap. LLC v. Credit Suisse Grp. AG*, 2019 WL 3940641, at *1 (S.D.N.Y. Aug. 16, 2019) (taking judicial notice of "public pricing data"), *vacated in part on other grounds*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021); *Acticon AG v. China North East Petroleum Holdings, Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012) ("We are entitled to take judicial notice of well

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY |
SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

publicized stock prices without converting the motion to dismiss into one for summary judgment"); *see also* ECF 115 at 6 n.5.

**Second**, where the data is "integral to the complaint." *See, e.g.*, *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (judicial notice appropriate where "the movement of Citizens' stock price is integral to the plaintiffs' fraud-on-the-market theory"). Indeed, the Second Circuit has emphasized that it is "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint" that is key in determining whether a document is subject to judicial notice. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion"); *see also* ECF 124 at 24-25.

Here, the Court may take judicial notice of the data submitted by NWBO on either basis: the trading data is publicly and readily available, *see* ECF 116 ¶¶ 12-29 (providing "publicly-available quote data from OTC Markets Group"), and the trading data is integral to the complaint because it is the same data relied on by NWBO for its spoofing allegations, *see* ECF 95 ¶ 61 n.10 ("The data utilized by Plaintiff to support the allegations in this Complaint consist of Level II quotes … provided directly by OTC Markets Group.").

In *In re IPO Sec. Litig.*, the court took judicial notice of trading data submitted by defendants to assess the "pivotal" question of whether plaintiffs' allegations were "flatly contradicted by objective fact." 383 F. Supp. 2d at 570. Plaintiffs in *In re IPO* had alleged that "stock prices rose *because* [of] defendants' conduct," but the court noted that based on the trading data, stock prices "decline[d]" or "show[ed] no consistent pattern of price increases." *Id.* at 584 (emphasis in original). Based on the trading data, the court found that plaintiffs had failed to allege loss causation and dismissed the complaint with prejudice. *Id.*

Here, the data shows that NWBO's allegations are contradicted by the surrounding public data NWBO was aware of but selectively omitted. **First**, as shown in the public trading data for NWBO, the "so-called Baiting Orders were always competitively priced offers to sell shares; they were not 'away from the market' or 'parked' at all." *See* ECF 124 at 23-24; ECF 115 at 37-38 & n.39; Defs.' Oral Arg. Pst'n at 21-22. If Defendants' orders were priced competitively, as the data shows, they were *likely* to be executed and were not "fictitious Baiting Orders" at all.[1]

**Second**, based on the public data, the price quotes for NWBO shares—both the best bid and the best offer (known as BBO)—"actually *went up* during many of NWBO's alleged spoofing episodes, the exact opposite of its claim that Defendants caused the price of its stock to decrease." ECF 115 at 36-37; ECF 124 at 23. This is not a question of what precisely is sufficient to allege

---

[1] NWBO's own allegations—without any consideration of publicly available trading data—also show that Defendants' orders were competitively priced, refuting NWBO's "parking" theory. *See, e.g.*, ECF 115 at 15-16 ("[I]n more than half of the sixteen "example episodes," many of the alleged "Baiting Orders" were at *better prices* than the offers of the one market participant the Defendant supposedly "parked" behind"); ECF 124 at 5-6; Defs.' Oral Arg. Pst'n at 19.

price decline, but instead a situation where NWBO's allegations cannot survive because they are "flatly contradicted by objective fact." *See In re IPO*, 383 F. Supp. 2d at 570.

      The publicly available trading data is thus fatal to several separate elements of NWBO's claim: scienter (no motive or recklessness if the purported Baiting Orders were competitively priced or if the stock price was not driven down); manipulative acts (competitively priced orders were not "Baiting Orders" at all); and loss causation (no loss if stock price went up during supposed spoofing episodes, *cf. id.* ("[N]o loss causation standard can be satisfied without a basic allegation that defendants' conduct actually caused some price changes in the stock…. Because plaintiffs do not allege a mechanism of artificial price inflation that survives exposure to actual trading data, they fail to allege loss causation under any standard.")).

      While the Court need not consider the publicly available trading data to dismiss the Amended Complaint with prejudice, the law is clear that it is permitted to do so, and should do so here where the data is fundamentally inconsistent with NWBO's allegations.

      Defendants are available to answer any other questions the Court may have.

Respectfully submitted,

*/s/ William A. Burck*
William A. Burck

cc:    All counsel of record (via ECF)