NbeWnorO

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   NORTHWEST BIOTHERAPEUTICS,
    INC.,
4
                    Plaintiff,
5
               v.                        22 Civ. 10185 (GHW)(GS)
6
    CANACCORD GENUITY LLC, CITADEL
7   SECURITIES LLC, G1 EXECUTION
    SERVICES LLC, GTS SECURITIES
8   LLC, INSTINET LLC, LIME
    TRADING CORP. and VIRTU
9   AMERICAS LLC,

10                  Defendants.
                                         Oral Argument
11  ------------------------------x
                                         New York, N.Y.
12                                       November 14, 2023
                                         10:30 a.m.
13
    Before:
14
                         HON. GARY STEIN,
15
                                         U.S. Magistrate Judge
16

17

18

19

20

21

22

23

24

25
```

NbeWnorO

APPEARANCES

COHEN MILSTEIN SELLERS & TOLL PLLC
     Attorneys for Plaintiff
BY:  LAURA H. POSNER
     RAYMOND M. SAROLA
     MICHAEL B. EISENKRAFT

MORRISON & FOERSTER LLP
     Attorneys for Defendant Canaccord
BY:  ERIC LAWSON

QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Defendant Citadel
BY:  WILLIAM A. BURCK
     CHRISTOPHER D. KERCHER
     PETER H. FOUNTAIN

BALLARD SPAHR LLP
     Attorneys for Defendant G1
BY:  LAURA E. KRABILL

KATTEN MUCHIN ROSENMAN LLP
     Attorneys for Defendant GTS
BY:  PETER G. WILSON

GREENBERG TRAURIG LLP
     Attorneys for Defendant Instinet
BY:  DANIEL P. FILOR

KEESAL YOUNG & LOGAN
     Attorneys for Defendant Lime
BY:  ELIZABETH H. LINDH (via speakerphone)

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Defendant Virtu
BY:  AUDRA J. SOLOWAY

NbeWnorO

```
 1              (Case called; appearances noted)

 2              THE COURT:  Good morning.  You may be seated.

 3              Well, thanks, everybody, for coming in.  I felt the

 4    issues in this case were sufficiently complex and

 5    sufficiently -- indeed, hotly -- contested that oral argument

 6    would be appropriate.  I do have a number of specific

 7    questions, but I also want to give each side an opportunity to

 8    present their view of the case and why they think I should rule

 9    in their favor.

10              Since this is defendants' motion, we'll begin with

11    you, Mr. Burck.

12              MR. BURCK:  Thank you, your Honor.

13              Your Honor, we have a presentation, or a slide deck,

14    that we'd like to use to help guide our arguments today.  It's

15    entirely drawn from our briefs and the appendices, exhibits and

16    public data that we've referenced in those briefs.  We've

17    notified plaintiff's counsel, and they didn't object to the

18    presentation.  They haven't seen it, but we told them this is

19    all drawn from our briefs.

20              THE COURT:  No objection, Ms. Posner?

21              MS. POSNER:  No objection.

22              THE COURT:  OK.

23              Very well.

24              MR. BURCK:  Thank you, your Honor.

25              Your Honor, if I may, I'll hand up a hard copy for the
```

NbeWnorO

1   Court.  We'll have it on screen as well.

2              THE COURT:  You may approach.

3              MR. BURCK:  Your Honor, Derek Lewis is the gentleman

4   sitting right beside me.  He's going to be operating the

5   audiovisual extravaganza we have here.

6              THE COURT:  Good morning, Mr. Lewis.

7              MR. LEWIS:  Good morning.

8              MR. BURCK:  Your Honor, we'll start with slide 2, and

9   your Honor, this is really a road map for what we'd like to

10  discuss on our side this morning.

11             Before I go into the road map, just in a nutshell,

12  from the defendants' perspective, your Honor, this is a case

13  about the plaintiffs trying to turn regular market activity,

14  normal behavior by market makers into wide scale, unbounded

15  spoofing.  And we'll go through each of the elements of the

16  PSLRA.  Each one of these, of course, is required under the

17  PSLRA to be met in order for the case to survive the motion to

18  dismiss.  In each of these, in this case, the plaintiffs fail,

19  and they fail badly.

20             Judge, they've had two opportunities here.  They had

21  an original complaint, which they then amended, based on a Rule

22  11 letter that we sent to them that pointed out the severe

23  factual mistakes in their complaint.  And then in their new

24  complaint, their amended complaint, which we'll go into detail

25  today, they simply erased a lot of those facts.  They didn't

NbeWnorO

1    correct them.  They just ignored them, and they expanded their

2    theory in a way that went from normal spoofing into some kind

3    of new spoofing that no one's ever heard of, your Honor.  So

4    I'll go through each of these elements, your Honor, and the

5    deck will go through it in this order.  But let's just start

6    with scienter.

7              Obviously scienter is a critical aspect of the

8    heightened and exacting pleading standards required by the

9    PSLRA.  We will demonstrate, and we have demonstrated, that

10   they have not even come close to meeting that standard, your

11   Honor.

12             Manipulative acts.  Again, they can't even explain

13   what the manipulative acts are.  Even taking their facts as

14   alleged and assuming them to be true -- assuming them to be

15   true -- it means that there was no spoofing.  There were no

16   manipulative acts.

17             We'll also go into loss causation, and the loss

18   causation in this case, your Honor -- we'll go into this a

19   bit -- the actual purchases by the plaintiffs in this case

20   occurred, as they admit, on closing dates, because they're a

21   publicly traded company; they have to buy on closing dates.

22   All of those closing dates that we've seen, with one exception,

23   didn't even happen on the same day as the spoofing allegations

24   that they said occurred, and the one day that it did, it

25   happened six-plus hours after the spoofing incident occurred.

NbeWnorO

1    And more importantly, potentially, your Honor, is the fact that

2    the stock price during this five-year period that they allege

3    doubled in price.  So the price didn't go down.  It doubled.

4    They are, of course, alleging that the spoofing here was

5    designed to drive the price down.  So this spoofing that they

6    allege not only didn't happen, if there was an attempt, it was

7    one of the worst attempts in history.

8         The *Harrington* case, which I'm sure will come up, from

9    the court, in that case the price went down 90 percent in the

10   alleged period.  This is a very different scenario.  Plus, of

11   course, in that case, we'll learn this as well, we're talking

12   about trading that occurred in milliseconds, which is normal

13   trading for market makers in 2023.  In this case, all the

14   spoofing they're alleging happened in minutes, two minutes,

15   three minutes, which, as the Court knows, is an eternity when

16   it comes to this type of trading.

17        And finally, your Honor, we will talk about the

18   reliance on efficient market theory, which is a necessary

19   component as well.  The plaintiffs allege that the OTC Link

20   market or this OTC market is an efficient market.  They say

21   courts have held that.  The Court, I'm sure, has read the cases

22   himself.  The courts do not say that.  The courts have said

23   either that it is not an efficient market or they don't reach

24   the issue.

25        THE COURT:  But there's a lot of cases on that.

NbeWnorO

1          Just so we can level set, you prefaced this slide by

2    saying these are the different things required under the PSLRA,

3    but just to make sure we're on the same page, the PSLRA

4    absolutely says something about scienter as the heightened

5    standard.  Not so for any of the other three elements, correct?

6    Because the PSLRA's heightened pleading standard for

7    misstatements and omissions does not apply in a manipulation

8    case.

9          MR. BURCK:  That's right, your Honor, and this is not

10    a misrepresentations case.

11          THE COURT:  Yes.

12          MR. BURCK:  That's 100 percent right, your Honor.  We

13    believe that these are the factors that should guide the

14    Court's thinking about the case, but of course, scienter is the

15    key issue, up-front issue.

16          THE COURT:  And 9(b), to be sure.

17          MR. BURCK:  9(b).

18          THE COURT:  Manipulative acts.

19          MR. BURCK:  Exactly.  Exactly, your Honor.

20          THE COURT:  OK.

21          MR. BURCK:  Next slide, please.

22          First, your Honor, we just want to level set on what

23    spoofing is.  It's a well-understood concept.  It's something

24    that everybody in the market knows, and it's a pretty simple

25    concept.  Spoofing is when the spoofer decides that they're

NbeWnorO

```
1    going to ask for a price that's above the market price, at a
2    particular moment, not with the intent to actually sell the
3    shares at that price but to create the impression in the market
4    that there's some pressure to sell.  In fact, the spoofer
5    doesn't want to actually sell because it's giving a price
6    that's higher than the market, so of course, they don't want to
7    actually sell it.  They just want to create a sense that
8    there's a pressure on the stock.  So they put a price that is
9    slightly above the market price.  They, again, have no intent
10   to sell those shares.
11           The pressure created by this, these very fast trades
12   at this slightly above-market price creates the downward price
13   pressure on the stock, because people think that somebody wants
14   to sell this stock, and you start seeing the price fall.  But
15   it's an artificial fall because, again, the purpose of the
16   spoofer is not to actually sell.  It's to create the impression
17   that there's a pressure to sell.
18           THE COURT:  I'm a little confused, maybe
19   embarrassingly, but you say in a real spoofing case, the
20   spoofer, if it wants to drive the market price downwards,
21   places offers to sell above the market price --
22           MR. BURCK:  Exactly.
23           THE COURT:  -- or below?
24           MR. BURCK:  Above, because the idea is that they're
25   trying to create the impression that there is an actual sale.
```

NbeWnorO

1    They're not doing it massively above.  They're doing it a

2    little bit above so that they create an impression that

3    there's -- and again, the key thing here, your Honor, is they

4    don't intend to sell it.  So in other words, they don't have to

5    sell.  They can put out an ask price.  They don't have to sell

6    it, and so the idea is to create the impression that there's a

7    desire to sell the shares.  But again, the key point is that

8    they don't intend to sell.  That's what the spoofer's goal is.

9           The spoofer's goal is not to actually sell, and in

10   fact, in spoofing, they don't sell for exactly the reason

11   you're talking about, your Honor, because it is a little bit

12   counterintuitive in the sense that you think, well, if I'm

13   going to offer to sell the stock at a higher price than the

14   market, a bunch of people are going to want to do that on the

15   other side.  But the reality here is the person offering to

16   sell doesn't want to do that.  That's not the point.  The point

17   is to create the impression that somebody in the market thinks

18   I want to sell, and you get other people in the market starting

19   to sell, and then the prices start going down as you have

20   people coming into the market more on the sell side than on the

21   buy side.

22          So the idea here is that the price starts coming down

23   as there are more sell orders, or asks for sell, offers to

24   sell, and then, when the price is depressed, the spoofer will

25   buy the stock at the depressed price that's been created by the

NbeWnorO

1    false impression that they were willing to sell at a slightly

2    higher price that then caused the increase in sale orders in

3    the market.  And they'll buy it at the lower price and that's

4    an artificially low price because, again, it all started from

5    the spoofer deciding I'm going to pretend like I'm going to

6    sell but I'm not going to sell.

7         And the key, final bit of spoofing -- that's stage

8    three here, your Honor -- is that the spoofer cancels the

9    deceptive sell orders because, again, the spoofer has no intent

10   to actually sell the stock at the slightly inflated price

11   because that will actually be a bad decision for them from an

12   economic perspective.  So again, they put it a little bit above

13   the market to create the impression that they want to sell.

14   They get other people in the market to decide to sell.  The

15   price comes down.  They wait until the price hits a certain

16   artificially low point, they jump and they buy the stock, and

17   then they cancel all their original sell orders.

18        So that is spoofing.  That is classic spoofing.  I

19   don't think that the plaintiffs would disagree with that.  In

20   fact, that's their case.  That's effectively what they're

21   saying.

22            THE COURT:  That's what they've alleged.

23            MR. BURCK:  Exactly, your Honor.

24        We can go to the next slide.

25        Let me go through exactly what they allege, and that

NbeWnorO

1    is parallel to what I just mentioned, your Honor.

2            Stage one, this is what the plaintiffs say.  Each

3    defendant separately displayed multiple baiting orders.  The

4    baiting order is the fake order to sell.  I want to sell a

5    little bit above.  I want to get people into the market.  I'm

6    not actually planning to do that.  And they don't intend to

7    execute.  They don't actually intend to sell the stock.

8            Baiting orders were parked, and I'll explain parking

9    in a bit.  Parking is the idea of hiding it right behind

10   somebody else who is not involved in the scheme but who has a

11   slightly higher price, as the market is moving around, so that

12   you can hide the order there so that it then -- you can

13   basically further the scheme by hiding it, by parking.  Again,

14   we'll get into that in a little more detail.

15           Stage two, defendants' baiting orders drove down the

16   price.  This is what we were talking about, the spoofing, the

17   impression of interest in selling in the market so other people

18   can start putting bids out there or asks out there, and the

19   price starts going down.  And then the defendants, according to

20   the plaintiff -- and we're not sure if it's on behalf of

21   clients or on behalf of themselves; they say it could be either

22   one, they're not really sure -- bought the stock at that lower

23   price.  That's the spoofing.  That's where you get the economic

24   value from the scheme.

25           And then stage three, and this is over a two-minute

NbeWnorO

period, your Honor, not milliseconds, unlike every other case
that has survived a motion to dismiss -- every other case.  In
two minutes, the defendant decides to cancel baiting orders and
so they would not actually have to sell the shares at the price
that they had originally put them at, which, of course, they
wouldn't want to because that price is now too high.

So that is what they allege, your Honor, and that is
classic spoofing.

Next slide, please.

And this slide, your Honor, we're going to go into a
fair bit more detail, but this is actually what they allege
factually, and this is also what they rely on.  This is taken
from what they rely on in their complaint and in their
briefing, from the public data about these trades.  What
actually happened is that the defendants' prices -- and this is
taken from public data, your Honor -- were competitive with the
market price.  In fact, they're often much lower -- and we'll
go into that in a minute, your Honor -- much lower than the
market price.  And the defendants' orders were not behind other
orders.  They were not parked in any sense of the word, and
there are a number of reasons for that, but they were never
parked.

For stage two, there is no actual allegation of a
price decline in this case, your Honor.  In fact, the record
shows it doubled.  But more importantly, your Honor, they don't

NbeWnorO

actually, the plaintiffs don't actually allege what the price was before the spoofing started.  There's literally nothing. In the first complaint, they said that this price was something -- we'll go into that -- it was X, and then it was pointed out to them they were wrong.  And so in this complaint, rather than try to find the right price, and we'll tell you what the right price was, based on public data, they just take it out.  So we have actually no understanding of what the price was, what the spoofing effect was on the price.  And that, of course, is a requirement by the Second Circuit under *ATSI*.  And in fact, of course, the share price went up during this entire period.

Stage three, they allege, your Honor, that orders may have been canceled -- may have been canceled.  Your Honor, they cannot point to a single, solitary instance in which an order was canceled in their entire complaint, not one by any of the defendants.  They also said originally that defendants did not sell any shares because, of course, that's a key part of the spoofer's scheme.  It doesn't make any sense to spoof and then sell at the higher price, because now you're losing money.  In fact, public data shows defendants did sell shares during this period.

So the allegations that they've actually made, and this is actually drawn from their complaint, because they say may have done this, they may have sold, they may not have sold,

NbeWnorO

1      they may have canceled, they may not have canceled, it doesn't

2      matter, your Honor, because ultimately what they were doing is

3      spoofing.  Of course, if they did all of these things, which,

4      again, the public data shows, and they even admit in their

5      factual allegations, it can't be spoofing.

6              Next slide, please.

7              Your Honor, we'll start with, as the Court pointed

8      out, the key issue under the PSLRA, scienter.  And we have a

9      quote here.  We thought it was just important to have it up

10     there.  The only factor that distinguishes legitimate trading

11     from improper manipulation is often scienter.  And especially

12     in a spoofing case, that is critical because, again, the

13     spoofer has to start with the intent not to sell; that they're

14     just going to put out a fake number and start the process of

15     getting people to think that there's a sale process going on.

16             You cannot have market manipulation without intent,

17     and where there's no motive -- and we'll go into the motive

18     issue in a minute -- the circumstantial allegations have to be

19     that much more enhanced to meet the standards of the PSLRA.

20             The plaintiffs fall woefully short on both of those

21     counts.

22             Next slide.

23             So first, your Honor, we're going to go through a bit

24     about what their allegations are and explain how the

25     allegations don't make sense on the face of the complaint and

NbeWnorO

```
1    also are belied by the actual public data on the trades.

2            As I mentioned earlier, the defendants say that these

3    market makers may have been trading for clients and maybe they

4    were trading for themselves.  It doesn't matter, from their

5    perspective, because ultimately it's spoofing.  Well, of

6    course, if they're trading for clients, your Honor, if the

7    defendants are trading for clients, then they have to be doing

8    spoofing for those clients.  They have to be actually doing it

9    for a specific client on both sides of the trade, on both the

10   fake sale and then the actual purchase and then the

11   cancellation.  So that has to be what they're doing.  There has

12   to be a conspiracy effectively with the clients.  They, of

13   course, don't allege that.  They simply say, well, it could

14   have been for clients, but they don't allege that any clients

15   were actually part of this scheme.

16           THE COURT:  That's the same as *Harrington*, isn't it?

17           MR. BURCK:  That is the exact --

18           THE COURT:  *Harrington II*.

19           MR. BURCK:  *Harrington II*, right.  And your Honor, in

20   that case --

21           THE COURT:  Are you suggesting I should disagree with

22   Judge Schofield on that issue?

23           MR. BURCK:  Well, your Honor, actually, we don't think

24   you have to disagree with Judge Schofield.  We don't

25   necessarily agree with *Harrington II*, but we don't think that
```

NbeWnorO

1   *Harrington* has anything to do with the facts that are alleged

2   in this case.  The facts alleged in *Harrington* -- and I can go

3   into that.

4           THE COURT:  No.  I understand you have a myriad of

5   ways of distinguishing *Harrington II*, but on this particular

6   issue, which is that the trading was or may have been done on

7   behalf of clients, was not a point that Judge Schofield

8   believed was fatal to the complaint.

9           MR. BURCK:  Well, I think, your Honor, in that case

10  the idea was that the defendants in that case were getting some

11  kind of benefit from the spoofing that they were assisting

12  clients with, and the idea was --

13          THE COURT:  To make clients happy.

14          MR. BURCK:  Make clients happy.

15          THE COURT:  Why would it be different here?

16          MR. BURCK:  Well, Judge, there are many difference,

17  but one difference here is that in this case, when we're

18  talking about the actual trades, the facts of this particular

19  case, putting aside *Harrington*'s which are about millisecond

20  trades and a whole other scheme to evade regulators, here you'd

21  be saying that these market makers who have people on both

22  sides of a trade -- right?  When they're market making, they

23  have people that are buying and people that are selling.  In

24  this case, there's no allegation that the clients were the same

25  people on either side.  There's no allegation that when they

NbeWnorO

1    were doing this alleged spoofing, that the client that they

2    were -- no allegation, your Honor, not even -- we're going to

3    go to the facts.  They don't even say the same person was

4    trying to do a spoofing, meaning they were trying to put up a

5    bid at a higher price and then purchase at a lower price and

6    then cancel their orders.

7            THE COURT:  Are you saying there was such an

8    allegation in *Harrington II*?

9            MR. BURCK:  I believe so, your Honor.  I believe that

10   it was at least something that was alleged in that case.  It's

11   definitely not alleged in this case.

12           THE COURT:  I don't know how the plaintiff either in

13   *Harrington II* or in this case could know?

14           MR. BURCK:  Well, your Honor, they don't allege it.

15   So it's not even a question of whether they could know.  They

16   have to allege that they believe, on information and belief,

17   for example, that they were doing this on behalf of X client or

18   Y client or Does.  In fact, in the *Kessev Tov* case, there was a

19   relaxed standard because they were saying that we don't know

20   who's actually doing this, the Does are doing it; we're going

21   to find out.

22           Here, they don't allege in any way that there was a

23   client on both sides, and if they don't allege it, your Honor,

24   they can't prove spoofing.  They can't even meet the standard.

25   It's not the defendants' burden to tell them, well, you should

NbeWnorO

1    have said that it was either an identified client or a John Doe

2    client or a Jane Doe client who you were doing it for.  They

3    just skip over it entirely, your Honor.

4              THE COURT:  Will you let me know where in the

5    *Harrington* --

6              MR. BURCK:  Yes.

7              THE COURT:  -- amended complaint or the opinion

8    there's an allegation that the plaintiffs knew or had

9    identified or alleged who the specific clients were?

10             MR. BURCK:  We'll definitely check that, your Honor.

11   I'm not saying that they identified them.  I'm saying I believe

12   there was an allegation, that it was on behalf of clients who

13   were on both sides.

14             THE COURT:  Well, isn't that the reasonable inference

15   to be drawn?  To the extent the complaint here alleges that the

16   trading was on behalf of clients, you would think that if the

17   spoofing was done on behalf of clients; it would follow from

18   that allegation or at least certainly a reasonable inference

19   from it is that it was done on behalf of the same client.

20             MR. BURCK:  Well, your Honor, first of all, I think

21   that they'd have to allege that.  And I think that the way the

22   actual markets work here and the way that their customer, the

23   actual customer base that the plaintiffs well know, there are

24   thousands and thousands of people on both sides of these

25   trades, and whenever Citadel or any of the other defendants

NbeWnorO

1   decides they're going to help a spoofer, they're hurting their

2   buy side people.

3              So the question is why would -- and they don't allege

4   this either, your Honor.  Why would Citadel decide, you know

5   what, one day here's what we're going to do.  We're going to

6   help our sell side people.  Right?  We're going to help our

7   sell side and our spoofers, we're going to hurt our buy side

8   people.  Why would they do that?  What would be the reason for

9   that?

10             The way they make money is on fees and commissions off

11   of trading.  Trading up, down.  Doesn't matter to them.  They

12   make it off of the fees, commissions for trades.  There's no

13   allegation, your Honor, at all that they had any motive to

14   favor spoofers over nonspoofers in the market.  They didn't

15   make any more money from helping somebody spoof.

16             THE COURT:  So with regard to the specific argument

17   you're now making, how do you distinguish that from *Harrington*,

18   your argument that there's no motive because market makers are

19   on both sides?

20             MR. BURCK:  Your Honor, let me address *Harrington* in

21   some detail.

22             THE COURT:  No.  I don't want to interrupt your flow.

23             MR. BURCK:  No, it's fine.

24             THE COURT:  I understand you have other ways of

25   distinguishing *Harrington*.  I'm trying to focus on the specific

NbeWnorO

1    claims you're making.

2              MR. BURCK:  Well, your Honor, I don't think you can

3    divorce *Harrington* and the client issue from the underlying,

4    the facts that the court looked at to determine that it could

5    get past the motion to dismiss, which are completely different

6    than here, because for example, in that case --

7              THE COURT:  I read your letter.

8              MR. BURCK:  Right.

9              THE COURT:  I'd rather get to those points.

10             MR. BURCK:  Fine, your Honor.  I'll get to those.  If

11   you want, I can just continue and then we'll get to *Harrington*.

12             THE COURT:  Sure.  Great.

13             MR. BURCK:  So one other point on this slide, your

14   Honor, there is no -- and this is very different from

15   *Harrington*, just as a point.  There is no explanation of how

16   these seven defendants coordinated to go after this same very

17   low-profile stock, exact same scheme, exact same stock, exact

18   same time period.  There's no allegation they coordinated.  So

19   apparently they all independently came up with the idea that at

20   the exact same time with this particular stock, here's what

21   we're going to do; we're going to spoof it.  And again, it's

22   very important that the plaintiff says that in the context of

23   not even alleging what the price was before these spoofing

24   incidents.  So we don't even know where the price was before

25   and what the effect, the price effect was.

NbeWnorO

1            So again, this is a truly miraculous conspiracy, where

2      seven independent competitors -- again, they're not even

3      alleging there was coordination, your Honor -- decide to attack

4      the same stock in the same way, and we have no idea what the

5      price effect was.  And oh, by the way the stock doubled in

6      price during this period.

7            Next slide, please.

8            Now, your Honor, this goes to something we were

9      talking about earlier, but this is a key point to understand,

10     and I think this is a distinction of sorts within the

11     *Harrington* framework.  NWBO acknowledges defendants are

12     broker-dealers that traded for their clients.  The defendants,

13     as I just explained, could not obtain any additional profits

14     from this spoofing on behalf of their clients.  In fact,

15     they're indifferent between you're buying or selling, and they

16     don't allege anything different.  And again, there's no

17     allegation they conspired with their clients.  Again, we'll

18     look at *Harrington* to understand what exactly was alleged.

19            THE COURT:  Just to be clear, they don't concede, as I

20     take it, the *Harrington* plaintiffs conceded after discovery,

21     that trading was conducted solely for clients.

22            MR. BURCK:  No.

23            THE COURT:  As I understand, the complaint here

24     alleges that it was done either for the defendants' own

25     accounts or on behalf of clients or both.

NbeWnorO

1          MR. BURCK:  Yes, your Honor.  They do, and they don't

2     explain which is which or why.

3          THE COURT:  At this stage of the litigation.

4          MR. BURCK:  Well, your Honor, we'll get to that.

5     We'll get to the proprietary trading in a minute, but I think

6     the proprietary trading is actually even more damaging to their

7     intent theory, the scienter, than the client trading.

8          We can go to the next slide, because we've already

9     covered this issue with the judge.

10         And again, your Honor, this is just the fact that

11    there's no greater commissions, etc.

12         We can go to the next slide.

13         Judge, now, to your question about proprietary

14    trading, so here's what we did, Judge, in order to figure out

15    what they mean by proprietary trading and what the motive could

16    have been to these market makers to do the spoofing on their

17    own behalf.

18         So here's what we did, your Honor.  We took the public

19    data.  We took the allegations of the complaint.  We took the

20    executing price from the public data.  We took the best offer

21    price from the public data, and we multiplied that by the

22    difference in the volume of them executing purchase.  In other

23    words, we just took the numbers that were in the public data

24    based on when they said the spoofing occurred, and we

25    multiplied out what the difference was over the entire period.

NbeWnorO

1    So if every single trade, your Honor, every single trade that
2    they allege was part of the spoofing scheme, the difference
3    would have been $94,458.68 total.
4              THE COURT:  OK.  Let me just see if I can unpack this.
5              First of all, the $94,000 figure is not what you
6    contend is the profits from the 11 or 16 example episodes
7    featured in the complaint.  It's the totality of the hundreds
8    or thousands; I forget which.
9              MR. BURCK:  From what we can discern from the
10   complaint, your Honor, yes.
11             THE COURT:  OK.  And then secondly, in making that
12   calculation, did you rely on any documents or exhibits other
13   than the complaint itself and the exhibits to the complaint?
14   In other words, did you rely on any of the publicly available
15   data that you contend is properly before the Court on a motion
16   to dismiss?
17             MR. BURCK:  Yes, your Honor, we did.  And in fact, we
18   used the same data that the complaint says it relied on.  So we
19   used the OTC Link data, which the complaint actually
20   specifically references, that's publicly available, which the
21   plaintiffs do say that they contest it without explaining why
22   or how they contest it.  But they actually reference it
23   themselves in the complaint.
24             THE COURT:  And is that data part of your exhibits,
25   the defendants' exhibits?

NbeWnorO

1          MR. BURCK:  Your Honor, one of my colleagues just

2     reminded me, this is actually all from the complaint and the

3     exhibit.  This is entirely from the complaint and the exhibit.

4          THE COURT:  OK.  Thank your colleague.

5          MR. BURCK:  And again, they reference this specific

6     public data that we then used as well to do the measurement.

7     In other words, this number's not in their complaint,

8     obviously, but we used the information that's in the complaint

9     and the exhibit.

10         THE COURT:  OK.  Give me one second.  This is a

11    question for either you or your colleague, but to ascertain

12    what the defendants sold the shares purchased in the executing

13    purchases at, the price for that, is that the column at the far

14    right of exhibit 1 to the complaint, next sale by defendant?

15         MR. BURCK:  I believe it is, your Honor, just on my

16    memory.  I have it in my mind, your Honor, but I want to make

17    sure I can --

18         Your Honor, I have it in front of me now.  I'm sorry.

19    The question, your Honor, the best offer --

20         THE COURT:  Yes, the question, in identifying -- so

21    the allegation is that there were executing purchases, I think,

22    is the terminology in the complaint, where the defendant bought

23    at the allegedly artificially depressed price, and then you're

24    saying you calculated the profits as alleged in the complaint

25    from those purchases.  And then the question is what did you

NbeWnorO

1    use in figuring out what those shares were sold for?

2        MR. BURCK:  Your Honor, if you look at the -- if you

3    have the exhibit in front of you, we used the best offer, which

4    is the top column, and then we looked at the price, the

5    executing purchase, under price.  Then we multiplied it by the

6    volume, which is under the baiting orders.

7        THE COURT:  Why would you use the best offer as

8    opposed to the next sale by defendant?  The offer isn't a sale

9    at all.  It's just an offer.

10       MR. BURCK:  Your Honor, the allegation in the

11   complaint is that it's the best that -- the proper, the baiting

12   issue is the best offer minus what the actual baiting offer

13   was.  That's the allegation in the complaint.  So we're using

14   what they've said is the basis.

15       THE COURT:  It seems like apples and oranges.  We're

16   trying to calculate how much money they made on the executing

17   purchases.

18       MR. BURCK:  Well, your Honor, they're saying that the

19   way to calculate that is the best offer, so we used the best

20   offer price and then used the executing price.

21       THE COURT:  OK.  You're saying you used their numbers.

22       MR. BURCK:  Right.  We used what they alleged.  And

23   then if you do the calculation -- of course, plaintiff is

24   welcome to check our work -- it ends up at $94,458 over the

25   entire period.  That's about $3,000 per market maker.

NbeWnorO

1          So, your Honor, we would submit that a $94,000 profit

2     divided by seven different defendants is probably not going to

3     immediate the PSLRA's exacting standards for saying they had a

4     motive to do this.

5          Go to the next slide.  Thank you.

6          Your Honor, without motive -- and we're going to talk

7     a little bit about the circumstantial allegations -- the

8     circumstantial evidence has to be much, much more significant.

9     That's black letter law in the Second Circuit.  The spoofing

10     allegations here, we submit, are indistinguishable from routine

11     market activity.  We'll go into that on the next slide.  And it

12     also relies on incomplete trading data, because the public data

13     set, which, again, they reference in their complaint -- they

14     don't use it, but they reference it in their complaint, and

15     again, we believe the Court can take judicial notice of what's

16     public information, refutes what they say.

17          Go to the next slide.

18          Your Honor, here we have the purported spoofing

19     indicia.  We have on one side the conclusory indicia of

20     spoofing that the plaintiff alleges and then we have on the

21     other side what they actually allege based on what they say in

22     the complaint.  So the indicia of spoofing that the plaintiff

23     admits is required for spoofing is that you cancel all the

24     baiting orders.  But their complaint, they admit that while

25     they may not have canceled, they may have or may not have

NbeWnorO

1    canceled, and they never, ever, a single time identify a single

2    moment that anybody canceled an order.

3          The defendants did not sell any shares during the

4    baiting periods.  That's another element of the spoofing.  They

5    admit that, well, they may or may not have sold shares, which

6    again is completely consistent with spoofing.

7          The defendants parked orders away from the market.

8    Well, we're going to show in a minute that the defendants'

9    prices were quite competitive, actually often much better, and

10   the defendants' orders were not, in fact, behind anything.

11         And then finally of course, there's the price

12   depression issue.  There was no price depression here.

13         Go to the next slide.

14         So I'll start with the cancellations.  Go to the next

15   slide.

16         Something very important to understand about the OTC

17   Link market, your Honor, is that, and this is in our briefing,

18   you can only show one bid at a time.  So the idea that you can

19   flood the market with a bunch of different bids and then pull

20   them all down is actually not how it works.

21         THE COURT:  I do have a question about that.

22   Accepting for the moment, and I may hear something on the

23   contrary from Ms. Posner, that you can only display one bidder

24   offer at a time, how does that negate the possibility that

25   there were multiple baiting orders flashed on the screen

NbeWnorO

1    sequentially over time, maybe only one stays on the screen at

2    any one time, such that the one placed at 1 o'clock only stays

3    on the screen until 1 o'clock and three seconds, when the next

4    one comes up.  But nevertheless, the market is still seeing

5    multiple offers and presumably taking that into account.  Why

6    would that indicate as spoofing?

7          MR. BURCK:  Well, your Honor, the way a typical

8    spoofing scheme works is that there are actually multiple

9    offers going out at the same time.  In other words, it's not a

10   one bid, one bid.

11         THE COURT:  No, but they're claiming -- in other

12   words, you're not disputing what I'm saying.

13         MR. BURCK:  No, not at all.

14         THE COURT:  That that's possible, that a spoofer on

15   this OTC Link market could, a real spoofer -- I know you say

16   your clients are not real spoofers -- could spoof the market

17   through a flood of presumably incrementally decreasing offers

18   to give the impression of softness in the market and a lot of

19   sell side demand.

20         MR. BURCK:  They could theoretically do that, your

21   Honor, but again, the reality of the OTC, what is actually

22   alleged here is that there were these multiple bids and then

23   you pull out a bid, it's canceled.  That's what they're

24   alleging, your Honor.  They're saying that once you see a bid

25   disappear, it's been canceled.  That's not how it works in the

NbeWnorO

1    OTC Link market.  In other words, when you see a bid disappear,
2    it doesn't mean it was canceled.  It just means that there's a
3    new bid.
4              THE COURT:  I understand that.  They're all canceled
5    later after the executing purchase.  That's what they allege.
6              MR. BURCK:  Well, that's what they allege, but again,
7    Judge, we'll go into some of the public data set, also what
8    they said in the complaint, that contradicts that.  But the
9    fact is what they're saying, on its face, that somehow the fact
10   that a bid disappears, they say that's the cancellation, your
11   Honor.
12             THE COURT:  I don't think they say that that's the
13   cancellation.
14             MR. BURCK:  Your Honor, I think they do allege that,
15   that effectively it's the cancellation.  They say other things
16   too, your Honor, but the idea that because it disappears,
17   they're canceling the bid, somebody puts up a bid or an ask
18   really, your Honor, and then the ask goes away, that therefore
19   they've canceled the ask.  That's not how the OTC Link market
20   works.  They're making an assumption that is actually not the
21   way the market works.
22             So, and as we say in the slide, an order can actually
23   be retained and redisplayed later on.  So when the market maker
24   takes the, or a new ask price comes up and the old ask price
25   hasn't disappeared, hasn't gone away or been canceled, it could

NbeWnorO

1    also come back, depending on how the market's moving.  That,

2    again, is very distinct from what they're alleging.  And that's

3    not actually how the OTC market works.

4              And again, your Honor, very important, we think, is

5    that the NWBO doesn't identify a single time, a single specific

6    order that was canceled.  Again, they want the Court to assume

7    that because a link, an ask price comes down that it's been

8    canceled, but that's not a cancellation, because it still could

9    come back up.  And they're not canceling an order in any sense

10   of the word.  And again, that's why they're trying to say --

11   that's how they're trying to create this impression that there

12   are all these cancellations going on, but they don't actually

13   allege any specific cancellation.  And without a cancellation,

14   you can't have spoofing.

15             THE COURT:  They very specifically allege in the

16   example episodes that beginning at a certain moment in time the

17   baiting orders were canceled.

18             MR. BURCK:  Yes, and we can go into that, your Honor.

19   We're going to go into those specific examples in hopefully not

20   nauseating detail but some detail.

21             THE COURT:  But that time period begins after, as

22   alleged, the executing purchase, I think, really determinative

23   what the executing purchase, so that seems to me to refute your

24   notion that they allege that baiting orders were canceled

25   before the executing purchases.

NbeWnorO

1          MR. BURCK:  Well, your Honor, I don't think it's clear

2     at all what they're alleging.  They say both things.  They

3     actually say in their complaint --

4          THE COURT:  They allege cancellations in very, very

5     high percentages vis-à-vis the other participants in the

6     market.  It seems like at this stage, on the motion to dismiss,

7     that that is something I need to accept as true.

8          MR. BURCK:  Your Honor, again, they allege in general

9     that they canceled and they can't point to a single

10    cancellation in the entire complaint.  So I don't think that's

11    what the PSLRA is talking about, that a plaintiff can simply

12    say, well, we meet the standard because we say this is what

13    they did.

14         THE COURT:  They allege baiting orders were placed

15    from such and such time to such and such time and then the

16    orders were canceled after that time.

17         MR. BURCK:  Your Honor, again --

18         THE COURT:  Isn't that what they have to allege, that

19    orders were canceled?

20         MR. BURCK:  Your Honor, it's not actually backed by

21    what they actually say and what they cite in their complaint.

22         THE COURT:  They don't have to cite evidence in their

23    complaint.

24         MR. BURCK:  They don't have to cite evidence, but they

25    have to actually have some basis to say what they said.  We're

NbeWnorO

1    in the PSLRA land here.  We're in heightened and exact pleading

2    standards, so they can't simply say these are baiting orders,

3    your Honor.

4              THE COURT:  They allege a specific number of shares,

5    30,263, and then allege that those orders were canceled.

6              MR. BURCK:  Your Honor, true, but on the public data

7    set and also what they cite in their complaint, we're going to

8    show that that didn't happen.  That actually did not happen, on

9    the face of the complaint.  And Judge, even if you think that

10   there's some enough evidence of baiting orders or cancellations

11   just based on the mere fact of an allegation, Judge, we don't

12   even know because they've removed from the complaint the price

13   effect.  We don't know the price that they're talking about.

14   So if.

15             THE COURT:  That's a different point.

16             MR. BURCK:  It's a different point, but it goes to the

17   fact that if they allege, OK, baiting orders, cancellations,

18   etc., that without the actual full, the key data that's part of

19   that scheme being alleged, the whole thing collapses.

20             And your Honor, the other thing that's very, very

21   important, and I mentioned this several times, because I think

22   this is, again, very important.  We're talking about two

23   minutes, your Honor.  They're alleging spoofing occurs in two

24   minutes from the bait to the execution.  There's no case --

25   *Harrington*, *Kessev Tov* -- that has anything to do with minutes.

NbeWnorO

1    We're talking about milliseconds.

2              THE COURT:  Are you referring to the cancellation of

3    the baiting orders or something else?

4              MR. BURCK:  The executing purchase, your Honor.

5              THE COURT:  No.  I understand the milliseconds

6    mentioned in the case law to refer to when the orders were

7    canceled in relation to the executing purchases.

8              MR. BURCK:  Your Honor, yes, they do talk, and what

9    we're talking about is that the milliseconds -- we're talking

10   about a two-minute scheme that they're alleging, two minutes

11   between the beginning and the end of the spoof, effectively.

12             THE COURT:  But in fact, they do allege that the

13   trades were canceled in at least one specific incident

14   beginning in milliseconds and in most of the other example

15   episodes within less than five seconds.  So it's not true when

16   you say that they allege that the orders, it took two minutes

17   to cancel, when you say they don't allege cancellations

18   happened within seconds or even at least in one instance

19   milliseconds.

20             MR. BURCK:  But, your Honor, the spoof has to include

21   the executing order.  In other words, if somebody has a baiting

22   order and then they -- or an order, call it an order, and then

23   they cancel it within milliseconds, that's not spoofing.

24   Happens all the time.  The whole scheme has to include the

25   final --

NbeWnorO

1          (Indiscernible overlap)

2          MR. BURCK:  Exactly.

3          THE COURT:  Correct.  And I know you said in your

4    letter they allege that defendants placed and then canceled the

5    baiting orders within one or two minutes, but as I understand

6    the complaint, they allege that the cancellations occurred

7    within seconds in most instances and in one instance within

8    milliseconds.

9          MR. BURCK:  Your Honor, again, I don't take issue with

10   that.  The point, though, is that saying the cancellations

11   occur within milliseconds has nothing to do with the actual

12   question of whether or not the spoofing occurs.  Because in the

13   other cases you're talking about everything happening,

14   including the executing purchase, happening within

15   milliseconds.  So everything happens within milliseconds.

16   This, the final part of the scheme, the most important part,

17   which is making the money off the executing purchases, doesn't

18   happen for two minutes.

19         Your Honor, I'm not speaking because I see you're

20   writing notes.

21         THE COURT:  No.  Go ahead.  Thank you.

22         MR. BURCK:  All right.  Let's go to the next slide.

23         So, your Honor, we don't have to belabor this point,

24   but this is what we were talking about, the fact that they can

25   only display one order at a time.  I think the Court gets our

NbeWnorO

1    point on that.

2              We can go to the next slide.

3              Your Honor, on the question of did the defendants sell

4    any shares during baiting periods, now, of course, the key of

5    the spoof is that you don't sell the shares during the baiting

6    period because the whole intent is to have a fake sale price

7    that you then have people come into the market to try to sell.

8              In this case, your Honor, the defendants did sell

9    shares during the periods.

10             Go to the next slide.

11             Now, your Honor, we spoke to plaintiff's counsel after

12   the first complaint because we pointed out that we, in fact --

13             THE COURT:  I understand the background.  I'm a little

14   nervous about time.

15             MR. BURCK:  Understood, your Honor.

16             We can move to the next slide.

17             THE COURT:  Well, but on the subject of sales during

18   the spoofing period, how many times do you claim that happened?

19             MR. BURCK:  Your Honor --

20             THE COURT:  You don't claim that happened every time,

21   do you?

22             MR. BURCK:  Right.  No, we don't claim it happened

23   every time.  We're also not trying to offer up here's how many

24   times they sold.  We just told them that there were actual

25   sales in that period, and they amended the complaint

NbeWnorO

1    accordingly.  So we're not saying --

2              THE COURT:  As I understand their amendments, they

3    said for each of the example episodes, we don't see any sales,

4    but even if there were sales, that wouldn't defeat our theory.

5              MR. BURCK:  Right.

6              THE COURT:  But they're not conceding there were

7    sales.

8              MR. BURCK:  They're not -- well, they may not be

9    conceding there weren't sales, but I think the reason why

10   they're not affirmatively alleging that there were no sales,

11   which is a key part of spoofing --

12             THE COURT:  No.  But they are.  They allege that as

13   far as we can tell there were no sales, unless I have that

14   wrong.

15             MR. BURCK:  No.  They actually said in their

16   complaint, your Honor, at some point that they may or may not

17   have sold.  Maybe that's a similar point you're making, but I

18   think it's a different --

19             THE COURT:  I understood it to be as far as we know

20   there are no sales, but even if there were, that wouldn't

21   matter.  That's not a concession that there were sales.

22             MR. BURCK:  Well, it's not a concession there were

23   sales, but your Honor, if they allege that there may have been

24   sales, it can't be spoofing.  You can't spoof and sell a

25   baiting order.  There's no such thing.

NbeWnorO

```
1          THE COURT:  I don't know why I'm not supposed to draw
2     the inference at this stage that their first allegation that
3     there were no sales is incorrect.  That's what they're saying.
4          MR. BURCK:  Well, that's what they said in their first
5     complaint.  And then when they amended, they changed that.
6          THE COURT:  They acknowledge that there may have been
7     sales, and I suppose if I drew inferences in your favor, I
8     would conclude as you suggest, but that seems to flip the usual
9     rule.
10         MR. BURCK:  Your Honor, just one thing on that point.
11    We're not obviously asking you to draw inferences in our favor,
12    but the PSLRA does require the courts to consider that if
13    something is equally plausible between what the plaintiff says
14    and what the defendant says, then the tie doesn't go to the
15    runner.
16         THE COURT:  With respect to scienter.
17         MR. BURCK:  With respect to scienter.
18         THE COURT:  Also, in *Harrington*, it seemed to me that
19    there was similarly an allegation or a concession -- again,
20    they had discovery in that case, so I guess they knew more
21    facts -- that sometimes there were sales during the spoofing
22    period, but that didn't seem to dissuade Judge Schofield from
23    upholding the complaint.
24         MR. BURCK:  Your Honor, again, we don't think -- we're
25    not here on *Harrington*.  Obviously, we don't think *Harrington*
```

NbeWnorO

1   was necessarily rightly decided, but we also think that it's so

2   dramatically different, the facts that are alleged there, than

3   what's alleged here, that there are all kinds of other reasons

4   why the judge would have reached the decision that he did.  So

5   this is -- and we'll get into *Harrington*.  Again, I'm conscious

6   of time, your Honor.  So I'll try to speed it up.

7           THE COURT:  There would be enough time for you, but

8   unfortunately --

9           (Indiscernible overlap)

10          MR. BURCK:  Well, maybe I'll just run out the clock.

11          I get it, your Honor.  Let me move on to, unless you

12  have any other questions about this, your Honor, to the

13  competitive price, the parked orders.  I think this is an

14  important issue, your Honor.

15          Now, the allegation, of course, in spoofing is that

16  you park orders away from the market.  Right?

17          And we can go to the next slide.

18          The idea of parking, of course, is that you're placing

19  those orders away from the market so it makes it highly

20  unlikely that anybody will actually try to buy it.  Right?

21  Because the point of the spoofer is not to actually sell the

22  stock.  Right?  And they don't want to sell it at what is now

23  an inflated price.

24          Now, in the complaint, your Honor, the plaintiff

25  alleges exactly one other market participant behind whom we

NbeWnorO

1   spoofed, the defendants spoofed.  And there's one time that

2   they allege it.  And that's not a market-wide phenomenon.

3   That's one particular incident, and we'll talk about that

4   incident in a minute.

5           Now, on this chart here, your Honor, the unsuspecting

6   market participant's lowest price -- that's the green -- was

7   $2.24.  The parked baiting order price range -- this is what

8   they allege in their complaint, your Honor -- was 2.19 to 2.25.

9    So as you can see, everything below that green line is a

10  better price than the 2.24.  Again, your Honor, this is taken

11  from their complaint and from the public data.  So this would

12  be the most backwards spoofing incident and parking of all

13  time, since they didn't park all that space below the green

14  line.

15          Next slide.

16          Now, and this is important to the point the Court

17  raised before about use of, what the complaint says and the

18  public data.  They say in their complaint, your Honor, that

19  they used historical data provided directly by OTC Markets

20  Group to support their allegations.  And the defendants

21  provided the Court with the very same publicly available data

22  from the OTC Markets Group.  And NWBO hasn't disputed that this

23  is the same data, and at every turn the data refutes what they

24  are alleging in their complaint.  Again, this is what they say

25  they used for their complaint.

NbeWnorO

1          Next slide.

2          So, your Honor, this is the parking example again.

3    This is one directly about Citadel and Ascendiant Capital

4    Markets.  This is an allegation that Citadel Securities parked

5    behind Ascendiant.  And we took the exact time, your Honor,

6    that they allege, the time period they allege for the baiting,

7    and we looked at what actually happened.  And so it's a little

8    bit of a busy slide, but if you look at the right-hand side,

9    Citadel Securities offers, and you look at the red offers on

10   the left side, which are Ascendiant's offers -- excuse me,

11   asks, to be precise -- you will see that in every instance,

12   Citadel's price was better than Ascendiant's -- before, after,

13   during, in every single instance.  And this is what they allege

14   specifically in their complaint, your Honor, is an example of

15   our spoofing and parking behind Ascendiant.

16          Next slide.

17          Your Honor, we're taking here six examples, and our

18   brief goes through all the examples, but we're taking six

19   examples here of the same phenomenon, your Honor, the parking.

20   The market range price is the green price.  That's the price

21   that the market is moving in the exact period that the

22   plaintiff is alleging the spoofing is occurring, and we're

23   looking at what the parked baiting order price range was at the

24   time from the seven defendants.

25          Your Honor, if you look at the fact that almost in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NbeWnorO

1    every one of those cases it's either at the bottom of the

2    market price range or toward the middle in one instance.  None

3    of that is consistent with spoofing.  It's the exact opposite

4    of spoofing.  It's the exact opposite of parking.  You can't

5    park something behind a worse price.

6              Next slide.

7              Now, your Honor -- actually, sorry.  Next slide.

8              Just on this parking, just a little bit more, your

9    Honor.  NWBO alleges that orders are parked even if they were

10   the best order when placed.  Citadel Securities parked these

11   baiting orders behind orders placed by other unsuspecting

12   traders; parking its baiting orders behind orders by other

13   market participants, further evidence that defendant was not

14   engaging in legitimate market activity.

15             The key point here, your Honor, again, from the public

16   data, is that Citadel, in this instance, was actually offering

17   the best price and that somehow is the baiting order and it's

18   being parked behind something that does not exist and is not

19   even alleged.

20             Go to the next slide.

21             Your Honor, this is -- hopefully I can move through

22   this relatively quickly, because I don't think there's really

23   any dispute on this point.

24             The defendants say they purchased shares at depressed

25   prices.  Well, of course, the shares were not depressed at any

NbeWnorO

1    point during this entire scheme, this alleged scheme.  Five

2    years.

3            THE COURT:  Well, Let's distinguish between the

4    long-term alleged price depression over the five-year period

5    and the much, much, much, much shorter term alleged price

6    depression connected to the specific spoofing incidents.

7            MR. BURCK:  Well, your Honor --

8            THE COURT:  And I understand you have an argument

9    that, at least in some instances, you say based on the publicly

10   available data, you're asking me to consider the price actually

11   went up.

12           MR. BURCK:  Well, your Honor, the price not only went

13   up through the entire period, but also they bought -- they

14   conceded this -- they bought at the closing price.

15           THE COURT:  I'm not even focused on the loss issue.

16           MR. BURCK:  Understood, your Honor, but the point is

17   that you can't -- beyond the loss causation, your Honor, if you

18   buy at the closing price, you're defeating the idea that

19   there's a spoofing effect, because the closing price happens

20   after, and in all these instances, long after the spoofing is

21   alleged to have occurred.

22           Remember, spoofing is supposed to -- eventually, the

23   price is supposed to go back to where it's meant to be.  The

24   whole idea of spoofing is that it's an artificial price and the

25   market will figure it out.  So it's not just a loss causation

NbeWnorO

1    issue, your Honor.  It's also the timing of when they bought it

2    is not during a spoofing incident.  In *Harrington*, the idea was

3    that there was a fund that had clients and they were buying

4    stock, they said, during the actual spoofing.  Their allegation

5    is that they bought the stock after the spoofing had occurred

6    and it had some long-term effect -- and that's their words --

7    on the stock price and that every time they bought at the

8    close, which they had to because they're a publicly traded

9    company, that they then suffer from the spoofing.  So it's not

10   just a loss causation issue, your Honor.  It's an actual

11   substantive question about whether or not spoofing occurred and

12   whether or not they suffered from any spoofing.

13           THE COURT:  Yes, but I thought we were talking about,

14   from the defendant's perspective -- forget about whether the

15   plaintiffs purchased or didn't purchase -- you contend that one

16   of the reasons why their allegations of spoofing are flawed is

17   the whole theory is that they supposedly weren't trying to

18   drive the price downwards, but instead the price went up.

19   Correct?

20           MR. BURCK:  Correct.

21           THE COURT:  OK.  And you rely on this publicly

22   available data to show that, and I want to get back to that in

23   a moment.  But even assuming I could consider that data, as I

24   understand it, and please tell me if I have this wrong, your

25   data is just quotes.  It's bids and asks.  It's actually not

NbeWnorO

1    transaction data.  It doesn't show prices.  Is that right?

2                MR. BURCK:  Well, your Honor, it's data that we took

3    from the OTC Markets Group.

4                THE COURT:  I didn't ask you where you got it from.

5                MR. BURCK:  No.  That -- I just want to make sure that

6    I speak to my colleague.  It shows the best prices, your Honor.

7                THE COURT:  But it doesn't show actual trades, at

8    actual prices.

9                MR. BURCK:  It does not, your Honor.

10               THE COURT:  OK.  And at least in one instance, in

11   footnote 60 of their brief, the plaintiff, relying on actual,

12   as I understand it, transaction data, says, well, actually, the

13   defendants have this wrong.  The price did go down shortly

14   before the -- I think it was Citadel's, but whichever defendant

15   was involved, before their purchase.  And I didn't see anything

16   in your reply brief about that.

17               MR. BURCK:  Well, your Honor, I think that -- well, I

18   know the footnote you're referring to.  We're not sure exactly

19   what they're talking about, but also --

20               THE COURT:  True, they didn't have a cite, but

21   nevertheless, they're at least talking about prices and

22   transactions, and you're not.

23               MR. BURCK:  Your Honor, with respect, we are talking

24   about best prices that are provided.  The best price is a key

25   issue for purposes of determining the baiting issue.

NbeWnorO

1   THE COURT:  It sounds to me like there's a dispute

2   over the interpretation of the data and what it means.

3   MR. BURCK:  Well, your Honor, actually, that's a good

4   segue to this slide, because -- let's take one of their

5   examples, your Honor.  OK?  October 12, 2020.  In the original

6   complaint --

7   THE COURT:  Speak of the devil.

8   MR. BURCK:  Right.

9   In the original complaint, they said that they had a

10  spoofing start date, price was 1.02, 1.04.  Right?  The

11  executing price is 1.02.  That makes sense from a spoofing

12  perspective.  Right?  You have a higher price than the

13  executing purchase price.  We showed them that, in fact, the

14  price was .995 to 1, the actual price, and that the executing

15  price is 1.02, so that was the opposite of spoofing.

16  So in their amended complaint, Judge, what they did is

17  they took out the price that starts at the spoofing start

18  period.  They took it out.  It's not alleged, and they simply

19  say the executing price is 1.02.  That's what they allege, and

20  that's what they allege throughout.  Again, this cannot meet

21  the Second Circuit's standard of showing a price effect of some

22  sort because we don't know what the price effect is because

23  they don't allege it, which goes back to the point that when

24  you look at the data, both in their complaint and the public

25  data, we know that the price doubled and they're not alleging

NbeWnorO

1    that there was even any specific price effect with respect to

2    the spoofing incidents that they identify.  And that's in their

3    complaint, your Honor.  That's not public data.  They just

4    didn't put it in there.  And we don't think that even comes

5    close to meeting what the standard is the PSLRA requires for

6    plaintiff.

7              Next slide.

8              So, your Honor, this is -- again, I'm conscious of

9    time, so I'm going to try to get through some of this

10   relatively quickly.

11             THE COURT:  Yes.  I think I can only give you, like,

12   another five minutes.

13             MR. BURCK:  OK, your Honor.  You know what I'm going

14   to do?  I'm going to go to a couple of, skip a couple points.

15   This is all in our briefing so we can skip this slide.

16             One thing I wanted to talk about, your Honor, is this

17   price decline formula that the plaintiff has.  They have it set

18   out in their complaint, in their brief.  And just in a

19   nutshell, your Honor, the math is very simple.  Every single

20   time, because they put X as the smaller number, Y as the larger

21   number, minus one, in every single case you have to have a

22   negative result or a zero result.  So their very formula, which

23   they're relying on to show that there was some impact, creates

24   a constant negative number.

25             THE COURT:  Here's the main question I have about

NbeWnorO

1    that, and they don't say this exactly, and I'll have the same

2    question for Ms. Posner, but what they did say sort of led me

3    to believe that what they are saying is that under their

4    formula, if the price went up rather than down, you'd get a

5    zero.  You wouldn't get a positive number, but you'd get a

6    zero -- and again, I'm showing -- they didn't say this in so

7    many words -- that I assume what they may be saying is, you

8    know, if this were sort of random, you'd have 50 percent zeroes

9    and 50 percent of the time it would be a negative number, but

10   in fact, under our calculation, it was negative each and every

11   time.  Do I have that wrong?  And if I don't have that wrong,

12   isn't that indeed some indicia at least at the pleading stage

13   that the price, in fact, declined?

14            MR. BURCK:  Your Honor, if we just look at the

15   example, so we're taking their formula, the price went from 1

16   to 2, minus 1, it went down 50 percent.  That's their formula.

17   So we're using the exact example that you just mentioned.

18   Their price went from 1 to 2, and you subtract 1, that's 50

19   percent.

20            THE COURT:  OK.  We'll hear from Ms. Posner on that.

21            MR. BURCK:  Next slide.

22            Your Honor, this is -- again, I'm going to be quick on

23   this, but I just think this is important.

24            Next slide.  I'm sorry.

25            So we took all of the actual examples of the purported

NbeWnorO

spoofing, and again, NWBO alleged that it sold shares at the closing price, certain pricing dates, so we looked at when they said they purchased.  And this is the 16 examples they actually cite.  None of the 16 spoofing examples occurred anywhere near the closing price or pricing date.  This is important, your Honor.  This is, again, the point we were making earlier.  And some were months after the alleged spoofing episode.  There's one, your Honor, and this is the 16 examples they have. There's one that happened six hours after the spoofing incident; the closing was six hours after the spoofing incident.  That's one time.  There's one that's 24 hours. There are three that were one to two weeks.  There are three that are two to four weeks, and there are two that are four to six months, your Honor.  And then the others, they just don't have any subsequent pricing date, so we don't know when it happened.  So -- and the ones we identify, your Honor, the best they have is six hours.  And again, I don't want to reopen the debate about the timing, your Honor, but the idea that there's no case of spoofing that's ever seen anything like a six-hour gap, much less 24, one, two weeks, two to four weeks, unless they're alleging a long-term effect, your Honor, which, of course, they do allege but they don't explain what that means, and of course, the long-term effect on its face is that the price doubles.

          All right, your Honor, the last issue, and then I will

NbeWnorO

1    hand over the mike, is really on the reliance issue.  And I

2    won't spend a lot of time on that, your Honor, because I'm sure

3    you've read the cases.  But the core point is that the OTC

4    market, no court has actually said that the OTC market on its

5    own is an efficient market.  In fact, many have said that it is

6    not.

7                THE COURT:  What about Judge Underhill in *In re Teva*

8    *Sec. Litig.?*

9                MR. BURCK:  Your Honor, I believe that's a case where

10   it was OTC and an exchange, like NASDAQ, or the like, and the

11   issues have not been engaged about whether or not the OTC

12   market has to be -- and there's also a case, your Honor, in

13   which the security itself is determined, specifically based on

14   the information about that security that is in the case, is

15   determined to be efficient, but the market itself is not

16   determined to be efficient.  It's the security trading on that

17   market.  I'm not sure if that was that specific case, but those

18   are the examples that we've seen.

19               THE COURT:  But the relevant question here is whether

20   the security in question was traded in an efficient market, not

21   whether the OTC market writ large is efficient.

22               MR. BURCK:  True, your Honor, although their

23   allegation is that the market writ large is efficient.  That's

24   what they say.  So we agree with you on both counts, that, A --

25   I shouldn't say I agree with you.  I will take your point and

NbeWnorO

1   make the point that on the first point, we don't think the OTC

2   market is efficient.  We don't think courts have found the OTC

3   market is generally efficient, and we don't think there's any

4   evidence here that the NWBO market is efficient either.  And

5   again, their allegation is that the OTC market --

6           THE COURT:  There usually isn't evidence at the

7   complaint stage.

8           MR. BURCK:  Well, there's no facts alleged, your

9   Honor.  How about that?  There are no facts alleged that the

10  OTC market is efficient other than to say courts have found

11  this, and all the cases they cite, your Honor, they don't reach

12  the issue or it's the specific -- one case in which there was a

13  specific security.

14          THE COURT:  They do allege the *Cammer* factors.  The

15  question is whether there's allegations that are too

16  conclusory, particularly given that this is an OTC.

17          MR. BURCK:  Correct, your Honor.  You anticipated my

18  next slide, which I can probably then skip, your Honor.

19          (Indiscernible overlap)

20          MR. BURCK:  I'll save some time.

21          THE COURT:  Thank you.

22          MR. BURCK:  OK.  Thank you.

23          THE COURT:  You've been going about an hour and ten

24  minutes.

25          Ms. Posner, your turn.

NbeWnorO

1          MR. LAWSON:  Your Honor, if I might?

2          I think it might be worth clarifying quickly the

3   benefit point on slide 10.  There's some confusion about it.

4          Your Honor, on slide 10 there was some confusion about

5   the benefit point, the $94,000, and I thought -- it was

6   actually quite an important point.  I thought it was worth

7   clarifying before plaintiffs step up so we have a chance to

8   respond.

9          The key point here is, your Honor, that NWBO

10  identifies all the spoofing episodes in exhibit 1 to their

11  complaint.  So we have all the examples that they've

12  identified, and they explain in their complaint at paragraph 67

13  that the benefits to the defendant is the difference between

14  the executing purchase price and the prevailing best offer

15  before it.  And that's the benefit because they're saying

16  without the spoofing --

17          THE COURT:  Where are you reading from?

18          MR. LAWSON:  Paragraph 67 --

19          THE COURT:  67?

20          MR. LAWSON:  -- of the complaint.

21          "As reflected in exhibit 1, defendants then took

22  advantage of the artificially depressed price of NWBO shares

23  they created by placing executing purchases to purchase a total

24  of 19,300,908 shares below the prevailing best offer prior to

25  entry of the baiting orders, pocketing the difference."

NbeWnorO

1          And the idea is we would have had to purchase at the

2     prevailing best offer if it weren't for the spoofing.  Instead,

3     we spoofed them.  We were able to purchase at the executing

4     price.  So your Honor, we can do that math in exhibit 1.  We

5     can look at the difference between the executing purchase

6     price.

7          THE COURT:  What does paragraph 67 have to do with the

8     prices at which the shares purchased via the executing

9     purchases were sold?  I don't see that.

10         MR. LAWSON:  Your Honor, the benefit that defendants

11    allegedly obtained is that they were able to purchase prices at

12    the executing purchase prices as opposed to the prevailing best

13    offer price immediately before the executing purchase.  That's

14    the benefit that the defendants obtained.  Otherwise, they

15    would have had to purchase at the prevailing best offer price.

16         And that's their theory, right on paragraph 67.  I

17    believe it's also in their opposition brief.  And your Honor,

18    they don't contest that.  This was in our opening brief and in

19    our reply brief.  So we're able to do that math, and it's in

20    exhibit 1.

21         THE COURT:  OK.  I have your point.

22         MR. LAWSON:  Yes.  And your Honor, the key is the

23    total benefit here to Canaccord was approximately $6,000,

24    according to plaintiff's own --

25         THE COURT:  Yes.  The same can be said by each and

NbeWnorO

```
 1    every one of your colleagues, but I'm not going to let them
 2    stand up too.
 3              MR. LAWSON:  OK.  Thank you, your Honor.
 4              MS. POSNER:  Good morning, your Honor.
 5              THE COURT:  Good morning.
 6              MS. POSNER:  So, the complaint here, as I think your
 7    Honor recognizes, is not based on information and belief.  It's
 8    not based on conjecture.  It's based on detailed and exhaustive
 9    economic analyses of the defendants' own trading data.  Those
10    same economic analyses and the indicia of scienter that we
11    plead in the complaint are the exact same economic analyses and
12    indicia of scienter that literally every court that has weighed
13    the evidence with regard to a spoofing case have found
14    indicative of not only manipulative conduct but when there is a
15    scienter component, that there was scienter by the defendants.
16    You see that in all the CFTC cases, the SEC cases, the DOJ
17    cases.  In fact, a number of those cases resulted in criminal
18    pleas and verdicts.
19              Defendants ignore virtually all of that case law in
20    their briefing.  They didn't cite to a single one of those
21    cases today during the argument.  And in addition to those
22    cases, there is a number of cases, including the *Harrington*
23    case, that we referenced earlier today, that address these
24    specific pleading requirements under the PSLRA and the
25    heightened pleading standard in private litigation.  And in
```

NbeWnorO

1    every one of those cases, both *Harrington* decisions, the second

2    *Kessev Tov* decision and also *CP Stone*, which is also in the

3    Northern District of Illinois, in all three of those cases they

4    look at the very same economic analyses, these very same

5    indicia of scienter and find that plaintiffs have sufficiently

6    pled market manipulation claim or spoofing claim.

7            In their initial motion to dismiss, the defendants

8    conceded that *Harrington*, *Kessev Tov* and *CP Stone* were on all

9    fours with the fact pattern here; that they are a reason why

10   this Court should dismiss this case.  In the case of

11   *Harrington*, they were referring to a discovery order, not the

12   actual motion to dismiss decision.  With regard to *CP Stone*,

13   they were referring to the first of three decisions.  And in

14   *Kessev Tov*, they just ignored the second decision.  But they

15   conceded that the facts alleged in all those cases were nearly

16   identical to our fact pattern alleged here, and that's why they

17   wanted the Court to follow the rulings in those cases.

18           When we brought to your Honor's attention the fact

19   that there were subsequent decisions in that case or different

20   decisions, addressing different aspects of the litigation in

21   those cases, suddenly those cases are wholly different than

22   what we allege in our complaint.  I don't think that is

23   credible.  And quite frankly, they ignore the facts in most of

24   those cases.

25           Essentially, what the defendants are asking this Court

NbeWnorO

1   to do, and I think defense counsel actually said it kind of

2   explicitly here today, is that they want the Court to overrule

3   the decisions that have been made in the spoofing cases,

4   including by Judge Schofield most recently in the *Harrington*

5   matters, and that they just disagree with the findings in those

6   cases, which is all fine and good, but that's generally not how

7   we practice law.

8           And in order to make their arguments, they resort to

9   essentially kind of, you know, the sky will fall rhetoric or

10  point to specific allegations that they claim need to be made

11  in these cases, but they cite to not a single case that

12  supports either proposition.  And they also try to claim that

13  somehow their behavior is routine unlawful market-making

14  activity.  It certainly may very well be routine for these

15  defendants.  I think that's actually quite likely.  What is

16  unlikely is that it is lawful, and numerous courts have found

17  it is not.  And in fact, contrary to ordinary, lawful market

18  making, defendants clearly injected exponentially large, more

19  sell side pressure in order to flow into the market, creating

20  this essentially ceiling on the stock price of Northwest Bio.

21          They have no defense.  They don't even address the

22  overwhelming majority of our arguments dealing with the

23  imbalance in the market making order book that existed for

24  Northwest Bio.  And they then tried to argue that what we

25  allege is somehow unbelievable because why would a number of

NbeWnorO

1    different entities get together and engage in the same

2    misconduct without any allegations that they conspired together

3    to do so?  I think that kind of argument is folly.  There are

4    numerous examples in which separate entities or defendants

5    engage in the same misconduct without conspiring together.  We

6    see that in kind of the world around us.  Right?  You can see,

7    like, steroids in baseball or the fact that 7-Elevens are

8    robbed at high numbers across the country.  But we also see

9    that in securities fraud cases.  Right?  We saw that

10   post-financial crisis, all of the *RMBS* cases.  We saw the stock

11   option backdating scandal of the early 2000s where companies

12   were engaging in the same kind of stock option backdating.  We

13   saw that in the *Enron, WorldCom, Sunbeam, Tyco* cases, where

14   these entities were engaging in improper accounting shenanigans

15   using special purpose vehicles, the same kind of frauds, no

16   allegations that these defendants were conspiring together to

17   engage in this kind of misconduct.

18            So let's turn a little bit to the specific elements

19   here.

20            As your Honor mentioned earlier, obviously the

21   pleading standard with regard to a market manipulation case is

22   different than with regard to a straight misrepresentation or

23   omissions case, and as the courts recognize, that's because

24   some of the information is wholly within defendants' own files

25   that we have no access to.  But even putting that aside, I

NbeWnorO

think we more than sufficiently plead and provide details that

indicate an extremely high level of specificity, demonstrating

that defendants engaged in misconduct here.  We allege in

specific detail how imbalanced their order books were.

Defendants say nothing about that.  We explain that there was a

high concentration of large cancelations after a small

executing purchase.  This is -- and I should have mentioned

with regard to the imbalanced order book, *Harrington*, *Kessev*

*Tov*, *Skudder*, *Oystacher*, all say these are indicative of market

manipulation.

       With regard to the high concentration of large

cancellations after a small executing purchase, multiple courts

look to that to see if there's indicia of fraud -- *Harrington*,

*Kessev Tov, Nowak*, *Flotron, Coscia*, all find that that is

indicia of market manipulation.  Defendants literally say

nothing about that.

       THE COURT:  Well, I wouldn't say they say nothing

about that.  They say, for example, that you haven't alleged

any actual cancellations.  That seems like --

       MS. POSNER:  So they do dispute what it means to

cancel.  They don't dispute that the bids went away, I think,

is a fair characterization.

       Also, we allege in specific detail that the share

volume of defendants' baiting orders and defendants' executed

sell side orders was completely out of whack.  They canceled

NbeWnorO

1   4,500 sell side shares while executing zero sell side orders,

2   again, another indicia that courts regularly look at --

3   *Skudder*, *Oystacher*; they say nothing about that.  We point out

4   in specific detail that there was a stark contrast between the

5   share volume of each the defendant's executing purchases and

6   each defendant's sell side orders.  They executed 2,000 shares

7   in executing purchases while not executing any sell side

8   orders.  That was a fact that the court looked at in *Lek*.

9   Defendants say nothing about that here.

10          They do say something about the cancellation speed,

11  which we allege to have been really quick.  But I think as your

12  Honor recognized, we do, in fact, allege that the cancellations

13  were within very short periods of time.  With regard to the 16

14  examples, they're all either milliseconds or seconds, no more

15  than 30 seconds.

16          THE COURT:  I think if I understood this correctly,

17  and I may not have, what Mr. Burck said is that the

18  milliseconds or seconds in your complaint are based off the

19  cancellation vis-à-vis when the executing purchase occurred.  I

20  think Mr. Burck said that in what he would probably call

21  classic spoofing scheme, the whole thing, the baiting orders,

22  you know, beginning with the baiting orders up through the

23  cancellation of the orders, happens within milliseconds or

24  seconds typically.  Do you allege for any of these that the

25  whole spoofing episode occurred within seconds?

NbeWnorO

1          MS. POSNER:  Yes.  So, two responses to that.

2          THE COURT:  OK.

3          MS. POSNER:  One is the case law does not suggest that

4    the entire spoofing episode has to be within two minutes.  The

5    case law specifically addresses the short time between

6    executing purchase and the cancellation, which is exactly what

7    we allege in the complaint.  But to your point specifically,

8    even if it was the entire spoofing scheme, I believe all 16

9    examples that we allege in the complaint are within seconds.  I

10   don't think there are any that go up to two minutes, but I have

11   to specifically look at the transaction numbers to get there.

12   But I think regardless of whether true or not, the case law is

13   not talking about, OK, you started placing a bid at time X and

14   finally the spoof is over at time Y and that change has to be

15   milliseconds.  In fact, that often would not give sufficient

16   time for the effect of the baiting order to take place.

17          And in this specific instance, we're not talking about

18   situations where there is one baiting order, one executing

19   purchase and then one cancellation.  We are talking about

20   thousands at times, often hundreds, of orders flashing in very

21   small periods of time, intending to move the market in very

22   small increments.  So the idea that somehow we shouldn't care

23   about the other stuff that's happening in the market, the other

24   transactions that are occurring in the market, doesn't really

25   make any economic sense to me.

NbeWnorO

1          THE COURT:  What about Mr. Burck's point about the

2     inability on OTC Link to show more or display more than one

3     order at a time?

4          MS. POSNER:  I mean that is, of course, true, but I

5     think as your Honor recognized in questioning Mr. Burck, what

6     matters is what the market sees and what the market thinks is

7     happening.  Right?  They see the orders flashing as they come,

8     which is encouraging the market to move in a specific

9     direction.  It's like a head fake.  Right?  They're trying to

10    say, hey, look over here, look over here, come this way, when

11    in reality they intend to move the other direction as soon as

12    you take a bite.  And that's exactly what is at issue here.

13          I think what they actually say in the pleadings -- or,

14    in the briefing is somehow a modification of their order is not

15    a cancellation.  I think that's the argument they're making,

16    which specifically only applies to OTC Link, not Global OTC,

17    but putting that to the side, again, what the courts look to

18    and what matters for purposes of spoofing is how the market is

19    reacting to the news.  If you modify an order from a hundred

20    shares to two shares, it has the same effect on the market as

21    if you cancel 98 shares.  What matters is what the market is

22    experiencing, what the market thinks is happening in this share

23    price and how it's moving.  And the courts are very clear about

24    that.  They don't suggest that there's something specific that

25    has to occur that indicates something is going to happen in the

NbeWnorO

1    future.  It's an amalgamation of all of the factors that the

2    market is seeing and how they are affecting those in the market

3    to react to that information.

4            THE COURT:  Just while I have this in mind, I think

5    Mr. Burck also said that your position or your allegation is

6    that the baiting order was canceled when it disappeared from

7    the screen.

8            MS. POSNER:  Yeah.  I don't --

9            THE COURT:  Is that correct?  Is he correct about

10   that?

11           MS. POSNER:  No, and I'm not sure where that came

12   from.  I think we're very specific in the complaint down to

13   milliseconds of when orders were placed and canceled and/or

14   modified.  We specifically allege in the complaint why a

15   modification is the same thing as a cancellation and why it's

16   used in that manner.  We are very specific about the number of

17   shares that each one of those orders -- and again, this is

18   information that's available from the trading records.  We're

19   not alleging that it somehow just disappears by happenstance.

20           All right.  They then -- OK.  Parking.  Right?  They

21   spent a lot of time today talking about parking.  We

22   specifically do allege a number of instances of parking in the

23   complaint.  We don't allege, first of all, which they argue in

24   their brief, that parking is required.  We never said that.  We

25   said that at times they did engage in parking and that parking

NbeWnorO

```
1    can be an indicia of manipulative conduct, and in fact, in

2    these certain circumstances, they engaged in parking.  The case

3    law actually is quite clear that you don't have to allege

4    parking in order to successfully plead a market manipulation

5    case.  And the same allegations of parking that we allege in

6    our complaint are the same types of allegations of parking that

7    have been sustained by numerous courts, Harrington, CP Stone,

8    Oystacher, Mohan.  And I think one of the important points, at

9    least with regard to both manipulative --

10        THE COURT:  Are you saying that accepting the

11   defendants' representations of what they describe as the

12   absence of parking based on the data that they're relying on,

13   that those same allegations of parking were accepted by courts

14   as being parking rather than nonparking?

15        That was a terrible question.

16        MS. POSNER:  I understand what you were trying to say.

17        So, I don't think, fairly, any courts have gotten into

18   the level of granularity that we saw in slide, I think, 22 by

19   the defendants with regard to parking.  But what I think

20   defendants' presentation missed is that there is no obligation

21   that the parking transaction be the worst offer in the numerous

22   orders that you saw in those charts.  Right?  It just has to be

23   behind an order.  And it doesn't necessarily even have to be

24   placed behind the order at the exact time at which it was

25   placed.  You often see a situation where there's, like,
```

NbeWnorO

1    stacking and moving the orders from place to place.  As long as

2    they're essentially keeping it behind one or more orders --

3           THE COURT:  I saw that argument in your brief, and I

4    found it rather curious, because you're saying that even if at

5    the time the defendants placed their orders, there was nothing

6    for them to park behind, if somebody else comes along and parks

7    their order -- I don't know if it's in front of or behind --

8    the defendants are still guilty of parking for leaving their

9    order in place?

10          MS. POSNER:  They, just like every other market

11   participant, are seeing the orders that are placed on the

12   ticket.  Right?  They see the order flow as it's coming in.

13   Knowing that it's not going to be executed at a specific place

14   but electing to choose to keep it behind that order --

15          THE COURT:  Doesn't this all happen in milliseconds?

16          (Indiscernible overlap)

17          MS. POSNER:  Yes.

18          THE COURT:  How could that be?

19          (Indiscernible overlap)

20          MS. POSNER:  No one is making a conscious decision in

21   the sense that no one is sitting there saying place A, B or C.

22   These are algorithmic high-speed trading programs that are

23   designed to operate in this specific manner.  If a trade does

24   X -- this is all coded.  If a trade does X, we do Y.  We either

25   sit, we stay, we move.  That is all preprogrammed and part of

NbeWnorO

1    the transactions.  No one is operating in milliseconds where

2    they're actually pushing buttons.  They'd be far behind the

3    ball by the time they actually got to hit the button.

4            THE COURT:  I think I saw that in a Star Trek episode.

5            MS. POSNER:  Unfortunately, the markets move a lot

6    quicker than they used to.

7            THE COURT:  Are you saying that if the defendants'

8    algorithms were legitimate, they would do something -- cancel

9    an order that they placed that was subsequently in a position

10   where it could be deemed to be parked behind another order and

11   that their failure to do that is, in their algorithm, an

12   indicia of an intent to spoof?

13           MS. POSNER:  Their failure to move such that the order

14   would actually be executed demonstrates that they had no intent

15   that the order be executed in the first place, which is the

16   whole concept behind parking.  Right?  You park in order to

17   indicate to the market that you want people to move in a

18   certain way, but you don't actually want anyone to engage with

19   your transaction.  You want them to engage with a different

20   transaction so you don't have to execute at that price.  So the

21   goal is to avoid actual execution by encouraging -- but still

22   encouraging the market to move in a specific direction.

23           I think one of the other points that I want to make

24   here that is important and, I think, lost a little bit in the

25   briefing, is that no one specific indicia of manipulative

1    conduct is sufficient or necessary to successfully plead a

2    market manipulation case.  What the courts require is that the

3    court look at all of these allegations in total, and where they

4    all seem to be indicating, I don't think there can be any real

5    dispute that the vast bulk of the indicia that we allege in the

6    complaint are all moving in only one direction.  They're not

7    refuted by the defendants in any significant way with regard to

8    at least the bulk of them, and all of the indicia that we refer

9    to are the indicia that the courts rely on in making their

10   determinations of whether there's manipulative conduct.

11        So what did defendants say in response to some of

12   these?  I think we heard this earlier, that somehow OTC markets

13   are immune from manipulation.  That's, of course, not true.

14   There's, in fact, ongoing cases brought in OTC Link for market

15   manipulation by both the SEC and the DOJ.  Regulators regularly

16   point out that the OTC Links --

17        THE COURT:  They don't have to show reliance.

18        MS. POSNER:  Correct, that is true.  They do not.  But

19   we have *Kessev Tov*, which is dealing with S&P 500 index options

20   market, which is very analogous to the OTC Link market, and no

21   problems showing reliance there.  And for purposes of the

22   reliance point, the pleading standard, again, is Rule 8 for

23   purposes of reliance.  We allege the specific *Cammer* factors.

24        I've been doing this for 20 years.  I don't remember

25   ever having to plead in more detail the specific allegations of

NbeWnorO

```
1    reliance.  It's a question for expert testimony post-discovery,

2    and we would be unable, absent an expert report, to put

3    together specific, detailed allegations about the efficiency of

4    this specific OTC market with regard to Northwest Bio.  I don't

5    think that's what the law requires.  I've seen no case to

6    suggest the contrary.  And contrary to what defense counsel

7    represented today here, OTC market cases get over the element

8    of reliance quite frequently.  In fact, the Cammer case that we

9    all look to for purposes of determining market efficiency was

10   an OTC market case.  So the idea that somehow OTC markets can't

11   be efficient is simply incorrect.

12            THE COURT:  Well, the best I can tell, there seems to

13   be a split in authority, frankly.

14            MS. POSNER:  I think the split of authority deals with

15   specific instances in which that market was not efficient, not

16   the idea that an over-the-counter market cannot be efficient.

17            THE COURT:  There are some statements, I think, in

18   some decisions that go further than you're depicting, but what

19   also seems to be maybe common ground is that either there is no

20   presumption or it's less easy to presume market efficiency in

21   an OTC situation, and in light of that, shouldn't you have to

22   allege something more than the Cammer factors, you know, the

23   boilerplate factors themselves without any supporting facts?

24   You don't allege any, I don't believe, supporting facts in

25   paragraph 297, or whatever.
```

NbeWnorO

1          MS. POSNER:  I actually think we do.

2                  (Indiscernible overlap)

3          THE COURT:  -- high volume of trading or something to

4     that effect, but why can't you allege --

5          MS. POSNER:  We do allege, we also allege the number

6     of analysts that were covering Northwest Bio, I believe.

7          THE COURT:  I don't think so, but we can sort that out

8     later.  Can you make those allegations?

9          MS. POSNER:  Could we?  I suppose we could submit some

10    form of expert analysis, which is really what goes to the vast

11    bulk of the *Cammer* factors.  These are typically expert reports

12    that analyze these factors.  Could we do that at the pleading

13    stage?  I suppose we could.

14         THE COURT:  I'm not talking about an expert report.

15    I'm talking about facts pled in a complaint to support what are

16    otherwise conclusory allegations, but that's not anything

17    novel.  It may be novel in this context.  You've already said

18    that, and maybe you're right.  Maybe typically all you do is

19    allege the boilerplate *Cammer* factors.  My question is should I

20    require more at the pleading stage because this is an OTC case?

21         MS. POSNER:  I don't think there's any support in the

22    case law to require it.  That being said, could we do more than

23    what we did?  I suppose we could engage with an expert to

24    conduct the analyses that are done pursuant to *Cammer* and plead

25    them more specifically in the complaint.

NbeWnorO

1          I do want to point out, though, that in paragraph

2     297(a) through (f), we do specifically plead some of these

3     facts.  We pled that they filed periodic public reports with

4     the SEC.  We pled the high weekly trading volumes.  We pled

5     that they filed registration statements with the SEC on Form

6     S-3.  We pled that the market promptly responded to information

7     that they disseminated.  We also talked about the fact that

8     they have regular dissemination of press releases, other major

9     news wires and analysts covering them, which are the factors

10    that the courts look to and the specific facts that the courts

11    look to in determining whether those --

12          THE COURT:  I get back to where I began.  You pled the

13    factors, but you haven't pled facts supporting the factors.

14          MS. POSNER:  I mean I guess I could cite to the SEC

15    EDGAR link or give the specific trading volumes per week.

16          THE COURT:  You don't allege the number of analysts.

17    In fact, I don't think you allege anything about analysts.

18          MS. POSNER:  Yeah.  We say it was regularly covered

19    throughout the relevant period by the financial news, and we

20    talk about the financial press and communications through other

21    news wires and similar reporting.

22          THE COURT:  Thank you for proving my point.

23          MS. POSNER:  And to the extent the Court cares, it was

24    covered by three analysts throughout the relevant time period.

25    Again, it's an over-the-counter stock, so the idea that

NbeWnorO

1    there's, like, 40 analysts covering it is not likely.  And in

2    fact, the courts have discussed with regard to that factor that

3    what really matters is their coverage of the information about

4    this company in the marketplace, reflecting the fact that the

5    markets have changed pretty significantly.  No one's waiting

6    around for somebody to hit EDGAR and going on to EDGAR to find

7    it.  The question is, is the financial press, are people in the

8    market covering the stock and getting information from it?  And

9    I think there can be no question here that that is true.  And

10   to the extent the Court wanted us to, we could be more specific

11   in our pleadings in an amended complaint.

12           THE COURT:  OK.  Thank you.

13           MS. POSNER:  All right.  In addition to the other,

14   specific arguments that they make in response to our pleadings

15   that I've already addressed, they say that cancellations are

16   normal, which is, of course, true, but not in the specific

17   pattern in which we allege it to be the case.

18           They argue -- with regard to the client issue, I think

19   your Honor is exactly correct.  We specifically allege that for

20   most of the defendants, that they were not trading on behalf of

21   clients.  This is true with all the defendants but for Lime and

22   Instinet.  All of those defendants, as they concede, and is, of

23   course, true, in their briefing, were market makers.  Market

24   makers don't trade on behalf of clients.  They trade on a

25   principal basis and proprietary accounts.  Whether they were

NbeWnorO

1   engaging in those transactions because in other platforms or in

2   other places they knew of specific order flow or even customers

3   wanting to do X or Y does not negate the fact that they are

4   trading on their own behalf in their own proprietary accounts.

5              Now, Lime and Instinet, they do trade on behalf of

6   customers.  But again, I think your Honor is absolutely

7   correct.  Not only have courts held, including in *Harrington*,

8   twice, that the fact that you are trading on behalf of a client

9   somehow exculpates you from liability is simply incorrect.

10  They have obligations in those contexts to ensure that there is

11  not market manipulation happening through their platform.  They

12  have to certify that pursuant to FINRA rules.  They, in fact,

13  did so during the relevant period here, and to the extent

14  customers were engaging in spoofing and they were having it

15  happen on their platform, they had no idea that it was

16  happening, which I think is highly unlikely, they had an

17  obligation to do so, and their failure to do so is, at best,

18  severely reckless and still sufficient to get over a motion to

19  dismiss.  There have been numerous cases that have suggested

20  that, not only *Harrington*, but *Skudder*, and it certainly flows

21  from the same interpretation as the Supreme Court's decision in

22  *Lorenzo* and the Second Circuit's decision in *U.S.*

23  *Environmental*, you are responsible for the actions of your

24  clients or your customers in the case of one of those cases,

25  regardless of whether you are the one doing it on your own

NbeWnorO

1    behalf.

2            THE COURT:  Could you address the defendants' argument

3    that taking the allegations of the complaint and the exhibits

4    to the complaint at their word, the defendants are only alleged

5    to have profited to the tune of collectively some $94,000 over

6    a five-year period.

7            MS. POSNER:  Yes.  We obviously disagree with regard

8    to the amount of profit they have earned.  What they are

9    purporting to calculate there is one side.  Right?  It's how

10   much cheaper they essentially got the shares than they would

11   have got had they purchased at the best offer.

12           What I think your Honor was referencing when you were

13   having your colloquy with defense counsel is that it doesn't

14   reflect the amount they then profited from either those

15   purchases and/or short positions that they otherwise had in the

16   security when they then sold, and in our specific case, we

17   allege sales within a three-day window post the spoofing

18   episode.  That three-day window we specifically chose because

19   it's consistent with the Second Circuit's case law with regard

20   to contemporaneous transactions under 20 cap A.  The courts in

21   this circuit, rules go up to five days.  Generally, kind of two

22   to five days is what they look at, but we picked three days as

23   a kind of fair assessment of that.  But I think it is only

24   looking at part of the question.  Obviously we don't have to

25   prove motive or financial pecuniary gain in order to be

1    sufficient under the securities laws, but I think we do, and

2    the specific allegations that we make in our case and, in fact,

3    the almost exact phraseology, is the same phraseology that

4    Judge Schofield found to be sufficient in *Harrington* and has

5    been found to be sufficient in other cases as well.

6          THE COURT:  I did say that -- namely, to figure out

7    the profits, you have to look at what they sold the shares

8    for -- but aren't they correct that you can't really look at

9    that as the amount of profit attributable to the spoofing

10   because there may have been other factors, intervening factors

11   that affected the market and therefore the price at which they

12   sold their shares, but that the difference between what they

13   bought for the shares and what the best offer at the time was,

14   which of course, they said is what you allege, is determinative

15   of how much they illicitly profited from the scheme?  Isn't

16   that the better measure?

17         MS. POSNER:  I don't think it's consistent with the

18   case law.  I'm not sure how it is a reflection of what they

19   actually learned as a result of their fraud.  I also think it's

20   premature.  I think the assessment of how the stock price was

21   impacted by the spoofing doesn't necessarily just look at what

22   the best offer was as compared to what their bid was, because

23   we are alleging that that best offer price was manipulated in a

24   way that is not reflective of true supply and demand and

25   accurate pricing.  So to suggest that somehow that delta is an

NbeWnorO

1    accurate measure even of what they are purporting to measure, I

2    think, is unfair and insufficient prior to having discovery and

3    expert analysis of the damages here.

4           And I'll just point out what the courts have said on

5    this.  In *Harrington*, the court said that the plaintiffs had

6    pled a plausible economic rationale for the alleged misconduct

7    by alleging that defendants "derived economic gain from the

8    spoofing scheme through paid transaction fees for completed

9    customer trades, hundreds of thousands of dollars in saved

10   execution costs for the baiting orders that were canceled and

11   at least millions of dollars in ill-gotten gains."

12          That's specifically what we allege in our complaint.

13   In *Oystacher* --

14          THE COURT:  Are you sure there's an allegation that

15   part of the way they benefitted was by saving costs from

16   canceling the baiting orders?  That's in your complaint?

17          MS. POSNER:  So, we say that the strong motive also

18   existed because they obtained commissions, fees or other forms

19   of compensation for acting on behalf of -- we're specifically

20   here talking about the client trades and that they had a

21   financial incentive to spoof the shares in order to execute

22   client trades at artificially favorable prices and, therefore,

23   gain or retain the trading business of brokerage clients.

24          I think what we're essentially trying to argue and

25   plead in the complaint is that but for them engaging in this

NbeWnorO

spoofing, the prices at which they purchased would have been

different.  The prices at which they sold would have been

different.  Whether they actually had to go through with the

transaction or not would have been different.  Right?  If they

were actually trying to get the transaction executed and were

not just baiting, they would have paid the execution costs on

those transactions.

So could we have been more specific?  I suppose we can

and could be, but I think that's implicitly what we are trying

to allege with regard to their motive in this scheme.

THE COURT:  And what paragraph were you reading from?

MS. POSNER:  There it is 286 and 287.

THE COURT:  Thank you.

MS. POSNER:  And I think the *Oystacher* court actually

goes to this point specifically.  They say the strategy allowed

defendants to buy or sell futures contracts in quantities and

at price levels that would not have otherwise been available to

them in the market absent their spoofing conduct, which I think

is exactly what we do plead here.

And we also plead with regard to the Instinet and Lime

financial motive as well.  We allege, as I just quoted, that

they were able to execute client trades and obtain favorable

prices for their clients and retain those clients as a result.

Again, that's a motive that courts in spoofing cases have found

to be sufficient.  Both *Harrington* and *Skudder* found that to be

NbeWnorO

1    true as well.

2           Would your Honor like me to turn to any specific area?

3    Do you want me to address loss causation or reliance any

4    further?

5           THE COURT:  Why don't you address loss causation.

6           MS. POSNER:  Sure.

7           As I think your Honor indicated and as is the case in

8    this circuit and as Judge Woods has held, pleading loss

9    causation is under the Rule 8 standard.  The types of

10   allegations that we allege in the complaint with regard to loss

11   causation have been sustained by numerous courts in not only

12   spoofing cases but in market manipulation cases more generally.

13   *Harrington*, *CP Stone*, *Sharette*, which is also from the Southern

14   District of New York, *Barclays*, which is also from the Southern

15   District of New York.

16          THE COURT:  I think your adversary says those cases

17   involve a much tighter temporal connection between the spoofing

18   and when the plaintiff or plaintiffs are alleged to have made

19   their sales or purchases.  Is he right about that?

20          MS. POSNER:  He is incorrect about that.

21          So we allege, let's talk specifically about *Gamma*,

22   because I think that's really what they're trying to get to

23   there.  So *Gamma* holds that there are two ways you can plead,

24   successfully plead.  In the case there it's CEA.  It's not

25   securities fraud, but it's analogous enough.  They're talking

NbeWnorO

about damages there versus loss causation, but they say you can plead it in one of two ways.  Either the sales happened so close in time to the spoofing episodes that the court may reasonably infer price artificiality affecting the trading, or two, information that shows that the effect of the defendants' spoofing was persistent.

We do both in the complaint.  We allege, even at the most conservative, that Northwest Bio sold 11 million shares less than an hour after defendants' spoofing.  We allege the sale of 2.6 million shares within ten minutes of defendants' spoofing, and in fact, we even allege the sale of 303,000 shares within 85 seconds of defendants' spoofing.  I think any one of those criteria are more than sufficient to meet the temporal requirement that is at issue in *Gamma*.  And not only that, unlike in *Gamma*, where they had no specific allegations with regard to when the transactions took place, we showed that the sales occurred after the spoofing so that they were impacted by the spoofing when made.

In addition to those kind of temporal, close temporal connections that we plead in the complaint, we also plead the second way that *Gamma* suggests you could plead loss causation, which is that there was a persistent, long-term impact from defendants.

Oh, I should point out, by the way, that in *Harrington* the window of time between the sales by the company and the

NbeWnorO

1    spoofing was 15 minutes, and *Harrington* said that that was

2    sufficient.

3              With regard to the persistent point, we cite to the

4    expert report of a Nobel Prize-winning economist, submitted in

5    a market manipulation case which references and cites to

6    extensive market microstructure literature, which supports the

7    idea that defendants' spoofing in this case was, in fact,

8    persistent.  This is paragraph 60 of our complaint.  And

9    defendants have no response to that other than saying that

10   spoofing must only have an effect of one to two minutes.

11   There's nothing in the case law that suggests that, including

12   *Gamma*.  And so I think we meet both criterions for spoofing,

13   but I think even more importantly, this is a Rule 8 pleading

14   standard.  This is certainly going to be the subject of

15   heightened and, I imagine, somewhat heated debate when we get

16   to the expert phase of this case.  But it is, I think, well

17   pled for purposes of surviving the motion to dismiss here.

18             THE COURT:  With regard to the long-term effect, *i.e.*,

19   throughout the entire period, the price did double.  Are you

20   alleging that the price at the end of the five-year period was

21   artificially depressed as a result of the spoofing?

22             MS. POSNER:  We are alleging that.

23             So, what's interesting in this case, typically in

24   spoofing cases you see the price being spoofed up and down.

25   Not always but a lot of the times.  Here, all of the spoofing

NbeWnorO

1    is one direction, and it's down.  And when you, at least my

2    kind of nascent understanding of the economic theory is that

3    when you have multiple and persistent -- in this case, we have

4    thousands and thousands and thousands of baiting orders pushing

5    the price only in one direction over a sustained period of

6    time -- that that has an impact on the stock price over time;

7    that it kind of is additive over time when it's only moving in

8    one direction and the market tends to believe that the market

9    will continue moving in that direction even beyond the specific

10   spoofing episode or the 15 minutes after the specific incident

11   occurs.  But again, I don't fancy myself a real economist.  I

12   think this is something that would be subject to expert

13   testimony.  I do think for purposes of pleading standards we

14   plead it sufficiently in this case.

15           THE COURT:  Does the report you refer to support that

16   long-term allegation over the five-year period or just that in

17   a given spoofing episode the effects can persist for longer

18   than defendants contend but still would be measured in a matter

19   of --

20           (Indiscernible overlap)

21           MS. POSNER:  Sure.

22           THE COURT:  The success of the scheme, at least with

23   regard to an individual spoofing episode, depends on the

24   spoofing effect dissipating, does it not?

25           MS. POSNER:  Potentially depends on the short position

NbeWnorO

1    in the case and in the security as well.

2                THE COURT:  In this case --

3                MS. POSNER:  We don't know the short positions.

4                (Indiscernible overlap)

5                THE COURT:  Allegations about --

6                MS. POSNER:  Because we have no way to have access to

7    that information absent discovery.  But I think there are

8    different transactions and positions that could impact that.

9    But it also could be short-term additional gain when they sell

10   at a profit a few days after a spoofing episode occurs, kind of

11   a churning effect, one after the other, one after the other.

12   Kind of like what you see with wash sales or churning

13   otherwise.  It's the same conduct and kind of doing it over and

14   over again in little bits of time over a longer period of time.

15               And I'll just point out, I think, because there's some

16   kind of visceral, I think, reaction to the fact that the stock

17   price did go up a little bit.  We're talking, by the way, about

18   a penny stock.  We're not talking about it went from 100 to

19   $200.  We're talking less than, like, a dollar to two dollars,

20   if that, which it did not.  But the expectation -- right --

21   this is a company that has successfully passed a phase III

22   trial for a personalized cancer vaccine that has demonstrated

23   that it significantly, and statistically significantly, can

24   extend life for patients with glioblastoma.  They believe that

25   that same technology can be used for all cancers.  The idea

NbeWnorO

1    that somehow the stock price in this company would not reflect

2    positively to that type of information coming out into the

3    market but basically be stymied or flat or, you know, little

4    bumps and go back down almost immediately thereafter is not

5    reflective of a market that is truly reacting to positive news.

6           THE COURT:  So you're arguing that the market is

7    inefficient here?

8           MS. POSNER:  No.  As the courts are very clear about

9    with regard to market manipulation cases, the question, as *Set*

10   *Capital* holds in the Second Circuit, the question is whether

11   the price is reflective of true supply.  The question is not

12   whether the stock price has to react in a specific way to

13   positive or negative news.  In fact, the Second Circuit, with

14   regard to typical 10b-5 misstatement and omissions cases is

15   very clear that for purposes of proving whether a market is

16   efficient, it doesn't matter even, A, whether you fulfill

17   *Cammer* factor 5, but even if you do that the stock price is

18   reacting in a way that is expected by the market.  That's not

19   what's reflective of true market efficiency.  So I think the

20   fact that the price is not reflective of true supply and demand

21   does not mean that it is not efficient.  That is going to

22   always be the case in a market manipulation case.

23          THE COURT:  You certainly aren't alleging that the

24   intent or purposes of the defendants was to cause a long-term

25   depression in the stock price, are you?

NbeWnorO

1        MS. POSNER:  We don't allege that.

2        THE COURT:  OK.  I would like to talk to you about

3   the, at least what the defendants characterize as the removal

4   of the prespoofing bid and offer prices from the amended

5   complaint.  As I understand it, the original complaint alleges

6   that beginning, let's say, at 2 p.m., here were the best bid

7   and offer and number the shares associated with that and the

8   prices, and that that allegation is made, yeah, as of 2 p.m.,

9   and then the bidding period is alleged to have occurred from 2

10  p.m. to two minutes after 2 p.m., and that allegation stays the

11  same in the amended complaint, and indeed, the prior allegation

12  about what the number of shares involved and the actual prices

13  involved in the best bid and offer also stays the same except

14  the time changes.  Now you're alleging that that's the case as

15  of 2:02 rather than as of 2:00, and I don't understand that.

16  First of all, why did you remove the allegation and that those

17  were the bid and offer as at what I'm saying 2:00 --

18       MS. POSNER:  Yeah, yeah.

19       THE COURT:  And how can it be that it was the same at

20  2:00 and at 2:02?

21       MS. POSNER:  So, I think there are two specific, like,

22  different issues here.  The point that you were making was not

23  the result of an amendment.  The exhibit just had a

24  technological problem, and there was some -- I believe prior to

25  your Honor being appointed to this case, there were some

NbeWnorO

1    letters back and forth with regard to that exhibit.

2    Essentially what had happened --

3          THE COURT:  This is the exhibit attached to the

4    original complaint.

5          MS. POSNER:  Yeah, exhibit 1.  Essentially, the table

6    got, like the columns got set off a little bit, and it messed

7    up the whole table.  So they weren't reflective of the actual

8    information.  We did not amend that at all other than to fix so

9    that the times were correct.  I don't think that's what the

10   defendants are arguing about with regard to the amendments.

11         It is true that once we received what we think are

12   completely without basis Rule 11 letters, that we made some

13   amendments to the actual substantive allegations in the

14   complaint, and we did that not because they pointed out

15   information that we got wrong in the complaint.  I think that

16   they were focusing on issues that were not germane to our

17   allegations and that were not reflective of the specific

18   pleadings we were making.  So they were making the point about

19   the fact that we removed the time -- sorry, or the stock price

20   change between the beginning of the spoofing episode and the

21   end of the spoofing episode.

22         That is, in fact, true.  We didn't do it because it

23   was wrong.  It was the correct prices.  We did it because what

24   we are alleging and what we continue to allege is that they

25   artificially depressed the price.  The fact that the stock

NbeWnorO

price changed from X to Y is not necessarily indicative of the
true impact of the spoofing on the price and the decline in the
value of that share as a result of the spoofing.  And we
specifically show that in each of the 16 examples.

        We also then use the peak to trough analysis to
supplement that analysis as well, but we don't believe we have
any obligation, and I don't think it is necessarily reflective
of impact for a stock price to change from X to Y in and of
itself.  So I think those are just, if I understood your
question correctly, I think those are two different things.  We
did not change anything about the times, amounts, shares or
anything.  It was just when we had to correct that exhibit, we
filed a corrected version of exhibit 1.

        THE COURT:  All right.  First of all, I'm being told
that there was no exhibit to the original complaint.

        MS. POSNER:  Yeah.  I'm talking about for the second
complaint.  When we initially filed the second amended
complaint, there was an exhibit attached.  We then submitted a
letter to the Court saying the exhibit was messed up, and then
we submitted a corrected version of that exhibit.

        THE COURT:  OK.  I think that's neither here nor
there.  I'm talking about the change between the original
complaint and the amended complaint, where, for example, on the
October 12, 2020, transaction, when you get to paragraph 74 in
the original complaint -- well, let me just start with

NbeWnorO

1    paragraph 75.  That stays the same.

2            Paragraph 75 becomes paragraph 84 of the current

3    complaint and, I think, is identical, but the prior paragraph,

4    which is 74 in the original complaint and 83 in the amended

5    complaint, in the original version it alleges that on October

6    12, 2020, at 141825, which is the beginning of the baiting

7    period or the baiting order period as described in paragraph

8    75, the best bid and offer was a bid to purchase 5,000 shares

9    at a price of $1.02 and offer to sell 100 shares at a price of

10   $1.04.  When we get to the amended complaint, all those numbers

11   I mentioned in what is now paragraph 83 are the same except

12   that that allegation is made as of 142025, the end of the

13   baiting period.

14           MS. POSNER:  Yes.  I apologize, your Honor.  I thought

15   you were talking about the exhibit changes.  I misunderstood

16   your question.

17           It is true.  There were, I think, a handful -- and I

18   don't remember the specific numbers; I apologize -- of

19   instances in which when we were preparing for and cite checking

20   the amended complaint, we noticed that there were some

21   typographical issues with regard to the time.  Some of those

22   might actually have been brought to our attention by the

23   defendants in their Rule 11 motion.  I just don't know the

24   specifics offhand.  I can assure your Honor, though, that it

25   was not an intent to change anything because we thought we were

NbeWnorO

1    obfuscating anything.  It was truly a reflection of errors as

2    originally pled.

3         THE COURT:  Well, I haven't checked all 16.  I only

4    checked this one and the next one, but the next one is the same

5    thing.  The allegation is changed, you know, the first

6    paragraph only in respect of the time and it's now alleged that

7    those were the bid and asks at the end of the baiting period

8    rather than the beginning.  Did that happen in each of the

9    other 16 episodes?  As I said, I haven't checked, so I don't

10   know.

11        MS. POSNER:  I apologize, your Honor.  I have not done

12   a redline to compare them and I, quite frankly, just don't

13   recall from when we originally made the amendments.  I do

14   recall that we had identified some errors that we were trying

15   to fix that were in the initial complaint, as drafted, and

16   that's why it was corrected in the amended complaint.  But I

17   don't recall the specifics.  I do feel confident that the

18   allegations in the amended complaint are accurate.

19        THE COURT:  So you're saying the original complaint on

20   the October 12, 2020, transaction was inaccurate, that those

21   were not --

22        MS. POSNER:  I believe the time was inaccurate, if I

23   recall correctly.

24        THE COURT:  But what is the point of alleging what the

25   best bid and offer were at the end of the baiting order period?

NbeWnorO

```
 1   I don't understand that.  I can see why you would want to
 2   allege, as you did allege in the original complaint, what they
 3   were at the beginning, because it's like a chronology.  Here
 4   was the price, then they baited and the price went down.  I
 5   don't understand.
 6              MS. POSNER:  I don't think it's that -- if I
 7   understand your Honor's question correctly, I don't think it's
 8   that one goes from the beginning to the end.  I think the time
 9   was wrong as originally pled, and that is what changed.
10              THE COURT:  But I'm asking a different question.
11              MS. POSNER:  OK.
12              THE COURT:  Why allege what the bid and offer was at
13   the end of the baiting period?  What's the significance of that
14   allegation?
15              MS. POSNER:  You mean to know what it was as it
16   progressed throughout the spoofing episode?
17              THE COURT:  Why is paragraph 83 in the amended
18   complaint?
19              MS. POSNER:  So I think the point, if I'm
20   understanding your Honor correctly, you're asking why did we
21   plead the facts set forth in paragraph 83?
22              THE COURT:  Yes.
23              MS. POSNER:  I think it's to show the impact on the
24   stock price and where it moves as a result of the baiting.
25              THE COURT:  OK.  Is that consistent with the
```

NbeWnorO

1    allegations in *Harrington*?

2            MS. POSNER:  Yes, your Honor.

3            THE COURT:  You're saying if I look at the *Harrington*

4    complaint, they will also allege what the best bid and offer

5    were at the end of the alleged baiting offer period rather than

6    at the beginning?

7            MS. POSNER:  So, I think, two things.

8            One, I think our allegations are much more detailed

9    than in *Harrington*.  But putting that to the side, I think they

10   do the same thing.  They are showing the impact and price

11   movement of the shares as a result of the spoofing transactions

12   by the defendants and what the best, what the ultimate best bid

13   and offer is as a result of those baiting orders.

14           THE COURT:  OK.  Putting aside the issue of the change

15   in the complaints, is it correct, as your adversary says, that

16   you don't allege what the pre-spoofing price was, and isn't

17   that critical, important, necessary for a spoofing claim?

18           MS. POSNER:  It is correct that we don't include that

19   information.  I do not believe it's correct that it is

20   required.  What is required is that we allege that the conduct

21   depressed the price below its natural price as a result of the

22   spoofing activity.  You see in *Set Capital*, the Second Circuit

23   says for market activity to artificially affect a securities

24   price, we generally ask whether the transaction or series of

25   transactions sends a false pricing signal to the market or

NbeWnorO

1    otherwise distorts the underlying economic value of the

2    securities trading.

3         That's not suggesting that we have to show that the

4    stock price moved from X to Y.  We just have to show that the

5    pricing signal that is reflected in the best bid and offer is

6    not truly reflective of the actual underlying economic value of

7    the shares.  And I should point out that for each of the 16

8    examples and in each of the instances in exhibit 1, we

9    demonstrate how the baiting orders allowed them to obtain the

10   executing purchases at a price below the prevailing best offer.

11   And that is direct evidence of the price decrease caused by

12   their specific spoofing allegations.  We then obviously also do

13   the peak to trough analysis, but we are providing the direct

14   evidence of the impact of their spoofing on the price, which is

15   demonstrating the price was not reflective of true supply and

16   demand.  It was less than it should have been, and by how much.

17        THE COURT:  With respect to peak to trough analysis,

18   that's your price decline formula, right?

19        MS. POSNER:  One of.  As I said, we show the actual

20   physical price decline from $1.05 to $1.03 as a result of the

21   spoofing as well, which is direct evidence of it, but we also

22   do the peak to trough analysis as well.

23        THE COURT:  And is Mr. Burck correct when he says that

24   under that formula, even when the price went up, your formula

25   would spit out a decline?

NbeWnorO

1              MS. POSNER:  Incorrect.  If you look at footnote 43 of

2      our brief, this is on page 27, we specifically give an example.

3      We say if the share price increased from $10 during the two

4      minutes before the executing purchase to $11 during the two

5      minutes after the executing purchase, then the peak to trough

6      calculation would actually be zero.

7              It is, in fact, the case that each of the instances

8      alleged in the complaint show a peak to trough decline, but

9      that's because we are only alleging those instances in which

10     there was a price decrease or a decline as a result of the

11     spoofing activity.  There are lots of other transactions in the

12     market that did not cause this impact and were not unlawful

13     spoofing activity.  We didn't allege those in the complaint.

14     That would be improper.  So yes, all of our examples show a

15     peak to trough decline, but it is not the case that any

16     transaction or any difference in price would always show a peak

17     to trough decline in the stock price.

18             THE COURT:  Was I correct when I posited to Mr. Burck

19     that if the price actually did go up under your formula, the

20     result would be a zero?

21             MS. POSNER:  Yes.  That is correct.

22             THE COURT:  Seems like something we should all be able

23     to agree on.

24             MS. POSNER:  You're right.

25             THE COURT:  Is your formula X minus Y all above the

line over 1 or is it X over Y minus 1?

MS. POSNER: It's X over Y minus 1, if I have this correctly. And actually, it's also in -- we have it in more detail in footnote 1 to exhibit 1. Might be the same rather than more detail. It might be actually the same as what I just read to you but in a different place, not more detail. But if I understand it correctly, it's X over Y minus 1.

THE COURT: So it's a little line, X with a Y direction underneath separated by line and then you take whatever the product of that is and then you subtract 1 from it.

MS. POSNER: I believe that is correct. Are you comparing that as to the slide in the defendants' presentation?

THE COURT: I'm just asking you what your formula is.

MS. POSNER: Yeah, I believe that is an accurate reflection of the formula. But I'm just trying to understand what you're seeing that is different than that, and that's what I was trying to find out.

THE COURT: Well, it's ambiguous. It could be X minus Y, so you subtract Y from X and then you divide that by 1.

MS. POSNER: No. It's X over Y minus 1.

THE COURT: OK. And I thought that's what Mr. Burck used in his example, but he showed me, or at least I was persuaded at the time, that you could have an increase in the stock price but it would look like a negative. What was wrong

NbeWnorO

1    about -- and perhaps Mr. Burck could tell us what slide it was.

2    Was it on a slide?

3              MR. BURCK:  Yes, it was.

4              MS. POSNER:  Slide 29.

5              THE COURT:  Can we put that up?

6              MR. BURCK:  Yes, your Honor.

7              MS. POSNER:  This is also a different footnote in our

8    opposition brief.  This is footnote 55.

9              THE COURT:  Uh-huh.

10             MS. POSNER:  And we describe here that, again, the

11   same fact pattern, 10 to $11 during the two minutes before and

12   after.  The price decline in that example would be 10, divide

13   by 10 minus 1 equals 1 minus 1 equals zero.  In other words,

14   the price decline is defined such that when the price increases

15   from before and after the executing purchase, the price decline

16   is zero.

17             THE COURT:  So applying that to Mr. Burck's example,

18   did he misunderstand it in your formula?

19             MS. POSNER:  Apologies.  I'm clearly not an economic

20   economist and all the more reason why loss causation is left to

21   the experts, but what I think is inaccurate about this slide is

22   the 2.  It should be a 1 in this fact pattern.  You're looking

23   at two minutes before, two minutes after.

24             THE COURT:  Just the way it's ten and ten in your

25   example.

NbeWnorO

1        MS. POSNER:  Correct.  Correct.

2        So I think what's wrong about this is it's not

3    accurately reflecting the formula.  It should be a 1, not a 2

4    there --

5        THE COURT:  OK.

6        MS. POSNER:  -- to be accurate.

7        THE COURT:  That's correct.

8        We're going to need to wrap this up.  I don't know

9    that I have any more questions for you, Ms. Posner.  Is there

10   anything else that you would like to say?

11       MS. POSNER:  Nothing further at this time, your Honor.

12   I'll see if there's anything after Mr. Burck gets back up here.

13       THE COURT:  Sure.

14       Mr. Burck, you have five minutes.

15       MR. BURCK:  I'll be very, very brief.

16       THE COURT:  Or less.

17       MR. BURCK:  Your Honor, this is a formula.  Right?  So

18   the idea that we put in the wrong numbers is the reason why the

19   formula doesn't work is obviously not -- it doesn't make any

20   mathematical sense.  In other words, this is the formula they

21   put in their brief, their complaint, X, smaller number, divided

22   by Y, larger number, minus 1, equals whatever it's going to

23   equal.

24       THE COURT:  She's saying you should put the 1.  But

25   there's no way we can sort this out here and now.  I have a

NbeWnorO

1    fair amount of confidence that between me and my law clerk we

2    can figure that out.

3              MR. BURCK:  Understood.

4              THE COURT:  If we need help, we'll ask for help.

5              MR. BURCK:  OK, your Honor.

6              Just on the point that the Court was focusing on with

7    respect to the difference between *Harrington*, the starting

8    price, what actually happened, Judge, is, and this is what you,

9    I think, were getting to, was that the original complaint had a

10   number in it as a starting number, which makes sense, as the

11   Court said.  Then the amended complaint, the starting number

12   disappears and it's just the end number, which the Court, of

13   course, pointed out, why does that matter.  We'll explain in a

14   minute how that happened, but that's also completely different

15   than *Harrington*.  *Harrington* has a starting point price and it

16   has a specified loss amount or decline amount, I should say,

17   for the baiting period alleged.

18             Neither is alleged here, and the reason why it's not

19   alleged is because the plaintiffs figured out that the number

20   they had in their original complaint was wrong.  And if you put

21   in the right number from the public data, which is on one of

22   the slides we had, and we could flash that up, that you had the

23   opposite effect.  It's not a baiting moment.  You have the

24   exact opposite of a spoof.  And that was the slide we went

25   through, your Honor, that said the reason why they excluded it,

NbeWnorO

1    your Honor, is because it completely destroys their theory.

2            Your Honor, this is the slide.  This is 27.  The

3    original complaint had a wrong number, 1.02, 1.04.  We told

4    them it was wrong.  We told them what the right number was,

5    .995 or 1.  So the executing purchase price was 1.02.  It's the

6    exact opposite of what you would have in a spoof.

7            So what they did in the amended complaint was simply

8    take it out.  So that's why that happened, your Honor.  And the

9    reality is that *Harrington* specifically in that case, defendant

10   has a baiting, spoofing start number, has a price decline

11   allegation, neither of which exists in this case.

12           So your Honor, just a final point that if you don't

13   know what the price was supposed to be at the beginning, like

14   what the baiting price was or where things all start from, how

15   do you know where you're ending up?  How do you know if you

16   have a price increase, decrease, it stays flat?  You have no

17   idea, because we don't know where we're starting from.

18           THE COURT:  You don't, but if you have a gazillion,

19   and I'm not being literal, canceled orders and a gross

20   imbalance in the sell side versus the buy side on the book and

21   some of the other factors that plaintiff has talked about, it

22   seems like you could infer that there was an intent to drag

23   down the price.

24           MR. BURCK:  Well, your Honor, that would mean --

25           THE COURT:  Even if there's no specific allegation of

NbeWnorO

1    what the price was initially.

2                MR. BURCK:  Well, your Honor, I think that that, I

3    don't think that the law suggests that the mere fact of a large

4    number of cancellations -- let's assume that's what happened --

5    is sufficient to say that there's spoofing, there's an effort

6    to drive down the price.  It has to be combined with all the

7    other factors that go into it --

8                THE COURT:  Yes.

9                MR. BURCK:  -- including a price number.  Judge, for

10   example, in this particular instance, we actually know that

11   despite the alleged imbalances and the cancellations, the price

12   went up double during that period.

13               THE COURT:  That's the long term.  That's irrelevant.

14   I'm not focused on that.  I'm focusing on the spoofing

15   episodes.

16               MR. BURCK:  Judge, even in the spoofing episodes, we

17   look at the number, the actual, the best offer, and this is

18   their theory.  Right?

19               THE COURT:  You haven't shown that to me, and we

20   haven't even talked about -- I don't know how I can rely on

21   that on the trading data, just because it's publicly available.

22   Do you have a case where anything like that was done?  Don't

23   cite a contract case where the court looked at the entire

24   contract.

25               MR. BURCK:  Judge, we can certainly look for one.  We

NbeWnorO

```
 1     can certainly look for one.

 2              But judge, one point, just the last point is that they

 3     know the starting price, your Honor.  They know what it is.

 4     They can find it.  We told them what the starting price was in

 5     this chart.  They didn't include it because it completely

 6     undermines their theory of the case.  The number cannot be --

 7     this cannot be a spoofing episode if the price started out at

 8     .995 to 1 and the executing purchase price was $1.02.

 9              THE COURT:  You're assuming reasonably enough given

10     the plaintiff's allegations that the baiting order period was,

11     in fact, that the baiting started exactly two minutes -- or

12     lasted exactly two minutes.

13              MR. BURCK:  That's what they say, your Honor.

14              THE COURT:  I understand, but I didn't ask plaintiff's

15     counsel, but I will.  Frankly, I will now.

16              I think it's more efficient, Ms. Posner, if you just

17     answer this question now, but I mean I think that's the

18     allegation for each of the 16 episodes, that it was a

19     two-minute baiting order period.  Do I take that literally, or

20     were you using two minutes as some sort of proxy and, in fact,

21     the baiting orders took place at different times within the

22     two-minute period; they may not necessarily have started at

23     what the complaint, frankly, suggests is the start period.

24              MS. POSNER:  So, your Honor, there are, as we allege,

25     I think, over -- we were talking hundreds of thousands of
```

NbeWnorO

1    bidding orders.

2              THE COURT:  I'm talking about the 16.

3              MS. POSNER:  No.  I understand.

4              What I'm trying to explain is that there are numerous

5    ways in which you could start and stop the baiting orders.

6    It's not as if this is a static market in which they only

7    operate in specific chunks.  We used what we see as a

8    conservative methodology, used actually in expert reports

9    submitted in a number of these spoofing cases, to look at a

10   window of time and see the impact of the baiting orders on the

11   price of Northwest Bio.  We would otherwise have to include in

12   the complaint literally thousands and thousands and thousands

13   of pages of transactions in order to show every single order

14   that's coming through at any given point in time, and we

15   wouldn't have a fair representation of what the impact is

16   unless we were to look -- you know, we could look at a

17   five-year period, I suppose, but I don't think that's helpful

18   to the Court and I don't think that's how spoofing cases have

19   been alleged in the past.

20             THE COURT:  So when you allege, for instance, with

21   regard to the October 12 example episode, that from 141825 to

22   142025 defendant Citadel placed 10,850 shares of baiting

23   orders, you don't mean to allege, despite the language, that

24   they placed the first baiting order at 141825 and the last one

25   at 142025.

NbeWnorO

1          MS. POSNER:  Correct.

2          THE COURT:  You just mean that there were baiting

3     orders within that range.

4          MS. POSNER:  Correct.  We used the same two-minute

5     window, and I think we have a footnote explaining that.  I

6     don't have it off the top of my head, why we picked that and

7     that we used it consistently throughout.

8          THE COURT:  Thank you.

9          In light of that, Mr. Burck, is there anything further

10    you want to say on this subject?  I guess my question would be

11    given that, isn't the price as of, I assume this is what's

12    reflected in the middle of your chart, at 141825 not so

13    significant?

14         MR. BURCK:  Well, your Honor, we totally disagree,

15    because again, we don't even -- the only price that's alleged,

16    now, is the one at the end, right?  After this period is over.

17    So again, we have no idea where the price went unless you

18    actually look at the price, and when you do, and they allege

19    the baiting period starts at a particular split second and you

20    look at the price, then you look at what the executing price

21    was and then you see what happened to the price.  It's very

22    simple.

23         And instead, what they did, your Honor, with every

24    single example -- I know they alleged hundreds of thousands

25    examples.  They presumably they took the best ones, if they

NbeWnorO

1   wanted to prove to the Court they had a good case, they took

2   the 16, originally had starting numbers for each of the 16, and

3   they ripped them all out.  Now, every one of the examples has

4   an end point and no beginning point.  It's just a fundamental

5   logical problem, which is you can't allege -- well, you can

6   allege anything you want.  You can say the price went down, but

7   we actually -- this is a knowable fact, and they exclude the

8   information because the information, if they use it, will show

9   that their entire theory crumbles at the very threshold,

10   because they cannot -- they cannot -- give us, they cannot give

11   the Court the starting price because if they give the Court the

12   starting price, there's no baiting.  Nothing happens even

13   consistent with what they've alleged.

14          Instead, they rely on a general statement that we have

15   alleged that the baiting happened, there were cancellations,

16   which they don't actually allege a specific cancellation,

17   here's the things that we hit using the standards that are out

18   there, and they throw out a lot of charts, a lot of big

19   numbers.  But when you actually go into the specifics and take

20   a look at what they are alleging examples that they chose, it's

21   missing the first thing that you need to know, which is where

22   did we start?  Right?  How is the Court going to decide what

23   happened if you don't know where we started?  How can you

24   determine a price decline or an increase?

25          I won't belabor the formula, but it goes to the

NbeWnorO

1   formula.  The formula itself is basic math, X divided by Y, X

2   has to be lower than or equal to Y minus 1 where maximum equals

3   zero.  That's the max.

4        THE COURT:  We've discussed this.

5        MR. BURCK:  Your Honor, the point is that they're

6   hiding the ball from the Court in a fundamental way, which is

7   there's no way to know what actually happened if you take away

8   the price.  They know what the price is.  They don't want the

9   Court to see it because that undermines their case.

10        THE COURT:  One last question.  Your exhibits that

11   have the publicly available quote data, is that a clean

12   document, or is that something that was literally printed out

13   from OTC Link?

14        MR. BURCK:  That was downloaded from OTC Link.

15        THE COURT:  As is.

16        MR. BURCK:  As is.

17        THE COURT:  OK.

18        MR. BURCK:  Your Honor, one other point, just to

19   clarify.

20        You asked us about *Harrington*, did the plaintiff

21   allege that there were the same clients on both sides.  They

22   did not.  They did not make that allegation, but the court

23   found and you went into this with plaintiff's counsel, that

24   there were some differences in what they alleged as to reckless

25   behavior, including saving costs with respect to the

NbeWnorO

1    cancellations, which they don't allege against us, but the

2    plaintiff in that case did not allege the client had to be on

3    both sides.  I just wanted to clarify that.

4              THE COURT:  Thank you for that clarification.

5              OK.  Thanks, everyone.  Have a good day.

6              (Adjourned)