# COHENMILSTEIN

Laura Posner<br>
(212) 220-2925<br>
lposner@cohenmilstein.com

November 22, 2023

Honorable Gary Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re:    <u>Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC, et. al.,</u>
              No. 1:22-cv-10185-GHW-GS

Dear Judge Stein:

      We represent Plaintiff Northwest Biotherapeutics, Inc. ("Plaintiff" or "NWBO") and write in response to Defendants' November 20, 2023 letter. ECF No. 133. As set forth below and in Plaintiff's Opposition Brief (ECF No. 123 at 38-40), the "trading data" relied on by Defendants are not only irrelevant to the sufficiency of Plaintiff's claims, but even if they were, these data are neither supportive of Defendants' arguments nor the type of information of which courts take judicial notice.

      <u>First</u>, even assuming *arguendo*, that Defendants' "trading data" somehow shows what they say it does, it does nothing to defeat Plaintiff's claims. The caselaw makes clear that there is no requirement that a plaintiff allege that the defendant "parked" its transactions in order to adequately allege manipulative spoofing. *See Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *4 (N.D. Ill. July 27, 2023) ("*Kessev Tov II*") ("While 'layering' or 'parking' bids may be one way of proving spoofing, there is no caselaw that holds it is the only way to do so"); *CFTC v. Skudder*, 2022 WL 17752392, at *8 (N.D. Ill. Dec. 19, 2022) (rejecting defendants' argument that CFTC needed to show that they "parked" orders).

      The caselaw is similarly clear that a plaintiff need not allege that a stock price declined in order to adequately plead price impact in a market manipulation case. Rather, as the Second Circuit has held, "[f]or market activity to 'artificially' affect a security's price, we generally ask whether the transaction or series of transactions 'sends a false pricing signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded." *Set Capital LLC v. Credit Suisse Group AG,* 996 F. 3d 64, 76 (2d Cir. 2021). Here, the Complaint does just that: it shows how Defendants' spoofing resulted in the price of NWBO shares being depressed below their true market value. Specifically, in each of the 16 examples in the Complaint

COHENMILSTEIN

November 22, 2023
Page 2

and for every Spoofing Episode alleged in Exhibit 1, Plaintiff shows how Defendants' Baiting Orders allowed Defendants to obtain Executing Purchases at a price below the prevailing best order – which is direct evidence of how and by how much Defendants' misconduct artificially depressed the price of NWBO's shares. *See, e.g.,* First Am. Cmplt., ECF No. 95 at ¶¶ 87, 101, 115. And, the Complaint goes even further and then also shows a peak to trough decline in the price of NWBO's shares as a result of Defendants' spoofing. ECF No. 95-1, n.1.

Second, courts do not take judicial notice of the type of "trading data" at issue here. All of the cases cited by Defendants involve the judicial notice of uncontroversial stock price information for publicly-traded securities or indices,[1] or (in one case) stock pricing information that the parties did not contest.[2] None involved the type of complex – and incomplete – order quote data from certain alternative trading systems that Defendants rely on here, and none involved disputes about what the data showed or its relevance to the claims at issue.

Third, the "trading data" at issue is not integral to the Complaint. As Defendants must concede, the specific type and portions of "trading data" that Defendants seek judicial notice of, are neither specifically mentioned in, or incorporated by reference into, the Complaint.

Fourth, there is significant dispute over what the "trading data" shows and means. Indeed, on its face, the "trading data" does not even support Defendants' assertions. For example, Defendants claim that their "trading data" shows that their Baiting Orders "were always competitively priced" and not "parked at all." But, Defendants are wrong and there are dozens of examples of Defendants' parking in their "trading data." For example, on October 27, 2020, there is clear evidence that Virtu parked in the trading data. At 10:27:23.190, the inside best offer was 68,105 shares for $1.17. At 10:27:24.980, Virtu placed new sell-side orders to sell 1,400 shares at $1.21 per share (*i.e.*, by increasing its sell-side offer from 100 shares to 1,500 shares, reflecting new sell-side orders for 1,400 shares). At the next update to the inside quote at 10:27:25.448, the inside best offer remained at $1.17 (the share quantity updated to 58,105 shares). At 10:27:47.550, after the executing purchase at 10:27:42, Virtu then cancelled those 1,400 shares and reduced its sell-side quote to 100 shares at $1.17. ECF No. 116-14.

---

[1] *Set Capital*, 996 F. 3d at 69-70 (public pricing data for a futures index published by Standard and Poor's); *Acticon AG v. China North East Petroleum Holdings, Ltd.*, 692 F.3d 34 (2d Cir. 2012) (NYSE-traded stock prices); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) (NYSE-traded stock prices); *In re IPO Sec. Litig.*, 383 F.Supp.2d 566, 583 (S.D.N.Y. 2005) (publicly-traded stock prices);
[2] *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *12 n. 16 (S.D.N.Y. Mar. 29, 2022) ("Plaintiffs do not contest the veracity of these metrics").

COHENMILSTEIN

November 22, 2023
Page 3

      Similarly, Defendants claim that the "trading data" shows that there was no stock price decline as a result of their spoofing. However, as Plaintiff's Opposition Brief makes clear, the full set of trading data shows no such thing, and instead shows the opposite. ECF No. 123 at 40, n. 60 (describing in detail how executed transaction data shows that the price of NWBO shares went down, not up, after the downward pressure induced by Defendant Citadel's Baiting Orders).

      Regardless, damages for securities fraud are "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Acticon AG*., 692 F.3d at 38 (2d Cir. 2012). If NWBO's share price would have risen by ten cents, but instead rose only by five cents due to Defendants' spoofing activity, Plaintiff suffered losses even though its stock price increased.

      <u>Finally</u>, certain of the "trading data" that Defendants' rely on is not "public" and other portions that are necessary for completeness are missing altogether. Specifically, while not addressed in their letter, Defendants in their Motion to Dismiss argue that some unspecified non-public "trading data" shows that they sold during a few of the Baiting Periods. ECF No. 115 at p. 16. Defendants make that assertion without attaching such trading data, or even so much as a citation.[3] Courts regularly reject judicial notice of such non-public information. *See, e.g., Maroney v. Woodstream Corp.*, 2023 WL 6318226, at *2 (S.D.N.Y. Sept. 28, 2023) (collecting cases). Other trading data necessary for completeness is missing altogether.[4]

      Accordingly, Defendants' request for judicial notice should be denied.

                                  Respectfully submitted,

                                  */s/ Laura Posner*

---

[3] Moreover, as the Complaint alleges (e.g., ECF No. 95 at ¶¶ 85, 99. 113)), and courts have held, selling during Spoofing Episodes is not only entirely consistent with spoofing, but a rational aspect of it because that is how one profits from manipulative spoofing. *See Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.*, 585 F.Supp.3d 405, 418 (S.D.N.Y. 2022) ("Ostensibly, when a Spoofing Defendant sold that stock, their profits would be increased, or losses decreased, by the difference of the price they paid versus the price they would have paid had they not engaged in spoofing."); *Kessev Tov II*, at *1 ("... Defendants could then execute on the other side of those [spoofed] orders, generating profits by selling the artificially inflated put options").

[4] For example, Defendants fail to attach any data from Global OTC, notwithstanding that the Complaint refers specifically to order and trade execution activity on that venue, including prices of cancelled orders. ECF No. 95 at ¶¶ 76, 90, 104, 118, 132, 173, 207, 220.