## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTHWEST BIOTHERAPEUTICS, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>CANACCORD GENUITY LLC, CITADEL<br>SECURITIES LLC, G1 EXECUTION<br>SERVICES LLC, GTS SECURITIES LLC,<br>INSTINET LLC, LIME TRADING CORP.,<br>AND VIRTU AMERICAS LLC,<br><br>    Defendants. | Case No. 1:22-cv-10185 (GHW) (GS)<br><br>**ORAL ARGUMENT REQUESTED** |

## <u>DEFENDANTS' OBJECTIONS TO REPORT & RECOMMENDATION</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 3

ARGUMENT ....................................................................................................................... 4

I.  The Court Should Reject The R&R's Erroneous Finding That NWBO Adequately
    Pled The Required "Strong Inference" Of Scienter ................................................... 4

    A.  The R&R Failed To Consider Competing Inferences As Required By The
        PSLRA And Supreme Court .......................................................................... 4

    B.  The R&R Erred In Finding That NWBO Sufficiently Alleged A "Strong
        Inference" Of Motive .................................................................................... 7

    C.  The R&R Erred In Finding That NWBO Adequately Pled Conscious
        Misbehavior Or Recklessness ..................................................................... 11

II. The Court Should Reject The R&R's Erroneous Finding That NWBO Pled
    Manipulative Acts With Particularity ...................................................................... 14

    A.  The R&R's Own Citations Demonstrate That NWBO Failed To Plead
        Manipulative Acts With The Required Particularity .................................... 14

    B.  The R&R Erred In Crediting Allegations That, By NWBO's Own
        Admission, Are Impossible .......................................................................... 16

    C.  The R&R Erred In Crediting NWBO's Allegations Of "Parking" .............. 18

III. The Court Should Reject The R&R's Erroneous Finding That NWBO Adequately
     Pled Market Effects ................................................................................................ 19

IV.  The Court Should Reject The R&R's Erroneous Finding That It Could Not
     Consider Public Trading Data ................................................................................. 21

V.   The Court Should Reject The R&R's Erroneous Finding That "Largely
     Conclusory" Allegations Are Sufficient To Plead Reliance ................................... 23

VI.  The Court Should Reject The R&R's Erroneous Finding That Loss Causation Can
     Be Divorced From The Allegedly Manipulative Activity ....................................... 25

CONCLUSION ................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012).................................................................................22

*Alki Partners, L.P. v. Vatas Holding GmbH*,
    769 F. Supp. 2d 478 (S.D.N.Y. 2011)...........................................................5

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).......................................................1, 4, 14, 15, 19

*C.F.T.C. v. Wilson*,
    2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)..............................................21

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989).............................................................23, 24

*Catania v. United Fed'n Of Teachers*,
    2022 WL 767107 (S.D.N.Y. Mar. 12, 2022) ..................................................3

*Cohen v. Cap. One Funding, LLC*,
    489 F. Supp. 3d 33 (E.D.N.Y. 2020) ...........................................................21

*In re Crude Oil Commodity Litig.*,
    2007 WL 1946553 (S.D.N.Y. June 28, 2007) ................................................8

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012)...........................................................24

*In re Duane Reade Inc. Sec. Litig.*,
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)...............................................9

*Ellison v. Am. Image Motor Co.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999)..............................................................15

*EMA Fin., LLC v. Vystar Corp.*,
    2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) ................................................8

*Flynn v. Cable News Network, Inc.*,
    2021 WL 5964129 (S.D.N.Y. Dec. 16, 2021) ................................................3

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
    41 F. 4th 71 (2d Cir. 2022) ...........................................................................25

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................14

*Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*,
    1982 WL 1348 (S.D.N.Y. Nov. 10, 1982)................................................................13

*Gray v. Alpha & Omega Semiconductor Ltd.*,
    2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021).........................................................12

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
    2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023).........................................................11

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
    585 F. Supp. 3d 405 (S.D.N.Y. 2022).....................................................................13

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
    309 F. Supp. 3d 100 (S.D.N.Y. 2018).......................................................................8

*Hull v. Glob. Digit. Sols., Inc.*,
    2018 WL 4380999 (D.N.J. Sept. 14, 2018) ............................................................24

*In re IPO Sec. Litig.*,
    383 F. Supp. 2d 566 (S.D.N.Y. 2005).....................................................................22

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020).......................................................................................14

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).................................................................................7, 10

*Leroy v. Delta Air Lines*,
    2022 WL 12144507 (2d Cir. Oct. 27, 2022)............................................................23

*Lynch v. City of N.Y.*,
    952 F.3d 67 (2d Cir. 2020).......................................................................................23

*Madhu v. Socure Inc.*,
    2023 WL 6214807 (S.D.N.Y. Sept. 22, 2023) ........................................................23

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).......................................................................24

*New Eng. Carpenters Guar. Annuity & Pension Funds v. DeCarlo*,
    80 F.4th 158 (2d Cir. 2023) ...............................................................................11, 12

*Norales v. Acevedo*,
    2022 WL 17958450 (2d Cir. Dec. 27, 2022) ..........................................................23

*Pa. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012)....................................................................23

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)....................................................................24

*Patel v. L-3 Commc'ns Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)........................................................12

*In re Platinum & Palladium Antitrust Litig*,
    2017 WL 1169626 (S.D.N.Y. Mar, 28, 2017) ........................................................8

*Ruderman v. Liberty Mut. Grp., Inc.*,
    2022 WL 244086 (2d Cir. Jan. 27, 2022) ............................................................23

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)......................................................................................5

*Saltz v. First Frontier, L.P.*,
    485 F. App'x 461 (2d Cir. 2012) ..........................................................................12

*Schwab v. E\*TRADE Fin. Corp.*,
    258 F. Supp. 3d 418 (S.D.N.Y. 2017)...................................................................13

*Set Cap. LLC v. Credit Suisse Group AG*,
    2019 WL 3940641 (S.D.N.Y. Aug. 16, 2019)................................................22, 23

*Shahzad v. H.J. Meyers & Co.*,
    923 F. Supp. 57 (S.D.N.Y. 1996) .........................................................................10

*In re Shanda Games Ltd. Sec. Litig.*,
    2022 WL 992794 (S.D.N.Y. Mar. 31, 2022) ........................................................24

*Silverman v. Citibank, N.A.*,
    2023 WL 7305243 (S.D.N.Y. Nov. 6, 2023)................................................21, 22, 23

*In re Sina Corp. Sec. Litig.*,
    2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006)......................................................22

*Smith v. Hogan*,
    794 F.3d 249 (2d Cir. 2015)..................................................................................23

*Sutton v. Stony Brook Univ.*,
    2022 WL 4479509 (2d Cir. Sept. 27, 2022) .........................................................23

*Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*,
    2019 WL 1368570 (S.D.N.Y Mar. 26, 2019) ........................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................1, 4, 5, 7, 23

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
    2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013) .......................................................11

*Woods v. Maytag Co.*,
    2010 WL 4314313 (E.D.N.Y. Nov. 2, 2010).........................................................13

*Zech Cap. LLC v. Ernst & Young Hua Ming*,
    636 F. App'x. 582 (2d Cir. 2016) ............................................................................7

## **Rules & Statutes**

15 U.S.C. § 78u-4 ............................................................................................ *passim*

Fed. R. Civ. P. 9(b) ....................................................................................................2

Fed. R. Civ. P. 11 ......................................................................................................3

Fed. R. Civ. P. 72 ......................................................................................................3

Defendants respectfully submit these objections to the Report and Recommendation issued by Magistrate Judge Gary Stein (the "R&R"). *See* ECF 137. Defendants specifically object to the R&R's findings and recommendations concerning each element of Plaintiff Northwest Biotherapeutics, Inc.'s ("NWBO") market manipulation claim (including the recommendation to allow amendment of the deficiently pled loss causation element), and the R&R's findings and recommendations concerning the public OTC Link data provided by Defendants.

## PRELIMINARY STATEMENT

Spoofing is a form of illegal market manipulation that involves placing sham orders that are never intended to be executed. Although spoofing has been aggressively prosecuted by the Department of Justice, Securities and Exchange Commission, and other regulators where there is clear evidence of intent, spoofing cases have, until recently, been rare in the civil context. Because both spoofing and lawful market activity involve the rapid placement and cancellation of orders, high-volume traders may be accused of spoofing when they have done nothing wrong.

For this reason, the exacting pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") are critical in civil spoofing actions. Congress enacted the PSLRA to prevent securities fraud actions from being "employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007). The PSLRA not only requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," but "to plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference" that could be drawn. *Id.* at 313, 328. As the Second Circuit has explained, "[t]his pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

In this spoofing action, NWBO posits that the rapid placement and cancellation of orders for its stock by the seven broker-dealer Defendants—conduct that is routine in the modern securities markets—was actually seven independent but identical spoofing schemes carried out over the exact same five-year period.  To sufficiently plead that this otherwise-ordinary trading activity was actually unlawful spoofing, NWBO must, at a minimum, allege some particularized facts regarding Defendants' intent to spoof, provide concrete and specific allegations of manipulative trading patterns distinguishable from regular trading activities, and allege the price of its stock before and after the purported spoofing to demonstrate the effect of the alleged scheme. It has not done so, and its circular allegations—for example, calling orders "fictitious Baiting Orders" while pleading no particularized allegations supporting intent—amount to nothing more than the conclusory application of nefarious-sounding labels to routine and lawful market activity.

In finding most of the elements of NWBO's claim adequately pled, the R&R endorses a troubling end-run around the PSLRA that will have far-reaching consequences.  On the critical scienter element, the R&R failed to consider competing non-fraudulent inferences, as the Supreme Court has emphasized that it must, and erroneously accepted implausible allegations.  And it is not just the scienter element the R&R misapplied—it erroneously accepted generic group-pleading despite Rule 9(b)'s particularity requirement, held that "largely conclusory" allegations are sufficient to plead reliance, and improperly failed to take judicial notice of public records. Adopting the R&R would open the door for any struggling public company to file a copy-and-paste lawsuit blaming a decline in stock price on generalized allegations of wrongdoing.  This concern is not hypothetical:  at least five such suits have been filed in this District in the last three years.

As only the second civil spoofing case concerning publicly-traded securities to reach the motion to dismiss stage in this Circuit, this case gives the Court an opportunity to clarify unsettled law, define the boundaries for pleading securities fraud based on alleged spoofing, and prevent frivolous suits from flooding the courts.  Because the R&R misapplied the applicable pleading standards, the Court should reject it and dismiss the Amended Complaint without leave to amend.

## BACKGROUND

NWBO commenced this action on December 1, 2022.  ECF 1.  On April 10, 2023, following service of a Rule 11 motion concerning the accuracy of its trading allegations, NWBO filed an Amended Complaint ("Complaint").  ECF 95.  On May 19, 2023, Defendant Citadel Securities served NWBO with a second Rule 11 motion and, on June 12, 2023, requested a pre-motion conference regarding the filing of this Rule 11 motion.  *See* ECF 110.  The Court directed that the Rule 11 motion be filed following disposition of the motion to dismiss the Complaint to avoid "burden[ing] the Court with multiple motions addressed to the same pleading."  ECF 113.  Defendants filed their joint motion to dismiss on July 12, 2023.  ECF 115 ("Mot.").  On September 19, 2023, the case was reassigned to Magistrate Judge Stein for general pretrial matters and Defendants' motion to dismiss.  Judge Stein heard oral argument on the motion to dismiss on November 14, 2023 and, on December 29, 2023, issued the R&R.

## STANDARD OF REVIEW

The Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to," and "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3); *see also Catania v. United Fed'n Of Teachers*, 2022 WL 767107, at *1-2 (S.D.N.Y. Mar. 12, 2022) (Woods, J.) (rejecting report & recommendation in its entirety); *Flynn v. Cable News Network, Inc.*, 2021 WL 5964129, at *1 (S.D.N.Y. Dec. 16, 2021) (Woods, J.) (rejecting report & recommendation in part).

## ARGUMENT

**I.    THE COURT SHOULD REJECT THE R&R'S ERRONEOUS FINDING THAT NWBO ADEQUATELY PLED THE REQUIRED "STRONG INFERENCE" OF SCIENTER**

The PSLRA requires a plaintiff to "plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors." *ATSI*, 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)). This "inference of scienter must be more than merely plausible or reasonable"—it must be "*at least as likely* as any plausible opposing inference" that could be drawn from the facts as alleged or supplemental facts. *Tellabs*, 551 U.S. at 309, 328 (emphasis in original). To meet these "[e]xacting pleading requirements," *id.* at 313, NWBO must allege facts (i) demonstrating "defendants had both motive and opportunity to commit the fraud," or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. The R&R should be rejected because it failed to apply the PSLRA's exacting pleading requirements for scienter, erroneously conflated scienter with the lower standard for pleading manipulative acts, and *sua sponte* invented allegations not pled in the Complaint.

### A.    The R&R Failed To Consider Competing Inferences As Required By The PSLRA And Supreme Court

Under *Tellabs*, "to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court [applying the PSLRA] *must engage in a comparative evaluation*; it must consider, not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged." 551 U.S. at 314 (emphasis added). NWBO claims that each of the seven Defendants independently engaged in an identical spoofing scheme over the exact same five-year period involving the placement of "Baiting Orders," which NWBO defines circularly as orders "that were not intended to be executed." ¶ 62.[1] According to NWBO,

---

[1] Citations to the Complaint are made by reference to the relevant paragraph number therein.

these "Baiting Orders" created a sell-side imbalance and drove down the price of NWBO stock, permitting the Defendant to buy NWBO shares at a discount, and then cancel the "Baiting Orders." ¶¶ 66-67.  The R&R should be rejected because it considered only the plausibility of NWBO's allegations and failed to properly conduct the required comparative analysis.  *See* R&R at 64.

*First*, the R&R erred by disregarding the plausible and obvious inference that the seven Defendants—who, as broker-dealers, routinely process client orders—were displaying and executing orders for their clients, on terms set by those clients.  The R&R concluded that the Complaint contains no "admission" of client trading, and speculated that "either way, it was Defendants' algorithms that controlled the trades."  R&R at 59, 40.  But NWBO expressly alleges that "[t]he spoofing activity that forms the basis of the claims in this action may have been executed by Defendants ... for client accounts, for which they acted as brokers."  ¶ 38.  And NWBO does not allege that Defendants' algorithms "controlled" client trades, nor does it allege any facts concerning any of Defendants' algorithms.  Thus, "[t]he alternative explanation, that [Defendants] were merely processing private purchase and sale transactions based on instructions provided by their clients, is more compelling than the plaintiffs' assertion that [Defendants] are also liable for the fraud."  *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 495 (S.D.N.Y. 2011).

*Second*, the R&R failed to consider competing inferences with respect to any facet of the trading alleged in the Complaint.  Instead, it examined the alleged trading only through the element of "manipulative acts"—where the R&R did not consider plausible non-fraudulent inferences— then found scienter adequately alleged "[f]or the reasons stated above" in that examination.  R&R at 61.  Combining the two elements in this manner was erroneous because it "does not capture the stricter demand Congress sought to convey in [the PSLRA]."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 314).

The R&R's erroneous treatment of the alleged cancellation of orders, one of the "hallmarks" of both spoofing and routine market activity, *see* R&R at 33, makes this clear. Cancelling orders is ubiquitous in today's securities markets, and the Complaint does not allege facts indicating the alleged cancellations resulted from manipulative intent rather than natural market activity.  Indeed, the R&R properly took judicial notice that *more than 95% of all orders placed on the market are canceled*.  *See* R&R at 41.  Yet the R&R then failed to compare the reasonable inference flowing from this fact—that Defendants' cancellations reflected normal trading activity—against NWBO's implausible inference of manipulative intent.

The same is true with respect to the purported "sell-side imbalances" that the R&R erroneously found established that Defendants "lacked the intent to fill the Baiting Orders."  R&R at 62.  NWBO's "imbalance" allegations are neither particularized nor contextualized and cannot support the required strong inference of scienter.  The Complaint asserts that "[d]uring the Cancellation Period following the Executing Purchases," "Defendants cancelled significantly more sell-side orders than after non-spoofed executed purchases."  ¶ 70.  But there are no allegations regarding cancellations after "non-spoofed executed purchases," regarding typical cancellation rates, or regarding whether there were similar cancellation rates on the buy-side.  In fact, these cancelled orders may have been *placed* "following the Executing Purchases," and thus have nothing to do with NWBO's purported Baiting Orders scheme.  Similarly, NWBO acknowledges that Defendants may have sold NWBO stock during the purported Baiting Periods, and "Defendants thus stood to lose profits."  R&R at 44, n.19.  Applying *Tellabs*' comparative analysis to NWBO's trading allegations, as the R&R was required to do, the compelling inference to be drawn from NWBO's generic and cherry-picked trading allegations regarding imbalances and cancellations is that NWBO merely describes frequent features in the modern securities

markets, rather than a manipulative scheme. *Zech Cap. LLC v. Ernst & Young Hua Ming*, 636 F. App'x. 582, 585 (2d Cir. 2016) (affirming dismissal where "[plaintiff]'s theory of recklessness [wa]s less compelling than the opposing logical inference" of non-fraudulent behavior).

*Finally*, the R&R erred by concluding that "[i]t is not implausible" for seven distinct Defendants to have coincidentally engaged in identical spoofing schemes targeting the same issuer because they traded with algorithms, and spoofing has become "a very real problem" in recent years.[2]  R&R at 63-64.  But "not implausible" is the wrong standard—the inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," and the R&R failed to weigh the likelihood of NWBO's extraordinary coincidence theory against the competing explanation that Defendants' trading was lawful market activity, as it was *required* to do.  *See Tellabs*, 551 U.S. at 323.  Here, lawful trading by seven distinct and highly regulated broker-dealers (and their clients) presents a far stronger explanatory inference than NWBO's theory that each of the seven Defendants (and their clients) independently decided to violate an aggressively-enforced prohibition by spoofing in an identical manner over the exact same five-year period.

### B.     The R&R Erred In Finding That NWBO Sufficiently Alleged A "Strong Inference" Of Motive

The Second Circuit's exacting motive standard requires particularized allegations of "a concrete and personal benefit ... resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Even crediting NWBO's allegations, the total profits from the purported scheme—

---

[2]  In determining that NWBO's extraordinary coincidence theory was "plausible," the R&R erroneously manufactured allegations to reach its plausibility conclusion, including that NWBO stock was a "likely target for spoofing" because it had "higher return volatility," "lower market capitalization," "lower price level," or "lower managerial transparency" as compared to other stocks, R&R at 64, despite the absence of any such allegations in the Complaint.

*across all Defendants combined*—would be under $95,000 over five years.  Such paltry sums cannot logically establish a cogent inference of motive for large, highly-regulated broker-dealers.

### 1. The R&R Erroneously Engaged In Circular Motive And Opportunity Analysis

The R&R found that NWBO adequately pled "motive and opportunity" because it alleged that "Defendants engaged in a form of illegal market manipulation, spoofing, for the specific purpose of generating profits by purchasing NWBO stock at artificially depressed prices and, once the market rebounded, selling it at a higher price."  R&R at 54.  But this analysis just describes *what a spoofing scheme is* without providing any particularized basis for the motive.  If that were sufficient, scienter would be a foregone conclusion whenever spoofing is alleged.  To the contrary, NWBO's "scienter allegations [] fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit."  *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018).  NWBO's allegations that Defendants had a "generalized motive" to engage in spoofing to profit from the artificial prices "could be imputed to any corporation" and "is insufficient to show intent."  *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007).[3]

### 2. Even Granting NWBO Every Inference, The Total Alleged Profit From The Purported Scheme Is De Minimis

NWBO's theory is that Defendants profited from the purported scheme by making "Executing Purchases" at a price lower than the "prevailing best offer," "pocketing the difference."

---

[3] The authority cited in the R&R is distinguishable, as those cases involved other kinds of market manipulation and other strong inferences of scienter, including significant profits absent here.  *See Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, 2019 WL 1368570, at *10 (S.D.N.Y Mar. 26, 2019) (scienter pled where defendants' sales allegedly reduced stock price by half, and defendants purposefully delayed filing Schedule 13Ds to conceal stock purchases); *EMA Fin., LLC v. Vystar Corp.*, 2021 WL 1177801, at *5 (S.D.N.Y. Mar. 29, 2021) (plaintiff alleged contractual benefit to defendants from massive stock price decline from $0.03 to $0.0005); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *32-33 (S.D.N.Y. Mar, 28, 2017) (defendants were only market members, and prices were in "near-perfect to perfect correlation" to maximize profits).

*See, e.g.*, ¶¶ 67, 286.  Comparing the alleged price of the "Executing Purchases" to the "best offer" prices supplied in the Complaint and its Exhibit 1, NWBO's allegations show total profits of $94,485 for all Defendants combined from 2017 to 2022—roughly $3,000 per Defendant per year. *See* ECF 124 ("Reply") at 16.  Such *de minimis* gains do not support a compelling inference of fraudulent intent.  *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *9 & n.22 (S.D.N.Y. Nov. 25, 2003) (where a company had an expected annual outlay of $50 million in capital expenditures and a $79.3 million credit facility, it would be "illogical to commit fraud to save money on acquisitions totaling $4.7 million."), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004).  Although it acknowledged that this "argument is not without force," R&R at 56, the R&R found it unpersuasive "for several reasons."  Each is erroneous.

*First*, the R&R misapprehended how spoofing operates and wrongly disregarded NWBO's own pleading by miscalculating Defendants' alleged "spoofing" profits to include the subsequent sale of shares.  R&R at 56-57.  The Complaint *itself* claims that the correct calculation of profit from the purported spoofing is the difference between the *purchase* price and the best offer.  *E.g.*, ¶ 286; ECF 123 ("Opp'n") at 15.  While the Complaint goes on to allege that Defendants *realized* their alleged profits through subsequent sales, *e.g.*, ¶ 89 (referring to selling shares to convert profits to cash), there is no allegation that the subsequent sale *price* reflects manipulation.  In fact, the R&R acknowledges that the stock was sold "once the market rebounded."  R&R at 54.  Therefore, the only relevant point of comparison is the price of the "Executing Purchase" versus the "best offer."  For instance, if NWBO stock was trading at $1, and a Defendant spoofed the price down to make an Executing Purchase at $0.99, and later sold that stock at a non-manipulated price of $1.05, only the $0.01 discount would be "profit" attributable to the spoofing (*i.e.*, the price increase from $1 to $1.05 would be ordinary appreciation from the available best offer unrelated

9

to any alleged manipulation).[4]  This is why under NWBO's theory, only the discount on the purchase price obtained via purported spoofing represents ill-gotten profits.  *See* ¶ 67.[5]

*Second*, although the spoofing examples alleged in the Complaint and Exhibit 1 involved approximately 7 million shares total, the Complaint also asserts in cursory fashion that 19 million shares were spoofed.  R&R at 57.  In crediting this cursory 19 million figure as demonstrating "potential profitability," the R&R failed to require the particularized allegations controlling precedent demands.[6]  And even using 19 million shares instead of 7 million, the "potential profitability" is still *de minimis*—approximately $8,000 per Defendant per year.

*Finally*, the R&R inappropriately relied on speculative and unpled facts, such as that Defendants were potentially also spoofing "different issuers' securities."  R&R at 56.  In assessing scienter, a court is required to limit its review to the complaint's well-pled factual allegations.  *See Shahzad v. H.J. Meyers & Co.*, 923 F. Supp. 57, 59 (S.D.N.Y. 1996).  NWBO alleged no spoofing activity related to any other securities, and the R&R erred by invoking unpled misconduct.

### 3.    *The R&R Improperly Credits Generic "Fees" Allegations*

The R&R stated in the alternative that it is sufficient to allege that Defendants were purportedly "motivated to obtain commissions and fees" and "gain or retain" clients.  R&R at 54,

---

[4]  This theory of profit calculation also fails because NWBO has not alleged anything linking the Executing Purchases with the "Next Sale," which is just an arbitrarily-selected sale within three days of the "Executing Purchase."  *See* Mot. at 19-20.  Further, a significant number of the Spoofing Episodes in Exhibit 1 are missing a "Next Sale," and because the R&R properly rejected NWBO's short sale allegations, R&R at 11 n.9, the "Prior Sale" is irrelevant.

[5]  Even adopting the R&R's erroneous approach, the comparison of the Executing Purchase price to the sale price results in a combined total profit of approximately $178,000 for all Defendants over five years—a little more than $5,000 per Defendant, per year.  This still defies economic reason; engaging in an illegal fraud for such limited gain is markedly less plausible than lawful trading.  *See Kalnit*, 264 F.3d at 140-41.

[6]  The R&R also erroneously suggested that Defendants erred in using the "Relevant Period" because NWBO alleged that 98% of the purported spoofing episodes occurred between September 2020 and June 2022.  R&R at 57.  Putting aside that NWBO itself defined the nearly five-year "Relevant Period," the allegations *still* show trivial profits of approximately $1,100 monthly, per Defendant.  It remains implausible that Defendants would hatch an extraordinarily risky fraud for such limited gain.  This math affords no particularized basis to infer the concrete benefit needed to plead scienter.  *See Kalnit*, 264 F.3d at 139.

58-59.  This is erroneous for two reasons.  *First*, NWBO fails to explain how spoofing generates greater or additional commissions as compared to lawful trading activity.  At most, NWBO alleges Defendants earned compensation "for acting as a broker for client trades" generally.  ¶ 287.  Such allegations do not impart a cogent inference of manipulative intent.  *See, e.g.*, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154220, at \*3 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' allegation that the [defendants] had a motive to grow profits and generate commissions is also totally insufficient to demonstrate scienter.").

*Second*, NWBO alleges no specifics about fees earned or execution costs saved that courts have required to substantiate commission-based scienter theories.  Mot. at 23-24.  In attempting to alter this well-settled pleading requirement, the R&R relied on a stray reference to *Harrington II*.  R&R at 59.  But *Harrington II* did not find that alleging *only* commissions and fees is sufficient to allege a "plausible economic rationale for alleged misconduct;" it required allegations that were more coherent and comprehensive.  *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 2023 WL 6316252, at \*8 (S.D.N.Y. Sept. 28, 2023) ("Defendants derived economic gain from the spoofing scheme through 'paid transaction fees for completed customer trades,' hundreds of thousands of dollars in saved execution costs for the baiting orders that were cancelled and 'at least millions of dollars in ill-gotten gains.'").

### C.   The R&R Erred In Finding That NWBO Adequately Pled Conscious Misbehavior Or Recklessness

NWBO does not make the showing required to plead scienter based on "deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to [cause] injur[y]."  *New Eng. Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 178 (2d Cir. 2023).  Nor does NWBO allege with particularity that any Defendant engaged in conduct that was an "extreme departure from the standards of ordinary care ... to the extent that

11

the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* This Court should reject the R&R's conclusions, which would substantially weaken the standard for pleading conscious misbehavior or recklessness under the PSLRA.

*First*, the R&R erred in finding that conscious misbehavior or recklessness is appropriately pled merely because Defendants "knew that spoofing was unlawful" and were required by FINRA to have "policies and procedures" to prevent fraudulent trading. R&R at 60-61. Violations of internal policies aimed at preventing illegal trading are insufficient to allege scienter. *See, e.g.*, *Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *11 (S.D.N.Y. Sept. 27, 2021) (allegations that "Defendants had a duty to monitor trade restrictions and compliance risks" were insufficient to allege scienter); *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *12 (S.D.N.Y. Apr. 21, 2016) ("duty to monitor internal controls" insufficient to allege scienter). Indeed, the assertion that Defendants should have detected the purported spoofing using their "policies and procedures," R&R at 60-61, does not come close to satisfying the recklessness standard for pleading scienter, which requires "a state of mind approximating *actual intent*, and not merely a heightened form of negligence." *Saltz v. First Frontier, L.P.*, 485 F. App'x 461, 464 (2d Cir. 2012) (citation omitted). NWBO has not alleged what Defendants' procedures to detect spoofing would have shown, why the procedures would have made it obvious to Defendants that spoofing was occurring, or any other details sufficient to approximate "actual intent." Also absent from the Complaint is any factual allegation drawn from any Defendant's employee, any internal documents, meetings, or emails corroborating knowledge of spoofing, or even allegations of direct contact between the seven Defendants who purportedly engaged in the same scheme—factual allegations that are routinely included in securities fraud pleadings. NWBO instead relies entirely on generic, group-pled allegations regarding the average trading by undifferentiated "Defendants."

*E.g.*, R&R at 62 ("Defendants proceeded to cancel these sell-side orders at a rate of 97.15% on average.").  Adopting the R&R would make conscious misbehavior or recklessness a foregone conclusion for every broker-dealer, or even any company with a code of conduct or some other "policy" or procedure regarding detection of alleged misconduct.

*Second*, the Court should reject the R&R's finding that scienter is adequately pled by NWBO's assertion that Defendants "designed and implemented algorithmic trading programs to execute their spoofing schemes."  ¶ 267.  This cursory assertion, devoid of any factual detail, *could be alleged against every broker-dealer in the United States* given the predominance of algorithms in modern trading, and thus cannot meet the high bar for pleading scienter set by the PSLRA.  *See, e.g.*, *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 432-34 (S.D.N.Y. 2017) (dismissing complaint for failure to plead scienter where details about "E\*TRADE's trading algorithms" were not alleged).  The assertion that the generic "Defendants'" algorithms were "designed" to spoof is unsupported by *any* factual allegations, and is instead premised solely on the allegation that Defendants purportedly engaged in spoofing.  This is wholly circular.

While the R&R suggested that any facts about the algorithms would be solely within Defendants' knowledge, R&R at 63, that does not lessen NWBO's pleading burden.  If NWBO believes Defendants used algorithms to spoof but lacks access to factual details regarding the algorithms, it still must "provide a statement of facts upon which the belief is founded" regarding how and why the algorithms were "designed and implemented" to engage in illegal conduct.  *Woods v. Maytag Co.*, 2010 WL 4314313, at \*9 (E.D.N.Y. Nov. 2, 2010).[7]  By excusing NWBO's

---

[7]  The R&R relied on *Harrington*, which expresses a concern that "it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms."  *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405 (S.D.N.Y. 2022).  But NWBO could have made these allegations based on information and belief—if there are "facts upon which its beliefs are founded."  *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at \*4 (S.D.N.Y. Nov. 10, 1982).

burden and its lack of any allegations regarding such details, the R&R improperly diluted the PSLRA's exacting pleading standards.

*Finally*, the R&R failed to address controlling Second Circuit authority that requires a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (citation omitted); Mot. at 30. NWBO's cursory reference to unnamed "corporate officials" who approved unidentified "activities" falls woefully short. ¶ 268. NWBO does not allege, as it must, what trading practices were approved, when, or by which officials. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient" to plead scienter). Adopting the R&R would thus improperly read this Second Circuit requirement out of existence.

## II.   THE COURT SHOULD REJECT THE R&R'S ERRONEOUS FINDING THAT NWBO PLED MANIPULATIVE ACTS WITH PARTICULARITY

"At the motion to dismiss stage, a plaintiff must plead, with particularity and to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" R&R at 30 (quoting *ATSI*, 493 F.3d at 102). Yet the R&R relied on wholly generalized, conclusory allegations—frequently regarding generic "Defendants" and aggregated orders over two-minute periods—that lack the requisite detail.

### A.   The R&R's Own Citations Demonstrate That NWBO Failed To Plead Manipulative Acts With The Required Particularity

The R&R found that the Complaint "contains particularized factual allegations evincing ... indicia of spoofing," finding that NWBO alleged with particularity that "Defendants submitted large quantities of sell-side Baiting Orders at levels much higher per each Executing

Purchase than for non-spoofed purchases." R&R at 33. The Complaint paragraphs cited by the R&R (¶¶ 62, 69), however, contain no allegations that are specific to *any* Defendant, nor do they contain particularized *facts* to support their conclusory assertions, such as the number of orders allegedly submitted by the Defendant or when they were submitted. *E.g.*, ¶ 69 ("During the Baiting Period for each Spoofing Episode, *Defendants* submitted new sell-side orders for an *average* of 17,170 shares per Executing Purchase" and an "*average* of 1,879 shares per purchase" for "non-spoofed executed purchases" (emphases added)). The R&R relied on allegations in the Complaint that refer to "averages" and "medians"—sometimes for one Defendant but often for undifferentiated "Defendants"—which do not provide any particularized information about the underlying orders for the proposition that Defendants behavior is "inconsistent with *bona fide* market making activity." R&R at 35; *see, e.g.*, ¶¶ 62, 69. These superficial aggregates[8] cannot fulfill the particularity requirement. *See ATSI*, 493 F.3d at 102; *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 639 (S.D.N.Y. 1999) (complaint lacked "requisite particularity" where it "aggregate[d] the[] defendants … without differentiating what conduct is attributable to each").

Relatedly, the R&R's conclusion that the Complaint "is replete with particularized allegations that specific quantities of Baiting Orders were cancelled on specific dates and times," R&R at 35 (citing ¶¶ 88, 102, 116), is erroneous because the Complaint refers only to *aggregated* volumes and prices. Indeed, the Complaint fails to identify *even one specific order that was cancelled*. Contrary to the R&R's statement, paragraphs 88, 102, and 116 of the Complaint contain *no allegations* concerning any "quantities of Baiting Orders," and each provides only a time by which the Defendant had purportedly completed the cancellation of the Baiting Orders. *E.g.*, ¶ 102

---

[8] This is not a technicality. Without particularized factual allegations, the massive trading volume in modern markets would allow any plaintiff to aggregate and cherry-pick data to present numerical allegations of any desired outcome.

("By 09:32:17, [Defendant] had cancelled all of its Baiting Orders"). The R&R's misreading of these allegations, and its acceptance of generic pleading (*e.g.*, the allegation that a total of 5,000 shares of Baiting Orders was placed during a given time period without identifying specific orders or volumes or times), is improper. *See* R&R at 35 (citing ¶ 88). The notion that a plaintiff with access to market data could allege a multi-year spoofing scheme without even identifying with specificity the time and volume of a *single order* that was placed or canceled—not aggregated numbers—cannot be squared with the heightened pleading requirements.[9]

### B. The R&R Erred In Crediting Allegations That, By NWBO's Own Admission, Are Impossible

The Complaint admits that "OTC Link shows only one quote at a time." R&R at 38 (quoting ¶ 8 n.4). This fact alone renders NWBO's "Baiting Orders" theory impossible, and the R&R erred both by misreading the Complaint's allegations and by supplying a wholly different theory of spoofing than is pled.

*First*, the R&R misinterpreted the Complaint's allegations. NWBO alleges Defendants' purported spoofing involved submitting multiple "Baiting Orders" over a two-minute period, which left Defendants with "an imbalanced order book position favoring the sell side." *E.g.*, ¶ 84. Defendants then purportedly "took advantage of this artificial downward pressure and executed Executing Purchases to buy," and then cancelled all of the Baiting Orders. *E.g.*, ¶¶ 87-88. As the R&R itself explained, "the Baiting Orders were cancelled 'immediately after the completion of [Defendants'] Executing Purchases.'" R&R at 34 (quoting ¶ 64). The Complaint alleges that *multiple* Baiting Orders were displayed to the market and *together* they contributed to the sell-side imbalance, and they were cancelled only after the Executing Purchases. *See, e.g.*, ¶ 88. The R&R

---

[9] For the same reason, NWBO's failure to allege the prices of its stock at the beginning of the purported spoofing episodes—information that is publicly-available and known to NWBO—renders its market manipulation claim deficient for failure to plead market effects.

thus committed a significant factual error by finding that "Plaintiff does not contend that Defendants displayed multiple Baiting Orders at the same time." R&R at 38. That is precisely what is alleged. Critically, this type of spoofing scheme—overloading the sell-side with multiple orders at the same time to create an imbalance—is impossible on OTC Link, where only one order can be displayed at a time.

*Second*, the R&R misinterpreted the Complaint as pleading a different type of spoofing scheme in which the Defendants "placed multiple Baiting Orders during the same Spoofing Episode, in rapid succession," and cancelled each order shortly after being placed—a form of spoofing, sometimes called "flashing," that is not alleged here. R&R at 38. Tellingly, the R&R did not cite the Complaint for this misreading, and there is not a single allegation in the Complaint that supports the R&R's erroneous conclusion, which was likely caused by *NWBO's failure to identify a single specific order that was allegedly placed or cancelled*. Rather, the R&R appears to have pulled this concept from an entirely unrelated Seventh Circuit decision. *See* R&R at 4-5. This is a significant misinterpretation of the alleged spoofing that affects all of the R&R's analysis.

*Third*, because OTC Link permits a market participant to display only its single best quote at a time, ¶ 8 n.4, a broker-dealer using OTC Link *must* update its quote if it receives a better-priced client order or if it fills the order. Mot. at 7. NWBO erroneously characterizes these order updates as "cancellations," ¶ 64 n.11, but in reality the broker-dealer is simply fulfilling its obligation to update the order previously displayed on OTC Link with a *better-priced* order. The R&R contended that Defendants' argument "mischaracterizes the [Complaint]" because NWBO alleges that "cancellation" includes "a modification of an order … which results in reduction in the volume of shares displayed in that order," and thus Defendants are merely quibbling with NWBO's definitions. R&R at 35. Not so. Defendants instead explained that NWBO's core

spoofing theory was impossible in light of NWBO's own admissions concerning how OTC Link works.  This is a wholly separate point that was unaddressed by the R&R, and which goes both to whether NWBO has alleged order placement with sufficient particularity (it has not), and whether a fraudulent scheme is a cogent inference to be drawn from the facts alleged (it is not).

### C.    The R&R Erred In Crediting NWBO's Allegations Of "Parking"

The R&R erroneously found that NWBO adequately alleged Defendants "parked" Baiting Orders behind other legitimate orders, *i.e.*, the Baiting Orders were allegedly priced higher than at least one other market participant so that the Baiting Orders were unlikely to be executed (*e.g.*, placing a sell order at $1.05 when there is a sell order in the market at $1.04).  R&R at 34, 42-43.[10] But many of Defendants' "Baiting Orders" were, *by NWBO's own allegations*, at *better* prices than the orders they allegedly were "parked" behind, making them *more likely* to be executed.  Mot. at 15-16; Reply at 5-6.  Contrary to the R&R's suggestion, R&R at 42, the Court need not take judicial notice of data outside the Complaint to reject these parking allegations because they are contradicted by NWBO's own allegations.

And even in the instances where Defendants' orders were not the actual lowest order alleged, they were still priced competitively, as all NWBO alleges is that the orders were not the single best order in the market—an entirely unremarkable and commonplace feature of securities markets.  Reply at 5.  In fact, if NWBO were correct that any order in the market that was not at the best price was "parked," then every single order in the market except the one at the best price would be considered "parked."  The R&R also ignored that NWBO alleges that an order was

---

[10]   The R&R's conclusion that "what it means for an order to be 'parked' … raises a factual dispute," R&R at 42-43, misapprehended Defendants' argument.  The Complaint alleges Defendants' orders were "parked" because another market participant displayed an order at "a better price than some or all of the Baiting Orders placed by the [Defendants]."  *E.g.*, ¶ 86.  Defendants explained that NWBO's allegations do not fit its own definition of "parking," and that NWBO's definition of "parking" simply defines routine market activity.  Neither is a factual dispute, but each demonstrates that NWBO has not sufficiently alleged manipulative intent.

"parked" even if it was placed earlier than the order it was purportedly parked "behind."  These allegations are not coherent, let alone cogent, because a party cannot have the intent to manipulate by hiding behind orders that do not yet exist.  With no factual basis that orders were parked or unlikely to be executed, NWBO's spoofing theory collapses because it fails to "distinguish legitimate trading from improper manipulation."  *ATSI*, 493 F.3d at 102.

III.   **THE COURT SHOULD REJECT THE R&R'S ERRONEOUS FINDING THAT NWBO ADEQUATELY PLED MARKET EFFECTS**

To maintain an action for spoofing, NWBO must "plead, with particularity and to the extent possible"—based on the information available to it—"what effect the scheme had on the market for the securities at issue."  R&R at 30 (citing *ATSI*, 493 F.3d at 102).  The R&R erred in finding that NWBO pled that Defendants' alleged conduct affected NWBO's stock price.  *First*, NWBO omits the pre-spoofing price of its stock—information readily available to it.  Thus, while the R&R speculated that the purported spoofing had an impact on NWBO's stock price, R&R at 46, the Complaint alleges no particularized facts showing an effect on the prevailing market price.  Unlike the case law, R&R at 46-47, NWBO provides no before-and-after-spoofing-pricing, which would show whether the alleged spoofing did in fact depress the price of NWBO shares.  *See Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, No. 1:21-cv-00761-LGS (S.D.N.Y.), ECF 133., *e.g.*, ¶ 78 (alleging pre-spoofing prices).

Without providing the price at the start of the purported spoofing episodes, NWBO cannot allege with particularity that the purported spoofing drove the price down.  The R&R erroneously excused NWBO's failure to allege the pre-spoofing prices, finding that the Complaint alleges that the Defendants "were able to effectuate Executing Purchases at prices lower than the *previously existing* prevailing best offer."  R&R at 52 (emphasis added).  But the Complaint alleges only the prevailing best offer price at the time of, or "immediately prior to," the Executing Purchase, *e.g.*,

¶ 87, ECF 102-1 at 1 n.3, not a "previously existing" best offer *before* the Baiting Orders allegedly influenced the market. The offer price immediately prior to the Executing Purchase is wholly different, and does not plead market effects. It is the before-spoofing price that is required— without alleging the stock price at the start of the spoofing (a price that is known to NWBO), it cannot allege that the price was driven down. Indeed, by citing a "previously existing" best offer, the R&R was acknowledging that a *prior* best offer is *required* to show the price impact. The R&R therefore erroneously relieved NWBO of its pleading burden based on apparent assumptions about spoofing's intrinsic price effects.

*Second*, NWBO's flawed "price decline" formula provides only the illusion of price impact. The formula is jerry-rigged to show a negative number even when a stock price *increases*, because it takes a lower number, divides it by a higher number, then subtracts one. *See* Mot. at 18. The R&R admitted that "[NWBO's] formula may generate a negative value," therefore signaling a price decline, "even where NWBO's stock price throughout the two-minute period after the Executive Purchase was *higher* than any price during the two-minute period preceding the Executing Purchase." R&R at 47-49. But the R&R then credited the formula anyway, improperly concluding that the price would result in a zero if the stock price increased (or remained the same). R&R at 48. This is a faulty conclusion. For example, if the stock price increased over the two minute period preceding the Executing Purchase—that is, when the purported spoofing was occurring—the formula would still show a negative number.[11] Rather than engage with the Complaint's defective metric, the R&R gave NWBO leeway to which it is not entitled—that the

---

[11]  NWBO's formula is "x/y-1, where *x* is the lowest transaction price over the two minutes preceding the Executing Purchase to the two minutes following the Executed Purchase and *y* the highest transaction price over the two minutes preceding the Executing Purchase." ECF 102-1 at 1 n1. The formula would result in a zero *only* if the price stayed the same for the entire two minutes preceding the Executing Purchase and increased only *after* the two minute period, or if the price stayed the same for the entire four-minute period.

"validity of [NWBO's] price decline formula is best left to expert analysis and should not be resolved by the Court at the motion to dismiss stage." *Id*. An inaccurate, self-serving formula and circular definition of the effect on the market are not sufficient to allege price decline with the specificity that is required. *C.F.T.C. v. Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (dismissing market manipulation claim reliant on "circular" theory that prices were illegitimate because defendants intended to affect them).

## IV.   THE COURT SHOULD REJECT THE R&R'S ERRONEOUS FINDING THAT IT COULD NOT CONSIDER PUBLIC TRADING DATA

Defendants provided public "quote and trade data from OTC Markets Group ('OTC Link Data')," R&R at 19-27, which was "integral to the complaint" and a proper subject of judicial notice. Indeed, there is no dispute that NWBO relied on this data for its Complaint. *See* ¶ 61 n.10. While NWBO's claims are insufficient even without considering this data, the R&R erred rejecting it. Adopting the R&R would enable NWBO to "freely utilize [trading data] … while omitting critical facts." *Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 46 (E.D.N.Y. 2020).

*First*, as to both the "integral to the complaint" and judicial notice doctrines, the R&R erroneously concluded that there was a dispute over the data's "accuracy and completeness." R&R at 24. Defendants explained that the OTC Link Data shows, among other things, that the price of NWBO stock rose *from the beginning to the end of the two-minute "spoofing" window* constituting the October 12, 2020 "Example Episode." In response, NWBO argued that during one 13-second period within the two-minute window, the price decreased by one-cent, and the R&R thus declined to consider the data. R&R at 23 (citing Opp'n at 40 n.60). NWBO's assertion does not challenge the "accuracy and completeness" of the OTC Link Data, and disagreement about the data's *import* does not preclude its consideration. *Silverman v. Citibank, N.A.*, 2023 WL 7305243, at *6 (S.D.N.Y. Nov. 6, 2023) (Woods, J.) (noting "the irony of Plaintiff disputing the accuracy,

authenticity, and relevance of documents he heavily relied upon"). Nor does NWBO "assert any *facts* that would call into question the authenticity or accuracy of the [data]." *Id.* (emphasis added).

*Second*, the R&R should have considered the OTC Link Data because it is suitable for judicial notice. In addition to the purported dispute over the interpretation of the data discussed above, the R&R declined to take judicial notice of the OTC Link Data on the basis that it consists of "quote data" rather than "price data." R&R at 26-27. This was error. As an initial matter, the quote data here is functionally equivalent to the pricing data courts routinely consider at the pleading stage. The quotes—bids and offers—show precisely the market price for NWBO's stock over time.[12] Case law draws no distinction between types of trading data. *See, e.g.*, *Acticon AG v. China N.E. Petrol. Holdings Ltd.*, 692 F. 3d 34, 37 & n.1 (2d Cir. 2012) (taking judicial notice of "historical data about stock prices" to determine whether the "stock price rose higher than Acticon's average purchase price on various dates" in the post-class period); *In re IPO Sec. Litig.*, 383 F. Supp. 2d 566, 583-84 (S.D.N.Y. 2005) (taking judicial notice of "charts summarizing pertinent trading data for the five Issuer defendants" to demonstrate that "[t]he market [ ] did not react as Plaintiffs have theorized"); *see also* ECF 133 (collecting cases).

Moreover, contrary to what the R&R suggested, R&R at 18, courts do take judicial notice of the sort of trading records like the OTC Link Data *for the truth of their contents*. *See, e.g.*, *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *11 (S.D.N.Y. Sept. 26, 2006) (taking judicial notice of "Defendants' trading activity" to determine that it "was not at all unusual when compared with their prior activity"); *Set Cap. LLC v. Credit Suisse Grp. AG*, 2019 WL 3940641, at *7 (S.D.N.Y. Aug. 16, 2019) (taking judicial notice of "[p]ublicly available price information" for its

---

[12] While the R&R stated that "[t]he data takes the form of spreadsheets comprising thousands of individual bids and offers arrayed over twenty columns whose meaning is unexplained and unclear (and in some cases incomprehensible) to the Court," Defendants merely included the full array for the sake of completeness and authenticity. Defendants refer only to the price of bids and offers of NWBO stock at set times. *See* Mot. at 36-39 & n.39.

truth).  "Such judicial notice is particularly appropriate where," as here, "the movement of the stock price is integral to the plaintiffs' ... theory."  *Id.* at 583 (cleaned up).

    *Third*, the R&R erred also in failing to consider the OTC Link Data as "integral to the Complaint" on the grounds that the "integral-to-the-complaint" doctrine is limited to only "written instruments."  R&R at 21 (citing *Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020)).  To the contrary, the Second Circuit considers as integral to the complaint documents "apart from written instruments" "that the plaintiffs either possessed or knew about and upon which they relied in bringing suit."  *See Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015); *see also Lynch*, 952 F.3d at 79 (noting "the types of exhibits incorporate[d] within the pleading ... consist[] *largely* of contracts, notes, and other writings..." (emphasis added)).  Indeed, following *Lynch*, the Second Circuit continues to adhere to this practical approach, finding myriad types of exhibits beyond written instruments integral to the complaint,[13] as has this Court.[14]

    *Finally*, the R&R erred in failing to "consider these documents to the extent they inform the competing inference analysis required by [*Tellabs*]," which the Court should do *even if* it finds the documents are not subject to judicial notice or integral to the Complaint.  *See Pa. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 360 (S.D.N.Y. 2012) (citation omitted).

## V.    THE COURT SHOULD REJECT THE R&R'S ERRONEOUS FINDING THAT "LARGELY CONCLUSORY" ALLEGATIONS ARE SUFFICIENT TO PLEAD RELIANCE

    "[W]hether reliance has been pled turns on the sufficiency of the [Complaint's] factual allegations," and courts regularly consider whether the complaint has sufficiently alleged the so-called *Cammer* factors.  R&R at 81-82 (citing *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)).

---

[13] *Leroy v. Delta Air Lines*, 2022 WL 12144507, at *1 & n.2–3 (2d Cir. Oct. 27, 2022); *Norales v. Acevedo*, 2022 WL 17958450, at *1-2 (2d Cir. Dec. 27, 2022); *Ruderman v. Liberty Mut. Grp., Inc.*, 2022 WL 244086, at *1 n.1 (2d Cir. Jan. 27, 2022); *Sutton v. Stony Brook Univ.*, 2022 WL 4479509, at *2–3 & n.2 (2d Cir. Sept. 27, 2022).

[14] *See, e.g.*, *Silverman*, 2023 WL 7305243 at *6 (memos regarding investigation of alleged fraud); *Madhu v. Socure Inc.*, 2023 WL 6214807 at *7 (S.D.N.Y. Sept. 22, 2023) (Woods, J.) (text messages integral to the complaint).

As the R&R noted, NWBO "alleged most but not all of the *Cammer* factors, albeit in largely conclusory fashion."  *Id*.  This is insufficient to state a claim.  In evaluating whether the *Cammer* factors were sufficiently alleged, courts "[s]olely examin[e] well-pleaded, non-conclusory factual allegations."  *In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *5 (S.D.N.Y. Mar. 31, 2022); *accord Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012) ("conclusory allegations … do not suffice to plead an 'efficient market'").  The R&R nonetheless found NWBO's conclusory allegations sufficient because, it contended, the reliance element was not properly decided on a motion to dismiss.  R&R at 84.  This was error.

As an initial matter, the argument advanced by the R&R was considered and rejected in *Shanda*, which explained that while courts need not rigidly apply the *Cammer* factors, more than conclusory assertions are required.  2022 WL 992794, at *5.  Indeed, courts frequently dismiss claims of market manipulation for failure to allege reliance, particularly in OTC Markets, where reliance is not presumed.  *See* Mot. at 35.  Moreover, the case law cited by the R&R for the proposition that NWBO "has pled enough," R&R at 83-84, featured far more robust showings that bolstered the plaintiff's overall efficiency allegations.  *See, e.g.*, *Hull v. Glob. Digit. Sols., Inc.*, 2018 WL 4380999, at *9 (D.N.J. Sept. 14, 2018) (plaintiff demonstrated a causal relationship between unexpected corporate events and stock price through "specific instances of price impact that cannot be easily explained away"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 304 (S.D.N.Y. June 28, 2005) (plaintiff alleged "an efficient worldwide market" where it alleged that the security was traded on several international exchanges, had an active American Depositary Receipt market, and specifically noted instances where "information about the company was available widely"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. Aug, 15, 2014) (similar).

**VI.**   **THE COURT SHOULD REJECT THE R&R'S ERRONEOUS FINDING THAT LOSS CAUSATION CAN BE DIVORCED FROM THE ALLEGEDLY MANIPULATIVE ACTIVITY**

To plead loss causation, the purported spoofing must have taken place "close in time" to the alleged stock sale.   R&R at 67-68 (citing *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F. 4th 71 (2d Cir. 2022)).   The R&R concluded "[v]iewed in the light most favorable to [NWBO]—and assuming [NWBO could amend its complaint to allege] a properly pled 'formulaic' connection between the referenced Pricing Dates and the sales price—[NWBO's] allegations regarding the 30 instances in its chart in which Spoofing Episodes occurred within an hour of the market's close [would be] sufficient."   R&R at 70.   *None of these "30 instances in [NWBO's chart]" are connected to the 16 "Example Episodes" in the Complaint*.   Instead, the purported "spoofing episode(s)" occurring within one hour of the close on these days can only be found within NWBO's Exhibit 1.[15]   But the "allegations" in Exhibit 1 are conclusory and do not meet the standard for pleading market manipulation.   Mot. at 19-20.   Thus, even if NWBO *could* properly supplement its loss causation pleading with respect to these 30 instances, it will have succeeded only in linking its stock sales to woefully deficient allegations regarding all of the other elements of a Section 10(b) claim.   The R&R's conclusion that a plaintiff may rely on one set of trades to establish manipulative activity, and then cite a wholly different set of trades for purposes of loss causation, would dramatically weaken the pleading standards and should be rejected.

## **CONCLUSION**

The Court should modify the R&R to find that NWBO failed to sufficiently allege scienter, manipulative acts, market effect, and reliance, reject the R&R's recommendation that NWBO be permitted leave to amend to replead loss causation, and dismiss the Complaint with prejudice.

---

[15]   Only one of the days implicated by the 30 examples—October 27, 2020—is a day on which an "Example Episode" occurs.   That example, however, occurs before noon, not within the last hour of the trading day.   ¶¶ 125-131.

Dated: January 12, 2024
    New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

 /s/ William A. Burck
William A. Burck
Christopher G. Michel (admitted *pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Peter H. Fountain
Leigha Empson
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for Defendant Citadel Securities LLC*

**MORRISON & FOERSTER LLP**

 /s/ *Anthony S. Fiotto* (with permission)
Anthony S. Fiotto
Julia C. Koch
200 Clarendon Street
Boston, MA 02116
Telephone: 617-648-4700
Facsimile: 617-830-0142
Email: AFiotto@mofo.com
Email: JKoch@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: 212-336-4067
Facsimile: 212-468-7900
Email: ELawson@mofo.com

*Attorneys for Defendant Canaccord Genuity LLC*

**GREENBERG TRAURIG, LLP**

 /s/ *Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Nicholas T. Barnes
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
barnesn@gtlaw.com

*Attorneys for Defendant Instinet, LLC*

**KATTEN MUCHIN ROSENMAN LLP**

 /s/ *Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac vice*)
Leigh Brissenden (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
leigh.brissenden@katten.com

*Attorneys for Defendant GTS Securities LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation

 /s/ *Stephen Young* (with permission)
Jon W. Zinke
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California 90802
Telephone: (562) 436-2000
jon.zinke@kyl.com
steve.young@kyl.com;
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading Corp.*

**BALLARD SPAHR LLP**

 /s/ *Marjorie J. Peerce* (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 223-0200
Fax: (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (admitted *pro hac vice*)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendant*
*G1 Execution Services LLC*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 /s/ *Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas*
*LLC*