**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NORTHWEST BIOTHERAPEUTICS, INC.,

        Plaintiff,

   v.

CANACCORD GENUITY LLC, CITADEL
SECURITIES LLC, G1 EXECUTION
SERVICES LLC, GTS SECURITIES LLC,
INSTINET LLC, LIME TRADING CORP.,
AND VIRTU AMERICAS LLC,

        Defendants.

Case No. 1:22-cv-10185 (GHW) (GS)

**ORAL ARGUMENT REQUESTED**

 

**DEFENDANTS' RESPONSE TO**
**<u>PLAINTIFF'S OBJECTION TO REPORT & RECOMMENDATION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ......................................................................................................................3

    A.    NWBO's Allegations .......................................................................................3

    B.    The R&R's Finding That NWBO Failed To Plead Loss Causation ........................5

STANDARD OF REVIEW ..........................................................................................................6

ARGUMENT ...........................................................................................................................6

I.    The R&R Correctly Found That NWBO Failed To Plead Loss Causation On A Long-Term Price Impact Theory ........................................................................................7

    A.    NWBO's Conclusory Allegations Of Long-Term Price Impact Are Just Like Those Rejected In *Gamma Traders* ........................................................7

    B.    NWBO's Allegations That Defendants Sold NWBO Stock After The Price Rebounded (Often Minutes After The Spoofing) Forecloses NWBO's Long-Term Pricing Argument ..............................................................11

    C.    The Milgrom Report Cannot Remedy NWBO's Deficient Allegations ...............13

II.    The R&R Correctly Found That NWBO Failed To Plead Loss Causation On A Temporal Proximity Theory ...........................................................................................15

    A.    NWBO Did Not Allege A Relationship Between The Purported Spoofing And NWBO's Sale Price ..............................................................................16

    B.    NWBO's Allegations Of Same-Day, Post-Spoof Sales Are Insufficient .............20

CONCLUSION .......................................................................................................................21

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Abu-Nassar v. Elders Futures, Inc.*,
  1994 WL 445638 (S.D.N.Y. Aug. 17, 1994) .......................................................................15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................................21

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
  390 F. Supp. 3d 432 (S.D.N.Y. 2019)...............................................................................11

*Clanton v. UMG Recordings, Inc.*,
  556 F. Supp. 3d 322 (S.D.N.Y. 2021)...............................................................................17

*CP Stone Fort Holdings, LLC v. Doe(s)*,
  No. 1:16-cv-04991 (N.D. Ill. Oct. 3, 2017), ECF 67 .........................................................11

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................................................10

*Gamma Traders – I LLC v. Merrill Lynch Comms., Inc.*,
  41 F.4th 71 (2d Cir. 2022) ...................................................................................... *passim*

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
  2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023)...............................................................10, 11

*In LJM Partners, Ltd. v. Barclays Capital Inc.*,
  2023 WL 6311471 (N.D. Ill. Sept. 28, 2023) ....................................................................20

*Jakobovits v. PHL Variable Ins. Co.*,
  2023 WL 3741993 (E.D.N.Y. May 31, 2023) ....................................................................15

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)..............................................................................................17

*In re London Silver Fixing Ltd. Antitrust Litig.*,
  2023 WL 3582198 (S.D.N.Y. May 22, 2023) ...........................................................8, 13, 14

*In re London Silver Fixing Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018)...........................................................................11, 12

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*,
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ........................................................ 1, 5, 10-11

*Tarafa v. Artus*,
  2013 WL 3789089 (S.D.N.Y. July 18, 2013) ..................................................................15, 17

## **Rules**

Fed. R. Civ. P. 72(b) ...........................................................................................................6

Defendants respectfully submit this response to Plaintiff Northwest Biotherapeutics, Inc.'s ("NWBO") Objection (ECF 142, "NWBO Obj.") to the December 29, 2023 Report and Recommendation regarding Defendants' Motion to Dismiss issued by Magistrate Judge Gary Stein (ECF 137, the "R&R").

## PRELIMINARY STATEMENT

NWBO alleges that each of the seven broker-dealer Defendants purportedly engaged in separate but identical "spoofing" schemes—allegedly displaying orders to sell NWBO stock without any intention of executing them, in order to drive down NWBO's stock price and enable the Defendant to purchase shares at lower prices and "pocket[] the difference."  According to NWBO's allegations, each Defendant then cancelled its "fictitious" orders and, often minutes later, monetized the spoofing by selling the shares *after NWBO's stock price reverted*, allowing the Defendant "to convert profits from its spoofing activity to cash."  NWBO alleges that this purported spoofing caused it to suffer losses when it sold its stock because: (i) the spoofing had a "long-term adverse effect on the market price of NWBO's securities" and (ii) NWBO sold at prices that were "formulaically derived from the closing price on dates where Spoofing Episodes occurred."

Defendants moved to dismiss for failure to plead each of the elements of a market manipulation claim.  *See* ECF 115.  The R&R recommended dismissal, finding NWBO's allegations insufficient to plead loss causation under controlling Second Circuit precedent.  *See Gamma Traders – I LLC v. Merrill Lynch Comms., Inc.*, 41 F.4th 71 (2d Cir. 2022).  As the District Court in *Gamma Traders* recognized, spoofing is a form of short-term market manipulation that "depend[s] for [its] profitability on a reversion of prices to the market level."  *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021) (citation omitted), *aff'd sub nom.*, *Gamma Traders*, 41 F.4th 71.  Accordingly, the Second Circuit held that

to plead loss causation in spoofing cases, a plaintiff must either (i) allege facts showing how long the effects of the alleged spoofing lasted and that the plaintiff traded during that affected period (which the R&R refers to as the "long-term effects" theory), or (ii) allege that it traded "so close in time" to the alleged spoofing that the Court can reasonably infer the sale price was still impacted (what the R&R calls the "temporal proximity" theory). *See Gamma Traders*, 41 F.4th at 80-82.

In evaluating the "long-term effects" theory, the R&R correctly found that NWBO failed to plead facts showing a persistent price impact from the purported spoofing. NWBO objects, pointing to a 2018 expert report filed in an unrelated antitrust price-fixing case that it quoted in its Complaint. Even if the Court could consider this expert report, the report provides no facts—or analysis of NWBO's allegations—that would permit NWBO to plead long-term price effects from the purported spoofing. Nor does the Complaint plead any such facts. To the contrary, by NWBO's own allegations, the price of its stock quickly reverted after each alleged spoofing episode, and, as the R&R observed, NWBO's stock price "more than doubled over the Relevant Period," undercutting any claim of a persistent price impact.

The R&R also correctly found that NWBO did not adequately plead loss causation under a temporal proximity theory because NWBO did not allege how its sale price was "formulaically derived" from the closing price on any given date. In its Objection, NWBO contends for the first time that its unspecified formula was "monotonic" and varied across sales—allegations that are wholly absent in the Complaint. Even if the Court could properly consider NWBO's belated attempt to augment its Complaint, NWBO's new explanation does nothing to supply the required close temporal proximity for its trades. As the R&R recognized, "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury." *Gamma Traders*, 41 F.4th at 80. NWBO must plead that it traded sufficiently close in time to the purported spoofing to allow the Court to

reasonably infer that the purported manipulation impacted the sale price.  The R&R thus correctly recommended dismissal.

## **BACKGROUND**

### A.    **NWBO's Allegations**

The Complaint alleges that Defendants purportedly "spoofed" NWBO stock on thousands of occasions from December 5, 2017 to August 1, 2022 (which it calls the "Relevant Period").  *See generally* ECF 95 ("Compl.").   The Complaint contains sixteen "Example Episodes" of this purported spoofing, in which NWBO alleges that, during a two-minute period, each Defendant placed "Baiting Orders"—offers to sell that allegedly were "never intended" to be executed, but instead were purportedly placed to create "an appearance of a downward trending market."  *E.g.*, ¶¶ 8, 76, 86, 237, 262-63.[1]  NWBO alleges these "Baiting Orders" purportedly drove down the price of NWBO shares, allowing the Defendant to make "Executing Purchases" of NWBO shares at artificially depressed prices, and then cancel the "Baiting Orders."  *E.g.*, ¶¶ 74, 84-85, 88. NWBO further alleges that, often minutes after the spoofing—when the stock price had reverted— the Defendant sold shares of NWBO, allowing it to "convert profits from spoofing into cash."  *E.g.*, ¶ 89.

NWBO attempts to allege loss causation under two theories that the R&R characterized as "long-term effects" and "temporal proximity."

As to long-term effects, NWBO alleges that because "the market neither immediately nor fully rebounded from the manipulated prices once each of the Spoofing Episodes was completed … a large fraction of trading in NWBO stock … took place at manipulated prices." ¶ 293.  NWBO alleges no facts in support of that claim.  The Complaint also quotes from an expert

---

[1]  Citations to the Complaint are made by reference to the relevant paragraph number therein.

report, filed in 2018 in an unrelated antitrust price-fixing case, in support of NWBO's theory that "manipulative trades can lead to permanent price impact." ¶ 60.

As to temporal proximity, NWBO alleges that "of [NWBO's] 283 million shares of stock sold during the Relevant Period, more than 49 million shares were sold by [NWBO] where the sale price was formulaically derived from the closing price on dates where Spoofing Episodes occurred, such that a decline in the price on that day caused a decline in the price at which [NWBO] sold shares of NWBO stock."[2] ¶ 289.  However, the Complaint does not describe or otherwise discuss the formula used to "derive[]" the sale prices.  Instead, it includes a purported loss causation chart listing the "Transaction Date," volume, and price at which NWBO sold shares.  *Id*.  The chart also lists an unexplained "Pricing Date," apparently reflecting which day's closing price was used to formulaically derive the sale price, along with the purported number of spoofing episodes, the average return to each episode, and the Defendant(s) allegedly involved.  *Id*.  Many of the Pricing Dates and Transaction Dates were weeks or days apart, including several instances where the Transaction Date was *before* the Pricing Date.  *See, e.g.*, *id.* at 91 (loss causation chart alleges the prices of NWBO's stock sales on February 8, 2018 were "formulaically derived" from allegedly artificial closing prices on February 25, 27, and 28, 2018).  NWBO marks 30 of the 97 sales in the chart with an asterisk to "denote[] a day where there were Spoofing Episodes in the final hour of trading." ¶ 289.

---

[2]  For the remaining 234 million shares, NWBO makes no attempt to plead temporal proximity.  *See generally* Compl.; *see also* ECF 95-2.

### B.      The R&R's Finding That NWBO Failed To Plead Loss Causation

Evaluating these allegations, the R&R found that NWBO "fail[ed] to adequately plead loss causation" through either a long-term price impact or temporal proximity theory.  R&R at 1, 65-79.

Analyzing NWBO's long-term price impact theory, the R&R declined to infer that every single one of NWBO's sales over a five-year period was at a price affected by Defendants' purported spoofing episodes.  R&R at 72-79.  *First*, the R&R found NWBO's allegation that its stock price never "fully rebounded" from the purported spoofing implausible because NWBO's stock price more than doubled during the Relevant Period.  *Id.* at 72-73, 77.  *Second*, it found that NWBO's own allegations undermine any long-term price impact theory because the Complaint alleges "the same 'reversion of prices to the market-level,' that typifies spoofing schemes."  *Id.* at 74-76 (citing *Merrill*, 2021 WL 827190, at *13).  *Finally*, the R&R found that the Complaint lacks any factual allegations demonstrating that the purported spoofing itself somehow had enduring impacts, and that NWBO's conclusory assertions that the price of its stock would have been higher "but for" the purported spoofing could not substitute for facts.  R&R at 72-73, 78-79.

With respect to temporal proximity, the R&R held that NWBO could not plead loss causation because it failed to "complete the circle of causation" by alleging "*how* the various stock sale prices" related to "the closing prices on the days when Spoofing Episodes took place."  *Id.* at 70-71 (emphasis in original).  As a threshold matter, the R&R found that NWBO failed to allege temporal proximity because it did not "explain what it means when it says that the 'sale price was formulaically derived from the closing price.'"  R&R at 67.  The R&R also found that even if NWBO explained the "formulaic" link between the closing price and NWBO's sale price, only those spoofing trades that allegedly occurred within an hour of the market close were sufficiently proximate to when the closing price was determined to potentially allege loss causation.  *Id.* at 67-

72. Citing *Gamma Traders*, which held that courts "cannot reasonably infer that spoofing's effects last throughout the day," 41 F.4th at 80, the R&R found that "the other NWBO sales are too remote in time from alleged Spoofing Episodes," R&R at 71. The R&R concluded that NWBO could potentially allege loss causation only with respect to the 30 instances where Defendants allegedly spoofed in the final hour of the trading day, and then only if NWBO amended the Complaint to adequately explain how its sale prices were formulaically derived from the closing prices on those days. R&R at 71-72.

NWBO now objects to the R&R's findings. Regarding long-term price impact, NWBO asserts that it alleged sufficient facts such that it is entitled to the inference that every single sale it made over a five-year period was affected by Defendants' purported spoofing, even if the alleged spoofing occurred days, weeks, or months earlier. *See generally* NWBO Obj. With respect to temporal proximity, NWBO argues that (i) it adequately explained the purported formulaic connection between NWBO's closing price on certain dates and its sale price and (ii) loss causation should be presumed on any day that Defendants purportedly spoofed and NWBO sold stock. *Id.*

## STANDARD OF REVIEW

The Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to," and "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3).

## ARGUMENT

In *Gamma Traders*, the Second Circuit held that a plaintiff can plead loss causation in a spoofing case in two ways: (i) by alleging facts indicating that the effects of the spoof lasted for a protracted period so as to "justify an inference that the market price was still artificial" when plaintiff traded, or (ii) by alleging that it traded "so close in time to Defendants' spoofing" to permit the court to "infer as a matter of common sense that the market prices were artificial" when plaintiff

traded.  41 F.4th at 80-81.  The R&R correctly found that NWBO failed to sufficiently plead loss causation under either standard.

## I.   THE R&R CORRECTLY FOUND THAT NWBO FAILED TO PLEAD LOSS CAUSATION ON A LONG-TERM PRICE IMPACT THEORY

The Complaint attempted to plead long-term price effects by alleging that Defendants' purported spoofing created a "persistent and long-lasting" price impact on NWBO's stock, and therefore the "price impact of Defendants' spoofing activity was not limited to the time period immediately following each individual Spoofing Episode."  ¶¶ 292, 294.  The R&R correctly found that NWBO's conclusory allegations of long-term price impact "do not plead 'facts' sufficient to justify an inference that the impact of Defendants' spoofing extended to sales by NWBO not close in proximity to the spoofing."  R&R at 72 (citing *Gamma Traders*, 41 F.4th at 80).  NWBO's Objection to this finding, and its assertion that the R&R's determination "was based on the Court's inability to locate an expert report," NWBO Obj. at 2, are meritless.

### A.   NWBO's Conclusory Allegations Of Long-Term Price Impact Are Just Like Those Rejected In *Gamma Traders*

NWBO's core allegation that Defendants' purported spoofing had a "persistent and long-lasting" price impact and that the market never "fully rebounded," ¶¶ 292-93, is far too conclusory to plead loss causation.  In *Gamma Traders*, the Second Circuit held that "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury *without any factual allegations* to support the inference that the effects of the spoof linger for the remainder of the trading day."  41 F.4th at 80 (emphasis added).  Absent those allegations, there is "no factual basis that would justify an inference that the market price was still artificial by the time [plaintiff] traded."  *Id.*  Here, NWBO asks the Court to infer that Defendants' purported spoofing affected its stock price for weeks, months, and years after the alleged spoofing, arguing that every single sale it made during the five-year Relevant Period must have been affected.  NWBO's conclusory allegations do not

come close to supporting its requested inference, and each of the arguments in NWBO's Objection fails.

*First*, NWBO argues that it pled "significantly more" than the plaintiff in *Gamma Traders*. NWBO Obj. at 18.  As the R&R explained, however, NWBO's allegations, "while more expansive rhetorically, are no less conclusory in substance" than those in *Gamma Traders*.  R&R at 72-73. The plaintiff in *Gamma Traders* alleged that "Defendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period."  41 F.4th at 80.  NWBO similarly alleges "the market neither immediately nor fully rebounded from the manipulated prices once each of the Spoofing Episodes was completed," ¶ 293, and it "sold over 283 million shares of stock in hundreds of distinct transactions at share prices artificially depressed by Defendants' manipulative spoofing over the Relevant Period," ¶ 288.  These conclusory allegations are indistinguishable from those rejected in *Gamma* Traders.  41 F.4th at 80; *see also, e.g.*, *In re London Silver Fixing Ltd. Antitrust Litig.*, 2023 WL 3582198, at *10-11 (S.D.N.Y. May 22, 2023) (allegation "that prices never fully recovered" was insufficient because complaint lacked facts that would permit the court to infer "the endurance of artificial prices caused by manipulation" as required by *Gamma Traders* (cleaned up)).

*Second*, NWBO argues that the R&R should have inferred a long-term price impact because the alleged sell-side pressure of Defendants' purported spoofing exceeded the upward pressure on NWBO's price once the spoofing stopped.  NWBO Obj. at 13-15.  Specifically, NWBO argues that Defendants placed a significant number of Baiting Orders and, because Defendants did not then execute an equal number of Executing Purchases, the negative effect of the so-called Baiting Orders "outweighed" market forces after the spoofing stopped, and thus the price *never* returned to equilibrium.  *Id.*  This argument is directly contradicted by NWBO's own

allegations of price reversion within minutes; the fact that NWBO's stock price doubled during the Relevant Period; and well-established case law describing the purpose, effects, and mechanisms of spoofing, which fundamentally depends on temporary imbalances and rapid reversion. *See infra* §§ I(B), II(B). In fact, the plaintiff in *Gamma Traders* alleged similar asymmetrical market pressures,[3] and those allegations were likewise rejected—by both the District Court and Second Circuit—as insufficient to support a reasonable inference of long-term price impact. 41 F.4th at 80. The Complaint—which alleges the volume of purported spoofing orders without any context regarding the other activity in the market, such as the total buy interest— pleads little, if anything, about overall price impact or the market's depth and natural stabilizing capacity. Without addressing the broader balance of economic pressures at play, NWBO's selective volume focus does not plausibly imply sustained impact once the purported spoofing ended. And critically, NWBO elsewhere pleads its stock trades in an efficient market, in which a stock price swiftly reverts absent continued spoofing. ¶¶ 297-98. Therefore, NWBO's own Complaint assumes the market would revert and not remain artificially depressed.

*Third*, NWBO's argument that its allegations are distinguishable from *Gamma Traders* because NWBO alleged spoofing on "nearly 400 days" during the Relevant Period, NWBO Obj. at 18, similarly fails. Raw frequency allegations are insufficient absent specific facts indicating *how* the frequency caused a persistent effect on the stock price. *See Gamma Traders*, 41 F.4th at 80. In *Gamma Traders* itself, plaintiff alleged defendants spoofed "thousands of times" throughout the relevant class period, and even those allegations fell short without more facts connecting the purported spoofing and plaintiff's transactions. *See id.* at 79.

---

[3]  *See In re Merrill*, No. 19-CV-6002 (LJL) (S.D.N.Y. Mar. 9, 2020), ECF 51 ¶¶ 48, 56 (alleging small executing purchases compared to much larger allegedly spoofed orders to sell).

*Fourth*, NWBO's requested inference of a long-term price impact is even more of a stretch than previously rejected loss-causation arguments because "the longer the time between" the wrongful act and the sale, "the more likely that other factors caused the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Even if NWBO was "regularly in the market and transacting throughout the [Relevant Period], while Defendants were also placing spoof orders, it does not follow that any particular trade of the Plaintiff[]—or necessarily any of the trades made by Plaintiff[]—would have been affected by Defendants' alleged manipulative conduct." *In re Merrill*, 2021 WL 827190, at *13. "To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*." *Id.*

*Finally*, NWBO tries to fall back on *Harrington*, in which the Court found loss causation adequately alleged. NWBO Obj. at 17-19 (citing *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 2023 WL 6316252, at *8 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*")). In *Harrington II*, the court found that alleging that the spoofing and sales occurred on the same day was sufficient to plead loss causation, 2023 WL 6316252, at *8—an approach the Second Circuit has expressly rejected, *see Gamma Traders*, 41 F.4th at 80-81. This was because, as the R&R correctly observed, "the *Harrington* court did not analyze loss causation under the *Gamma Traders* framework, as *Gamma Traders* had not been decided at the time of *Harrington I* and was not cited in the parties' briefs in *Harrington II* on the loss causation issue." R&R at 78. Critically, *Harrington II* also took particular note of the fact that the alleged spoofing "caused the collapse of Concordia's share price from $28.02 to $3.13," 2023 WL 6316252, at *8—the opposite of the facts here, where NWBO's share price more than doubled during the Relevant Period, *see* R&R at 78.

In fact, NWBO does not cite a single case that applies the controlling *Gamma Traders* framework. NWBO relies on *Sharette v. Credit Suisse Int'l*, for example—which was not a

spoofing case—but there the plaintiffs "*pleaded facts* giving rise to a plausible inference that the [manipulation] caused a depression in the price of ECD stock from which ECD never recovered," leading to ECD declaring bankruptcy, 127 F. Supp. 3d 60, 103 (S.D.N.Y. 2015) (emphasis added). NWBO, by contrast, has not alleged any *facts* that could lead to an inference of persistent price effect, and its stock price more than doubled during the Relevant Period.  The other cases cited by NWBO are likewise inapposite.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (S.D.N.Y. 2019) (applying a "zone of foreseeable risk" loss causation analysis that is no longer good law after *Gamma Traders*); Order, *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 1:16-cv-04991 (N.D. Ill. Oct. 3, 2017), ECF 67 (three-page out-of-Circuit order pre-dating *Gamma Traders* found loss causation adequately alleged for manipulation of U.S. Treasury markets without any discussion of temporal proximity or long-term price impact).

### B.     NWBO's Allegations That Defendants Sold NWBO Stock After The Price Rebounded (Often Minutes After The Spoofing) Forecloses NWBO's Long-Term Pricing Argument

The Complaint's own allegations contradict any argument that NWBO pled a long-term price effect.   NWBO alleges that after Defendants completed a Spoofing Episode, they "dramatically revers[ed]" their position and sold shares minutes later, after NWBO's stock price increased.  *E.g.*, ¶¶ 87-89 (Defendant allegedly spoofed to make purchase at artificially depressed price at 14:20:25, then allegedly sold shares at higher price at 14:32:35).  This is an essential allegation, as "[m]anipulative trading strategies like 'spoofing' ... depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief."  *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018); *see also In re Merrill.*, 2021 WL 827190, at *13 (similar).  The R&R correctly found that this "reversion of the stock price in a brief period of time, as alleged in the [Complaint], undermines Plaintiff's speculative hypothesis that the spoofing had a long-term or persistent price impact."  R&R at 76;

*see also London Silver*, 332 F. Supp. 3d at 899 (rejecting allegations that prices never fully recovered because allegation of manipulative trading tactics "dependent on a reversion in prices" post-manipulation is "inconsistent with a conspiracy to persistently depress [] prices").

NWBO now attempts to defend the inconsistency between its assertion of price reversion and its theory of long-term negative price impact, arguing that the price reversion was only "partial." NWBO Obj. at 15-17. That allegation does not appear in the Complaint and is in fact contradicted by NWBO's own allegations, which "allege[] that the vast majority of these sales were at prices at or, more frequently, *above* the previously existing best offer," R&R at 76 (emphasis in original); *see generally* ECF 102-1. As just one example, on October 15, 2020 at 11:45 a.m., NWBO alleges that a Defendant completed an "Executing Purchase" of NWBO shares at an artificially low price of $1.46 (compared to a best offer of $1.47) and realized those profits through a sale two minutes later at 11:47 a.m. at a price of $1.53. ECF 102-1 at 2. Thus, according to NWBO's own allegations, NWBO's stock price had rebounded and increased seven cents in only two minutes. NWBO has alleged no facts to justify an inference that the sale price at 11:47 a.m. was still artificial and should have been higher, or that the reversion was "partial."

NWBO identifies a single example in its Objection that it argues supports its partial reversion theory. NWBO Obj. at 16-17. In that example, NWBO asserts that the Complaint alleges the price of NWBO stock decreased from $1.59 to $1.56 due to a Defendant's alleged spoofing, at which point an Executing Purchase was completed, and then the Defendant sold NWBO stock an hour and a half later at $1.57 per share. *Id.* (citing ¶¶ 179-85). NWBO's example fails.

As an initial matter, NWBO does not allege the pre-spoofing price of NWBO stock anywhere in the Complaint and therefore cannot allege price impact.[4]  The $1.59 price used by NWBO is *not* the price before Defendants' spoofing—as NWBO falsely states—but rather the offer price *after* the spoofing.  *Compare* NWBO Obj. at 16 *with* ¶¶ 179-83 (spoofing allegedly began at 9:28:51, stock price was $1.59 two minutes later, at 9:30:51).  Moreover, a sale of stock an hour and a half after the spoofing—at 11:04:58—provides no inference as to the stock's price immediately after the spoofing, and NWBO makes no allegation that the price did not revert *prior to* the sale at $1.57.  ¶ 185.  Although NWBO now argues that the stock price never exceeded $1.57 after the purported spoofing that day, NWBO Obj. at 16-17, that is not alleged in the Complaint.[5]  In any event, this single example does not control for other factors that may have affected NWBO's stock price following the alleged spoofing episode.  *See In re London Silver*, 2023 WL 3582198, at *6 (rejecting statistical analysis purporting to show long-term price impact where analysis did not control for exogenous factors).  NWBO's cited example thus adds no factual allegations sufficient to allege a long-term price impact.

### C.   The Milgrom Report Cannot Remedy NWBO's Deficient Allegations

NWBO argues that its Complaint adequately pled loss causation because it cites to an expert report (ECF 142-1, the "Milgrom Report") submitted in an antitrust price-fixing case, involving a different type of alleged manipulation, in a different type of market, in a different time period.  NWBO Obj. at 12-15.  NWBO asserts that the Court should have reviewed and relied on

---

[4]  ECF 115 at 17-18, 31; ECF 124 at 6-7, 20-21; ECF 141 ("Defs.' Objs.") at 19-20.

[5]  Oddly, NWBO references Exhibit 6 to Defendants' Motion to Dismiss, NWBO Obj. at 16, n.11, of which the R&R took judicial notice.  However, that stock price data only reflects NWBO's stock price at the beginning and end of the Relevant Period; it does not support NWBO's proposition.  *See* ECF 116-6.

the Milgrom Report's purported finding that "potentially informed trades can result in permanent price impact," rather than analyzing NWBO's factual allegations.  *Id.*  This argument fails.

*First*, the Milgrom Report does not add any *factual allegations* concerning Defendants' purported spoofing, as is required to plead long-term price impact under controlling authority.  *See Gamma Traders*, 41 F.4th at 80 ("In the absence of such *factual allegations*, we cannot reasonably infer that spoofing's effects last throughout the day." (emphasis added)); *see also, e.g.*, *In re London Silver*, 2023 WL 3582198, at *6 ("The persistence of anticompetitive effects must be established *in the pleadings* to the extent that Plaintiffs rely on the argument that they were injured by the persistent effects of the defendants' anticompetitive conduct in an otherwise efficient market." (emphasis added)).

*Second*, contrary to NWBO's objection, the R&R *did* consider the Milgrom Report.  *See* R&R at 73-74.  It correctly found the Report unpersuasive due to the significant differences between the antitrust price-fixing context analyzed in the Report and the spoofing claims here.  *Id.* The Report is not about (and does not even mention) spoofing, which is a specific type of market manipulation that involves rapid price reversion.  R&R at 74 (discussing scheme analyzed by Milgrom Report and noting that "[s]poofing is a different form of market manipulation"); *see also supra* § I(A).  Instead, the Report opines that there may be "permanent" impacts from a different form of manipulation—price fixing—arising from the actions of "a trader who other market participants believe may potentially be privately informed."  ECF 142-1 ¶ 12.  *Gamma Traders* expressly rejected a similar attempt to apply antitrust price-fixing theory to spoofing claims.  41 F.4th at 79 ("Gamma's reliance on antitrust cases is also misplaced, since price-fixing behavior—unlike spoofing—results in harms to all market participants, without the possibility of some market participants inadvertently benefitting from the illegal conduct").  In any event, NWBO also makes

no allegation that any trader believed Defendants may "potentially be privately informed," and NWBO alleges that Defendants *both bought and sold stock*, and thus, if viewed as "potentially informed" under the Milgrom Report's framework, Defendants would have driven NWBO's stock price both down *and up*. *Id.*

  *Finally*, the Milgrom Report is a piece of advocacy prepared as a response to opposing expert analyses. *See* ECF 142-1. If NWBO's approach were adopted—where a plaintiff can supply an advocacy piece from a separate years-old litigation as a substitute for pleading and analyzing facts—plaintiffs in every securities case could cite to expert reports filed in other cases; defendants could ask the Court to take judicial notice of the responses to those reports; and the battle of the experts would replace the pleading stage in a manner that would eviscerate the requirements of the PSLRA and even *Iqbal*.[6] *Cf. Jakobovits v. PHL Variable Ins. Co.*, 2023 WL 3741993, at *3 (E.D.N.Y. May 31, 2023) (plaintiff cannot "rely on expert reports from another case … to support its interpretations").

## II. THE R&R CORRECTLY FOUND THAT NWBO FAILED TO PLEAD LOSS CAUSATION ON A TEMPORAL PROXIMITY THEORY

  The R&R correctly found that NWBO failed to plead that any of its sales of stock were in sufficiently "close proximity" to Defendants' purported spoofing to plead loss causation. R&R at 66-72. As explained above, the R&R found that NWBO failed to plead temporal proximity at all because it did not allege how its sale prices were "formulaically derived" from NWBO's closing

---

[6] NWBO adds citations to other literature on the topic of price impact, NWBO Obj. at 14 n.9, but this authority is cited nowhere in NWBO's Complaint and should not be considered, *see, e.g.*, *Gamma Traders*, 41 F.4th at 80 (declining to consider various economic reports regarding the continuing effects of spoofing cited in brief); *Abu-Nassar v. Elders Futures, Inc.*, 1994 WL 445638, at *4 n. 2 (S.D.N.Y. Aug. 17, 1994) (declining to consider arguments not raised before the Magistrate Judge because entertaining them would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"); *Tarafa v. Artus*, 2013 WL 3789089, at *2 (S.D.N.Y. July 18, 2013).

price and, even assuming it could, it failed to plead loss causation for any sales at prices not based on NWBO's stock price within an hour of the purported spoofing. *Id.* at 67-72.[7]

### A.   NWBO Did Not Allege A Relationship Between The Purported Spoofing And NWBO's Sale Price

NWBO attempted to plead loss causation by alleging that it sold shares at prices "formulaically derived from the closing price on dates where Spoofing Episodes occurred, such that a decline in the price on that day caused a decline in the price at which [NWBO] sold shares of NWBO stock." ¶ 289. The R&R correctly found that this was insufficient because "[n]either in the FAC nor its opposition brief does Plaintiff explain what it means when it says that the 'sale price was formulaically derived from the closing price.'" R&R at 67. NWBO's attempts to remedy its deficient pleading fail.

*First*, NWBO asserts that its allegation that "a decline in the price on that day caused a decline in the price at which Plaintiff sold shares of NWBO stock" is "factual" and purportedly explains what "formulaically derived" means. NWBO Obj. at 8 (quoting ¶ 289). But there are no *facts* alleged in the Complaint—and NWBO does not identify any now—that would explain what NWBO's formula is or how a decline in the price of NWBO's stock on one day caused a decline in NWBO's sale price on some unspecified different date.[8] Nor is there any allegation linking the purported spoofing to the decline in sale price, let alone demonstrating any causal connection between the two. This is fatal to NWBO's argument. *See, e.g.*, *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174-75 (2d Cir. 2005) ("Though all reasonable inferences are drawn in the

---

[7]   As set forth in Defendants' Objections to the R&R, Defendants object to the R&R's suggestion that, if NWBO amends its Complaint to allege the details of the formulaic connection between closing price and sale price, it has adequately stated a claim. Defs.' Objs. at 25.

[8]   NWBO argues it set forth in "painstaking detail" certain information like the transaction date and number of shares sold, NWBO Obj. at 6, but unsurprisingly none of this purported "detail" says anything about how the closing price on a particular date was formulaically linked to a sale price sometimes weeks later.

plaintiff's favor on a motion to dismiss on the pleadings, conclusions of law or unwarranted deductions of fact are not admitted." (cleaned up)).

Indeed, the R&R examined the exact language now relied on by NWBO, R&R at 66-67 (citing ¶ 289), and found that NWBO alleged facts that demonstrated *the opposite* of what it now claims—that there was no connection between the purported spoofing and the sale of NWBO's stock.  As the R&R explained, "[i]n many instances in Plaintiff's loss causation chart, the 'Pricing Date' is several days or even weeks—as many as four weeks—prior to the date on which NWBO sold its shares" whereas "[i]n other instances, there is a 'Pricing Date' days or weeks *after* the date on which NWBO sold its shares."  R&R at 67.  NWBO's convoluted loss causation chart further demonstrates the ambiguity created by its unexplained "formulaically derived" allegation—and defeats NWBO's urged inference that it traded "so close in time to Defendants' spoofing" that the market prices were still artificial.  *See* NWBO Obj. at 3 (citing *Gamma Traders*, 41 F.4th at 80-81).

*Second*, NWBO asserts for the first time in its Objection that its pricing formula was "monotonic," apparently meaning the sale price necessarily decreased if the closing price dropped on spoofing dates.  *See* NWBO Obj. at 8.  But these allegations—that NWBO's unexplained "formula" was "monotonic" or even a suggestion of how its formula worked—are entirely absent from the Complaint and cannot be added now.  *See, e.g.*, *Tarafa*, 2013 WL 3789089, at *2 ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the R&R, and indeed may not be deemed objections at all." (cleaned up)); *cf. Clanton v. UMG Recordings, Inc.*, 556 F. Supp. 3d 322, 327 n.1 (S.D.N.Y. 2021) ("Because a plaintiff cannot raise allegations not raised in its complaint in a brief in opposition to a motion to dismiss, the Court does not take notice of these allegations.").

Even if the Court did consider NWBO's new explanation for its formula, NWBO's attempts to plead temporal proximity are still deficient.  NWBO's cited definition does not show any causal connection between the alleged *spoofing* and a decline in NWBO's stock price.  Instead, it simply indicates that any "*decline* in the price on that day *caused a decline*" in the price at which Plaintiff sold shares."  NWBO Obj. at 8 (emphasis added).[9]  NWBO fails to allege facts linking temporary price impacts induced by the alleged spoofing (as opposed to general market shifts) to reductions in NWBO's sale pricing on pricing dates.  *See* ¶ 289.  With no such vital causal link pled, NWBO's formulaic pricing theory fails under controlling precedent.

*Third*, NWBO tries to salvage its deficient allegations by pointing to a single instance in which it alleged that "on Sunday, December 12, 2021, Plaintiff sold 1.9 million shares at a price equal to the closing price of NWBO stock on Friday, December 10, 2021."  NWBO Obj. at 8-9 (citing ¶¶ 290-91).  This fails for several reasons.  As an initial matter, the Complaint is entirely devoid of any explanation as to how NWBO was able to sell shares on a Sunday, when the OTC markets on which NWBO alleged the trading occurred are closed.  *E.g.*, ¶ 293.  Moreover, NWBO's allegation that the price was "*equal to* the closing price," ¶ 290 (emphasis added), does not plausibly allege that there was any *causal connection* between the prices, particularly given that NWBO alleges that the sale price was "formulaically derived" from the closing price, ¶ 289.  If anything, the specific "equal to" language in NWBO's allegation indicates that this was mere coincidence, not causation.

NWBO's argument fails also because NWBO does not link the sale of its stock on December 12, 2021 to a single one of the 16 "Example Episodes" of spoofing, and thus does not

---

[9] NWBO cites the Merriam Webster definition of "monotonic"—"[h]aving the property either of never increasing or of never decreasing as the values of the independent variable of the subscripts of the terms increase."  *Id.* n.5 (quoting Merriam-Webster).

even attempt to connect specific allegations of misconduct to allegations of economic loss; NWBO cannot divorce its loss causation allegations from the only allegedly manipulative acts it even attempts to plead with the required specificity. *See* Defs.' Objs. at 25. And the cursory allegations in NWBO's Exhibit are wholly inadequate for the reasons explained in Defendants' motion to dismiss, ECF 115 at 11-12, and because NWBO's "five" instances of spoofing on December 10, 2021 are themselves significantly deficient, *see* ECF 102-1 at 6, 53, 79. For example, in one of the December 10, 2021 spoofing examples, the "Best Offer" was at a much higher price than the "Baiting Orders," suggesting NWBO's stock price went up during the final hour of trading on December 10, 2021, not down. *See* ECF 102-1 at 53. Other examples inexplicably rely on an identical "prior sale" by the Defendant, *id.* at 6, 53, and for all of these five examples, there is no listed "Next Sale By Defendant," *id.* at 6, 53, 79.[10] Simply put, the five examples of purported spoofing on December 10, 2021 not only lack NWBO's indicia of misconduct—such as "parking" or the absence of sales during the "Baiting Period"—they involve dramatically different alleged trading activity that controverts NWBO's model of spoofing because, for example, the Defendants did not sell stock after the purported spoofing. *Compare id.* at 6, 53, 79 *with, e.g.*, ¶¶ 89, 103, 117.

In all events, the fact that NWBO alleged a single instance where the closing price on a "Pricing Date" was "equal to" the sale price of the stock days later does not overcome NWBO's failure to allege how the "formula" that *resulted* in that sale price worked, as would be required to allege a causal connection between the two prices. The Court should thus adopt the R&R's finding that NWBO failed to plead loss causation because it did not adequately allege the purported "formulaic connection" between the purported spoofing and its alleged sale prices.

---

[10] These spoofing episodes are thus deficient for the additional reason that they rely entirely on a "hypothetical" short selling allegation that was properly rejected by the R&R. R&R at 11 n.9.

### B.        NWBO's Allegations Of Same-Day, Post-Spoof Sales Are Insufficient

The R&R correctly found that, even assuming *arguendo* that NWBO had sufficiently explained the "formulaic connection" between its sale price and the closing price on days when there was purported spoofing, "it does not follow that [NWBO] has adequately pled that all 49 million shares listed in its loss causation chart were sold 'in close proximity' to Spoofing Episodes." R&R at 67-68 (citing *Gamma Traders*, 41 F.4th at 80).  NWBO objects to this finding, arguing that it has adequately alleged loss causation for each of its sales that was priced using "the closing prices for which Defendants spoofed within the same trading day (6.5 hours)."  NWBO Obj. at 9-11.  NWBO is wrong.

*First*, in an attempt to overcome *Gamma Traders*' clear holding that the spoofing must be sufficiently close in time to the stock sale, 41 F.4th at 80, NWBO argues that it alleged "facts to support its theory" that the effects of spoofing lasted throughout the trading day, NWBO Obj. at 10.[11]  This argument is addressed in the R&R and above and, unsurprisingly, NWBO *fails to identify a single fact* alleged in the Complaint that does or even could support this inference.[12]  *See* NWBO Obj. at 10.

*Second*, NWBO argues that the R&R's use of "a bright-line cutoff of one hour" between the alleged spoofing and NWBO's alleged purchase is arbitrary, *id.* at 10-11.  Instead, NWBO advocates for a holding that NWBO "adequately alleged loss causation for each of [NWBO's]

---

[11]   NWBO argues that *Gamma Traders* does not govern because the Second Circuit was evaluating allegations of "actual damages" rather than loss causation.  NWBO Obj. at 6 n.2.  But NWBO offers no explanation as to why that distinction matters, and *Gamma Traders* explicitly evaluates what is necessary to allege that manipulation caused prices to remain artificial for a given amount of time, which is directly relevant to the issue here.  In fact, case law suggests that actual damages are easier to plead than loss causation in a securities case.  *See infra* at 20 n.12.

[12]   NWBO cites a single, out-of-Circuit authority for the proposition that Defendants' conduct may affect the price of a security throughout a trading day.  *See* NWBO Obj. at 11 n.6 (citing *In LJM Partners, Ltd. v. Barclays Capital Inc.*, 2023 WL 6311471 (N.D. Ill. Sept. 28, 2023)).  NWBO neglects to inform this Court that in *LJM*—unlike the instant securities fraud action—"there [wa]s no securities-like loss causation requirement."  2023 WL 6311471 at *15.  The case is also plainly distinguishable on the facts, including that the plaintiff had—unlike NWBO—alleged facts to show that the manipulative conduct caused long-term price impacts.  *Id.* at *15-16.

sales that were priced at the closing prices for which Defendants spoofed within the same trading day." *Id*.  As an initial matter, NWBO's argument that one hour is "arbitrary" falls flat given that its *own Complaint* specifically denotes the purported spoofing episodes that occurred within one hour of NWBO's stock sale.  *See* ¶ 289 (an asterisk "denotes a day where there were Spoofing Episodes *in the final hour of trading*" (emphasis added)).  And while Defendants do not agree that one hour is an appropriate boundary given that the Complaint alleges price reversion within minutes, NWBO's proposed alternative metric—that any same-day spoofing is sufficient to establish loss causation—is arbitrary as well and, more importantly, has been squarely rejected by the Second Circuit in *Gamma Traders*.[13]  *See supra* § I(A).

*Finally*, NWBO's half-hearted argument that the Court should leave the determination of loss causation to expert discovery, NWBO Obj. at 10, is directly contrary to the Second Circuit's holdings in *Gamma Traders* and *ATSI*.  *See, e.g.*, *Gamma Traders*, 41 F.4th at 80 (although "the effects of spoofing pose questions of fact[,] … federal pleading standards require" plaintiffs to plead facts that demonstrate injury and causation first); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007) (finding that "the complaint does not sufficiently allege loss causation").

## **CONCLUSION**

The Court should adopt the R&R's recommendation to find that NWBO failed to plead loss causation, and modify the R&R for the reasons set forth in Defendants' Objections.

---

[13]   Defendants respectfully submit that even the R&R's finding that the effects of spoofing could be inferred to last for up to an hour is improper, as none of the Spoofing Episodes within the final hour of trading are sufficiently alleged. *See* Defs.' Objs. at 25.

Dated: January 26, 2024
      New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

 */s/ William A. Burck*
William A. Burck
Christopher G. Michel (admitted *pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Peter H. Fountain
Leigha Empson
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for Defendant Citadel Securities LLC*

**MORRISON & FOERSTER LLP**

*/s/ Anthony S. Fiotto* (with permission)
Anthony S. Fiotto
Julia C. Koch
200 Clarendon Street
Boston, MA 02116
Telephone: 617-648-4700
Facsimile: 617-830-0142
Email: AFiotto@mofo.com
Email: JKoch@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: 212-336-4067
Facsimile: 212-468-7900
Email: ELawson@mofo.com

*Attorneys for Defendant Canaccord
Genuity LLC*

**KATTEN MUCHIN ROSENMAN LLP**

*/s/ Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac
vice*)
Leigh Brissenden (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
leigh.brissenden@katten.com

*Attorneys for Defendant GTS Securities
LLC*

**GREENBERG TRAURIG, LLP**

*/s/ Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Nicholas T. Barnes
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
barnesn@gtlaw.com

*Attorneys for Defendant Instinet, LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation

*/s/ Stephen Young* (with permission)
Jon W. Zinke
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California 90802
Telephone: (562) 436-2000
jon.zinke@kyl.com
steve.young@kyl.com;
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading
Corp.*

<div style="display: flex;">
<div>

**BALLARD SPAHR LLP**

 */s/ Marjorie J. Peerce* (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 223-0200
Fax: (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (admitted *pro hac vice*)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendant*
*G1 Execution Services LLC*

</div>
<div>

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 */s/ Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas*
*LLC*

</div>
</div>