# EXHIBIT 7

EFiled: Dec 30 2022 12:09PM EST
Transaction ID 68771930
Case No. 2022-0193-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE NORTHWEST | ) | |
| BIOTHERAPEUTICS, INC. | ) | C.A. No. 2022-0193-JTL |
| STOCKHOLDER LITIGATION | ) | Consolidated |
|  | ) | |

## AMENDED AND SUPPLEMENTAL CONSOLIDATED VERIFIED STOCKHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT

On behalf of Nominal Defendant Northwest Biotherapeutics, Inc. ("Northwest Biotherapeutics" or the "Company"), Plaintiff Glenn F. Schaeffer ("Plaintiff") asserts claims for breach of fiduciary duty and unjust enrichment against members of the Company's board of directors (the "Board" or the "Directors" or the "Director Defendants") and General Counsel (collectively, the "Individual Defendants").[1] On behalf of himself and all other similarly situated stockholders of Northwest Biotherapeutics, Plaintiff also brings a claim against the Director Defendants for breach of the fiduciary duty of candor and a claim against the Company and the Individual Defendants for declaratory relief.

---

[1] Plaintiff's allegations are made upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included a review of documents Plaintiff obtained from the Company in connection with a books and records demand under 8 *Del. C.* § 220 (the "Demand"), documents filed with the U.S. Securities and Exchange Commission (the "SEC"), and various media and analyst reports.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative and class action brought to hold Northwest Biotherapeutics' insiders accountable for abusing their positions and breaching their fiduciary duties by awarding themselves over $40 million worth of stock options in May 2020 and now belatedly seeking the stockholders' approval of these awards on the basis of materially false and misleading disclosures.

2.     Since 2017, the Board comprised five Directors: (a) non-employee directors J. Cofer Black ("Black"), Jerry Jasinowski ("Jasinowski"), and Navid Malik ("Malik"); and (b) executive directors Linda F. Powers ("Powers"), the Company's Chief Executive Officer ("CEO") and Chairperson of the Board, and Alton L. Boynton ("Boynton"), the Company's co-founder and Chief Scientific Officer.

3.     In May 2018, as compensation for their services to the Company, the Directors awarded themselves and Leslie J. Goldman ("Goldman"), the Company's General Counsel, an aggregate of 84,280,000 stock options worth $14.4 million (the "2018 Option Awards").

4.     Northwest Biotherapeutics is a biotechnology company that has no commercial products and relies primarily on equity issuances in order to raise sufficient capital to fund its operations. During the two years following the 2018 Option Awards, the Company raised tens of million dollars in cash through various

equity issuances (the "Financing Transactions"), but as a result saw its outstanding share count increase by approximately 290 million shares, thus diluting all equity holders in the process. That is, with 290 million additional shares outstanding, each equity holder now had a smaller percentage ownership stake in the Company.

5.      In May 2020, the Directors (with Goldman attending all meetings) granted themselves (and Goldman) an aggregate of 134,575,229 stock options worth **$40.64 million**. These awards were not intended as a reward for performance or service. Instead, according to the documents produced in connection with Plaintiff's Demand, these awards were intended to "true-up" the Individual Defendants to "offset . . . the dilutive effects" of the Financing Transactions on Defendants' 2018 Option Awards. Stated differently, the Individual Defendants decided to offset their decreased percentage ownership stake occasioned by the Company's financing needs simply by granting themselves 134,575,229 stock options to bring their percentage ownership stake in the Company back up to their previous levels (the so-called "True-Up" Awards).

6.      The True-Up Awards are unprecedented and indefensible. The Individual Defendants do not have the right – whether by employment agreement, contract, or otherwise – to own a specific percentage of the Company's common stock.  All of the Company's equity holders – public stockholders and Individual Defendants alike – suffered dilution as a result of the Financing Transactions. Of

course, public stockholders, including Plaintiff, could not simply take more shares from the Company in order to offset the dilution and "true-up" their respective stakes. In a gross abuse of their positions as Company fiduciaries, the Individual Defendants did exactly that.

7.     Moreover, the Individual Defendants suffered absolutely no economic harm as a result of the Financing Transactions. While their percentage ownership stake in the Company decreased as a result of the equity issued in the Financing Transactions, Northwest Biotherapeutic's value increased as a result of the resulting cash inflow. Accordingly, all else being equal, the value of the Individual Defendants' equity stakes did not change as a result of the Financing Transactions. In other words, the "true-up" rationale is a pretext for what is in reality a windfall of over $40 million that the Individual Defendants secured for themselves in a self-dealing transaction. And it is a pretext that has no logical end point: when the Company issues more shares to raise money going forward, the Individual Defendants apparently will feel entitled to be "trued up" again.

8.     The Individual Defendants' process lacked any semblance of sound corporate governance. They did not retain any consultants or experts to advise them regarding their True-Up Awards, which were never presented to any independent person or entity. Instead, the Individual Defendants handled everything themselves. The manner in which they did so made a mockery of the concept of director

"disinterest:" the executive directors (Powers and Boynton) approved the awards for the non-employee directors (Black, Jasinowski, and Malik), while the non-employee directors, in turn, approved the awards for their counterparts, the executive directors and Goldman. Through this "round robin" voting process, the Board attempted to claim that each group was "disinterested" vis-à-vis the other.

9.      It is also notable that the Board originally contemplated seeking, as it had in the past, stockholder approval for the awards made to the non-employee directors, but later abandoned that plan. Instead, as the Company's internal documents show, the Board proceeded to grant the True-Up Awards to Black, Jasinowski, and Malik in August 2020. More than two years passed without the Board taking any steps towards seeking stockholder approval of these grants.

10.     Then, several months after Plaintiff commenced this action, the Board proceeded to schedule a meeting, issue a (materially false and misleading) proxy statement, and seek the "approval" of the Company's stockholders for these awards, and "ratification" of the True-Up Awards made to Powers, Boynton, and Goldman, as discussed further below.

11.     The True-Up Awards are blatantly unfair to the Company and should therefore be rescinded in their entirety.

**PARTIES**

12.    Plaintiff Glenn F. Schaeffer has continuously owned shares of the Company's common stock since 2019.

13.    Nominal Defendant Northwest Biotherapeutics is a Delaware corporation with its principal place of business in Bethesda, Maryland.  With respect to Count IV for Declaratory Relief, Northwest Biotherapeutics is being named as a Defendant.

14.    Defendant Black has served on the Board since January 2016.

15.    Defendant Jasinowski has served on the Board since April 2012.

16.    Defendant Malik has served on the Board since April 2012.

17.    Defendant Powers has served as Chairperson of the Board since May 2007 and as the Company's CEO and President since June 2011. As of June 2020, Powers also serves as the Company's Chief Financial and Accounting Officer.

18.    Defendant Boynton co-founded the Company in 1996 and has served as its Chief Scientific Officer and as a director since 1998. Defendant Boynton served as the Company's CEO from June 2007 to June 2011.

19.    Defendant Goldman joined the Company as Senior Vice President, Business Development in June 2011, and became Senior Vice President, General Counsel in 2018.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Background*

20.    Northwest Biotherapeutics is a "biotechnology company focused on developing personalized immune therapies for cancer." Since its inception in 1996, the Company has not brought any product candidates to the commercialization stage of development, i.e., the stage capable of producing meaningful revenues.

21.    Northwest Biotherapeutics' lead product, DCVax®-L, is designed to treat solid tumor cancers in which the tumor can be surgically removed. While the Company recently completed a 331-patient international Phase III trial of DCVax-L for Glioblastoma multiforme brain cancer, a trial that began almost a decade ago, the results of which were announced in November 2022.

### *The 2018 Option Awards*

22.    Since July 2017, the Board has comprised the following five directors: non-employee directors Black, Jasinowski, and Malik, and executive directors Boynton and Powers.

23.    Since 2015, the Company's non-employee director compensation program has consisted of an annual cash retainer of $150,000.

24.    As Northwest Biotherapeutics' CEO and President, Powers received a $502,000 annual salary from 2016 to 2019, and a $700,000 salary in 2020.  She also

received a $300,000 bonus that was paid in 2020 but approved in 2019 according to the Company's disclosures.

25.     As Chief Scientific Officer, Boynton received a $325,000 salary from 2016 to 2019 (his 2020 salary was not publicly disclosed). Boynton also received a $20,000 bonus in 2019.

26.     As the Company's Senior Vice President, Business Development/General Counsel, Goldman received a $375,000 salary from 2016-2019, and a $525,000 salary in 2020. Goldman also received a $200,000 bonus that was paid in 2020 but approved in 2019 according to the Company's disclosures.

27.     On January 16, 2018, Northwest Biotherapeutics filed an 8-K with the SEC (the "January 2018 8-K"), which disclosed that, on November 19, 2017, the Board approved stock option awards to various individuals "to take account of employee and director performance over the last approximately 6 years and anticipated performance over the next approximately 2 years." As further stated in the January 2018 8-K, the Company had begun "undertaking the steps for implementation" of these awards.

28.     On April 9, 2018, the Company filed a Schedule 14A Definitive Proxy Statement (the "2018 Proxy") in connection with a special meeting of stockholders held on April 27, 2018 (the "Special Meeting"). As disclosed in the 2018 Proxy, Powers and Boynton approved the stock option awards designated for Black,

Jasinowski, and Malik (the "2018 NED Option Awards"), pursuant to which, subject to stockholder approval, Black would receive 1,715,000 stock options, Jasinowski would receive 4,900,000 stock options, and Malik would receive 9,065,000 stock options.

29.    In Proposal No. 3 of the 2018 Proxy, the Board sought stockholder approval of the 2018 NED Option Awards. According to the 2018 Proxy, Powers and Boynton had approved the 2018 NED Option Awards based on a "number of factors and considerations," including (a) "the extraordinarily long period that the independent directors have been serving without having received any equity compensation, despite the Company's promises to make such awards"; (b) "the extraordinary amount [of] time, effort and support contributed by the independent directors throughout their respective periods of service, going far beyond the activities typically involved in Board service"; and (c) "the extent of personal and professional risk [the] independent directors have endured in serving on our Board." At the Special Meeting, stockholders approved Proposal No. 3.

30.    On June 1, 2018, the Company filed an 8-K with the SEC (the "June 2018 8-K"), which disclosed that, on May 28, 2018, the Company completed the implementation of the option awards and issued an aggregate of 84,280,000 stock options to the Individual Defendants (i.e., the 2018 Option Awards) in the following amounts:

|              | No. Options | Value[2]    |
|--------------|------------:|------------:|
| Black        |   1,715,000 |    $293,000 |
| Boynton[3]   |   4,900,000 |    $837,000 |
| Goldman      |  24,500,000 |  $4,186,000 |
| Jasinowski   |   4,900,000 |    $837,000 |
| Malik        |   9,065,000 |  $1,549,000 |
| Powers       |  39,200,000 |  $6,698,000 |
| *Total*      |  *84,280,000* | *$14,400,000* |

31.     As disclosed in the June 2018 8-K, the stock options issued to Powers, Goldman, and Boynton had an exercise price of $0.23 per share (the closing price of the Company's common stock on the preceding business day, May 25, 2018), and the stock options issued to Black, Jasinowski, and Malik had an exercise price of $0.30 per share.

32.     On May 14, 2018, just prior to the issuance of the 2018 Option Awards, Northwest Biotherapeutics had 419,465,016 outstanding shares of common stock.

---

[2] The value represents the grant date fair value as disclosed by the Company in its Form 10-K Annual Report filed with the SEC on April 2, 2019.

[3] On August 31, 2018, Boynton was granted an additional 2,967,065 stock options with a grant date fair value of approximately $691,000.

### *The Company Issues Equity to Raise Cash and Fund Operations*

33.    With no commercialized products, Northwest Biotherapeutics relies primarily on equity issuances to raise sufficient capital to fund its operations. [4]

34.    During 2018, the Company received $8.4 million in cash proceeds from the issuance of convertible preferred stock, common stock and warrants, in both public and private offerings. The Company also received $2.6 million in cash proceeds from the exercise of warrants during 2018.

35.    During 2019, the Company received $6.9 million from the issuance of convertible preferred stock, common stock and warrants, in both public and private offerings. The Company also received $2.2 million in cash proceeds from the exercise of warrants during 2019.

36.    During the six months ended June 30, 2020, the Company received approximately $11.6 million in cash from the issuance of 68.6 million shares of common stock.

37.    As a result of these and other equity issuances (i.e., the Financing Transactions), the number of Northwest Biotherapeutics' shares outstanding increased substantially. As of June 12, 2020, the Company had 710,282,469

---

[4] The Company reported revenues of $2.4 million, $1.3 million, and $1 million, in 2019, 2020, and 2021, respectively.

outstanding shares – nearly 300 million more shares than when the 2018 Option Awards were issued.

### *The Directors Grant Themselves and Goldman the True-Up Awards*

38.    On January 26, 2020, the Board convened a meeting attended by all five Directors and Goldman.  As described in the minutes of the meeting, the Board "discussed the true-up of options held by certain Board members in accordance with the Company's outstanding securities and issuances in the past year." The discussion included "the options at issue, the mechanics of the true-up, and the process for shareholder approval."

39.    On March 23, 2020, the Board convened a meeting attended by all five Directors and Goldman.  As stated in the minutes of the meeting, the Board discussed a "true-up of the number of options" held by Black, Jasinowski, and Malik "in accordance with the number of securities issued by the Company."  At the meeting, Powers and Boynton "voted to approve" a proposal seeking "shareholder ratification" of these grants at a special meeting of stockholders before implementing any such "true-up."

40.    On May 23, 2020, the Board again met with all five Directors and Goldman present (the "May 23 Meeting").  According to the minutes, the purportedly "disinterested" directors, Powers and Boynton, "voted unanimously to approve awarding true-up options to the independent directors." As further stated in

the minutes, the "true-up options [would] offset or partially offset the dilutive effects of issuances since the prior option awards to these directors in 2018."

41.    Three days later, on May 26, 2020, Powers emailed the members of the Board's Compensation Committee (the "Compensation Committee"), Malik and Jasinowski, a list of proposed option awards for various employees and consultants, including Boynton, Goldman, and herself. As described in the email, the list was a joint recommendation from Powers and Goldman, and the proposed options were intended to "true up to new denominator (total securities outstanding at COB on Friday, 5/22/20)."

42.    On May 29, 2020, the Board convened a meeting attended by all five Directors and Goldman (the "May 29 Meeting").  As described in the minutes, the Compensation Committee had "met twice this week," and after "extensive discussions about the potential awards" for employees and certain consultants, the Compensation Committee had "approved the recommendations from Management." The Board "asked questions about the factors used to prepare and to evaluate the proposed allocations," and following a discussion, the Board – with Black, Jasinowski, and Malik voting while Powers and Boynton "recused" themselves – approved "the proposed option awards as approved by the [Compensation] Committee."

43.    Thereafter, the Company began implementing the issuance of the "true-up" awards. On July 2, 2020, the Company issued 43,329,153 stock options to Powers, 28,554,455 stock options to Goldman, and 18,794,191 stock options to Boynton.  For Powers and Goldman, these options comprised just a portion of their allocated stock options, as explained below.  The stock options were originally issued with a $0.25 exercise price, but were later amended to a $0.35 exercise price (which was the closing price of the Company's common stock on July 2, 2020). The options had certain time-based vesting requirements.

44.    On July 19, 2020, the Board convened a meeting attended by all five Directors and Goldman. At the meeting, management and the Board discussed their progress in implementing the previously-approved stock option awards. As described in the minutes of the meeting, the options "for senior management were recently implemented, except that Ms. Powers and Mr. Goldman volunteered to set aside a portion of their option awards until the option awards for staff employees were determined to be sufficient."  Meanwhile, the stock option awards for the non-employee directors were "pending for implementation (subject to shareholder approval at the next meeting, as in the past)."

45.    On August 5, 2020, the Board convened another meeting attended by all five Directors and Goldman. At the meeting, the Board approved the stock option awards for staff employees, thus paving the way for Powers and Goldman to receive

the rest of their allocated stock options. As described in the minutes of the meeting, the Board, with Powers recusing herself, "voted to approve again the award of the options that were previously set aside for but not yet issued to management (Ms. Powers and Mr. Goldman) while staff options were handled."

46. Though not explained in the minutes of this meeting, the Board apparently also determined that it would no longer be seeking stockholder approval of the stock option awards to Black, Jasinowski, and Malik. Instead, Powers and Boynton "noted that the implementation of the options previously awarded to the independent Board members should also be completed."

47. Accordingly, on August 5, 2020, Black received 4,769,433 stock options, Jasinowski received 5,710,891 stock options, and Malik received 15,732,288 stock options. The stock options were issued originally with a $0.25 exercise price, but were later amended to a $0.34 exercise price (which was the closing price of the Company's common stock on August 5, 2020). Half of the options would vest upon grant and the remaining 50% would vest over the following 12 months.

48. On September 2, 2020, the Board convened a meeting attended by all five Directors and Goldman. As described in the minutes of the meeting, the Board "reaffirmed the issuance" of the stock option awards to Powers and Goldman that had been "set aside until employee options were completed." Accordingly, on

September 2, 2020, Powers received an additional 11,789,879 stock options and Goldman received an additional 5,894,939 stock options. These additional options would vest on March 31, 2021 or upon the achievement of certain performance milestones, whichever was earlier. Accordingly, by March 31, 2021, these options had vested.

49.    In all, the Directors granted themselves and Goldman 134,575,229 stock options worth $40.64 million in the aggregate (i.e., the True-Up Awards):

|  | No. Options | Value[5] |
|---|---|---|
| Black | 4,769,433 | $1,250,000 |
| Boynton | 18,794,191 | $5,905,000 |
| Goldman | 34,449,394 | $10,548,000 |
| Jasinowski | 5,710,891 | $1,497,000 |
| Malik | 15,732,288 | $4,123,000 |
| Powers | 55,119,032 | $17,317,000 |
| *Total* | *134,575,229* | *$40,640,000* |

### The True-Up Awards Unfairly Enrich the Individual Defendants

50.    As described above, the Individual Defendants' stated rationale for the True-Up Awards was to "offset or partially offset the dilutive effects" on the 2018 Option Awards caused by the Financing Transactions. Stock dilution is the decrease

---

[5] This represents the grant date fair value as disclosed by the Company in its Schedule 14A Definitive Proxy Statement filed with the SEC on April 16, 2021 (the "2021 Proxy"). While the value of Boynton's options was not publicly disclosed, it is calculated based on the assumption that his options had the same per-share value as Powers' and Goldman's options.

in an existing stockholders' ownership percentage that results from the company issuing new equity. With roughly 419.4 million shares outstanding when the 2018 Option Awards were granted, the Individual Defendants' 84.28 million stock options represented a 16.7% stake in the Company.[6]

51.    By May 2020, primarily as a result of its Financing Transactions, Northwest Biotherapeutics had approximately 710.3 million outstanding shares, and accordingly the Individual Defendants' 2018 Option Awards represented a 10.6% stake in the Company.[7] Accordingly, the True-Up Awards were intended to offset this decrease in the Individual Defendants' respective ownership stake by providing them with more stock options and bringing their ownership stake in the Company back up to previous levels.

52.    The Individual Defendants were not the only ones who suffered dilution as a result of the Financing Transactions.  All of the Company's equity holders did. But public stockholders, including Plaintiff, could not simply help themselves to

---

[6] The 419.4 million outstanding shares plus the 84.28 million options equates to approximately 504 million shares. The 84.28 million options represent a 16.7% ownership stake of the 504 million shares.

[7] The 710.3 million shares outstanding plus the 84.28 million stock options equates to 794.6 million shares. The 84.28 million options represent a 10.6% ownership interest of the 794.6 million shares. This calculation and the one in the preceding footnote, which do not include any other warrants or options that may have been outstanding at the time, is provided simply to explain the effect of dilution, and not to specifically detail the precise dilutive effect of the Financing Transactions.

more shares to offset the dilution and give themselves a "true-up." In a gross abuse of their position, the Individual Defendants did exactly that, but only for themselves.

53.     The Individual Defendants are not entitled to own a specific percentage of the Company's common stock. In fact, no one is.

54.     Northwest Biotherapeutics' Seventh Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") denies stockholders the preemptive right to participate in a stock offering in order to maintain their level of ownership. Specifically, Section Article IV, Section 1(d) of the Certificate of Incorporation states:

> No stockholder of the Corporation shall by reason of his/her/its holding shares of any class of capital stock of the Corporation have any preemptive or preferential right to acquire or subscribe for any additional, unissued or treasury shares (whether now or hereafter acquired) of any class of capital stock of the Corporation now or hereafter to be authorized, or any notes, debentures, bonds or other securities convertible into or carrying any right, option or warrant to subscribe for or acquire shares of any class of capital stock of the Corporation now or hereafter to be authorized, whether or not the issuance of any such shares or such notes, debentures, bonds or other securities would adversely affect the dividends or voting or other rights of that stockholder.

55.     The Individual Defendants effectively circumvented this provision and they did so without even paying for their additional shares. Instead, they just gave themselves stock options for no consideration.

56.     The True-Up Awards become even more egregious when considering the equity that was being "trued-up" – the 2018 Option Awards. While public

stockholders had to pay for their shares, the 2018 Option Awards were shares the Individual Defendants granted to themselves. As described above, the 2018 Option Awards were a one-time lucrative award designed to compensate the Defendants for up to six years of past performance and two years going forward. With the True-Up Awards, the Individual Defendants were now using the 2018 Option Awards as a vehicle by which the Individual Defendants could maintain a certain percentage level of ownership in the Company in perpetuity.

57.    While the Individual Defendants' percentage ownership stake in the Company decreased as a result of the equity issued in connection with the Financing Transactions, the Company's value increased as a result of the cash it received in return. All else being equal, the value of the equity held by the Individual Defendants would not have changed.

58.    For example, consider a hypothetical company that has 100 million shares outstanding, which trades at $10.00 per share, and thus has a total market capitalization of $1 billion. A stockholder holding 10 million shares would own 10% of the company and have shares worth $100 million. If the company sold 50 million shares at $10.00 per share and raised gross proceeds of $500 million, the company would now have 150 million shares outstanding, and all else being equal, would be valued at $1.5 billion, with the shares still trading at $10.00 per share. The stockholder with 10 million shares would have been diluted to a 6.66% ownership

stake, but because the company was now worth an additional $500 million, her shares, still trading at $10.00 per share, would continue to be worth $100 million.

59.    As this hypothetical example illustrates, in reality, the Individual Defendants suffered no economic harm at all as a result of the Financing Transactions, and the True-Up Awards simply provided them with a $40 million windfall.

60.    The process the Individual Defendants employed in connection with their True-Up Awards was as defective as their justification for these awards. The Individual Defendants did not retain any consultants or experts to advise them. Nor did they then involve the stockholders. Instead, the Individual Defendants ran the entire process themselves. While the Board minutes indicate that the Individual Defendants' True-Up Awards were approved by "disinterested" directors, the process the Individual Defendants employed to reach that conclusion was absurd. The executive directors (Powers and Boynton) approved the awards for the non-employee directors (Black, Jasinowski, and Malik), while the non-employee directors, in turn, approved the awards for the executive directors and Goldman. *No one* was disinterested in approving these awards.

61.    For all of these reasons, the True-Up Awards were a blatant abuse of power by the Individual Defendants, and accordingly, should be rescinded in their entirety.

62.     Additionally, though not designed to serve as annual compensation, the True-Up Awards would be grossly excessive had that been the Individual Defendants' intention.

63.     With their $150,000 cash retainer and True-Up Awards, the non-employee Directors received the following compensation in 2020:

|  | Cash | Option Awards | Total |
|---|---|---|---|
| Malik | $150,000 | $4,123,000 | $4,273,000 |
| Jasinowski | $150,000 | $1,497,000 | $1,647,000 |
| Black | $150,000 | $1,250,000 | $1,400,000 |

64.     This is facially excessive and unfair to the Company. As described above, Malik, Jasinowski, and Black received $1,549,000, $837,000, and $293,000 respectively, from their 2018 NED Option Awards, which was intended to cover up to eight years of equity compensation (six years going back and two years going forward). Yet in one shot each of the non-employee Directors' received True-Up Awards the value of which far exceeded what they had received for up to eight years of work.

65.     The True-Up Awards were not supported by any peer analysis. Indeed, it does not appear that Northwest Biotherapeutics ever developed a peer group for compensation benchmarking purposes. If the Board had performed any sort of peer analysis, it would have revealed that the True-Up Awards could not possibly be justified from a market perspective.

66.    For example, the following three companies recently listed Northwest Biotherapeutics as their peer for compensation purposes: Evoke Pharma, Inc. ("Evoke"), Isoray, Inc. ("Isoray"), and Navidea Biopharmaceuticals, Inc. ("Navidea").  During the 2020 fiscal year, these three companies paid their non-employee directors (who were on their respective boards the full year) average compensation packages valued at $170,960, $52,844, and $69,530, respectively.

67.    Similarly, the following three companies recently listed Northwest Biotherapeutics as a competitor: Alaunos Therapeutics, Inc. ("Alaunos"), ImmunityBio, Inc. ("ImmunityBio"), and Kintara Therapeutics, Inc. ("Kintara"). During the 2020 fiscal year, these three companies paid their non-employee directors (who were on their respective boards the full year) average compensation packages valued at $64,752, $560,466, and $94,015, respectively.

68.    By way of another example, TD Ameritrade has identified the following four companies, who are also developing cancer therapies, as peers of Northwest Biotherapeutics: Fate Therapeutics, Inc. ("Fate"), Fortress Biotech, Inc. ("Fortress"), Cyclacel Pharmaceuticals, Inc. ("Cyclacel"), and Plus Therapeutics, Inc. ("Plus").  During the 2020 fiscal year, these four companies paid their non-employee directors (who were on their respective boards the full year) average compensation packages valued at $337,641, $260,000, $83,079, and $155,410, respectively.

69.    In fact, one would be hard-pressed to find even a handful of publicly-traded companies in the United States where non-employee directors are paid over $1 million each, let alone between $1.4 million and $4.27 million. For example, Frederic W. Cook & Co., Inc. ("F.W. Cook"), an executive and director compensation consulting firm, publishes an annual study of compensation paid to non-employee directors using 300 companies of various sizes and industries. In November 2020, F.W. Cook published its 2020 Director Compensation Report. For "small-cap" companies (those with market capitalization of less than $1 billion) such as Northwest Biotherapeutics, F.W. Cook found that the median, non-employee director compensation was $164,000, and the 75th percentile was $200,000.  For "large-cap" companies (companies with a market capitalization greater than $5 billion), F.W. Cook found that the median, non-employee director compensation was $290,000, and the 75th percentile was $323,000.

70.    Similarly, Steven Hall & Partners ("Steven Hall"), an independent compensation consulting firm, specializing exclusively in the areas of executive and director compensation, publishes an annual study of compensation to non-employee directors.  Its "2020 Director Compensation Study" revealed that the median total compensation paid to non-employee directors at the 200 companies *with the largest revenues* in fiscal 2019 equaled just $315,000. In other words, with the True-Up

Awards, the Company's non-employee Directors paid themselves more than what many of the largest companies in the world pay their non-employee directors.

71.    Powers, Goldman, and Boynton fare no better from a peer analysis perspective. With her $700,000 salary and $17,317,000 stock option award, Powers received total compensation of $18,017,000 in 2020. With his $525,000 salary and $10,548,000 in stock options, Goldman's compensation package was valued at $11,073,000. And with a $5,950,000 stock option award and a $325,000 salary, Boynton's compensation package was valued at approximately $6,230,000.

72.    Meanwhile, the CEOs of Evoke, Isoray, and Navidea received compensation packages in 2020 valued at $1,171,210, $491,637, and $1,225,051, respectively. The CEOs of Alaunos, ImmunityBio, and Kintara paid their CEOS compensation packages in 2020 valued at $2,090,922, $490,248, and $1,054,476, respectively. And the CEOs of Fate, Fortress, Cyclacel, and Plus received 2020 compensation packages valued at $5,600,167, $2,636,602, $1,409,644, and $838,000, respectively.

73.    Regardless of which companies are selected as "peers," it is impossible to justify Powers's $18 million package, which makes her one of the highest-paid CEOs in the United States. Since 2006, the *New York Times*, in conjunction with Equilar, has reviewed the largest pay packages awarded to CEOs at U.S. public companies. In June 2021, the *New York Times* and Equilar published a data set titled

"Equilar | New York Times 200 Highest-Paid CEOs," which listed the 200 highest-paid chief executives at American public companies with revenue of at least $1 billion during the 2020 fiscal year. Of course, with no meaningful revenues to speak of, Northwest Biotherapeutics does not even qualify to make this list. Nonetheless, Powers' $18 million compensation would place her 133rd on the list:

| Rank | Company | CEO Compensation |
|---|---|---|
| 131 | HCA Healthcare, Inc. ("HCA") | $18,131,223 |
| 132 | BioMarin Pharmaceutical Inc. ("BioMarin") | $18,119,133 |
| 133 | The Allstate Corporation ("Allstate") | $18,009,544 |
| 134 | Crown Castle International Corp. ("CCI") | $17,999,135 |
| 135 | Fidelity National Information Services, Inc. ("FIS") | $17,905,009 |

74.    Incongruously, Powers finds herself in the company of the CEOs of HCA (an $81 billion company with revenues of $51.5 billion in 2020), BioMarin (a $14 billion company with revenues of $1.86 billion in 2020), Allstate (a $35 billion company with revenues of $44.79 billion in 2020), CCI (a $74 billion company with revenues of $5.84 billion in 2020), and FIS (a $55 billion company with revenues of $12.5 billion in 2020). Leading a company with no revenues and that has not brought a product to commercialization during her 15-year tenure at the Company, Powers has no business being on this list at all.

### *Stockholders Have Not Been Told the Truth About the "True-Up" Awards*

75.    On April 16, 2021, Northwest Biotherapeutics filed the 2021 Proxy in connection with its 2021 Annual Meeting of Stockholders. SEC rules required the Company to disclose, among other things, the value and nature of any equity awards granted to its non-employee directors and named executive officers during the year ended December 31, 2020.

76.    With respect to the non-employee Director awards, the 2021 Proxy provided no information other than the grant date fair value of the awards ($4,123,000 for Malik, $1,497,000 for Jasinowski, and $1,250,000 for Black).  These numbers were included in a "Director Compensation" table, as required by SEC rules, showing the amount of "compensation" received by the non-employee directors in 2020. Accordingly, no one reading the 2021 Proxy (or any other public filing for that matter) has any idea what these enormous awards are all about.

77.    Meanwhile, the disclosures regarding the awards to Powers and Goldman are affirmatively misleading. In a "Summary Compensation Table" required by SEC rules, the Company disclosed that Powers and Goldman received stock option awards valued at $17,317,000 and $10,548,000, respectively, during 2020.[8]   In an effort to downplay the amount of these awards, the 2021 Proxy stated

---

[8] Boynton was not considered a "named executive officer," and was not included in the Summary Compensation Table.  Likewise, Boynton was not a "non-employee

that the stock options "were granted for employee performance during 2018, 2019 and 2020." Of course, this is not true.

78.    As described above, the 2018 Option Awards were designed to compensate Powers and Goldman for their 2018 and 2019 performance. More importantly, the minutes of the internal Board meetings do not indicate that there was any discussion of "employee performance during 2018, 2019, and 2020," much less identify this as the basis for the True-Up Awards. The actual rationale the Individual Defendants used, i.e., the "true-up" nature of these awards, has not been disclosed at all.

79.    Finally, another telling lack of "disclosure" is with respect to the Board's decision not to present the non-employee Directors' True-Up Awards for stockholder approval, as originally planned. Because the 2018 NED Option Awards were supported by a normal rationale (compensation) and covered a long period of time (eight years), the Board had no problem presenting these awards to the stockholders. But realizing there was no way to justify the True-Up Awards, the Director Defendants granted these awards and disclosed them (as they were required to do), but did not dare initially to seek the stockholders' approval. After Plaintiff

director," and is not included in the "Director Compensation" table. Accordingly, the Director Defendants simply chose not to discuss the awards received by Boynton during 2020.

challenged these awards, the Director Defendants apparently changed their mind
again.

### *The Board files a False and Misleading 2022 Proxy*

80.    On December 5, 2022, roughly two and a half years after the True-Up
Awards were issued, the Company filed a Schedule 14A Definitive Proxy Statement
(the "2022 Proxy") in connection with the Company's 2022 Annual Meeting of
Stockholders (the "2022 Annual Meeting"), which is scheduled for December 30,
2022.

81.    In Proposal 3 of the 2022 Proxy ("Proposal 3"), the Board is seeking
stockholder "ratification" of the True-Up Awards granted to Powers, Goldman, and
Boynton.    Proposal 3 is titled: "RATIFICATION OF THE SAME OPTION
AWARDS THAT WERE MADE IN 2020 TO THE NAMED EXECUTIVE
OFFICERS AND FOR WHICH THE STOCKHOLDERS ALREADY VOTED IN
FAVOR IN AN ADVISORY VOTE AT LAST YEAR'S ANNUAL MEETING."

82.    In Proposal 5 of the 2022 Proxy ("Proposal 5," and collectively with
Proposal 3, the "Proposals"), the Board is seeking stockholder "approval" of the
True-Up Awards granted to Black, Jasinowski, and Malik.    Proposal 5 is titled
"APPROVAL OF PREVIOUSLY REPORTED 2020 OPTION AWARDS TO THE
COMPANY'S    INDEPENDENT    DIRECTORS    OF    THE    BOARD    OF
DIRECTORS."

83.    In determining whether to vote in favor or against the Proposals, a reasonable stockholder would need to know the consequences of his or her vote. The 2022 Proxy completely fails in this regard. There is no disclosure as to what will happen if either proposal is approved, nor is there any disclosure as to what will happen if either proposal is rejected. While the Individual Defendants undoubtedly want to preserve their options depending on how the votes turn out, this is not how voting works.

84.    In determining whether to vote in favor or against the Proposals, a reasonable stockholder would find it important to know *the purpose* of the True-Up Awards. As reflected in the Company's internal documents and as detailed above, the True-Up Awards were granted to the Individual Defendants to "offset the dilutive effects" on the 2018 Option Awards caused by the Financing Transactions in order to bring each of the Individual Defendants' ownership stake in the Company back up to previous levels.  Yet nowhere in the 2022 Proxy is this information disclosed, and for this reason alone the vote on the Proposals is not fully informed.

85.    In the Proposals, the Board detailed the "factors and considerations" that were purportedly considered in granting the True-Up Awards.  Specifically, with respect to the True-Up Awards to Powers, Goldman, and Boynton, which the 2022 Proxy refers to as the "2020 Executive Options," the 2022 Proxy states in Proposal 3:

In 2020, as part of its evaluation and determination of the compensation for our executive officers, the Compensation Committee granted the 2020 Executive Options to our executive officers for service to the Company and progress achieved during the years 2018, 2019 and 2020.

Prior to receiving the 2020 Executive Options, our executive officers had not received any equity-based compensation since 2018, and those 2018 options were for service to the Company for years prior to 2018 as well as for 2018.

The 2020 Executive Options awards **were based on a number of factors and considerations**. These awards were determined after taking account of the years of service by our executive officers, the important progress achieved in the Company's clinical programs and other operations (including major milestones in 2018 related to the Phase III trial of DCVax®-L for Glioblastoma), market factors, the need to retain the executives' valuable service going forward (including for completion of the Phase III trial program which is key to the Company's value) and our overall compensation philosophy.

**For all of the above reasons**, the Compensation Committee (which is composed solely of independent directors), and the independent members of the Board determined that the 2020 Executive Options were in best interests of the Company and our stockholders, and approved the 2020 Executive Options awarded to each of Ms. Powers, Mr. Goldman and Dr. Boynton.

86.    With respect to the True-Up Awards for Black, Jasinowski, and Malik, which the 2022 Proxy refers to as the "2020 Director Options," the 2022 Proxy states in Proposal 5:

**The 2020 Director Options were based on a number of factors and considerations**. One set of considerations was the extraordinary amount time, effort and support contributed by the independent directors throughout their years of service, including the years 2018, 2019 and 2020 that were covered by the option awards. The time and

involvement of the Directors went far beyond the activities typically involved in Board service…

Another set of considerations for the 2020 Director Options was the extent of personal and professional risk our independent Directors have endured in serving on our Board. Our Company has experienced ongoing attacks from short sellers, and from bloggers whom the Company believes may be connected with short sellers… Further, our Company has been subjected to multiple lawsuits which we believe were and are vexatious and without merit, and which we have fought, and continue to fight, vigorously — but which have named our Directors personally and put them at personal risk…

Of special note, in addition to undertaking far more activities in support of the Company's operations than would normally be expected of directors, enduring attacks and lawsuits, our independent Directors have also tolerated long delays in their cash compensation and have waited for as long as 6 years for the Company to implement their equity compensation. Our Directors have also provided personal loans to the Company when needed to help the Company survive, and allowed such loans to remain outstanding and unpaid long after they were due.

Finally, an additional consideration was the long period of years that the independent Directors have been serving and the valuable continuity that has afforded the Company.

***For all of the above reasons***, the 2020 Director Options were approved by the disinterested directors, subject to stockholder approval, and our management also strongly supports the 2020 Director Options.

87.    The above disclosures are materially false and misleading. Each of the above discussions purport to disclose the "factors and considerations" that the True-Up Awards were based upon.  The Board thus had a duty to make sure this list was complete and accurate.  But missing from the list is, of course, the primary reason

the True-Up Awards were approved as reflected in the Company's internal documents – to offset the dilution caused by the Financing Transactions. Notably, each of the reasons provided in the 2022 Proxy were reasons that arguably weighed in favor of the True-Up Awards. But the Board affirmatively left out of this list a reason -- indeed, the primary reason for the True-Up Awards -- that undermined the fairness of the True-Up Awards. As a result, the vote on the Proposals is based on a materially misleading 2022 Proxy.

88.    According to the above disclosures, one of the primary reasons for the lucrative size of the True-Up Awards was to compensate the Individual Defendants for *three* years of service -- 2018, 2019, and 2020. Certainly, to the extent this is true, a reasonable stockholder would find this information important in determining whether to approve the Proposals. But this statement is outright false. The minutes of the internal Board meetings produced in connection with the Demand do *not* indicate that there was *any* discussion by the Individual Defendants that they had not been adequately compensated for 2018, 2019, and 2020, much less identify this factor as the basis for the True-Up Awards. Moreover, as detailed above, when the Company granted the sizable 2018 Option Awards, it publicly disclosed that *those* awards were intended to compensate the Individual Defendants for their service "over the next approximately 2 years," i.e., 2018 and 2019.

89.    In a similar vein, the statement that, as of the time the True-Up Awards were granted in 2020, Black, Jasinowski, and Malik had been "waiting for as long as 6 years for the Company to implement their equity compensation" is also outright false. Black, Jasinowski, and Malik received the 2018 NED Option Awards just *two* years earlier in 2018 (which, as described above, were intended to compensate them for the prior six years and the following two years). The similar statement in the 2022 Proxy was simply copied from the 2018 Proxy in connection with the vote on the 2018 NED Option Awards. Indeed, virtually all of the "factors and considerations" detailed in the 2022 Proxy regarding the True-Up Awards to Black, Jasinowski, and Malik -- including the attacks by short sellers, the personal and professional risk the directors face, and the extraordinary amount of time and effort they supposedly contribute to the Company – are copied almost verbatim from the 2018 Proxy in connection with the 2018 NED Option Awards. Rather than comply with their fiduciary duties and tell the stockholders the true purpose of the True-Up Awards, the Director Defendants believe they can simply trick stockholders into going along with approving this largesse by rehashing a laundry list of disclosures that pertained to past awards.

90.    The 2022 Proxy also misleads stockholders into believing that the size of the True-Up Awards granted to Black, Jasinowski, and Malik was supported by peer analysis. As stated in Proposal 5: "In determining the

independent directors' compensation, ***we take into account market data and practices***, and we evaluate and compare the nature and scope of responsibilities undertaken and contributions made by our independent directors in helping to support the Company and its operations compared with the typical directors' roles in other companies."    But this disclosure is materially false. The internal documents produced in the Demand revealed that the Board did *not* look at any "market data and practices" whatsoever.   And as described above, the size of the awards bore no relation to the compensation received by non-employee directors at the Company's peers. Instead, as the Company's internal documents revealed, the size of the True-Up Awards was not determined through an analysis of "market data and practices," but was instead dictated by the amount necessary to satisfy the Individual Defendants' desire to bring their ownership stake in the Company up to certain levels.

91.    In Plaintiff's Consolidated Verified Stockholder Derivative Complaint filed on June 8, 2022 (the "Complaint"), Plaintiff alleged, among other things, that the True-Up Awards were financially unfair to the Company and its stockholders and were granted through an unfair process in which all of the Directors were interested. Plaintiff is seeking, among other things, the cancellation and/or rescission of the True-Up Awards.   In Proposal 3, the Board has asked stockholders to "ratify" the True-Up Awards granted to Powers, Goldman, and Boynton.  Proper stockholder

"ratification" of interested director action generally shifts the standard of review from entire fairness to the business judgment rule.

92.     The "ratification" vote in Proposal 3 is legally deficient for at least three reasons. *First*, to have legal effect, "ratification" requires a fully *informed* vote of the stockholders, whereby stockholders are provided with accurate and complete disclosure of material information.  And as described above, the 2022 Proxy failed in this regard.

93.     Moreover, in addition to the disclosure deficiencies listed above, which are applicable to any stockholder vote, with respect to the concept of "ratification," stockholders need also to be adequately informed regarding the allegations against the interested directors that the "ratification" vote is seeking to cleanse.

94.     In this regard, Proposal 3 contains a single paragraph – three sentences long – "summar[izing]" this lawsuit.[9] As stated in Proposal 3:

> **Summary of Lawsuit**
>
> In June 2022, an alleged stockholder filed a consolidated derivative lawsuit in the Delaware Court of Chancery against the Company, its individual directors and certain executives, seeking to have the 2020 Executive Options revoked and cancelled. Despite acknowledging that the 2020 Executive Options have already been approved by the Company's Compensation Committee and independent Board members, and for which stockholders already voted in favor (with nearly 90% of the votes) in their advisory Say on Pay vote at last

---

[9] Proposal 5 also relies on this summary as it states: "See Summary of Lawsuit under Proposal No. 3 above."

year's Annual Meeting, the complaint still seeks to dispute the appropriateness of the 2020 Executive Options awarded to Ms. Powers, Mr. Goldman and Dr. Boynton. In addition, although the equity compensation to the Directors is subject to stockholder approval and the process for that approval has not yet taken place, the lawsuit also seeks to dispute the 2020 options to the independent directors.

95.     To say the least, the Board's summary of Plaintiff's allegations – that Plaintiff "seeks to dispute" the "appropriateness" of the True-Up Awards – is not a complete and accurate disclosure of Plaintiff's allegations.     Indeed, even in this short description, the Board managed to make more materially false and misleading statements than accurate statements.  For instance, Plaintiff does not "acknowledg[e]" that the True-Up Awards to Powers, Goldman, and Boynton were approved by "independent Board members."  To the contrary, Plaintiff alleged that the True-Up Awards were approved in a round-robin process in which each director was interested in the other directors' awards.  Nor did Plaintiff "acknowledg[e]" that "stockholders already voted in favor" of the True-Up Awards to Powers, Goldman, and Boynton.  Given the advisory nature of the Say-on-Pay-Vote, Plaintiff's position is that it has no bearing on what stockholders thought about the True-Up Awards. Nor did Plaintiff seek to challenge the True-Up Awards to Black, Jasinowski, and Malik despite the awards having been "subject to stockholder approval" all along. As the Complaint specifically alleged on the basis of the documents produced in connection with the Demand, the Individual Defendants had long abandoned that

plan. To the extent the Individual Defendants wish to state their viewpoint on the True-Up Awards, they are of course free to do so. But in attributing these viewpoints to Plaintiff and describing them as having been alleged in the Complaint, the 2022 Proxy is materially false and misleading.

96. *Second*, under Delaware law, stockholder "ratification" will have legal effect only if stockholders are specifically told the consequences of their vote. As it applies here, the "consequences" of a favorable vote on Proposal 3 would be to provide business judgment rule protection for the True-Up Awards granted to Powers, Goldman, and Boynton, thus effectively extinguishing Plaintiff's claims on these awards. Yet, the 2022 Proxy fails to disclose this consequence (or any consequences of a favorable vote). Nor does the 2022 Proxy disclose the "consequences" if the stockholders reject Proposal 3 – for example, whether Powers, Goldman, and Boynton will return their True-Up Awards if Proposal 3 is rejected.

97. *Third*, stockholder "ratification" will have legal effect only if it is approved in a fully informed vote of *disinterested* stockholders. However, each of the Directors are being permitted to vote the shares of Northwest Biotherapeutics common stock they currently own on Proposal 3. As stated in the 2022 Proxy, approval of Proposal 3 "requires the affirmative vote of a majority of the votes cast at [the 2022] Annual Meeting." And as further stated in the 2022 Proxy, all

1,052,853,960 shares of common stock outstanding as of October 31, 2022 will be "entitled to vote" at the 2022 Annual Meeting.

98.    Finally, Proposal 3 is improperly structured, as it "bundles" together what should be separate proposals for Powers, Boynton, and Goldman. Stockholders may well have different views on the compensation awarded to Powers, Boynton, and Goldman, who are dissimilarly situated with respect to the True-Up Awards. Because stockholders are not being permitted to vote separately on these distinct matters, the vote on Proposal 3 is structurally unsound and no ratification effect can be achieved.

## DEMAND FUTILITY ALLEGATIONS

99.    Plaintiff realleges each allegation contained above as if set forth herein.

100.    Plaintiff brings this action derivatively on behalf of Northwest Biotherapeutics to redress injuries suffered, and to be suffered, by the Company as a direct and proximate result of the Individual Defendants' misconduct.

101.    Plaintiff has owned Northwest Biotherapeutics stock continuously throughout the course of wrongful conduct and continues to hold Northwest Biotherapeutics common stock.

102.    Plaintiff will adequately and fairly represent the interests of Northwest Biotherapeutics in enforcing and prosecuting its rights, and has retained counsel with substantial experience in stockholder derivative litigation.

103.   At the time of this filing there are five directors on the Board: Black, Boynton, Jasinowski, Malik, and Powers (the "Current Board"). Each member of the Current Board has been named as a defendant in this action.

104.   Plaintiff did not make a demand on the Current Board prior to instituting this action because such a demand would be futile.

105.   Each member of the Current Board, and therefore a majority of the Current Board, received the True-Up Awards. Each Current Board member thus has a strong financial incentive to refuse to authorize any corrective action that would involve the rescission, cancellation, or disgorgement of the True-Up Awards. Accordingly, because each member of the Current Board is interested in the True-Up Awards, none of them would be able to impartially consider a demand.  Demand is therefore excused.

106.   The True-Up Award that each Individual Defendant received cannot be separated for demand futility purposes from the True-Up Awards received by the other Individual Defendants. This is notwithstanding the Individual Defendants' transparent attempt to separate the transaction by having the non-employee directors approve the awards for the executive directors and the executive directors approve the awards for the non-employee directors.

107.   As described above, the True-Up Awards were, among other things, developed in the same tainted process, based on the same improper rationale,

approved within days of each other (May 23rd and May 29th, 2020), and effectively constitute one transaction. Because each Individual Defendant received a True-Up Award, none of them would be able to impartially consider a demand seeking the rescission of another Individual Defendant's True-Up Awards, as any attempt to do so would require them to question the fairness of their own award.

108.    Moreover, as executives of the Company and with their principal source of income based on their employment with the Company, Powers and Boynton lack independence from the Company's non-employee Directors (who are responsible for establishing the executive compensation program). In its 2021 Proxy, the Company acknowledges that Powers and Boynton are not independent. Accordingly, demand is excused as to Powers and Boynton for this reason as well.

## CLASS ACTION ALLEGATIONS

109.    Pursuant to Court of Chancery Rule 23, Plaintiff brings this action on his own behalf and as a class action on behalf of those who held Northwest Biotherapeutics stock as of the close of business on October 31, 2022, which is the record date for stockholders entitled to vote at the 2022 Annual Meeting, and who continue to hold shares through the present (the "Class"). The Individual Defendants are excluded from the Class, as are the Individual Defendants' affiliates, immediate families, legal representatives, heirs, successors or assigns, and any entity in which the Individual Defendants have or had a controlling interest.

110.    The action is properly maintainable as a class action.

111.    The Class is so numerous that joinder of all members is impracticable. The Company had 1,052,853,970 shares of common stock outstanding and 972,700 shares of preferred stock outstanding as of October 31, 2022.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, there likely are thousands of members in the Class.

112.    Questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)      Whether the 2022 Proxy omits material information and/or includes materially false and misleading information in connection with the Proposals;

(ii)     Whether the Director Defendants breached their fiduciary duties by failing to disclose all material information and/or by presenting false and misleading information in connection with the Proposals;

(iii)    Whether the vote on Proposal 3 constitutes proper stockholder "ratification" under Delaware law; and

(iv)     Whether Plaintiff and other members of the Class have been or will be harmed by the wrongs complained of herein and, if so, what is the proper remedy.

113.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff has the same interests as other members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

114.    The prosecution of separate actions by individuals members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Director Defendants, or adjudications with respect to individual members of the Class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

115.    The Director Defendants have acted, or refused to act, on grounds that apply generally to the Class, and caused injury to the Class, such that final injunctive or declaratory relief is appropriate on behalf of the Class as a whole.

116.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## COUNT I
### Breach of Fiduciary Duty
### (Derivative Claim Against the Individual Defendants)

117.   Plaintiff re-alleges each allegation contained above as if set forth herein.

118.   As directors and officers of the Company, each Individual Defendant owes fiduciary duties to the Company and its stockholders.

119.   The Individual Defendants must prove the entire fairness of the True-Up Awards, which they awarded themselves in a conflicted transaction.

120.   Defendants Black, Boynton, Jasinowski, Malik, and Powers breached their fiduciary duty of loyalty by granting themselves the improper and unfair True-Up Awards.

121.   Defendant Goldman breached his fiduciary duty of loyalty by accepting the improper and unfair True-Up Awards.

122.   As a result of the Individual Defendants' actions, the Company has been and will be damaged.

123.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II
### Unjust Enrichment
### (Derivative Claim Against the Individual Defendants)

124.   Plaintiff re-alleges each allegation contained above as if set forth herein.

125.   Each Individual Defendant received improper and unfair financial benefits as a result of the True-Up Awards.

126.   It would be unconscionable and against fundamental principles of justice and equity for the Individual Defendants to retain the benefits of the improper and unfair True-Up Awards.

127.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT IIII**
**Breach of Fiduciary Duty**
**(Individual and Class Claim against the Director Defendants)**

128.   Plaintiff re-alleges each allegation contained above as if set forth herein.

129.   The Director Defendants owe fiduciary duties to the Company's stockholders, including the duty to speak truthfully when seeking stockholder action.

130.   The Director Defendants breached their fiduciary duty by causing the Company to issue the 2022 Proxy that omitted material information and contained materially false and misleading representations in connection with the vote on the Proposals.

131.   As a result of the Directors Defendants' breaches of fiduciary duty, Plaintiff and the Class are being, and will continue to be, harmed.

132.   Plaintiff and the Class have no adequate remedy at law.

## COUNT IV
### (Individual and Class Claim Against the Company and the
### Director Defendants for Declaratory Relief)

133.   Plaintiff re-alleges each allegation above as if set forth in full herein.

134.   In Proposal 3, the Director Defendants are seeking stockholder "ratification" of the True-Up Awards granted to Powers, Boynton, and Goldman.

135.   To constitute legally binding "ratification," the stockholder vote must, among other things, be a fully informed vote based on complete and accurate disclosures, stockholders must be told of the consequences of the "ratification," and only disinterested stockholders may be permitted to vote.  The vote on Proposal 3 fails in all three respects.

136.   In addition, Proposal 3 is improperly structured, as it "bundles" together what should be separate proposals for Powers, Boynton, and Goldman. Stockholders may well have different views on the compensation awarded to Powers, Boynton, and Goldman, who are dissimilarly situated with respect to the True-Up Awards. Because stockholders are not being permitted to vote separately on these distinct matters, the vote on Proposal 3 is structurally unsound and no ratification effect can be achieved.

137.   Plaintiff and the Class are entitled to a declaration that the vote on Proposal 3 does not constitute a legally binding "ratification" under Delaware law.

138.   Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of an order of judgment as follows:

A.      Finding that any demand upon the Current Board concerning the wrongdoing complained of herein would be futile;

B.      Declaring this action, as to Counts III and IV, to be a properly maintained class action, and certifying Plaintiff as the Class representative and his counsel as Class counsel;

C.      Finding that Defendants breached their fiduciary duty to the Company's stockholders;

D.      Rescinding, cancelling, and/or ordering disgorgement of the True-Up Awards, including all shares of Northwest Biotherapeutics common stock issued through any exercise of the True-Up Awards;

E.      Finding that the 2022 Proxy omitted material information and contained materially false and misleading information in connection with the Proposals;

F.      Declaring that the purported "ratification" vote on Proposal 3 does not constitute legally binding stockholder ratification under Delaware law;

G.      Declaring the stockholder votes on the Proposals to be ineffective and invalid;

H.    Awarding restitution and damages, including rescissory damages, against all Defendants in favor of the Company as a result of Defendants' breaches of fiduciary duties, plus pre-judgment and post-judgment interest;

I.    Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

J.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated: December 30, 2022

SMITH, KATZENSTEIN & JENKINS LLP

  /s/   David A. Jenkins

David A. Jenkins (No. 932)
Neal C. Belgam (No. 2721)
Jason Z. Miller (No. 6310)
1000 North West Street, Suite 1501
P.O. Box 410
Wilmington, DE 19899 (courier 19801)
daj@skjlaw.com
ncb@skjlaw.com
jzm@skjlaw.com

*Attorneys for Lead Plaintiff Glenn F. Schaeffer*

Of Counsel:

Steven J. Purcell
Robert H. Lefkowitz
Anisha Mirchandani
PURCELL & LEFKOWITZ LLP
369 Lexington Avenue, Third Floor
New York, New York 10017
212-725-1000