**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NORTHWEST BIOTHERAPEUTICS, INC.,

Plaintiff,

- against-

CANACCORD GENUITY LLC, CITADEL
SECURITIES LLC, G1 EXECUTION
SERVICES LLC, GTS SECURITIES LLC,
INSTINET LLC, LIME TRADING CORP.,
and VIRTU AMERICAS LLC.

Defendants.

Case No:  1:22-cv-10185-GHW-GS

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    PROCEDURAL HISTORY .............................................................................. 2

    A.  The Report & Recommendation And Order .............................................. 2

    B.  The Second Amended Complaint .............................................................. 4

III.   ARGUMENT ...................................................................................................... 6

    A.  Defendants Improperly And Ineffectively Attempt To Re-Litigate The
        Court's Finding That The Complaint Sufficiently Pled Price Impact .......... 6

    B.  Spoofing Causes Harm Both During Periods Of Rising Prices And Falling
        Prices In The Spoofed Security ................................................................. 9

        1.  A price reversion following an individual Spoofing Episode does not
            measure the price impact of Defendants' spoofing activity ................................ 10

        2.  Plaintiff was harmed by its sale of shares, even when those sales were
            at the price that prevailed before a Spoofing Episode, because the price
            would have been higher absent Defendants' spoofing ........................................ 11

    C.  The Second Amended Complaint Sufficiently Pleads Loss Causation ...................... 13

        1.  Plaintiff provides the market price-dependent formula used to price
            Plaintiff's sales, satisfying the temporal proximity theory for sales both
            within one hour and within one trading day of Spoofing Episodes ................... 14

        2.  Plaintiff satisfies the *Gamma Traders* long-term price impact theory
            for all other sales ................................................................................................. 20

    D.  Defendants' Belated Challenges To Other Elements Of Manipulation
        Claims Are Contrary To The R&R, Order And Caselaw ............................................... 24

        1.  The Court correctly held that the Plaintiff adequately pled all other
            elements of manipulation claims ....................................................................... 24

        2.  The Court correctly found Plaintiff adequately pled scienter ........................... 25

IV.   CONCLUSION ................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd*.,
   692 F.3d 34 (2d Cir. 2012)................................................................9, 12

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
   390 F. Supp. 3d 432 (S.D.N.Y. 2019)....................................................14

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLLC*,
   750 F. 3d 227 (2d Cir. 2014)...............................................................8

*CFTC v. Oystacher et al*,
   No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016)..............................24

*CFTC v. Skudder*,
   No. 22-CV-1925, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022)............................24

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
   413 F. Supp. 3d 187 (S.D.N.Y. 2019) (Woods, J.) ......................................13

*Gamma Traders-I LLC v. Merrill Lynch Commodities, Inc.*,
   41 F. 4th 71 (2d Cir. 2022) ...............................................................14

*Gruber v. Gilbertson*,
   628 F. Supp. 3d 472 (S.D.N.Y. 2022)......................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)........................................................................7

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*,
   585 F. Supp. 3d 405 (S.D.N.Y. 2022)......................................................8

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*
   No. 21 Civ. 761 (LGS), 2023 WL 6316252, (S.D.N.Y. Sept. 28, 2023)..................8, 9, 14, 24

*Kessev Tov, LLC v Doe(s)*,
   No. 20 Civ. 4947,2023 WL 4825110 at *6 (N.D. Ill. July 27, 2023)  ................*9, 25*

*LJM Partners, Ltd. v. Barclays Capital Inc.*,
   No. 19 Civ. 368, 2023 WL 6311471 (N.D. Ill Sept. 28, 2023)............................15

*Parchmann v. MetLife*,
   No. 18 Civ. 780, 2021 WL 320051 (E.D.N.Y. Jan. 11, 2021)...............................25

*S.E.C. v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007)...................................................................21

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)...................................................................................6

*Sharette v. Credit Suisse Intl'l.*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015).....................................................................14

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................24

*In re Tufin Software Technologies Ltd. Sec. Litig.*,
    No. 20 Civ. 5646, 2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) ...........................25

*U.S. v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013)............................................................................21, 22

*U.S. v. Nowak*,
    No. 19-cr-669 (N.D. Ill. Dec. 26, 2022), ECF 828-3 [attached as Ex. 6] ...............17

**Other Authorities**

Eun Jung Lee et al., *Microstructure-Based Manipulation: Strategic Behavior and
    Performance of Spoofing Traders* 16 J. FIN. MKTS. 227, 242 (2013).....................15

Jing Lu & Rongze Chen, *Do Individual Investors Pay Attention to the Information
    Acquisition Activities of Institutional Investors?*, 58 FIN. RES. LETTERS 104579
    (2023).................................................................................................................23

Jonathan Brogaard, Dan Li & Jeffrey Yang, *Does High Frequency Market
    Manipulation Harm Market Quality?* available at SSRN ID 4280120,
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4280120...........................16

Jonathan Brogaard, Terrence Hendershott & Ryan Riordan, *Price Discovery without
    Trading: Evidence from Limit Orders*, 74 J. FIN. 1583 (2019) ............................7

Lei Gao et al., *Market Intraday Momentum*, 129 J. FIN. ECON. 394 (2018) ................13

Merritt B. Fox et al., *Spoofing and Its Regulation*,
    2021 COLUM. BUS. L. REV. 1244 .........................................................................16

Nikolaus Hautsch & Ruihong Huang, *The Market Impact of a Limit Order*,
    36 J. ECON. DYN. & CTRL 501 (2012)...................................................................15

Nafiz Fahad et al., *The Role of Stock Message Boards in Processing Less Readable
    Disclosures*, Feb. 10, 2024, available at SSRN ID 4758510
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4758510............................23

Plaintiff Northwest Biotherapeutics, Inc. ("NWBO" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss ("Motion," ECF #156).[1]

## I.    <u>INTRODUCTION</u>

Despite encouraging news about its lead life-saving Glioblastoma treatment, Defendants ceaselessly engaged in the illegal manipulation of NWBO's share price between December 5, 2017 and August 1, 2022 (the "Relevant Period").[2] As the Court held ("Order," ECF #148) in adopting the detailed 85-page Report & Recommendation ("R&R," ECF #137), Plaintiff adequately alleged Defendants engaged in deliberate and repeated manipulative spoofing of NWBO shares that drove NWBO's share price downward from its true market level.

The Court identified a single deficiency in Plaintiff's allegations: the need to provide the pricing formulas for Plaintiff's stock sales demonstrating that those sales were based on market prices impacted by Defendants' spoofing. The SAC does exactly this and more, satisfying Rule 8's "not heavy burden" standard for loss causation. The SAC not only adds new and detailed factual allegations regarding the pricing formulas for Plaintiff's sales, but also provides citations to and analysis of economic literature on the price impact of market manipulation generally and spoofing in particular, and alleges new quantitative statistical analysis demonstrating that the persistent impact of Defendants' spoofing depressed the prices received by Plaintiff for all of its sales during the Relevant Period. These new allegations make clear that, by manipulating the market for NWBO shares through spoofing, Defendants caused Plaintiff to suffer significant losses

---

[1] Citations to Defendants' Joint Memorandum of Law in Support of Motion to Dismiss Second Amended Complaint (ECF #156) are set forth as "Def. Br." Citations to "¶ __" are to paragraphs of the Second Amended Complaint ("SAC," ECF #150). Unless otherwise indicated, quotation marks and citations are omitted and alterations are adopted.

[2] The positive scientific developments regarding NWBO's cancer treatment continue. *See, e.g.,* Richard G. Everson *et al,* "TLR agonists polarize interferon responses in conjunction with dendritic cell vaccination in malignant glioma: a randomized phase II Trial," Nature Communications (May 2024).

through its sale of over 274 million shares at artificially depressed prices, including over 40 million shares sold at the closing price on dates when Spoofing Episodes occurred. ¶11. Rather than address these well-pled allegations, Defendants baselessly attempt to relitigate elements already found to be sufficient by the Court, and make arguments completely divorced from both the allegations (that must be accepted as true), as well as caselaw and economic theory. Defendants' motion to dismiss should be denied.

## II.  **PROCEDURAL HISTORY**

### A.  **The Report & Recommendation And Order**

The R&R held the First Amended Complaint ("FAC," ECF #95) adequately pled every element of a market manipulation claim except for loss causation, and held that because the FAC adequately pled price impact of at least one hour, all that was required in an amendment for those sales was for Plaintiff to plead the formula for how the sales were priced.

Specifically, the R&R held that the FAC "contains particularized factual allegations evincing all [the] indicia of spoofing" to which courts look in determining whether manipulative acts have been pled. R&R at 33. On scienter, the R&R concluded that the FAC satisfied this element in both of two independently sufficient ways, by adequately alleging that Defendants had "an economic motivation, as well as the opportunity as market makers and sophisticated trading firms, to engage in the alleged spoofing," and that Defendants acted with conscious misbehavior or recklessness. *Id.* at 59. On reliance, the R&R held that the FAC "alleged sufficient facts to invoke the presumption of reliance" at the pleading stage. R&R at 84. Notably, the R&R also found that Plaintiff adequately alleged price impact, holding that "the FAC's allegations amply support the inference that Defendants' conduct affected the market price for NWBO stock." *Id.* at 46; s*ee also id.* at 65 ("the allegations in the FAC sufficiently plead that Defendants' spoofing schemes drove down the price for NWBO and enabled Defendants to effectuate Executing

Purchases at lower prices than they would have absent the spoofing").

While the R&R held that **"NWBO *has sufficiently alleged loss causation*** based on the temporal proximity between the spoofing and stock sales in the case of the 30 asterisked transactions in the chart in Paragraph 289," it required Plaintiff to "submit[] an amended complaint adequately explaining how the sales prices were 'formulaically derived' from the relevant closing prices." *Id*. at 71-72.  The Court explained:

> **Plaintiff has alleged enough facts to support a common-sense inference that, with respect to the 10.9 million shares sold in the 30 asterisked instances, NWBO's stock price remained artificially depressed at the close of trading on the Pricing Dates in question**. However, in order to proceed on a temporal proximity theory as to these 30 instances, Plaintiff must complete the circle of causation by pleading in an amended complaint a sufficient explanation as to *how* the various stock sale prices were "formulaically derived" from the closing prices on the days when Spoofing Episodes took place.  *Id*. at 70-71.

And, while the R&R acknowledged that under Second Circuit law, a plaintiff may plead "long-term price impact" by alleging facts sufficient to justify the inference that the impact of defendants' spoofing was persistent, and found the FAC's allegations "suggest[ed] a theoretical possibility of a long-term price impact from spoofing," the R&R held that Plaintiff needed to plead additional facts sufficient to "nudge [these] claims across the line from conceivable to plausible." *Id.* at 79. The R&R recommended Plaintiff be granted leave to amend the complaint to bolster its loss causation allegations.  *Id*. at 84.

On February 14, 2024, after substantial briefing on objections to the R&R, the Order adopted the R&R in full, and granted leave to amend on loss causation grounds.

### B.    The Second Amended Complaint

The SAC satisfies the sole deficiency identified in the R&R for sales within one hour of Spoofing Episodes by explaining in detail the formulaic connection between Plaintiff's sale prices and Defendants' spoofing.  In total, Plaintiff sold over 22.5 million such shares during the Relevant Period (*see* ¶¶294, 300 and ECF #150-4 and 150-6).  Plaintiff sold an additional nearly 18 million shares between one hour and 24 hours of a Spoofing Episode during the Relevant Period. (*see* ¶¶ 295, 301 and ECF #150-5 and 150-7).

As the SAC explains, Plaintiff engaged in two types of sales during the Relevant Period – Cash Stock Sales and Exchange Agreement Sales. ¶289. In Cash Stock Sales, "Plaintiff sold shares in transactions that were executed at the secondary market closing price on a single given date (a "Pricing Date") or at a price equal to the average secondary market closing price of NWBO's shares over one or more Pricing Dates." ¶290. Because of this strict formulaic mechanism in which "a decline in any component of an average mathematically leads to a decline in the average, a decline in the closing price of NWBO's shares on the days included in that average led to a decline in the price at which Plaintiff sold shares of stock." *Id*.

The SAC attaches a chart (ECF #150-4 and ¶294) showing the 44 transactions for a total of over 14 million shares sold where the sale price was determined by the closing price of NWBO shares on one or more Pricing Dates having one or more Spoofing Episodes in the final hour of a trading day (*i.e.*, between 3pm – 4pm), and a chart (ECF #150-5 and ¶295) showing an additional three transactions for a total of over 1 million shares sold in which the sale price was determined by the closing price of NWBO shares on one or more Pricing Dates having one or more Spoofing Episodes between one hour and twenty-four hours before the close of trading on the Pricing Date.

In Exchange Agreement Sales, "Plaintiff sold shares to lenders in exchange for the extinguishment of debt obligations having an outstanding value equal to the market value of Plaintiff's shares as determined by a standard pricing formula." ¶297. The formula for the price of Exchange Agreement Sales was "(a) 85% multiplied by (b) the average of the five lowest closing sale prices of NWBO shares in the last twenty trading days immediately preceding the date of each exchange agreement," and like the formula for the pricing of Cash Stock Sales, "a decline in the closing price of NWBO's shares on the days included in that average led to a decline in the price at which Plaintiff sold shares of stock." ¶297. The SAC also included as exhibits charts showing the 23 Exchange Agreement Sale transactions for a total of over 8 million shares in which the sale price was determined based on dates on which Defendants spoofed in the last hour of trading (ECF #150-6 and ¶300), and the 25 Exchange Agreement Sale transactions for a total of over 16 million shares in which the sale price was determined based on dates on which Defendants spoofed between one and 24 hours before the close of trading on the Pricing Date (ECF #150-7 and ¶301).

The SAC's new allegations, based on detailed econometric analyses, also demonstrate how Plaintiff's sales that took place more than one hour after a Spoofing Episode were sold at artificially depressed prices due to the persistent adverse effect of Defendants' spoofing, including:

- That Defendants' spoofing caused an immediate decline in the price of NWBO shares that *did not* fully reverse on average over time (¶304);
- That the cumulative negative price impact of Defendants' spoofing extended beyond the specific spoofing cycle, on average for up to sixty trading days (¶¶308-309, 314);
- Statistical analyses comparing the average price impact of Spoofing Episodes to industry-standard and court-approved benchmark indices over various time periods, demonstrating that the negative price impact was caused by Defendants' spoofing (¶¶311-315);
- An explanation of peer-reviewed economic literature establishing that the price impact of all forms of trade-based manipulation, including spoofing, persists over time (¶¶316-321);
- That the price of NWBO shares (like all securities) may be higher or lower after a Spoofing Episode for reasons unrelated to spoofing, and therefore the price impact of Defendants'

spoofing is appropriately and accurately shown by the average price impact over the entire spoofing scheme (¶322);

- That Defendants' spoofing often occurred during periods of increasing investor enthusiasm for NWBO, and that absent Defendants' spoofing the price of NWBO shares would have risen even higher (¶¶323-325); and

- That persistent price impact from spoofing exists even after Baiting Orders are cancelled and the manipulative trades are "unwound" since traders buy and sell to unwind trades in ways designed to minimize the price impact of that unwinding (¶¶326-327).

## III.    ARGUMENT

### A.    Defendants Improperly And Ineffectively Attempt To Re-Litigate The Court's Finding That The Complaint Sufficiently Pled Price Impact

Faced with the narrow deficiency identified by the Court, and the SAC's detailed factual allegations satisfying it, Defendants pivot to another tack altogether. They raise for the first time a new theory – contrary to the facts pled in the SAC, the Court's holdings, and without any basis in legal or economic authority – that the presumption of reliance on an efficient market is somehow incompatible with any persistent price impact from spoofing because "once the alleged spoof orders ceased, the price immediately corrected."[3] Def. Br. at 1, 25.[4]

Defendants' theory completely misconstrues the effect of spoofing on the market. The difference between a spoofing order and a legitimate order is determined by the intent of the entity placing the order. ¶¶8, 55. If the entity placing the order wants to purchase or sell the security at that price, it is a legitimate order. ¶56. If the entity does not actually want to purchase or sell the security at that price, but instead wants to manipulate the market by creating the false impression of additional supply or demand, that is an illegal manipulative order. *See* ¶8, 55; *Set Cap. LLC v.*

---

[3] Nowhere in their earlier briefing did Defendants argue that the presumption of reliance on an efficient market was inconsistent with price impact. Instead, they argued that Plaintiff failed to allege that the market for NWBO stock was efficient. *See* Motion to Dismiss First Amended Complaint, ECF #115 at 34-35.

[4] The SAC also pleads actual reliance, which is not dependent on an efficient market. ¶335.

*Credit Suisse Grp. AG,* 996 F.3d 64, 77 (2d Cir. 2021) ("scienter is the only factor that distinguishes legitimate trading from improper manipulation"). When a Defendant places a fake Baiting Order – one designed to trick the market instead of to make a purchase or sale – the market does not know it is a spoofing order, but instead thinks of it as a legitimate order and it incorporates that order into its overall estimation of the price of the security – a price driven by the balance of supply and demand. ¶¶10, 55. That is why spoofing creates an artificial price.

Even *after* a spoofer cancels an order, the fake Baiting Order does not disappear from the market's memory – instead, the cancelled order remains part of the historical record of order flow in the security that determines the share price. As the SAC alleges, "peer-reviewed research has found that sell-side order cancellations drive the price *up* by *less* than new sell-side orders drive the price *down*."[5] For this reason, the impact of Baiting Orders is not likely to dissipate merely because those orders were subsequently cancelled. Further, manipulative spoofing causes the execution of *trades*, not only the placement of orders, because Baiting Orders induce other market participants to sell shares at artificially depressed transaction prices. ¶317.

Accordingly, the market **never learns that the Baiting Order was fake**. ¶60. Instead, the market mistakenly believes it was a legitimate order that was cancelled. ¶60. That is the key flaw in Defendants argument – Defendants are falsely equating the cancellation of the fake Baiting Order with the truth being restored to the market. Def. Br. at 1, 25. An efficient market is not an all-knowing market, it is a market that quickly incorporates all publicly available information – both true **and** false. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014). The

---

[5] ¶317, n.68 (citing Jonathan Brogaard, Terrence Hendershott & Ryan Riordan, *Price Discovery without Trading: Evidence from Limit Orders*, 74 J. Fin. 1583, 1635 (2019) (magnitude of price impact of order placement exceeds magnitude of price impact of order cancel)), Exhibit 1 to the Declaration of Laura H. Posner (hereinafter "Ex. __"). The Court may take judicial notice of the publicly-available documents cited in this memorandum.

efficient market in NWBO stock incorporates the false information conveyed by the fake Baiting Order, then it incorporates the information conveyed by the cancellation of that order, but the market ***never learns*** that the fake Baiting Order was fake. That missing information – that the cancelled order was fake – is never revealed, so the price artificiality created by the fact that the order was not intended to be fulfilled remains even after the order was cancelled. ¶60. *C.f.* R&R p. 61-62 ("the Court finds the inference that market participants (many or most of whom lack the same degree of sophistication as Defendants) were unaware that Defendants were engaging in spoofing at least as cogent as the inference that market participants caught on to Defendants' alleged manipulation"). The efficiency of the market is not affected by the fake Baiting Order, the efficiency of the market is ***why*** the fake Baiting Order creates an artificial price – that is why an efficient market is entirely compatible with the allegations in the SAC and, indeed, why "alleging reliance for market manipulation claims requires allegations that a plaintiff "reli[ed] on an assumption of an efficient market free of manipulation." *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 585 F. Supp. 3d 405, 420 (S.D.N.Y. 2022), reconsideration denied, No. 21 CIV. 761 (LGS), 2022 WL 580787 (S.D.N.Y. Feb. 25, 2022), quoting *Set Cap.*, 996 F.3d at 76. *See* ¶¶331-332, 335, 342.

Not only has no court accepted Defendants' suggestion that the presumption of reliance on an efficient market is incompatible with loss causation in spoofing cases, but courts have expressly allowed spoofing claims to proceed based on reliance on an efficient market. *See Harrington II*, No. 21 Civ. 761 (LGS), 2023 WL 6316252, at *8-9 (S.D.N.Y. Sept. 28, 2023) (plaintiff sufficiently pled loss causation and also sufficiently pled reliance based on the presumption of an efficient market)[6]; *CP Stone Fort Holdings*, No. 16 Civ. 4991, 2017 WL 1093166, at *5 (N.D. Ill. Mar. 22,

---

[6] *Harrington I* cited to *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLLC*, 750 F. 3d 227, 234 (2d

2017) (reliance based on fraud on the market presumption) and No. 16 Civ. 4991, 2017 WL 11884601, at *1 (N.D. Ill. Oct. 3, 2017) (loss causation).[7]

**B.**    **Spoofing Causes Harm Both During Periods Of Rising Prices And Falling Prices In The Spoofed Security**

Defendants next attempt to re-litigate another argument that was already rejected by this Court – that all spoofing claims must be analyzed solely by reference to actual security price movements, ignoring the well-settled principle of securities law that investor harm and damages are measured by the difference between the manipulated artificial price and the price that would have existed *but for* defendants' manipulation. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (securities fraud damages are "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct"). This Court has already held that Plaintiff adequately pled price impact not limited to periods when the price was otherwise declining.[8]

Defendants do not engage with this principle, and in place of legal authority offer a heads-we-win-tails-you-lose tautology that if the price was otherwise rising, there is no price impact, and

---

Cir. 2014) that "the efficient market hypothesis, premised upon the speed (efficiency) with which new information is incorporated into the price of a stock, does not tell us how long the inflationary effects of an uncorrected misrepresentation remain reflected in the price of a security," concluding that "whether the effects of the alleged market manipulation dissipated is a question of fact that can be answered only upon a more fully developed record." 585 F. Supp. 3d at 419-420.

[7] Defendants' references to *Phunware* are inapposite as the sale transactions in that case were of a different nature than the Cash Stock Sales and Exchange Agreement Sales here, which are priced based on specific formulas. In any event, the Court in *Phunware* (which relied on this Court's R&R almost entirely) did not hold that a spoofing plaintiff *could not plead* both reliance on an efficient market and loss causation – to the contrary, although the complaint in that matter alleged reliance based, in part, on the presumption of an efficient market (an element not challenged by the defendant's motion to dismiss), the Court allowed the plaintiff to move for leave to amend to add new loss causation allegations.

[8] This argument was also rejected in *Kessev Tov, LLC v Doe(s)*. In response to defendants' argument that that "prices fell over the course of bidding"—*i.e.*, that the share price moved in the opposite direction as Baiting Orders over the spoofing episode—the court concluded that "this price drop, however, could still reflect artificial prices." No. 20 Civ. 4947, 2023 WL 4825110 at *6 (N.D. Ill. July 27, 2023).

if the price is otherwise falling, there is no profit motive. Both are wrong because actionable harm from spoofing is not immunized because the actual price of a security is rising for unrelated reasons during periods of spoofing when the spoofing caused the price to be lower than it otherwise would be, and because the profit motive exists for a spoofing scheme even if one or more out of thousands of particular spoofing episodes did not result in a profit (indeed, "motive" is never required to prove scienter in securities fraud cases).

### 1.    A price reversion following an individual Spoofing Episode does not measure the price impact of Defendants' spoofing activity

Defendants point to price increases after certain *individual* Spoofing Episodes to claim that Plaintiffs were not harmed by Defendants' spoofing activity. Def. Br. at 10-11, 20-21. This argument is flawed because it is a mathematical certainty that the price will increase by random chance alone after certain Spoofing Episodes even if those Spoofing Episodes artificially drove down the share price from what it would have been absent the Spoofing Episode. Although much more than Rule 8 requires, the SAC employs a standard, peer-reviewed methodology to eliminate randomness and isolate the actual price impact of Defendants' spoofing activity on NWBO shares.

For a simplified example that shows the error in Defendants' approach, suppose that every Spoofing Episode caused a decline of one cent in NWBO's share price, and immediately following Spoofing Episodes, the next price change is determine by a coin flip, where an increase of one cent occurs when the coin lands on heads and a decrease of one cent occurs when the coin lands on tails. In that example, approximately half of the Spoofing Episodes would be immediately followed by a complete price reversion (an increase of one cent). But it would be economically wrong to conclude that those Spoofing Episodes had no impact on the price, just as it would be economically wrong to conclude that half the Spoofing Episodes caused a decline of two cents. In both cases, the price impact of every Spoofing Episode was a decline of one cent, which is what is obtained

by averaging across all the coin flips.  For the same reason, a subsequent price reversion following any individual Spoofing Episode is not a measure of the price impact of that Spoofing Episode.

Accordingly, to identify and recover the actual price impact of Spoofing Episodes it is necessary to average price changes after Defendants' spoofing activity over many episodes, so that price paths arising by random chance cancel each other out.  The SAC does just such an analysis for Spoofing Episodes and shows that, *on average*, Defendants' spoofing activity had an immediate, persistent and long-run negative impact on the price of NWBO shares. ¶¶311, 313. This analysis also shows that this long-term negative impact *was not* followed by complete price reversals as would be expected if the effect of Defendants' spoofing activity had fully dissipated.

### 2. Plaintiff was harmed by its sale of shares, even at prices that prevailed before a Spoofing Episode because the price would have been higher absent Defendants' spoofing

Even if individual price reversions were relevant, Plaintiff was still harmed by its sales at the price that prevailed before a Spoofing Episode. Defendants identify two Spoofing Episodes after 3pm on Pricing Dates and argue that a reversion of the stock price to the pre-spoofing level following those two episodes indicates that Plaintiff was not harmed. They are wrong.

***First***, a post-spoof price increase may reflect only a *partial reversion* of the total downtrend caused by Defendants' spoofing activity. Defendants point to the best offer at the time of the Executing Purchase to conclude that the price completely reverted following the Spoofing Episode. While a price decline from the best offer indicates that the spoofing activity impacted the price, a determination of whether a reversion was partial or complete requires evaluating the entire price impact of a Spoofing Episode.

Consider Defendants' first example of the Spoofing Episode at 3:58:35pm on February 25, 2021.  The following figure shows the stock price of NWBO (*see* R&R at 27 (taking judicial notice

of stock prices)) before and after that Spoofing Episode:[9]



In the minutes before the Spoofing Episode, NWBO's share price oscillated around $1.42 to $1.44, at an average price of $1.43. During the Baiting Period, NWBO's share price declined and oscillated between $1.40 and $1.41. After the Executing Purchase, NWBO's share price remained depressed and continued to oscillate around $1.40 to $1.42, before closing at $1.42. This example shows how Defendants' spoofing activity had a persistent effect on NWBO's share price notwithstanding the partial reversion from $1.40 to $1.42 per share, and how Defendants' spoofing caused NWBO to be unable to sell shares at $1.44 per share, which caused NWBO losses.[10]

**Second**, an increase in the price of NWBO shares that would have occurred absent Defendants' spoofing does not unwind the deflationary effect of a Spoofing Episode, which is "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Acticon AG*, 692 F.3d at 38. A straightforward measure of the but-for price is given by comparing the trend prior to the Spoofing

---

[9] Defendants asked this Court to take judicial notice of NWBO stock prices. Def. Br. at 21, n.28.

[10] There are other similar examples pled in the SAC. *E.g.*, ¶¶ 179-185 (prevailing best offer before Spoofing Episode was $1.59 per share, Executing Purchase occurred at $1.56 per share, and subsequent sale at $1.57 per share).

Episode to the trend thereafter, as shown in the following figure:



As this figure shows, over the period 3:07pm to 3:20pm, NWBO's share price was increasing from $1.355 to $1.39 per share. Defendants' spoofing activity not only caused an immediate decline in the share price from $1.39 to $1.37, but it also halted the upward trend in the share price that was occurring and would have economically been expected to continue, and transformed it into a downward trend.[11] Because NWBO's share price would have risen to at least $1.40 absent the Spoofing Episode, NWBO sold shares at an artificially depressed price *relative to what the price would have been absent the spoofing activity*.[12]

### C.    The Second Amended Complaint Sufficiently Pleads Loss Causation

A plaintiff's burden to plead loss causation is "not a heavy one." *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. 2019) (Woods, J.)

---

[11] *See, e.g.*, Ex. 2, Lei Gao et al, *Market Intraday Momentum*, 129 J. FIN. ECON. 394 (2018) (finding intraday persistence in asset prices from first half-hour to last half-hour of trading day).

[12] Similar trends are observed on other dates where Defendants claim that the share price of NWBO reverted to the pre-spoofing level (*e.g.*, Def. Br. at 21). For example, on August 1, 2018, the share price rose from $0.2135 to $0.2160 before the spoofing activity, only to fall by 2.3% to $0.2110 immediately prior to the Executing Purchase, which indicates the but-for share price would have been higher, notwithstanding the partial reversion to $0.2140 following the Executing Purchase.

(citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)). Under the "prevailing practice" in this District, "a short and plain statement that provides the defendant with notice of the loss and its causal connection to the alleged misconduct [is] sufficient" and "pleading the elements with particularity is not required." *Sharette v. Credit Suisse Intl'l.*, 127 F. Supp. 3d 60, 80, 102-03 & n.12 (S.D.N.Y. 2015).

Plaintiff meets this standard. The SAC alleges exactly how Defendants' manipulative spoofing allowed Defendants to manipulate and depress the price of NWBO stock and how, as a result of Defendants' spoofing, NWBO was forced to sell stock at artificially depressed prices. ¶¶ 288-330.[13]

1. **Plaintiff provides the market price-dependent formula used to price Plaintiff's sales, satisfying the temporal proximity theory for sales both within one hour and within one trading day of Spoofing Episodes**

This Court held Plaintiff sufficiently pled the "temporal proximity" theory under *Gamma Traders-I LLC v. Merrill Lynch Commodities, Inc.,* 41 F. 4th 71 (2d Cir. 2022) for its sales priced based on closing prices on days in which Defendants spoofed within an hour of the end of trading, so long as its new allegations explain how those sale prices were "formulaically derived." R&R at 70-71. The SAC does precisely this.[14] ¶¶288-301. The SAC similarly does so for sales that occurred between 1 hour and 6.5 hours (same trading day) after a Spoofing Episode. *Id. See*

---

[13] *See Harrington*, at 419 (plaintiff sufficiently pled loss causation by alleging spoofing occurred on a majority of trading days during the Relevant Period, that the plaintiff traded on twenty-seven of those days and that "the spoofing depressed the price for up to fifteen minutes with lingering cumulative effects over the Relevant Period"); *Sharette*, 127 F. Supp. 3d at 103 (plaintiffs "pleaded enough facts evidencing a link between the alleged manipulative scheme and their damages" because they "have shown in some detail exactly how the structure of the Offerings allowed investors to manipulate and depress the price of ECD stock" and "that following the Offerings, short sales of ECD stock skyrocketed while the price of ECD stock plummeted."); *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (S.D.N.Y. 2019) (plaintiffs plausibly alleged "that the Exchanges' alleged misconduct was *a* proximate cause of the economic loss they suffered by trading in the manipulated securities market").

[14] As explained above, *supra* pgs. 6-8, there is no inconsistency between reliance on an efficient market and a short-term price impact from spoofing. Def. Br. at 10.

*Gamma Traders*, at 80 (holding that "same-day, post-spoof trades" could justify "an inference of injury" if the plaintiff provides "factual allegations justifying an inference that the effects of the spoof linger for that long"). For those sales, Plaintiff also alleges how "its trades occurred so close in time to Defendants' spoofing as to permit [the Court] to infer as a matter of common sense that the market prices were artificial when [NWBO] traded." *Id.* at 80. *See also LJM Partners, Ltd. v. Barclays Capital Inc.*, No. 19-CV-368, 2023 WL 6311471, at *16 (N.D. Ill Sept. 28, 2023) (holding that allegations that defendants' conduct affected the price of a security "for the entire afternoon of February 5 and morning of February 6," during which time the plaintiff transacted, was sufficient under *Gamma Traders* to plead loss causation).[15]

a)    *Academic literature demonstrates that spoofing has a persistent price impact on market prices*

Defendants distort academic literature outside the four corners of the SAC to fit an inaccurate narrative that the price impact of every form and instance of spoofing can only last "seconds or less" (Def. Br. at 13). First, Defendants cite an article published over a decade ago for the proposition that "[T]he effect of spoofing-buy orders is short-lived."[16] This study, based on four months of trading 23 years ago in Korea, is hardly determinative of the effect of spoofing in NWBO shares during the Relevant Period. Regardless, Defendants misconstrue it. Two paragraphs later, the authors write, "*it takes some time for the effect of the spoofing-buy order to be*

---

[15] There is no discontinuity that would justify different treatment for sales priced 59 minutes after a Spoofing Episode and those sales priced 61 minutes after a Spoofing Episode. Here, in addition to the 68 sales priced within one hour after Defendants' spoofing, the SAC and Exhibit 7 (ECF 150-7) include 11 sales for which Defendants spoofed within 2 hours before NWBO's sales were priced, and another 4 sales for which Defendants within 3 hours before NWBO's sales were priced.

[16] Ex. 3, Eun Jung Lee et al., *Microstructure-Based Manipulation: Strategic Behavior and Performance of Spoofing Traders*, 16 J. FIN. MKTS. 227, 237 (2013).

*incorporated into the price*."[17] Defendants then cite an article entitled "*The Market Impact of a Limit Order*"[18] for the proposition that "Spoofing literature shows the market reacts within 13 seconds on average." Def. Br. at 13. That article is not a study of spoofing and refers only in passing to a prior 2009 study on spoofing from the Korean markets. Regardless, this article too stands for the opposite of what Defendants' claim. The study finds that limit orders have a "highly persistent" effect on prices.[19]  The only other literature Defendants cite is a legal (not finance) article that does not analyze market data, but presents legal arguments based on hypothetical conjectures not analogous to this case.[20]

Defendants also ignore relevant – and current – finance literature that contradicts their preconceived thesis that the price impact of spoofing lasts "a few seconds." For example, a recent study by market microstructure economists measured spoofing activity impacting prices for longer periods of time.[21]

---

[17] *Id.* Defendants left out the conclusion that spoofing "generates extra profits in the range of 67–83 basis points *over the course of approximately 45 minutes*." *Id.* at 229. The authors further note that "The duration from the execution of the sell order to the cancellation of the spoofing-buy order was *longer* than one might have anticipated" and conclude that "while transaction costs reduce the profitability of spoofing, *they do not diminish the harm inflicted on other traders by this manipulation.*" *Id.* at 245.

[18] Ex. 4, Nikolaus Hautsch & Ruihong Huang, *The Market Impact of a Limit Order*, 36 J. ECON. DYN. & CTRL 501, 511 (2012).

[19] *Id.* at 502. In particular, "both ask and bid tend to significantly increase (decrease) after the arrival of a buy (sell) limit order" and "quotes converge to a (new) *permanent* level at which the information content of the incoming limit order is completely incorporated." *Id.* at 511. The study further emphasizes that the "significant *permanent* impact induced by an incoming limit order indicates that it contributes to price discovery." *Id.* at 512.

[20] Merritt B. Fox et al., *Spoofing and Its Regulation*, 2021 COLUM. BUS. L. REV. 1244, 1317-18 (2021). Defendants quote an excerpt beginning with "*in the Atlee example*, only the liquidity suppliers, no one else, were hurt by the spoof." *Id.* at 1318. That example supposes a market participant ("Atlee") trading on both sides of the market within milliseconds. But Plaintiff is fundamentally different than Atlee, and did not trade on both sides of the market, buying and selling within milliseconds.

[21] Ex. 5, Jonathan Brogaard, Dan Li & Jeffrey Yang, *Does High Frequency Market Manipulation Harm Market Quality?* Available at SSRN ID 4280120, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4280120. That study showed at least a 5-minute impact from spoofing, measuring price impact in the form of return volatility at the 15-second, 1-minute

These findings are consistent with the language quoted by Defendants in the Declaration of Professor Venkataraman in the *Nowak* matter; namely, that the loss impacts the price within seconds after the spoof. Def. Br. at 13-14 (citing *U.S. v. Nowak*, No. 19-cr-669 (N.D. Ill. Dec. 26, 2022), ECF 828-3 [attached as Ex. 6]). That simply means that prices ***start*** reacting quickly to Baiting Orders, which is what the SAC alleges as well, *e.g.*, ¶84 (prices declined during the two minutes preceding an Executing Purchase); *see also supra* pgs. 10-13 (price decline occurs quickly during Baiting Period). That says nothing about how quickly prices ***revert*** following a Spoofing Episode,[22] and it says nothing about a situation like this one in which Defendants engaged in repeated, sustained and constant spoofing of NWBO over long periods of time. *See, e.g.,* ¶¶304, 308-315.

> b)  *Plaintiff adequately plead sale transactions within one hour of Spoofing Episodes*

In their motion to dismiss the FAC, Defendants argued that NWBO "failed to plead loss causation as to any of its sales, even those relating to the 30 instances in which spoofing allegedly occurred within an hour of the close," because according to Defendants, the sale must have

---

and 5-minute intervals, and showing an increase of 33%, 28% and 23%, respectively, in volatility. *Id.* at *49. This indicates the effect of spoofing dissipates slowly. While that study did not take steps to measure beyond the 5 minute interval, its estimates fit a power curve tightly, which extrapolates to a price impact of 21% at 10 minutes, 18.5% at 30 minutes and 17.45% at 60 minutes. The academic literature on spoofing, including a paper cited in the R&R at p. 62, also suggests that spoofing undermines long-run price accuracy. *See generally* STOCHASTIC CALCULUS FOR FINANCE I: THE BINOMIAL ASSET PRICING MODEL (2004). Comparing spoofing to a "benchmark equilibrium" with no spoofing, the authors conclude that "the average executed price at date 2 [i.e., the long-run price] in the spoofing equilibrium is further from the true asset value v than in the benchmark equilibrium." Williams & Skrzypacz at *14. Thus, "***trading histories*** involving canceled orders are less informative of the asset's value than under the benchmark."

[22] Defendants note that in *Nowak*, Professor Venkataraman's loss analysis was limited to transactions occurring prior to cancellation of spoof orders. Def. Br. at 14. But Professor Venkataraman acknowledged that spoofing has a "lasting effect" not captured by his analysis. He gave an example of a lasting effect of Spoof Orders, conceding that "the best offer price remained below what it had been prior to the placement of Mr. Smith's first Spoof Orders in this episode." *Id.* at 32. He also emphasized that "the Spoofing Sequences have ***lasting detrimental effects*** far beyond the periods covered by Defendants' Spoofing Sequences." *Id.* at 33.

occurred within, "at most, one to two minutes" of the Spoofing Episode for the requisite causal connection to exist. This argument was flatly rejected in the R&R: "But *Gamma Traders* does not go that far, nor do Defendants cite to any authority supporting their proposed bright-line rule. Indeed, the court in *Gamma Traders* recognized that ordinarily the effects of spoofing pose questions of fact." R&R at 70.

Undeterred, Defendants again offer a series of irrelevant challenges to the sufficiency of these transactions that were within one hour of a Spoofing Episode. First, Defendants assert that for 17 of the 31 Spoofing Episodes, the actual price of NWBO stock increased following the Spoofing Episode and prior to the close of trading. Def. Br. at 20-21. As explained above, this is not the proper measure of the price impact of spoofing because it does not reflect the difference between the artificial spoofed price and the but-for price absent the spoofing. Defendants raise no other objection to the pleading of these 17 Spoofing Episodes (and say nothing of the thousands of additional Spoofing Episodes in Exhibit 1, ECF#150-1).

For the remaining 14 Spoofing Episodes examples, Defendants point to specific aspects in which the examples differ from each other, but without any legal support or citation to a single opinion that requires every (or any) example to contain every feature of a scheme or element of a cause of action. No court has required a plaintiff to plead each element for each of thousands of Spoofing Episodes (or even any discrete subset of a complaint's allegations). *Cf. Harrington II*, 2023 WL 6316252 at *6 ("It would be both unwieldy and unreasonable to require Plaintiff to proffer detailed descriptions of each alleged episode in order to plead a sufficient claim."); *id.* ("These illustrative examples represent the hundreds of manipulative spoofing episodes identified over the Relevant Period."); R&R at 44-45. Nevertheless, addressing Defendants' points in order (Def. Br. at 21):

- Not every transaction requires pleading of Defendants' "next sale," especially when all of Defendants' trading data is within their possession (R&R at 31 (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102) (that plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.")));

- The seven different Spoofing Episodes that occurred on October 27, 2020 sufficiently illustrate Defendants' scheme and the actual increases and decreases in prices during those episodes do not undermine the conclusion that Defendants' spoofing drove the price of NWBO lower than it otherwise would have been;

- Defendants were not the only market participants, and spoofing "baits" other traders into placing their own orders in response to Baiting Orders;

- Pages 42-43 of Exhibit 3 to the SAC (ECF #150-3) list January 26, 2021 as a True-Up Pricing Date for two sales on January 19, 2021, one for a sale of 185,155 shares and another for a sale of 68,790 shares; and

- Price reversion relative to pre-spoofing prices is not the relevant comparison and Defendants' spoofing is sufficiently alleged to have driven down the price of NWBO relative to its true (but-for) market level.

c) *The SAC "Completes the Circle of Causation" by explaining how Plaintiff's sale prices were "Formulaically Derived"*

Twenty-two pages into Defendants' twenty-five page brief, they finally address the specific deficiency identified in the R&R, in a total of three paragraphs. The substance of Defendants' challenge is limited to repeating its incorrect (and already rejected) assertion that there can be no price impact if the actual price of NWBO stock did not decrease over some period following a Spoofing Episode. *See* Def. Br. at 22-23. But as this Court already held, Plaintiff "***has alleged enough facts to support a common-sense inference that, with respect to the 10.9 million shares sold in the 30 asterisked instances, NWBO's stock price remained artificially depressed at the close of trading on the Pricing Dates in question***," negating any import of Defendants' argument. R&R at 70.

Further, Defendants' conclusory assertion that the detailed descriptions of the Cash Sales and Exchange Agreement Sales formulas "are far too attenuated" is flatly contradicted by the new allegations in the SAC that demonstrate how those formulas resulted in the mathematical certainty that the negative price impact already held by this Court to have been sufficiently pled resulted in

Plaintiff receiving lower prices for the sale of its stock than it would have absent Defendants' spoofing.[23]

### 2. Plaintiff satisfies the *Gamma Traders* long-term price impact theory for all other sales

The SAC also pleads detailed "facts to support its theory about the length of time that spoofing affect[ed] the market or the timing of any of its trades in relation to the spoofs" (*id.* at 81-82) sufficient to allege loss causation for the remainder of Plaintiff's sales.[24] The R&R did not hold that Plaintiff *could not* plead that Defendants' spoofing depressed the price of NWBO shares for "days, weeks, or months after the Spoofing Episodes," only that the FAC did not contain sufficient allegations to justify this inference. R&R at 78. Plaintiff's new allegations, *supra* pgs. 5-6, "nudge [its] claims across the line from conceivable to plausible." R&R at 79 (quoting *Twombly*, 550 U.S. at 550).

### a) *Long-term price impact is consistent with partial reversion of security prices*

As discussed previously, the price impact of Spoofing Episodes is not determined by the random path that the stock price took after any individual Executing Purchase. But, these random price increases after individual Executing Purchases did provide Defendants an opportunity to

---

[23] Defendants only response is to suggest that the "true-up" provisions of Exchange Agreement Sales would not explain different prices for sales that used the same Pricing Dates. However, transactions on the same date, using the same Pricing Dates and the same "single formula," could nonetheless have different effective sale prices between purchasers because true-up obligations varied from purchaser to purchaser. For example, when NWBO's share price after a prior sale was higher than the price before it, a preceding true-up obligation would effectively reduce the number of shares the purchaser was entitled to retain, leading to a higher effective sale price than for a purchaser lacking a prior true-up obligation. True-up obligations differed between purchasers because they were based on each purchaser's prior transaction history. Nonetheless, it is always the case that a decline in the closing price of any of the Pricing Dates, including those used in true-up calculations, led to a sale of shares at a lower price than otherwise would have occurred.

[24] As explained above, *supra* pgs. 6-8, there is no inconsistency between reliance on an efficient market and a long-term price impact from spoofing. *Cf.* Def. Br. at 15.

profit by selling shares purchased at an artificially depressed price.[25]

The average price path across thousands of Spoofing Episodes shown in paragraph 311 demonstrates that Defendants profited through a strategy of buying at artificially depressed prices and holding through partial reversions, even if some of those Executing Purchases were followed by price declines. The absence of an, *on average*, complete reversion[26] shows that Defendants' activity had a persistent and long-lasting impact on NWBO's share price.[27]

In addition, new allegations in the SAC demonstrate that there was a statistically significant association between NWBO's share price and standard industry indices (¶¶311-315 and n.65) that courts have held sufficient for loss causation purposes. *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 488 (S.D.N.Y. 2022) (upholding expert testimony on loss causation which examined whether industry factors had a "statistically significant impact on movements in [the] stock price"); *U.S. v. Gushlak*, 728 F.3d 184, 199 (2d Cir. 2013) (upholding loss analysis which evaluated industry control by examining statistical significance).

---

[25] In any given case, Defendants could not be sure whether the price would randomly increase or decrease in the minutes immediately following an Executing Purchase. Thus, some fraction of purchases could be immediately resold at a profit. But conduct that is uneconomical at certain times to further a broader scheme has long been a defining characteristic of manipulative activity. *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) (manipulation entails trading "not for any legitimate economic reason").

[26] The scatterplot in ¶311 is "the *average* price of NWBO shares following Spoofing Episodes." Of course, the price reverted to the pre-spoofing level after individual Spoofing Episodes, just as it declined further after other Spoofing Episodes. The *average* of these price movements displays multiple "partial reversions" where the average price increases from low points.  (A reversion *above* the 0-minute mark would be a complete—not partial—reversion.)

[27] The mere fact that a spoofing Defendant reversed its position following its spoofing activity does not imply that the price would systematically reverse thereafter. Defendants were not the only participants in the market. The SAC alleges that Defendants' spoofing "successfully induced the entry of sell orders from other market participants" that would not have occurred otherwise. ¶¶74, 76, 87, 90, 101, 104, 115.

b)    *Academic literature supports that Defendants' spoofing had a long-term price impact*

The SAC contains new factual allegations that go beyond the conclusions in the Milgrom Report to the underlying academic literature on the long-term price impact of market manipulation on which it relied. *See, e.g.,* ¶¶ 317, n. 67 (citing recent paper *Spoofing in Equilibrium* that disagreed with the notion that spoofing is "an out-of-equilibrium phenomenon that can be completely neutralized by sophisticated traders once understood by all market participants"); *id.* n. 68 (citing recent paper *Price Discovery without Trading: Evidence from Limit Orders* that found the magnitude of price impact of order placement exceeds the magnitude of price impact of order cancellation).[28] The SAC further explains exactly how the steps of a spoofing scheme necessarily create the conditions for lasting price impact from trade-based manipulation. ¶¶318-321 ("the spoofing activity identified in this Complaint consists of *trade-based manipulation* whereby Baiting Orders induced market participants to place marketable sell orders that executed against Defendants' non-marketable Executing Purchases …. The Placement of non-marketable buy orders after the completion of a Spoofing Episode induced only a *partial price reversion* that did not fully unwind the impact of Defendants' manipulative spoofing.")

Defendants do not substantively engage with these new allegations other to claim they are irrelevant because they concern trade-based manipulation generally (Def. Br. at 17-18), even though the allegations both refer to a finance article on the impact of spoofing specifically[29] and

---

[28] The Milgrom report is not limited to price fixing or other factual allegations unique to the ISDAfix matter, but rather discusses the extensive economic literature establishing that the price impact of *any* form of trade-based manipulation (like spoofing) is not likely to fully reverse. ¶317. It also finds that the unwinding of a manipulative transaction through subsequent trading to realize profits does not eliminate the permanent price impact of that manipulation. *Id.* at ¶326.

[29] The paper cited in ¶316, n.67 ("*Spoofing in Equilibrium*") specifically addresses spoofing and explains how spoofing undermines long-run price accuracy. *Supra* pg. 21.

explain that spoofing is a form of trade-based manipulation.

      c)     *Investor sentiment analysis demonstrates spoofing's long-term price impact*

The SAC includes new allegations based on economic analyses using a modified version of the Loughran-McDonald (2011) dictionary, which has been cited in hundreds of papers written and published during the Relevant Period.[30] ¶324, n.74. These analyses show Defendants regularly engaged in Spoofing Episodes when investor enthusiasm over NWBO was rising, and that absent Defendants' spoofing, the price of NWBO shares would have increased. The analyses also demonstrate that Defendants' spoofing "cut off" investor enthusiasm, preventing NWBO's share price from rising even further. For this reason, increases in the price of NWBO shares does not mean that the price impact of Defendants' spoofing dissipated fully. Regardless of whether NWBO's share price increased or decreased following a Spoofing Episode, but for Defendants' manipulative conduct, the price of NWBO shares **would have been even higher**. *E.g.,* ¶309, n.64. Defendants' only response to these allegations is that the dictionary has not been used to analyze investor sentiment. This is both inappropriate at the pleading stage and wrong – the dictionary has been applied in broad settings, including to analyze sentiment in message board postings.[31]

      d)     *Asymmetric order placement supports spoofing's long-term price impact*

Defendants argue that the SAC's detailed factual allegations that their total share volume of Baiting Orders far exceeded their share volume of Executing Purchases is not suggestive of

---

[30] https://scholar.google.com/scholar?cites=16721256441322644652&as_sdt=5,33&sciodt=0,33&hl=en

[31] *See, e.g.*, Ex. 7, Jing Lu & Rongze Chen, *Do Individual Investors Pay Attention to the Information Acquisition Activities of Institutional Investors?*, 58 FIN. RES. LETTERS 104579 (2023) (applying Loughran-McDonald dictionary to message board posts to measure sentiment concerning stocks); Ex. 8, Nafiz Fahad et al, *The Role of Stock Message Boards in Processing Less Readable Disclosures*, Feb. 10, 2024, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4758510 (same).

long-term price impact. Def. Br. at 19-20. However, such statistical measures are commonly looked to by courts[32], including this Court[33], as evidence of spoofing, which by its nature causes artificial price impacts.  R&R at 46 ("sufficient allegations of a spoofing scheme necessarily tend to show an effect on the market."). This conclusion is not undercut by Defendants' references to the far more limited allegations in *Gamma Traders*[34], or by their passing reference to an *unspecified* number of new buy-side orders they placed *after* Spoofing Episodes. Def. Br. at 20.

### D. Defendants' Belated Challenges To Other Elements Of Manipulation Claims Are Contrary To The R&R, Order And Caselaw

#### 1. The Court correctly found Plaintiff adequately pled all other elements of manipulation claims

In a final improper effort to re-litigate issues already decided both in the R&R and the Order, Defendants invent a "rule" that a spoofing complaint must allege each element for each alleged Spoofing Episode. This rule flies in the face of Supreme Court precedent that allegations in a securities complaint must be analyzed *as a whole*. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). No court has imposed a requirement that each spoofing "example" contain allegations relating to every element of a claim. *See, e.g*, R&R at 45 (citing *Harrington II*, at *6 (denying motion to dismiss and stating "[i]t would be both unwieldy and unreasonable to

---

[32] *See CFTC v. Skudder*, No. 22-CV-1925, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022) at *3 (upholding spoofing complaint where defendant's "median futures spoof order was 100 times the size of his genuine futures orders" and defendant "canceled more than ninety-nine percent of all of the spoof order contracts that he placed"); *CFTC v. Oystacher et al*, No. 15-CV-9196, 2016 WL 3693429, at *31 (N.D. Ill. July 12, 2016) (defendant's "execution rates were much higher on the trade side than on the cancel side"); *Harrington,* 585 F. Supp. 3d at 417 (common indicia of spoofing include "large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer").

[33] *See* R&R at 49 ("The Second Circuit and district courts in this circuit routinely rely on … statistical analyses contained in pleadings").

[34] *Cf.* Def. Br. at 20 n. 26 (these allegations in *Gamma Traders* concerned orders to buy only 50 contracts and to sell only 550 contracts).

require Plaintiff to proffer detailed descriptions of each alleged episode")).[35] Indeed, this Court already held that the FAC sufficiently pled scienter and reliance based on allegations other than those in the specific Spoofing Examples.[36]

### 2. The Court correctly found Plaintiff adequately pled scienter

Despite the fact that the R&R held that Plaintiff adequately pled scienter under both of the independently sufficient avenues of motive and conscious misbehavior and that there is no requirement that a plaintiff allege motive, Defendants assert that a lasting price impact would "fatally undermine" the scienter element because it would remove a profit motive. Def. Br. at 24-25.[37] This assertion is incorrect because spoofing Defendants can profit during *partial* price reversals even in the broader context of persistent negative price impact, *see Kessev Tov*, 2023 WL 4825110 at *6, and because "[w]hether Defendants' alleged misconduct was ultimately economically rational is a matter to be explored at summary judgment or trial." *Harrington II*, 2023 WL 6316252, at *8.

## IV. <u>CONCLUSION</u>

For these reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.[38]

---

[35] Defendants' citation to *Parchmann v. MetLife*, No. 18 Civ. 780, 2021 WL 320051 (E.D.N.Y. Jan. 11, 2021) is inapposite as that case did not involve spoofing, or any scheme to defraud under 10(b)-5(a) or (c), but instead concerned misstatements or omission in a company's financial statements.

[36] *See, e.g.,* R&R at 56 ("While profits from any single episode may be miniscule, spoofers can generate substantial returns by repeating the scheme thousands of times across the same and different issuers' securities"). *See also Kessev Tov*, 2023 WL 4825110 at *5 (evaluating the effect of Baiting Orders on the market rather than the specific characteristics of individual orders); *Harrington II*, 2023 WL 6316252, at *6 (finding that similar allegations of spoofing satisfied "manipulative act" requirement of market manipulation claim")."

[37] Defendants reargue as an attack on this Court's reliance holding that market efficiency and price impact are mutually exclusive. This fallacy is as inapplicable to the element of reliance as it is to loss causation, for all the reasons explained above.

[38] Should the Court dismiss the Complaint, Plaintiff respectfully requests leave to amend. *See In re Tufin Software Technologies Ltd. Sec. Litig.*, No. 20 Civ. 5646, 2022 WL 596861, at *11 (S.D.N.Y. Feb. 25, 2022) (Woods, J.) (granting leave to amend for a second time).

Dated:  May 31, 2024
       New York, New York

Respectfully submitted,

By:  *Laura H. Posner*
     Laura H. Posner
     Michael B. Eisenkraft
     COHEN MILSTEIN SELLERS & TOLL PLLC
     88 Pine Street, 14th Floor
     New York, New York 10005
     Tel: (212) 838-7797
     Fax: (212) 838-7745
     lposner@cohenmilstein.com
     meisenkraft@cohenmilstein.com

     Raymond M. Sarola
     Cohen Milstein Sellers & Toll PLLC
     100-120 N. 18th Street, Suite 1820
     Philadelphia, PA 19103
     Tel: (267) 479-5700
     Fax: (267) 479-5701
     rsarola@cohenmilstein.com

     *Counsel for Plaintiff*

26