**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NORTHWEST BIOTHERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CANACCORD GENUITY LLC, CITADEL SECURITIES LLC, G1 EXECUTION SERVICES LLC, GTS SECURITIES LLC, INSTINET LLC, LIME TRADING CORP., AND VIRTU AMERICAS LLC, <br><br> Defendants. | Case No. 1:22-cv-10185 (GHW) (GS) |

**DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**


**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT .................................................................................................................................2

I.  The Opposition Fails To Rescue The SAC's Defective Loss Causation Allegations .................................................................................................................2

    A.  *Phunware* And All Other Authority Confirm Spoofing's Price Effect Is Ephemeral, Not Enduring ..................................................................2

    B.  NWBO's Attempts To Explain Away Rapid Reversions Contradict Its Own Allegations And Every Prior Spoofing Decision ............................................5

    C.  NWBO's Persistent Price Impact Theory Is Factually Baseless And Economically Irrational ...........................................................................6

II.  Even Crediting NWBO's Implausible "Entire Hour" Theory, No Alleged Spoofing Episode Satisfies All Elements Of A Market Manipulation Claim .....................8

III.  The Absence Of A Single Adequately Pled Spoofing Episode Is Independently Fatal ..........................................................................................................8

IV.  NWBO's Claims Of Persistent Price Impact Irreconcilably Undermine Reliance And Scienter ......................................................................................................9

CONCLUSION ............................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..................................................................................................8

*CP Stone Fort Holdings, LLC v. Doe(s)*,
  2017 WL 11884601 (N.D. Ill. Oct. 3, 2017).......................................................................6

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
  41 F.4th 71 (2d Cir. 2022) ...............................................................................................4, 7

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*,
  2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023).....................................................................6

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018).................................................................................4

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)...............................................................................10

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*,
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ................................................................4, 5, 7

*Parchmann v. MetLife, Inc.*,
  2021 WL 320051 (E.D.N.Y. Jan. 11, 2021) .......................................................................8

*Phunware v. UBS Secs. LLC*,
  2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024)...................................................................2, 3

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018).........................................................................................10

Defendants respectfully submit this reply memorandum of law in support of their motion to dismiss the SAC[1] (ECF 156, "Mot.").

## PRELIMINARY STATEMENT

The Opposition exposes the fundamental incoherence of NWBO's claims. According to NWBO, Defendants engaged in spoofing "by purchasing NWBO stock at artificially depressed prices and, once the market rebounded, selling it at a higher price." Acceptance of this "buy low, sell high" scheme, where "fake" orders were cancelled within seconds or milliseconds to profit from the immediate rebound, relies on the foundational premise of market efficiency, that the market rapidly incorporates into stock prices all available information. But now, in an effort to save its claim centered on a scheme that not only embraces but *requires* market efficiency, NWBO asks this Court to reject that premise and accept its implausible position that the effects of purported spoof orders persist for hours or days after they are cancelled—even in an efficient market. NWBO cannot have it both ways. Its theory of loss is impossible to reconcile with the alleged "buy low, sell high" spoofing scheme and with bedrock principles of market economics.

This contradiction between NWBO's pleading and the theory presented in the Opposition is the inevitable result of its efforts to escape two inescapable realities. First, in an efficient market, all available information is swiftly incorporated into prices. Second, no rational trader would engage in a scheme designed to lose money by repeatedly buying and selling shares while that scheme was "persistently" depressing prices, or where pricing reversals were subject to "random chance"—there would be no benefit to engaging in this scheme, much less a profit. NWBO's "fake" orders and "long-term" price impact claims defy the first principle. Its "dramatic reversals" and "buy low, sell high" theories defy the second. The alleged scheme premised on profiting from

---

[1] Defined terms have the meanings used in the Motion. The Opposition, ECF 160, is "Opp'n."

rapid reversions in an efficient market simply cannot be reconciled with NWBO's claim that its stock price remained depressed *after* the rebound.

NWBO also invites the Court to treat its 2,849 alleged Spoofing Episodes like a shell game, mixing and matching scattered "indicia" of manipulative intent from a handful of Episodes with alleged losses associated with entirely separate Episodes.  This is an independent basis for dismissal: while the SAC need not plead each element for *every* alleged Spoofing Episode, it must plead each element for *at least one* Episode.

Ultimately, NWBO's loss causation theories are contrary not just to common sense and its own allegations—they are contrary to on-point precedent dismissing a copycat case brought by NWBO's own lawyers.  In *Phunware v. UBS Secs. LLC*, Judge Ho considered materially identical spoofing allegations and held they were irreconcilable with allegations of price impact because plaintiff's sales took place *after* the rebound.  2024 WL 1465244, at *7 (S.D.N.Y. Apr. 4, 2024).  Judge Ho's reasoning applies with equal force here and confirms NWBO's allegations are not just economically irrational, but legally deficient.  As in *Phunware*, this Court should reject NWBO's attempt to escape the inescapable consequences of its own allegations, and dismiss the SAC with prejudice.  Artful pleading cannot salvage a theory so fundamentally untethered from reality and at war with itself.

## ARGUMENT

### I. THE OPPOSITION FAILS TO RESCUE THE SAC'S DEFECTIVE LOSS CAUSATION ALLEGATIONS

#### A. *Phunware* And All Other Authority Confirm Spoofing's Price Effect Is Ephemeral, Not Enduring

NWBO cannot distinguish *Phunware*, which dismissed materially identical trading allegations brought by the same lawyers for failure to allege loss causation.  *Phunware* also alleged a spoofing scheme in which the defendant allegedly placed sell-side "Baiting Orders," made an

2

"Executing Purchase," then cancelled its "Baiting Orders" within seconds or milliseconds of the purchase. 2024 WL 1465244, at *1, *5. As here, the plaintiff alleged the defendant "convert[ed] profits from its spoofing activity to cash" by selling shares at a higher price just seconds after its "Executing Purchase." *Compare* ¶ 89 *with Phunware* Compl.[2] ¶ 61. And as here, the plaintiff claimed that it sold shares at an artificially depressed price after the Spoofing Episodes were completed. *Compare* ¶ 289 *with Phunware* Compl. ¶ 118.[3]

As NWBO recognizes, *Phunware* "relied on this Court's R&R almost entirely." Opp'n 9 n.7. As the R&R found, "in order to plead a *bona fide* spoofing scheme," NWBO "must" allege that "Defendants 'dramatically revers[ed]' direction and placed lopsided *buy* orders" in order to "profit after prices *rose*." R&R at 76. *Phunware* picked up where this Court left off, directly addressing the loss causation issues this Court deferred until after further pleading and briefing, holding that allegations of rapid reversion were "insufficient to establish harm" to a plaintiff that sold its stock after the rebound, and that plaintiff's long-term theory was "at odds with [its] allegations of how Defendant profited from its spoofing activity." 2024 WL 1465244, at *7.

In a footnote, NWBO claims *Phunware* is distinguishable because the "sale transactions in that case were of a different nature." Opp'n 9 n.7. This is wrong: the issue in both cases is whether the stock price was still artificial when the plaintiff's sale price was determined, and the "nature" of the sale transactions has nothing to do with *Phunware*'s analysis that spoofing's price effects are fleeting. Nor does it matter that the plaintiff in *Phunware* alleged it sold stock two hours after the spoofing episodes; the Court's analysis turned on the "rebound period," which was measured

---

[2] No. 23-cv-06426 (S.D.N.Y. July 25, 2023), ECF 1 ("*Phunware* Compl.").

[3] The proposed Amended Complaint submitted in *Phunware* further demonstrates that NWBO fails to adequately allege loss causation. For instance, the *Phunware* plaintiff now proposes to allege it sold "just seconds" after Defendant's spoofing. *See Phunware*, 23-cv-06426 (S.D.N.Y. Apr. 17, 2024), ECF 31-3 ¶ 118. Despite amending twice, NWBO was unable to make any such temporal proximity allegation here.

3

by the close of each alleged spoofing cycle—*a matter of seconds*. 2024 WL 1465244, at *7. All other relevant caselaw is in accord, Mot. 12-13, and NWBO makes no argument otherwise.[4]

Criminal prosecutions and academics likewise confirm that spoofing's price effects are fleeting. Mot. 12-15. Professor Venkataraman's analysis, which NWBO relies on, concluded that "99% of the unadjusted market loss occurs within the first five seconds after the placement of the Spoof Order." Mot. 14.[5] NWBO mischaracterizes the literature again[6] in a failed attempt to assert that spoofing has lasting price effects:

- NWBO claims that a recent study "measured spoofing activity impacting prices for longer periods of time," Opp'n 16 & n.21, but that is false—that study measured "*return volatility*" not "price impact" as NWBO claims, ECF 161-5 at 3 (emphasis added).

- NWBO claims that a study cited by Defendants supports its claim that "the effects of spoofing" are highly persistent, Opp'n 16, but the language NWBO cites states that "*order book inventory* is highly persistent"—not price impact, ECF 161-4 at 3 (emphasis added).

- NWBO claims that a study found that it "takes some time" for orders to be incorporated into the price, Opp'n 15-16, but refers to the spoof orders, not their cancellation, and "some time" in modern markets is measured in seconds, ECF 161-3 at 12; Mot. 13.

Ultimately, *Gamma Traders* tasks the Court with drawing a "common sense" inference of price effect from the alleged spoofing. 41 F.4th 71, 80 (2d Cir. 2022). NWBO does nothing more than label a handful of "last hour" trades with an asterisk, even conceding that its line-drawing is arbitrary. *See* Opp'n 15 n.15 ("There is no discontinuity that would justify different treatment for sales priced 59 minutes after a Spoofing Episode and those sales priced 61 minutes after a Spoofing Episode."). Defendants' requested inferences, by contrast, are drawn directly from the

---

[4]  *See* Opp'n (failing to even mention *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) or *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885 (S.D.N.Y. 2018)).

[5]  The Opposition contends that Professor Venkataraman "acknowledged that spoofing has a 'lasting effect' not captured by his analysis" Opp'n 17 n.22, but the conclusion of Venkataraman's analysis was that "practically all of the unadjusted market loss occurs within the first thirty seconds [after the placement of the spoof order]," Mot. 14.

[6]  *See* R&R at 75 n.32 (the literature "mean[s] something very different from what [NWBO] suggests.").

4

methodology "accepted by the courts to analyze loss causation"—that spoofing's price effects lasted only while the "Baiting Orders" were pending—and are linked to NWBO's own claim that the manipulative orders were fully "eliminated" within 120 seconds, the very allegations this Court relied on in finding scienter adequately pled.  *See* Mot. 13-14.

> **B.    NWBO's Attempts To Explain Away Rapid Reversions Contradict Its Own Allegations And Every Prior Spoofing Decision**

Unable to distinguish relevant case law, NWBO tries to explain away the fatal implications of rapid reversions, arguing that any price rebounds were "random chance" or that the "fake" cancelled orders somehow still affected the price of its stock after they were cancelled.  Opp'n 10-13, 7.  These arguments fail as a matter of law.

As an initial matter, rapid price reversion is the core feature of a spoofing scheme, not a bug.  R&R at 76; *see also In re Merrill*, 2021 WL 827190, at *13 ("[S]poofing depend[s] for [its] profitability on a reversion of prices to the market-level").[7]  That is why NWBO alleges a scheme in which Defendants consistently sold at or above the pre-spoofing price to lock in gains—not losses—after each spoofing cycle.  R&R at 74.  This new "random chance" theory—which appears nowhere in the 111-page SAC—should be seen for what it is: another fatally flawed attempt to disown the SAC's allegations of systematic reversions that were necessary for this Court's finding of scienter.  *See* R&R at 60, 74.

The Opposition also tries to overcome its own allegations of market efficiency by arguing that "the fake Baiting Order does not disappear from the market's memory," and the "sell-side order cancellations drive the price *up* by *less* than new sell-side orders drive the price ***down***," Opp'n 7 (emphasis in original), but this ignores that Defendants allegedly "'dramatically

---

[7] In the Opposition, NWBO identifies an entirely different purported metric for determining the "but-for" price, Opp'n 12, but this metric appears nowhere in the SAC, which confirms that NWBO measured the pre-spoofing price based on the "prevailing best offer," *see, e.g.*, ¶ 87; R&R at 11.

5

revers[ed]' direction and placed lopsided *buy* orders" that permitted them to sell "after the price *rose*," R&R at 76 (emphasis in original); Mot. 16. NWBO cannot rely on these reversals to the buy-side to plead scienter, then ignore them to try to establish loss. Mot. 20. NWBO's claim that the orders remained in the "market's memory"—a concept neither alleged in the SAC nor in any caselaw or literature of which Defendants are aware—likewise cannot be reconciled with its own allegations of trading in an efficient market that "promptly digested current information" and "reflected such information" in NWBO's stock price. ¶ 332. In fast-moving electronic markets, it defies common sense (and the efficient market hypothesis) that any market participant would look back 60 seconds—let alone 60 minutes—for information about *current* prices.[8]

### C. NWBO's Persistent Price Impact Theory Is Factually Baseless And Economically Irrational

The Motion explains not only that the SAC lacks "a factual basis that would justify an inference" of long-term price effect, Mot. 15-16, but that all reliable facts are to the contrary. Indeed, NWBO concedes that (i) the very nature of spoofing "depend[s] for [its] profitability on a reversion of prices to the market level," R&R at 74; (ii) NWBO's share price more than doubled during the Relevant Period, R&R at 77; and (iii) the SAC is replete with examples of dramatic price increases on days with alleged spoofing, refuting any "cumulative effect," Mot. 15. And NWBO provides no "factual basis that would justify an inference" that the price was "still artificial" when it traded. R&R at 78.

NWBO points to its cursory "partial reversion" chart, asserting that it "demonstrates that Defendants profited through a strategy of buying at artificially depressed prices and holding

---

[8] NWBO's assertion that "courts have expressly allowed spoofing claims to proceed based on reliance on an efficient market," Opp'n 8-9, attacks a strawman; neither *CP Stone Fort Holdings, LLC v. Doe(s)*, 2017 WL 11884601 (N.D. Ill. Oct. 3, 2017) nor *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) alleged that spoofing's price effects last more than seconds, *see also* Mot. 12 n.16.

through partial reversions, even if some of those Executing Purchases were followed by price declines." Opp'n 21. Yet NWBO again fails to address *any* of the deficiencies in this chart raised by Defendants,[9] including that (i) not a single scatterplot point in the chart reverts above the pre-spoofing price, contrary to the SAC's alleged scheme in which Defendants cancelled all of their Baiting Orders, reversed their positions to place "lopsided *buy* orders," and profited by selling above the Executing Purchase price; and (ii) Defendants could not have profited from the scheme if, on average, NWBO's share price never reverted above the Executing Purchase price. Mot. 16; Opp'n 21 n.26.[10] NWBO's so-called "average price path" likewise fails to establish that any alleged Spoofing Episode—whether individually or on average—caused loss.[11]

NWBO falls back on its already-rejected argument that the price of its stock would have been higher "but for" the spoofing. Opp'n 11-12. This is the "rank speculation" rejected in *Gamma Traders* and by this Court, *see* R&R at 79. NWBO's graphs are also riddled with errors. As to the February 25, 2021 Spoofing Episode, NWBO manipulates the time interval to claim a "pre-spoofing average" of $1.43 to $1.40; but using the 120-second "Baiting Period" NWBO actually alleges, the pre-spoofing and post-spoofing price are both $1.42. *See* Mot. 11; Burck Decl. Ex. 11 at 3. NWBO's April 1, 2021 graph is even more misleading. It purports to show that "Defendants' spoofing activity . . . halted the upward trend," shamelessly extrapolating a "trend" based on a cherry-picked low point *fifteen minutes before* the Executing Purchase, a time interval

---

[9] NWBO fails to address the deficiencies in its "sentiment analysis," instead falsely asserting that "Defendants' only response . . . is that the dictionary has not been used to analyze investor sentiment." Opp'n 23; *but see* Mot. 18-19.

[10] NWBO also attempts to allege price effect by claiming that it sufficiently alleged spoofing, which "by its nature causes artificial price impacts." Opp'n 24. But the opposite is true, as spoofing "depend[s] for [its] profitability on a reversion of prices to the market-level." *In re Merrill*, 2021 WL 827190, at *13; *see also* R&R at 76.

[11] NWBO asserts again that there was a "statistically significant association between NWBO's share price and standard industry indices," Opp'n 21, yet still fails to explain what this "association" purports to be measuring, nor does it address that the alleged correlation is weak and thus indicative of nothing, Mot. 16 n.24.

7

contrary to NWBO's 120-second "Baiting Period" and one NWBO does not even try to justify. In fact, NWBO's share price was trending downward prior to the alleged spoofing, and trending upwards after the alleged "Executing Purchase." *See* Burck Decl. Ex. 12 at 3.

## II. EVEN CREDITING NWBO'S IMPLAUSIBLE "ENTIRE HOUR" THEORY, NO ALLEGED SPOOFING EPISODE SATISFIES ALL ELEMENTS OF A MARKET MANIPULATION CLAIM

Without long-term price impact, not one of NWBO's 2,849 Spoofing Episodes satisfies all elements of a market manipulation claim. *See* Mot. 23-24. NWBO makes no argument to the contrary, complaining instead that it should not be "requir[ed]" to plead "each element [of a manipulation claim] for each" one of the more than 2,800 Spoofing Episodes. Opp'n 24. But that is a strawman. Defendants' argument is merely that the SAC must plead each element for at least one Episode. *See* Mot. 24 (citing *Parchmann v. MetLife, Inc.*, 2021 WL 320051, at *4-6 (E.D.N.Y. Jan. 11, 2021)).[12] The Court should reject NWBO's efforts to bootstrap a securities claim without a single Episode that satisfies the required elements. Mot. 24.

## III. THE ABSENCE OF A SINGLE ADEQUATELY PLED SPOOFING EPISODE IS INDEPENDENTLY FATAL

Even if the price impact of spoofing plausibly lasted an hour—which no court has ever found—the SAC still fails to plead loss causation for two reasons: (i) each of the mere 31 "last hour" Spoofing Episodes suffers from fatal deficiencies; and (ii) the SAC still fails to adequately allege how its sale price was determined. *First*, each of the 31 "last hour" Episodes is fatally defective, and NWBO's arguments to the contrary are meritless. Mot. 22-23; Burck Decl. Ex. 13.

- For the 20 Episodes involving complete price reversion, NWBO simply asserts that its share price would have been higher "but for" the spoofing, Opp'n 19—the same "rank speculation" that fails for the reasons described in the R&R and above, *supra* at 7.

---

[12] NWBO attempts to distinguish *Parchmann*, arguing that it arose under Rule 10b(5)(b), not Rule 10(b)(5)(a) or (c), Opp'n 25 n.35, but NWBO does not explain why the analysis should be any different here. *Compare ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) *with Parchmann*, 2021 WL 320051, at *3. It should not.

- For the five Episodes with no alleged "Next Sale," NWBO claims that this information is within Defendants' possession. Opp'n 19. This is evasion, as NWBO evidently had the information necessary to allege the "Next Sale" for 92% of the 2,849 Spoofing Episodes. Red herring aside, NWBO does not dispute that, without any alleged "Next Sale," there is no allegation that these 5 Episodes were "spoofing."

- The alleged October 27, 2020 Spoofing Episode has several defects, including Baiting Orders at lower prices than the Executing Purchase, and Baiting Orders at prices the Defendant allegedly sold. Mot. 21. NWBO does not address these defects, instead arguing that it is enough to allege "actual increases and decreases in prices" on that date. Opp'n 19. But NWBO fails to address that its allegations refute that this was actual spoofing.

- Four Spoofing Episodes have a larger volume of Executing Purchases than alleged Baiting Orders, which means the Defendants would have increased NWBO's stock price more than it was driven down. Mot. 21. NWBO responds by pointing to its allegation that spoofing "baits" other traders into placing their own orders, Opp'n 19—but this misses the point, as it would be true for the Executing Purchases even more than for the Baiting Orders.

- The January 26, 2021 Episode was not a Pricing Date. Mot. 21. NWBO argues that January 26 was a "True-Up Pricing Date" for two sales on January 19, 2021, Opp'n 19, which is not alleged in the SAC and is not in fact listed for either sale, SAC Ex. 6 at 2, 6.

*Second*, the SAC still fails to allege any "formulaic connection" between its sale price and the purported spoofing. Mot. 23-25. Moreover, because the SAC fails to allege the pricing inputs for each sale, it cannot be inferred that any closing price affected NWBO's sale price. Mot. 22. It also remains "impossible to tell" how NWBO determined the price for its Exchange Agreement Sales. The SAC alleges these sales were based on a "single formula," yet the Opposition admits that the formula returns different prices using the same inputs due to unexplained "true-up" calculations that differed from purchaser to purchaser in unexplained ways. Mot. 22-23; Opp'n 20 n.23. The Opposition also concedes that any purported effect from spoofing alleged in the SAC is too attenuated from the closing price on any day "Pricing Date." Opp'n 20.

## IV. NWBO'S CLAIMS OF PERSISTENT PRICE IMPACT IRRECONCILABLY UNDERMINE RELIANCE AND SCIENTER

NWBO does not even attempt to explain the logical incompatibility between its loss causation theory and its own allegations of reliance and scienter, instead simply recounting the

9

R&R's prior findings regarding scienter. Opp'n 25. But this too misses the point: the SAC makes new allegations inconsistent with the elements of a market manipulation claim, and ignores the shifting history of NWBO's claims, which relied first on the pre-spoofing price, then removed it, and now claims reversion is irrelevant because NWBO's price was driven by "random chance."

*First*, the Opposition doubles down in refuting its own efficiency allegations—if NWBO's stock price was determined by "random chance" despite "dramatic revers[als]" to the buy-side, then "new information" is not "swiftly incorporated into share prices." Mot. 16-17. Because NWBO "may not at the same time presume an efficient market to prove reliance and an inefficient market to prove loss causation," the SAC should be dismissed. Mot. 25.[13]

*Second*, NWBO's claim that Defendants depressed its share price for up to sixty trading days while simultaneously selling those shares at a loss fatally undermines scienter. Mot. 24-25. The law does not countenance such claims of irrationality that "contradict[] the assumption that [defendants] were acting in their own economic self-interest."[14] *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003). And the Opposition's "random chance" argument fatally undermines scienter too—no rational actor would repeatedly sell within seconds or minutes if prices were not consistently reverting within that period. R&R at 76.

## CONCLUSION

As set forth in Defendants' motion and above, the SAC should be dismissed with prejudice. NWBO's one-sentence footnote requesting leave to file a fourth complaint "does not suffice to raise the issue." *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018).

---

[13]  NWBO asserts bizarrely that it "pleads actual reliance," Opp'n 6 n.4, but the cited paragraph of the SAC alleges that NWBO relied "on an assumption of an efficient market free of manipulation," ¶ 335.

[14]  The Opposition's only response is that "conduct that is uneconomical at certain times to further a broader scheme has long been a defining characteristic of manipulative activity." Opp'n 21 n.25. Of course, the issue is not that Defendants allegedly failed to maximize profit on every single trade, but that NWBO is claiming Defendants engaged in a consistent money-losing scheme over a five-year period. Mot. 25.

| | |
|---|---|
| Dated: June 14, 2024<br>New York, New York | Respectfully submitted,<br><br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br><br> /s/ *William A. Burck*<br>William A. Burck<br>Christopher G. Michel (admitted *pro hac vice*)<br>1300 I Street NW, Suite 900<br>Washington, D.C. 20005<br>Tel: 202-538-8000<br>Fax: 202-538-8100<br>williamburck@quinnemanuel.com<br>christophermichel@quinnemanuel.com<br><br>Christopher D. Kercher<br>Daniel R. Koffmann<br>Jesse Bernstein<br>Peter H. Fountain<br>Leigha Empson<br>51 Madison Ave., 22nd Floor<br>New York, New York 10010<br>Tel: 212-849-7000<br>Fax: 212-849-7100<br>christopherkercher@quinnemanuel.com<br>danielkoffmann@quinnemanuel.com<br>jessebernstein@quinnemanuel.com<br>peterfountain@quinnemanuel.com<br>leighaempson@quinnemanuel.com<br><br>*Attorneys for Defendant Citadel Securities LLC* |

| | |
|---|---|
| **MORRISON & FOERSTER LLP**<br><br> /s/ *Anthony S. Fiotto* (with permission)<br>Anthony S. Fiotto<br>Julia C. Koch<br>200 Clarendon Street<br>Boston, MA 02116<br>Telephone: 617-648-4700<br>Facsimile: 617-830-0142<br>Email: AFiotto@mofo.com<br>Email: JKoch@mofo.com<br><br>Eric D. Lawson<br>250 West 55th Street<br>New York, NY 10019<br>Telephone: 212-336-4067<br>Facsimile: 212-468-7900<br>Email: ELawson@mofo.com<br><br>*Attorneys for Defendant Canaccord Genuity LLC* | **KATTEN MUCHIN ROSENMAN LLP**<br><br> /s/ *Peter G. Wilson* (with permission)<br>Peter G. Wilson<br>Christian T. Kemnitz (admitted *pro hac vice*)<br>Leigh Brissenden (admitted *pro hac vice*)<br>525 West Monroe Street<br>Chicago, Illinois 60661-3693<br>Telephone: (312) 902-5200<br>peter.wilson@katten.com<br>christian.kemnitz@katten.com<br>leigh.brissenden@katten.com<br><br>*Attorneys for Defendant GTS Securities LLC* |
| **GREENBERG TRAURIG, LLP**<br><br> /s/ *Richard A. Edlin* (with permission)<br>Richard A. Edlin<br>Daniel P. Filor<br>Nicholas T. Barnes<br>One Vanderbilt Avenue<br>New York, NY 10017<br>Telephone: (212) 801-9200<br>Facsimile: (212) 801-6400<br>edlinr@gtlaw.com<br>filord@gtlaw.com<br>barnesn@gtlaw.com<br><br>*Attorneys for Defendant Instinet, LLC* | **KEESAL, YOUNG & LOGAN**<br>A Professional Corporation<br><br> /s/ *Stephen Young* (with permission)<br>Jon W. Zinke<br>Stephen Young (admitted *pro hac vice*)<br>Elizabeth H. Lindh (admitted *pro hac vice*)<br>400 Oceangate Avenue, Suite 1400<br>Long Beach, California 90802<br>Telephone: (562) 436-2000<br>jon.zinke@kyl.com<br>steve.young@kyl.com;<br>elizabeth.lindh@kyl.com<br><br>*Attorneys for Defendant Lime Trading Corp.* |

| | |
|---|---|
| **BALLARD SPAHR LLP** | **PAUL, WEISS, RIFKIND,**<br>**WHARTON & GARRISON LLP** |
| /s/ *Marjorie J. Peerce* (with permission)<br>Marjorie J. Peerce<br>1675 Broadway, 19th Floor<br>New York, NY 10019-5820<br>Tel: (212) 223-0200<br>Fax: (212) 223-1942<br>peercem@ballardspahr.com<br><br>Norman Goldberger (*pro hac vice* forthcoming)<br>Laura Krabill (*pro hac vice*)<br>J. Chesley Burruss<br>1735 Market Street, 51st Floor<br>Philadelphia, PA 19103<br>Tel: (215) 665-8500<br>Fax: (215) 864-8999<br>goldbergerm@ballardspahr.com<br>krabilll@ballardspahr.com<br>burrussc@ballardspahr.com<br><br>*Attorneys for Defendant*<br>*G1 Execution Services LLC* | /s/ *Andrew G. Gordon* (with permission)<br>Andrew G. Gordon<br>Audra J. Soloway<br>Jessica S. Carey<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Phone: (212) 373-3000<br>Fax: (212) 757-3990<br>agordon@paulweiss.com<br><br>*Attorneys for Defendant Virtu Americas LLC* |