# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NORTHWEST BIOTHERAPEUTICS, INC., | |
| Plaintiff, | |
| v. | |
| CANACCORD GENUITY LLC, CITADEL SECURITIES LLC, G1 EXECUTION SERVICES LLC, GTS SECURITIES LLC, INSTINET LLC, LIME TRADING CORP., AND VIRTU AMERICAS LLC, | Case No. 1:22-cv-10185 (GHW) (GS) **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## DEFENDANTS' OBJECTIONS TO REPORT & RECOMMENDATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 3

STANDARD OF REVIEW ................................................................................................ 4

ARGUMENT ...................................................................................................................... 5

I.   The R&R Impermissibly Presumes A Market That Is Simultaneously Efficient
     And Inefficient Based on NWBO's Inconsistent Allegations ................................... 5

II.  The Court Should Reject The R&R's Erroneous Conclusion That Spoofing's
     Price Effects Last More Than Seconds ....................................................................... 6

     A.   As In *Phunware*, NWBO's Own Allegations Preclude The R&R's Finding
          That The Effects Of Spoofing Last An Entire Hour ........................................... 7

     B.   The R&R's Day-Long Price Impact Theory Is Irreconcilable With Second
          Circuit Law And NWBO's Allegations ............................................................... 9

III. The R&R's Temporal Proximity Theory Requires Rejection Of NWBO's Core
     Allegations of Market Manipulation ......................................................................... 15

CONCLUSION ................................................................................................................. 18

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Allegheny Cnty. Emp. Ret. Sys. v. Energy Transfer LP*,
  623 F. Supp. 3d 470 (E.D. Pa. 2022) ........................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................2

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...................................................................15, 18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................2

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*,
  853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom.*, 752 F.3d 82 (1st Cir. 2014) ..........................................................................................................5

*Catania v. United Fed'n of Teachers*,
  2022 WL 767107 (S.D.N.Y. Mar. 12, 2022) ..............................................4

*Cromer Fin. Ltd. v. Berger*,
  205 F.R.D. 113 (S.D.N.Y. 2001) ..............................................................15

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994)........................................................................12

*Flynn v. Cable News Network, Inc.*,
  2021 WL 5964129 (S.D.N.Y. Dec. 16, 2021) ...........................................4

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
  41 F. 4th 71 (2d Cir. 2022) ................................................................6, 7, 9

*Gruntal & Co. v. San Diego Bancorp*,
  901 F. Supp. 607 (S.D.N.Y. 1995)..............................................................6

*Hamlett v. Everly*,
  2024 WL 1892265 (S.D.N.Y. Apr. 30, 2024)...........................................15

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)......................................................16

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*,
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021), *aff'd sub nom. Gamma Traders*,
  41 F.4th 71 (2d Cir. 2012) ..........................................................................7

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..................................................................................16

*Parchmann v. MetLife*,
    2021 WL 320051 (E.D.N.Y. Jan. 11, 2021), *aff'd sub nom. KBC Asset Mgmt.*
    *NV v. MetLife, Inc.*, 2022 WL 480213 (2d Cir. Feb. 17, 2022) .................................18

*Phunware, Inc. v. UBS Secs. LLC*,
    2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024)...............................................................8

*Phunware, Inc. v. UBS Securities LLC*,
    2024 WL 4891891 (S.D.N.Y. Nov. 26, 2024)......................................................2, 7, 8

*Roots P'ship v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) .....................................................................................6

## Rules / Statutes

Fed. R. Civ. P. 9(b) ...........................................................................................................3

Fed. R. Civ. P. 11 ...............................................................................................................3

Fed. R. Civ. P. 72(b)(3)......................................................................................................4

## Other Authorities

Merritt B. Fox et al., *Spoofing and Its Regulation*, 2021 COLUM. BUS. L. REV.
    (2021)...................................................................................................................13, 14

Nikolaus Hautsch & Ruihong Huang, *The market impact of a limit order*, 36 J. OF
    ECON. DYNAMICS & CONTROL (2012) .....................................................................13

Eun Jung Lee et al., *Microstructure-Based Manipulation: Strategic Behavior and*
    *Performance of Spoofing Traders*, 16 J. OF FIN. MKTS. (2013) ...............................13

Defendants respectfully object to the portions of the January 31, 2025 Report and Recommendation issued by Magistrate Judge Gary Stein (ECF 174, the "R&R") that denied Defendants' Motion to Dismiss Plaintiff Northwest Biotherapeutics, Inc.'s ("NWBO") Second Amended Complaint (ECF 150, "SAC").

## **PRELIMINARY STATEMENT**

The R&R erred in concluding that a claim of market manipulation premised on economically incoherent conduct and internally inconsistent theories can state a viable claim.

The SAC alleges a five-year spoofing scheme in which Defendants placed and promptly canceled fake orders to artificially depress NWBO's share price, then profited by quickly transacting before the market swiftly reverted to normal levels. Yet NWBO also maintains—and the R&R endorses—that, impossibly, these ephemeral orders continued to suppress prices for hours or a full day after being withdrawn, supposedly causing NWBO to lose money when it sold its stock at still-distorted prices up to 24 hours after the manipulative activity ceased.

The R&R failed, against this background, to recognize that such a theory defies law, economics, and the SAC's own factual allegations:

- It violates foundational principles of market efficiency and price adjustment, which would rapidly incorporate the disappearance of artificial trading signals from the order book.

- It completely ignores Defendants' immediate placement of buy-side orders, which would quickly drive the price of NWBO back up.

- It simultaneously alleges a rapid market response for purposes of scienter and a significantly delayed response for loss causation—an implausible claim that defies the law and is irreconcilable on its face.

Indeed, the SAC itself proves its theory incoherent and contradictory. The SAC repeatedly describes manipulative orders to sell that were canceled within seconds, with Defendants buying shares at a discount, then selling at a profit as the price predictably rebounded moments later. This

rapid in-and-out trading—fleeting price dip, quick purchases, then a return to normal so the manipulator can sell at a profit—is the essence of spoofing. An artificially depressed stock price that stays depressed is a spoofer's worst nightmare, as it traps them in a losing position. Without an immediate snap back, the entire scheme collapses. This is NWBO's scienter theory. But the SAC also maintains as its loss causation theory, impossibly, that these ephemeral orders continued to suppress prices for up to 24 hours after being withdrawn—supposedly causing NWBO to lose money by selling at still-distorted prices long after any manipulative activity ceased.

This kind of economic fallacy has been consistently rejected, most recently by Judge Ho in *Phunware II*, which found loss causation adequately pled only for trades executed "within seconds" of spoofing. The reason is evident: unlike disclosures or filings that are disseminated textually and digested over longer periods, electronic order book information is pure market data that gets incorporated by high-frequency traders at lightspeed. Decisions the R&R relies on regarding corporate information are inapposite.

Under *Twombly* and *Iqbal*, a complaint must be "plausible on its face."[1] A theory that is not just unsupported, but refuted by its own internal logic and the economic principles it purports to rely on does not clear that bar. No amount of discovery can harmonize NWBO's mutually exclusive assertions that a manipulative scheme was optimally designed for hit-and-run profits yet also left a day-long depression in the stock price. Nor can any rational jury be expected to find an iota of plausibility in the notion that "spoofing" depresses prices for an entire day, yet somehow does not inhibit the stock price from doubling during the Relevant Period.[2] In essence, NWBO asks this Court to conclude that markets are selectively hyper-efficient, supply and demand do not

---

[1] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[2] Capitalized terms not defined herein have the meaning attributed to them in Defendants' Motion to Dismiss. ECF 156.

apply, and rational economic actors design losing strategies to achieve impossible ends. The Court should credit its own common sense over a tall tale.

NWBO also fails to plead this alleged spoofing scheme with the specificity required by Rule 9(b). The R&R lets NWBO get away with not identifying a single instance of spoofing that meets all the elements of a market manipulation claim, but a plaintiff may not bring a securities fraud claim through various "examples," each with overt and fundamental flaws.

Allowing a claim this illogical to survive would enable any plaintiff to reverse-engineer "manipulation" from any unfavorable price movement, no matter how remote in time or unsupported by market realities. The Court should reject the R&R's invitation to suspend economic rationality and dismiss NWBO's nonsensical theory with prejudice before it can wreak havoc in the markets.

## **BACKGROUND**

This case has followed a lengthy procedural path, with multiple rounds of motion practice highlighting the fundamental deficiencies in NWBO's allegations. NWBO initiated this action on December 1, 2022 (ECF 1), then amended its complaint on April 10, 2023 (ECF 95), after Citadel Securities served a Rule 11 motion identifying serious pleading defects. When that amendment failed to cure the defects, Citadel Securities sought leave to file a Rule 11 motion, which the Court directed be held in abeyance pending resolution of Defendants' motion to dismiss the Amended Complaint (ECF 110, 113).

On December 29, 2023, the Magistrate Judge issued a report and recommendation finding that NWBO failed to adequately allege loss causation ("2023 R&R," ECF 137), which this Court adopted over the parties' objections on February 14, 2024 (ECF 148). Specifically, the 2023 R&R found that NWBO had not adequately pled long-term price impact from spoofing, but that NWBO could adequately allege loss causation on a temporal proximity theory for "the 30 instances in its

chart in which Spoofing Episodes occurred within an hour of the market's close" if NWBO amended to adequately plead the formulas linking the closing price on the dates of those 30 instances and NWBO's sale prices.  2023 R&R at 70-71.  Critically, the 2023 R&R expressly rejected NWBO's claim that the effects of spoofing could last an entire trading day.  *Id.* at 67-68.

NWBO then filed its Second Amended Complaint, adding only allegations regarding loss causation.  ECF 150.  Defendants moved to dismiss (ECF 156, "Mot."), and on January 31, 2025, the Magistrate Judge issued the instant R&R, again rejecting NWBO's attempt to allege loss causation on a long-term price impact theory (ECF 174 at 37-48, "2025 R&R" or "R&R").  In a marked shift from its prior analysis, however, the 2025 R&R found that NWBO adequately alleged loss causation on a temporal proximity theory not only for the last hour of the trading day on Pricing Dates, but for any purported spoofing that occurred up to 24 hours before market close on a Pricing Date.  *Id.* at 13-37.  This dramatic expansion of temporal proximity theory conflicts with both the 2023 R&R and established precedent regarding the fleeting nature of spoofing's market impact.

## STANDARD OF REVIEW

The Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to," and "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3); *see also Catania v. United Fed'n of Teachers*, 2022 WL 767107, at *1 (S.D.N.Y. Mar. 12, 2022) (Woods, J.) (rejecting report & recommendation in its entirety); *Flynn v. Cable News Network, Inc.*, 2021 WL 5964129, at *1 (S.D.N.Y. Dec. 16, 2021) (Woods, J.) (rejecting report & recommendation in part).

## **ARGUMENT**

### I.    THE R&R IMPERMISSIBLY PRESUMES A MARKET THAT IS SIMULTANEOUSLY EFFICIENT AND INEFFICIENT BASED ON NWBO'S INCONSISTENT ALLEGATIONS

NWBO's efficient market claims contradict themselves:  NWBO alleges both that the market is efficient enough for spoofing to work (requiring instant price reactions) and inefficient enough for artificial prices to persist for hours after spoofing ends.  But in an efficient market, price effects from new information—whether from legitimate orders or spoofed ones—manifest almost instantaneously through high-frequency trading.  This is why courts consistently find that a plaintiff "may not at the same time presume an efficient market to prove reliance and an inefficient market to prove loss causation." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012), *aff'd sub nom.*, 752 F.3d 82 (1st Cir. 2014).  This fundamental contradiction requires rejection of NWBO's theory.

The R&R relies erroneously on case law regarding corrective disclosures in securities cases premised on misstatements (not market manipulation) to find NWBO's theory that the effects of spoofing last a day to be consistent with its claims of an efficient market, because there is no bright-line limit to how much time an efficient market takes to absorb information.  R&R at 18-21.  As the R&R itself acknowledges, "none of these cases examine the price impact of spoofing under conditions of market efficiency." *Id*. at 20.  Instead, the R&R's cases examine why a one- or two-day window for a stock price to absorb corrective public disclosures may be appropriate because, for instance, "the related price impact may occur more slowly where clarifying or contextualizing information is disclosed later." *Allegheny Cnty. Emp. Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 486 (E.D. Pa. 2022) (cited in R&R at 19).

But this case is not about the reaction of investors to a press release or SEC filing for a publicly traded company—it is about nearly instantaneous reactions of a stock traded

electronically to displayed bids and offers. The R&R even identifies the fatal flaw in its own analysis by observing that "[c]orrective disclosures concerning the former could be expected to take longer for securities analysts and other market participants to digest than the time it takes algorithmic trading programs to adjust to the 'corrective' information released to the market when a spoofer reverses position and drives the stock price in the opposite direction." R&R at 21. NWBO cannot argue that its stock price reacted essentially instantly to the purported "Baiting Orders," but the cancellation of those orders and the placement of buy-side orders could take hours or a full day to be reflected in the price. *See, e.g.*, *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) ("[Plaintiff] cannot ask us to presume that the market reacted to the allegedly fraudulent prediction but ignored later information of [defendant's] actual earnings results, which information was announced months before plaintiffs purchased.").

In an efficient market, spoofing's effects should dissipate quickly once the Baiting Orders are canceled and orders on the opposite side of the market are placed. *See, e.g.*, *Gruntal & Co. v. San Diego Bancorp*, 901 F. Supp. 607, 617 (S.D.N.Y. 1995) (in an efficient market, once manipulation ceases, "the market thereafter corrects the price of the shares."); Mot. 10. This is consistent with academic literature finding the effects of spoofing are short-lived once the manipulation ceases. *See infra* at 13-15.

## II. THE COURT SHOULD REJECT THE R&R'S ERRONEOUS CONCLUSION THAT SPOOFING'S PRICE EFFECTS LAST MORE THAN SECONDS

The Second Circuit has explained that temporal proximity requires trades "so close in time" to the alleged spoofing that artificial pricing can be inferred "as a matter of common sense." *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F. 4th 71, 80-81 (2d Cir. 2022). No court—before or after *Gamma Traders*—has ever found spoofing's impact lasts more than seconds, let alone an hour or even a day. This is no accident—as the 2023 R&R itself recognizes,

spoofing schemes "depend for their profitability on *a reversion of prices to the market-level*, meaning that the period of artificiality may be brief." 2023 R&R at 74 (quoting *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021), *aff'd sub nom. Gamma Traders*, 41 F.4th 71) (emphasis in original).

### A.    As In *Phunware*, NWBO's Own Allegations Preclude The R&R's Finding That The Effects Of Spoofing Last An Entire Hour

The R&R's finding that NWBO adequately alleged loss causation for purported spoofing episodes within an hour of a "Pricing Date" runs squarely into a recent decision in this district, *Phunware, Inc. v. UBS Securities LLC*, 2024 WL 4891891 (S.D.N.Y. Nov. 26, 2024) ("*Phunware II*"), recently submitted to this Court by NWBO. ECF 166. As in *Phunware II*, NWBO's allegations that its stock price quickly rebounded to allow alleged spoofers to profit cannot be reconciled with the theory that NWBO's sales an hour (much less a day) later were harmed by the alleged spoofing. For example:

- NWBO alleges Defendants canceled Baiting Orders and "eliminat[ed] the artificial sell-side imbalance" within minutes. SAC ¶ 88.

- In 55% of alleged "last hour" spoofing episodes, prices reverted to their pre-spoofing level before the market closed. Mot. 7.

- NWBO alleges Defendants regularly sold shares within seconds or minutes at prices above pre-spoofing levels. SAC ¶¶ 89, 103.

When a plaintiff's own allegations show prices typically rebounding within minutes, the Court cannot simply assume artificial pricing persisted for hours. Indeed, the R&R repeatedly observes that NWBO's stock price quickly rebounded to or above the pre-spoofing level, which is inconsistent with the price remaining artificially depressed for an hour or longer. For instance, the R&R notes that "Defendants regularly were able to earn profits when they sold NWBO shares purchased at an allegedly depressed price after the stock price rebounded to or above its pre-spoofing level." R&R at 51. Many of these sales were within seconds or minutes of the spoofing

episode.  Mot. 11; SAC ¶¶ 88-89.  Based on substantially the same allegations, Judge Ho correctly dismissed the prior complaint in *Phunware*.  *Phunware v. UBS Secs. LLC*, 2024 WL 1465244, at *7 (S.D.N.Y. Apr. 4, 2024).

In *Phunware II*, the plaintiff's amended complaint alleged a detailed chronology of sales and spoofs occurring in rapid succession that stands in stark contrast to NWBO's allegations:

> "Plaintiff sold 36,157 shares of PHUN from 09:30:01.265 A.M. to 09:30:51.329 A.M., ***within seconds*** of Defendant's alleged spoofing activity . . . Plaintiff specifically made one sale transaction at 09:30:01.265 A.M. ***less than one second*** from Defendant's spoofing activity; six executing sales at 09:30:04 A.M. ***within four seconds*** of Defendant's spoofing activity; seven executing sales at 09:30:06 A.M. ***within six seconds*** of Defendant's spoofing activity; and nine executing sales at 09:30:10 A.M. ***within ten seconds*** of Defendant's spoofing activity."

*Phunware II*, 2024 WL 4891891, at *2 (emphasis added).  Based on these allegations, Judge Ho found loss causation adequately pled *only* when trades occurred "within seconds" of alleged spoofing—not hours or days later.  *Id.*

NWBO offers no such allegations, and the R&R misreads *Phunware II* to support its finding that NWBO has adequately alleged loss causation.  *Phunware II* cited the 2023 R&R to support its finding that trades "within seconds" of the alleged spoofing were temporally proximate enough to plead loss causation—not as support for expanding temporal proximity beyond a matter of seconds, and certainly not hours.  Indeed, *Phunware II* represents a straightforward application of the principle that spoofing's effects are fleeting, while the R&R's hour-or-day theory represents an unprecedented and unsupported expansion of the temporal proximity doctrine.

The R&R even observes that NWBO's long-term price impact theory

> "***completely ignores the spoofer's*** other ***actions to drive the market in the opposite direction*** following the placement of the Baiting Orders. … ***Unless the price moves back in the opposite direction*** of the artificial price resulting from the spoofed orders, ***the spoofer would be unable to profit from the spoofing***."

R&R at 38 (emphasis added).  This observation applies with equal force to NWBO's hour-long impact theory.  When analyzing temporal proximity, the R&R ignores NWBO's allegations that Defendants "rapidly reversed course" and placed buy-side orders driving the price back up.  *E.g.*, SAC ¶ 76.  This internal inconsistency within the R&R is NWBO's dilemma—and should be cause for the Court to reject the R&R's price impact finding.

## NWBO's Dilemma

**Scienter Requires Rebound**



**Loss Causation Requires Decline**



### B.    The R&R's Day-Long Price Impact Theory Is Irreconcilable With Second Circuit Law And NWBO's Allegations

The R&R's most dramatic departure from precedent is its holding that spoofing's price effects can last an entire trading day.  R&R at 36-37.  The 2023 R&R rejected such a contention, holding that spoofing more than an hour before market close was "too far removed from the corresponding sale to be considered 'close.'"  2023 R&R at 71 (quoting *Gamma Traders*, 41 F.4th at 80).  To justify this remarkable expansion of temporal proximity, the R&R relies on two new allegations in the SAC: (i) a purported statistical analysis of "average" price movements that fails basic scientific rigor, and (ii) an ad hoc review of anonymous internet message board posts that cannot bear the weight the R&R places upon it.  Such additions do not justify such a departure

from the 2023 R&R or the unprecedented finding that the effects of spoofing can be inferred to last beyond seconds—let alone an entire trading day.

The R&R notes that "in excess of 80%" of same-day Spoofing Episodes, "NWBO's stock price rebounded, prior to the close, to a level at or above the pre-spoofing Best Offer price." R&R at 33 (citing SAC Ex. 1, ECF 150-1). Further, in 17 of the 31 (or 55%) of the "last hour" Spoofing Episodes, NWBO alleges price reversion to or above the pre-spoofing level before the close. Mot. 7. The R&R suggests that Defendants have cherry-picked data points contrary to NWBO's alleged scheme and ignored those that support it. R&R at 25-26. But it is not cherry-picking to point out that NWBO's theory is internally inconsistent more than half the time, which undermines NWBO's theory entirely. And as the R&R itself observes in the context of long-term price impact, this "theory remains fundamentally incompatible with Plaintiff's own allegations that NWBO's stock price repeatedly reverted to the pre-spoofing market level on the same day as Spoofing Episodes." R&R at 48. The same reasoning should also defeat NWBO's allegations that spoofing's effects persisted an entire day.

The R&R relies on a chart included in the SAC that purportedly depicts "the average price impact of Spoofing Episodes over the minutes following each Spoofing Episode." R&R at 34 (citing SAC ¶ 311). In accepting this unexplained and nonsensical chart, the R&R ignores the contradictions the chart introduces to the SAC. To start, as Defendants explained in their Motion to Dismiss, the chart is inconsistent with NWBO's allegations that 65% of the Spoofing Episodes involved a Next Sale at a price at or above the pre-spoofing price before market close because the chart alleges that, on average, the price does not approach, let alone revert, to the pre-spoofing price. Mot. 16. This internal contradiction alone should defeat NWBO's claim.

The R&R responds that the chart "does not suggest that the stock price never reverted to its pre-spoofing level" because it is merely a chart of average movement.[3]  R&R at 35.  But the chart still suggests the price on average did not revert, which would be contrary to the goal of spoofing—if the price, even on average, does not revert and downward pressure persists throughout the full day, Defendants' "dramatic revers[al]" to the buy side after canceling Baiting Orders would not make economic sense, as the alleged spoofers would lose money on average. Mot. 16.  A spoofing scheme that consistently loses money is no scheme at all.

Next, the R&R erroneously relies on NWBO's analysis of anonymous posts on an online message board, InvestorsHub ("iHub"), to support NWBO's allegations that Defendants' alleged spoofing affected prices for an entire trading day, up to 24 hours before market close on a Pricing Date.  R&R at 35-36.

*First*, NWBO's attempt to divine market manipulation from anonymous internet posts fails basic standards of reliability and relevance.  Mot. 18-19.  The R&R notes that "if a statistical analysis is pled with the requisite specificity, it must be accepted as true on a motion to dismiss." R&R at 36 (citation omitted).  But this principle only highlights the inadequacy of NWBO's analysis—the R&R expressly finds that the iHub "analysis" is "lacking in fulsome detail" (R&R at 36), and NWBO's methodology is riddled with obvious flaws: it purportedly downloaded 235,194 posts on the NWBO message board on iHub and assigned them a value (positive, negative, etc.) using a "dictionary" developed more than a decade ago to analyze SEC Form 10-Ks.  SAC ¶¶ 323-25.  NWBO then translated those 235,194 posts into a chart that purportedly shows investor sentiment rising for roughly two hours following alleged spoofing episodes.  *Id.* ¶ 324.  The defects

---

[3]   This chart, even though showing an average, cannot be accurate on its face because it contradicts Exhibit 1 of the SAC.  *See* SAC Ex. 1; Mot. 16.

in this analysis are immediately apparent. For example, iHub is reportedly replete with false information (*id.* ¶ 323, Mot. 19), and the authors of the academic paper that inspired the "dictionary" expressly limited its approved application to SEC Form 10-Ks, which are formal financial reports prepared by professionals and submitted under oath, and markedly different than chats on an online message board. Mot. 19. NWBO's attempt to repurpose a specialized tool for analyzing formal regulatory filings into a gauge of anonymous internet chatter stretches methodological credibility past the breaking point.

The R&R did not find otherwise. Rather, it acknowledged that Defendants' arguments "may ultimately prove convincing" but refused to address them at the pleading stage. R&R at 36. This is backwards—NWBO bears the burden of establishing the reliability of its analysis at the pleading stage. Especially in fraud cases, where heightened pleading standards govern, NWBO must allege facts establishing the reliability of any statistical analysis that it offers to establish an element of its claims. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771-72 (2d Cir. 1994) (plaintiff's analysis relied on "guesswork and inconsistencies" and was "so defective . . . that no 'reasonable inferences' can be drawn therefrom"). NWBO has not done so, nor has it provided any authority for the reliability of its purported "analysis."

*Second*, as the R&R recognized, the SAC does not even attempt to tie its message board analysis to a single alleged spoofing incident. R&R at 36 (acknowledging that "the SAC gives no examples of a day" when "Defendants' same-day spoofing arrested positive momentum in NWBO stock that would have led to a higher closing price"). This complete disconnect between NWBO's theoretical analysis and actual trading data is fatal. Even if NWBO's analysis demonstrated that the alleged spoofing incidents generally occurred during periods of increasing investor enthusiasm, it would not follow that any alleged spoofing episode "cut off" investor enthusiasm and prevented

further price increases. Those are wholly conclusory assertions with no basis in the SAC. The leap from correlation to causation is particularly problematic here, where NWBO asks the Court to infer not just that spoofing affected sentiment, but that this effect persisted for hours or up to a day. The R&R erred by crediting these unsupported inferences.

*Finally*, the academic literature confirms what market mechanics require and the R&R elsewhere acknowledges: spoofing's price impact lasts mere seconds. Studies examining modern electronic trading markets consistently support this conclusion:

- Nikolaus Hautsch & Ruihong Huang, *The market impact of a limit order*, 36 J. OF ECON. DYNAMICS & CONTROL 501, 511 (2012) (finding that the market reacts within 13 seconds on average).

- Merritt B. Fox et al., *Spoofing and Its Regulation*, 2021 COLUM. BUS. L. REV. 1244, 1288 (2021) (concluding that spoofing's price effects are "very brief"—"so brief as to have no real economic efficiency implications.").

- Eun Jung Lee et al., *Microstructure-Based Manipulation: Strategic Behavior and Performance of Spoofing Traders*, 16 J. OF FIN. MKTS. 227, 242 (2013) ("[T]he effect of spoofing-buy orders is short-lived").

Mot. 12-14. These studies' uniform conclusion—that price impacts from order book manipulation last mere seconds—reflects the reality of how high-frequency traders and other market participants respond to and eliminate artificial price pressures.

The R&R misreads each study. It criticizes the Hautsch & Huang study because it examines placed orders, not "spoofing" specifically. R&R at 26-27. But the study analyzes exactly what is at issue here—how markets respond to large orders that create temporary price pressure. Whether those orders are labeled as "spoofing" is irrelevant to the underlying market dynamics. In fact, spoofing only works because the entry of these orders is indistinguishable from other large orders.

The R&R's treatment of the Lee study is equally flawed, and fails to acknowledge that the study's central finding—that spoofing effects are "short-lived"—directly contradicts the R&R's theory of hour- or day-long price impacts. R&R at 27.

Nor is the R&R correct in its dismissal of Defendants' citation to declarations submitted by Professor Kumar Venkataraman. R&R at 28. The R&R notes that Professor Venkataraman only considered losses caused by spoofing while the orders were "active," *i.e.*, before they were canceled, and that Professor Venkataraman noted that spoofing *may* have had a price impact even after they were canceled. *Id.* This misreads both the declarations and their significance. Nowhere does Professor Venkataraman even imply that such orders may have had an effect an hour or a full day after being canceled. Instead, the declarations support the common-sense proposition that any price impact from spoofing dissipates once the artificial orders are canceled. That the government focuses on harm caused during active spoofing—rather than hypothetical lingering effects—only reinforces this understanding. Mot. 13-14. If the government in these criminal prosecutions could have proven that spoofing's effects reliably lasted an hour or a day after cancellation, presumably it would have done so, given its obligation to seek restitution on behalf of victims.

Perhaps most telling is the R&R's selective citation of the academic literature. When rejecting NWBO's long-term price impact theory, the R&R accurately referenced the scholarship finding spoofing's effects are "very brief" and have no real economic efficiency implications. R&R at 40 (citing Merritt B. Fox, Lawrence R. Glosten & Sue S. Guan, *Spoofing and Its Regulation*, 2021 Colum. L. Rev. 1244, 1288-89 (2021)). Yet it inexplicably failed to reference this same evidence when analyzing NWBO's temporal proximity theory. This selective application of relevant studies further demonstrates the R&R's flawed analysis.

In sum, the academic literature uniformly contradicts the R&R's temporal proximity holding.  No study has ever found—or even suggested—that spoofing's price impact could persist for hours in modern electronic markets, let alone an entire day.  The Court should thus reject the R&R's ruling, which runs directly contrary to that academic consensus.

## III.    THE R&R'S TEMPORAL PROXIMITY THEORY REQUIRES REJECTION OF NWBO'S CORE ALLEGATIONS OF MARKET MANIPULATION

The R&R's findings regarding loss causation, if accepted, require rejection of NWBO's claims regarding the other elements of market manipulation: manipulative acts, scienter, and reliance.  R&R at 48-51; *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101-02 (2d Cir. 2007) (setting forth elements of market manipulation).

As a threshold matter, the R&R incorrectly asserts that Defendants have attempted to "relitigate the adequacy of Plaintiff's (unchanged) pleading with respect to other elements."  R&R at 49.  This is erroneous.  As a factual matter, the SAC's new loss causation allegations create contradictions that undermine previously-pled elements.  *See* Mot. 22-25.  Legally, Defendants have argued appropriately that NWBO's new allegations negate multiple elements of market manipulation that the Court previously found satisfied.  *See, e.g.*, *Hamlett v. Everly*, 2024 WL 1892265, at *5 n.1 (S.D.N.Y. Apr. 30, 2024) ("Where, as here, the plaintiff has filed an amended complaint following an earlier ruling, the law of the case doctrine does not apply 'to the extent that the plaintiff has offered new claims or factual allegations.'") (citation omitted) (collecting cases).

*First*, as discussed above, NWBO's new allegations create an irreconcilable conflict with market efficiency that defeats reliance.  Accepting the SAC's new allegations as true, NWBO's stock price remained depressed even after the spoofing was completed, meaning the market did not incorporate "all the available information" and was therefore inefficient.  *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 130 n.21 (S.D.N.Y. 2001) (citation omitted).  The R&R found otherwise

based on its erroneous conclusion that NWBO's loss causation arguments are consistent with the efficient market hypothesis. R&R at 50. But NWBO pled itself into a Catch-22. Either (i) NWBO has sufficiently alleged that the effects of spoofing last an hour or entire day, but it cannot plead reliance because it cannot allege an efficient market; or (ii) NWBO has not sufficiently alleged loss causation on a temporal proximity theory because it has alleged NWBO trades on an efficient market that appropriately rebounds after spoofing ceases. NWBO must "take the bitter with the sweet, and if [it] chooses to embrace the efficient market theory for purposes of proving one element of a § 10(b) claim, [it] cannot then turn around and contend that the market is not efficient for purposes of proving another element of the very same claim." *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013).

*Second*, the SAC's new persistent price impact allegations likewise negate any inference of scienter. This Court previously found scienter adequately alleged based in large part on NWBO's allegation that Defendants' alleged spoofing was profitable. *See* 2023 R&R at 54-64. Indeed, the first R&R acknowledged that "it would be difficult to prove intent to deceive if Defendants did not make money off their alleged spoofing." *Id.* at 56 (citation omitted); *accord In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 262-63 (S.D.N.Y. 2003). Yet the R&R curiously holds that "a spoofing cycle consists of three parts: (1) the placement of Baiting Orders; (2) the placement of Executing Purchases to take advantage of the lower price resulting from the Baiting Orders; and (3) the cancellation of the Baiting Orders," and "[a] sale by the spoofer of the stock purchased at the artificially lower price is not a part of this cycle." R&R at 25. This analysis defies both logic and NWBO's own allegations. As NWBO itself alleges, profit is the entire point of NWBO's alleged scheme:

16



*See, e.g.*, ¶ 85 ("[I]n order to ultimately convert profits from spoofing into cash, Defendant [] ***must*** sell NWBO shares that it acquired at artificially depressed prices") (emphasis added); ¶¶ 99, 113, 127, 141 (same).

As the R&R itself observed, "[u]nless the price moves back in the opposite direction of the artificial price resulting from the spoofed orders, the spoofer would be unable to profit from the spoofing. No trader would place fake Baiting Orders and then immediately cancel them just for the fun of it." R&R at 38-39. But NWBO's own chart shows that, on average following the alleged spoofing episodes, NWBO's share price does *not* revert and downward pressure persists throughout the full day. No trader would spoof if, on average, they lost money.

*Finally*, NWBO's piecemeal pleading approach highlights a fundamental deficiency: the SAC's new allegations confirm that NWBO has not identified a single spoofing episode that satisfies all elements of a market manipulation claim. Instead, the R&R finds that the supposed scheme may be properly alleged even where NWBO has only identified 16 "example" episodes, none of which overlap with the purported spoofing episodes for which temporal proximity has been adequately alleged. R&R at 50. This attempt to mix-and-match elements from different

episodes cannot satisfy NWBO's pleading burden.  Accepting the R&R's logic would gut the heightened pleading standards for market manipulation claims, *see ATSI Commc'ns, Inc.*, 493 F.3d at 99, and allow plaintiffs in such cases to proceed to discovery without pleading a single unlawful act.  The Court should reject this effective elimination of the protections of the PSLRA and clarify that NWBO must plead all elements of its claim for at least one alleged episode as is required for securities fraud claims premised on misrepresentations.  *See, e.g., Parchmann v. MetLife*, 2021 WL 320051, at *4-6 (E.D.N.Y. Jan. 11, 2021) (dismissing securities fraud complaint premised on multiple alleged misstatements and omissions because none satisfied all elements of a claim), *aff'd sub nom. KBC Asset Mgmt. NV v. MetLife, Inc.*, 2022 WL 480213 (2d Cir. Feb. 17, 2022).

## **CONCLUSION**

The Court should modify the R&R to find that NWBO failed to sufficiently allege loss causation or any other element of NWBO's market manipulation claim and dismiss the SAC in its entirety.

Dated: February 14, 2025
    New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ William A. Burck*
William A. Burck
Christopher G. Michel (admitted *pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: 202-538-8000
Fax: 202-538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Christopher D. Kercher
Daniel R. Koffmann
Jesse Bernstein
Peter H. Fountain
Leigha Empson
295 Fifth Avenue
New York, NY 10016
Tel: 212-849-7000
Fax: 212-849-7100
christopherkercher@quinnemanuel.com
danielkoffmann@quinnemanuel.com
jessebernstein@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for Defendant Citadel Securities LLC*

**MORRISON & FOERSTER LLP**

*/s/ Anthony S. Fiotto* (with permission)
Anthony S. Fiotto
Julia C. Koch
200 Clarendon Street
Boston, MA 02116
Telephone: 617-648-4700
Facsimile: 617-830-0142
Email: AFiotto@mofo.com
Email: JKoch@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: 212-336-4067
Facsimile: 212-468-7900
Email: ELawson@mofo.com

*Attorneys for Defendant Canaccord
Genuity LLC*

**KATTEN MUCHIN ROSENMAN LLP**

*/s/ Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac
vice*)
Leigh Brissenden (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
leigh.brissenden@katten.com

*Attorneys for Defendant GTS Securities
LLC*

**GREENBERG TRAURIG, LLP**

*/s/ Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Nicholas T. Barnes
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
barnesn@gtlaw.com

*Attorneys for Defendant Instinet, LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation

*/s/ Stephen Young* (with permission)
Jon W. Zinke
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California 90802
Telephone: (562) 436-2000
jon.zinke@kyl.com
steve.young@kyl.com
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading
Corp.*

**BALLARD SPAHR LLP**

 /s/ *Marjorie J. Peerce* (with permission)
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 223-0200
Fax: (212) 223-1942
peercem@ballardspahr.com

Norman Goldberger (*pro hac vice* forthcoming)
Laura Krabill (admitted *pro hac vice*)
J. Chesley Burruss
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
burrussc@ballardspahr.com

*Attorneys for Defendant*
*G1 Execution Services LLC*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

 /s/ *Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
agordon@paulweiss.com

*Attorneys for Defendant Virtu Americas*
*LLC*