**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NORTHWEST BIOTHERAPEUTICS, INC.,

              Plaintiff,

      - against-

CANACCORD GENUITY LLC, CITADEL
SECURITIES LLC, G1 EXECUTION
SERVICES LLC, GTS SECURITIES LLC,
INSTINET LLC, LIME TRADING CORP.,
and VIRTU AMERICAS LLC,

              Defendants.

---

Case No:  1:22-cv-10185-GHW-GS

**PLAINTIFF'S LIMITED OBJECTION TO**
**<u>MAGISTRATE JUDGE STEIN'S REPORT AND RECOMMENDATION</u>**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   LONG-TERM PRICE IMPACT ALLEGATIONS ................................. 6

III.  THE R&R'S LONG-TERM PRICE IMPACT RECOMMENDATIONS ......................... 7

IV.   LEGAL STANDARD ............................................................................ 8

V.    PLAINTIFF NEED NOT DEMONSTRATE DAMAGES ON EACH OF ITS SALES AT THE PLEADING STAGE .................................................. 10

VI.   THE SECOND AMENDED COMPLAINT ADEQUATELY PLEADS LONG-TERM PRICE IMPACT ............................................................ 11

      A.  Quantitative Analysis Supports Long-Term Price Impact ........................................... 12

      B.  Defendants Took No Action To "Drive The Market" Up ........................................... 15

      C.  The Economic Literature Supports Long-Term Price Impact ...................................... 18

      D.  Courts Regularly Adopt Multi-Day Periods For Price Impact ..................................... 21

VII.  CONCLUSION ................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re Arakis Energy Corp. Sec. Litig.*,
    No. 95-cv-3431, 1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) .............................................10

*Artista Recs., LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)...........................................................................................8

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
    390 F. Supp. 3d 432 (S.D.N.Y. May 28, 2019) .........................................................4

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) .....................................................................................................22

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
    763 F.Supp.2d 423 (S.D.N.Y. 2011)........................................................................13, 14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2017).......................................................................................................8

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ................................................................... *passim*

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
    No. 17-cv-10014, 2019 WL 719751 (S.D.N.Y. Feb. 19, 2019) .............................................13

*CP Stone Fort Holdings, LLC v. Doe(s)*,
    No. 1:16-cv-04991 ........................................................................................................4

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) (Woods, J.).......................................................6, 9, 13

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3rd Cir. 2011), *abrogated on other grounds by Amgen Inc. v.*
    *Connecticut Retirement Plains and Trust Funds*, 133 S. Ct. 1184 (2013) ............................22

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003).........................................................................................11, 12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).......................................................................................................9

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................................................22

*FXCM Inc. Sec. Litig.*,
    No. 17-cv-916, 2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021)................................................10

*Gruber v. Gilbertson*,
    628 F. Supp. 3d 472 (S.D.N.Y. 2022)....................................................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ................................................................................................................22

*Harrington Global Opportunity Fund, Limited, v. CIBC World Markets Corp.*,
    No. 21-cv-761, 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ................................................4

*Harrington Global Opportunity Fund, Ltd v. CIBC World Markets Corp.*,
    585 F. Supp. 3d 405 (S.D.N.Y. 2022)..................................................................................3, 9

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)....................................................................................13

*Meyer v. Concordia Int'l Corp.*,
    No. 16-cv-6467, 2017 WL 4083603 (S.D.N.Y. July 28, 2017)................................................13

*Monroe County Employees' Ret. Sys. v. The Southern Co., et al.*,
    332 F.R.D. 370 (N.D. Ga. Aug. 22, 2019)................................................................................22

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC*,
    No. 02-cv-0767-LBS, 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002) ......................................3

*Saskatchewan Healthcare Empl.'s Pension Plan v. KE Holdings Inc.*,
    718 F. Supp. 3d 344 (S.D.N.Y. 2024) (Woods, J.) ................................................................21

*Set Capital LLC v. Credit Suisse Group AG*,
    996 F.3d 64 (2d Cir. 2021)........................................................................................................8

*In re Shanda Games Ltd. Sec. Litig.*,
    No. 22-3076, 2025 WL 365767 (2d Cir. 2025) .................................................................3, 11

*Sharette v. Credit Suisse Int'l.*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015).....................................................................................4, 9

*U.S. v. Gushlak*,
    728 F.3d 184 (2d Cir. 2013)....................................................................................................15

*In re Vale S.A. Sec. Litig.*,
    No. 15-cv-9539, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) ......................2, 9

*In re Vivendi Universal, S.A., Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009).....................................................................................22

*In re Wells Fargo & Co. Sec. Litig.*,
　　No. 20-cv-4494, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) (Woods, J.)............................8

*In re Xcelera.com Sec. Litig.*,
　　430 F.3d 503 (1st Cir. 2005) .......................................................................................................22

Plaintiff Northwest Biotherapeutics, Inc. ("NWBO" or "Plaintiff") respectfully submits this limited objection to Magistrate Judge Stein's Report & Recommendation ("R&R") regarding only whether Plaintiff sufficiently pleaded loss causation for Plaintiff's sales that took place more than one-day after Defendants engaged in manipulative spoofing of NWBO (ECF 174).[1]

## I.    PRELIMINARY STATEMENT

This case arises from Defendants' illegal manipulation of NWBO's share price between December 5, 2017 and August 1, 2022 (the "Relevant Period"). On February 14, 2024, the Court held that the First Amended Complaint adequately pled the elements of manipulative acts, scienter, and reliance, and granted Defendants' motion to dismiss only on the issue of loss causation. (ECF 148.) Specifically, the Court held that Plaintiff could plead loss causation for those sales within 1 hour of a Defendant's spoof under the temporal proximity theory of *Gamma Traders* if it amended the complaint to add allegations explaining how those sales were "formulaically derived" from the closing prices on those days, but needed to plead further information regarding the remainder of Plaintiff's sales to establish loss causation. Plaintiff filed a Second Amended Complaint ("SAC") that included those factual allegations.

Specifically, in addition to adding detailed information regarding how the prices at which NWBO sold over 40 million shares were "formulaically determined" from closing prices on dates on which Defendants spoofed NWBO within an hour of the close of trading, the SAC pleads: (1) a detailed quantitative analysis of the average price impact of Spoofing Episodes up to 400 minutes following each Spoofing Episode (¶¶ 311-312); (2) a detailed quantitative analysis showing the

---

[1] Citations to the Report & Recommendation are set forth as "R&R at __." References to "¶ __" are to paragraphs of the Second Amended Complaint (ECF 150) (the "Complaint"). Unless otherwise indicated, emphasis is added, quotation marks and citations are omitted, and alterations are adopted.

average change in NWBO's share price from the two minutes prior to Spoofing Episodes up to 60 trading days thereafter (¶¶ 313-315); (3) a detailed econometric analysis of posts about NWBO on a popular message board called InvestorsHub (¶¶ 323-25); and (4) further detail regarding the expert analysis of Nobel prize winning economist Professor Paul Milgrom[2] regarding the long lasting effects of market manipulation on a company's security (¶¶ 316-17, 326-328) and related additional economic literature on that topic (¶¶ 317-319).

The R&R correctly held that, for those sales within 1 hour of a Defendant's spoof, "the SAC provides an explanation of how the sale prices for these 40 million shares were formulaically determined from the closing prices on dates when spoofing occurred" and thereby pled loss causation under the temporal proximity theory. (R&R at 5.) And the R&R also correctly held that, for an additional 18 million shares sold within 1 day (but after 1 hour) of a Defendant's spoof, the SAC "pled enough facts to support a plausible inference that the closing prices of NWBO stock were adversely affected by Defendants' same-day spoofing even when there were no Spoofing Episodes during the final hour of trading." (R&R at 32, 36-37.) Both of these conclusions are supported by the allegations in the SAC, which easily hurdle the liberal pleading standard for loss causation that prevails in this District, which requires only a "short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure." (R&R at 10.) *See also In re Vale S.A. Sec. Litig.*, No. 15-cv-9539, 2017 WL 1102666, at \*26 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) (the burden of pleading loss causation is "not a heavy one" and a complaint "must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations") (quoting *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)).

---

[2] While expert disclosure is premature, Dr. Milgrom has been retained as Plaintiff's expert in this matter.

While the R&R acknowledged that the SAC "adds allegations designed to beef up NWBO's claims that Defendants' spoofing had [] a long-term effect on the price of all of Plaintiff's sales, regardless of type, during the Relevant Period," it recommended this Court find that Plaintiff had not sufficiently pled long term price impact under *Gamma Traders* for the remainder of its sales. (R&R at 7, 37.) The R&R's recommendation that these allegations were insufficient to plead loss causation in the Second Circuit is incorrect.

In the Second Circuit, all a plaintiff must do is "simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the … alleged manipulative acts." (R&R at 11.) This "not heavy burden," particularly in a market manipulation case such as this one where the pleading standards are even more relaxed[3], has been met here.

Indeed, the SAC's long-term price impact allegations are far more detailed and compelling than the types of allegations routinely held sufficient to plead loss causation in securities cases in this Circuit. *See, e.g., Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233-34 (2d Cir. 2014) (finding loss causation adequately pled and holding that "[w]e cannot conclude, as a matter of law and without discovery, that any artificial inflation of Barclays's stock price after January 2009 was resolved by an efficient market prior to June 27, 2012. The efficient market hypothesis, premised upon the speed (efficiency) with which new information is incorporated into the price of a stock, does not tell us how long the inflationary effects of an uncorrected misrepresentation remain reflected in the price of a security."); *In re Shanda Games*

---

[3] Because manipulation "can involve facts solely within the defendant's knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc.*, 493 F.3d 87, 102 (2d Cir. 2007). *See also Harrington I*, 585 F. Supp. 3d at 418 (same). Rather, the plaintiff need only "lay out the nature, purpose, *and effect* of the fraudulent conduct and the roles of the defendant without requiring specific instances of the conduct." *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC*, No. 02-cv-0767-LBS, 2002 WL 31819207 at *5 (S.D.N.Y. Oct. 10, 2002) (italics added).

*Ltd. Sec. Litig.*, No. 22-3076, 2025 WL 365767, at *18 (2d Cir. Feb. 3, 2025) (finding plaintiff adequately alleged loss causation by alleging that "Plaintiff and Class members suffered economic loss when they sold their Shanda Securities for less than those securities were worth. . . . Had the holders of Shanda Securities not been induced to sell at deflated prices they could have secured the fair value of their shares through appraisal.").

This is true with regard to spoofing and other market manipulation cases as well. *See, e.g., Harrington Global Opportunity Fund, Limited, v. CIBC World Markets Corp.,* No. 21-cv-761, 2023 WL 6316252, (S.D.N.Y. Sept. 28, 2023) at *8 ("*Harrington II*") (finding loss causation adequately pled for all the plaintiff's sales because the complaint alleged that, "[when] spoofing events occur continuously throughout the day and continue without interruption for a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the spoofing events."); *Sharette v. Credit Suisse Int'l.*, 127 F. Supp. 3d 60, 103 (S.D.N.Y. 2015) (finding "Plaintiffs have more than adequately pleaded facts giving rise to a plausible inference that the Offerings caused a depression in the price of ECD stock from which ECD never recovered."); *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (S.D.N.Y. 2019) (finding plaintiffs plausibly alleged "that the Exchanges' alleged misconduct was *a* proximate cause of the economic loss they suffered by trading in the manipulated securities market"); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 1:16-cv-04991, at ECF 67 (N.D. Ill. Oct. 3, 2017) (holding that plaintiff adequately pled loss causation in a spoofing case where it provided defendant with "some indication of the loss.")

To reach its conclusion that the SAC did not adequately plead the long-term negative impact of Defendants' spoofing on NWBO's stock price, the R&R improperly strayed from the liberal pleading standard set out by the Second Circuit and went beyond the four corners of the

SAC. Specifically, the R&R based its conclusion that NWBO had inadequately pled the long-term price impact of Defendants' spoofing on NWBO's stock price on the theoretical possibility that some unidentified (and un-pled) negative news about NWBO might have been responsible for some of the price decline in NWBO stock following Spoofing Episodes. Yet the R&R does not say what this negative news was or might have been, or how it concluded that such news was released to the market at the same time as Defendants' Spoofing Episodes such that the considerable long-term average declines following Spoofing Episodes alleged in the SAC were caused by the unspecified corporate news. Nor can it, as it is directly at odds with the allegations in the SAC, which explain that during the Relevant Period, NWBO disclosed only overwhelmingly positive news regarding its key, life extending Glioblastoma treatment. *See, e.g.,* ¶¶ 3-7, 39-51 (NWBO completed Phase 3 clinical trial in U.S. and internationally with statistically significant efficacy and safety, and "The Company believes that this is the first Phase 3 trial of a systemic treatment in nearly 20 years to have shown such survival extension in newly diagnosed GBM patients, and the first time in nearly 30 years that a Phase 3 trial of any type of treatment has shown such survival extension in recurrent GBM.")

The R&R similarly improperly speculates, again contrary to the allegations in the SAC (*see, e.g.,* ¶ 61), that some of Defendants' manipulative conduct might have had the effect of *increasing* the price of NWBO to some unspecified degree. That is an issue for summary judgment, not a motion to dismiss. According to the R&R, this un-pled possibility somehow completely negates the SAC's quantitative analysis showing that NWBO stock prices only partially reversed following Spoofing Episodes, and remained artificially depressed for up to 60 days thereafter (¶¶ 313-314).

In so doing, the R&R created a new standard contrary to existing law that no plaintiff could

realistically meet in a spoofing case at the pleading stage because it necessarily involves extensive discovery of information solely in the possession of the defendants, quantitative analysis of years' worth of detailed trading data, and complex expert opinions. Indeed, what the R&R requires of a plaintiff at the pleading stage – the quantitative isolation of the impact of spoofing relative to every other market occurrence that could impact a security's price – is precisely what courts uniformly – including this one – hold is unnecessary at the pleading stage. *See, e.g., Carpenters Pension Trust Fund of St. Louis, et al.* v. *Barclays PLC, et al.*, 750 F.3d 227, 233 (2d Cir. 2014) (plaintiff "need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price."); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018) (Woods, J.) ("[I]f the complaint plausibly alleges that the alleged misrepresentations caused the plaintiffs' losses, the issue of whether 'the loss was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'") (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

The Court should adopt the R&R's recommendation that the SAC adequately alleges loss causation for those sales in temporal proximity to Defendants' spoofs, but then find that the SAC also adequately alleges loss causation for the remainder of Plaintiff's sales. Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.    <u>LONG-TERM PRICE IMPACT ALLEGATIONS</u>

The SAC's amended loss causation allegations, based on multiple detailed econometric analyses and spanning 42 paragraphs over 16 pages, demonstrate how Plaintiff's sales that took place more than one day after a Spoofing Episode were sold at artificially depressed prices due to the persistent adverse effect of Defendants' spoofing, including:

- That Defendants' spoofing caused an immediate decline in the price of NWBO shares that *did not* fully reverse on average over time (¶ 304);

- That the cumulative negative price impact of Defendants' spoofing extended beyond the specific spoofing cycle, on average for up to sixty trading days (¶¶ 308-309, 313-315);

- Statistical analyses comparing the average price impact of Spoofing Episodes to industry-standard and court-approved benchmark indices over various time periods, demonstrating that the negative price impact was caused by Defendants' spoofing and not other NWBO specific news (¶¶ 311-315);

- That the price of NWBO shares (like all securities) may be higher or lower after a Spoofing Episode for reasons unrelated to spoofing and, therefore, that the price impact of Defendants' spoofing is appropriately and accurately shown by the average price impact over the entire spoofing scheme (¶ 322);

- That Defendants' spoofing often occurred during periods of increasing investor enthusiasm for NWBO, and that absent Defendants' spoofing the price of NWBO shares would have risen even higher (¶¶ 323-325);

- An explanation of peer-reviewed economic literature establishing that the price impact of all forms of trade-based manipulation, including spoofing, persists over time (¶¶ 316-321); and

- That persistent price impact from spoofing exists even after Baiting Orders are cancelled and the manipulative trades are "unwound," since traders buy and sell to unwind trades in ways designed to minimize the price impact of that unwinding (¶¶ 326-327).

## III.    THE R&R's LONG-TERM PRICE IMPACT RECOMMENDATIONS

<u>First</u>, the R&R found that, while the SAC's quantitative analysis showed that, on average, NWBO's stock price declined during the first 5, 10, and 20 trading days after a Spoofing Episode and then stabilized at a still depressed level over the next 40 days (¶¶ 313-15), that analysis only demonstrated correlation, not causation because the analysis purportedly did not "control for negative performance or news about NWBO that may have caused its stock price to fall irrespective of any spoofing." (R&R at 45-46.)

<u>Second</u>, the R&R disregarded the SAC's allegations and its cited economic literature in support thereof, that spoofing has a long-term price impact because the price-lowering impact of

the placement Baiting Orders is greater than the price-increasing impact of their cancellation. According to the R&R, these allegations are flawed because they did not take into account the spoofer's "actions to drive the market in the opposite direction following the placement of the Baiting Orders" (R&R at 38) and were incompatible with certain other allegations in the SAC (R&R at 48.)  Instead, the R&R concluded, relying on three papers that are not referenced in the SAC and do not support its finding, that the economic literature establishes that "the security's price returns quickly to the pre-spoofing level once the temporary artificiality injected by the spoofed orders dissipates" (R&R at 40). It also finds the expert analysis of Nobel-prize winning economist Professor Milgrom inapplicable because, while it demonstrated the long-term price impact of market manipulation in the ISDAFix market, it did not deal specifically with spoofing and, according to the R&R, its principles do not translate to the spoofing context because "the profitability of Defendants' spoofing activity depended on maximizing the impact of their buy-side trading activity, not minimizing it." (R&R at 43.)

## IV. <u>LEGAL STANDARD</u>

When reviewing an R&R, the District Court has full discretion to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). For any dispositive matter, "any part of the magistrate judge's recommendation that has been properly objected to must be reviewed by the district judge *de novo*." *Artista Recs., LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010) (citing Fed. R. Civ. P. 72(b)).  *See* Order Adopting Report & Recommendation, dated Feb. 14, 2024 (ECF 148) at 2-3.

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Set Capital LLC v. Credit Suisse Group AG,* 996 F.3d 64, 75 (2d Cir. 2021) (citation omitted).  *See also In re Wells Fargo & Co. Sec. Litig.*, No. 20-cv-4494, 2021 WL 4482102, at *8 (S.D.N.Y.

Sept. 30, 2021) (Woods, J.) (same). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at 556 (2017) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

Loss causation "is the causal connection" between the alleged misconduct and plaintiff's economic harm. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 808 (2011). As the R&R correctly noted, under the "prevailing practice" in this District, loss causation need not be plead with particularity. R&R at 10 (citing *Sharette*, 127 F. Supp. 3d, at 80, 102-03 & n.12). *See also In re Vale S.A.*, No. 15-cv-9539, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) ("Ordinary pleading rules under Fed. R. Civ. P. 8(a)(2), which apply to loss causation, are not meant to impose a great burden upon a plaintiff."). "A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient." *Sharette*, at 103. *See also Harrington Global Opportunity Fund, Ltd v. CIBC World Markets Corp.*, 585 F. Supp. 3d 405 at 419 (S.D.N.Y. 2022) ("A plaintiff's burden in alleging loss causation 'is not a heavy one.'") ("*Harrington I*") (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)); *DoubleLine Capital LP*, 413 F. Supp. 3d at 212 (Woods, J.) (same). The plaintiff "need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension Trust Fund of St. Louis, et al.* v. *Barclays PLC, et al.*, 750 F.3d at 233.

In analyzing the requirement under the Commodity Exchange Act ("CEA") that a plaintiff suffer "actual damages," the Second Circuit in *Gamma Traders* held that there are two independently sufficient ways in which *price impact* may be pled in a CEA spoofing case. Under the "temporal proximity" theory, a plaintiff may allege that it traded "so close in time to Defendants' spoofing" as to permit the court to "infer as a matter of common sense that the market

prices were artificial" when plaintiff traded.  Under the "long-term price impact" theory, a plaintiff may allege a factual basis indicating that the effects of the spoof lasted for a protracted period so as to "justify an inference that the market price was still artificial" when plaintiff traded.  41 F. 4th at 80-81.

## V.    PLAINTIFF NEED NOT DEMONSTRATE DAMAGES ON EACH OF ITS SALES AT THE PLEADING STAGE

As discussed above, *Gamma Traders* addressed whether the plaintiff had sufficiently pled under the CEA that it had been damaged by the defendants' misconduct, not whether the plaintiff had sufficiently alleged loss causation under the securities laws. Because this Court has already found that Plaintiff sufficiently pled the elements of manipulative acts, scienter and reliance (ECF 148, adopting "in full the thoughtful and well-reasoned [December 29, 2023] R&R by Judge Stein"), and the R&R finds that Plaintiff has now also sufficiently pled loss causation and damages with regard to at least over 40 million of its shares that it sold within a day of Defendants' spoofs, Plaintiff should be permitted to proceed on all of its claims.

Nothing in the securities laws or in any of the caselaw requires a plaintiff to show at the pleading stage that it suffered damages on each and every one of its purchases or sales of the security at issue. Indeed, Courts regularly sustain and even certify securities fraud cases where the plaintiff did not hold through, and therefore did not have damages on, each of the alleged corrective disclosures. *See, e.g.*, *In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, No. 17-cv-916, 2021 WL 1160056, at *9 (S.D.N.Y. Mar. 18, 2021) (rejecting typicality challenge to proposed class representative who purchased shares after and, therefore, did not have damages on, one of the corrective disclosures), *Order Adopting Report and Recommendation*, No. 17-cv-916, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021); *In re Arakis Energy Corp. Sec. Litig.*, No. 95-cv-3431, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999) (rejecting typicality challenge to proposed class

representative who purchased shares after and, therefore, did not have damages on, multiple corrective disclosures). The extent and amount to which Plaintiff was damaged by Defendants' manipulative spoofing is a question for the merits phase of the litigation.

## VI.   THE SECOND AMENDED COMPLAINT ADEQUATELY PLEADS LONG-TERM PRICE IMPACT

The Second Circuit and courts in this District, including this one, routinely find loss causation to be sufficiently pled when the complaint pleads only that the truth of the alleged fraud was revealed through a piece of news or revelation of a risk and that the stock price dropped in response.  *See, e.g., Carpenters Pension Trust Fund of St. Louis,* 750 F.3d at 233 (2d Cir. 2014) (finding plaintiff sufficiently pled loss causation by alleging that the falsity of the alleged misrepresentations "was revealed to the public for the first time in the Settlement Agreements," and that "the market reacted negatively to the . . . corrective disclosure by a significant . . . decline in Barclays's stock" the next day); *In re Shanda Games Ltd. Sec. Litig.*, No. 22-3076, 2025 WL 365767, at *18 (2d Cir. Feb. 3, 2025) (plaintiff adequately pled loss causation by alleging that "he suffered an economic loss when he accepted the tender price [for his shares in defendant company] due to the misleading statements in the [company's] Prox[y Statements] instead of receiving a higher value in an appraisal action"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (plaintiff adequately pled loss causation by alleging that its loss "was a foreseeable consequence of defendants' omissions particularly in light of the drastic price declines which occurred in the shares of . . . other companies" controlled by defendant . . . which allowed the reasonable inference that "the decline in [defendant] NETV's stock value was brought about by the same forces that caused the failures of the other Panzo-Appel ventures"). A chart demonstrating the types of loss causation allegations regularly found to be sufficient by this Court and by the Second Circuit is attached hereto as Ex. A to the Declaration of Laura H. Posner.

The new, detailed, factual allegations in the SAC far exceed the allegations found to be sufficient in these cases and easily meet the liberal standard for pleading loss causation. Each of the reasons given by the R&R for finding the SAC's long-term loss causation allegations lacking would impose requirements contrary to law and that would prevent any plaintiff from sufficiently pleading long term price impact in a spoofing case.[4]

A.     **Quantitative Analysis Supports Long-Term Price Impact**

The R&R found that, while the SAC's quantitative analysis showing that, on average, NWBO's stock price declined during the first 5, 10, and 20 trading days after a Spoofing Episode and then stabilized at that still artificially depressed level over the next 40 days (¶¶ 313-15) demonstrated correlation, it was insufficient to plead causation because Plaintiff's analysis purportedly did not "control for negative performance or news about NWBO that may have caused its stock price to fall irrespective of any spoofing." (R&R at 45.) This finding is contrary to both the law and the well-pled facts in the SAC, which the Court is required to credit as true.

First, the law does not impose an obligation for a plaintiff to demonstrate the complete absence of any potentially confounding news or other market factors at the pleading stage. Rather, the jurisprudence in this Circuit is uniform that a plaintiff is not required to plead the relative impacts of potentially countervailing market events. *See, e.g., Carpenters Pension Trust Fund of St. Louis*, 750 F.3d at 233 (2d Cir. 2014) ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price."); *Emergent*

---

[4] The only spoofing case cited in the R&R in support of its conclusion that the SAC did not adequately plead long-term price impact was *Phunware I.* (R&R at 37, 48.) However, the plaintiff in *Phunware* subsequently amended its complaint and the court ruled in *Phunware II* that the amended complaint adequately pled loss causation under the temporal proximity theory and that it was, therefore, unnecessary for it to rule on the issue of whether the plaintiff also sufficiently pled long-term price impact. *See* R&R at 30 (noting that *Phunware II* "did not find any of Phunware's loss causation allegations in its amended complaint to be deficient."). The *Phunware* defendant then moved to dismiss again, and the parties are currently briefing that issue.

*Capital Inv. Mgmt., LLC.*, 343 F.3d at 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, ... the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."); *DoubleLine Capital LP.*, 323 F. Supp. 3d at 456 (S.D.N.Y. 2018) (Woods, J.) ("[I]f the complaint plausibly alleges that the alleged misrepresentations caused the plaintiffs' losses, the issue of whether 'the loss was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'")[5]; *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) (finding that plaintiffs are not required to "plead[] that *no other possible event* could have caused plaintiffs' losses" to sufficiently plead loss causation (emphasis in original)); *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17-cv-10014, 2019 WL 719751, at *8 (S.D.N.Y. Feb. 19, 2019) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes."); *Meyer v. Concordia Int'l Corp.*, No. 16-cv-6467, 2017 WL 4083603, at *8 (S.D.N.Y. July 28, 2017) ("[w]hether a loss was 'caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss'" (quoting *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 233, 245 (S.D.N.Y. 2012))); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F.Supp.2d 423, 507 (S.D.N.Y. 2011) ("[A]t the motion to dismiss stage, the [complaint] need not rule out all competing theories for the drop in ... stock price; that is an issue to be determined by the trier of fact on a fully developed record.").

This jurisprudence aligns with common sense given that it would be impossible at the

---

[5] While the Court in *DoubleLine Capital* found that certain alleged corrective disclosures did not cause any impact on the company's stock price, this was because those disclosures did not contain information that revealed new material information, it was not based on the length of time that a negative price impact persisted.

pleading stage to account for every possible news item or market condition that could have impacted a company's stock price absent extensive discovery and expert analysis. This is particularly true in a market manipulation case like this one, where the trading data necessary to conduct such an analysis is in the exclusive control of Defendants. *ATSI Commc'ns, Inc.*, 493 F.3d 87, 102 (2d Cir. 2007).

Second, the R&R does not identify any example of such negative news that it posits could have caused the declines in NWBO stock that followed Defendants' Spoofing Episodes, and no such facts exist in the SAC from which even such an inference could be made. At most, the R&R speculates that other unspecified events *may* have impacted the price of NWBO stock at unspecified times and to some unspecified degree. The SAC's well-pled allegations are to the contrary – that despite overwhelmingly positive news regarding NWBO's groundbreaking cancer treatment, its stock price instead declined (¶¶ 3-7, 39-51), and that "news about NWBO or other firm-specific events cannot explain the[] price declines" following each Spoofing Episode. *Id.* at n.66.

Third, the methodology utilized in the quantitative analysis – namely, the use of average prices following Spoofing Episodes throughout the entire Relevant Period – does exactly what the R&R claims must be done (¶¶311-315): it mitigates the effects of other factors, such as NWBO specific corporate news or financial results, and demonstrates that there was still a persistent and long-lasting downward trend caused by Defendants' spoofing. *See* ¶ 315 ("The stabilization of the decline in the price of NWBO shares from between twenty (20) to sixty (60) trading days after the Spoofing Episodes makes clear that the decline was not driven by negative news affecting the price of NWBO shares during the Relevant Period, because such news would have continued to cause a further price decline on the dates following Spoofing Episodes.")

Fourth, the SAC then even goes further and conducts a "sentiment analysis" to measure investor enthusiasm prior to and following Spoofing Episodes to demonstrate that, in instances where Defendants were spoofing during periods of rising NWBO stock prices, the spoofing "cut off" investor enthusiasm and prevented the stock price from rising even further (¶ 325; *see also* ¶ 309 n. 64 ("Whether the market was reacting at any particular instant to positive or negative news regarding NWBO, the market price of its stock was lower than it would have been throughout the Relevant Period absent Defendants' manipulative conduct.")).

Finally, the SAC demonstrates that there was a statistically significant association between NWBO's share price and standard industry indices (¶¶311-315, n.65), providing even further quantitative support for its allegations that decreases in NWBO stock price following Spoofing Episodes were the result of Defendants' spoofing, not broader market-wide conditions. *See, e.g. Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 488 (S.D.N.Y. 2022) (upholding expert testimony on loss causation which examined whether industry factors had a "statistically significant impact on movements in [the] stock price"); *U.S. v. Gushlak*, 728 F.3d 184, 199 (2d Cir. 2013) (upholding loss analysis which evaluated industry control by examining statistical significance).

Taken as a whole, the SAC thus alleges far more than mere "correlation" between the long-term negative impacts on its stock price and Defendants' spoofing conduct.

**B.    <u>Defendants Took No Action To "Drive The Market" Up</u>**

The SAC demonstrates through its detailed econometric analysis (¶¶ 313-315) that the negative price impact of Defendants' spoofing did not fully reverse over time. As the SAC pleads, this is because Baiting Orders drive the price down more than their cancellation drives the price up, since the market cannot immediately ascertain with certainty that a particular spoofing order was fake and, therefore, a portion of the negative price impact from spoofing episodes does not

fully vanish for some time (if ever). (¶ 317.)[6]

The R&R found these allegations inconsistent with other portions of the SAC that purportedly alleged that the Defendants took "actions to drive the market in the opposite direction following the placement of the Baiting Orders." (R&R at 38.) However, nowhere in the SAC does NWBO allege that Defendants took any action to "drive the market" higher following the placement of Baiting Orders[7] – nor does it say anywhere that any drive in the opposite direction took place to the exact same degree as the drive downward caused by the spoofing. Nor are such actions an inherent part of spoofing the price of a security *downward* to purchase it at a *lower* price. The steps of the alleged spoofing scheme are (1) the placement of Baiting Orders to drive the price of NWBO stock down; (2) the execution of purchases (Executing Orders) at artificially low prices; and (3) the cancellation of Baiting Orders so that they would not execute at prices at which Defendants never intended to trade. (¶¶ 62-64.)

The R&R appears to assert, without any basis in the SAC, that Defendants' Executing Purchases would "drive the market" higher (R&R at 38-39), but this misunderstands both the nature of Executing Purchases and Defendants' profit mechanism. When Defendants capitalize on

---

[6] The R&R suggests that because Baiting Orders were cancelled and Executing Purchases were made, the market would have known that the Baiting Orders were fake (*i.e.*, did not represent legitimate buying interest) and this knowledge would "offset the impact of the Baiting Orders." (R&R at 42.) This is an improper factual determination at the pleading stage and is directly contrary to the well-pled allegations of the SAC that specifically allege why it is highly improbable that market participants would be able to readily identify trades as manipulative. ¶60.

[7] The R&R cites to particular paragraphs of the SAC alleging that after cancelling Baiting Orders, Defendants were left with an order book position weighted to the buy-side, and asserts that the SAC thereby alleged that Defendants "sought to push the price up."  R&R at 42 (citing ¶¶ 88, 102, 144, 205, 232.)  Neither the cited paragraphs, nor any other allegations in the SAC, allege that Defendants took any action to "push the price up."  The SAC alleges the opposite – that every Executing Purchase utilized passive, non-marketable buy orders that had the immediate impact of lowering NWBO's share price. ¶¶ 318-321. Defendants were incentivized to structure their Executing Purchases in this manner precisely to avoid pushing the price up so that they could accumulate more shares of NWBO at the artificially low prices their spoofing caused.

the artificially low price induced by their Baiting Orders to purchase NWBO shares at discounted prices, their incentive is to acquire these shares *at the lowest price*. *See* ¶ 63 ("Defendants placed their Executing Purchases on the opposite side of the Limit Order Book or IDQS to purchase NWBO shares at the lower stock prices created by the downward manipulation of their Baiting Orders to sell.")  Defendants, therefore, structure their Executing Purchases to *minimize* any upward price impact so that they can acquire a larger number of shares at the artificially low price. The SAC details how Defendants use non-marketable buy orders that execute transactions when other market participants place marketable sell orders. (¶ 320 ("Every Executing Purchase identified in this Complaint consists of a non-marketable buy order executing against a marketable sell order by another market participant, leading to a decline in NWBO's share price").)  Because it is the seller, not Defendants, who "cross the spread" to execute that transaction (*i.e.*, these are aggressively priced sales of shares below the best offer), it has the effect of driving the stock price *lower*. (¶ 320.) In this manner, Defendants profit from their scheme by acquiring a substantial volume of NWBO shares at artificially low prices.

Having acquired a substantial volume of NWBO shares at artificially low prices, Defendants can monetize their profit by selling shares for cash upon any subsequent dissipation of the price deflation, however slight.  As the SAC explains (¶¶ 311-315) and the R&R acknowledges (R&R at 34-35), the data show only a *partial* price reversion in the short term that does not result in a complete dissipation of the artificial price deflation. That is because when Defendants later sell shares, they would rationally execute those sales in a manner that has the least downward price impact so that they can obtain the highest price. The SAC does not allege that Defendants sought to "drive up" the price of NWBO shares in any way, nor does it allege that Defendants took any

actions that would have that effect.[8] The long-term price movement of NWBO shares indicates that Defendants' Baiting Orders had a systematic downward impact, notwithstanding any partial price reversions along the way.

### C.    The Economic Literature Supports Long-Term Price Impact

The Second Circuit in *Gamma Traders* acknowledges that spoofing can have a long-term impact on a stock's price. *Gamma Traders*, 41 F.4th at 80 (plaintiff may satisfy pleading standard by alleging facts "about how long the effects of spoofing last.") Nevertheless, the R&R goes on to reach a factual conclusion – based on articles not cited in the SAC – that the economic literature establishes that "the security's price returns quickly to the pre-spoofing level once the temporary artificiality injected by the spoofed orders dissipates" (R&R at 40.) In reaching this improper factual conclusion, the R&R ignores not only the Second Circuit in *Gamma Traders*, but also discounts the analysis by Nobel-prize winning economist Paul Milgrom and a number of other peer-reviewed economics articles that are cited in the SAC[9], based on its (incorrect) assessment that those analyses dealt with market manipulation generally rather than spoofing specifically, and, according to the R&R, these principles did not translate because "the profitability of Defendants' spoofing activity depended on maximizing the impact of their buy-side trading activity, not

---

[8] The R&R observes that in a few instances Defendants were able to sell NWBO shares at a price at or above the pre-spoofing level on the same day as a Spoofing Episode. (R&R at 39.) However, the SAC includes comprehensive factual allegations that Defendants' spoofing lowered the price of NWBO shares below what they would have been in an unmanipulated market (¶ 322), which can occur during times when the price of NWBO shares is otherwise moving up or down. The R&R does not state, and the SAC nowhere alleges, that Defendants intentionally took any action to "drive the price up" prior to these sales, nor is there any inherent price-increasing aspect of Defendants' spoofing conduct. It is, therefore, appropriate when analyzing the isolated impact of Defendants' conduct on NWBO share price to consider only those actions through which Defendants manipulate the price of the security.

[9] The R&R states that *Price Discovery without Trading: Evidence from Limit Orders* (¶ 317 n.68) did not mention spoofing, but its analysis of the price impact of order placement relative to order cancellation is what spoofing schemes are made of (R&R at 40.)

minimizing it." (R&R at 43.) Specifically, the R&R states that "[n]owhere does NWBO plead or argue that, taking into account all components of the spoofing scheme as alleged, there was an asymmetry or other basis for claiming that the downward pressure exerted on NWBO's stock price by the scheme exceeded the upward pressure." (R&R at 44-45.)

Putting aside that it is inappropriate to rely on articles not referenced or cited to in the SAC, none of the three articles the R&R relies on (R&R at 40), provide econometric support for the Court's conclusion. *Spoofing and Its Regulation*[10] is a law-review article that does not perform any econometric analysis and presents its quoted statements that spoofing effects will be "brief" in the context of its assertion that spoofing "will not seriously undermine the role that share prices play in guiding the real economy." (At 39.) But loss causation in a securities case is not concerned with whether Defendants' conduct affects large-scale capital allocation decisions in the real economy, it is concerned with whether it reduces the security's price below the level that would otherwise obtain. *Spoofing and Price Manipulation in Order Driven Markets*[11] does not analyze any actual security price movements; instead it presents a model designed to "derive[] the optimal trading strategy" for spoofing, and actually reaches conclusions that support Plaintiff's allegations, finding that while the price impacts of spoofing are "expected to subside" at some unidentified period of time, "[i]n the meantime, market participants make trading decisions on distorted information about the price of the asset." (At 3, 23.)[12] Likewise, *Impact of False Information from*

---

[10] Merritt B. Fox, et al., SPOOFING AND ITS REGULATION, Columbia Business Law Review, (2021)(SSRN-4002696).

[11] Alvaro Cartea, et al., SPOOFING AND PRICE MANIPULATION IN ORDER DRIVEN MARKETS, Mathematical Institute, University of Oxford, Oxford, UK (2020) (SSRN 3431139).

[12] This article found that in its model of trading a specific security, after a five-minute spoofing period, the price of that asset was materially impacted relative to its price in the absence of spoofing. (At 3.)

*Spoofing Strategies*[13] does not analyze actual security price movements and its trading model assumes that one type of trader ("fundamentalist agents") will "*gradually*" move the price of the security back to its equilibrium level.[14] None of these articles quantify the length of time during which prices are impacted by spoofing, and even acknowledge the price impact of spoofing may be long-term, consistent with and supporting the well-pleaded allegations in the SAC.

By contrast, Dr. Milgrom's analysis regarding how market manipulation, like spoofing, can create long-term price impacts when the "unwinding" of trades is not symmetrical because "when unwinding the trade, [the manipulative] trader will seek to minimize the price impact to avoid losses" (¶ 326), is directly relevant here. Even if the "unwinding" is Defendants' Executing Purchases, the SAC alleges that Defendants minimized the price impact of that unwinding by placing passively priced buy limit orders (¶¶ 318-321). (*See supra* pgs. 16-18.)

The other economic literature cited in the SAC also supports the long-term price impact of Defendants' manipulative spoofing. *Price Discovery without Trading: Evidence from Limit Orders* (¶ 317 n.68) did not mention spoofing specifically, but its analysis of the price impact of order placement relative to order cancellation is directly relevant to spoofing schemes, which have at their core the placement and cancellation of fake orders. The SAC also cites to *Spoofing in Equilibrium*, which disagrees with the R&R's conclusion that the price effects of spoofing "can be completely neutralized by sophisticated traders once understood by all market participants." (¶ 316 n.67.)

---

[13] HaoHang Li, Steve Y. Yang, Impact of False Information from Spoofing Strategies: An ABM Model of Market Dynamics, School of Business, Stevens Institute of Technology, Hoboken, NJ. U.S. (2022).

[14] This article notes that a limitation of its model is that it excludes many types of market participants, such as market makers, and that it assumes that all market participants "always act in the same way no matter how the market condition changes," and that the model could be improved by incorporating these aspects. (At *10.)

At most, the R&R's treatment of the economic literature cited in the SAC, and its own citation to sources outside of the SAC, may suggest some level of disagreement on the precise duration of the negative price impacts of spoofing. *Cf.* R&R at 28 (stating with regard to temporal proximity that "the studies cited by the parties are inconclusive as to how long these effects [of spoofing] may endure.") But at the motion to dismiss stage, all factual inferences must be drawn in favor of the plaintiff. *Saskatchewan Healthcare Empl.'s Pension Plan*, 718 F. Supp. 3d at 374 (S.D.N.Y. 2024) (Woods, J.) Arguments about the extent and timing of the negative price impacts of Defendants' conduct "are not suitable for resolution on a motion to dismiss" (R&R at 36), and will be the subject of extensive expert discovery in this case like all spoofing cases, which paradoxically the R&R acknowledged in its temporal proximity analysis. *See* R&R at 21 ("Given the particular characteristics of spoofing, expert testimony might ultimately substantiate Defendants' view that its effects on a stock price last only seconds. But on this motion to dismiss, the issue is not whether Defendants have articulated a plausible claim that this is so, but whether the Court should conclude that Plaintiff's competing contention is implausible.")  The same inference should be drawn in Plaintiff's favor as to long-term impact.

### D.    Courts Regularly Adopt Multi-Day Periods For Price Impact

The allegations in the SAC adequately plead loss causation. Should the Court determine that the SAC must allege damages for each of Plaintiff's sales and that the SAC only alleges that Defendants' spoofing impacted the market for some shorter period of time, however, at a minimum, NWBO's sales that were based on Pricing Dates that occurred within 2 trading days after a Spoofing Episode (*see* Exhibit B)[15], attached hereto) would be consistent with both the

---

[15] For ease of reference, Exhibit B to the Declaration of Laura H. Posner identifies from Exhibit 2 to the SAC, those of Plaintiff's sale transactions where the sale price was formulaically derived from the closing price on Pricing Dates that occurred within 2 trading days after a Spoofing

reasoning of the R&R's analysis of the temporal proximity theory[16] and the substantial body of caselaw finding that the price impact of corrective disclosures (which by contrast to the allegations here are public and incorporated into efficient stock prices relatively quickly), often lasts for at least 2 or 3 days. *See, e.g., In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (using a three-day window for event study analysis); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (accepting event study with three-day event window and rejecting argument that this rule only applied "where the timing of discrete events was [not] ascertainable"); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (rejecting argument that a two-day event window is inconsistent with an efficient market); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3rd Cir. 2011) ("That some information took two days to affect the price does not undermine a finding of efficiency."), *abrogated on other grounds by Amgen Inc. v. Connecticut Retirement Plains and Trust Funds*, 133 S. Ct. 1184 (2013); *Monroe County Employees' Retirement System v. The Southern Company, et al.*, 332 F.R.D. 370, at 391-392 (N.D. Ga. Aug. 22, 2019) (finding that the caselaw and "academic literature supports the use of two-day (or more) event windows,"). Indeed, the Supreme Court has expressly refused to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) at 248 n.28. *See also Halliburton Co.*

---

Episode. To avoid double-counting, this chart does not include any sale transactions that were identified in Exhibit 3 to the SAC.

[16] When analyzing temporal proximity, the R&R acknowledged that while certain factual challenges to the SAC "may ultimately prove convincing, they raise issues of fact that are not suitable for resolution on a motion to dismiss." (R&R at 36.) This is particularly so, the R&R explains, because "[a]t the motion to dismiss stage, it is difficult to draw a bright line between Spoofing Episodes that took place during the final hour of trading and those that took place earlier in the afternoon." *Id*. Applying this same analysis to the long-term price impact theory, there is similarly no factual or legal basis at to draw a bright-line rule between a one-day period and a period lasting incrementally longer at the pleading stage. The precise boundary of the negative price impact of Defendants' conduct can only be assessed with expert testimony.

*v. Erica P. John Fund, Inc.,* 573 U.S. 258 (2014) at 271-72 (declining to "enter the fray" of academic debates about the speed at which information is impounded into a stock price).

In addition to the over 40 million shares of NWBO stock that were sold in transactions that had a Pricing Date on the same day as a Spoofing Episode, NWBO engaged in **14 sales** of a total of **11,416,171 shares** where there was a Pricing Date that was one trading day after a Spoofing Episode, and NWBO engaged in another **16 sales** of a total of **11,501,842 shares** where there was a Pricing Date that was two trading days after a Spoofing Episode.

## VII.    CONCLUSION

The R&R's proper recommendation that loss causation is adequately pled for at least 40 million of Plaintiff's sales is sufficient for this case to move forward on all of Plaintiff's claims. A proper application of the liberal pleading standard for loss causation is also exceeded by the allegations in the SAC, which provide a plausible basis for long-term price impact with factual allegations of "partial" price reversal, quantitative statistical analysis, and economic literature.

*Gamma Traders* acknowledges that spoofing can have long-term price impact on a security's price, but the R&R's analysis would prevent any plaintiff from being able to satisfy that theory of loss causation with the "short and plain" statement that Rule 8 requires. The mere conjecture that the extent of long-term price impacts may be mitigated by other factors outside the complaint is not a sufficient basis to dismiss claims at the pleading stage and should be addressed with discovery and expert testimony as the case progresses.

For the foregoing reasons only, Plaintiff respectfully objects to the R&R and submits that the Court should deny Defendants' Motion to Dismiss in its entirety.

Dated:  February 14, 2025
      New York, New York

Respectfully submitted,

By:  *Laura H. Posner*           
  Laura H. Posner
  Michael B. Eisenkraft
  COHEN MILSTEIN SELLERS & TOLL PLLC
  88 Pine Street, 14th Floor
  New York, New York 10005
  Tel: (212) 838-7797
  Fax: (212) 838-7745
  lposner@cohenmilstein.com
  meisenkraft@cohenmilstein.com

  Raymond M. Sarola
  COHEN MILSTEIN SELLERS & TOLL PLLC
  100-120 N. 18th Street, Suite 1820
  Philadelphia, PA 19103
  Tel: (267) 479-5700
  Fax: (267) 479-5701
  rsarola@cohenmilstein.com

  *Counsel for Plaintiff*