KASOWITZ LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

STEPHEN W. TOUNTAS
DIRECT DIAL: (212) 506-1739
DIRECT FAX: (212) 500-3550
STOUNTAS@KASOWITZ.COM

ATLANTA
BOULDER
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
WASHINGTON DC

September 16, 2026

**VIA ECF**

Hon. Gary Stein, U.S.M.J.
United States District Court, Southern District of New York

Dear Judge Stein:

We write on behalf of Plaintiff Northwest Biotherapeutics, Inc. ("NWBO"), in accordance with the Court's August 27, 2026 Order (Dkt. 326), to respond to Defendants' letter and declarations concerning algorithmic or automated trading.

Defendants present a baffling mix of sophistry and apparent misstatements.[1] Each Defendant has denied "algorithmic trading." But they ignore NWBO's defined term[2] in favor of their own definition,[3] seeking to evade essential discovery through semantics rather than substance. Crucially, ***no Defendant disputes that it used "automated systems" for trading activities in NWBO such as routing decisions, quote displays, and execution decisions***. *See, e.g.*, Dkt. 329 ¶ 14; Dkt. 331 ¶ 6; Dkt. 332 ¶¶ 10, 19; Dkt. 334 ¶¶ 15, 17; Dkt. 337 ¶¶ 11, 18. Moreover, their contentions in downplaying the role of these "systems" are contradicted by the minimal trading data they have reluctantly produced. Attached to this letter is Plaintiff's Appendix that provides detailed examples that contradict key representations in Defendants' declarations.

Defendants' denials are at best selective wordplay, at worst outright falsehoods. Costly and time-consuming depositions are unnecessary to show that the denials are hollow and the need for source code and design specifications is clear.

---

[1] Reference to "Defendants" in this letter generally refers to Defendants other than Lime Trading Corp. NWBO requests that Lime be ordered to produce: (1) its customer order flow routing source code and design specifications and procedures (*see* Dkt. 330 ¶ 11); (2) updated trading records that deanonymize their clients and that indicate which orders utilized which routing program; and (3) documentation sufficient to show that Lime did not offer other algorithms or automated trading software to customers for OTC trading at any time during the Relevant Period.

[2] NWBO's discovery requests define "Algorithm" to mean "any automated or semi-automated set of rules, instructions, logic, or code that is designed or utilized to model, make and/or execute Trades, routing decisions, timing, pricing, volume control, risk management, or strategy implementation." *E.g.*, Ex. 1 at 2 (NWBO 1st Rogs to Citadel).

[3] Defendants refuse to use NWBO's definition, instead defining "algorithm" narrowly by reference to an SEC staff report. *See* Dkt. 319 at 1; Ex. 2 (SEC Staff Report on Algorithmic Trading) at 5-6. But the SEC report expressly disclaims its use to narrow the definition of algorithmic trading. *See* Ex. 2 at 6 ("In light of the wide diversity of algorithms in modern trading, it is not a goal of this report to define a single type of trading or activity as uniquely algorithmic. Rather, this staff report attempts to describe many dimensions of the contemporary secondary markets for equity and debt securities that operate algorithmically . . . .").

## I. DEFENDANTS ADMIT THAT THEY USED AUTOMATED SYSTEMS TO TRADE NWBO

In an attempt to evade production, Defendants have rebranded their algorithmic systems as "order routing systems," "automated order handling systems," "order management systems," or "electronic systems." *See* Dkt. 329 ¶ 14; Dkt. 331 ¶ 6; Dkt. 332 ¶ 19; Dkt. 334 ¶ 18; Dkt. 337 ¶¶ 11, 18. But Defendants cannot deny that these are automated systems used to conduct the trading at issue, about which they have not provided critical information despite NWBO's requests. *See* Ex. 1 at 2; Ex. 3 (NWBO 1st RFPs) at RFPs 6, 7.[4] As the Court recognized, the best evidence of intent is the design and operation of these order and trading systems. *See* Dkt. 327 at 21:4-6.

Defendants' declarations admit such systems exist and were used to trade NWBO. ***Citadel*** admits it "relied on its own electronic systems [redacted] Dkt. 334 ¶ 17. And Citadel has not disputed that it uses autonomous systems to trade NWBO stock. Citadel described its source code as "supersensitive stuff," and offered to come up with "creative ways to deal with that sort of problem…when we get there." *See* Dkt. 225 at 24:10, 29:15-16. At the August 18 conference, Citadel again conceded "there couldn't have been trading without the source code." Dkt. 327 at 26:16-17. ***Virtu*** admits it [redacted] Dkt 337 ¶ 11. ***GTS*** admits it uses "automated client order handling and quote management systems" and "automated order handling systems to trade OTC securities" including NWBO during the Relevant Period. Dkt. 329 ¶¶ 11, 14. It admits those systems perform auto-execution, riskless principal executions, quote display, and OTC Link order transmission. Dkt. 329 ¶ 14. GTS's own compliance materials acknowledge that its Wholesale Market Making "does not manually place every market making order" Dkt. 329 ¶ 11. ***G1X*** admits its systems perform order routing, crossing of matching orders, internalization in response to client orders, responding to inbound links, updating quotations, and limit order protection. Dkt. 332 ¶ 19. ***Instinet*** admits it "used an order management system to route quote messages in thousands of different securities, including NWBO" and used it to transmit orders and route messages to access other market participants' quotes. Dkt. 331 ¶ 6. ***Lime*** admits it routes customer order flow "by source code." Dkt. 330 ¶ 11.

## II. DEFENDANTS' DATA DEMONSTRATES THEIR SYSTEMS APPLY AUTONOMOUS DECISION-MAKING TO TRADING ACTIVITY

Defendants' efforts to evade productions rest primarily on the contention that their automated trading systems are little more than neutral scaffolding that applies no logic or decision-making to client data. In the same breath, Defendants emphasize that the code for the systems used to trade in NWBO is "among [a trading firm's] most valuable assets and used to process billions of dollars of order flow each day" and that disclosure of even the most general details of its function

[4] The Requests for Production are identical for each Defendant.

risk "irreparable competitive harm." Dkt. 299 at 1, 3. The two contentions are irreconcilable.[5] Indeed, regulatory filings demonstrate Defendants' participation in automated or algorithmic trading in the OTC market. For example, in 2020, Citadel paid a FINRA fine after its OTC trading systems allowed Citadel to trade ahead of client orders, in violation of FINRA Rules 5320(a) and 2010. *See* Ex. 5. Additionally, Defendants' own websites tout their algorithmic trading capabilities.[6]

Defendants' denials that their systems apply logic and autonomous decision-making are directly contradicted by Defendants' own trade data demonstrating precisely the type of automated logic they expressly disclaim, both for proprietary and client trades. As discussed in more detail in Plaintiff's Appendix:

***Citadel*** claims that the systems used to trade NWBO did not alter or affect the timing, quantity, side or other relevant characteristics of orders received from clients. Dkt. 334 ¶¶ 26-29. But Citadel's trading data and declarations confirm that Citadel's automation systems exercised control over quote display. *See* App'x at 1-3 (Citadel Example 1 & 2); Dkt. 334 ¶ 17. Citadel's production includes the names of the autonomous systems it deploys including [redacted] and [redacted] *See* App'x at 1-3 (Citadel Examples 1 & 2). The notion that these systems—including multiple with [redacted] in the name—reflect human traders making independent decisions is absurd. These systems initiated "child orders" at volumes and prices which differed from the "parent orders" received from clients, modified the displayed quotes and altered the order characteristics displayed to the market. These *Citadel-initiated orders* were sent to OTC Link as quote changes, not the as-received client orders. In addition, Citadel's autonomous systems exercised discretion in filling client orders, holding back, and declining to execute otherwise marketable orders. *See* App'x at 4-6 (Citadel Example 3).

***Virtu*** claims it did not "use any algorithm or source code that altered or affected the timing, price, volume or any other characteristic of Virtu's client orders in NWBO." Dkt. 339 ¶ 4; Dkt 327 at 11:3-25. However, Virtu's production confirms that its internal systems *did* alter those characteristics when trading in NWBO. *See* App'x at 6 (Virtu Example 1). For example, Virtu's systems decided not to execute a marketable client order against other broker-dealers' messages that indicated a willingness to transact at a price at which Virtu had displayed an order to sell. *See* App'x at 7-9 (Virtu Example 2). Additionally, Virtu's claim that "[t]here are humans at desks who

[5] As a threshold matter, the notion that no algorithmic logic is applied by these systems is implausible. Market-makers make their money by "earning a spread between bids and offers." *See* Ex. 4 at 7. As the SEC has recognized, "fast, effective processing of market data is central to the business of wholesale market-making" as "the market maker algorithm's data-driven assessment of the market is not only central to its obligations with respect to best execution and compliance with the order protection rule, but allows it to make order-handling decisions, and… for evaluating price improvement." *See* Ex. 2 at 32. Further, the internalization process used to determine whether to make a proprietary trade or to match to client trades is algorithmic. *See* Ex. 6 at 2; Ex. 7.

[6] *See, e.g.*, Ex. 8 at 4 (Citadel's website) ("Cutting-edge mathematical models and ***algorithms*** power our strategies."); ("In both our algorithmic and discretionary strategies. . ."), ("Traders collaborate with our engineering team to automate our processes."); Ex. 9 at 1 (Instinet's website); Ex. 10 at 15 (Instinet describing its smart order router as "***an algorithm*** that places individual orders to trade on one or more trading venues in accordance with pre-defined rules." (emphasis added)).

make trading decisions depending on where the market goes and what you need to have a balanced book" cannot be reconciled with the transaction speed seen in Virtu's production. Dkt. 327 at 18-19: 25-2; App'x at 7-9 (Virtu Example 2). Virtu's trading data production shows link messages declined within seconds. App'x at 8-9. (Virtu Example 3).

***GTS*** claims that "[t]he only decision makers at GTS determining the trading strategy in NWBO during the Relevant Period were humans – *i.e.* the GTS traders filling client orders and market making." Dkt 329 ¶ 15. This cannot be reconciled with their trading data production. *See* App'x at 9-10 (GTS Example 1). GTS's production confirms that automated systems made trading decisions in NWBO during the Relevant Period, including placing a burst of [redacted] distinct orders in less than a second—a speed faster than a human could accomplish. *Id.*

***G1X*** admits its "automated system" made routing and display decisions when receiving client orders, deciding in real time whether to fill from inventory, link to another market participant's quote, or hold and display the order. Dkt. 332 ¶¶ 10, 19. G1X concedes the automation made those decisions; it simply contends they were "not algorithmic." Dkt. 332 ¶ 22. As shown in App'x at 10-12 (G1X Example 1), G1X's systems exercised control over client orders.

***Instinet's*** system determined the quantity of the client order to send to the market through so-called "smart routing" with specific routing codes, including [redacted] and [redacted] NWBO's definition of Algorithm encompasses these smart router systems. *See* App'x at 12; Ex. 1 at 2.

* * *

For these reasons, NWBO respectfully requests that the Court order Defendants to produce the documents and information NWBO has requested concerning their algorithmic or automated trading activity in NWBO, including all variants of the source code and design documents for, as well as communications concerning, the systems used in or underlying Defendants' trading in NWBO during the Relevant Period.

Respectfully submitted,

Stephen W. Tountas

cc: All counsel of record (via ECF)

# APPENDIX
# FILED UNDER SEAL