Hon. Gary Stein September 22, 2026
United States District Court, Southern District of New York

Re: *Northwest Biotherapeutics, Inc. v. Citadel Securities LLC, et al.*, No. 1:22-cv-10185—Defendants' Reply Letter Regarding Statements in Defendants' Declarations

Dear Judge Stein:

Defendants respectfully submit this reply pursuant to the Court's August 27, 2026 Order ("Order," ECF 326) and in reply to NWBO's September 16, 2026 letter (ECF 347). NWBO asks the Court to compel production of source code because Defendants used "automated systems," but being "automated" does not render a system's source code relevant. ECF 347 at 2. Every modern broker-dealer uses automated systems to receive, format, display, and execute orders.

The question the Court posed—and the declarations answer—is whether Defendants' automated systems altered the client orders they processed. They did not. Each Defendant has now confirmed under oath that the trading at issue was overwhelmingly on behalf of clients and no algorithm or source code altered the terms of the client orders. ECF 329-332, 334, 337. And as to the few orders not on behalf of a client, they were not executed by any algorithm.

NWBO declined to test these sworn statements through depositions, relying instead on its own incorrect interpretation of selected trading data. As explained below, NWBO's examples mistake steps in processing and executing orders for alterations to the terms of those orders. ECF 347 at 3. NWBO's Appendix does not refute the sworn declarations submitted by each Defendant and is not a basis to order the production of code. NWBO's request should be denied.

## I. NWBO's Examples are Consistent with and Do Not Contradict the Declarations

NWBO claims its examples prove that the code altered or affected client orders. They do not. NWBO repeatedly treats actions taken to process, display, route, or execute an order as though they changed the terms of the underlying client order. The data shows no such changes. As explained in more detail in the Appendix, the trading events NWBO points to have straightforward explanations that are consistent with the declarations and do not show any change to the terms of any client order.

Source code would add nothing to that record. The supposed contradictions NWBO identifies can be addressed from the same records it cites and the sworn explanations of how Defendants' systems operated. As the Appendix explains, those records do not mean what NWBO claims they mean. Source code is not necessary to show why.

## II. NWBO Has Declined the Opportunity to Test the Declarations

To the extent the Court has any doubt about Defendants' explanations, the way to test them is through the depositions NWBO declined—not source code. The Court identified depositions as the way to test Defendants' accounts of how they traded NWBO stock, observing that the answers will first "be in the form of affidavits, depositions, and/or, if warranted, testimony from the clients," and inviting NWBO to state "whether it wishe[d] to depose any of Defendants' affiants." ECF 327 at 31:20–23; ECF 326 at 4.

NWBO elected not to test the declarants, instead relying on its own interpretation of the trading data to label the sworn declarations "falsehoods." ECF 347 at 1. But as explained in the Appendix, that conclusion rests on NWBO's misinterpretation of the data, not any contradiction in the declarations. That misinterpretation was readily avoidable. NWBO has had Defendants' trading data for five months,[1] yet never requested a meet-and-confer to understand it, never asked Defendants what the data shows, and has raised issues with the data only in court filings.

NWBO's interpretation of the data does not rebut the declarations. And "[a]n attorney's unsworn statements in a brief are not evidence." *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (per curiam); *see also Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 407 (S.D.N.Y. 1997) ("Unsworn statements by counsel simply will not do."). The declarations are therefore unrebutted by any contrary evidence. Indeed, NWBO's assertion that depositions are "unnecessary" reflects its own position that questioning the declarants would add nothing to the record. On that record, NWBO cannot meet its burden to compel the production of source code.

## III. Conclusion

Defendants respectfully request that the Court deny NWBO's request to compel source code.

[1] NWBO's assertion that Defendants have produced "minimal trading data" is wrong, and NWBO has never explained what additional data it needs or why it needs it. ECF 347 at 1.

## Appendix

### A. Citadel Securities

The data reflects precisely the order-handling processes Mr. Yara explained. NWBO first points to internal system names and repeatedly labels those systems "algorithms." A system name is a label, not evidence of what the system does. The relevant question is what those systems actually did, which Mr. Yara's declarations already explain. *See, e.g.*, ECF 334 at ¶ 24; ECF 299-1 at ¶ 5.

In the first example (Appendix A at Figure 1a and Figure 2a), NWBO claims that Citadel Securities did not post the client orders it identified. But the trading data shows otherwise. ECF 347, App'x A at 1-2. [redacted]

In NWBO's second example, it asserts that the [redacted]

NWBO's third example fares no better. It argues that the "data shows that dealers sent Citadel marketable orders which could have filled against open client orders in NWBO, but Citadel's algorithms refused to fill those orders." *Id.* at 4-5. But under OTC Link rules, Citadel Securities was not required to accept an inbound link for fewer than 100 shares, and accepting it could have made it more difficult to fill the remainder of the client's order. The order was filled shortly after.

### B. G1X

The trading examples NWBO provides for G1X support Brian Rorke's statement in his Declaration that G1X did not engage in algorithmic trading of NWBO stock. ECF 332 at ¶¶ 4, 22.

NWBO uses Figures 19 and 20 to show "that many inbound OTC Link orders were answered within milliseconds of receipt, and others were answered after seconds of delay." ECF 347, App'x A at 10. These illustrations undermine NWBO's argument that an algorithm responded to inbound messages. Instead, as stated by Rorke, these examples show nothing more than G1X's previously described automated system. ECF 332 at ¶¶ 19–20.

First, as Rorke explained, "OTC Link allows dealers such as G1X to post quotations reflecting the prices at which they are willing to buy or sell a given security." ECF 332 at ¶ 7. "If another market participant wishes to trade at a posted price, that participant sends an electronic message — commonly referred to as a 'link' — directly to the dealer that posted the quote,

requesting to trade at the quoted price and size." *Id.* Figure 19 shows incoming messages that (1) matched or exceeded the quotation G1X posted (and accounted for the order in which the messages were received) or (2) came in below the quoted price and size. These incoming messages were resolved quickly, either through G1X's automated systems or because they were cancelled by the sender. G1X "did not alter the timing, quantity, side, price, or any other relevant characteristics of a client's NWBO order." ECF 332 at ¶ 12.

Second, Figure 20 shows messages that matched G1X's posted quotation, but that were not the first responses received. G1X's automated systems did not immediately respond because other messages had a higher priority. During this time, a human trader at G1X could assess the message; but after a short amount of time—mere seconds—the message reverted to G1X's automated systems. Any decision made prior to the automation would have been made by a human trader who simply executed a trade. There was no algorithmic trading.

Finally, NWBO misrepresents the data in Figure 21. NWBO alleges that Figure 21 shows [redacted] Not so. [redacted] Nothing about this [redacted] demonstrates "algorithmic discretion."

**C. GTS**

NWBO contorts GTS' data productions into an "example" it says shows that "automated systems made trading decisions in NWBO during the Relevant Period." Specifically, NWBO claims: (1) that the "speed" of certain outbound OTC Link quotations "strongly indicates algorithmic trading;" and (2) that the "disparity between the timing and volume" between outbound OTC Link quotations and executions suggest "sell orders independent of client instructions." Appendix at 9. Neither claim withstands scrutiny. In reality, the data reflect the exact client order handling and quote management systems described in Mr. Pleffner's Declaration, none of which altered the timing, price, volume, or any other instructions received with GTS' client orders in NWBO. ECF No. 329 at ¶¶ 6, 9–14.

First, the quantity and timing (i.e., "speed") of the link orders created and the trade executions reflected in the Appendix does not support the inferential leap that those orders were placed in connection with algorithmic trading strategies. Rather, the quantity and timing merely support the fact that GTS employed automated systems to handle the execution of client orders, which by rule, GTS must make every effort to execute "fully and *promptly*." *See* FINRA Rule 5320, Supplemental Material .07 (emphasis added). These automated order handling systems are described in detail in Mr. Pleffner's Declaration, including the fact that they do not alter the timing, price, volume, or any other instructions received with clients' orders. ECF No. 329 ¶¶ 13–14. Nothing in the trade and order data supports NWBO's assertion that these automated systems "made trading decisions in NWBO," including the quantity and timing at which the link orders were placed.

Second, NWBO claims that differences in timing and volume between GTS' outbound OTC Link order data and GTS' internal trade executions suggest "sell orders independent of client

instructions." Appendix at 9. Not so. [redacted] This execution process is a quintessential function of a market maker.

### D. Instinet

NWBO's arguments concerning the Instinet data referenced in Figures 22 and 23 of its letter are mistaken and confirm that Instinet's algorithms were not used in trading the NWBO stock at issue. Figure 22 contains client orders that are not within the scope of NWBO's allegations because none of these orders ever reached the market. All of them were "rejected" by Instinet's system and therefore were never displayed to any market participants. That is evidenced by the very spreadsheet NWBO excerpted from to generate Figure 22. *See* Exhibit A (INST000006 at column B [redacted] Accordingly, Figure 22 is consistent with Instinet's Francini Declaration statements that "Instinet did not engage in any proprietary trading of NWBO during the Relevant Period using any algorithm;" and that "No Instinet algorithm was used in the Remaining Instinet Alleged Spoofs." Francini Decl., ECF 331 at ¶¶ 4-5.

NWBO's second argument, regarding the orders reflected in Figure 23, also fails. [redacted] Accordingly, Figure 23 confirms that no Instinet algorithms were used.

### E. Lime

NWBO cabins its response to Lime Trading to a single footnote where it seeks additional discovery from Lime Trading, none of which is warranted.

NWBO provides no justification for its request that Lime Trading produce "its customer order flow routing source code and design specifications and procedures," which is neither relevant nor proportional to the needs of the case. Lime Trading has already explained that it did not offer algorithms to any customers for the trading of NWBO and that any source code or non-algorithmic

[2] NWBO mistook "MAN" in the "Source" column of GTS' trade execution data to mean "Manual." This abbreviation actually refers to the "Manning Rule," now captured in FINRA 5320, which prohibits market makers and other broker dealers from trading on their own behalf ahead of a customer limit order at more favorable prices. *See* FINRA 5320; *see also In re E.F. Hutton & Co.,* Securities Exchange Act Release No. 25887 (July 6, 1988), 41 SEC Docket 473 (the "Manning" decision). Here, the "Manning" trades reflected in NWBO's "example" were facilitated via GTS' automated order handling system, not entered manually.

"programs" used for routing orders did not alter the terms, conditions, or characteristics of any customer orders—including timing, price, or volume. *See* Bolberov Declaration, ECF 330.

As Lime Trading explained in Defendants' joint letter (ECF 341) regarding NWBO's request for documentation of algorithms or automated trading software, all of Lime Trading's activity in NWBO during the alleged spoofing episodes was conducted by Lime Trading's clients—not Lime Trading—and none of these orders were routed using a Lime Trading algorithm. Consistent with that, Lime Trading's document search using NWBO's proposed search terms (including "algorithm*" and "high frequency") located no responsive documents, and there is nothing more to produce.

NWBO's additional request that Lime Trading "deanonymize their clients" in its trading data violates the Court's protective order, which permits "[a]ny party producing trading or order data reflecting client-identifying information" to "anonymize client names . . . or other identifying information." ECF 232; *see also* Hearing Transcript, June 27, 2025. Plaintiff has made no showing for why disturbing that order would be warranted. Lime Trading has also already produced internal order-level trading data for all episodes pertaining to Lime Trading that survived the motion to dismiss.

NWBO's example as to Lime Trading fares no better, as it ignores the critical point, reflected in the Bolberov Declaration, that all NWBO orders associated with Lime Trading were directed by and placed by Lime Trading's customers, for which no Lime Trading algorithms were used. Regardless, NWBO's claim that Lime Trading's order file records "indicates algorithmic activity, even if performed by Lime's customers," is wholly speculative and inaccurate. As one example, [redacted] not "multiple NWBO orders within seconds of each other" indicative of algorithmic trading, as NWBO claims. [redacted] *See* Figure 24.

**F. Virtu**

NWBO's Appendix includes three examples as to Virtu, but none supports its contention that Virtu "determined the price and volume" of its client orders using algorithms.

As to Virtu Example 1, NWBO claims that Virtu's internal order data indicated a client sell order [redacted] . . . thus indicat[ing] that some other program determined the price and volume of these orders." Appendix at 6. NWBO's conclusion is incorrect. FINRA Rule 6460 provides that OTC market makers like Virtu "shall publish immediately a bid or offer that reflects . . .the price and the full size of each customer limit order" except that "this Rule <u>shall not apply</u> to any customer limit order . . . that is <u>a block size order</u>," defined as an order "of at least 10,000 shares and [that] has a market value of at least $100,000." *See* FINRA Rule 6460(a), (d). The order in question was a block order, and Virtu was therefore not obligated to publish it. As explained in the Verderese Declaration, Virtu employs automation "to allow the Firm to make markets in thousands of OTC securities <u>in compliance with applicable FINRA rules</u>[.]" ECF No. 337 ¶ 18 (emphasis added). Virtu Example 1 is thus an example of Virtu's automation doing *exactly what it was designed to do* and is in no way indicative of algorithmic trading or, per the Court's question, that any "algorithm or source code of [Virtu]

may have altered or affected the timing, price, volume, or any other characteristic of the client's orders." ECF 326.

In Virtu Example 2, NWBO commingles buy-side and sell-side quotations, making any argument as to that example utterly incomprehensible. Accordingly, we do not address it here. And as to Virtu Example 3, the data itself undermines the conclusions NWBO seeks to draw from it. NWBO claims Virtu [redacted] *See* Appendix at 9, Figures 15 and 16. [redacted] Thus, this example is also not indicative of algorithmic trading regarding timing, price, and volume.

In sum, Virtu does not use algorithms to trade NWBO stock, ECF No. 337 ¶ 4, and NWBO's confusion as to Virtu's data and the purpose of its automation does not undermine that undisputed evidence.

Respectfully submitted,

/s/ *William A. Burck*
William A. Burck
Peter H. Fountain
Leigha Empson
Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, New York 10016
Tel: 212-849-7000
Fax: 212-849-7100
williamburck@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com

Jonathan K. Youngwood
Meredith Karp
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Tel: (212) 455-2000
Fax: (212) 455-2502
jyoungwood@stblaw.com
meredith.karp@stblaw.com

*Counsel for Defendant Citadel Securities LLC*

/s/ *Lauren W. Engelmyer* (with permission)
Lauren W. Engelmyer
J. Chesley Burruss
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
T: (212) 223-0200
engelmyerl@ballardspahr.com
burrussc@ballardspahr.com

M. Norman Goldberger (admitted *pro hac vice*)
Ballard Spahr LLP
1735 Market Street, 51st Fl.
Philadelphia, PA 19103
T: 215-665-8500
goldbergerm@ballardspahr.com

*Counsel for Defendant G1 Execution Services LLC*

/s/ *Peter G. Wilson* (with permission)
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac vice*)
Benjamin C. Levine (admitted *pro hac vice*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
benjamin.levine@katten.com

*Counsel for Defendant GTS Securities LLC*

/s/ *Richard A. Edlin* (with permission)
Richard A. Edlin
Daniel P. Filor
Stephen Day
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
edlinr@gtlaw.com
filord@gtlaw.com
days@gtlaw.com

*Counsel for Defendant Instinet LLC*

/s/ *Kevin P. Broughel* (with permission)
Kevin P. Broughel
Zoe Lo
Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, NY 10020-1605
Phone: (212) 940-6343
Fax: (212) 940-8776
kevin.broughel@katten.com
zoe.lo@katten.com

*Counsel for Defendant Lime Trading Corp.*

/s/ *Andrew G. Gordon* (with permission)
Andrew G. Gordon
Audra J. Soloway
Jessica S. Carey
Alison R. Benedon
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
agordon@paulweiss.com
asoloway@paulweiss.com
jcarey@paulweiss.com
abenedon@paulweiss.com

*Counsel for Defendant Virtu Americas LLC*

cc: All counsel of record via ECF